Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF + HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone:     (510) 999-7908
Facsimile:     (510) 999-7918

Attorneys for Defendants
COUNTY OF ALAMEDA, MELISSA WILK, EVA HE
and MARIA LAURA BRIONES

ORBACH HUFF + HENDERSON LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LISAMARIA MARTINEZ,<br><br>                    Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA, MELISSA WILK, in her individual capacity, EVA HE, in her individual capacity, MARIA LAURA BRIONES, in her individual capacity,<br><br>                    Defendants. | Case No.  20-cv-06570-TSH<br><br>**DEFENDANTS COUNTY OF ALAMEDA, MELISSA WILK, EVA HE AND MARIA LAURA BRIONES' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:          August 4, 2022<br>TIME:          10:00 a.m.<br>DEPT:          Courtroom G (15th Floor)<br>JUDGE:        Hon. Thomas S. Hixson |

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL ARGUMENT........................................................................................... 2

    A.      Plaintiff Was Not Excluded from Defendants' Services, Programs, or Activities ............ 2

        1.      Filling Out Forms for Patrons is Not a Normal Function of the CRO................... 2
        2.      Plaintiff Fails to Rebut Defendants' Authority......................................... 2
        3.      The CRO's Plan to Reserve a Kiosk in the CRO for Disabled Persons, with Screen Access Software and an Electronic FBNS Suite, Is Not Speculative ........ 6

    B.      The CRO Was Not Required Under the ADA to Fill Out Plaintiff's FBNS ..................... 8

        1.      The CRO Effectively Communicated with Plaintiff..................................... 8
        2.      Defendants Are Not "Relying" On Plaintiff to Provide Her Own Auxiliary Aid or Service to Establish Effective Communication ................................. 10
        3.      Qualified Readers Are Not Required to Act as Scribes................................. 11
        4.      The Department of Justice Guidance Plaintiff Relies On Is Still Not Binding or Controlling and Still Contradicts the Regulation at Issue ............................. 15
        5.      Plaintiff Still Has Not Established the Existence of a Reasonable Modification that Was Required Under the Circumstances ................................. 17

    C.      Plaintiff Has Not and Cannot Establish Deliberate Indifference ...................................... 19

        1.      Plaintiff Has Not Established Notice ..................................................... 19
        2.      Plaintiff Has Not Established the Failure to Act Element ................................. 20

    D.      The Individual Defendants Are Not Liable Under the ADA ............................................ 21

        1.      The ADA Does Not Allow for Individual Liability............................................ 21
        2.      The Individual Defendants Remain Entitled to Qualified Immunity................... 23

    E.      Plaintiff Has Abandoned Her Independent Unruh Claim and the Remaining State Law Claims Fail Where Plaintiff's ADA Claim Fails ........................................... 24

III.    CONCLUSION...................................................................................................... 25

ORBACH HUFF + HENDERSON LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) .................................................................................................24

*B-K Lighting, Inc. v. Vision3 Lighting*,
  No. CV0602825MMMPLAX, 2006 WL 8421831 (C.D. Cal. Nov. 14, 2006) ...............3, 11

*Barber ex rel. Barber v. Colo. Dep't of Revenue*,
  562 F.3d 1222 (10th Cir. 2009) ...............................................................................21

*Barden v. City of Sacramento*,
  292 F.3d 1073 (9th Cir. 2002) ...................................................................................2

*Bostock v. Clayton Cnty., Georgia*,
  140 S. Ct. 1731 (2020) .............................................................................................16

*Botosan v. Paul McNally Realty*,
  216 F.3d 827 (9th Cir. 2000) ...................................................................................16

*Bryan Cnty. v. Brown*,
  520 U.S. 397 (1997) .................................................................................................21

*Cal. Council of the Blind v. Cty. of Alameda*,
  985 F.Supp.2d 1229 (N.D. Cal. 2013) ........................................................................3

*Chapman v. Pier 1 Imports (U.S.), Inc.*,
  779 F.3d 1001 (9th Cir. 2015) ...................................................................................7

*Datto v. Harrison*,
  664 F.Supp.2d 472 (E.D. Pa. 2009) ..........................................................................21

*Duvall v. County of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001) .................................................................................20

*Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*,
  823 F.Supp.2d 995 (N.D. Cal. 2011) ...................................................................14, 15

*Fink v. N.Y.C. Dep't of Pers.*,
  855 F. Supp. 68 (S.D.N.Y. 1994) .........................................................................14, 15

*G.D. Searle & Co. v. Chas. Pfizer & Co.*,
  231 F.2d 316 (7th Cir.1956) .....................................................................................8

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

1

2

ORBACH HUFF + HENDERSON LLP

# TABLE OF AUTHORITIES

**Page(s)**

*Hope v. Pelzer*,
    536 U.S. 730 (2002)................................................................................24

*Illinois Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979)................................................................................15

*J.C. by and through W.P. v. Cambrian School District*,
    No. 12-CV-03513-WHO, 2014 WL 229892 (N.D. Cal. Jan. 21, 2014)................22

*Kennedy v. Allied Mut. Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991) .........................................................................10

*L.W. v. Grubbs*,
    92 F.3d 894 (9th Cir. 1996) ...........................................................................21

*Lain v. Pleasanton Unified Sch. Dist.*,
    No. 20-CV-02350-LB, 2020 WL 12674190 (N.D. Cal. Sept. 14, 2020).........22, 23

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ...........................................................................2

*Leine v. Cal. Dep't of Rehab.*,
    205 F.3d 1351 (9th Cir. 1999, not published)................................................3, 18

*Liese v. Indian River Cty. Hosp. Dist.*,
    701 F.3d 334 (11th Cir. 2012) ........................................................................21

*Memmer v. Marin County Cts.*,
    168 F.3d 630 (9th Cir. 1999) ....................................................................18, 19

*Minkley v. Eureka City Schools*,
    No. 17-CV-3241-PJH, 2017 WL 4355049 (N.D. Cal. Sept. 29, 2017)...............22

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019)...................................................................................16

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001)......................................................................................7

*Pearson v. Callahan*,
    555 U.S. 223 (2009)....................................................................................23

*River City Mkts., Inc. v. Fleming Foods W., Inc.*,
    960 F.2d 1458 (9th Cir. 1992) .......................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

*Robinson v. Bay Club L.A., Inc.,*
No. CV 21-3578-DMG, 2022 WL 2167457 (C.D. Cal. Feb. 18, 2022) ...........................................21

*Sanders v. Douglas,*
565 F. Supp. 78 (C.D. Cal. 1983) .......................................................................................................8

*Shotz v. City of Plantation,*
344 F.3d 1161 (11th Cir. 2003) ....................................................................................................21, 22

*Sorrels v. McKee,*
290 F.3d 965 (2002)............................................................................................................................24

*Stassart v. Lakeside Joint School District,*
No. C 09-1131 JF (HRL), 2009 WL 3188244 (N.D. Cal. Sept. 29, 2009) ........................................22

*Sutton v. United Air Lines, Inc.,*
527 U.S. 471 (1999)............................................................................................................................16

*T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.,*
806 F.3d 451 (9th Cir. 2015) .............................................................................................................21

*Washington v. Maricopa County,*
143 F.2d 871 (9th Cir.1944) ................................................................................................................8

*Webster v. Fall,*
266 U.S. 507 (1925)............................................................................................................................15

*West Virginia v. EPA,*
___ U.S. ___, No. 20-1530, 2022 WL 2347278 (U.S. June 30, 2022) ..............................................17

*Where Do We Go Berkeley v. California Dep't of Transportation,*
32 F.4th 852 (9th Cir. 2022) ..................................................................................................... *passim*

*White v. Pauly,*
137 S. Ct. 548 (2017)..........................................................................................................................23

*Williams v. California Dep't of Corr. & Rehab.,*
No. 216CV01377MCECKD, 2017 WL 977766 (E.D. Cal. Mar. 14, 2017)........................................7

*Zimmerman v. Oregon Dep't of Just.,*
170 F.3d 1169 (9th Cir. 1999) ................................................................................................2, 4, 5, 6

*Zukle v. Regents of the Univ. of Cal.,*
166 F.3d 1041 (9th Cir. 1999) ......................................................................................................16, 19

ORBACH HUFF + HENDERSON LLP

# TABLE OF AUTHORITIES

**Page(s)**

**STATE CASES**

*Crawford v. State Bar of California,*
54 Cal.2d 659 (1960) ..................................................................................................3

**FEDERAL STATUTES**

20 U.S.C. section:
1400-1491 ...............................................................................................................15

29 U.S.C. section:
794(a) .....................................................................................................................15

42 U.S.C. section:
12101 ........................................................................................................................4
12189 ......................................................................................................................14
12203 ........................................................................................................21, 22, 23
12203(a) ..................................................................................................................22
12203(b) ............................................................................................................22, 23

**STATE STATUTES**

Business & Professions Code section:
17916 ......................................................................................................................19

Civil Code section:
51(b) ..................................................................................................1, 23, 24, 25
51(f) ..................................................................................................................24, 25

Government Code section:
27203(d) ............................................................................................................18, 19

**REGULATIONS**

28 C.F.R. section:
35.104....................................................................................................... *passim*
35.104(1) .................................................................................................................13
35.104(1)-(2) ..........................................................................................................12
35.104(2) .................................................................................................................13
35.133 .......................................................................................................................7
35.133(a)-(b) .............................................................................................................7
35.160 .................................................................................................5, 12, 14, 23
36.303 ......................................................................................................................15
36.309 ......................................................................................................................14
36.309(b)(1)(i) .........................................................................................................14

ORBACH HUFF + HENDERSON LLP

# TABLE OF AUTHORITIES

**Page(s)**

**OTHER AUTHORITIES**

Federal Rules of Evidence:
  56(e) ...................................................................................................................8
  701 .....................................................................................................................8

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

## I.    INTRODUCTION

Defendants submit this Reply in support of their Motion for Summary Judgment or Partial Summary Judgment.  The Opposition does nothing to save Plaintiff's claims.  She has effectively admitted at this point that the CRO's programs, services and activities relative to FBNS's are accessible to persons with disabilities, including vision disabilities, and is now arguing that the problem was that Plaintiff did not receive the service at the exact time she wanted it.  However, Plaintiff has cited no authority, let alone Ninth Circuit authority, that the Title II contains a "reasonable time element."  It does not.  Plaintiff is attempting to force the CRO to implement a new service, program, or activity through the ADA's effective communication requirement, which is not only improper, but also unnecessary where the communications between Plaintiff and the CRO were certainly effective, as demonstrated by Plaintiff's own audio recordings.

The fact is that filling out forms for patrons that are filed or recorded in the CRO is not a "normal function" of the CRO, is not part of the CRO's services, programs, or activities, and is not required as an accommodation or auxiliary aid or service under the express language of Title II of the ADA or its corresponding regulations.  Nor is filling out forms for patrons necessary for them to access the CRO's services, programs, or activities relative to FBNS's.  The CRO already makes its FBNS services available to persons with vision disabilities, including making the FBNS electronically available online and allows patrons to file FBNS's by mail, such that they do not need to travel to the CRO at all.  To the extent that a patron with a disability needs assistance with printing or signing the form, or wishes to file in person, the CRO will both print the FBNS for the patron and assist the patron with signing the form.  If there are defects in the form which must be corrected, the CRO will explain those deficiencies to the individual and provide the individual with a "go-back" letter setting forth that same guidance in writing, including in electronic format if so requested.  The CRO's FBNS services are and clearly were available to Plaintiff and all other persons with vision disabilities at the time of the incident.  The Opposition also fails to cure the defects in Plaintiff's deliberate indifference arguments and Title V claim, and concedes Plaintiff cannot establish an independent Unruh Act claim under California Civil Code section 51(b).

For these reasons, Defendants respectfully request that the Court grant Defendants' MSJ, deny Plaintiff's MSJ, dismiss Plaintiff's Complaint, and enter judgment in favor of Defendants.

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORBACH HUFF + HENDERSON LLP

## II.    LEGAL ARGUMENT

### A.    Plaintiff Was Not Excluded from Defendants' Services, Programs, or Activities

#### 1.    Filling Out Forms for Patrons is Not a Normal Function of the CRO

Plaintiff was not excluded from the benefit of the CRO's services, programs, or activities; she is impermissibly seeking to expand them and add a new one.  Plaintiff understandably relies on *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) for the notion that the "ADA's broad language brings within its scope anything a public entity does."  Plaintiff's Opposition and Reply MPA ("Plaintiff's Opp."), at 3:11-13.  However, as discussed in Defendants' Opposition and Motion for Summary Judgment or Partial Summary Judgment ("Defendants' MSJ"), there is in fact an inquiry the Court must undertake to determine whether a particular purported public function constitutes a "service, program, or activity" of a public entity, which focuses "not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a *normal function* of a governmental entity."  *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); Defendants' MSJ, at 9:5-10.  If so, the Ninth Circuit confirmed just this year that the Court must then "define the scope of the program" to determine whether the proposed modification is a reasonable modification required by the ADA.  *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 861 (9th Cir. 2022).  Filling out forms for patrons is not a "normal function" of the CRO, and certainly not within the scope of the CRO's FBNS-related services.  Defendants' MSJ, at 9:20-10:15.

#### 2.    Plaintiff Fails to Rebut Defendants' Authority

Plaintiff's argument regarding *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169 (9th Cir. 1999) relies on a simplistic red herring intended to distract the Court from the straightforward language therein.[1]  Plaintiff first seems to suggest that *Zimmerman* is inapplicable because it is an employment case under Title I but then concedes *Zimmerman* does in fact provide a Title II analysis.  Plaintiff's Opp., at 3:25-4:5.  Plaintiff then poses a bizarre hypothetical that attempts to incorporate *Zimmerman*, where she pontificates that if one were to ask an imaginary patron of the CRO what the CRO's "services, programs, and activities" are in which he or she seeks to participate, that imaginary patron

---

[1] Plaintiff never attempts to explain how the personal/business information that must be filled in on the FBNS could possibly be an "output" of the CRO, where the personal/business information belongs to the patron, not the CRO, and where the patron is responsible for completing the FBNS, not the CRO.

1    would include, "filing forms in person" in their answer. Id., at 4:5-8. However, that is not what is at

2    issue in this lawsuit. In-person filing services are available at the CRO, to all members of the public,

3    including blind and other disabled persons. In fact, as Plaintiff admits, she filed her FBNS in-person at

4    the CRO on May 31, 2019.[2] SUF 33. What is at issue is whether the CRO is required to serve as a

5    personal scribe for blind individuals and physically fill out or correct legal forms for them that are filed

6    or recorded in the CRO. And, Plaintiff faces a fundamental and fatal problem regarding her inability to

7    prove that filling out forms for patrons constitutes a "normal function" of the CRO, the fact that blind

8    individuals including Plaintiff herself do in fact file forms in-person at the CRO, and the fact there are

9    *multiple avenues available for blind individuals to file FBNS's in the CRO.* Therefore, she is now

10   asking the Court to focus solely on *time* and her apparent claim that *only* blind people are sometimes

11   unable to file an FBNS in the CRO in a single day. This is inaccurate.[3]

12         First, Plaintiff has cited "no Ninth Circuit case law that defines reasonable accommodation as an

13   accommodation of her choice, *or as including a reasonable time element.*" *See Leine v. Cal. Dep't of*

14   *Rehab.*, 205 F.3d 1351, *2 (9th Cir. 1999, not published) (emphasis added). It does not contain such an

_____

[2] Notably, Plaintiff argues that the fact Plaintiff was easily able to file her FBNS in person in the CRO on May 31, 2019 does not mean Plaintiff received the benefits of the CRO's programs or activities, but offers absolutely no authority in support of her argument. Plaintiff's Opp., at 6:9-13. And, for all of the reasons discussed in Defendant' MSJ, Plaintiff could have filed her FBNS in the CRO on the day of the incident. SUF 31, 41-42; Yankee MSJ Decl., ¶ 10. She chose not to. Id. Regarding Plaintiff's citation to *Cal. Council of the Blind v. Cty. of Alameda*, 985 F.Supp.2d 1229, 1239 (N.D. Cal. 2013), it is unavailing and inapposite. That case related to a special interest in voting *privately*, such that simply completing the act of voting did not comprise the entire picture that the Court had to analyze. *California Council of the Blind*, 985 F.Supp.2d at 1238. The Court ultimately held that under the terms of the ADA, the covered entity must provide meaningful access to private and independent voting. *Id*. That concern is not at issue here where the FBNS is a publicly filed document and where the sole issue is whether Plaintiff was able to receive the benefits of the CRO's services, programs, or activities, which she clearly was where she filed her FBNS in person, at the CRO, on May 31, 2019. SUF 33. FBNS's are matters of public record and are not subject to the same privacy concerns as voting and political preferences. *B-K Lighting, Inc. v. Vision3 Lighting*, No. CV0602825MMMPLAX, 2006 WL 8421831, at *3, fn. 14 (C.D. Cal. Nov. 14, 2006).

[3] As is Plaintiff's repeated assertion that she "would have been able to correct and file the FBNS at the CRO counter if she had the assistance of a sighted person." Plaintiff's Opp., at 2:20-21, see also 8:4-5. Aside from the fact that this is nothing but rampant, unbridled speculation, Plaintiff has not even established that she knew what formal legal title to identify for herself on the FBNS, given that the title of "Founder" that she originally listed is not appropriate for an FBNS being filed by a limited liability company. SUF 45-48. And, again, it would constitute legal advice for a CRO clerk, who is not a licensed attorney, to advise Plaintiff of the legal title she should assume with respect to her LLC. *Crawford v. State Bar of California*, 54 Cal.2d 659, 667-668 (1960).

1   element.  Moreover, whether a patron chooses to complete a transaction in a single day is not a

2   "function" of the CRO; it is a subjective and voluntary decision of the patron and depends on whether

3   the patron has all of the necessary information and documentation to complete the transaction in a single

4   day.  It has nothing to do with the CRO's services, programs, or activities or whether those services,

5   programs, or activities are available to disabled persons.[4]  To this end, Plaintiff is offering nothing but

6   unsupported and rampant speculation that all nondisabled persons are per se able to complete

7   transactions in the CRO in a single day.  SUF 39.  This was refuted by uncontroverted evidence.[5]  Id.

8           More importantly, Plaintiff simply failed to address the actual argument in Defendants' MSJ

9   regarding the very explicit language set forth in *Zimmerman*, providing that the preparatory steps

10  leading up to the delivery of the services, programs, or activities do not themselves constitute part of the

11  "services, programs, or activities" of the public entity.  *Zimmerman*, 170 F.3d at 1174; Defendants'

12  MSJ, at 10:5-9.  Plaintiff has no answer for the fact that the CRO has no role in assisting patrons with

13  completing forms that are filed or recorded in the CRO, such as FBNS's, other than advising patrons of

14  technical deficiencies in the forms that must be corrected before the form can be filed or recorded, which

ORBACH HUFF + HENDERSON LLP

---

[4] This is a critical point.  All of the CRO's services were available to Plaintiff on the day of the incident
– namely, filing the FBNS.  The *only* reason Plaintiff believes she was discriminated against is because
there were errors in her form that had to be corrected, and since some sighted persons sometimes choose
on their own accord to make corrections to defective FBNS's while still in the CRO, Plaintiff believes it
is the CRO's responsibility to make sure she can do all of the same things that sighted persons can do,
irrespective of whether they are actually required by the ADA or necessary for Plaintiff to receive the
benefit of the CRO's services, programs, or activities.  However, that is not the purpose of the ADA and
Plaintiff cites no law in support of her contention.  For example, some of those sighted patrons with
defective forms may choose to drive home or to their places of business to retrieve any information or
documentation that they needed to file the form in the CRO, but did not initially have with them, and
then return that same day.  That does not impose an obligation on the CRO to drive blind individuals to
their homes or places of business, or to buy them an Uber or bus ticket, etc.  Title II of the ADA was
intended to eliminate discrimination against individuals with disabilities, and there can be no dispute
that FBNS's and the CRO's service of filing FBNS's are available to persons with vision disabilities.  42
U.S.C. § 12101.  As noted, Plaintiff has cited absolutely no Ninth Circuit authority involving any
"reasonable time element" under Title II and none exists.

[5] Additionally, Plaintiff has not addressed exactly how the personal information of the individual or
business which must be input into the FBNS by *patrons*, could possibly be an "output" of the CRO.  It is
not.  Plaintiff is misconstruing the CRO's responsibilities.  It is the patron's responsibility to fill out the
form, not the CRO's.  SUF 35-38.  Thus, the act of inputting information into an FBNS has nothing to
do with the "outputs" of the CRO.  Id.  Nor did Plaintiff address Defendants' argument in the MSJ that
she could not have been excluded from the CRO's FBNS-related services where she did not seek to
procure a fictitious business name as a matter of law.  Defendants' MSJ, at 9:23-28, fn. 9.

is simply a preparatory step leading up to the delivery of the services, programs, or activities – the filing of the FBNS.  Id.; SUF 36; *Zimmerman*, 170 F.3d at 1174.  And, in fact, the CRO did *exactly* that for Plaintiff, through Moran and Briones, *numerous times*.  SUF 27, 31.

With respect to *Where Do We Go Berkeley*, 32 F.4th 852, Plaintiff's attempt to distinguish the case only demonstrates its applicability.  Plaintiff argues that, "the lower-court injunction was reversed because it forced Caltrans to supplement its normal programs and services with a fundamental alteration that added entirely new programs, which was beyond the ADA's requirement for an *auxiliary aid or service*."  Plaintiff's Opp., at 4:22-25.  That is exactly what Plaintiff is seeking to do in this action, whether she realizes it or not.  The CRO's *only* responsibility is to *file* the FBNS, just like it only *records* recorded documents.  SUF 35.  That is the extent of the CRO's normal functions with respect to FBNS's.  Id.  Thus, by demanding that the CRO begin filling out forms for blind patrons that are filed or recorded in the CRO, which is a function that the CRO has never and does not provide to *any* patrons, Plaintiff is in fact seeking to force the CRO to supplement its normal programs with an entirely new program that is beyond the ADA's requirement for an *auxiliary aid or service*.[6]  As for Plaintiff's repeated attempts to use imprecise language to persuade the Court that the CRO has more involvement with FBNS's than it actually does, the CRO's "normal scope" of public functions with respect to FBNS's is not so broad as "handling forms and their technical deficiencies."  Plaintiff's Opp., at 4:25-27.  The CRO files FBNS's; that is it.  Thus, just like *Where Do We Go Berkeley*, the CRO's services,

---

[6] Plaintiff attempts a reductio ad absurdum argument, asking the Court to "[i]magine a claim that sign language interpretation is not usually provided to anyone, regardless of disability, so it does not need to be provided to a Deaf patron.  Or that producing Braille materials is not generally offered to everyone, so materials will only be offered in print."  Plaintiff's Opp., at 6:4-8.  The major difference here is that, for deaf individuals, "sign language interpreters" are expressly identified as an auxiliary aid or service under 28 C.F.R. section 35.104 where they are included in the definition of "qualified interpreter."  Likewise, "Brailled materials and displays" are expressly included in the definition of "auxiliary aids and services" for blind individuals.  28 C.F.R. § 35.104.  (Moreover, even those auxiliary aids and services would not be required if the public entity provides a reasonable alternative.  28 C.F.R. Pt. 35, App. A § 35.160 (2011).)  On the other hand, physically serving as a personal scribe for blind individuals is not an "auxiliary aid or service" required under the ADA or its regulations, expressly or implicitly.  Defendants' MSJ, at 11:1-15:2.  Plaintiff continues to try to finagle scribe services into the definition of "auxiliary aids and services" for blind individuals in 28 C.F.R. section 35.104, but as discussed in Defendants' MSJ, it is neither the parties' nor the Court's place to read words into statutes that do not exist.  Defendants' MSJ, at 12:14-22.

ORBACH HUFF + HENDERSON LLP

programs, or activities relative to FBNS's, "[f]airly analyzed,…are for more limited than Plaintiff[]

contend[s]…" *Where Do We Go Berkeley*, 32 F.4th at 861.[7]

> ### 3. The CRO's Plan to Reserve a Kiosk in the CRO for Disabled Persons, with Screen Access Software and an Electronic FBNS Suite, Is Not Speculative

As for CRO's plan to add screen-access software for blind individuals to a kiosk that is already

physically located in the CRO, along with an FBNS software suite, such that blind persons could

complete an FBNS on the kiosk in the CRO – it is not "speculative," as Plaintiff contends.  Plaintiff's

Opp., at 5:3-7.  Matt Yankee, the Assistant Controller for the County's Auditor-Controller/Clerk-

Recorder Agency (and the number two in charge of the CRO behind only Melissa Wilk), stated

categorically that adding screen-access software to a kiosk in the CRO, with an FBNS suite, reserved for

use by blind persons, is something the CRO *is doing*; not that the CRO is merely considering doing so or

may do so.  SUF 52-55; Declaration of Matt Yankee in support of Defendants' MSJ ("Yankee MSJ

Decl."), ¶ 9.  It is not as though there is a significant amount of infrastructure that must be put in place

first.  It is simply a matter of the vendor finishing the FBNS software suite that is nearly complete and

then the County will procure a vendor to install the screen-access software on the kiosk.[8]  Id.

Plaintiff's argument regarding the potential for "technical failures" in the kiosk reveals an

unfortunate aspect of her lawsuit.  Plaintiff's Opp., at 5:7-9.  As Plaintiff and her counsel must be aware,

---

[7] And, again, Plaintiff notably opted to make a half-hearted attempt to distinguish *Where do We Go Berkeley* instead of focusing on the specific argument in Defendants' MSJ regarding the mandate therein that the Court undertake an inquiry concerning not only whether a particular alleged public function is a normal function of the public entity, but must also specifically define its scope.  Defendants' MSJ, at 9:5-19.  Plaintiff would rather not address the scope of the CRO's services, programs, or activities regarding FBNS's, because that scope does not and has never included anything besides filing the FBNS for patrons.  SUF 35-38.  To the extent the CRO advises patrons of technical deficiencies in the forms which must be corrected before they can be filed, that is a preparatory step incidental to the CRO's normal government function of filing FBNS's (*Zimmerman*, 170 F.3d at 1174), and which is *exactly* what Moran and Briones did for Plaintiff.  SUF 27, 31.

[8] In the interim, as discussed at length in Defendants' MSJ, there are already ample systems in place to ensure blind persons are able to file FBNS's with and in the CRO.  Defendants' MSJ, at 17:2-19:2.  The kiosk is an additional resource that will be available to disabled persons. SUF 52-55; Yankee MSJ Decl., ¶ 9.  With respect to Plaintiff's reference to "voluntary cessation," it is unclear what Plaintiff is arguing.  Defendants made no such argument in Defendants' MSJ.  See generally, Defendants' MSJ.  The Policy prohibiting CRO clerks from completing or altering forms for patrons that are filed or recorded in the CRO remains in place and has no bearing on whether the CRO's services are accessible to blind persons, which they are.

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

the ADA was enacted as an anti-discrimination statute, not a means by which *every* injury suffered by a disabled individual is subject to redress.  *Williams v. California Dep't of Corr. & Rehab.*, No. 216CV01377MCECKD, 2017 WL 977766, at \*3 (E.D. Cal. Mar. 14, 2017), citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).  Thus, the ADA's implementing regulations make it abundantly clear that "a violation does not occur every time there is a temporary loss of accessibility as a result of equipment malfunction." *Id.*  Indeed, 28 C.F.R. section 35.133, which provides that public entities must "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities," also specifically provides that "isolated or temporary interruption[s] in service or access due to maintenance or repairs" *do not constitute violations of the ADA*.  Id., § 35.133(a)-(b); 28 C.F.R. Pt. 35, App'x B ("This paragraph is intended to clarify that temporary obstructions or isolated instances of mechanical failure would not be considered violations of the Act or this part...").  This is consistent with the Ninth Circuit's holding in other contexts that temporary and transitory denials of access do not amount to ADA violations.  *See, e.g., Chapman v. Pier 1 Imports (U.S.), Inc.*, 779 F.3d 1001, 1008–09 (9th Cir. 2015).

While people with disabilities must certainly be reasonably accommodated, the ADA does not hold those within its purview to an impossible standard.  Yet, Plaintiff refuses to accept even the most natural and inevitable of impediments to receiving exactly what she wants, exactly when she wants it; while Plaintiff maintains that she herself should be entitled to great leeway with respect to her own conduct, asking the Court to simply ignore the fact that she refused to inform the CRO's clerks on the day of the incident that she had screen access software on her phone that she could have used to correct her FBNS right then and there.  SUF 31, 41-42; Yankee MSJ Decl., ¶ 10.  It appears to be this belief system which leads to very misguided interpretations of the ADA, to the point that Plaintiff is arguing that the mere possibility of a simple technical failure renders insufficient any auxiliary aid or service that has the potential to stop working temporarily.  Plaintiff's Opp., at 5:3-15.  However, the ADA was never intended to be a draconian trap and the truly unfortunate aspect of Plaintiff's belief system is that it is forcing her to take positions which run counter to the greater good of other disabled persons and her own self-identity as an "activist."  Supplemental Declaration of Nicholas D. Fine in support of Reply ("Fine Reply Decl."), ¶ 3, Exh. U (Martinez Depo.), 84:19-25.  A physical kiosk in the CRO with screen-access

ORBACH HUFF + HENDERSON LLP

- 7 -

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

software for disabled persons, reserved for use only by those persons, will be an invaluable resource, especially for those who wish to remain as independent as possible and not rely on human assistance.

### B. The CRO Was Not Required Under the ADA to Fill Out Plaintiff's FBNS

#### 1. The CRO Effectively Communicated with Plaintiff

Plaintiff argues that Defendants only provided Plaintiff with effective "one-way" communication, not "two-way" communication.  Plaintiff's Opp., at 7:3-8:27.  However, Plaintiff fails to address that her own audio recordings demonstrate that there was effective "two-way" communication and that she was able to both receive information from and convey information to, Briones and Moran.  SUF 31.  They both spoke extensively to Plaintiff on the recordings and were clearly able to effectively communicate with each other where Plaintiff never once suggested that she could not understand them.[9]  Id.  Further, the recordings actually capture that the extent of the CRO's communications with Plaintiff reached the same extent they would reach with *any other patron attempting to file a defective FBNS.*  Id.  Specifically, both Moran and Briones explained the technical deficiencies in Plaintiff's FBNS to her, numerous times, and Briones even provided her with a "go-back" letter, explaining those deficiencies in writing, in detail.  SUF 27, 31.  Plaintiff bears the ultimate burden and cannot establish that the communications between Plaintiff and the CRO were ineffective.

Further, Plaintiff's argument is premised on an assumption that is entirely unsupported by authority, whereby Plaintiff continues to argue that "effective" communication and the ability to

---

[9] Regarding Plaintiff's contention that she testified she did not find the communication equal to that afforded to sighted customers of the CRO, that is irrelevant.  Plaintiff's Opp., at 8:2-4.  First, Plaintiff's subjective analysis must be disregarded as a matter of law.  Plaintiff is not the fact finder in this action, she is not the judicial officer presiding over the case, nor is she an attorney, a paralegal, or someone with even one iota of legal training.  Fine MSJ Decl., ¶ 6, Exh. D (Martinez Depo.), 98:21-99:2.  Plaintiff is not even qualified to understand what the term "communication" means under the ADA, let alone opine on whether her subjective experience amounted to effective communication for purposes of the ADA.  It would also require rampant speculation for Plaintiff to attempt to evaluate the communications between the CRO and *other* patrons.  Fed. Rules of Evid. 701.  Moreover, like any plaintiff in a civil lawsuit, Plaintiff's testimony must be viewed in the context of her self-interest.  Obviously, Plaintiff will not admit that she received effective communication – it would be fatal to her entire lawsuit.  This is exactly why it is well settled that an affidavit containing ultimate facts or conclusions of law cannot defeat summary judgment under Rule 56(e).  *Sanders v. Douglas*, 565 F. Supp. 78, 80-81 (C.D. Cal. 1983).  "Indeed, legal conclusions 'are totally ineffectual, and are not to be given any consideration or weight whatsoever.'"  *Id.*, citing *G.D. Searle & Co. v. Chas. Pfizer & Co.,* 231 F.2d 316, 318 (7th Cir.1956); *Washington v. Maricopa County,* 143 F.2d 871, 872 (9th Cir.1944), *cert. denied,* 327 U.S. 799, 66 S.Ct. 900, 90 L.Ed. 1024 (1946).  Accordingly, Plaintiff's testimony must be disregarded.

ORBACH HUFF + HENDERSON LLP

"convey information to" a public entity must necessarily include an obligation on the public entity's part

to fill out or complete legal forms for patrons that are filed or recorded in the CRO.  Plaintiff's Opp., at

7:12-17, 7:21-23.  However, this is merely Plaintiff's self-interested interpretation – not the

interpretation of any court in the United States or even the DOJ.  Plaintiff does not cite a single case,

statute, or regulation in support of her interpretation, and nowhere in Title II, its regulations, or even the

DOJ's "Effective Communication" technical assistance manual (the only one specifically dedicated to

communication under the ADA) is it provided that "effective communication" includes an obligation to

fill out legal forms for patrons.[10]  Fine MSJ Decl., ¶ 19, Exh. Q.

Moreover, to the extent Plaintiff contends that "written communications provided by public

entities are subject to the requirement for effective communication," she failed to provide the Court with

the entire passage from the Title II Technical Assistance Manual.  Id., at 8:8-13.  The full passage is:

> *Must tax bills from public entities be available in Braille and/or large
> print?* What about other documents? Tax bills and other written
> communications provided by public entities are subject to the requirement
> for effective communication. Thus, where a public entity provides
> information in written form, it must, when requested, make that
> information available to individuals with vision impairments in a form that
> is usable by them. "Large print" versions of written documents may be
> produced on a copier with enlargement capacities. Brailled versions of
> documents produced by computers may be produced with a Braille printer,
> or audio tapes may be provided for individuals who are unable to read
> large print or do not use Braille.

TAM II-7.000, https://www.ada.gov/taman2.html#II-7.0000 (last visited July 6, 2022).  The full

paragraph makes it abundantly clear that the applicable guidance pertains to making the information in

written forms accessible to persons with disabilities such that they can understand it; not physically

altering or filling out forms for them.  Id.  To this end, both Moran and Briones relayed the information

in the FBNS to Plaintiff verbally and in writing, explaining to Plaintiff what the form required and what

needed to be fixed, which Plaintiff does not dispute.  SUF 27-29, 31.

---

[10] Plaintiff's entire argument appears to be an attempt to sneak through a back door.  Because the
"scribe" services Plaintiff demanded are clearly not required by the ADA, she is improperly seeking to
use and expand the ADA's effective communication requirement and the general authority associated
therewith to force the CRO to expand the scope of its services, programs, and activities, to include
filling out legal forms for patrons that are filed or recorded in the CRO.  That is not the purpose of the
ADA or the applicable law, as discussed herein.

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

### 2.      Defendants Are Not "Relying" On Plaintiff to Provide Her Own Auxiliary Aid or Service to Establish Effective Communication

Clearly surprised by the fact Defendants pointed out that Plaintiff herself had the means to file the FBNS in the CRO on the day of the incident using the screen access software she had in her own pocket (on her own cell phone) and refused to do so, Plaintiff attempts to turn this back around on Defendants by accusing them of "relying" on Plaintiff to provide her own auxiliary aid or service to establish effective communication.  Plaintiff's Opp., at 7:26-28, fn. 5.  Plaintiff claims that she was never able to work with CRO forms without an auxiliary aid or service that she supplied.  Plaintiff's Opp., at 7:21-24.  That is simply not accurate.  As discussed above, the communications between the CRO and Plaintiff were clearly effective.  Further, even assuming the effective communication requirement obligated the CRO to find a way for Plaintiff to file her FBNS *that day* (which it does not), Defendants' MSJ set forth all of the various options that were available to Plaintiff to file her FBNS on the day of the incident.  Defendants' MSJ, at 15:20-28, SUF 31, 41-42; Yankee MSJ Decl., ¶¶ 4-10.  As discussed, the CRO provides an electronic version of the FBNS online and allows patrons to file FBNS's by mail, such that they do not need to travel to the CRO at all.[11]  SUF 49.  To the extent the patron with a disability needs assistance with printing or signing the form, or wishes to file it in person, the CRO will both print the FBNS for the patron and assist the patron with signing the form.  SUF 50; Yankee MSJ Decl., ¶¶ 8, 10.  If there are defects in the form which must be corrected, the CRO will explain those deficiencies to the individual and provide the individual with a "go-back" letter setting forth that same guidance in writing, including in an electronic format if so requested.  SUF 29, 51; Yankee MSJ Decl., ¶ 5.  The CRO's FBNS services are and were accessible to Plaintiff.

---

[11] Plaintiff cannot use a declaration on an MSJ to contradict her own deposition testimony.  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  Plaintiff was clear in her deposition that she could not recall whether or not she was unable to check a box in the online FBNS prior to the incident because her memory is a "little blurred."  SUF 9.  All she could confidentially say is that she needed assistance signing the document.  Id.  Plaintiff cannot now miraculously remember a different narrative for purposes of MSJ.  *Kennedy*, 952 F.2d at 266.  Further, even in Plaintiff's declaration in support of her MSJ, she does not specifically identify what in the form is not accessible to her, such as a check box. See Plaintiff's Declaration in support of Plaintiff's MSJ, at ¶ 9.  If a portion of the form besides the signature line was actually inaccessible to Plaintiff, she would have said so.  She did not.  The online FBNS is clearly accessible to blind persons and as noted, to the extent they require assistance signing the form, the CRO will provide that assistance and print the form.  SUF 50; Yankee MSJ Decl., ¶¶ 8, 10.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORBACH HUFF + HENDERSON LLP

It is in addition to these options that Defendants point out the obvious – that Plaintiff herself had an additional means to correct and file her FBNS in the CRO on the day of the incident, but voluntarily declined to use those means or so much as inform Moran or Briones about them.  SUF 41-42.  Indeed, Plaintiff could have accessed the online FBNS on her cell phone on the day of the incident with her screen access software and the CRO clerks could have directed Plaintiff to make the changes she needed to make to her FBNS, via Plaintiff's cell phone, and the CRO clerks would have assisted her with signing it.  Id.; SUF 50; Yankee MSJ Decl., ¶¶ 8, 10.  Instead, Plaintiff opted to contact three different attorneys about a potential legal claim while still in the CRO.  Fine Decl., ¶ 9, Exh. G (Martinez Depo.), 84:19-25, 86:16-87:23, 104:106:6.  When you consider that Plaintiff voluntarily opted to forego using her cell phone to correct her FBNS on the day of the incident in lieu of filing a lawsuit, her self-described identity as an "activist" puts her claims into perspective.  Fine Reply Decl., ¶ 3, Exh. U (Martinez Depo.), 84:19-25.  This case is not truly about ensuring blind people have access to the FBNS, which they clearly do.  This is about expanding disability rights beyond the confines of the current state of the law, to require all public entities to begin acting as personal scribes for people with disabilities, including on legal forms filed or recorded in a county's official record.[12]  If Plaintiff wishes to accomplish this extraordinary feat, she needs to take it up with the Legislature, not the Court.

### 3.    Qualified Readers Are Not Required to Act as Scribes

Plaintiff's misunderstanding of applicable ADA law is no clearer than the simplistic syllogism she presents in the first paragraphs of her argument that qualified readers are required to act as scribes.  Specifically, Plaintiff argues that: (1) public entities must give primary consideration to the requests of individuals with disabilities; (2) Plaintiff demanded scribe services; and (3) therefore, Defendants must provide such "scribe" services as an auxiliary aid for purposes of effective communication unless they

---

[12] Also making this clear is Plaintiff's claim that she could not have used her cell phone at the CRO to correct her FBNS on the day of the incident because it would have "violate[d] [her] right to privacy."  Plaintiff's Opp., at 18:14-16.  This is nonsensical.  If Plaintiff had pulled up the online version of the FBNS that the CRO makes available, on her cell phone, then the clerk would have been viewing the exact same form that Plaintiff presented at the counter, and she apparently had no privacy concerns there.  Again, FBNS's are matters of public record.  *B-K Lighting, Inc.*, 2006 WL 8421831, at *3, fn. 14.  Further, Plaintiff's claim that Defendants have not even established that the online FBNS is available on electronic devices is also without logic.  The entire point of putting the form online is so that it can be accessed using electronic devices and Plaintiff has already testified she accessed the form at home using a computer and filled it in using her screen-access software.  SUF 8.

1 │ can prove that doing so would result in an undue burden or fundamental alteration.  Plaintiff's Opp., at

2 │ 9:2-10:2.  That is *not* the applicable law.

3 │     First, as discussed in Defendants' MSJ and above, there was no need for an auxiliary aid or

4 │ service where Moran and Briones were clearly able to effectively communicate with Plaintiff without

5 │ the need for such aid.  Second, a public entity has no obligation to honor a demand for scribe services

6 │ considering such services are not required by the ADA, expressly or implicitly.  Third, as Plaintiff

7 │ herself noted, the public entity has no legal obligation to honor the specific demand of the individual

8 │ with a disability where the public entity can demonstrate that another effective means of communication

9 │ exists.  Plaintiff's Opp., at 9:8-9 (citing 28 C.F.R. Pt. 35, App. A § 35.160 (2011)).  Thus, even if the

10 │ Court were to accept that "effective communication" extends to the disabled person's entry of his or her

11 │ own personal or business information on the FBNS, which it does not, Plaintiff's argument here still

12 │ fails where there are indeed alternatives available to blind individuals which render the CRO's services

13 │ relative to FBNS's accessible to them, as discussed extensively in Defendants' MSJ and above.[13]

14 │     Clearly left without any options in terms of primary authority supporting her claims, Plaintiff

15 │ now resorts to deceptive editing of the ADA's regulations in a last-ditch attempt to point to something

16 │ besides one sentence of unsupported DOJ guidance that contradicts the regulation it purports to

17 │ interpret.  Specifically, Plaintiff claims that the type of "scribe" services she demanded are actually

18 │ provided for in 28 C.F.R. section 35.104(1)-(2), and then quotes some of the language, while failing to

19 │ disclose that much of it only applies to *deaf individuals*, not blind individuals.  Plaintiff's Opp., at 10:17-

---

[13] Plaintiff argues that "a qualified human reader is one of the least burdensome auxiliary aids available" and therefore, Defendants should have no problem providing one.  Plaintiff's Opp., at 10:3-7.  It is important to note here that Defendants do not dispute that a "qualified reader" is an auxiliary aid or service identified for blind individuals in 28 C.F.R. section 35.104.  And, where it is necessary for purposes of effective communication with a person with a disability, such as when a blind individual seeks to understand the contents of a legal form filed or recorded in the CRO, the CRO will provide an accommodation to assist that person, such as a qualified reader to convey the contents of the form to the individual.  In fact, Briones and Moran did exactly that by explaining the contents of the FBNS to Plaintiff, multiple times, and what needed to be fixed.  SUF 27, 29, 31.  Rather, Defendants dispute that a "qualified reader" must physically serve as a scribe and alter or complete those forms for individuals with disabilities.  While Defendants agree that the burden associated with simply conveying information on a form to a person with a vision disability is minimal, the burden associated with forcing a public entity to actually modify or complete the form is substantial, and puts the entity at significant risk of liability.  Defendants' MSJ, at 16:1-17:1.  It would also put the CRO's clerks in the position of being asked to provide legal advice, as discussed in Defendants' MSJ.  Id.

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

28.  Specifically, "Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers…exchange of written notes…voice, text, and video-based telecommunications products and systems" are all auxiliary aids and services which may be provided to "individuals who are deaf or hard of hearing." 28 C.F.R. § 35.104(1) (subparagraph (1) applies to deaf individuals while subparagraph (2) applies to blind persons).  Plaintiff simply deleted those important words and mashed the two paragraphs together.  This sort of deceptive gamesmanship should not be tolerated.  Considering those auxiliary aids and services are for deaf individuals, it makes clear that they are intended to convey audible information to deaf individuals in a manner that they can perceive, such as through sign language interpreters.[14]  For obvious reasons, they do not expressly or implicitly have anything to do with filling out forms for deaf (or blind) individuals, let alone legal forms that are filed or recorded in a county's official record.

With respect to subparagraph (2), which identifies the auxiliary aids and services for blind individuals, Plaintiff notably omits "qualified reader" (effectively conceding that "qualified readers" do not have "scribe" obligations) and lists only, "accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 35.104(2).  Defendants agree that this language is in the regulation and no where does it state that public entities have an obligation to fill out forms for blind individuals, it only requires that visually delivered materials be made accessible to them.  The FBNS was and is clearly accessible to Plaintiff for all of the reasons discussed above.

Next, if the Court does not agree with Plaintiff that it may rely on inapplicable auxiliary aids or services for deaf individuals (which have nothing to do with filling out forms for them) to support Plaintiff's claim, Plaintiff contends that she should be allowed to simply dream up any accommodation she pleases and that public entities must bend to her will because 28 C.F.R. section 35.104 states that auxiliary aids or services for blind persons generally include "other *similar services and actions*."  Plaintiff's Opp., at 11:1-13.  However, the problem with Plaintiff's theory is that 28 C.F.R. section 35.104 does not identify any auxiliary aids or services which could be even remotely considered similar

---

[14] 28 C.F.R. section 35.104 explains that "[q]ualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-sign language interpreters."

ORBACH HUFF + HENDERSON LLP

1    to type of "scribe" services Plaintiff demanded.  In fact, as noted in Defendants' MSJ, even the DOJ's

2    *only* technical assistance manual dedicated solely to communication does not identify filling out forms

3    for disabled persons as an auxiliary aid or service, or any similar services.  Fine MSJ Decl., ¶ 19, Exh.

4    Q.  The ADA is not a playground for Plaintiff's imagination.  Moreover, as discussed, the CRO already

5    offered and offers numerous ways for blind individuals to file FBNS's, including in the CRO, and

6    Plaintiff is not entitled to her choice of accommodation.[15]  28 C.F.R. Pt. 35, App. A § 35.160 (2011).

7         Plaintiff then cites two cases in support of her argument that there is in fact primary authority

8    supporting Plaintiff's assertion that qualified readers are required to act as scribes for blind individuals,

9    including *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 823 F.Supp.2d 995, 1010 (N.D. Cal. 2011)

10    and *Fink v. N.Y.C. Dep't of Pers.*, 855 F. Supp. 68, 70 (S.D.N.Y. 1994).  Plaintiff's Opp., at 12:1-8.

11    Both are inapplicable and entirely inapposite.  In *Enyart,* which involved a request for accommodations

12    (*only* JAWS screen-reading software and ZoomText screen magnification software, and *not a qualified*

13    *reader*) to take the California Bar Examination, the Ninth Circuit analyzed 42 U.S.C. section 12189,

14    which falls within Title III of the ADA governing professional licensing examinations, and the

15    interpreting regulation, 28 C.F.R. section 36.309.  *Enyhart*, 823 F.Supp.2d at 998-1000.  Section 36.309

16    contains a "best ensure" standard.[16]  The case had absolutely nothing to do with a qualified reader

17    serving as a scribe for Ms. Enyart, or Title II of the ADA, or any of the regulations and statutes that

18    Plaintiff relies on in this action.  See generally, *id.*  To the extent the case discusses that Ms. Enyhart had

19    a "reader" during law school to assist her with bubbling answers (*id.*, at 1010), the opinion does not state

20    what law that "reader" was provided under, which alone is fatal to the applicability of this opinion

---

[15] Again, to the extent Plaintiff cites the TAM for the quote that "readers should be provided when necessary for equal participation and opportunity to benefit from any governmental service, program, or activity, such as reviewing public documents, examining demonstrative evidence, and filling out voter registration forms or forms needed to receive public benefits" (28 C.F.R. Pt. 35, App. B (2011)), again, while that assistance would certainly include conveying information to the individual filling out the form, nowhere does it state that the "reader" him or herself is actually required to act as the individual's scribe or "amanuensis" and actually physically fill the form out for the individual.  Id.  That language simply is not present and would contradict the definition of qualified reader in 28 C.F.R. section 35.104.

[16] This standard requires a private entity offering a licensing examination to assure that "the examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability…[,] the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills."  28 C.F.R. § 36.309(b)(1)(i).

ORBACH HUFF + HENDERSON LLP

1    because Plaintiff fails to mention that there are much different disability requirements in the education

2    context, under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. sections 1400-

3    1491.  *Enyhart* simply does not provide that public entities under Title II of the ADA must fill out forms

4    for blind individuals and it was not even an issue in the lawsuit.  Questions "merely lurk[ing] in the

5    record, neither brought to the attention of the court nor ruled upon," are not "considered as having been

6    so decided as to constitute precedents."  *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also Illinois Bd.*

7    *of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979).

8            As for *Fink, it is not even an ADA case and it is out of New York.  Fink*, 855 F. Supp. at 70.  The

9    plaintiff only brought a claim under Section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C.

10   section 794(a).  *Id.*  The case is entirely inapplicable for that reason alone, where Plaintiff does not bring

11   any claims under the same statute.  See generally, Compl.  Additionally, the case involved ineffective

12   readers that the defendant, New York City Department of Personnel, voluntarily provided to the

13   plaintiffs taking an examination for a promotion in their employment, and the plaintiffs' demand for

14   materials in Braille that the defendant refused to provide.  *Id.*, at 70-71.  The opinion did *not* involve the

15   issue of whether the defendant was required to provide the reader to actually scribe answers, since the

16   reader was provided voluntarily (and the plaintiff even claimed that the reader was ineffective).  *Id.*

17   Again, an issue not decided is not precedent.  *Webster*, 266 U.S. at 511.  The fact that these are the *only*

18   two cases Plaintiff could locate confirms that there is no primary authority which supports her claims.

19                    **4.       The Department of Justice Guidance Plaintiff Relies On Is Still Not Binding**

20                    **or Controlling and Still Contradicts the Regulation at Issue**

21           Plaintiff concedes that DOJ guidance is not controlling and must be disregarded where it is

22   "plainly erroneous or inconsistent with the regulation."  Plaintiff's Opp., at 12:9-19.  Plaintiff argues that

23   it should be irrelevant that the regulatory definition of "qualified reader" only requires the individual to

24   know how to read and not write, because the "two catch-all provisions" in 28 C.F.R. sections 35.104 and

25   36.303 allegedly make clear that the list of auxiliary aids and services identified in Section 35.104 is not

26   exhaustive.[17]  Plaintiff's Opp., at 13:1-7.  Plaintiff's logic is flawed.  The issue identified by Defendants

27

28   ─────────────────
     [17] Understanding that she is not going to be able to present the Court with any primary or controlling
     authority in support of her position, Plaintiff attempts to turn this around on Defendants, arguing that

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

is that the regulatory definition of "qualified reader" does not include any requirement that the

individual know how to write, *and that definition is exhaustive*.  28 C.F.R. § 35.104.  There is no "catch-

all" provision in the regulatory definition of "qualified reader."  Id.  There is simply no requirement in

the exhaustive definition of "qualified reader" that the individual know how to write, just like there is no

requirement in the applicable statute or regulation that "qualified readers" must fill out legal forms for

persons with disabilities.

The Supreme Court has recently offered guidance on the impropriety of a court reading words

into statutes and regulations, explaining:

> This Court normally interprets a statute in accord with the ordinary public
> meaning of its terms at the time of its enactment.  After all, only the words
> on the page constitute the law adopted by Congress and approved by the
> President.  If judges could add to, remodel, update, or detract from old
> statutory terms inspired only by extratextual sources and our own
> imaginations, we would risk amending statutes outside the legislative
> process reserved for the people's representatives.  And we would deny the
> people the right to continue relying on the original meaning of the law
> they have counted on to settle their rights and obligations.

*Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (2020) (citing *New Prime Inc. v.*

*Oliveira*, 139 S. Ct. 532, 538-539 (2019)).  Thus, none of Plaintiff's contentions about what she thinks

the law was meant to do, or should do, allow the Court "to ignore the law as it is."[18]  *Id.* at 1745.

---

"Defendants cite no cases even suggesting scribes are an auxiliary aid excluded from the ADA and provide no law suggesting scribes are prohibited or even disfavored by the ADA or its regulations." Plaintiff's Opp., at 13:7-11.  However, Defendants do not have the burden of proof in this action. Plaintiff has the ultimate burden of proof and must present authority that the specific accommodation she demanded is actually required under the ADA.  *River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  She failed to do so.  Moreover, to the extent Plaintiff cites *Botosan v. Paul McNally Realty*, 216 F.3d 827, 834 (9th Cir. 2000) as somehow supporting her position, it does not.  *Botosan* had nothing to do with qualified readers or whether they are required to fill out legal forms for persons with disabilities. Rather, the issue there was whether the plaintiff was denied access to a private real estate office due to a lack of handicapped parking, in violation of Title III of the ADA.  *Botosan*, 216 F.3d at 829-830.  With respect to *Sutton*, the point of that citation in Defendants' MSJ was merely to establish that Courts are not bound by DOJ guidance and that DOJ guidance has a history of exceeding the confines of the applicable ADA statutes and regulations.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-489 (1999).  In other words, DOJ guidance must be analyzed closely and cannot be accepted as gospel as Plaintiff would have.

[18] Plaintiff also ignores that when a proffered interpretation of a statute or regulation would provide an agency with authority resulting in significant societal, political, or economic consequences, the Supreme

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

1

2

**5.     Plaintiff Still Has Not Established the Existence of a Reasonable Modification that Was Required Under the Circumstances**

3     Plaintiff attempts to draw a distinction between her alleged entitlement to a modification of the

4     CRO's Policy and the provision of an auxiliary aid and service.  However, the only modification she

5     claims to have demanded is the provision of a scribe, which she believes falls under the definition of

6     "qualified reader" (it does not), and a qualified reader is considered an auxiliary aid or service under 28

7     C.F.R. section 35.104.  See generally, Plaintiff's Compl.; SUF 15-16, 22-23.  As discussed in

8     Defendants' MSJ, Plaintiff is therefore asserting a hybrid failure to accommodate/disparate treatment

9     claim based on alleged ineffective communication and the alleged corresponding failure to provide an

10    auxiliary aid or service in the form of a "qualified reader" to provide scribe services.  Defendants' MSJ,

11    at 7:17-8:2.  All of her claims depend on her assertion that the CRO was required to physically fill out

12    the FBNS for Plaintiff, whether she wants to call that an accommodation or an auxiliary aid or service.[19]

13

14    Court has recognized that "[e]xtraordinary grants of regulatory authority are rarely accomplished

15    through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, ___ U.S. ___, No.

16    20-1530, 2022 WL 2347278, at *12 (U.S. June 30, 2022).  In such circumstances, the Supreme Court

17    requires that there be "'clear congressional authorization'" for the power [an agency] claims," because

18    "Congress [does not] typically use oblique or elliptical language to empower an agency to make a

19    'radical or fundamental change' to a statutory scheme." *Id.*, at *3.  The societal, political, and economic

      consequences of forcing public entities in California to physically fill out legal forms for blind

      individuals are obvious, as discussed in Defendants' MSJ, in addition to the fact that there is simply no

      clear congressional authorization that such services must be provided.

20    [19] Plaintiff contends that the CRO could have "someone who is not a clerk – perhaps someone working

21    at the front desk, as a receptionist, or even from an independent agency" perform the scribe services

      Plaintiff demanded, "meaning absolutely no modification would be required to the general policy that

      the clerks do not fill out the documents."  Plaintiff's Opp., at 14:15-18.  Plaintiff also suggests that the

22    CRO should hire someone to act as Plaintiff's scribe. Id., at 14:18-23.  However, again, and as

23    discussed throughout this brief, the ADA does not require public entities to provide that service,

      regardless of which specific employee or hired outside agency Plaintiff claims should provide it.

24    Second, Plaintiff misunderstands the meaning of the term "clerk" in this context and offers no evidence

      in support of her contention whatsoever.  The CRO uses the term "clerk" with respect to the Policy

25    because that is the person who is interacting with the customer at the CRO.  The Policy extends to all

      CRO employees, including front desk clerks, which should be obvious given the reasons for the Policy.

26    Defendants' MSJ, at 16:1-17:1.  The County would still be subject to significant potential liability

      whether it is a clerk in a filing window at the CRO or a front desk clerk who were to undertake filling

27    out legal forms for patrons.  Id.  Further, just like the clerk in the filing window, a front desk clerk would

      be subject to potential liability for the unauthorized practice of law without a license. Id.  Further,

28    Plaintiff's contention that the CRO should hire an outside agency to provide scribe services implicates

      *Where Do We Go Berkeley*, in that Plaintiff is admitting that the provision of such services is not part of

ORBACH HUFF + HENDERSON LLP

1    Plaintiff then contends that the CRO's Policy leads to a disparate impact to blind individuals and

2 argues that a local policy cannot supersede an obligation under federal law without an affirmative

3 showing by a public entity that making the modifications would fundamentally alter the nature of the

4 service, program, or activity.  Plaintiff's Opp., at 15:17-16:23.  However, Plaintiff fails to explain how

5 the Policy could possibly conflict with federal law where federal law does not require public entities to

6 fill out legal forms for persons with disabilities, as discussed extensively throughout this Reply and

7 Defendants' MSJ.  Moreover, Defendants do not need to prove that the accommodation Plaintiff

8 demanded would result in a fundamental alternation – and not only because that proffered modification

9 is not required under federal law – but because the CRO already offers multiple ways for individuals

10 with vision disabilities to receive the benefits of the CRO's programs, services, or activities, as

11 discussed.  Again, Plaintiff is not entitled to her choice of accommodations, only a reasonable

12 accommodation.  *Memmer v. Marin County Cts.*, 168 F.3d 630, 634 (9th Cir. 1999); *Leine*, 205 F.3d at

13 *2.  Further, Plaintiff has cited no authority invoking a "reasonable time element" in the analysis of the

14 accommodation.[20]  *Leine*, 205 F.3d at *2.

15    Plaintiff's argument regarding Government Code section 27203(d) is unavailing.  Essentially,

16 Plaintiff argues that section 27203(d) only applies to records "deposited in the recorder's office," and

17

18 the CRO's programs, services, or activities.  See Plaintiff's Opp., at 4:18-20 ("The Ninth Circuit [in

19 *Where Do We Go Berkeley*] vacated the injunction because the actual program involved other entities

20 providing housing and relocation other than Caltrans itself," and thus, the ADA "did not apply to

20 Caltrans *in these circumstances*…").  And again, Plaintiff offers neither authority nor evidence that

21 hiring an outside agency would in any way reduce concerns about potential liability to the County/CRO.

[20] Regarding Plaintiff's claim that the CRO is not in danger of liability because it is only a "middle man"

22 and that its role is limited to filing the FBNS and offering preparatory guidance on technical deficiencies

23 in the forms (Plaintiff's Opp., at 16:24-27), that is exactly the point.  As it stands, because of the Policy,

the CRO is not presently in danger of potential liability for claims arising out of filling out forms for

24 patrons that are filed or recorded in the CRO.  It is only if the Court were to order Defendants to begin

providing that service as an obligation under the ADA that the CRO would be at significant risk of

25 liability.  Notably, Plaintiff simply chose not to address the issue Defendants raised in Defendants' MSJ

concerning the fact Plaintiff's initial FBNS included an improper title for Plaintiff (she wrote

26 "Founder") and Plaintiff has not established that she was capable of determining that day what her actual

and appropriate title would be.  Defendants' MSJ, at 17:18-28, fn. 16.  These are the exact situations that

27 would lead to a clerk being asked to provide legal advice.  Id.  Plaintiff entirely ignored this argument

and these points regarding her own FBNS. See generally, Plaintiff's Opp., at 17:21-25.  Clearly, she did

28 not know what title to put on the day of the incident, and would not have been able to file the FBNS

during that trip, regardless of her claims in this lawsuit.

argues that the record is only "deposited in the recorder's office" when it is "accepted" for filing. Plaintiff's Opp., at 17:1-20.  However, aside from one inapplicable statute in the Business and Professions Code (section 17916), Plaintiff has not cited *any* authority in support of her position or even regarding generally what "deposited" means in these circumstances.  See generally, Plaintiff's Opp. With respect to Section 17916, all that statute states is the steps necessary to "constitute *filing* under this chapter," not what must occur for the form to be deemed *deposited*.  Cal. Bus. & Prof. Code § 17916. And, considering both section 17916 and 27203(d) are in the Business and Professions Code and relate to fictitious business name statements, clearly "filed" and "deposited" have two different meanings.  Id. Plaintiff simply has not proffered any authority that "deposited" means anything other than "in the possession or custody of the CRO."  SUF 43.  In fact, take mail filings of FBNS's as an example.  Under Plaintiff's construction of Section 27203(d), a clerk could make any changes he or she wished to an FBNS sent in for filing by mail, before it is deemed "filed" or "accepted" according to Plaintiff, and face absolutely no statutory liability, which cannot be the right result.  The Policy helps ensure the CRO will not face liability under Section 27203(d) and is entirely consistent with the ADA where the ADA does not require public entities to fill out forms for persons with disabilities, as discussed.

### C.   Plaintiff Has Not and Cannot Establish Deliberate Indifference

#### 1.   Plaintiff Has Not Established Notice

Plaintiff's deliberate indifference argument attempts to simplify the applicable legal analysis in Plaintiff's favor by setting forth an incomplete picture of the applicable law.  Essentially, Plaintiff argues that she satisfied the "notice" element of deliberate indifference when she alerted Moran and Briones to the fact she is blind and demanded that Moran and Briones modify and correct and Plaintiff's FBNS for her.  Plaintiff's Opp., at 19:1-16.  Plaintiff further argues that the "reasonableness" of that modification is irrelevant with respect to notice, but cites absolutely no authority in support of that statement.  Id., at 19:16-24.  Rather, according to Plaintiff, without any supporting authority, merely demanding an accommodation that has no basis in the black letter law somehow establishes notice for purposes of deliberate indifference.  Id., at 19:7-24.  However, again, it is Plaintiff who bears the burden of establishing the existence of a reasonable modification that the public entity was required to, but did not provide.  *Zukle*, 166 F.3d 1041, at 1048; *Memmer*, 169 F.3d at 633.  Plaintiff never requested a

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

1  reasonable modification of Moran or Briones on the day of the incident; she *only* demanded that they

2  physically modify Plaintiff's FBNS for her, which is neither required by the ADA nor reasonable.  SUF

3  16, 24.  And, the CRO already offers multiple methods of making its FBNS filing-services accessible to

4  persons with vision disabilities, as discussed.  Plaintiff simply cannot establish notice that the

5  accommodation she demanded was required.

6  **2.    Plaintiff Has Not Established the Failure to Act Element**

7  Plaintiff argues that she satisfied the failure to act element of deliberate indifference because

8  Defendants allegedly failed to undertake a "fact-specific investigation" regarding Plaintiff's demand for

9  scribe services.  Plaintiff's Opp., at 19:25-20:8.  However, Plaintiff fails to set forth any authority on

10  what that phrase means or what the specific attendant obligations are, if any.  Plaintiff has not

11  established what Defendants were allegedly required to do or not do, particularly where Plaintiff never

12  requested a reasonable modification.  This is particularly important where Briones testified that she did

13  in fact look on Google to see if she could find any support for Plaintiff's demand that the CRO was

14  legally obligated to physically alter Plaintiff's FBNS for her, and then went and analyzed the situation

15  with two supervisors, including Ms. He.  Fine Reply Decl., ¶ 4, Exh. V (Briones Depo.), at 38:8-40:10.

16  Obviously, Briones' investigation would not have and did not reveal the one sentence of inaccurate DOJ

17  guidance on which Plaintiff rests her entire case, which incorrectly suggests that qualified readers must

18  be capable of completing forms for blind individuals.[21]  Id., ¶ 4, Exh. V (Briones Depo.), at 41:3-43:9.

19  Additionally, despite citing only *Duvall* throughout her entire deliberate indifference argument,

20  Plaintiff fails to address any of the language therein that militates against a finding of deliberate

21  indifference.  As noted in Defendants' MSJ, deliberate indifference "does not occur where a duty to act

22  may simply have been overlooked, or a complaint may reasonably have been deemed to result from

23  events taking their normal course."  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139-40 (9th Cir. 2001).

24  Rather, the "failure to act must be a result of conduct that is more than negligent, and involves an

25  element of deliberateness."  *Id.*, at 1140.  This requires more than gross negligence and is a "stringent

---

26  [21] Plaintiff appears to admit that a Google search would not reveal the proverbial (and legally flawed)
27  "needle in a haystack" DOJ guidance, where she states that a "simple Google search would have alerted
    Defendants, at the very least, *of the need to attain additional information about the obligations*…"
28  Plaintiff's Opp., at 20:27-21:1.  Plaintiff does not contend that anyone in the CRO would have been able
    to locate that legally flawed "needle in a haystack" on the day of the incident.

- 20 -

1    standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of

2    his action."  *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997); *L.W. v. Grubbs*, 92 F.3d 894, 899-900

3    (9th Cir. 1996).  To this end, Plaintiff does not contest in the Opposition that the Individual Defendants

4    were merely acting pursuant to the CRO's policy and not due to any discriminatory intent.  SUF 17, 24.

5    Nor does Plaintiff address the fact that with respect to the Policy itself, the County/CRO could not have

6    had the requisite mental state (more than gross negligence), where neither the ADA nor the

7    corresponding regulations explicitly require the provision of the "scribe" services Plaintiff demanded.

8            This is why Defendants raised the authority in Defendants' MSJ concerning negligence per

9    se/strict liability – because that is exactly the standard Plaintiff is seeking to apply.  Plaintiff seems to

10   believe that simply saying she is blind and demanding assistance (that is not required under the ADA) is

11   alone sufficient to support a finding of deliberate indifference.  Plaintiff's Opp., at 19:1-20:17.  Thus, the

12   point of Defendants citing to *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 469-

13   70 (9th Cir. 2015), as well as *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012),

14   and *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1232 (10th Cir. 2009) (neither of

15   which Plaintiff addressed in the Opposition), was simply to establish that the type of strict liability

16   analysis Plaintiff is attempting to apply is inappropriate under the deliberate indifference standard.

17           **D.      The Individual Defendants Are Not Liable Under the ADA**

18                   **1.      The ADA Does Not Allow for Individual Liability**

19           Regarding Defendants' position that the Title V claim (alleged against the Individual Defendants

20   only) must be dismissed where the ADA does not allow for individual liability, all Plaintiff argues is that

21   the ADA "contemplate[s] bringing actions against individuals in limited circumstances involving

22   retaliation, interference, coercion, or intimidation under Title [V]," before citing the general statute (42

23   U.S.C. § 12203) and case law from other jurisdictions which has already been rejected by this Court,

24   including: (1) *Shotz v. City of Plantation*, 344 F.3d 1161 (11th Cir. 2003), out of the Eleventh Circuit;

25   (2) *Robinson v. Bay Club L.A., Inc.*, No. CV 21-3578-DMG, 2022 WL 2167457, at *4 (C.D. Cal. Feb.

26   18, 2022), a recent case from the Central District of California that relies on *Shotz*; and (3) *Datto v.*

27   *Harrison*, 664 F.Supp.2d 472, 491 (E.D. Pa. 2009), a case from the Eastern District of Pennsylvania that

28   also relies on *Shotz*.  See Plaintiff's Opp., at 21:8-25.

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

In *Shotz*, the Eleventh Circuit held that individual liability is appropriate under section 42 U.S.C. section 12203(a)'s anti-retaliation provision where the underlying conduct is unlawful under Title II concerning public services. *Shotz v. City of Pleasanton, Fla.*, 344 F.3d 1161, 1186 (11th Cir. 2003). However, Plaintiff is not asserting an anti-retaliation claim under section 12203(a), she is asserting an interference claim under section 12203(b). See Plaintiff's Compl., ¶¶ 70-82. In fact, the Court will not find a single instance of the words, "retaliation," "coercion," or "intimidation" in the Complaint. See generally, Compl. As such, neither *Shotz* nor any of the cases relying on its reasoning apply to this action. And, Plaintiff has not and cannot proffer *any* authority that there is individual liability for "interference" under section 12203(b). Moreover, the Northern District recently declined to follow *Shotz* and confirmed there is no individual liability under Title V. *Lain v. Pleasanton Unified Sch. Dist.*, No. 20-CV-02350-LB, 2020 WL 12674190, at *4-5 (N.D. Cal. Sept. 14, 2020).

In *Lain*, the plaintiff sued two public school districts, a county office of education, and six individual educators, including for discrimination under Title II of the ADA and retaliation under 42 U.S.C. section 12203(a) of the ADA. *Id.*, at *1, *4. The court (in this District) first noted that a "plaintiff cannot sue a state official in his individual capacity under Title II of the ADA" and that the "issue [was] whether the claim for retaliation changes this ordinary analysis." *Id.*, at *4. The plaintiffs relied on *Minkley v. Eureka City Schools,* No. 17-CV-3241-PJH, 2017 WL 4355049, at *6 (N.D. Cal. Sept. 29, 2017) in support of their argument that section 12203(a) allows for individual liability. *Id.* In *Minkley*, the court followed *Shotz* in denying a motion to dismiss an ADA retaliation claim under section 12203(a) against individual defendants in a former employee's lawsuit against her school-district employer. *Minkley*, 2017 WL 4355049, at *8 (following *Shotz*, 344 F.3d 1161). The court in *Lain* distinguished *Minkley* on the ground it is an employment case, declined to follow *Shotz*, and dismissed the retaliation claim under section 12203(a) on the ground it does not allow for individual liability.[22] *Lain*, 2020 WL 12674190, at *4-5.

[22] In doing so, the Court in *Lain* relied on other Northern District cases, including *Stassart v. Lakeside Joint School District*, No. C 09-1131 JF (HRL), 2009 WL 3188244, at *13 (N.D. Cal. Sept. 29, 2009) (holding that a "plaintiff cannot maintain an ADA retaliation claim against individual defendants who do not otherwise satisfy the definition of an employer" and that "[b]y analogy, school officials may not be held liable either"), and *J.C. by and through W.P. v. Cambrian School District*, No. 12-CV-03513-WHO, 2014 WL 229892, at *1 (N.D. Cal. Jan. 21, 2014), *aff'd*, 648 F.App'x 652 (9th Cir. 2016)

- 22 -

ORBACH HUFF + HENDERSON LLP

As in *Lain*, this is not an employment case and "the weight of authority in the district" supports the conclusion that Plaintiff cannot bring a claim under 42 U.S.C. section 12203 against the Individual Defendants. *Lain*, 2020 WL 12674190, at *5. Accordingly, the sole cause of action under the ADA that Plaintiff alleged against the Individual Defendants must be dismissed as a matter of law. In addition, because the Title V claim is the only ADA claim asserted against the Individual Defendants, and because Plaintiff has abandoned her independent claim under section 51(b) of the Unruh Act as discussed below, all of Plaintiff's other claims (which are solely derivative of her ADA claims) must also be dismissed against the Individual Defendants and judgment should be entered in their favor.

### 2. The Individual Defendants Remain Entitled to Qualified Immunity

Even if the Court finds individual liability exists under 42 U.S.C. section 12203(b), which it does not, the Individual Defendants remain entitled to qualified immunity. As an initial matter, Plaintiff does not dispute that qualified immunity is an available defense to public officials sued under the ADA and thus concedes the issue. See Plaintiff's Opp., at 20:19-21:5. Rather, Plaintiff instead argues in conclusory fashion, citing no authority, that "it is clear the individual defendants knew of the law they were violating because Plaintiff specifically cited to Title II of the ADA in her discussion with the Defendants," that a "simple Google search would have alerted Defendants…of the need to attain additional information about the obligations," and that questions such as whether Plaintiff brought someone with her to assist her somehow "establish intentional conduct."[23] Opp., at 20:18-21:5.

Qualified immunity applies regardless of whether the government official's error is a "mistake of law, a mistake of fact, or a mistake based on mixed question of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The U.S. Supreme Court has instructed lower courts that the "clearly established law" must not be defined "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

---

(dismissing ADA retaliation claim against individual defendants and holding that the "ADA…do[es] not allow for suits against individual defendants, even for retaliation claims"). *Lain*, 2020 WL 12674190, at *5.

[23] It is not "impermissible" under the ADA to ask a disabled person if they brought someone with them to assist them, as Plaintiff contends. Plaintiff's Opp., at 21:1-3. 28 C.F.R. section 35.160 prohibits a public entity from "*requiring*" an individual with a disability "to bring another individual to *interpret* for him or her." Plaintiff did not need "interpretation" services. She demanded scribe services. Further, merely asking a question is clearly not prohibited by the statute. The ADA has not adopted the mantra that mere words break one's bones.

ORBACH HUFF + HENDERSON LLP

1   Rather, officials are entitled to "fair notice" or "fair warning" of the allegedly "clearly established law."

2   *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).  This is why existing precedent must place the

3   constitutional or statutory issue with respect to the official's conduct "beyond debate" in order to

4   overcome application of the qualified immunity protections.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

5   (2011).

6          With this in mind, consider Plaintiff's claim that the Individual Defendants should not be entitled

7   to qualified immunity merely because Plaintiff supposedly mentioned Title II during her discussions

8   with Briones and Moran, or because they had access to Google.  Plaintiff does not even attempt to

9   explain how Plaintiff saying the words "Title II," or how access to Google, would have somehow

10  miraculously directed Moran or Briones (or He for that matter, none of whom are attorneys) to DOJ

11  technical guidance, let alone the *one sentence* of DOJ technical guidance that exists which (incorrectly)

12  provides that qualified readers must be capable of filling out forms for blind individuals, buried in

13  hundreds of pages of guidance from the DOJ, especially where the black letter law does not expressly or

14  implicitly support Plaintiff's demand.  Moreover, even after submitting two briefs totaling near 50

15  pages, Plaintiff *still* has not cited a single published or unpublished federal or state case, from *any*

16  jurisdiction, in which a court has held that qualified readers are required to provide the type of scribe

17  services that Plaintiff demanded, let alone on legal forms that are filed or recorded in a county's record.

18  See generally, Plaintiff's Opp.  Plaintiff cannot overcome the fact there is no controlling authority or

19  robust consensus of cases (or a single case for that matter) of persuasive authority which settles this

20  question in her favor.  Thus, she cannot meet her burden of showing that pre-existing law had placed the

21  existence of the right at issue "beyond debate."  *See al-Kidd*, 563 U.S. at 741; *Sorrels v. McKee*, 290

22  F.3d 965, 969 (2002).  Accordingly, the Individual Defendants are entitled to qualified immunity.

23          **E.      Plaintiff Has Abandoned Her Independent Unruh Claim and the Remaining State**

24                  **Law Claims Fail Where Plaintiff's ADA Claim Fails**

25          Plaintiff attempted to assert two Unruh Act claims in the FAC, including an independent Unruh

26  Act claim under California Civil Code section 51(b), and a derivative Unruh Act claim under section

27  51(f) premised on a violation of the ADA.  Compl., ¶¶ 84, 88.  In Defendants' MSJ, Defendants argued

28  that Plaintiff failed to establish an independent Unruh Act violation under section 51(b) because Plaintiff

- 24 -

cannot satisfy the stringent standard of intentional discrimination necessary to establish the claim. Defendants' MSJ, at 24:15-25:4.  Plaintiff opted not to address this argument or defend Plaintiff's section 51(b) claim in Plaintiff's Opposition.  See generally, Plaintiff's Opp., and at 22:1-16.  Rather, Plaintiff has clearly waived that claim and is now limiting her Unruh Act claim to a violation of section 51(f), which is dependent on a violation of the ADA.  See Plaintiff's Opp., at 22:1-12.  Accordingly, Plaintiff's Unruh Act claim under California Civil Code section 51(b) must be dismissed.  Moreover, because Plaintiff has affirmatively abandoned the independent section 51(b) claim, all of Plaintiff's remaining state law claims are solely derivative of and reliant upon a violation of the ADA.  As discussed at length in Defendants' MSJ and this Reply, Plaintiff's ADA claims fail.  Therefore, the derivative state claims must also fail.  Defendants' MSJ, at 6:18-7:15.

## III.    CONCLUSION

For these reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment, deny Plaintiff's Motion, dismiss Plaintiff's Complaint, and enter judgment in favor of Defendants.


Dated:  July 8, 2022                    Respectfully submitted,


**ORBACH HUFF + HENDERSON LLP**

By:___/s/ *Nicholas D. Fine*_____
            Kevin E. Gilbert
            Nicholas D. Fine
            Attorneys for Defendants
            COUNTY OF ALAMEDA, MELISSA WILK,
            EVA HE and MARIA LAURA BRIONES

ORBACH HUFF + HENDERSON LLP

Defs' Reply Memorandum ISO MSJ or, in the Alt, Partial Summary Judgment [20-cv-06570-TSH]