Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF + HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone:      (510) 999-7908
Facsimile:      (510) 999-7918

Attorneys for Defendant
COUNTY OF ALAMEDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LISAMARIA MARTINEZ,<br><br>                    Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA,<br><br>                    Defendant. | Case No.  20-cv-06570-TSH<br><br>**DEFENDANT COUNTY OF ALAMEDA'S NOTICE OF MOTION AND MOTIONS *IN LIMINE*:**<br><br>**NO. 1 – TO EXCLUDE EVIDENCE OF OTHER PUBLIC ENTITIES PROVIDING "SCRIBE SERVICES"**<br><br>**NO. 2 – TO EXCLUDE EVIDENCE OF OTHER INDIVIDUALS' EXPERIENCES WITH THE COUNTY OR OTHER PUBLIC ENTITIES**<br><br>**AND DECLARATION OF NICHOLAS D. FINE**<br><br>PTC:          February 15, 2024<br>TIME:        10:00 a.m.<br>DEPT:        Courtroom G, 15th Floor<br>JUDGE:      Hon. Thomas Hixson<br>TRIAL:      March 25, 2024 |

ORBACH HUFF + HENDERSON LLP

1  TO THIS HONORABLE COURT, PLAINTIFF AND HER ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on February 15, 2024, at 10:00 a.m., or as soon thereafter as this

3  Honorable Court may hear said Motions, Defendant COUNTY OF ALAMEDA ("Defendant" or "County")

4  will move *in limine* for an order precluding the introduction of evidence, testimony, or argument regarding:  (1)

5  evidence of other public entities providing "scribe services" whether to Plaintiff LISAMARIA MARTINEZ

6  ("Plaintiff") or other individuals; and (2) evidence of other individuals' experiences with the County or other

7  public entities.

8         These Motions are based upon this Notice, the attached Memorandum of Points and Authorities,

9  Declaration of Nicholas D. Fine and the exhibit attached thereto, and any further evidence that may be

10 presented at the hearing on these Motions.  Pursuant to this Court's Case Management Order regarding pretrial

11 and trial procedures, counsel for both parties have been in continuous discussions regarding trial filings in this

12 matter, including the subjects of these Motions.  Notwithstanding those discussions, the parties were unable to

13 agree on the issues advanced herein.

14 **Motion *in Limine* No. 1 to Exclude Evidence of Other Public Entities Providing "Scribe Services"**

15 **I.        SUMMARY OF ARGUMENT AND KEY FACTS**

16        Plaintiff Lisamaria Martinez ("Plaintiff"), a disability-rights activist with a vision disability, claims to

17 have been subjected to disability discrimination on March 29, 2019, by employees of the County Clerk-

18 Recorder's Office ("CRO"), when Plaintiff sought to file a Fictitious Business Name Statement ("FBNS") at

19 the CRO's physical office in Oakland, California.  Specifically, and despite the fact Plaintiffs' own recordings

20 of the incident reflect fluent communications between Plaintiff and the County's employees, Plaintiff alleges

21 that the County failed to provide Plaintiff with an auxiliary aid or service, in the form of "scribe services,"

22 which Plaintiff claims was necessary to ensure "effective communication" between Plaintiff and the County

23 and for Plaintiff to enjoy the benefits of the CRO's programs, services, or activities.  Plaintiff brings suit for

24 disability discrimination under the ADA and derivative state statutes.

25        The County's Motion *in Limine* No. 1 seeks to exclude any evidence that other public entities have

26 provided Plaintiff, or anyone else, with the "scribe services" that she now seeks to force the County to provide to

27 members of the public by way of this action.  Throughout this case, Plaintiff has repeatedly suggested that the

28 mere fact other public entities have allegedly provided her with the "scribe services" she demanded from the

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

County on March 29, 2019, means the County has a legal obligation to provide the same service.  However, such evidence should be excluded as (1) irrelevant (Fed. R. Evid. 401, 402); (2) unduly prejudicial, confusing and misleading to the jury (Fed. R. Evid. 403); (3) hearsay (Fed. R. Evid. 801-807); (4) speculative and unsupported (Fed. R. Evid. 402, 403); and (5) lacks foundation.

## II.    LEGAL ARGUMENTS

### A.    Evidence of Other Public Entities Providing "Scribe Services" is Not Relevant

Federal Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 402 establishes that while all relevant evidence is admissible, "[e]vidence which is not relevant is not admissible."  Whether a fact is "of consequence" "is determined by the substantive law which governs the action."  *United States v. Shomo*, 786 F.2d 981, 985 (10th Cir. 1986).  All of Plaintiff's claims are derivative of her claim under Title II of the ADA.  Thus, in this case, the ADA determines whether evidence is "of consequence."  Fed. R. Evid. 401; see also *Hutchinson v. City of Thompson Falls*, No. CV 19-195-M-DLC, 2021 WL 321886, at *2 (D. Mont. Feb. 1, 2021).

Whether other public entities may voluntarily choose to provide a particular service has no bearing on whether *Plaintiff* was entitled to an auxiliary aid or service on March 29, 2019, or, if so, the type of auxiliary aid that would have been appropriate and reasonable under Plaintiff's specific circumstances.  Indeed, the mere fact a public entity may voluntarily choose to provide a particular service, under their specific circumstances, says nothing about whether that service is *required* as a matter of law under the ADA or any other statute.  Assuming for argument's sake that an accommodation was required during Plaintiff's March 29, 2019, visit to the CRO, meaning the provision of an auxiliary aid or service, the applicable law provides that whether a particular accommodation is reasonable depends on the individual circumstances of each case and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) ("the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry").  "The issue is not what would be reasonable in a general sense, but what would be reasonable given the individualized facts before the court." *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  Further, the ADA's effective communication provision for

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

Title II, at 28 C.F.R. section 35.160, provides that the "type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). Thus, the relevant analysis in this action must be *specific to Plaintiff and her specific circumstances during her visit to the CRO on March 29, 2019*, not circumstances involving a different public entity, at a different time, in a different situation and context entirely.

**B. Evidence Related to "Scribe Services" Provided By Other Public Entities is Unfairly Prejudicial, Confusing, Speculative, Constitutes Hearsay, and Lacks Foundation**

Even relevant evidence may be excluded at trial if its probative value is substantially outweighed by the danger of unfair prejudice. Federal Rules of Evidence 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or a needless presentation of cumulative evidence."

Rule 403 requires the prejudice be "unfair." *U.S. v. Young*, 754 F. Supp. 739, 742 (D.S.D. 1990). "Unfair" in this context means the evidence has an undue tendency to suggest a jury decision based upon an improper basis, usually an emotional one. *Young*, 754 F. Supp. at 742. Additionally, where evidence is not closely related to the issue being charged and is otherwise irrelevant, the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. *U.S. v. Guerrero*, 756 F.2d 1342, 1348 (9th Cir. 1984); *U.S. v. Black*, 20 F.3d 1458, 1464 (9th Cir. 1994).

Even if evidence of other public entities providing "scribe services" were somehow relevant, which it is not, this evidence should be excluded under Federal Rules of Evidence 403, as any probative value is substantially outweighed by the danger of undue prejudice, misleading the jury, and causing undue delay and waste of time. The introduction of evidence of, or reference to, the provision of "scribe services" by a different public entity under different circumstances would be unduly prejudicial to the County. Jurors may subconsciously infer, even if instructed otherwise, that the mere fact a different public entity provided scribe services under different circumstances means the County was required to provide such services to Plaintiff on March 29, 2019. Jurors may also be confused about the relevant standard and focus on these purported instances of different public entities providing scribe services under different circumstances, instead of focusing

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

1   on the individualized circumstances Plaintiff encountered during her visit to the CRO on March 29, 2019.

2   Thus, making reference to such topics during the trial would be unduly inflammatory and would result in

3   extreme prejudice to Defendants.  Allowing this evidence or references also would only serve to confuse the

4   issues as jurors may feel compelled to spend their time deliberating about these other alleged public entities

5   providing scribe services in different circumstances, instead of Plaintiff's individualized circumstances on

6   March 29, 2019, and thus ignore the evidence relevant to *this* case.  Reference to the subject items could

7   certainly mislead the jury and could unduly prolong the trial and waste valuable judicial resources, as the

8   County would be forced to rebut such evidence, which has no correlation to the facts of this case.

9        If evidence of or reference to the provision of scribe services by different public entities under different

10   circumstances were permitted, the County would have to bear the burden of defending themselves against not

11   only the specific allegations of this action, but also against the irrelevant, vague, incomplete, and unreliable

12   hearsay allegations regarding these other public entities.  The waste of judicial time involved in holding a

13   "mini-trial" on each and every such alleged instance of a different public entity providing scribe services under

14   different circumstances cannot be justified.  Further, the evidence of such services being provided by other

15   public entities under different circumstances, which is anticipated to come from Plaintiff and potentially other

16   witnesses called by Plaintiff, constitutes inadmissible hearsay, is fatally speculative, and lacks foundation.

17   There have been no witnesses in this matter from any of these different public entities which allegedly provided

18   scribe services in other circumstances, at other times.  As such, there is no evidence in this matter concerning

19   the specific reasons these other public entities allegedly provided scribe services, and any testimony from

20   Plaintiff or any other witnesses in that regard would constitute inadmissible speculation and/or hearsay.  While

21   Plaintiff is certainly offering this testimony to infer that scribe services are required under the ADA, that

22   assumption cannot be made from the mere fact that another public entity voluntarily opted to provide scribe

23   services.

24   ## III.       CONCLUSION

25        For these reasons, the County respectfully requests that the Court grant the County's Motion *in Limine*

26   No. 1 and exclude any evidence, testimony or argument regarding other public entities allegedly providing

27   "scribe services."

28   ///

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

**Motion *in Limine* No. 2 to Exclude Evidence of Other Individuals' Experiences With the County or Other Public Entities**

## I.   SUMMARY OF ARGUMENT AND KEY FACTS

Plaintiff Lisamaria Martinez ("Plaintiff"), a disability-rights activist with a vision disability, claims to have been subjected to disability discrimination on March 29, 2019, by employees of the County Clerk-Recorder's Office ("CRO"), when Plaintiff sought to file a Fictitious Business Name Statement ("FBNS") at the CRO's physical office in Oakland, California.  Specifically, and despite the fact Plaintiffs' own recordings of the incident reflect fluent communications between Plaintiff and the County's employees, Plaintiff alleges that the County failed to provide Plaintiff with an auxiliary aid or service, in the form of "scribe services," which Plaintiff claims was necessary to ensure "effective communication" between Plaintiff and the County and for Plaintiff to enjoy the benefits of the CRO's programs, services, or activities.  Plaintiff brings suit for disability discrimination under the ADA and derivative state statutes.

The County's Motion *in Limine* No. 2 seeks to exclude any evidence of other individuals' experiences with the County or other public entities, particularly other persons with disabilities who have requested accommodations from the County or other public entities.  Plaintiff has offered several proposed witnesses who will testify about their alleged experiences requesting accommodations from the County, and potentially other public entities, including Marco Salsiccia, Lucia Greco, and Raymond Leimana Akahi Macapagal.[1]  (Fine Decl., ¶ 3, Ex. A.)  Further, one of Plaintiff's expert witnesses, Steven Clark, intends to testify that Plaintiff's counsel was provided with scribe services on an FBNS during their visit to the CRO together in August 2023, in connection with their work on this case.  (Fine Decl., ¶ 4, Ex. B at PL_EXPERT0054.)  In essence, Plaintiff appears to be trying to use these other individuals' alleged experiences with the County to infer that the County was required to provide Plaintiff with "scribe services" during Plaintiff's visit to the CRO on March 29, 2019.  However, such evidence should be excluded as (1) irrelevant (Fed. R. Evid. 401, 402); (2) unduly prejudicial, confusing and misleading to the jury (Fed. R. Evid. 403); (3) hearsay (Fed. R. Evid. 801-807); (4) speculative and unsupported (Fed. R. Evid. 402, 403); and (5) lacks foundation.

---

[1] The focus of this motion pertains to the testimony these non-party witnesses intend to offer regarding their personal experiences with the County and their contention that they were provided "scribe services" by the County.  However, to the extent any of these witnesses also seek to testify regarding their experiences with *other* public entities and corresponding accommodations that were requested or provided, such evidence should likewise be excluded for the same reasons.

ORBACH HUFF + HENDERSON LLP

1    II.    **LEGAL ARGUMENTS**

2          A.    **Evidence of Other Individuals' Experiences Is Not Relevant**

3          Federal Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the

4    existence of any fact that is of consequence to the determination of the action more probable or less probable

5    than it would be without the evidence."  Rule 402 establishes that while all relevant evidence is admissible,

6    "[e]vidence which is not relevant is not admissible."  Whether a fact is "of consequence" "is determined by the

7    substantive law which governs the action."  *United States v. Shomo*, 786 F.2d 981, 985 (10th Cir. 1986).  All of

8    Plaintiff's claims are derivative of her claim under Title II of the ADA.  Thus, in this case, the ADA determines

9    whether evidence is "of consequence."  Fed. R. Evid. 401; see also *Hutchinson v. City of Thompson Falls*, No.

10   CV 19-195-M-DLC, 2021 WL 321886, at *2 (D. Mont. Feb. 1, 2021).

11         Assuming for argument's sake that an accommodation was required during Plaintiff's March 29, 2019,

12   visit to the CRO, meaning the provision of an auxiliary aid or service, the applicable law provides that whether a

13   particular accommodation is reasonable depends on the individual circumstances of each case and requires a

14   fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that

15   might allow him to meet the program's standards.  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002);

16   *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) ("the determination of what constitutes reasonable

17   modification is highly fact-specific, requiring case-by-case inquiry").  "The issue is not what would be

18   reasonable in a general sense, but what would be reasonable given the individualized facts before the court."

19   *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  Further, the ADA's effective

20   communication provision for Title II, at 28 C.F.R. section 35.160, provides that the "type of auxiliary aid or

21   service necessary to ensure effective communication will vary in accordance with the method of communication

22   used by the individual; the nature, length, and complexity of the communication involved; and the context in

23   which the communication is taking place."  28 C.F.R. § 35.160(b)(2).  Thus, the relevant analysis in this action

24   must be *specific to Plaintiff and her specific circumstances during her visit to the CRO on March 29, 2019*, not

25   some other individual and their separate and unique circumstances at some different point in time, whether with

26   the County or some other public entity.

27   ///

28   ///

- 6 -

Further, the fact Plaintiff will present witnesses who will testify that some rogue County employee may have, at some point in the past, provided them with "scribe services," does not in any way establish that scribe services were or are *required* as a matter of law.  As a matter of common sense, a voluntary act does not give rise to an assumption that the act was legally required.  Similarly, the fact a rogue County employee may have provided scribe services to some other individual in the past does not mean that Plaintiff was entitled to any accommodation *in this matter*, on the day of the incident, or that scribe services constituted a reasonable and appropriate auxiliary aid or service, *in this matter*, *under Plaintiff's specific circumstances*.

**B.    Evidence Related to Other Individuals' Experiences is Unfairly Prejudicial, Confusing, Speculative, Constitutes Hearsay, and Lacks Foundation**

Even relevant evidence may be excluded at trial if its probative value is substantially outweighed by the danger of unfair prejudice.  Federal Rules of Evidence 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or a needless presentation of cumulative evidence."

Rule 403 requires the prejudice be "unfair."  *U.S. v. Young*, 754 F. Supp. 739, 742 (D.S.D. 1990). "Unfair" in this context means the evidence has an undue tendency to suggest a jury decision based upon an improper basis, usually an emotional one.  *Young*, 754 F. Supp. at 742.  Additionally, where evidence is not closely related to the issue being charged and is otherwise irrelevant, the probative value of such evidence is substantially outweighed by the danger of unfair prejudice.  *U.S. v. Guerrero*, 756 F.2d 1342, 1348 (9th Cir. 1984); *U.S. v. Black*, 20 F.3d 1458, 1464 (9th Cir. 1994).

Even if evidence of other individuals' experiences at the County, or with other public entities, were somehow relevant, which it is not, this evidence should be excluded under Federal Rules of Evidence 403, as any probative value is substantially outweighed by the danger of undue prejudice, misleading the jury, and causing undue delay and waste of time.  The introduction of evidence of, or reference to, other individuals who claim to have received "scribe services" provided by the County, or other public entities, would be unduly prejudicial to the County.  Jurors may subconsciously infer, even if instructed otherwise, that the mere fact some rogue County employee is alleged to have provided scribe services to a disabled individual in the past means that Plaintiff was entitled to an accommodation on March 29, 2019, that the County was required to

ORBACH HUFF + HENDERSON LLP

1  provide scribe services to Plaintiff on March 29, 2019, and/or that scribe services must have constituted a

2  reasonable accommodation on March 29, 2019.

3       Jurors may also be confused about the relevant standard and focus on these purported instances of non-

4  parties who were allegedly provided scribe services under different circumstances, instead of focusing on the

5  individualized circumstances of Plaintiff during her visit to the CRO on March 29, 2019.  Thus, making

6  reference to such topics during the trial would be unduly inflammatory and would result in extreme prejudice to

7  Defendants.  Allowing this evidence or references also would only serve to confuse the issues as jurors may

8  feel compelled to spend their time deliberating about these other individuals who were allegedly provided

9  scribe services by the County, and ignore the evidence relevant to *this* case.  The *only* evidence relevant to this

10 case pertains to *Plaintiff's* specific circumstances during her visit to the CRO on March 29, 2019.  Reference to

11 the subject items could certainly mislead the jury and could unduly prolong the trial and waste valuable judicial

12 resources, as the County would be forced to rebut such evidence, which has no correlation to the facts of this

13 case.

14      If evidence of or reference to the County's alleged provision of scribe services to nonparties, under

15 different circumstances, were permitted, the County would have to bear the burden of defending themselves

16 against not only the specific allegations of this action, but also against the irrelevant, vague, incomplete, and

17 unreliable hearsay allegations regarding these other interactions between nonparties and the County.  Further,

18 such evidence constitutes inadmissible hearsay, is fatally speculative, and lacks foundation.  Plaintiff has not

19 identified any specific County employees who have allegedly provided "scribe services" to any disabled

20 individuals, at any point.  As such, there is no evidence in this matter concerning the specific reasons these

21 alleged County employees allegedly provided scribe services to disabled individuals, and any testimony from

22 Plaintiff or any other witnesses in that regard would constitute inadmissible speculation and lack foundation.

23 While Plaintiff is certainly offering this testimony to infer that scribe services are required under the ADA, that

24 assumption cannot be made from the mere fact that some rogue County employee is alleged to have provided

25 scribe services in the past, on his or her own accord.

26 ///

27 ///

28 ///

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

**III.   CONCLUSION**

For these reasons, the County respectfully requests that the Court grant the County's Motion *in Limine* No. 2 and exclude any evidence, testimony or argument regarding other individuals' experiences with the County or other public entities, particularly with respect to requests for accommodations and the provision of scribe services.

Dated:  January 25, 2024

Respectfully submitted,

**ORBACH HUFF + HENDERSON LLP**

By:   */s/ Nicholas D. Fine*
Kevin E. Gilbert
Nicholas D. Fine
Attorneys for Defendant
COUNTY OF ALAMEDA

Defendant Co/Alameda's Notice of Motion and MILs Nos. 1 and 2; Dec of N. Fine [20-cv-06570-TSH]

## DECLARATION

I, Nicholas D. Fine, declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts in the State of California and the United States District Court – Northern District of California.  I am an attorney with Orbach Huff + Henderson LLP and one of the attorneys of record for Defendant County of Alameda ("County").  If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this Declaration, except as to those matters that are stated on information and belief herein.

2.      This Declaration is submitted for the purpose of presenting evidence in support of the County's Motions *in Limine* Nos. 1 and 2.

3.      Attached as **Exhibit A** is a true and correct copy of Plaintiff's Amended Exchanged Pretrial Disclosures.

4.      Attached as **Exhibit B** is a true and correct copy of Steven Clark's expert reports in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25th day January, 2023, at Pleasanton, California.

 */s/ Nicholas D. Fine*
Nicholas D. Fine

ORBACH HUFF + HENDERSON LLP

# EXHIBIT A

TIMOTHY ELDER (CA BAR NO. 277152)
**TRE LEGAL PRACTICE**
1155 Market Street, Tenth Floor
San Francisco, CA 94103
Telephone:      (415) 873-9199
Facsimile:      (415) 952-9898
Email:          telder@trelegal.com


S. Tomiyo Stoner (CA Bar No. 289246)
**Undaunted Law Firm, P.C.**
600 California St., Floor 7
San Francisco, CA 94108
Telephone:      (214) 415-7340
E-mail:         tstoner@undauntedlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LISAMARIA MARTINEZ**, | Case No. 3:20-cv-06570-TSH |
| Plaintiff, | **PLAINTIFF'S AMENDED EXCHANGED PRETRIAL DISCLOSURES** |
| v. | |
| **COUNTY OF ALAMEDA**, **MELISSA WILK**, in her individual capacity, **EVA HE**, in her individual capacity, **MARIA LAURA BRIONES**, in her individual capacity, | |
| Defendants | |

**PLAINTIFF'S EXCHANGED PRETRIAL DISCLOSURES**

Per the Court's Case Updated Management Order (ECF No. 87) and FRCP 26(a)(3), Plaintiff

provides the following pretrial disclosures.

**I.   WITNESS LIST**

**Lisamaria Martinez**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

Plaintiff will testify as to all aspects of the claims and defenses presented herein. See Plaintiff's deposition for further detail. Direct examination is anticipated to take approximately 3 hours.

**Joseph A. Bakker**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

4513 Fernandez St.
Union City, CA 94587
(408) 410-8228

Plaintiff's husband will testify as to the tools, techniques and technologies Ms. Martinez uses on a daily basis to navigate the world as a person who is blind. He will testify about the assistance that he had to provide to help Plaintiff fill out the inaccessible FBN PDF forms. He will also testify as to the emotional and stigmatic injury suffered by Ms. Martinez. Direct examination is anticipated to take 1.5 hours.

**Emily Grimm**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

34862 Lilac St.
Union City, CA 94587
(707) 704-0416

Ms. Grimm will testify as to the process of acting as a qualified reader as she performed it for Ms. Martinez. Ms. Grimm will also testify as to her experiences accompanying Ms. Martinez to the CRO on a second occasion and the charges Plaintiff incurred for using her services at a rate of $25 per hour. She will also testify as to the emotional and stigmatic injury suffered by Ms. Martinez. Direct examination is anticipated to take 1.5 hours.

1

2

**Marco Salsiccia**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

3

4

10405 Foothill Blvd.
Oakland, CA 94605
(408) 314-5401

5

6

7

Mr. Salsiccia will testify about the experience of using a County scribe to complete and file a paper FBNS form between 12/8/2022 and 12/22/2022 in the Oakland Clerk Recorder's Office. Direct examination is anticipated to take 1 hour.

8

9

10

**Lucia Greco**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

11

12

819 Peralta Ave.
Berkeley, CA 94707
(510) 918-9621

13

14

Ms. Greco will testify about the experience of using a County scribe to complete and file a paper FBNS form between 12/8/2022 and 12/22/2022 in the Oakland Clerk Recorder's Office. Direct examination is anticipated to take 1 hour.

15

16

17

**Corporate Representative for County of Alameda**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

18

19

20

The Corporate Representative is expected to testify as to the relevant policies of the CRO and all aspects of the defenses brought by the county. Direct examination is anticipated to take 2-3 hours.

21

22

**Angelina Moran**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

23

24

25

Ms. Moran is expected to testify as to Ms. Martinez's attempts to file the FBN, the policies of the CRO as she understood them, her prior training, and all other matters relevant to the defenses of the County of Alameda. Direct examination is anticipated to take 1-2 hours.

26

27

28

**Matt Yankee**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

Mr. Yankee will testify as to the relevant policies of the CRO, his understanding of the ADA, deliberate indifference, damages and all aspects of the defenses brought by the county. Direct examination is anticipated to take 2-3 hours.

**Expert Witnesses**

**Steven Clark**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

2 McLea Court, Suite 201
San Francisco, CA 94103
(415) 409-6650

Mr. Clark will testify at the trial of this case as an expert pursuant to Fed. R. Evid. 702-705. He will testify regarding the matters and opinions stated in his report based on education, training, and experience. Direct examination is anticipated to take 2 hours.

**Karen McCall**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

64 West River Street
Paris ON Canada N3L 2V1
(519) 442-2856

Ms. McCall will testify at the trial of this case as an expert pursuant to Fed. R. Evid. 702-705. She will testify regarding the matters and opinions stated in her report based on education, training, and experience. Direct examination is anticipated to take 2 hours.

**Eve Hill**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
(410) 962-1030

Ms. Hill will testify at the trial of this case as a rebuttal expert pursuant to Fed. R. Evid. 702-705. She will testify regarding the matters and opinions stated in her report based on education, training, and experience. Her examination is anticipated to take 1-2 hours if she is called for rebuttal testimony.

**Witnesses to be Called if the Need Arises**

**Maria Laura Briones**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

Ms. Briones is expected to testify as to Ms. Martinez's attempts to file the FBN, the policies of the CRO as she understood them, her prior training, her understanding of the ADA, deliberate indifference, damages and all other matters relevant to the defenses of the County of Alameda. Direct examination is anticipated to take 1-2 hours if this witness is called.

**Melissa Wilk**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

Ms. Wilk is expected to testify as to the relevant policies of the CRO, deliberate indifference, damages, and all aspects of the defenses brought by the county. Direct examination is anticipated to take 1-2 hours if this witness is called.

**Eva He**
c/o ORBACH HUFF, et al.
6210 Stoneridge Mall Road, #210
Pleasanton, CA 94588

Ms. He is expected to testify as to Ms. Martinez's attempts to file the FBN, the policies of the CRO as she understood them, her prior training, her understanding of the ADA, deliberate indifference, damages, and all other matters relevant to the defenses of the County of Alameda. Direct examination is anticipated to take 1-2 hours if this witness is called.

**Raymond Leimana Akahi Macapagal**
c/o TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, CA 94103

2430 Road 20
Apt. 3B01
San Pablo, CA 94806
(619) 206 9667

Mr. Akahi may testify at the trial of this case about his experience of using the County of Alameda's computer kiosk and JAWS system and/or other arrangements to complete forms at the CRO in Oakland. Direct examination is anticipated to take 1.5 hours if this witness is called.

Plaintiff reserves the right to call any witness designated by Defendants.

## II.   PLAINTIFF'S PROPOSED EXHIBITS

Exhibit 1 – Title II Elements and Jury Charge Demonstrative Chart(s)

Exhibit 2 – Excerpts from the Code of Federal Regulations – He Dep. Ex. H1

Exhibit 3 – DOJ Guidance – Briones Dep. Ex. B1 and all sources referenced therein

Exhibit 4 –DOJ Publication – ADA Requirements – Effective Communication,

https://www.ada.gov/resources/effective-communication/

Exhibit 5 – DOJ ADA Title II Technical Assistance Manual, Equally effective communication and Primary consideration § II-7.1000-1100, https://archive.ada.gov/taman2.html#II-7.1000

Exhibit 6 – Demonstrative Photographs of the CRO Public Waiting Area, PL1573, PL1583

Exhibit 7 – Plaintiff's Initial Completed FBN Form – Briones Dep. Ex. M2, PL0009

Exhibit 8 – Be Confident Be You Articles of Incorporation – PL0007-8

Exhibit 9 – Go Back Letter – Briones Dep. Ex. M1, County_0012

Exhibit 10 – Final Filed FBN – Briones Dep. Ex. M4, County_0011

Exhibit 11 – Letter to Ziegler & Welk at the County of Alameda re Structured Negotiations (11/14/19), County_001-010

Exhibit 12 – Martinez family mementos

Exhibit 13 – Photographs/promotional materials from Be Confident Be You™

Exhibit 14 – Audio recordings and/or transcripts of the incident in question – PL0001, PL0003, PL0005

Exhibit 15 – Plaintiff's Claim Against the County of Alameda – Yankee 30(b)(6) Dep. Ex. Y1, PL0014-16

Exhibit 16 – Acknowledgement of Plaintiff's Claim – Yankee 30(b)(6) Dep. Ex. AC3

Exhibit 17 – "May I Help You? Legal Advice vs. Legal Information: A Resource Guide for Court Clerks" (California Judicial Council Access and Fairness Advisory Committee), https://www.courts.ca.gov/documents/mayihelpyou.pdf, PL0047-PL0058

Exhibit 18 – "Can the court system help me fill out a form as an accommodation," NYCOURTS.GOV Accessibility General FAQ's, https://ww2.nycourts.gov/Accessibility/faqs.shtml, PL0059-PL0066

Exhibit 19 – "How to ask for a court accommodation under the Americans with Disabilities Act," Mass.gov, https://www.mass.gov/info-details/how-to-ask-for-a-court-accommodation-under-the-americans-with-disabilities-act, PL0067-PL0070

Exhibit 20 – Fictitious Business Name PDF dated 10/18 – McCall Report, Ex. 1, PL1547

Exhibit 21 – Fictitious Business Name PDF dated 4/21 – McCall Report, Ex. 2, PL1549

Exhibit 22 – Fictitious Business Name PDF dated 11/22 – McCall Report, Ex. 3, PL1551

Exhibit 23 – Fictitious Business Name PDF dated 12/22 –McCall Report, Ex. 4, PL1553

Exhibits 24 - Graphic figures from 10/02/23 expert report of Steven Clark, PL_EXPERT0046-51

Exhibit 25 – Demonstrative $100 bill

Exhibit 26 – Demonstrative clock timer

Exhibit 27 – Demonstrative ink pen

Exhibit 28 – Demonstrative Kleenex package

### Exhibits to Be Offered if the Need Arises

Exhibit 29 – Memorandum with JAWS instructions sent to Clerks describing the process of accommodating a blind applicant who cannot use JAWS, County_0121-23

Exhibit 30 – County Budgets – PL0071-0584, PL0585-1056, PL1057-1546

Exhibit 31 – California Government Code 2720 – Yankee 30(b)(6) Dep. Ex. AC5

Exhibit 32 – Defendants' Discovery Responses

Exhibit 33 – Defendants' Initial Disclosures

Plaintiff reserves the right to use all evidence designated by Defendants and all deposition exhibits, document productions, and other discovery materials for impeachment purposes.

### III. DESIGNATION OF DEPOSITION TESTIMONY

Plaintiff intends to present all witnesses live or over real-time video conference as permitted by the Court. However, in the event of the unavailability of a witness at trial, Plaintiff provides disclosures as set forth in **Exhibits A-E**. Plaintiff reserves the right to use all non-designated testimony for impeachment.

DATED: October 10, 2024                    Respectfully submitted,

                                           TRE LEGAL PRACTICE

                                           */s/ Timothy Elder*
                                           Timothy R. Elder

                                           *Attorneys for Plaintiff*

# Exhibit A

# Briones, Maria Laura - Vol. I

brian

### Page 6

4 5 6 7 8 9 10 11 12 13 14 15 16 17 THE REPORTER: Good morning. We are on the record for the deposition of Maria Laura Briones. Today's date is January 26, 2022, and the time is 9:53 a.m. My name is Kevin McGuire. I am the digital reporter for today's proceedings. Will Counsel please introduce themselves and state whom they represent, beginning with counsel for the plaintiff? MR. ELIA: This is Albert Elia, counsel for Plaintiff, Lisamaria Martinez. MR. FINE: This is Nick Fine, counsel for the County of Alameda, Ms. Briones, Ms. He, and -- I think that's it. Oh, Ms. Wilk, excuse me. THE REPORTER: Can Ms. Briones please raise your right hand?

18 19 20 21 22 23 24 25 (WHEREUPON MARIA LAURA BRIONES, having been first duly sworn to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:) THE REPORTER: Okay. Thank you. You may take your hand down. And Counsel, you may proceed.

### Page 7

2 3 4 5 6 7 BY MR. ELIA: Q. Good morning, Ms. Briones. My name is Albert Elia. I'm representing Ms. Martinez in this matter. I want to make sure I pronounce your name correctly. Is it Briones or Briones? How do you prefer? A. Briones.

### Page 9

9 10 11 12 13 14 15 16 17 18 19 Q. Where are you currently employed? A. I'm currently employed at the clerk-recorder's office under the Auditor-Controller Agency. Q. And what's your current position there? A. I'm a clerk-recorder supervisor II. Q. And what are the responsibilities of a clerk-recorder supervisor II? A. I manage and supervise subordinates in the clerk-recorder's office. Specifically for my unit, I supervise the vital records and general business unit.

### Page 13

5 6 7 8 9 10 11 Q. Okay. Thank you. I'm going to refer to the clerk-recorder's office as the CRO; is that okay? A. Sure. Q. Thank you. So as a supervisor, do you train front-line CRO staff? A. Yes. I do. I train all the staff that come into my

### Page 18

21 22 23 24 25 Q. Okay. Do you know which policies that pertain to customers with disabilities in the CRO are written down and which ones are not? A. No. I don't know. Q. Okay. But it is your testimony today, and I

### Page 19

1 2 3 4 5 6 7 8 want to make sure I'm very clear on this, that there are some policies that pertained to customers with disabilities in the CRO that are written down; is that correct? MR. FINE: Vague as to policies. You can answer if you understand the question. A. No. There's no written -- specific written policy.

19 20 21 22 23 BY MR. ELIA: Q. Are all of the policies that pertain to customers with disabilities and the CRO unwritten policies? A. Yes.

### Page 20

6 7 8 9 10 11 Q. Is it your understanding that the ADA requires that the CRO sometimes modify policies and procedures to accommodate persons with disabilities? MR. FINE: Vague and ambiguous, calls for legal conclusion. You can answer if you understand. A. I don't know.

12 13 14 15 16 17 18 19 20 21 22 23 24 Q. Is there an ADA coordinator for the CRO? A. Is there a-- Q. An ADA coordinator for the CRO? A. I don't know. Q. So do you understand that when I say ADA, I'm referring to the Americans with Disabilities Act? A. I do. Q. Okay. So is it your understanding that CRO policies can never be changed to accommodate persons with disabilities? MR. FINE: Lacks foundation, calls for speculation. You can answer if you know. A. I don't know.

### Page 22

24 25 Q. On March 29, 2019, did you understand that Ms. Martinez was blind?

### Page 23

1 2 A. She indicated to me that she was visually impaired.

22 23 24 25 Q. Did you understand -- and again, these questions are all what you understood on March 29, 2019. So March 29, 2019, did you understand blindness to be a disability?

### Page 24

1 2 MR. FINE: Calls for legal conclusion. A. Yes

9 10 11 12 13 14 15 16 17 18 19 20 Q. Okay. On March 29, 2019, did you understand that the ADA affords protections to persons with disabilities seeking county services? MR. FINE: Calls for legal conclusion, overbroad. A. For copy services? Q. I'm sorry, for county services. A. County services. MR. FINE: Same objections. A. Well, I know there's reasonable accommodation for persons with disabilities that we do provide in our office up until the point where it is a request that is illegal or improper.

### Page 25

17 18 19 20 21 22 23 24 Q. I understand that. Did you understand that she was seeking that assistance as an aid or service that she needed because of her disability? A. I understood that she was asking for the service. Q. Okay. And that you understood that she was asking for it because of her disability? A. Yes

25 Q. Thank you. Did you provide her with the

**Page 26**

1 2 assistance she sought? A. No.

**Page 27**

3 4 5 6 7 8 9 10 11 12 13 Q. Did you tell Ms. Martinez that what she was asking for was not reasonable? A. I did. Q. Did you provide her with any other aid, service, or modification -- scratch that. Did you provide her with any other aid, service, or accommodation that would have enabled her to record and deposit her FBN form on March 29, 2019? MR. FINE: Lacks foundation and calls for speculation. A. No.

14 15 16 17 18 19 20 21 22 23 24 25 Q. Did you suggest any other aid, service, or accommodation that would have enabled her to record and deposit her FBN form in the CRO while she was already there on March 29, 2019? MR. FINE: Same objections. A. Yes. I suggested to her if -- asked her if she had someone accompanying her on this day that could assist her that she could ask to assist her on completing the a -- and making the changes on the FBN informed. Q. Okay. And did you suggest any other anything else besides that?

**Page 28**

1 2 3 4 5 6 A. No. Not while she was there. Q. Okay. Did you suggest anything after she left? A. I did -- I did provide her with a rejection letter and gave her the option to mail in her fictitious business statement.

21 22 23 24 25 Q. Okay. Did you understand that if Ms. Martinez was not blind, she would have been able to record and deposit her FBN form in the CRO on March 29, 2019 while she was already there? MR. FINE: Lacks foundation, calls for speculation

17 18 19 20 Did you understand that unless you provided her the assistance she requested, she would not be able to record and deposit for FBN form on March 29, 2019 while she was already at the CRO? A. Yes.

**Page 29**

1 2 3 4 A. If she would've been able to make the corrections and have the -- and meet the requirements that were asked of her. She would have been able to file it that day and pay for the filing.

**Page 33**

13 14 15 16 17 18 A. I can see one of the documents. It's the rejection letter that was given to Ms. Martinez. Q. So you recognize this document? A. Yes. Q. Do you know who created this document? A. I believe I did.

**Page 34**

17 18 19 20 21 22 23 24 25 Q. How did you -- how did you learn to write rejection

letters? A. I was trained to write rejection letters. Q. And who trained you? A. My supervisor at the time. Q. Okay. And when that person trained you on how to write rejection letters, they never mentioned anything about legal advice or being concerned that you weren't giving legal advice?

### Page 35

1 2 3 4 5 6 7 8 A. We base it on what's wrong with the filing, and we're simply giving the requirements that are needed. Q. Okay. So no one's ever told you that telling people what's wrong with their FBN forms and telling them how to correct it is legal advice? MR. FINE: Misstates testimony. A. No.

17 18 19 20 21 22 Q. Does the CRO have a policy regarding written decisions about denying accommodations to persons with disabilities to request them? MR. FINE: Vague and ambiguous. You can answer if you understand the question. A. No.

### Page 36

4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 Q. Did you offer to do anything more for Ms. Martinez than you would have done for a similarly-situated non-disabled person? MR. FINE: Same objection. You can answer. A. I off- -- I offered to write the rejection letter, which we typically do not do at the front counter. So I did offer that to Ms. Martinez. Q. Okay. So how do rejection letters typically come about if not at the counter? A. Typically, it's something we receive in the mail when we don't have the customer at the counter. Because at the counter, we're able to explain to them what corrections need to be made, and so this is -- this -- rejection letters are used primarily for a request we receive by mail.

19 20 21 22 23 Q. I see. So does that mean that typically when a customer comes to the counter, you tell them what's wrong and you rely on the customer to write down the information? A. Yes.

### Page 37

25 A. Ms. Moran informed me of the situation with

19 20 21 22 23 24 did you discuss Ms. Martinez's request with anybody else while she was in the CRO? A. Yes. Q. Who? A. With Ms. Moran, Ms. Cole, and Ms. He. Q. Okay. And what did you discuss with Ms. Moran?

### Page 38

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 Ms. Martinez, and she informed me that Ms. Martinez -- of her request and that Ms. Martinez was accusing our office of disability discrimination. That she was being discriminated against. Q. Okay. And was that everything you discussed with Ms. Moran? A. Well, the -- the detail -- Q. I'm sorry, is that everything you discussed with Moran on March 29, 2019, while Ms. Martinez was in the office? A. Yes. Q. Okay. And you said Ms. He. Is that Eva He? A. Yes. Q. And can you tell me what you discussed with Ms. He? A. With Ms. He, I informed her of the situation with this customer, Ms. Martinez, and we had a discussion about what she was demanding and about our office unable to provide her with assistance she was

requesting. It was against our policy.

21 22 23 24 25 Q. And do you remember what you -- do you remember specifically what you said to Ms. He? A. Not specifically, just to that effect. Q. Okay. And do you remember what Ms. He said to you?

### Page 39

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 A. Well, from my recollection, it was her informing me that we were unable to assist her with her demand in this case because FBN is a document that's signed under penalty of perjury, and we don't do that for any customer whether it's disability or not. It's just not a practice and policy we do in our office, so it would go against our policy. Q. Okay. And you said you discussed this with Ms. Cole as well; is that correct? A. Yes. Q. Is that Jocelyn Cole? A. Yes. Q. And what did you discuss with Ms. Cole? A. It was the same -- from what I recall, it was about the same situation with this customer and the incident. So it was -- it was the same.

### Page 40

14 15 16 17 18 19 20 21 22 23 24 25 Q. Okay. When you were speaking with Ms. Moran, Ms. Cole, or Ms. He, did you do any research on the requirements of the ADA? A. I -- not when I was speaking to them, but -- Q. Okay. A. -- I did do some research. I did Google ADA accommodations on my computer. Q. Okay. And that was while Ms. Martinez was in the office? A. Yes. She was. Q. And do you remember if that was before or after you spoke to Ms. Cole and Ms. He?

### Page 41

1 2 3 4 5 6 7 8 9 10 11 12 13 A. I don't recall. Q. I apologize. Do you remember if you did that before you spoke to Ms. Cole? A. I believe I did. Q. Okay. And what did you learn from your research on the ADA from Google? A. Well, the -- from what I can remember, I just saw some examples of ADA accommodations, but I didn't spend too much time researching it, like, further. It was just a brief search. Q. Okay. And did you discuss what you found with either Ms. Cole or Ms. He? A. No.

### Page 43

14 15 16 17 18 19 20 21 22 23 24 25 Q. Yeah. That's fine. Okay. In that case, Ms. Briones, I would actually ask you -- if we go back to page 7 and the paragraph that begins with "similarly," if you could actually read that out loud into the record. A. Okay. "Similarly, those serving as readers for people who are blind or have low vision must also be qualified. For example, a qualified reader at an office where people must apply for permits would need to be able to read information on the permit process accurately and in a manner that the person requiring assistance can understand. The qualified reader would

### Page 44

1 2 3 4 5 6 7 8 also need to be capable of assisting individual in completing forms by accurately reading instructions and recording information on such form in accordance with each forms instruction and instructions provided by the individual who requires

the assistance." Q. Thank you very much. When you were doing your research on Google, did you encounter this guidance?

9 10 11 12 13 14 15 A. No. Q. Okay. Had you encountered this guidance, would you have provided Ms. Martinez with the assistance she requested? MR. FINE: Incomplete hypothetical. Calls for speculation. Lacks foundation. A. No.

**Page 47**

13 14 15 16 17 18 19 20 21 22 23 24 25 Q. I'm going to give you a hypothetical situation, and it's complicated. So I'm going to go assumption by assumption. And I'm going to ask you if you understand and if you don't understand, I'll explain it and then we'll move on; is that okay? A. Okay. Q. Okay. So we're assuming that Ms. Martinez is the business owner as she stated on March 29, 2019, okay? A. Yes. Q. Also, assume that she had brought a sighted person with her on March 29, 2019, to assist her in filling out a form, okay?

**Page 48**

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 A. Okay. Q. Assume that that sighted person had obtained a blank FBN form identical to Exhibit B2 from the CRO, okay? A. Okay. Q. Assume that that sighted person read the information on the blank FBN form to Ms. Martinez, okay? A. Okay. Q. All right. Also, assume that that sighted person filled out the blank FBN form by transcribing information that Ms. Martinez dictated to her for each field of the form, okay? A. Okay. Q. Now, assume that when they were finished, the form that they filled out was identical to Exhibit M4 that's up on the screen, in all respects other than it would obviously be handwritten instead of typed, okay? A. Okay. Q. Now, assume that Ms. Martinez asked the sighted person to read back the form in its entirety to confirm that all the information was correct, okay? A. Okay.

24 25 Q. Assume also that the sighted person showed Ms. Martinez where to sign the form, okay?

**Page 49**

2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Assuming that Ms. Martinez then signed the form in the proper place after being shown by the sighted person, okay? A. Okay. Q. All right. Assume that the sighted person and Ms. Martinez did all of this at the counter in front of you, okay? A. Okay. Q. And finally, assume that Ms. Martinez had the $40 fee in a proper form that could be accepted by the CRO, okay? A. Okay. Q. All right. Assuming all those conditions, would you ever -- would you have determined that the resulting FBN form was recordable? MR. FINE: Incomplete, hypothetical, lacks foundation, calls for speculation. You can answer if you understand all the assumptions and the question. A. Well, we would ask one more requirement of Ms. Martinez. Q. Okay. A. Because she is filing as an LLC, in this situation, it is a requirement that we see a certified copy from the Secretary of State that she has filed her

**Page 50**

1 2 3 4 5 6 7 8 9 10 11 12 13 14 paperwork with them. So we asked for a copy of that document. Q. Okay. So -- thank you, I appreciate that. So assuming that she had provided -- that she had the document you just identified and provided it to you, then would you determine that the resulting FBN form was recordable? MR. FINE: Lacks foundation, calls for speculation, incomplete, hypothetical. A. Well, we would -- we will -- we would have reviewed it one more time to make sure that everything was completed properly, no -- nothing missing or incorrect. And then if no other corrections were needed, we would most likely file this FBN.

### Page 52

6 7 8 9 10 11 12 13 14 15 16 Q. You just said what -- you just said -- and please correct me if I'm paraphrase incorrectly because I'm unable to go back and look at the record for two minutes ago. But you said, well, she would be taking the risk. What did you mean by she would be taking the risk? A. She -- it's up to her if she wants to have someone else complete the form for her. Q. Okay. And so -- A. It's her choice -- her choice, not our choice.

### Page 61

7 8 9 10 Q. Okay. So does that mean that the only reason why you were -- you did not help Ms. Martinez is because of the CRO policy against it? A. Yes.

### Page 69

6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Must an FBN form be determined to be recordable before it is recorded and deposited in the CRO? A. Yes. Q. When you accept an FBN form to be recorded and deposited in the CRO, do you provide some sort of receipt? A. We do. Q. Can you describe what information is on that receipt? A. Sure. We have the name of the business listed on there. The -- the date, the file number, what method of payment was given to us. If it's a check number, we would have the check number. And then the amount of money given to us, and then the name of the employee that assisted. It's only the last name, first letter of their name, and a name or header. Q. Okay. So does that mean that an FBN form cannot be a record deposited in the CRO unless a receipt has been given?

### Page 70

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 MR. FINE: Calls for legal conclusion. You can answer based on your understanding. A. We -- we would need to collect payment before we can issue a receipt. Q. I understand. And so if you've not -- you already said that if you haven't collected payment, it's not a record deposited into the CRO, correct? A. Correct. Q. Okay. And so if you haven't given a receipt, it's not a record deposited into the CRO yet, correct? MR. FINE: It's -- call for legal conclusions. You can answer based on your understanding if you understand the question. A. So by us collecting the payment in our system and fulfilling all the procedure, that's what prompts the file number which is associated with this filing. So without us completing the process, there would be no file number associated, so therefore, it would not be filed in our office.

### Page 78

22 23 24 25 Q. You did not provide the auxiliary aid. The auxiliary service referred to in the prior paragraphs that you agreed she had asked for it? A. No.

## Page 79

1 2 3 4 5 6 7 8 9 10 11 12 13 14 MR. FINE: Misstates testimony. Q. Thank you. Could you please read the next sentence? A. "When asked under what legal authority she was refusing to assist, Ms. Briones cited no legal authority, but asserted that it was due to the form being signed under penalty of perjury." Q. Is that -- sounds accurate to the best of your recollection? A. To the best of my recollection, yes. Q. Could you please read the next sentence? A. "After approximately ten minutes of this discussion, Ms. Briones left to speak with someone of greater authority."

15 16 17 18 19 20 21 22 23 24 Q. To the best of your recollection, is that sentence accurate? A. Yes. Q. Okay. Now, in paragraph 26, would you please begin with the first sentence? A. "When Ms. Briones returned, she said she had spoken with Ms. Eva He, the assistant clerk-recorder, and said that Ms. He had confirmed that no one from the clerk-recorder's office would assist Ms. Martinez in completing her form."

25 Q. Is that sentence accurate to the best of your

## Page 80

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 recollection? A. Yes. Q. And the next sentence, please? A. "Ms. Martinez asked if Ms. He had cited any authority for that decision." Q. And is that sentence accurate to the best of your recollection? A. To the best of my recollection, because it's still a little -- I don't remember all the details. But as far as I can remember, yes. Q. Okay. And the next sentence, please? A. "Ms. Briones said that there was no legal authority, and that Ms. Briones would not no longer speak with Ms. Martinez. Ms. Martinez then walked away." Q. I'm sorry. I believe the sentence ends with "Ms. Briones then walked away," not Ms. Martinez then walked away; is that correct?

19 20 21 22 23 24 25 A. Oh, yes. I'll read it again. Q. Okay. Thank you. Go ahead. A. "Ms. Briones said that there was no legal authority and that Ms. Briones would no longer speak with Ms. Martinez. Ms. Briones then walked away." Q. Are those sentences correct to the best of your recollection?

## Page 81

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 A. I don't recall if I walked away at that time because during my interaction, I did provide her a rejection letter, also giving her the option to mail in her Fictitious Business Name Statement. And I don't recall if I did it before this or it was already after I had done that part. But at some point, I did walk away. Q. Okay. I see. So at some point, at the end of the conversation, you walked away when Ms. Martinez was still -- sorry, let me rephrase that. Did you walk away when Ms. Martinez was still attempting to convince you to assist her? A. No. Not at -- not at that time. I told her -- I repeated why we couldn't assist her, and there was nothing further that I could do.

16 17 18 Q. Okay. And do you remember who walked away first? A. It may have been me. I don't recall.

# Exhibit B

# He, Eva - Vol. I

brian

### Page 6

4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 THE REPORTER: Good morning. We are on the record for the deposition of Eva He. Today's date is January 28, 2022, and the time is 9:52 a.m. My name is James Tuverson, and I am the digital reporter for today's proceedings. Would counsel please introduce themselves and state whom they represent, beginning with counsel for the plaintiff? MR. ELIA: This is Albert Elia, A-L-B-E-R-T E-L-I-A, for Plaintiff Lisamaria Martinez. MR. FINE: This is Nick Fine, N-I-C-K F-I-N-E of Orbach Huff & Henderson for Defendants Eva He, Melissa Wilk, Laura Briones, and the County of Alameda. THE REPORTER: Thank you, Counsel. Ms. He, can I ask you to raise your right hand for me?

20 21 22 23 24 25 (WHEREUPON EVA HE, having been first duly sworn, testifies as follows:) THE REPORTER: Thank you. You may lower your hand. Counsel, you may proceed.

### Page 8

17 18 19 20 21 22 23 24 25 Would you please tell me where you're currently employed? A. I'm an employee of Alameda County Clerk-Recorder's Office. Q. And what is your current position there? A. My title is Assistant County Clerk-Recorder. Q. And what are your duties? A. My duty is to oversee the operation of the office and to train employees and make sure the

### Page 9

1 2 3 document that's filed and recorded in the office up to code and it's permitted by law and statute.

### Page 16

22 23 24 25 Do you know if there is an ADA coordinator for the CRO? A. Yes, I do. Q. Do you know who that ADA coordinator is?

### Page 17

1 2 3 4 5 6 7 A. It's Ms. Sabrina Amador. Q. And do you know whether the ADA coordinator was Ms. Amador on March 29, 2019? A. I do not know. Q. Okay. Are there circumstances where you would contact the ADA coordinator about a request for, as you put it, a reasonable accommodation?

8 9 10 11 12 13 14 MR. FINE: Hypothetical. You can answer if you know. A. With the position I'm given with the discretions that I have with -- within the operation in the office, I believe I -- I should be able to make the assessment based on what was requested. And it's my call.

15 16 17 18 19 20 21 22 23 24 25 Q. Okay. Is it part of your responsibility to inform other associates and supervisors that there is an ADA coordinator? A. I do not know that answer. Q. Okay. What is your understanding of who is supposed to contact the ADA coordinator? MR. FINE: It's vague and ambiguous. Calls for speculation. Lacks foundation. You can answer if you understand the question. A. I don't understand your question. Q. Okay. So correct me if I misunderstand your

### Page 18

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 testimony. But it seemed like you said that you felt that you had the authority to make decisions about ADA, reasonable accommodations. Am I correctly stating your understanding of your testimony? A. I'm saying that based on the operation of the office and based on what was requested, I'm able to make the judgment call. Q. Okay. So were there any circumstances you can imagine where you would contact the ADA coordinator about a request for a reasonable accommodation? MR. FINE: Calls for speculation. A. Maybe somebody, let's say, need a -- like thing of -- there's no access for wheelchair, maybe I would -- that might be an example of it, but otherwise I can't think of any.

### Page 23

6 7 8 9 10 11 12 13 14 15 16 17 18 19 Q. Is there one person at the top of the CRO in the organization chart of the CRO? MR. FINE: Calls for speculation. You can answer if you know. A. Well, Mrs. Melissa Wilk is the elected official, so that's what -- Q. And do you report -- and do you report directly to Ms. Wilk? A. No. Q. Okay. Who do you report to? A. I report directly to Ms. Yankee -- Q. Is that Matt? A. -- I mean, Mr. Matt Yankee. I'm sorry. Q. Thank you. Okay.

### Page 24

19 20 21 22 23 24 25 Q. Turning to the events on March 29th, 2019 that are at issue in this case, do you recall speaking with Maria Laura Briones about the plaintiff in this case, Lisamaria Martinez? MR. FINE: Vague as to time. A. Yes. A brief phone call. Q. What do you recall about that phone call?

### Page 25

1 2 3 4 5 6 7 8 9 10 11 12 13 14 A. I only remember that she contacted me and said that we've a customer who says she's blind and the form -- and she's filing FBN and there are corrections that need to be made. And then she demand our office to make the changes for her on the form. She asked can we do that. I told her no. That's all I remember. Q. Okay. Did you and Ms. Briones discuss Ms. Martinez using a person accompanying her to assist her instead of CRO staff? A. No. Q. Did you discuss Ms. Martinez's request with anyone other than Ms. Briones and your attorney? MR. FINE: Vague as to time. A. No. Not that I remember, no.

### Page 28

10 11 12 13 14 On March 29th, 2019, did you understand that blindness is a disability? MR. FINE: Calls for legal conclusion. You can answer if you understand the question. A. Yes.

1 2 A. I informed Ms. Briones that, No, we cannot make changes on any customer's form. www.storycloud.co | (866) 787-6774 | depos@storycloud.co 30

3 4 5 6 7 8 9 10 11 12 13 14 15 Q. Did you also understand that Ms. Martinez sought assistance reading a blank FBN form and transcribing dictated information onto that form? A. Can you repeat that, please? MR. ELIA: James? THE REPORTER: Stand by. (THE REPORTER PLAYS BACK REQUESTED QUESTION.) A. I do not know that. Q. Had you understood that, would you have acted differently? MR. FINE: Incomplete hypothetical. You can answer. A. Based on her request, no, I would not.

19 20 21 Q. And you understood that she would not be able to correct it without assistance? A. Yes, based on what Ms. Briones told me.

22 23 24 25 Q. Did you understand that but for Ms. Martinez's blindness, she would have been able to correct and file her FBN form while she was in the CRO on March 29th, 2019?

1 2 3 MR. FINE: Lacks foundation. Calls for speculation. You can answer.

4 5 6 7 8 9 10 THE WITNESS: Do I understand that if -- can -- can you play it back the question? MR. ELIA: Go ahead, James. THE REPORTER: Stand by. (THE REPORTER PLAYS BACK REQUESTED QUESTION.) MR. FINE: Same objections. THE WITNESS: Yes.

21 22 23 24 25 When you spoke with Ms. Briones about Ms. Martinez's request, did you do any research on the requirements of the ADA? A. No. Q. Have you ever done any research on the

1 2 requirements of the ADA? A. No.

24 25 Q. Okay. This is a copy of 28 Code of Federal Regulations Part 35, which are the Department of

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 Justice's regulations with respect to public entities under Title II of the ADA. Would you please go to PDF page 35? A. 35. Q. Let me know when you have page 35 up, please. And again, that's PDF page 35. I unfortunately don't know if it is marked something different, but if you go to the PDF

navigation and go to page 35. MR. FINE: Yes. It is marked page 581 on the document itself. MR. ELIA: Thank you, Nick. A. 581. Okay. Yeah, I have page 581. Q. Thank you. Do you see the paragraph starting with "several commenters"? MR. FINE: Ms. He, this is the second full paragraph down on the right column.

18 19 20 21 22 23 24 25 THE WITNESS: Starting with -- MR. FINE: "Several commenters." THE WITNESS: "Several commenters." MR. FINE: So the right column. THE WITNESS: Okay. BY MR. ELIA: Q. You see it? A. Yes.

## Page 57

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 Q. Would you please read the second sentence? A. Second sentence. Q. It starts with "reading devices or readers." A. Second sentence. Q. It's the sentence that begins "reading devices or readers." A. Give me one second. Oh, reading -- reading. Reading device -- starting with "reading device or readers"? Q. Yes. A. Okay. "Reading devices or readers shall be provided when necessary for equal participation and opportunity to benefit from any other mental service, program, or activity, such as reviewing public documents, examining demonstrated evidence, and filling out voter registration forms or form needed to receive

17 18 19 20 21 22 23 24 25 public benefits. The importance of providing qualify readers for examinations" -- Q. You may stop. I'm sorry. I only needed you to read the first sentence which -- A. Oh, I'm sorry. Q. No, it's fine. I appreciate it. So were you aware of the information in the sentence you just read prior to reading it now? A. No.

## Page 58

1 2 3 4 5 6 7 Q. Okay. And again, had you been aware of the information in that sentence, would you have acted any differently with respect to the request Ms. Martinez made on March 29th, 2019? A. No. MR. FINE: Incomplete hypothetical. Calls for speculation. Lacks foundation.

## Page 60

23 24 25 Q. Did you produce any written statement of the reasons why providing Ms. Martinez with the assistance she requested would fundamentally alter CRO services,

## Page 61

1 2 3 programs, or activities or would result in administrative or financial burdens? A. No.

## Page 66

10 11 12 13 14 15 Q. Okay. Do you have -- do you have any reason to believe that any of the CRO staff, and that would be the sort of auditor associates and supervisors who interact directly with customers, are not capable of reading, writing, speaking, and comprehending English? A. They are capable.

## Page 69

9 10 11 12 13 14 15 Q. Okay. And is there any information in Exhibit H2 that you could not have read back to Ms. Martinez so that she could verify you transcribed it correctly? A. No. Q. Same question for CRO staff. A. No, they can read it back. No.

## Page 80

12 13 14 15 16 So when Ms. Martinez made her request for assistance on March 29, 2019, her FBN form -- the FBN form that she brought with her to the CRO was not yet a record deposited in the CRO, by your understanding; is that correct? A. That's correct.

Exhibit C

# Moran, Angelina - Vol. I

Robbi

### Page 6

20 21 22 23 24 25 (WHEREUPON ANGELINA MORAN, duly sworn to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:) THE REPORTER: Okay. Thank you. You may take your

5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 THE REPORTER: Good morning. We're on the record for the deposition of Angelina Moran. Today's date is January 24, 2022, and the time is 9:55 a.m. My name is Kevin McGuire, I am the digital reporter for today's proceedings. Would counsel please introduce themselves and state whom they represent, beginning with counsel for the plaintiff. MR. ELIA: This is Albert Elia, counsel for Plaintiff, Lisamarie Martinez. MR. FINE: This is Nick Fine of Orbach, Huff, and Henderson for Defendants County of Alameda, Melissa Wilk, Eva He and Maria Laura Briones, as well as the deponent, Angelina Moran. THE REPORTER: Okay. Ms. Moran, please raise your right hand.

### Page 7

1 hand down. Counsel, you may proceed.

### Page 9

1 2 3 4 5 6 7 8 BY MR. ELIA: Q. Ms. Moran, can you tell me where you're currently employed? A. I'm currently employed at the Alameda County clerk recorder's office. Q. And what is your current position there? A. My title is Auditor Associate, previously known as Clerk Recorder Specialist.

18 19 20 21 22 23 24 25 A. Okay. So in our office at my current position, we process birth and death records requests, marriage license applications. We also record those marriage license applications, make them certificates. Fictitious business names. We do process server applications, legal document assistant applications, and photocopiers. We also take notary oath applications and forward them onto the state.

### Page 10

1 2 3 4 5 Q. And -- thank you. And do you interact directly with customers? Do you call them customers? A. Yes. Yes, we call them customers Q. Okay. So you work directly with customers? A. Yes, I work at the counter.

### Page 20

17 18 19 20 21 22 23 24 25 assistance to people with disabilities under the ADA? A. I -- I will only say that we do this every day. So we provide customer service every single day from what we do, what we're able to do to provide reasonable accommodations. It's if the customer walks in and needs assistance, then we do what we can without

doing anything improper or illegal. So if -- if a customer needs to be escorted to the counter, that's -- that's what we understand to be ADA.

7 8 9 10 11 12 13 14 15 16 Do you remember when you last got any formal training on providing assistance to people with disabilities under the ADA? A. We -- we -- we don't call it formal training. It's -- it's -- it's something we do every day. It's constant. "From now on, we're going to do this," sort of, but not -- we didn't have a sit-down class that says, "Okay, this training is titled, 'ADA.'" Q. Okay. I understand now. So then let me ask. When was the last time that you got informal training specifically on what you have to provide, in terms of

### Page 23

9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Okay. Thank you. What did you understand you were supposed to do if somebody asked for the type of assistance that you were taught that you were not allowed to provide? MR. FINE: Calls for -- strike that. You can answer. A. Okay. So if someone comes to my counter and a change needs to be made, I hand the application back to the customer where he or she will make the change. If he or she is not able to make the change due to a disability, we stop right there. I cannot complete or alter a legal document. This is a legal document that will stand up in court. I do not take responsibility, nor do I allow or am -- am I allowed to, because the county would also be legally liable. If I changed the document, if it was correct or incorrect, I do not even go there, that's a line we do not cross.

### Page 25

2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 Q. Okay. So if a person with a disability asks you to help them alter an FBN form because they are unable to do so themselves due to a disability, who taught you that you are still not to fill it out even when you were asked because of a disability? A. That is who taught us not to fill it out. We do not fill it out, regardless of disability. So if even if it was an able-bodied person or someone that is visually able, we do not fill it out. MR. FINE: Ms. Moran, he was asking who taught you that? A. Who taught. That was at my -- in my training. Q. Okay. And so that would have been Ms. Briones or the person, I think you said her name was Roselle? A. Yes.

19 20 21 22 23 24 25 Q. Okay. Thank you. So in that situation -- and the situation I'm talking about is the person comes with an FBM form, they need help filling it out or altering it, because of the disability -- what have you been trained to do in that situation? MR. FINE: Incomplete hypothetical. You can answer, if you know.

### Page 26

1 2 3 4 5 A. I would give them options. I -- I -- in this case, I -- I said, you know, "You could take it back home, someone else needs to help you fill it out." Or you ask a customer and I can lead them into what needs to be changed, but I cannot touch the document.

6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Okay. And in terms of those options as you referred to them, you have never been trained on what sort of options to offer people in that situation? MR. FINE: Misstates testimony, vague, and incomplete hypothetical. You can answer if you know, Ms Moran. Q. Have you ever been trained --

that's fine. Have you ever been trained on what options to offer people in that situation? A. No, there are no options. Q. I'm sorry. I believe you just testified that you would offer them options. A. If that was -- if that was possibility. But if there is no -- if -- if those are not possible, then there's nothing left to do. Q. So -- and please correct me if I'm incorrect -- but I believe you just testified that you would offer options such as taking the form home and having somebody help them fill it out. A. Yes. That's about it. But nothing can be

### Page 27

1 2 3 4 5 6 7 done in the office. Q. Okay. And did anyone train you or teach you on options like suggesting they go home and have someone help them fill it out? A. I -- I don't remember. It's just -- it's just my own trying to help the customer come to the conclusion of getting her form filed.

8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 Q. Okay. So now I want to ask about the events that specifically took place with Plaintiff, Ms. Martinez, on March 29, 2019. A. Okay. Q. Do you remember speaking with Ms. Martinez? A. Yes. Q. What do you recall about that interaction? A. It -- what I recall is, my -- another supervisor, the customer's supervisor, kind of giving me just a heads up that we had a blind customer. I -- I said fine, you know, we will -- we will do what we can. So she came up to the counter, presented her document. I reviewed it at that time, let her know that there was some corrections that need to be made, and handed it back to her.

23 24 25 The -- the exact words or exchange, I do not remember, but I -- something to the effect that she was not able to complete it. And then I said, "Well, I

### Page 28

2 3 4 5 6 7 8 9 10 can't complete it for you. So is there someone else that you had -- did you bring someone else with you?" And that's what I was leading to before. "Did you bring somebody else with you that can make these changes?" She said, "No." I said, "I'm sorry, ma'am. I did -- at that point, I -- I can't do anything. Is there someone else here that you can ask, and I can guide them into what needs to be corrected here? But I cannot touch the document." She said, "No." I said, "Okay."

11 12 13 14 15 16 17 18 19 20 21 22 23 So that's it. Those -- as far as what options I was talking about, that was our conversation. I do my very best to accommodate, to offer possibilities just as a customer service person, I -- but I cannot touch the document. That's improper for me. We do not touch documents. These are legally binding, I can -- the county can be legally liable, and I -- we don't go there. Q. Okay. A. So there was nothing else. So that when you say, "Okay, you just said there were options and now you're saying that there are no options," now there's no options.

### Page 35

13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Okay. So Ms. Moran, do you now have M2 and M1 both up so that you can look at them together? A. Yes, they are there. I just want to enlarge the zoom screen. Q. Okay. A. Okay. Yes. Yes, that's fine. That's the best we can do. Q. Thank you. Do you recognize Exhibit M2? (Exhibit 2 marked for identification.) A. Yes. Q. If you look at Exhibit M1 and M2 -- strike that. I'm going to

rephrase it. Do these documents refresh your recollection of what you told Ms. Martinez

## Page 36

1 2 3 4 5 6 7 8 9 10 11 12 13 was incorrect about her FBN form? A. Yes. Q. Okay. And what is Exhibit M2? A. That -- it -- sorry. M2 is the Fictitious Business Name statement. Q. Okay. And does Exhibit M1 contain the information about corrections that needed to be made to M2 that you provided verbally to Ms. Martinez -- A. Yes. Q. -- on March 29th, 2019? A. Yes. Q. Okay. Thank you. With respect to the first item in Exhibit M1, the insufficient fee?

14 15 16 17 18 A. My supervisor, Laura, wrote this, but she did consult with me. And that is just the box that we check just to show what the fee is, but that had nothing to do. She -- we -- we didn't -- I didn't even collect a payment.

## Page 37

6 7 8 9 10 11 12 13 14 15 16 17 Q. Did your interaction progress to the point where a fee would have been required? MR. FINE: Vague and ambiguous. You can answer, if you understand the question. A. I -- I was not accepting the application as is, so I hadn't even did step 1, step 2, step 3, to collect the fee. Q. I see. So do you have to accept a form before you begin the process of charging a fee? A. Yes. Q. Thank you. And you didn't accept this form? A. No.

## Page 47

18 19 20 21 22 23 24 25 Approximately how frequently do people present you with a fictitious business name form that you reject because it's improperly filled out? A. There's -- there's often something missing that -- maybe they forgot the county. So they would put the county in there in Section A or B. They wouldn't put the state. So yes, there are a lot of times that things need to be corrected at the counter. But I do not touch the document.

## Page 48

10 11 Q. Does it happen at least once a day? A. Yes.

12 13 14 15 16 17 18 19 20 21 22 23 24 25 Q. Okay. Thank you. And when that happens, do you tell them why you're rejecting to the form? MR. FINE: Incomplete, hypothetical, vague, and ambiguous. You can answer, if you understand. A. We do exchange until the correction is -- until the application is acceptable. Q. I'm sorry, I don't understand. What do you mean "exchange?" A. So if they hand me to application and I said, "Oh this -- this is missing," I hand it back to them and they complete it and then they hand it back to me. And then if there's something else, then I would say, "Oh by the way," and I hand it back to them and then they correct it and then they hand it back to me. So,

## Page 49

1 exchange.

### Page 50

12 13 14 15 16 17 18 19 20 21 22 23 Q. And are there blank forms that they can use to -- strike that. Are there blank forms at the CRO where a customer who has to make several changes that would, as you say -- I apologize. I don't know the right, I don't recall the words that you used, but I'll just say, that would distort the form. Are there blank forms in the CRO that they can start over from scratch? MR. FINE: Vague as to form. You can answer, if you know. A. The fictitious business name statements? Yes, we have forms -- those forms available for the customer to complete them in our office.

2 3 4 5 6 7 8 9 10 11 During the exchange as you referred to it, do the customers generally correct the form at the counter? A. Yes. If there is -- I'll stop there. Yes. Q. No, please go ahead. What were you going to say? A. I was just going to say, if there were multiple changes and it would distort the form as far as illegibility, I would tell them to walk away from the counter, take their time, complete it correctly, and then return to me.

### Page 52

7 8 9 10 11 12 13 14 15 16 17 18 Q. Okay. When customers ask you to fix an FBN form for them, do you tell them that it would be breaking the law? A. No. MR. FINE: An incomplete hypothetical. You can answer. A. It's -- it's not illegal. It's against our policy due to liability issues that would arise. Q. So did you tell Ms. Martinez that you would be breaking the law for you to help her fill out the form? A. No.

### Page 58

3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 I'm asking you whether or not, if a person dictated the information that is in the fields on that form where a person needs to fill them out to you, you are capable of transcribing them. MR. FINE: Lacks foundation, calls for speculation, incomplete hypothetical. You can answer if you understand the question. THE WITNESS: I don't want to answer. MR. FINE: You have to answer to that. MR. ELIA: You have to answer. MR. FINE: True. THE WITNESS: If I understand the question. So if she spoke to me what to write down, then am I able to write it down? BY MR. ELIA: Q. Yeah, are you -- A. She's speaking English, I understand English. Q. Yes. A. And I can write words down on a piece of paper? Q. Yes. MR. FINE: Same objections. A. Yes.

### Page 59

1 2 3 4 5 6 7 8 9 10 11 12 Q. Okay. And so there's no information that is on that form that you could not -- that you are not capable -- let me strike that. There's no information on that form that you are not capable of transcribing? MR. FINE: Same objections. Q. Such as a drawing or or a picture, or something that could not be dictated to you in English? MR. FINE: Same objections. THE WITNESS: Do I answer, still? MR. FINE: Yes, you have to answer. THE WITNESS: Is there anything on this form that I could not read and then write the answer? No.

### Page 60

24 25 BY MR. ELIA: Q. So a similar question as before, but in

### Page 61

1 2 3 4 5 6 7 8 9 reverse. Is there anything on this form in the areas that need to be completed by the business owner that you could not verbally read to Ms. Martinez? MR. FINE: Lacks foundation. Calls for speculation, incomplete hypothetical, but you can answer, if you know. A. No, I can read everything. Q. And you could speak it all out loud? A. Yes.

10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 MR. FINE: Same objections, hypothetical. Q. So I'm just going to ask some questions that are general about the CRO as a physical plan, because I'm -- I've never been there. I'm not familiar with it. You said there was a counter between you and Ms. Martinez, I think you said there was a counter between you and Ms. Martinez; is that correct? A. Yes. Q. How wide is that counter? A. There's a writing space for me with the computer, so that's about 2 feet, and then an additional higher level counter where the customer writes. So I'm sitting down and the customer stands up, and that's about 5 feet wide, but probably another foot or so deep.

25 Q. Okay. So there is a space for the customer

### Page 62

1 2 to be able to write? A. Yes.

3 4 5 6 7 8 Q. And is that -- is that area a place that you would be able to, either standing or sitting, be able to see the form that the customer was writing on? A. Yes. I -- I'm able to stand, and we can be at the same level, and I can point to different areas of the application.

### Page 63

22 23 24 25 Q. Do you recall walking away from Ms. Martinez, and refusing to speak with her anymore? A. I -- I don't like the word "refuse." Q. Okay.

### Page 64

1 2 3 4 5 6 7 8 A. I--I--I--that--I--thatdoesn't speak to my customer service skills, I did as much as I could. And then since I was not able to help her or she would not accept the answer I was giving her, yes, I did walk away. And I was actively looking for a supervisor, and I believe I even spoke to my supervisor when she came back from lunch, as the extent of the time that she was speaking of.

9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 Q. Okay. At the CRO the counter that you were sitting at that Ms. Martinez interacted with you at -- is -- is that called the customer service counter,or how do you refer to that counter? A. We have nine windows in -- in our inner office. There is a lobby where numbers are given, and then nine windows. Three of them are reserved for vitals, birth certificate, death, marriage certificates, three are reserved for marriage licenses, and three are reserved for what we call GB services. And that's general business, which this fictitious business name falls under. Q. Okay. And how close are those counters to one another? The three -- A. They are next to each other, but they are wide counters.

### Page 69

20 21 22 23 24 25 Q. Okay. What did you tell Ms. Briones? A. I told her that once -- my first interaction, I had a customer at my counter that was blind, unable to complete the forms or make changes to the form, and she wanted me to. And right away, she said, "No." Oh, I can't tell you what she said, but.

### Page 70

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 Q. I'm sorry? A. I was just hearsay. I -- I -- Q. No. Sorry. You can tell me what she said. A. I can? Okay. Q. Yes. A. And then she responded that, "No, we don't do that." And I said, "Yeah, I know, but she won't take 'no' for an answer. I don't know what else to do." And she said, "Okay, well, let me go talk to Eva," which is Ms. He, and that extended the amount of time that she was at the counter. Q. Okay. Do you recall whether or not Ms. Briones spoke to Ms. He before or after speaking to Ms. Martinez? A. I don't.

16 17 18 19 20 21 22 23 24 25 Q. Okay. A. If -- I -- I -- speculation. Q. Well, no. A. If -- just in a normal practice, if Ms. Martinez did not accept we do not alter forms from me, she may have not accepted we do not alter forms even from my supervisor, and so my supervisor decided, let's just bypass that, and just go straight to her supervisor. Q. Okay. Do you remember if you said anything

### Page 71

1 2 3 4 5 6 7 8 9 else to Ms. Briones, or if Ms. Briones said anything to you in response? A. Not until she returned. She did look up the ADA, because that was part of the discrimination exchange at the counter. And she said, "We are -- this is all that we're able or allowed to do is, you know, help them in the door, you know. If she needs something to be read, we can do that, but we do not touch the form."

19 20 21 22 23 24 25 Q. Okay. So you weren't there when she looked up the ADA, but she told you she looked up the ADA? A. Yes. With Ms. He. Q. Thank you. And do you recall if you had any additional conversations with other people after your conversation with Ms. Briones? A. That was it.

### Page 78

17 18 19 20 21 22 23 24 Q. Okay. So you don't know why you would have said that it was breaking the law? A. You can ask me, and I can answer if you want to know why I would say that -- Q. Yes. A. It would probably could be just the exchange, the frustration, the 45 minutes, the not taking no for an answer.

### Page 79

14 15 16 17 Q. Okay. So as far as you are aware, no one in the CRO has ever told you it would be breaking the law to complete an FBN form for somebody? A. No.

# Exhibit D

# Yankee, Matt - Vol. I

### Page 6

4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 THE REPORTER: Good afternoon. We're on the record for the deposition of Matthew Yankee. We -- today's date is February 1, 2022 and the time is 12:56 p.m. My name is Chelsea Rojo Bermudez and I am the digital reporter for today's proceedings. If Counsel will please introduce themselves, starting with plaintiff? MR. ELIA: This is Albert Elia, counsel for plaintiff, Lisamaria Martinez. MR. FINE: This is Nick Fine of Orbach Huff & Henderson for defendants County of Alameda, Melissa Wilk, Eva He, and Maria Laura Briones, as well as the deponent, Matt Yankee. THE REPORTER: Thank you, Counsel. Mr. Yankee, please raise your right hand? (WHEREUPON, MATT YANKEE, having been first duly sworn to tell the truth, the whole truth, and nothing

22 23 24 2 but the truth, was examined and testified as follows:) THE REPORTER: Thank you. You may proceed.

25 ///

### Page 26

10 11 12 13 14 15 16 17 18 19 20 21 Q. Have you ever researched the requirements of the ADA? A. I would suspect at some point in the past under, you know, various other circumstances. Like I had mentioned before, I do recall, within the last few years, we had a request for someone who requested a sign language interpreter for their marriage ceremony. And I know we, you know, did some preliminary research on that and consulted with counsel on the best way to accommodate that request. So, in certain respects, yes. But have I studied it, you know, beginning to end, no.

### Page 38

7 8 9 10 11 12 13 14 15 16 17 18 19 20 So have you ever -- have you ever written a statement explaining why providing a requested action, such as providing a auxiliary service, such as a reader, would result in a fundamental alteration or would result in undue burdens, financial or administrative, to anyone within the CRO or anyone outside the CRO? MR. FINE: Compound. Vague and ambiguous. The witness can understand -- answer if he understands the question. A. Well, I mean, would this include written communications to counsel and other representatives? Q. No. Not written communications to counsel. A. Then no.

### Page 41

17 18 19 20 21 22 23 24 25 Q. Can you tell me what your understanding is of the process of recording an FBN form? A. Just to start with, I would want to clarify and say that an FBN form is not technically recorded, it's filed. Q. Okay. What's the difference? A. We're a County Clerk Recorder's office, and -- and an FBN is filed under our County Clerk hat, whereas certain other documents are recorded under the

### Page 42

1 2 3 4 5 6 7 8 Recorder hat. It's not put in the same system as -- while we keep it on

file and it's, you know, generally speaking, serves the same general purpose, it's not considered a recorded document. Q. Okay. Does that mean it -- is it considered a filed document in lieu of a recorded document? A. It would be a file document, correct. Q. Okay.

9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 A. I just want to -- I'm sorry. Q. No, I appreciate that. Please. This is part of the reason we have this deposition is because you know more than I do about this. Are -- are filed documents also considered records? A. Yes. Q. Okay. So could you please walk me through your understanding of the process of filing an FBN form such that at the end of the process, it is recorded in the CRO? And I will say that sort of the presumption here is that a person has walked into the CRO with a form that has been filled out such that it would be accepted by the CRO staff. A. Okay. Q. And they have the fee. A. Okay.

**Page 43**

1 2 3 4 5 6 7 8 9 10 11 12 13 MR. FINE: Calls for a narrative and overbroad, but the witness can answer. A. Generally speaking, assuming it's been examined and it meets all the requirements and, you know, and the person has the correct fee, we would cashier that document. I believe the front end clerk may enter the FBN name. I don't recall off the top of my head if that's done on the front. We've changed systems just a few years ago, so some of these processes may be somewhat changed. But it's either the front end clerk or a member of our indexing staff would enter in the name of the FBN or FBN's that were filed. That statement would then go also to unit who would image it and attach it to file that, you know, that's already been there index know, What does cashiered mean as you -- as you used it? A. That would be that we would accept payment, issue a receipt, and then that document would be given a unique file number. Q. Okay. And prior to cashiering, that FBN form has not -- it's not yet filed in the CRO; is that would be a copy of it, you know. of the FBN name would match up with the, you scanned image of the physical document. Q. Okay. So you used the verb "cashiered". our scanning

14 15 16 17 18 unit who would image it and attach it to file that, you know, that's already been there index know, What does cashiered mean as you -- as you used it? A. That would be that we would accept payment, issue a receipt, and then that document would be given a unique file number. Q. Okay. And prior to cashiering, that FBN form has not -- it's not yet filed in the CRO; is that would be a copy of it, you know. of the FBN name would match up with the, you scanned image of the physical document. Q. Okay. So you used the verb "cashiered". our scanning the electronic made so that So that the

19 20 21 22 23 24 25 What does cashiered mean as you -- as you used it? A. That would be that we would accept payment, issue a receipt, and then that document would be given a unique file number. Q. Okay. And prior to cashiering, that FBN form has not -- it's not yet filed in the CRO; is that Q. Okay. So you used the verb "cashiered".

**Page 44**

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 correct? A. We would not considered it --

consider it legally filed. Q. Okay. A. Because we would file stamp it with that -- with that number. Q. Okay. Thank you. If Ms. Martinez came into the CRO today and asked for a blank CRO -- I'm sorry, strike that whole thing. Let's start over. If Ms. Martinez walked into the CRO today, asked for and was provided with a blank FBN form, and then asked a CRO staff person to write down on the form the name of her fictitious business name, and that request got kicked up to you through a supervisor to you, would you allow the CRO staff person to provide that assistance?

18 A. I would not.

# Exhibit E

# Alameda County 30(b)(6) Yankee, Matt - Vol. II

### Page 6

5 6 7 8 9 10 11 12 13 14 15 16 17 THE REPORTER: Good morning. We are on the record to begin the deposition of Matt Yankee, 30(b)(6), for the representative of Alameda County. Today's date is February 4, 2022. The time is 9:58 A.M. Would Counsel please introduce themselves, beginning with counsel for plaintiff. MR. ELIA: This is Albert Elia, counsel for Plaintiff Lisamaria Martinez. MR. FINE: Nick Fine of Orbach Huff & Henderson for defendants, County of Alameda, Melissa Wilk, Eva He, and Maria Laura Briones, as well as the deponent, Matt Yankee, who is here today in this capacity as the person most knowledgeable for Alameda County.

18 19 20 21 22 23 24 25 THE REPORTER: Thank you, Counsel. Also present, Kristopher A. Nelson from TRE Legal. And, Mr. Yankee, would you please raise your right hand. (WHEREUPON MATT YANKEE, duly sworn to tell the truth, the whole truth, and nothing but the truth was examined and testified as follows:)

### Page 7

9 All right. Counsel, you may proceed. MR. ELIA: Thank you.

### Page 8

21 22 23 24 25 Q. And while I understand it may be a little confusing, if I then refer to Mr. Yankee, I will -- I want you to understand that I'm referring to you in your individual capacity as an employee of the County as opposed to, you know, you as the deponent today for

12 13 14 15 16 17 18 19 20 I want to make sure you understand that whereas on Tuesday you were answering questions for yourself as an individual, that today you were answering questions for Alameda County. Is that understood? A. I understand. Q. AndsowhenIreferto"you"inoneofmy questions or "your," I'm referring to the county. Understood? A. Yes.

### Page 9

1 2 3 4 5 6 the County. Did that make sense? A. Yes. Q. Okay. MR. FINE: And, Matt, if you're confused, please ask. THE WITNESS: Okay.

### Page 19

16 17 18 19 20 21 22 23 24 25 Q. Is there a reason why -- if a customer asked to make a change to a form after it had already been filed or recorded in the CRO -- that you would -- that you would apply that policy against making the change for the customer? A. Well, there's a government code that says that we're not allowed to -- the kind of recorder may not alter any records in our -- in our possession. Q. Okay. And if a person walks in with a form that has not yet been recorded, does that same reason

### Page 20

1 2 3 4 5 6 7 8 9 10 11 12 apply? A. I would say it depends where at in the process. If it's

something that's -- let me pull it back a little bit. There's variety of ways that documents can come into our possession. Q. Sure. A. But someone could walk in to -- to our office and, you know, hand us something. We also get, for example, documents that's submitted to us through the mail. So if it's mailed to us and someone were to call up and say, "Hey, I mailed something a few days ago. Have you -- have you filed it yet?" we would say,

13 14 15 16 17 18 19 20 21 22 23 24 25 "No," And they said, "Okay. I want you to change line three," for instance. We would not change that for the same reason it's already in our possession. So if someone -- if -- if the person is still holding it, that's one thing. But once it's given to us for our possession, then we would not change it. Q. And so what if -- so tell me if that reason -- if the reason you were just discussing being in your possession would apply if the person is still holding it? A. Well, if it's still holding it, we would -- we would ask them to make any -- any changes, but once it's in our possession, we would not change it then.

### Page 21

1 2 3 4 5 Q. Okay. And so at what point -- if a person walks into the CRO with a form, at what point to that -- do you consider that to be in the CRO's possession? MR. FINE: Vague as to form. A. I would say when they -- they give it to us.

### Page 32

14 15 16 17 18 19 Q. Do you know who Sabrina Amador is? A. I do, yes. Q. Do you know what her title is? A. Division Chief of management services. Q. Is she also the ADA Coordinator? A. Yes, she is.

**PROOF OF SERVICE**

I, Michelle Korosy, declare.

    1.   I am over 18 years of age and not a party to this action.

    2.   My business address is 1155 Market Street, 10th Floor, San Francisco, CA 94103.

    3.   On January 10, 2024, I served the following document(s) via electronic service at the email addresses set forth below:

PLAINTIFF'S AMENDED EXCHANGED PRETRIAL DISCLOSURES, EXHIBITS A-E

    4.   Persons served include:

Attorneys for Defendants County of Alameda, Melissa Wilk, Eva He, and Maria Laura Briones:

Kevin Gilbert - kgilbert@ohshlaw.com

Nicholas D. Fine - nfine@ohshlaw.com

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Clovis, California on January 10, 2024.

*Michelle Korosy*

Michelle Korosy

# EXHIBIT B

ADAPTIVETECHNOLOGYSERVICES

**PDF Accessibility Assessment**

**Alameda County Fictitious Business Name Statement**

Date:                     December 21, 2022

Filename:                 GBNS275-321FictitiousBusinessNameStatement-REV111422

Document Source:

Internet Archive capture of Alameda County website – www.acgov.org

Document URL:

http://co.alameda.ca.us/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf

*and also at*

https://web.archive.org/web/20221209002203/http://acgov.org/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf

JAWS Versions:            JAWS 2023 – 2023.2212.23    JAWS 2022 – 2022.2211

Acrobat Version:          Acrobat Pro 2021.007.20099

Browsers:                 Microsoft Edge          Google Chrome

**Executive Summary**

It is my opinion to a reasonable degree of professional certainty as an expert in JAWS and screen reader accessibility, based on over 23 years of working with JAWS, other screen readers and PDF content, and my testing in several environments, that:

- this FBNS form is not accessible under any professional standard;

- this FBNS form cannot be independently completed by a blind person who needs non-visual access through screen reader technology such as JAWS; and

- The above is true no matter which screen reader or PDF viewer might be used.

**Document Review**

The document is a 2-page form used to provide information about the owners of a business with a fictious name.

Page 1 of the document is a form that that collects address information about the business, names and addresses of the registered owners, the type of owner. The form

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0027

uses standard edit boxes and checkboxes.

Page 2 of the document is a text-only page of instructions for how to complete the form.

The form cannot be independently completed or signed by a blind applicant.

Label names for each of the form elements are not announced as the user tabs through the document.

When entering text in the form fields, JAWS does not echo the key names. Users cannot use the arrow keys to review entered text. The backspace key removes text but does not announce the letters being deleted.

**Test Results**

I reviewed the document from the Alameda County website. There are two ways to access PDF documents from the web; open the document and read it within the browser or download the document to the computer and open it with Acrobat Reader or Acrobat Pro. I tested both methods. Best practice for accessing PDF forms is to use Acrobat Reader or Acrobat Pro.

For the browser method I tested the document with both Microsoft Edge and Google Chrome, the two most popular browsers. The results were identical for both browsers. I was not able to successfully complete the form relying only on JAWS feedback.

For the second method, I downloaded the document and opened it in Acrobat Pro. With Acrobat Pro I was able to examine the document properties and verify that no security settings were enabled that might prevent JAWS from reading the document correctly. I was unable to successfully complete the form relying only on JAWS feedback.

In both cases, JAWS would not announce the label names of form elements or announce input into the edit boxes properly.

**Testing Notes**

When the document is first opened JAWS announces the message "document has no links" and begins reading text at the top of the second page. The document indeed has no links. JAWS should begin reading on page 1.

Document properties are set to start reading at page one, but JAWS immediately jumps to page two and starts reading. JAWS should begin reading on page 1.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA 94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0028

Users can navigate page 2 using standard JAWS navigation commands and JAWS does read the page in the correct order.

Page 2 has a document number and revision at the top of the page (275-321 [Rev. 10/18]) that JAWS does not read. When commands are given to jump to the top of the page, JAWS moves to and begins reading from the center heading ("Instructions for Completion…"). I was unable to read the document number and revision.

I could move to the first page with the standard Previous Page command (Control+PageUp). If I alt-tabbed away from the file, then alt-tabbed back, the document would jump back to the second page and JAWS would announce the title bar text (including document name). If I used any cursor navigation commands (up/down/left/right arrow, home, end, etc). The document would jump back to the second page.

The first page contains the form elements and descriptive text to provide information about each specific control. I reviewed the form elements and determined that the Form Element Properties ToolTip field was contained text values (this field is required by JAWS). The text in this field is announced by JAWS as the field label when tabbing through the form.

I could not review any non-form element text on the page 1 with Acrobat Pro. Anytime I tried to use a JAWS command to read any of the descriptive text on the page, the virtual focus jumped back to the second page.

I was able to review some non-form element text on page 1 when using a browser to access the document. However, this text was not announced in logical order, instead, JAWS would jump around to different parts of the document and blocks of text out of order.

To complete an Acrobat PDF form, a blind user presses the Tab key to move from field to field. I could press tab and the focus would move to the next field. However, JAWS would not announce the field label (the text entered in the Tooltip field of the form elements).

If I tried to use JAWS commands to read the text above or to the left of the field (where the labels are shown visually on the page), JAWS would jump back to the second page.

I could tab through the entire set of form elements, but JAWS would not announce any labels.

In the web browsers and Acrobat Pro, when I typed text in a field, it would let me enter

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA 94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0029

text, but it would perform the Virtual PC cursor action for the keystroke. If I turned the Virtual PC cursor off, JAWS would announce the characters, but I was unable to use the arrow keys or backspace key to review or correct an entry. Arrow keys would move but not announce the current character. Backspace would not work at all.

Notes about the Virtual PC Cursor: The Virtual PC cursor is a JAWS feature that makes it easier to navigate web pages and some Word and PDF forms. When the Virtual PC cursor is on, a user can type Navigation Quick Keys (single letters) to jump to specific elements on a web page or in a document. JAWS automatically detects when it is in a form field and turns off the Virtual PC cursor so the user can type characters in the form field.

For example, if I typed the letter E when the Virtual PC cursor is on, JAWS will try to jump to the next edit box and say the label. If I type the letter E while the Virtual PC cursor is off, JAWS will input the character into the form element.

JAWS did not detect that is was in a form element in either the browsers or Acrobat Pro and did not turn off the Virtual PC cursor automatically.  When typing text, sometimes JAWS would enter the letter into the form element, sometimes not. I could not hear the name of any key as I filled out the form from the keyboard while JAWS was running. Instead, JAWS would announce the text as if a Navigation Quick Key action had occurred. Once I had text in an edit box, I was not able to use cursor keys to review the text letter by letter. JAWS would not announce the letters when I arrowed back. I was not able to use the backspace key to erase text while JAWS was running but could use the key when JAWS was not running.

I was able to check and uncheck check boxes, but JAWS would not announce the name of the check box as I tabbed through the list and only announced "space" when I pressed the space bar and did not announce the status of the check box.

Users are unable to sign the form without sighted assistance.

Sincerely,

Steven Clark
Adaptive Technology Services

PL_EXPERT0030

# Exhibit H

**ADAPTIVE**TECHNOLOGY**SERVICES**

### Alameda County Fictitious Business Name Statement

### On-Site/On-Line Assessment of Application Form

| | |
|---|---|
| Date: | August 29, 2023 [Date of inspection] |
| Location: | Alameda County Clerk-Recorder Office |
| | 1106 Madison St. |
| | Oakland 94607 |
| Website URL | Local on computer at on-site location |
| | Off-Site Review: |
| | https://rechart1.acgov.org/BusinessLicense/ASNApplication.aspx?cabinet=LICENSES_FBN |
| JAWS Versions: | On-Site Review: JAWS 2022 – 2022.2211.7 |
| | Off-Site Review: JAWS 2023 – 2023.2307.37 |
| Browsers: | Google Chrome (on-site and on-line) |
| | Microsoft Edge (on-line only) |

**Executive Summary**

It is my opinion to a reasonable degree of professional certainty as an expert in the field of making forms accessible to blind individuals, including the use of JAWS and screen readers, based on over 23 years of working in the field, and my testing in several environments and consideration of provided information, that:

- The electronic FBNS form (FBNS software wizard web browser format) cannot be independently completed by an average blind person who needs non-visual access through screen reader technology such as JAWS;

- the process for a blind applicant to use the electronic FBNS form on the computer in the Clerk Recorder's Oakland office adds significant time and complexity to the process that a sighted applicant would experience. Waiting for specific staff members to be prepared to support access to the computer and checking with staff after submitting the form was required to move forward in the process;

- providing scribe services to fill out a paper FBNS form at the check-in desk as

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0044

described by Ms. Greco would be much faster and less complex and confusing for a blind person than the process that the County has constructed for completing FBNS forms for blind individuals in the Oakland location.

**Site/Form Review**

The form is a 1-page form used to provide information about the owners of a business with a fictitious name.

The form collects address information about the business, names and addresses of the registered owners, and the type of owner. The form uses standard edit boxes and checkboxes. The form also uses what appears to be a third-party Calendar element and some graphic elements as controls.

I reviewed the FBNS software wizard version of the form both on-site through the provided computer kiosk at the Alameda County Clerk-Recorder Office and from my home computer on the Clerk-Recorder website.

**Process Review**

Applicants must submit the FBNS software wizard form to the Clerk-Recorder's office in person, whether they complete the form on-line or fill it out in the office. I visited the Clerk-Recorder's office with a blind individual and observed the process required to complete the FBNS software wizard at the office and file it in person.

The process introduces several steps that substantially increase the amount of time it took to complete and submit the form. See Process notes below for more information.

The process to complete and submit the form at the office required using a computer with the JAWS screen reader installed. While this program is a very popular screen reader, not all blind or low vision computer users are going to be familiar with the product. There are several other products available to visually impaired computer users; NVDA, ZoomText/Fusion, and VoiceOver are among the more popular choices. None of these other screen readers were available on the County's computer.

Below is a chart from the WebAIM 2021 Screen Reader User Survey that shows the percentage of people who use different common screen readers as their primary screen reader.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0045

| Which of the following is your primary desktop/laptop screen reader? | | |
|---|---|---|
| **Response** | **# of respondents** | **% of respondents** |
| JAWS | 832 | 53.7% |
| NVDA | 476 | 30.7% |
| VoiceOver | 100 | 6.5% |
| ZoomText/Fusion | 72 | 4.7% |
| System Access or System Access to Go | 12 | 0.8% |
| Narrator | 8 | 0.5% |
| ChromeVox | 5 | 0.3% |
| Other | 43 | 2.8% |

Source: https://webaim.org/projects/screenreadersurvey9/#primary

46% of respondents use a screen reader other than JAWS as their primary screen reader. Those applicants could have difficulty completing the form.

With respect to those blind individuals who cannot use JAWS to access the FBNS form in the Oakland location, I have reviewed the information contained in Alameda County's Response to Plt's Interrogs (Set Three) -- email 9.26.23, County's Response to Plt's RFA (Set Three) -- email 9.26.23, and a document titled "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-123].pdf."

I have also observed staff at the Oakland location providing scribe services to make corrections on a paper FBNS form for a blind person and am familiar with the signed statement of Lucia Greco, a blind individual who received scribe services at the Oakland location that I visited.

Alameda County's Response to Plt's Interrogs (Set Three) and the document title "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-1230.pdf" describe a process where the county's sighted assistant would click on portions of forms and the blind applicant would type the text. This can be confusing to the blind applicant as they will hear text as the mouse moves over it and could require some back-and-forth conversation to confirm which control has just been selected.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0046

There are also a couple of controls in the form that are difficult to use with this process, check boxes [see Figures 6 and 10] and red graphic delete symbols [see Figures 1 and 5].

For check boxes the sighted assistant would have to select (change the setting of the item) with the mouse then change it back for the applicant to use the keyboard or require the applicant to reach to the mouse and press the left mouse button to select or unselect the check box.

For the graphic delete symbols, the sighted assistant would have to place the mouse over the delete symbol and the applicant would have to press the right mouse button to perform the deletion.

This process to complete the form is complicated and would take considerably more time than using a scribe to complete a paper or electronic form.

**Web Form Test Results**

I reviewed the form on the Alameda County Clerk-Recorder offices computer on-site and from my own computer through the Alameda County website. Results were identical in both tests.

I tested the form with both Microsoft Edge and Google Chrome, the two most popular browsers. The results were identical for both browsers. The average screen reader user would not get enough information to be sure they completed the form completely and correctly. An advanced user may be able to use advanced navigation techniques or commands to complete the form, but the process would be time consuming.

**Web Form Testing Notes**

I found the basic form and navigation issues while trying to complete the form with the screen reader. These issues occurred while tabbing through the document. This is the most common way a screen reader user would try to read and navigate the page.

Business Address: is not indicated as a required field (does not announce star) [See Figure 1]



*Figure 1*

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0047

Combo Boxes below do not announce any label or required status [See Figures 2, 3, and 4]. Note: the document titled "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-123].pdf" (page 1, last paragraph) provided by Alameda County acknowledges that these controls do not work properly, even when using the mouse to read back screen text.

Examples:

Located At:
Business Address
* State:



*Figure 2*

Located At:
Mailing Address
* State:

*Figure 3*

Is (are) hereby registered by the following owner(s):
* State of Incorporation/Organization:
* State:



*Figure 4*

If additional Business Names/Registered Owner(s) are present Remove Name/Owner graphic (Red X) is not in the tab order. [See Figure 5]

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0048

If additional Business Names are added, subsequent fields are announced as "Remove/Clear this Entry edit". [See Figure 5]



*Figure 5*

Same as Business Address check box does not indicate that it is asking if the Business Address is the same as the Mailing Address. [See Figure 6]

Mailing Address edit box line one does not announce that the field is required. [See Figure 6]



*Figure 6*

Residence Address announces only "Address Line one" and does not indicate that it is Residence Address or is a required field. [See Figure 7]



*Figure 7*

"This is the Registered Owner" check box is not announced correctly. Screen Reader announces "Enter Registered Owners Name: (which is the text of the next field, an edit box). [See Figure 8]



*Figure 8*

"This business is conducted by:" List box does not announce a label or required status. [See Figure 9]

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0049

**This business is conducted by:**

CO-PARTNERS
CORPORATION
GENERAL PARTNERSHIP
INDIVIDUAL
JOINT VENTURE
LIMITED LIABILITY COMPANY
LIMITED PARTNERSHIP

*Figure 9*

Commencement Date: field does not announce label or required status. Screen Reader does read the highlighted text (__/__/____) multiple times. [See Figure 10]

NA check box reads instruction a. in the commencement date section as the label. [See Figure 10]



*Figure 10*

A more advanced JAWS user might use the Forms List feature to identify and complete the form. This command is activated with Insert + F5 and shows a list of the form elements found on the page and their values. I found the following problems with the form field list:

> Labels are not shown for Check Boxes for "This is the Registered Owner" and "NA".

> Form elements from the login page are shown in the list of Form Elements even though they are not active or can be selected. This could be confusing to the user when trying to move to specific elements on the page.

The graphic elements for Red X's (Remove/Clear This Entry) do not appear in either the tab order or the Forms List. There is a way with JAWS to get a list of graphic symbols, but they are all listed as Remove/Clear This Entry. It is not clear from the list which entry is

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0050

being removed. The average JAWS user is unlikely to be aware that the graphic symbols are there, know the command to get a list of the symbols, or be able to find and activate the correct symbol if they need to remove an entry.

**Process Notes**

I met with a blind individual at the Alameda County Clerk-Recorder's office at 1106 Madison Street, Oakland 94607. I observed the process as we checked in, were directed to the JAWS computer, and finally turned in the completed form to a clerk.

During the process of completing the form, I documented and tested how JAWS works with the on-line form and observed how the user would fill out the form. See Form Testing Notes above.

We arrived at the Clerk-Recorder's office and proceeded to the check-in location. The check-in desk is in a protected outdoor area where a line forms to check in [See Figure 11]. Users announce the service they are there for, are then given a check-in ticket with a number, then directed to the proper location in the building for that service.



*Figure 11*

When we checked in (around 10:25), there was no one in line. The applicant explained that he was blind and was there to complete a Fictitious Business Name application. We were directed to wait near the check-in counter while we were told a supervisor was being contacted. Note: The Clerk-Recorder's office knew the applicant was coming.

While we waited, several other people (4 or 5), checked in and proceeded to move through the process. After about a 10-minute wait, we were told that we could proceed

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0051

inside to the computer room located on the right just inside the main door. We were told to check in at a counter in the computer room and that they knew we were coming.



*Figure 12*

At the counter in the computer room, we were told that a supervisor had been contacted and would be with us shortly. After waiting for several minutes, the supervisor met us, introduced himself and guided us to the JAWS computer [See Figure 13]. He signed us in and made sure JAWS was running. He asked if we needed anything else and told us to ask for him at the counter when we were done with the form.



*Figure 13*

After reviewing the application and testing the web form with JAWS (see notes above) we saved and submitted the form and went back to the counter. At the counter we waited a short time while the supervisor was called back. When he returned, he

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0052

provided us with a print ticket, read us the number on the ticket, gave the ticket to the applicant, and guided us to the clerk counter area to submit the form [See Figure 14].



*Figure 14*

In the waiting area of the clerk counters there is a large screen monitor showing the current ticket being served and which (numbered) counter to go to when called [See Figure 15]. They also announce the ticket number and counter over a loudspeaker system. As we entered the room our number was called. The supervisor guided the applicant to the proper window [See Figures 16 and 17].



*Figure 15*



*Figure 16*



*Figure 17*

At the window, the applicant was asked for information to identify the application. The clerk retrieved the application on the screen and reviewed the form to confirm that the provided information was correct. The applicant noticed that the business name was incorrect. After telling the clerk the business name was incorrect, she quickly typed the correct name into the form from her computer. She then submitted the form, took the cash payment for the service, then printed the certificate and provided it to the applicant.

We then exited the building.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0054

Sincerely,                                    October 2, 2023

Steven Clark
Adaptive Technology Services

PL_EXPERT0055

# Exhibit I

# Steven Clark

2 McLea Court, Suite 201 | San Francisco, CA 94103 | 415.409.6650 | sclark@adaptivetec.com

## Education

- Ball State University, Muncie, IN
- Bachelor of Arts, 1983
- General Psychology

## Experience

2002 – Present
Co-Owner | Adaptive Technology Services | San Francisco, CA

1997 – 2002
Co-Owner | AccessAbility, Inc. | San Francisco, CA

1986 – 1997
Marketing Engineer | TeleSensory, Inc. | Mountain View, CA

Key Positions:

| | |
|---|---|
| 1995-1997 | Technical Marketing Support Manager/Marketing Engineer |
| 1994-1995 | Product Management Supervisor |
| 1993-1994 | Integrated Systems Manager |
| 1992-1993 | Product Manager (Screen Reader Development) |
| 1990-1992 | Product Marketing Support Manager |
| 1988-1990 | Application Engineer Supervisor |
| 1986-1988 | Application Engineer |

1984 – 1986
Computer Instructor | Sensory Access Foundation | Palo Alto, CA

PL_EXPERT0031

# Sample Scripting and PDF Projects

- El Camino Hospital
  Modified a set of PDF forms used by the organization for use by a blind employee. Project included 12 forms that had to be completed independently by the user and faxed or emailed to other offices in the organization.

- Gardner Health Systems
  Modified a set of PDF forms used by the organization for use by a blind employee. Project included 25 forms that had to be completed independently by the user.

- Court Report Billing Project
  Modified 6 PDF forms used by a court reporter to document her court reporting activities and for invoicing her contract employers.

- Wells Fargo, Sacramento, CA
  Created custom scripts for a wide variety of applications used by a blind Business Banking Representative.  Project include scripts for proprietary customer database and account information and creating accessible PDF forms.

- MidMichigan Health, Alpena, MI
  Original scripting project completed in 2012 for a blind physical therapist.  Project included providing access to ReDoc, the electronic medical record system used by the organization at the time.  In 2017 the organization switched to EPIC, and I completed scripts to allow the employee to perform the same essential work flow in the new application. I continue to provide updated scripts for this project as of 2022.

- Employment Development Department, Sacramento, CA
  Original scripts were done for employees in Riverside, CA and San Diego CA in 2007 and migrated to Sacramento in 2012.  Job tasks included accessing a terminal emulation based system to provide EDD information to callers. I've continued to support EDD employees as of 2022 with script updates required because of system updates and new computers.

- Seattle Lighthouse for The Blind, Seattle, WA
  Project included scripts for custom machine tools that used a Windows interface. Original project was done in 2007.  Major updates to the system and expansion to other tools was done in 2012 and again in 2017. In 2022, I provided custom scripts for a store inventory and ordering system.

2

- Travis Airforce Base Call Center, Travis, CA
  Custom scripting for Travis Call Center operator software.  Original project was completed in 2010 and updated for system upgrades in 2015, 2017 and 2022.

- California State Department of Motor Vehicles, Sacramento, CA
  I have completed several projects for the CA DMV.  The original project in 2006 was to create scripts for 2 blind employees in Southern California for access to a terminal emulation based system that provided DMV information to callers and adding script code to support braille displays.  In 2008 the project was expanded to include an employee in the Sacramento call center who was not a braille user.

  In 2011, DMV implemented a browser-based front end to the older terminal emulation-based system.  This project included working with the DMV developers to implement accessible web code and add scripts to smooth out employee workflow.  Scripts were also developed then for DMV's softphone system.

  In 2013, DMV workstations were migrated to Windows 7 and the scripts were modified to support the new operating system.

- Alaska Airlines, Seattle, WA
  Proprietary software used by Alaska Airline to complete airline reservations.  Original project was completed in 1999 and used by up to 3 employees until 2019.  I provided periodic updates and script fixes every few years as the system was updated.  Project included two re-writes of the scripts to accommodate software updates.

- CalTrans, Oakland, CA
  Created scripts for custom database systems for CalTrans.  Project included braille access to proprietary Highway Patrol accident notification system and Remote Desktop access to statewide highway repair status database.

- Disney Travel, Anahiem, CA
  Original project involved scripts for terminal emulation-based application to schedule reservations at Disney properties. When Disney migrated to a web-based system, I met with developers to advise on and test accessible implementation of new system.

3

PL_EXPERT0033

# Exhibit J

# **Invoice**

## **Adaptive Technology Services**

San Francisco, CA 94103
2 McLea Court

| Date | Invoice # |
|------|-----------|
| 1/6/2023 | 38887 |

| Bill To |
|---------|
| TRE Legal Practice<br>ATTN:Timothy Elder<br>1155 Market Street, Tenth Floor<br>San Francisco, CA 94103 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 3 | Scripting for Jaws<br>Date: 12/21/22<br>Consultant: Steve Clark | 195.00 | 585.00 |

Thank you for choosing Adaptive Technology Services

Adaptive Technology Services
EIN#35-2161899

| **Total** | $585.00 |
|-----------|---------|