Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF + HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone:      (510) 999-7908
Facsimile:      (510) 999-7918

Attorneys for Defendant
COUNTY OF ALAMEDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LISAMARIA MARTINEZ,<br><br>              Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA,<br><br>              Defendant. | Case No.  20-cv-06570-TSH<br><br>**DEFENDANT COUNTY OF ALAMEDA'S NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 3 TO EXCLUDE IMPROPER TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT WITNESSES AND TESTIMONY AS TO MATTERS BEYOND THEIR AREAS OF EXPERTISE; DECLARATION OF NICHOLAS D. FINE**<br><br>PTC:          February 15, 2024<br>TIME:         10:00 a.m.<br>DEPT:         Courtroom G, 15th Floor<br>JUDGE:       Hon. Thomas Hixson<br>TRIAL:        March 25, 2024 |

ORBACH HUFF + HENDERSON LLP

TO THIS HONORABLE COURT, PLAINTIFF AND HER ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 15, 2024, at 10:00 a.m., or as soon thereafter as this Honorable Court may hear said motion, Defendant COUNTY OF ALAMEDA ("Defendant" or "County") will move *in limine* for an order limiting or precluding the testimony of Plaintiff's expert witnesses, including Steven Clark, Karen McCall, and Eve Hill.

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, Declaration of Nicholas D. Fine, and any further evidence that may be presented at the hearing on the Motion. Pursuant to this Court's Case Management Order regarding pretrial and trial procedures, counsel for both parties have been in continuous discussions regarding trial filings in this matter, including the subject of this Motion. Notwithstanding those discussions, the parties were unable to agree on the issues advanced herein.

## I.   SUMMARY OF ARGUMENT AND KEY FACTS

Plaintiff Lisamaria Martinez ("Plaintiff"), a disability-rights activist with a vision disability, claims to have been subjected to disability discrimination on March 29, 2019, by employees of the County Clerk-Recorder's Office ("CRO"), when Plaintiff sought to file a Fictitious Business Name Statement ("FBNS") at the CRO's physical office in Oakland, California. Specifically, and despite the fact Plaintiffs' own recordings of the incident reflect fluent communications between Plaintiff and the County's employees, Plaintiff alleges that the County failed to provide Plaintiff with an auxiliary aid or service, in the form of "scribe services," which Plaintiff claims was necessary to ensure "effective communication" between Plaintiff and the County and for Plaintiff to enjoy the benefits of the CRO's programs, services, or activities. Plaintiff brings suit for disability discrimination under the ADA and derivative state statutes.

As part of her initial expert disclosures, Plaintiff designated Steven Clark and Karen McCall as experts on the subjects, broadly, of PDF and other software "accessibility" and adaptive technology. Declaration of Nicholas D. Fine ("Fine Dec."), ¶¶ 3-4, Exs. A, B. In response to the County's designation of Cris Vaughan as an expert on accessibility under the ADA, Plaintiff designated Eve Hill as a rebuttal expert. Id., ¶ 5, Ex. C. (Clark, McCall, and Hill are collectively referred to herein as the "Expert Witnesses.") Plaintiffs' Expert Witnesses should be precluded from offering opinions that are irrelevant, lack foundation, lay, speculative, conclusory, prejudicial, based on hearsay and draw legal and factual conclusions.

///

Def Co/Alameda's Notice of Motion and MIL No. 3 to Exclude Improper Expert Testimony & Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

## II.  STANDARDS GOVERNING WHETHER TO ALLOW EXPERT TESTIMONY

The County moves under Federal Rules of Evidence 403, and on foundational grounds, to limit the testimony of Plaintiffs' three Expert Witnesses.  When experts such as Mr. Clark, Ms. McCall and Ms. Hill are "relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Hendrix v. Evenflo Co*., 609 F.3d 1183, 1201 (11th Cir. 2010), quoting Fed. R. Evid. 702, Advisory Committee Note, 2000 Amendment.

Federal Rules of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue: (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, in applying Rule 702, the trial court exercises its discretion regarding the admissibility of expert-technical evidence by performing a "'gatekeeping role…to all expert testimony….'" *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004); see *Daubert*, 509 U.S. at 590-592.  In this regard, it is the trial judge's role as gatekeeper to screen such testimony for relevance and reliability: that is, to make an assessment as to whether the reasoning and methodology underlying the expert testimony is scientifically valid and can be properly applied to the facts at issue.  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591-593 (1993).  "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  If not, the expert opinion is inadmissible.  *Id*.

In addition to being reliable, expert testimony must also be relevant in order to be admissible.  *Daubert*, 509 U.S. at 589.  Whether testimony is relevant depends on whether the testimony can properly be applied to assist the trier of fact in understanding and deciding facts at issue.  *Id*. at 589, 591; *Stilwell v. Smith &Nephew, Inc*., 482 F.3d 1187, 1191-1192 (9th Cir. 2007).  Thus, to meet the relevance standard, expert testimony must be "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Id*.

ORBACH HUFF + HENDERSON LLP

Furthermore, the offering party must show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion. *Daubert*, 509 U.S. at 588-590; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that a court may exclude expert opinion where it deems that the expert's opinion is not sufficiently supported by the facts or evidence upon which the expert relies in support of that opinion). In other words, expert testimony is not admissible if it is speculative. See *General Elec. Co.*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); cf. *Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 771 (2001) ("proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture"; applying a standard similar to *Daubert*).

"Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 at 146.

Thus, *Daubert* and its progeny have set forth the four elements that must be met before a proposed expert's testimony will be allowed. The courts should only allow a proposed expert's testimony if: (1) it will assist the trier of fact in determining or understanding the facts in issue because the facts are beyond the common knowledge of the average lay person; (2) the proposed expert testimony is relevant; (3) the proposed expert witness is sufficiently qualified; and (4) there is a reliable basis for expert's opinions and testimony. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 579; see also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002).

Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," a court has more control over experts than lay witnesses under Federal Rules of Evidence, Rule 403. *Daubert*, 509 U.S. at 595. In addition, the party offering an expert witness bears the burden of establishing that Rule 702 is satisfied. See *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542–43 (C.D. Cal. 2012). The following are more specific principles of law relative to expert witness testimony.

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

**A.      The Expert's Testimony Must Be Relevant**

The only evidence that is admissible at trial is evidence which proves or disproves a disputed fact of consequence.  Rule 402, states in relevant part that, ". . . Evidence which is not relevant is not admissible." "Relevant evidence" is "any evidence having any tendency to make the existence of any fact that is of consequence of the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.7 (9th Cir. 2002); see also *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986) ("The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony."); see also *Godinez v. Huerta*, No. CV16-0236-BAS-NLS, 2018 U.S. Dist. LEXIS 73623, *12, 106 Fed. R. Evid. Serv. (Callaghan) 318 (S.D. Cal. May 1, 2018).

**B.      The Expert's Testimony Cannot Invade the Province of the Jury By Suggesting the Real Facts or the Law**

Furthermore, expert witnesses are prohibited from drawing legal conclusions because to do so would interfere with the province of the trier of fact or the court.  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) ("[E]vidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible." (internal quotations omitted)); *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." (emphasis in original)).

"[I]nstructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations omitted).  An expert cannot tell the jury what the law is or how to determine liability based on the law.  *Hangarter*, 373 F.3d at 1016; *Valtierra v. City of Los Angeles*, 99 F.Supp.3d 1190, 1198 (C.D. Cal. April 13, 2015).  An expert's "opinion as to what 'current law' 'mandates' or whether defendants were 'legally' 'justified' … usurps the jury's role." *Taylor v. Lemus*, No. CV11-9614 FMO (SSx), 2015 U.S. Dist. LEXIS 186790, 2015 WL 12698306, at *6 (C.D. Cal. June 17, 2015), citing *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994).

If expert testimony is allowed, the expert's opinions cannot be expressed in a way that invades the province of the jury, such as suggesting to the jury what the "real" facts are or what legal conclusion to draw.

1   *Hangarter*, 373 F.3d at 1016; Fed. R. Evid. 704(a).  Most courts hold that an expert's opinions must be

2   explored through hypothetical questioning to avoid invading the province of the jury.  *Cooke v. City of*

3   *Stockton*, 2017 U.S. Dist. LEXIS 207779, *15 (E.D. Cal. December 18, 2017); see also *Valtierra v. City of Los*

4   *Angeles*, 99 F.Supp.3d 1190, 1198 (C.D. Cal. 2015) (excluding expert testimony that "the use of force was

5   'excessive' or 'unreasonable,' under the circumstances," but allowing expert's opinions to "be explored

6   through hypothetical questioning so as to avoid invading the province of the jury").

7       If the subject of the proffered expert testimony is "within the understanding of the average juror," then

8   under Ninth Circuit precedent, the testimony ought not be admitted.  *Rahm*, 993 F.2d at 1413; see also *United*

9   *States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001), amended by 246 F.3d 1150 (9th Cir. 2001) (holding that

10  "expert testimony must ... address an issue beyond the common knowledge of the average layman" to be

11  admissible).  The rationale underlying this point of law is the protection of the jury's province to determine

12  facts well within their ability to grasp.  *Muhktar*, 299 F.3d at 1066 n.10.

13      The federal courts also bar experts from using judicially defined or legally specialized terms, such as

14  "excessive" and "unreasonable".  See *Rascon v. Brookins*, No. CV14-00749-PHX-JJT, 2018 U.S. Dist. LEXIS

15  20088, 2018 WL 739696, at *4 (D. Ariz. Feb. 7, 2018).

16      **C.    The Expert's Opinions Must Be Based on Competent, Admissible Evidence and Cannot**

17          **Be Based On Speculation, Personal Opinion, Hearsay and/or Suggest Witness Credibility**

18      As part of its gate-keeping function, the Court is "supposed to screen the jury from unreliable nonsense

19  opinions, . . .."  *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  Expert

20  qualifications, including adequate and relevant training and experience, are required to lay the foundation for

21  the expert's opinion; otherwise, it is mere "unsupported speculation."  See *Plush Lounge Las Vegas LLC v.*

22  *Hotspur Resorts Nev., Inc.*, 371 F. Appx. 719, 720 (9th Cir. 2010).  Further, the facts or data upon which the

23  expert relies must either themselves be admissible or "of a type reasonably relied upon by experts in the

24  particular field of forming opinions or inferences upon the subject."  Fed. R. Evid. 703.

25      It further is inappropriate for an expert to attempt to impart his opinion as to a party or witness'

26  subjective knowledge or to create a question of fact as to what a party or witness knew.  *Cotton v. City of*

27  *Eureka*, No. C08-04386 SBA, 2011 U.S. Dist. LEXIS 101657 at *2 (N.D. Cal. Sep. 8, 2011), quoting *Gobert*

28  *v. Caldwell*, 463 F.3d 339, 348 n.29 (5th Cir. 2006).  Experts cannot testify that facts be found in a particular

ORBACH HUFF + HENDERSON LLP

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

way, what anyone in the incident thought or the reasons behind a person's actions. *See, e.g.*, *Valiavicharska v. Celaya*, No. CV10-04847 JSC, 2012 U.S. Dist. LEXIS 8191, at *14 (N.D. Cal. Jan. 24, 2012); *Cotton*, 2011 U.S. Dist. LEXIS 101657 at *2. An expert also cannot suggest to the jury what inferences a party should have made. *Watson v. Torruella*, No. CV S-06-1475 LKK EFB P, 2009 U.S. Dist. LEXIS 93729, 2009 WL 324805 at *6 (E.D. Cal. Oct. 7, 2009); *see also Hernandez v. City of Napa*, No. C-09-02782 EDL, 2010 U.S. Dist. LEXIS 109011, 2010 WL 4010030 at *6 (N.D. Cal. Oct. 13, 2010) (stating that expert testimony cannot contain speculative conclusions).

Expert witness testimony also cannot be used as a backdoor means to present otherwise inadmissible hearsay evidence to the jury. Fed. R. Evid. 703; *U.S. v. Velasquez*, 2011 U.S. Dist. LEXIS 132701, 2011 WL 5573243 at *3 (N.D. Cal. Nov. 14, 2011); *see also U.S. v. Santini*, 656 F.3d 1075, 1078 (9th Cir. 2011). An expert may not opine on the subjective intent, motive, or beliefs of anyone involved in the incident. *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 (9th Cir. 1980) (finding trial court's admission of expert testimony regarding parties' subjective intents was error, even though it was harmless error in that case).

In addition, an expert witness is not permitted to testify as to a witness' credibility or to testify in a manner as to suggest whether a witness is credible. *See United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989). Opinions that make credibility determinations or draw inferences are impermissible as these tasks are for a jury and are not ones for which an expert's opinion is necessary. *See, e.g.*, *Cooke v. City of Stockton*, 2017 U.S. Dist. LEXIS 207779, 2017 WL 6447999 (E.D. Cal. December 18, 2017), *6.

**D.    Any Permissible Expert Opinions Should Be Established Through Hypothetical Questioning**

The courts routinely hold that an expert's opinions must be explored through hypothetical questioning to avoid the expert offering impermissible testimony, such as that discussed herein. *Cooke*, 2017 U.S. Dist. LEXIS 207779 at *15; *Engman v. City of Ontario*, No. EDCV 10-284 CAS (PLAx), 2011 U.S. Dist. LEXIS 66128, *7 (C.D. Cal. June 20, 2011); *see also Valtierra*, 99 F.Supp.3d at 1198 (excluding expert testimony that "the use of force was 'excessive' or 'unreasonable,' under the circumstances," but allowing expert's opinions to "be explored through hypothetical questioning so as to avoid invading the province of the jury").

///

///

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

1

## III. LEGAL ARGUMENTS

2      **A.      Plaintiffs' Expert Witnesses' Opinions Concerning Interpretation of Federal ADA Law**

3              **and Ultimate Questions of Fact Should Be Excluded**

4              Plaintiff intends to offer opinions from her Expert Witnesses concerning their interpretation of legal

5      precedent and how that applies to ultimate questions of fact in this case. However, it has long been stated that

6      questions of law are for the Court to decide and questions of fact are for the jury to decide. An opinion as to an

7      interpretation of federal ADA statutes, regulations, and corresponding case law, as Plaintiff seeks to elicit from

8      her experts, does not satisfy any of the elements of Federal Rules of Evidence 702, nor does their application of

9      such interpretations to ultimate questions of fact in this case. Such an "opinion": (1) is not scientific, technical,

10     or based on some other specialized knowledge that Plaintiff's experts may have; (2) is not based on sufficient

11     facts or data; (3) is not the product of reliable principles and methods; and, (4) Plaintiffs' experts could not be

12     deemed to have reliably applied the principles and methods to the facts of the case.

13             Such an opinion of an "interpretation" of law is not allowed under Federal Rules of Evidence Rule 703,

14     either, as such an opinion is not based on "facts or data in the case that [the expert witness] has been made

15     aware of or personally observed." In short, Plaintiff simply wants her Expert Witnesses to opine as to what

16     they believe the ADA requires, as a matter of law, thus invading the province of the Court, and how those

17     requirements should apply to ultimate questions of fact in this case, thus invading the province of the jury.

18     These are not matters on which an expert should be allowed to opine before a jury; legal questions are for the

19     Court to decide and factual questions are for the jury. It would violate well settled and accepted authority as

20     well as Federal Rules of Evidence 702 and 703 for Plaintiff's Expert Witnesses to offer their "interpretation" in

21     the form of an opinion as to any legal authority, and how that interpretation should be applied to questions of

22     fact in this case.

23             Even if the law to be determined is California law, it is not for an expert to decide. Rather, where there

24     is a question of California law in a court of review, California Rules of Court Rule 8.548 is applied, which

25     provides as follows:

26     (a) Request for decision
        On request of the United States Supreme Court, a United States Court of Appeals, or the court
27     of last resort of any state, territory, or commonwealth, the Supreme Court may decide a
        question of California law if:

28

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

1    (1) The decision could determine the outcome of a matter pending in the requesting court; and

2    (2) There is no controlling precedent.

3    Cal. Rules Ct., Rule 8.548(a).  Certainly, if reference to an "expert" would suffice, California Rules of Court

4    Rule 8.548 would not have been enacted to authorize the California Supreme Court to decide a question of law

5    – such reviewing courts would simply send the matter back to the trial court to have the trial court refer to a so-

6    called expert's interpretation of the law.  This is not how questions and issues of law are in this district.

7    Accordingly, for these reasons, the County seeks to have the following opinions and corresponding testimony

8    excluded, which constitute either improper interpretations of the law or the witness's conclusions of ultimate

9    facts.

| Expert Witness | Opinions and Corresponding Testimony |
|---|---|
| Steven Clark | (1)  The County's FBNS form, in PDF format, is not "accessible," which is clearly a reference to ADA standards (Fine Decl., ¶ 3, Ex. A, at PL_EXPERT0027). |
| | (2)  The County's FBNS form, in PDF format, cannot be "independently completed by a blind person who needs non-visual access through screen reader technology," particularly to the extent Mr. Clark is suggesting that the ADA contains an "independent completion" standard for reasonable accommodations (Id., Ex. A at PL_EXPERT0027). |
| | (3)  That the above two opinions "are true no matter which screen reader or PDF viewer might be used" (Id., Ex. A at PL_EXPERT0027). |
| | (4)  The County's electronic FBNS form/software wizard cannot be "independently completed by an average blind person who needs non-visual access through screen reader technology," particularly to the extent Mr. Clark is suggesting that the ADA contains an "independent completion" standard for reasonable accommodations (Id., Ex. A at PL_EXPERT0044). |
| | (5)  The process for a blind applicant to use the electronic FBNS form on the |

ORBACH HUFF + HENDERSON LLP

| Expert Witness | Opinions and Corresponding Testimony |
|---|---|
| | CRO's kiosk adds significant time and complexity to the process that a sighted applicant would experience. (Id., Ex. A at PL_EXPERT0044).<br>(6) Providing scribe services to fill out a paper FBNS at the check-in desk as described by Ms. Greco would be much faster and less complex and confusing for a blind person than the process involving the CRO's kiosk and electronic FBNS. (Id., Ex. A at PL_EXPERT0044-45.) |
| Karen McCall | (1) The four versions of the County's FBNS form, in PDF format, are not "accessible," which is clearly a reference to ADA standards (Fine Decl., ¶ 4, Ex. B, at PL_EXPERT0040);<br>(2) The four versions of the County's FBNS form, in PDF format, cannot be "independently completed" by a blind person who needs non-visual access through screen reader technology," particularly to the extent Ms. McCall is suggesting that the ADA contains an "independent completion" standard for reasonable accommodations (Id., Ex. B, at PL_EXPERT0040);<br>(3) That two of the versions of the County's FBNS form, in PDF format, represent a degradation on "accessibility" when compared with a prior version, to the extent McCall is testifying as to "accessibility" requirements under the ADA (Id., Ex. B, at PL_EXPERT0040).<br>(4) The problems allegedly identified in the third version Ms. McCall analyzed in December 2022 allegedly have not been addressed as of the date of her supplemental report, which pertains again to her opinions regarding "accessibility." (Id., Ex. B, at PL_EXPERT0040). |

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

| Expert Witness | Opinions and Corresponding Testimony |
|---|---|
| Eve Hill | (1) That the County's expert witness, Cris Vaughan, is "not an expert" (Fine Decl., ¶ 5, Ex. C, at p. 1); |
| | (2) A scribe is a common auxiliary aid provided by Title II entities to effectively communicate with blind people (Id., Ex. C, at p. 3); |
| | (3) The County's offered auxiliary aids when Plaintiff visited the CRO on March 29, 2019, were not "equally effective" to Plaintiff's requested aid, particularly to the extent Ms. Hill is asserting that a public entity has an obligation to provide an auxiliary aid or service that is "equally effective" to the auxiliary aid or service requested by the person with a disability (Id., Ex. C, at p. 3); |
| | (4) The County's expert has not shown that the County's alternative aids offered today on the computer are "equally effective" to the requested scribe, particularly to the extent Ms. Hill is asserting that a public entity has an obligation to provide an auxiliary aid or service that is "equally effective" to the auxiliary aid or service requested by the person with a disability (Id., Ex. C, at p. 4). |

**B.    Clark's Opinions are Cumulative of McCall's Opinions**

McCall intends to testify that, in her opinion, the four different versions of the County's FBNS, in PDF format, which she obtained online, are not "accessible." Fine Decl., ¶ 4, Ex. B, at PL_EXPERT0040. Likewise, Clark intends to testify that the (one) version of the County's FBNS that he analyzed, in PDF format, is not "accessible." Id., ¶ 3, Ex. A, at PL_EXPERT0027. Even if this testimony was proper, which it is not, there is no need for two different expert witnesses to provide the exact same testimony. As such, Clark's testimony concerning the accessibility of the County's FBNS, in PDF format, should be excluded as cumulative. *United States v. McCollum*, 732 F.2d 1419, 1426 (9th Cir. 1984) ("The trial court acted within its discretion by excluding Dr. Walker's testimony, particularly because the subject of that testimony was the same as that of Jorgensen's and the testimony would have been cumulative.").

Defendant Co/Alameda's Motion In Limine No. 3 to Exclude Improper Expert Testimony and Opinions [20-cv-06570-TSH]

ORBACH HUFF + HENDERSON LLP

**C.      Clark Lacks Expertise to Support His Testimony**

Mr. Clark asserts that he is an expert in adaptive technology and accessibility of electronic materials. Fine Decl., Ex. A, at PL_EXPERT0031-33.  Mr. Clark is not blind and, in any event, is not an expert in whether any particular accommodation would be suitable, appropriate, or reasonable for a particular person with a vision disability, nor is he an expert on whether any particular accommodation may be more reasonable than any other accommodation in a specific individual's unique circumstances.  Again, the relevant analysis focuses on the individualized circumstances of the person with a disability, not what the "average" person with a disability might experience.  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  Thus, it is entirely improper for Mr. Clark to opine that the "process for a blind applicant to use the electronic FBNS form on the computer in the Clerk Recorder's Oakland office adds significant time and complexity to the process that a sighted applicant would experience."  Id., Ex. A, at PL_EXPERT0044.  It is likewise entirely improper for Mr. Clark to opine that "providing scribe services to fill out a paper FBNS form at the check-in desk as described by Ms. Greco would be much faster and less complex and confusing for a blind person than the process that the County has constructed…"  Id., Ex. A, at PL_EXPERT0044-45.  These opinions do not fall within Mr. Clark's alleged expertise.

**D.      Hill Cannot Testify as to Vaughan's Credibility**

Hill intends to testify that Vaughan, the County's expert witness, is not a credible witness.  Fine Decl., ¶ 5, Ex. C, at pp. 1, 4.  Such testimony is improper and should be excluded.  See *Candoli*, 870 F.2d at 506.  As discussed above, opinions that make credibility determinations are impermissible as these tasks are for a jury and are not ones for which an expert's opinion is necessary.  See, e.g., *Cooke*, 22017 WL 6447999, at *6.

**IV.      CONCLUSION**

As set forth above, Defendant County of Alameda respectfully requests the specific opinions identified hereinabove, and any corresponding testimony, be excluded in their entirety from being presented at trial.

Dated:  January 25, 2024            **ORBACH HUFF + HENDERSON LLP**

By:  _/s/ Nicholas D. Fine_____
Kevin E. Gilbert
Nicholas D. Fine
Attorneys for Defendant
COUNTY OF ALAMEDA

- 11 -

ORBACH HUFF + HENDERSON LLP

**DECLARATION**

I, Nicholas D. Fine, declare as follows:

1.      I am an attorney at law duly licensed to practice before all the courts in the State of California and the United States District Court – Northern District of California.  I am an attorney with Orbach Huff + Henderson LLP and one of the attorneys of record for Defendant County of Alameda ("County").  If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this Declaration, except as to those matters that are stated on information and belief herein.

2.      This Declaration is submitted for the purpose of presenting evidence in support of the County's Motion *in Limine* No. 3.

3.      Attached as **Exhibit A** is a true and correct copy of Steven Clark's two expert reports in this action, and his curriculum vitae.

4.      Attached as **Exhibit B** is a true and correct copy of Karen McCall's two expert reports in this matter.

5.      Attached as **Exhibit C** is a true and correct copy of Eve Hill's expert report in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25th day January, 2023, at Pleasanton, California.

 */s/ Nicholas D. Fine*
 Nicholas D. Fine

ORBACH HUFF + HENDERSON LLP

# EXHIBIT A

**ADAPTIVE**TECHNOLOGYSERVICES

## PDF Accessibility Assessment

## Alameda County Fictitious Business Name Statement

Date:                    December 21, 2022
Filename:               GBNS275-321FictitiousBusinessNameStatement-REV111422
Document Source:
Internet Archive capture of Alameda County website – www.acgov.org
Document URL:
http://co.alameda.ca.us/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf
*and also at*
https://web.archive.org/web/20221209002203/http://acgov.org/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf

JAWS Versions:        JAWS 2023 – 2023.2212.23   JAWS 2022 – 2022.2211

Acrobat Version:       Acrobat Pro 2021.007.20099

Browsers:              Microsoft Edge        Google Chrome

**Executive Summary**

It is my opinion to a reasonable degree of professional certainty as an expert in JAWS and screen reader accessibility, based on over 23 years of working with JAWS, other screen readers and PDF content, and my testing in several environments, that:

- this FBNS form is not accessible under any professional standard;

- this FBNS form cannot be independently completed by a blind person who needs non-visual access through screen reader technology such as JAWS; and

- The above is true no matter which screen reader or PDF viewer might be used.

**Document Review**

The document is a 2-page form used to provide information about the owners of a business with a fictious name.

Page 1 of the document is a form that that collects address information about the business, names and addresses of the registered owners, the type of owner.  The form

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0027

uses standard edit boxes and checkboxes.

Page 2 of the document is a text-only page of instructions for how to complete the form.

The form cannot be independently completed or signed by a blind applicant.

Label names for each of the form elements are not announced as the user tabs through the document.

When entering text in the form fields, JAWS does not echo the key names. Users cannot use the arrow keys to review entered text. The backspace key removes text but does not announce the letters being deleted.

**Test Results**

I reviewed the document from the Alameda County website. There are two ways to access PDF documents from the web; open the document and read it within the browser or download the document to the computer and open it with Acrobat Reader or Acrobat Pro. I tested both methods. Best practice for accessing PDF forms is to use Acrobat Reader or Acrobat Pro.

For the browser method I tested the document with both Microsoft Edge and Google Chrome, the two most popular browsers. The results were identical for both browsers. I was not able to successfully complete the form relying only on JAWS feedback.

For the second method, I downloaded the document and opened it in Acrobat Pro. With Acrobat Pro I was able to examine the document properties and verify that no security settings were enabled that might prevent JAWS from reading the document correctly. I was unable to successfully complete the form relying only on JAWS feedback.

In both cases, JAWS would not announce the label names of form elements or announce input into the edit boxes properly.

**Testing Notes**

When the document is first opened JAWS announces the message "document has no links" and begins reading text at the top of the second page. The document indeed has no links. JAWS should begin reading on page 1.

Document properties are set to start reading at page one, but JAWS immediately jumps to page two and starts reading. JAWS should begin reading on page 1.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0028

Users can navigate page 2 using standard JAWS navigation commands and JAWS does read the page in the correct order.

Page 2 has a document number and revision at the top of the page (275-321 [Rev. 10/18]) that JAWS does not read. When commands are given to jump to the top of the page, JAWS moves to and begins reading from the center heading ("Instructions for Completion…"). I was unable to read the document number and revision.

I could move to the first page with the standard Previous Page command (Control+PageUp). If I alt-tabbed away from the file, then alt-tabbed back, the document would jump back to the second page and JAWS would announce the title bar text (including document name). If I used any cursor navigation commands (up/down/left/right arrow, home, end, etc). The document would jump back to the second page.

The first page contains the form elements and descriptive text to provide information about each specific control. I reviewed the form elements and determined that the Form Element Properties ToolTip field was contained text values (this field is required by JAWS). The text in this field is announced by JAWS as the field label when tabbing through the form.

I could not review any non-form element text on the page 1 with Acrobat Pro. Anytime I tried to use a JAWS command to read any of the descriptive text on the page, the virtual focus jumped back to the second page.

I was able to review some non-form element text on page 1 when using a browser to access the document. However, this text was not announced in logical order, instead, JAWS would jump around to different parts of the document and blocks of text out of order.

To complete an Acrobat PDF form, a blind user presses the Tab key to move from field to field. I could press tab and the focus would move to the next field. However, JAWS would not announce the field label (the text entered in the Tooltip field of the form elements).

If I tried to use JAWS commands to read the text above or to the left of the field (where the labels are shown visually on the page), JAWS would jump back to the second page.

I could tab through the entire set of form elements, but JAWS would not announce any labels.

In the web browsers and Acrobat Pro, when I typed text in a field, it would let me enter

PL_EXPERT0029

text, but it would perform the Virtual PC cursor action for the keystroke. If I turned the Virtual PC cursor off, JAWS would announce the characters, but I was unable to use the arrow keys or backspace key to review or correct an entry. Arrow keys would move but not announce the current character. Backspace would not work at all.

Notes about the Virtual PC Cursor: The Virtual PC cursor is a JAWS feature that makes it easier to navigate web pages and some Word and PDF forms. When the Virtual PC cursor is on, a user can type Navigation Quick Keys (single letters) to jump to specific elements on a web page or in a document. JAWS automatically detects when it is in a form field and turns off the Virtual PC cursor so the user can type characters in the form field.

For example, if I typed the letter E when the Virtual PC cursor is on, JAWS will try to jump to the next edit box and say the label. If I type the letter E while the Virtual PC cursor is off, JAWS will input the character into the form element.

JAWS did not detect that is was in a form element in either the browsers or Acrobat Pro and did not turn off the Virtual PC cursor automatically.  When typing text, sometimes JAWS would enter the letter into the form element, sometimes not. I could not hear the name of any key as I filled out the form from the keyboard while JAWS was running. Instead, JAWS would announce the text as if a Navigation Quick Key action had occurred. Once I had text in an edit box, I was not able to use cursor keys to review the text letter by letter. JAWS would not announce the letters when I arrowed back. I was not able to use the backspace key to erase text while JAWS was running but could use the key when JAWS was not running.

I was able to check and uncheck check boxes, but JAWS would not announce the name of the check box as I tabbed through the list and only announced "space" when I pressed the space bar and did not announce the status of the check box.

Users are unable to sign the form without sighted assistance.

Sincerely,

Steven Clark
Adaptive Technology Services

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0030

# Exhibit H

# ADAPTIVE TECHNOLOGY SERVICES

## Alameda County Fictitious Business Name Statement

### On-Site/On-Line Assessment of Application Form

Date:                  August 29, 2023 [Date of inspection]

Location:              Alameda County Clerk-Recorder Office
                       1106 Madison St.
                       Oakland 94607

Website URL            Local on computer at on-site location
                       Off-Site Review:
                       https://rechart1.acgov.org/BusinessLicense/ASNApplication.aspx?
                       cabinet=LICENSES_FBN

JAWS Versions:         On-Site Review: JAWS 2022 – 2022.2211.7
                       Off-Site Review: JAWS 2023 – 2023.2307.37

Browsers:              Google Chrome (on-site and on-line)
                       Microsoft Edge (on-line only)

**Executive Summary**

It is my opinion to a reasonable degree of professional certainty as an expert in the field of making forms accessible to blind individuals, including the use of JAWS and screen readers, based on over 23 years of working in the field, and my testing in several environments and consideration of provided information, that:

- The electronic FBNS form (FBNS software wizard web browser format) cannot be independently completed by an average blind person who needs non-visual access through screen reader technology such as JAWS;

- the process for a blind applicant to use the electronic FBNS form on the computer in the Clerk Recorder's Oakland office adds significant time and complexity to the process that a sighted applicant would experience. Waiting for specific staff members to be prepared to support access to the computer and checking with staff after submitting the form was required to move forward in the process;

- providing scribe services to fill out a paper FBNS form at the check-in desk as

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA 94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0044

described by Ms. Greco would be much faster and less complex and confusing for a blind person than the process that the County has constructed for completing FBNS forms for blind individuals in the Oakland location.

**Site/Form Review**

The form is a 1-page form used to provide information about the owners of a business with a fictitious name.

The form collects address information about the business, names and addresses of the registered owners, and the type of owner. The form uses standard edit boxes and checkboxes. The form also uses what appears to be a third-party Calendar element and some graphic elements as controls.

I reviewed the FBNS software wizard version of the form both on-site through the provided computer kiosk at the Alameda County Clerk-Recorder Office and from my home computer on the Clerk-Recorder website.

**Process Review**

Applicants must submit the FBNS software wizard form to the Clerk-Recorder's office in person, whether they complete the form on-line or fill it out in the office. I visited the Clerk-Recorder's office with a blind individual and observed the process required to complete the FBNS software wizard at the office and file it in person.

The process introduces several steps that substantially increase the amount of time it took to complete and submit the form. See Process notes below for more information.

The process to complete and submit the form at the office required using a computer with the JAWS screen reader installed. While this program is a very popular screen reader, not all blind or low vision computer users are going to be familiar with the product. There are several other products available to visually impaired computer users; NVDA, ZoomText/Fusion, and VoiceOver are among the more popular choices. None of these other screen readers were available on the County's computer.

Below is a chart from the WebAIM 2021 Screen Reader User Survey that shows the percentage of people who use different common screen readers as their primary screen reader.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0045

| Which of the following is your primary desktop/laptop screen reader? | | |
|---|---|---|
| **Response** | **# of respondents** | **% of respondents** |
| JAWS | 832 | 53.7% |
| NVDA | 476 | 30.7% |
| VoiceOver | 100 | 6.5% |
| ZoomText/Fusion | 72 | 4.7% |
| System Access or System Access to Go | 12 | 0.8% |
| Narrator | 8 | 0.5% |
| ChromeVox | 5 | 0.3% |
| Other | 43 | 2.8% |

Source: https://webaim.org/projects/screenreadersurvey9/#primary

46% of respondents use a screen reader other than JAWS as their primary screen reader. Those applicants could have difficulty completing the form.

With respect to those blind individuals who cannot use JAWS to access the FBNS form in the Oakland location, I have reviewed the information contained in Alameda County's Response to Plt's Interrogs (Set Three) -- email 9.26.23, County's Response to Plt's RFA (Set Three) -- email 9.26.23, and a document titled "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-123].pdf."

I have also observed staff at the Oakland location providing scribe services to make corrections on a paper FBNS form for a blind person and am familiar with the signed statement of Lucia Greco, a blind individual who received scribe services at the Oakland location that I visited.

Alameda County's Response to Plt's Interrogs (Set Three) and the document title "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-1230.pdf" describe a process where the county's sighted assistant would click on portions of forms and the blind applicant would type the text. This can be confusing to the blind applicant as they will hear text as the mouse moves over it and could require some back-and-forth conversation to confirm which control has just been selected.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0046

There are also a couple of controls in the form that are difficult to use with this process, check boxes [see Figures 6 and 10] and red graphic delete symbols [see Figures 1 and 5].

For check boxes the sighted assistant would have to select (change the setting of the item) with the mouse then change it back for the applicant to use the keyboard or require the applicant to reach to the mouse and press the left mouse button to select or unselect the check box.

For the graphic delete symbols, the sighted assistant would have to place the mouse over the delete symbol and the applicant would have to press the right mouse button to perform the deletion.

This process to complete the form is complicated and would take considerably more time than using a scribe to complete a paper or electronic form.

**Web Form Test Results**

I reviewed the form on the Alameda County Clerk-Recorder offices computer on-site and from my own computer through the Alameda County website. Results were identical in both tests.

I tested the form with both Microsoft Edge and Google Chrome, the two most popular browsers. The results were identical for both browsers. The average screen reader user would not get enough information to be sure they completed the form completely and correctly. An advanced user may be able to use advanced navigation techniques or commands to complete the form, but the process would be time consuming.

**Web Form Testing Notes**

I found the basic form and navigation issues while trying to complete the form with the screen reader. These issues occurred while tabbing through the document. This is the most common way a screen reader user would try to read and navigate the page.

Business Address: is not indicated as a required field (does not announce star) [See Figure 1]



*Figure 1*

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0047

Combo Boxes below do not announce any label or required status [See Figures 2, 3, and 4]. Note: the document titled "JAWS SCREEN READER SOFTWARE INSTRUCTIONS [122-123].pdf" (page 1, last paragraph) provided by Alameda County acknowledges that these controls do not work properly, even when using the mouse to read back screen text.

Examples:

Located At:
Business Address
* State:



*Figure 2*

Located At:
Mailing Address
* State:

*Figure 3*

Is (are) hereby registered by the following owner(s):
* State of Incorporation/Organization:
* State:



*Figure 4*

If additional Business Names/Registered Owner(s) are present Remove Name/Owner graphic (Red X) is not in the tab order. [See Figure 5]

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0048

If additional Business Names are added, subsequent fields are announced as "Remove/Clear this Entry edit". [See Figure 5]



*Figure 5*

Same as Business Address check box does not indicate that it is asking if the Business Address is the same as the Mailing Address. [See Figure 6]

Mailing Address edit box line one does not announce that the field is required. [See Figure 6]



*Figure 6*

Residence Address announces only "Address Line one" and does not indicate that it is Residence Address or is a required field. [See Figure 7]



*Figure 7*

"This is the Registered Owner" check box is not announced correctly. Screen Reader announces "Enter Registered Owners Name: (which is the text of the next field, an edit box). [See Figure 8]



*Figure 8*

"This business is conducted by:" List box does not announce a label or required status. [See Figure 9]

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0049



*Figure 9*

Commencement Date: field does not announce label or required status. Screen Reader does read the highlighted text (__/__/____) multiple times. [See Figure 10]

NA check box reads instruction a. in the commencement date section as the label. [See Figure 10]

*Figure 10*

A more advanced JAWS user might use the Forms List feature to identify and complete the form. This command is activated with Insert + F5 and shows a list of the form elements found on the page and their values. I found the following problems with the form field list:

Labels are not shown for Check Boxes for "This is the Registered Owner" and "NA".

Form elements from the login page are shown in the list of Form Elements even though they are not active or can be selected. This could be confusing to the user when trying to move to specific elements on the page.

The graphic elements for Red X's (Remove/Clear This Entry) do not appear in either the tab order or the Forms List. There is a way with JAWS to get a list of graphic symbols, but they are all listed as Remove/Clear This Entry. It is not clear from the list which entry is

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0050

being removed. The average JAWS user is unlikely to be aware that the graphic symbols are there, know the command to get a list of the symbols, or be able to find and activate the correct symbol if they need to remove an entry.

**Process Notes**

I met with a blind individual at the Alameda County Clerk-Recorder's office at 1106 Madison Street, Oakland 94607. I observed the process as we checked in, were directed to the JAWS computer, and finally turned in the completed form to a clerk.

During the process of completing the form, I documented and tested how JAWS works with the on-line form and observed how the user would fill out the form. See Form Testing Notes above.

We arrived at the Clerk-Recorder's office and proceeded to the check-in location. The check-in desk is in a protected outdoor area where a line forms to check in [See Figure 11]. Users announce the service they are there for, are then given a check-in ticket with a number, then directed to the proper location in the building for that service.



*Figure 11*

When we checked in (around 10:25), there was no one in line. The applicant explained that he was blind and was there to complete a Fictitious Business Name application. We were directed to wait near the check-in counter while we were told a supervisor was being contacted. Note: The Clerk-Recorder's office knew the applicant was coming.

While we waited, several other people (4 or 5), checked in and proceeded to move through the process. After about a 10-minute wait, we were told that we could proceed

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0051

inside to the computer room located on the right just inside the main door. We were told to check in at a counter in the computer room and that they knew we were coming.



*Figure 12*

At the counter in the computer room, we were told that a supervisor had been contacted and would be with us shortly. After waiting for several minutes, the supervisor met us, introduced himself and guided us to the JAWS computer [See Figure 13]. He signed us in and made sure JAWS was running. He asked if we needed anything else and told us to ask for him at the counter when we were done with the form.



*Figure 13*

After reviewing the application and testing the web form with JAWS (see notes above) we saved and submitted the form and went back to the counter. At the counter we waited a short time while the supervisor was called back. When he returned, he

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0052

provided us with a print ticket, read us the number on the ticket, gave the ticket to the applicant, and guided us to the clerk counter area to submit the form [See Figure 14].



*Figure 14*

In the waiting area of the clerk counters there is a large screen monitor showing the current ticket being served and which (numbered) counter to go to when called [See Figure 15]. They also announce the ticket number and counter over a loudspeaker system. As we entered the room our number was called. The supervisor guided the applicant to the proper window [See Figures 16 and 17].



*Figure 15*

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0053



*Figure 16*



*Figure 17*

At the window, the applicant was asked for information to identify the application. The clerk retrieved the application on the screen and reviewed the form to confirm that the provided information was correct. The applicant noticed that the business name was incorrect. After telling the clerk the business name was incorrect, she quickly typed the correct name into the form from her computer. She then submitted the form, took the cash payment for the service, then printed the certificate and provided it to the applicant.

We then exited the building.

Adaptive Technology Services • 2 McLea Court, Suite 201 • San Francisco, CA  94103
Phone: (415) 409-6650 • Toll Free: (866) 564-6650 • Web: www.adaptivetec.com

PL_EXPERT0054

Sincerely,                              October 2, 2023

Steven Clark
Adaptive Technology Services

PL_EXPERT0055

# Exhibit I

# Steven Clark

2 McLea Court, Suite 201 | San Francisco, CA 94103 | 415.409.6650 | sclark@adaptivetec.com

## Education

- Ball State University, Muncie, IN
- Bachelor of Arts, 1983
- General Psychology

## Experience

2002 – Present
Co-Owner | Adaptive Technology Services | San Francisco, CA

1997 – 2002
Co-Owner | AccessAbility, Inc. | San Francisco, CA

1986 – 1997
Marketing Engineer | TeleSensory, Inc. | Mountain View, CA

Key Positions:

| | |
|---|---|
| 1995-1997 | Technical Marketing Support Manager/Marketing Engineer |
| 1994-1995 | Product Management Supervisor |
| 1993-1994 | Integrated Systems Manager |
| 1992-1993 | Product Manager (Screen Reader Development) |
| 1990-1992 | Product Marketing Support Manager |
| 1988-1990 | Application Engineer Supervisor |
| 1986-1988 | Application Engineer |

1984 – 1986
Computer Instructor | Sensory Access Foundation | Palo Alto, CA

# Sample Scripting and PDF Projects

- El Camino Hospital
  Modified a set of PDF forms used by the organization for use by a blind employee. Project included 12 forms that had to be completed independently by the user and faxed or emailed to other offices in the organization.

- Gardner Health Systems
  Modified a set of PDF forms used by the organization for use by a blind employee. Project included 25 forms that had to be completed independently by the user.

- Court Report Billing Project
  Modified 6 PDF forms used by a court reporter to document her court reporting activities and for invoicing her contract employers.

- Wells Fargo, Sacramento, CA
  Created custom scripts for a wide variety of applications used by a blind Business Banking Representative.  Project include scripts for proprietary customer database and account information and creating accessible PDF forms.

- MidMichigan Health, Alpena, MI
  Original scripting project completed in 2012 for a blind physical therapist.  Project included providing access to ReDoc, the electronic medical record system used by the organization at the time.  In 2017 the organization switched to EPIC, and I completed scripts to allow the employee to perform the same essential work flow in the new application. I continue to provide updated scripts for this project as of 2022.

- Employment Development Department, Sacramento, CA
  Original scripts were done for employees in Riverside, CA and San Diego CA in 2007 and migrated to Sacramento in 2012.  Job tasks included accessing a terminal emulation based system to provide EDD information to callers. I've continued to support EDD employees as of 2022 with script updates required because of system updates and new computers.

- Seattle Lighthouse for The Blind, Seattle, WA
  Project included scripts for custom machine tools that used a Windows interface. Original project was done in 2007.  Major updates to the system and expansion to other tools was done in 2012 and again in 2017. In 2022, I provided custom scripts for a store inventory and ordering system.

2

- Travis Airforce Base Call Center, Travis, CA
  Custom scripting for Travis Call Center operator software.  Original project was completed in 2010 and updated for system upgrades in 2015, 2017 and 2022.

- California State Department of Motor Vehicles, Sacramento, CA
  I have completed several projects for the CA DMV.  The original project in 2006 was to create scripts for 2 blind employees in Southern California for access to a terminal emulation based system that provided DMV information to callers and adding script code to support braille displays.  In 2008 the project was expanded to include an employee in the Sacramento call center who was not a braille user.

  In 2011, DMV implemented a browser-based front end to the older terminal emulation-based system.  This project included working with the DMV developers to implement accessible web code and add scripts to smooth out employee workflow.  Scripts were also developed then for DMV's softphone system.

  In 2013, DMV workstations were migrated to Windows 7 and the scripts were modified to support the new operating system.

- Alaska Airlines, Seattle, WA
  Proprietary software used by Alaska Airline to complete airline reservations.  Original project was completed in 1999 and used by up to 3 employees until 2019.  I provided periodic updates and script fixes every few years as the system was updated.  Project included two re-writes of the scripts to accommodate software updates.

- CalTrans, Oakland, CA
  Created scripts for custom database systems for CalTrans.  Project included braille access to proprietary Highway Patrol accident notification system and Remote Desktop access to statewide highway repair status database.

- Disney Travel, Anahiem, CA
  Original project involved scripts for terminal emulation-based application to schedule reservations at Disney properties. When Disney migrated to a web-based system, I met with developers to advise on and test accessible implementation of new system.

3

# Exhibit J

# Invoice

## Adaptive Technology Services

San Francisco, CA 94103
2 McLea Court

| Date | Invoice # |
| --- | --- |
| 1/6/2023 | 38887 |

| Bill To |
| --- |
| TRE Legal Practice<br>ATTN:Timothy Elder<br>1155 Market Street, Tenth Floor<br>San Francisco, CA 94103 |

| P.O. No. | Terms | Project |
| --- | --- | --- |
| | | |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| 3 | Scripting for Jaws<br>Date: 12/21/22<br>Consultant: Steve Clark | 195.00 | 585.00 |

Thank you for choosing Adaptive Technology Services

Adaptive Technology Services
EIN#35-2161899

| **Total** | $585.00 |
| --- | --- |

PL_EXPERT0056

# EXHIBIT B

# PDF Document Audit for Accessibility

Karen McCall, M.Ed.
December 21, 2022

Prepared for: Timothy Elder
Attorney
TRE Legal Practice
1155 Market Street, Tenth Floor
San Francisco, CA 94103
Phone: (415) 873-9199
Fax: (415) 952-9898
E-mail: telder@trelegal.com
www.trelegal.com

Signature:

Printed Name: Karen McCall

Date: December 21, 2022

# Table of Contents

**Background** ................................................................................................. **3**

International Standards............................................................................... 3

What is an accessible PDF?......................................................................... 4

Accessibility Barriers.................................................................................. 5

Access versus Accessibility....................................................................... 11

**Summary** .................................................................................................. **12**

PL_EXPERT0002

# Background

This report represents the audit of three documents hereafter referred to as Exhibit 1, Exhibit 2 and Exhibit 3:

- Exhibit 1 (Lists rev date of 10/18 in top left), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20190214191025/http://acgov.org:80/forms/auditor/275-321.pdf (February 14, 2019).

- Exhibit 2 (Lists rev date of 4/21 in top left of the first page), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20220813030306/http://acgov.org/forms/auditor/GBNS275-321Rev04-21-2021fillable.pdf.

- Exhibit 3 (Lists rev date of 11/22 in top left of the first page), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20221209002203/http://acgov.org/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf; or at http://co.alameda.ca.us/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf.

## International Standards

The scope of this audit is confined to the accessibility of Exhibit 1, 2 and 3. The first page is a form, and the second page contains instructions on how to fill out the form.

The following are international standards for accessible PDF:

- ISO 14289: 2014 or PDF/UA (Universal Accessibility)[1].

- ISO 32000 – 1:2008[2].

- ISO 32000 – 2:2017[3]  (PDF).

---

[1] ISO 14289: 2014, ISO: ISO - ISO 14289-1:2014 - Document management applications — Electronic document file format enhancement for accessibility — Part 1: Use of ISO 32000-1 (PDF/UA-1)

[2] ISO 32000 – 1:2008, ISO: ISO - ISO 32000-1:2008 - Document management — Portable document format — Part 1: PDF 1.7

[3] ISO 32000 – 2:2017, ISO: ISO - ISO 32000-2:2017 - Document management — Portable document format — Part 2: PDF 2.0

PL_EXPERT0003

ISO 32000 chapter 14 details the ability to tag PDFs to make them accessible. ISO 14289 contains the specifications for implementing chapter 14 of ISO 14289. ISO and the PDF Association are currently working on an update to ISO 14289 – 1:2014. As a result, the international standard for PDF is ISO 14289 – 1:2014. ISO 32000 – 2: 2017 is only referenced if there is a significant change between the standards that may affect accessibility.

ISO is the International Standards Organization, the governing body that sets international standards for many things, including archival PDF and document management systems.

The PDF Association has published the "Tagged PDF Best Practice Guide: Syntax"[4].

The other international standard is WCAG 2.1 (Web Content Accessibility Guidelines). The WCAG is published by the W3C (World Wide Web Consortium, WAI (Web Accessibility Initiative). The WCAG criteria are now part of ISO as ISO/IEC 40500![5]

These ISO standards are referenced by legislation in several countries, including the United States (Refresh of Section 508[6], the Americans with Disabilities Act[7]), the European Union (EN 301 549: 2021 – 03[8]), the Canadian province of Ontario (Integrated Accessibility Standards Regulations[9]) and Australia (Web Accessibility in Australia, The Full Compliance Guide 2022[10])

In addition, the W3C WAI published "PDF Techniques for WCAG 2.0"[11] which attempts to map PDF accessibility to WCAG 2.0. However, there is some misinformation in these techniques, such as tagging page numbers instead of using page labels, and the techniques have not been updated. Therefore, they are not to be relied upon.

## What is an accessible PDF?

Section 7.1 of ISO 14289 states that an accessible PDF will have content marked in the structure tree with semantically correct tags in a logical reading order. Elements that are

---

[4] Tagged PDF Best Practices Guide: Syntax, the PDF Association: Tagged PDF Best Practice Guide: Syntax – PDF Association

[5] WCAG 2.0 is now ISO/IEC 40500, W3C website: WCAG 2.0 is now also ISO/IEC 40500! | W3C Blog

[6]  About the ICT Accessibility 508 standards and 255 Guidance, US Access Board: Revised 508 Standards and 255 Guidelines (access-board.gov)

[7]  Guidance on web accessibility and the ADA, ADA.gov: Guidance on Web Accessibility and the ADA | ADA.gov and

[8]  EN 301 549:: 2021-03: https://www.etsi.org/deliver/etsi_en/301500_301599/301549/03.02.01_60/en_301549v030201p.pdf

[9]  O. Reg. 191/11: INTEGRATED ACCESSIBILITY STANDARDS, Government of Ontario: O. Reg. 191/11: INTEGRATED ACCESSIBILITY STANDARDS (ontario.ca)

[10]  Web Accessibility in Australia, the Full Compliance Guide 2022, Web Accessibility Australia: https://web.archive.org.au/awa/20170423124903mp_/http://www.finance.gov.au/publications/wcag-2-implementation/docs/wcag-transition-strategy.aspx

[11]  PDF Techniques for WCAG 2.0, W3C, WAI: PDF Techniques | Techniques for WCAG 2.0 (w3.org)

PL_EXPERT0004

not to be rendered to the end-user are to be marked as artifacts (part of the background and ignored by adaptive technology).

For purposes of understanding, an accessible PDF has:

- All content that needs a tag, has a tag.

- The tags are correct for the type of content (headings, paragraphs, lists, tables, figures and so forth).

- The tags/content is in a logical reading order.

ISO 14289: 2014 identifies 3 components of an accessible PDF: the document is tagged correctly, the PDF reader can render the tagged content, and the adaptive technology is able to render the accessibility features/tags of the document. The references in ISO 14289: 2014 are 6.3 Conforming Reader and 6.4 Conforming Assistive Technology.

In the case of Exhibits 1, 2 and 3, an accessible PDF reader and adaptive technology are moot points because parts of the content are not tagged.

## Accessibility Barriers

All three iterations of the form have significant accessibility barriers that impede someone without functional vision from reliably filling out the form.

Page 2, with a revision date of 10/18 is common to Exhibits 1, 2 and 3.

Exhibit 1 also has the revision date of 10/18 on page 1.

Exhibit 2 has a revision date of 04/21 on page 1.

Exhibit 3 has a revision date of 11/22 on page 1.

This indicates that the first page, the form, was removed from Exhibits 2 and 3 and replaced with an updated revision number and differently tagged (or not), page.

While this is a technique used to update forms where the form is updated but instructions are not, attention is typically paid to the tagging, inclusion of form controls in the Tags Tree, and overall accessibility of the page to be reinserted into the PDF.

**Exhibit 1** has both pages tagged. The tags are not correct. There are no form controls in the document. This means that while someone using a screen reader might be able to read the form, they cannot reliably fill it out. The phrase "might be able to fill it out" is used because the tags that are present are not correct for the type of content in the form. This demonstrates that the creator of the form knows about tagged PDF. This document would

PL_EXPERT0005

require some remediation (headings and lists structured correctly) and the addition of form controls in the Tags Tree.



Figure 1 Exhibit 1 showing the entire document has tags.

**Exhibit 2** is also inaccessible. This document does have tags for both pages. However, the tags are not correct for the type of content. The form controls are not in the Tags Tree. This means that while someone using adaptive technology might be able to read the text in the form, the form controls may not be "seen" by the adaptive technology. The phrase "might be able to read the text" is used because the text that is tagged/available to adaptive technology is not tagged correctly. While this version of the form does have the form controls added, they are not in the tags tree and therefore not accessible to adaptive technology. This demonstrates that the creator of the form knows about tagged PDF and that form controls were needed.



Figure 2 Exhibit 2 showing tags on the first page, but the form controls have not been added.

**Exhibit 3** takes a huge step backward in accessibility. The first page is not tagged at all. The form controls have been added but since only the second page is tagged, adaptive technology begins reading at page 2 and does not "see" page 1. It is not intuitive or expected that someone who cannot see the document would assume that additional content is not accessible but might be rendered to their adaptive technology. One would

PL_EXPERT0006

hear the instructions and think that the form was in a different document. Separating a form from the instructions is a technique that is sometimes used for forms and is therefore not unexpected by those of us who use adaptive technology.



Figure 3 Exhibit 3 showing only the second page of the document is tagged/accessible.

The preceding graphic illustrates that the first page of Exhibit 3 is not tagged, not accessible to end-users who are using adaptive technology.

An additional note is that asterisks are being used for something in Exhibits 1, 2 and 3 but there is no legend as to what the asterisks represent. Typically, an asterisk represents required form controls. None of the form controls on page 1 indicate that they are required.

**Exhibit 3 on iPhone**. The latest version of the form was tested on an iPhone 12 with the current iOS 16 version. The results are that there are parts of the form that are not accessible.

Parts of the text are read in a single block as illustrated in the following graphic.

PL_EXPERT0007



Figure 4 Checkbox form controls on an iPhone showing a block of text read by VoiceOver.

When the gestures for moving through the content and form controls were used, the check box for "An Individual" was not accessible. Even trying to target that check box using some functional vision with VoiceOver would not put focus on the check box so that it could be checked.

The check boxes were not accessed in a logical manner. With the blocks of text being read followed by random check boxes, the form was confusing to fill out. An end-user couldn't reliably understand where they were in the form.

PL_EXPERT0008



Figure 5 Check box on page 1 of the form, out of sequence.

After hearing the block of text shown in the previous graphic, the next element was a check box in column 2 of the series of check boxes. For someone who cannot see the form, the question arises as to whether the block of text shown in figure 4 was a single check box or not. As someone uses gestures to move through the check boxes, some of the check boxes in the first column are identified, but not in any logical order. As stated, "an Individual" is not accessed in any of the testing.

Moving forward through Exhibit 3 on the iPhone using the default onboard PDF reader, another block of text is read. However, using gestures, the end-user has already found the check boxes. It is not clear to an end-user whether this content is different from the content with the check boxes or not.

PL_EXPERT0009



Figure 6 Another block of text read as a single option on the form.

As someone using VoiceOver moves through the check boxes, blocks of text unrelated to check boxes are accessed followed by check boxes in random order. Listening to this is confusing and disorienting.

Since some of the check boxes are not "seen" by VoiceOver, a correct answer is not possible if it is one of the form controls VoiceOver doesn't "see".

PL_EXPERT0010



Figure 7 Large block of text in the checkbox area of the form.

## Access versus Accessibility

There is a difference between someone being able to access or open a document, and being able to read all content that is necessary to understanding the document or filling out a form and read it in a logical reading order.

Exhibits 1, 2 and 3 represent access to some of the content but not all the content necessary to understand the form and fill it out.

The first page of Exhibit 3, the page with the form, has no tags. This means it has no structure and the form controls cannot be recognized as part of the document's structure. The result is that adaptive technology can sometimes "see" the form controls on page 1 while at other times, it won't. During the audit, focus had to be visually forced using the mouse to form controls to be able to identify whether they were rendered to an end-user or not. This depended on being able to visually look at the contents on page 1, pick up a mouse and specifically target form controls. Most of the time this technique was not successful in

PL_EXPERT0011

providing information through the screen reader so that an end-user would be able to fill out the form.

If someone cannot see the form, they will not be able to use a mouse to target form controls.

In testing Exhibit 2 and Exhibit 3 using the JAWS 2023 screen reader and NVDA screen reader, both current versions, when asked for a list of form controls from the screen reader, the end-user is told there are no form controls.

When the Tab key is pressed to move from form control to form control in Exhibits 2 and 3, while the focus does move to the next form control, the screen readers do not announce this. From the perspective of an end-user who cannot see the form, there is no indication that Tab has moved them anywhere and no indication of the ToolTip for the form control. This means that even if they were able to know that Tab moved them to the next form control, they would not know what information to enter in the form control.

Exhibits 1, 2 and 3, are perfect examples of access to something without the accessibility component in place. Exhibit 1 has the text but not the form controls tagged, Exhibit 2 has the text tagged, form controls added but not put in the Tags Tree, and finally, Exhibit 3 has the first page of the form not tagged but has form controls and the second page has tags. All three iterations of the form represent PDFs with accessibility barriers for someone who can't visually access the form to fill it out.

An analogy would be installing a ramp to a building but not installing automatic door openers, not making the doors wide enough for a wheelchair and not installing elevators to access the floors in the building. Access but not accessibility.

# Summary

While Exhibits 1, 2 and 3 do have tags, the tags are either missing from large parts of the form or are incorrect for the type of content in the PDF.

For example, for Exhibits 1, 2 and 3, all lists on page 2 are tagged as paragraphs. This means that someone with functional vision can see the bullets and understand that the items in the list are related. Someone using adaptive technology will not be able to understand those relationships because of the missing list structure.

For Exhibits 1, 2 and 3, the two headings (one on page 1 and the other on page 2) are tagged as paragraphs. Headings are navigational points in digital content. Without the correct tags for headings, someone using adaptive technology will not be able to move

PL_EXPERT0012

between the form controls and the instructions without having to read through everything else in between those two points.

The Bookmarks in Exhibit 3 do not replicate the headings in the document. Bookmarks are a way for those who are not using adaptive technology to navigate to a specific point in the PDF. This is identified in ISO 14289: 2014 section 7.17 Navigation. Exhibits 1 and 2 do not have any Bookmarks.

Exhibits 2 and 3 have form controls, but the form controls are not in the Tags Tree. This means that they may not be rendered to the end-user in a logical manner, that they may not be seen by adaptive technology and, as stated after testing with three screen readers, the ToolTips may not be read by the adaptive technology. Without the forms being tagged correctly, content can randomly be rendered to an end-user and some parts of the content might not be rendered.

It is my opinion to a reasonable degree of professional certainty as an expert in PDF accessibility, based on international standards, 22 years of working with PDF content to provide accessibility, and testing in several environments, that:

1. Exhibits 1, 2 and 3 are not accessible under any professional standard;

2. Exhibits 1, 2 and 3 cannot be independently completed by a blind person who needs non-visual access through screen reader technology such as JAWS; and

3. Exhibit 3 represents a degradation on accessibility when compared with Exhibit 2.

Exhibits 1, 2 and 3 were tested on two Windows 11 desktop computers, Adobe Acrobat Pro DC was used with JAWS 2023 and the latest version of NVDA (Non-Visual Desktop Access). JAWS and NVDA represent the two commonly used screen readers.

Exhibit 3 was tested on an Apple iPhone 12 with an onboard PDF reader.

PL_EXPERT0013

# Exhibit B

# Updated PDF Document Audit for Accessibility

Karen McCall, M.Ed.

September 26, 2023

Prepared for:    Timothy Elder

Attorney

TRE Legal Practice

1155 Market Street, Tenth Floor

San Francisco, CA 94103

Phone: (415) 873-9199

Fax: (415) 952-9898

E-mail: telder@trelegal.com

www.trelegal.com

# Table of Contents

Background ................................................................................3

Exhibit 4 Accessibility Summary ................................................4

Comparison of Exhibit Details.....................................................6

Summary.......................................................................................7

Signature......................................................................................8

# Background

This report represents a supplement to the December 21, 2022 audit of three documents hereafter referred to as Exhibit 1, Exhibit 2 and Exhibit 3. This report compares the newly created Exhibit 4 with the previous results:

- Exhibit 1 (Lists rev date of 10/18 in top left), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20190214191025/http://acgov.org:80/forms/auditor/275-321.pdf (February 14, 2019).

- Exhibit 2 (Lists rev date of 4/21 in top left of the first page), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20220813030306/http://acgov.org/forms/auditor/GBNS275-321Rev04-21-2021fillable.pdf.

- Exhibit 3 (Lists rev date of 11/22 in the top left of the first page), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20221209002203/http://acgov.org/forms/auditor/GBNS275-321FictitiousBusinessNameStatement-REV111422.pdf.

- Exhibit 4 (Lists rev date of 12/22 in top left of the first page), which I have verified as being the same PDF available at the Internet Archive as https://web.archive.org/web/20230926002324/https://www.acgov.org/forms/auditor/GBNS275-321Rev01-01-2023fillable.pdf and, as of the date of this report, currently available active and linked to from at https://web.archive.org/web/20230926002324/https:/www.acgov.org/auditor/clerk/fbnforms.htm

# Exhibit 4 Accessibility Summary

Filename: GBNS275-321Rev01-01-2023fillable

Version ID on page 1: 275-321 [Rev. 12/22]

Exhibit 4 was downloaded from both the current website and the Internet Archive. Upon opening the form, the JAWS screen reader notifies the end-user that they are on an "empty page".

The revision date for pages 1 and 2 is 12/22.

From the December 21, 2022 report:

For purposes of understanding, an accessible PDF has:

- All content that needs a tag, has a tag.

- The tags are correct for the type of content (headings, paragraphs, lists, tables, figures and so forth).

- The tags/content is in a logical reading order.

The following graphic of Exhibit 4 from the Tags Tree in Adobe Acrobat Pro DC, shows tags (outlined in blue) for page 2 of the form but not for page 1. While page 1 does have form fields, they have not been integrated into the Tags Tree/Tags which makes them inaccessible. As indicated in the initial report, dated December 21, 2022, the "form" part of this form is not accessible.

Page **5** of **8**



Figure 1 The current (and repost of Exhibit 3) PDF form showing the Tags Tree with no tags on the first page.

# Comparison of Exhibit Details

The following table shows the similarities and differences between Exhibits 1, 2, 3, and 4.

| Description | Exhibit 1 | Exhibit 2 | Exhibit 3 | Exhibit 4 |
|---|---|---|---|---|
| **Revision Date/Page 1** | 10/18 | 4/21 | 11/22 | 12/22 |
| **Revision Date/Page 2** | 10/18 | 10/18 | 10/18 | 12/22] |
| **Page 1 is tagged** | Yes | No | No | No |
| **Tags on Page 1 are correct** | No | No | No | No |
| **Page 2 is tagged** | Yes | Yes | Yes | Yes |
| **Tags on page 2 are correct** | No | No | No | No |

# Summary

It is my opinion to a reasonable degree of professional certainty as an expert in PDF accessibility, based on international standards, 23 years of working with PDF content to provide accessibility, and testing in several environments, that:

1. Exhibits 1, 2, 3,  and 4 are not accessible under any professional standard;

2. Exhibits 1, 2, 3,  and 4 cannot be independently completed by a blind person who needs non-visual access through screen reader technology such as JAWS; and

3. Exhibits 3 and 4 represent a degradation on accessibility when compared with Exhibit 2.

4. The problems identified with Exhibit 3 in  December 2022 have not been addressed as of the date of this report.

**Note:** The signature page is a scanned image containing my signature. The rest of the document is a tagged PDF and is accessible.

# Signature

Name: Karen McCall

Date: September 28, 2023

Signature:

# Exhibit C



# Karen McCall, M.Ed.

64 West River Street
Paris ON Canada N3L 2V1
Phone: 1-519-442-2856
E-mail: k4mccall@karlencommunications.com
Web site: http://www.karlencommunications.com
Karen McCall School on Teachable: https://karen-mccall.teachable.com/

## Subject Matter Expert – Accessible Document Design/Remediation

As a woman with a disability who owns her own business (Karlen Communications), Karen is familiar with adaptive technology and the need for accessible digital content. It is what makes her employment in accessible document design possible.

Karen has authored one book that has become an essential resource for those working in the field of PDF remediation for accessibility: "Accessible and Usable PDF Documents: Techniques for Document Authors[1], Fourth edition was published in February 2017 (first edition was published in 2005). In May 2017, Karen published "Styles in Word: A Primer for Accessible Document Design[2]" in response to the need for a primer for people entering the field of accessible document design.

Other publications[3] include Disability Awareness Training [4] (to support the Ontario Government's Customer Service standard for the Accessibility for Ontarians with Disabilities Act).

In 2018 Karen contributed a chapter on Digital Accessibility for the book "Disability and the University: A Disabled Students' Manifesto[5]" edited by Christopher McMaster and Benjamin Whitburn and published by Peter Lang. She is updating her chapter for the second edition of this book, to be published in 2022.

---

[1] Accessible and Usable PDF Documents: Techniques for Document Authors, Fourth Edition: http://www.pubcom.com/books/ ,
[2] Styles in Word: A Primer for Accessible Document Design: http://www.pubcom.com/books/
[3] Complete list of publications by Karen McCall: http://www.karlencommunications.com/adobe/Publications.pdf
[4] Disability Awareness Training Resource by Karen McCall: http://www.karlencommunications.com/DisabilityRights.html
[5]  Disability and the University: A Disabled Student's Manifesto: https://www.peterlang.com/view/title/67647

There are supportive documents showcasing Karen's conference presentations, organisational memberships, experience in accessible banking and a complete list of publications attached to this PDF document. All documents are accessible.

In response to the vast number of students with disabilities who will be left behind in their educational goals due to the COVID-19 pandemic of 2020, Karen has written a blog article on Disability, Access to Education and the Pandemic[6]. She was interviewed for a Canadian Press article "Disabled Canadians feel Excluded from COVD-19 Information[7]", as well as a press release from Human Rights Watch " Protect the Rights of Persons with Disabilities During COVID-19[8]" and "Navigating COVID-19 for the Visually Impaired[9]". Karen participated in the YouTube Town Hall sponsored by the Ontario Autism Coalition and the AODA Alliance on Persons with Disabilities and COVID-19[10], as well as discussing the inaccessibility of digital learning content in a subsequent Town Hall hosted by both organisations on Students, Parents and Teachers with Disabilities and COVID-19[11]. She was interviewed on People with Disabilities and COVID-19[12] by the Interactive Accessibility Podcast and a podcast on Higher Education Post-COVID-19[13] by the Australian Disability Clearinghouse in Education and Training (ADCET). Karen was the first guest speaker for the AllyHam Meetup in its virtual incarnation, talking about the barriers encountered by people with disabilities during a global pandemic[14].

---

[6] Disability, Access to Education and the Pandemic, Karen McCall, 2020:
https://www.karlencommunications.com/adobe/PandemicAndDisability.pdf
[7] Disabled Canadians feel Excluded from COVID-19 Information, CTB News:
https://www.ctvnews.ca/health/coronavirus/disabled-canadians-feel-excluded-from-covid-19-messaging-1.4857691
[8] Protect the Rights of Persons with Disabilities During COVID-19, Human Rights Watch:
https://www.hrw.org/news/2020/03/26/protect-rights-people-disabilities-during-covid-19
[9] Navigating COVID-19 for the Visually Impaired, Open Access Technologies, Inc:
https://www.openaccesstech.com/2020/03/18/navigating-covid-19-for-the-visually-impaired/
[10] Ontario Autism Coalition and AODA Alliance Town Hall on Persons with Disabilities and COVID-19:
https://www.youtube.com/watch?v=gJ23it9ULjc
[11] Ontario Autism Coalition and AODA Alliance Town Hall on Students, Parents and Teachers with Disabilities and COVID-19: https://www.youtube.com/watch?v=phdtibf5DbM
[12] Interactive Accessibility Podcast, People with Disabilities and COVID-19:
https://interactiveaccessibility.com/content/iap-2020-e3-karen-mccall-pioneer-field-accessible-document-design
[13] Australian Disability Clearinghouse on Higher Education Podcast:
https://techcommunity.microsoft.com/t5/humans-of-it-blog/guest-blog-changing-the-world-with-inclusive-education/ba-p/1360804
[14] AllyHam Meetup recording on Persons with Disabilities and Barriers encountered with a Pandemic:
https://www.youtube.com/watch?v=Twp05FX_oiI&feature=youtu.be

PL_EXPERT0015

In November 2020, Karen was a keynote speaker at the ADCET virtual conference discussing the difference between "access" to digital content versus "accessibility" of digital content and the advocacy that had taken place toward inclusive education during the pandemic.

In March 2021, Karen participated in a follow-up AllyHam meetup talking about the lessons learned through the pandemic and where digital accessibility was one year later.

Karen conducts three annual research surveys on PDF and the user experience[15]e: general PDF accessibility, PDF form accessibility and PDF remediator's experience. The latest survey, conducted in the fall of 2021, focuses on the value of Alt text for those who depend on it and looks at ways to improve it or develop new technology. The survey results will be published in the summer of 2022. The survey is the foundation for a paper, co-authored by Bevi Chagnon, accepted for the ICCHP (International Conference on Computers Helping People with Disabilities to be held in the summer of 2022.)

The Karen McCall School[16] on the Teachable LMS platform provides access to self-paced online training in accessible document design and free tutorials on accessible document design.

Karen has been at the forefront of digital accessibility since the beginning of the concept. In 1999 she was contracted by Adobe Systems to review their white paper on tagged PDF for inclusive language. In 2003, Karen was employed by Adobe Systems to produce two user guides for Adobe Acrobat 6: "Reading PDF Documents with Adobe Reader 6.0, A Guide for People with Disabilities"[17] and "Creating Accessible Adobe PDF Documents with Adobe Acrobat Pro 6.0." In 2016 Adobe Systems contracted Karen to develop and write an accessible PDF training curriculum for their premier clients. The training curriculum included the instructor workbook, participant workbook, exercise documents, videos of the remediation techniques and a practical test for Adobe Systems certification. Karen taught the first iteration of this curriculum.

## Focus on Inclusive Communities

In 1989 Karen spoke at an event for Canadian National Access Awareness week on the shift from the medical to the social model of disability ("Timmy doesn't live here anymore"). In 2009 she published a white paper based on the newly passed legislation in Ontario

---

[15] PDF and the User Experience Survey: http://www.karlencommunications.com/PDFsurvey.html
[16]  Karen McCall School on Teachable: https://karen-mccall.teachable.com/
[17] Reading PDF Documents with Adobe Reader 6.0, A Guide for People with Disabilities: https://www.fcc.gov/accessibility/docs/reading-pdfs-guide.pdf

PL_EXPERT0016

(Accessibility for Ontarians with Disabilities Act) on the need to create an inclusive education standard.

Karen has a history of working for non-profits and foundations. In 2007 she provided hands-on training on accessible document design for Winrock International[18] at their Washington DC and Little Rock AK offices. In 2015 Karen provided accessible Word document remediation services and consultation on creating more accessible Word templates for Wellspring Advisors.[19]  In 2017 Karen provided accessible document remediation services to the San Diego Futures Foundation[20] for their employee handbook.

In 2013, after attending workshops on the CRPD and the UNICEF Forum on Children with Disabilities held in New York, Karen began actively advocating for a global inclusive education standard[21] as a baseline for all countries that adopt the CRPD. Karen has an article published in the Journal of Technology & Persons with Disability.[22]

Karen McCall represents Canada on two mirror committees for ISO: Accessible Tourism and Active Assisted Living. She recently joined the ISO Technical Management Group, Strategic Advisory Group on Accessibility. Karen has been a member of the City of Brantford Tourism Committee for three years. In 2012 she was an active member of the Specialized Transportation Committee for the County of Brant.



As a Microsoft Most Valued Professional for Office Apps and Services (MVP from 2009-present) and a Microsoft Accessibility MVP (2014-present), Karen appeared on a panel at the Microsoft MVP Summit on Inclusion in Technology in 2016. Karen accepted an invitation to a panel discussing Accessibility and Technology for the Microsoft Ignite conference in September of 2017. In 2020 she participated in a day-long virtual conference representing the need to develop inclusive digital ecosystems and content. Karen wrote a guest blog for the Microsoft Humans of IT in 2020 titled "Changing the World through Inclusive Education"[23]. She was featured in a Microsoft MVP Spotlight article[24].

---

[18] Winrock International: https://www.winrock.org/about/
[19] Wellspring Advisors: https://www.wellspringadvisors.com/our-mission/
[20] San Diego Futures Foundation: http://sdfutures.org/
[21] Karlen Communications, Conference Handouts page:
http://www.karlencommunications.com/handouts.html
[22] Journal of Technology and Persons with Disability, Volume 4:
http://scholarworks.csun.edu/handle/10211.3/180111
[23]  Humans of IT Blog, Microsoft, Changing the World through Inclusive Education:
https://techcommunity.microsoft.com/t5/humans-of-it-blog/guest-blog-changing-the-world-with-inclusive-education/ba-p/1360804
[24]  Microsoft MVP Spotlight, Karen McCall: https://mvp.microsoft.com/en-us/spotlight/Karen%20McCall-20150126140846

PL_EXPERT0017

Karen became involved in a loosely formed group in 2002 to establish international standards for accessible PDF documents. This group was brought under the ISO (International Standards Organization in 2006. Karen is a Canadian delegate to the ISO 3200 (PDF) and ISO 14289 (PDF/UA Universal Access) committees from 2005-2008 and 2012-2018 and recently rejoined both ISO committees and the PDF Association. She is currently a member of the Standards Council of Canada's [Technical Standard for Plain Language](#)[25] committee and the Technical Standard for ICT (Information Communication Technology) committee.

 Karen participates in #A11yHam meetings as a facilitator of roundtable discussions on inclusion and as a host for the Meetup meetings. The Hamilton Ontario accessibility Meetup group launched in January 2019 with over 100 participants. Meetings are held at the Fennell campus of Mohawk College, where Karen is adjunct faculty in the Accessible Media Design post-graduate certificate program.

## Security Clearances

In 2022 Karen is a consultant for Microsoft Corporation and passed a HireRight background check that included Canadian criminal and credit checks.

In 2021 Karen was a consultant for Crawford Technologies and passed a HireRight background check that included Canadian criminal and credit checks.

In 2014 Karen worked on Canadian federal government documents and passed a security check by CSIS (Canadian Security Intelligence Service).

In 2009, Karen was under contract with a company in the US to make FDIC (Federal Deposit Insurance Commission) documents accessible from bankrupt/closed banks in the US. To do this, she had to be fingerprinted and undergo an FBI security check which she passed.

## Academic Advisory Committee Work

In 2016 Karen was asked to join the advisory boards for two inclusive education programs at the post-secondary level. Mohawk College in Hamilton, Ontario, offers a course for journalism students on accessible document design. Seneca College in Toronto was developing a course on inclusive design and rethinking our approach to digital content, but

---

[25]  Technical Standard for Plain Language, government of Canada: [https://accessible.canada.ca/creating-accessibility-standards/technical-committee-plain-language](https://accessible.canada.ca/creating-accessibility-standards/technical-committee-plain-language)

PL_EXPERT0018

the program did not run, and the advisory board was disbanded. Karen has been a member of these advisory boards since 2016.

In 2017, Karen was asked to teach the Mohawk College Accessible Media Design course. The first iteration of the course was successfully introduced in December 2017. Karen continues to teach this course.

Member of the planning committee for Georgian College certificate program in Adaptive Technology [2001]

Member: Distributed Learning Task Force at Sheridan College, Oakville, Ontario  [1999-2000]

## Education

There are two parts to this section of the CV: education level earned and courses taught.

- M.Ed. in Adult Education.
- B.Ed. and Ontario Teachers Certificate. (Junior/Intermediate, additional qualification Special Education, Level 2, Learning Disabilities).
- Computer Systems Analyst, Level 1.

**Mohawk College**
In 2022 Karen is project lead and SME (Subject Matter Expert) for four micro-credential courses offered through Mohawk College. The courses are Accessible Office Documents 1, Accessible Office Documents 2, Accessible PdF: Introduction and Accessible PdF: Advanced.

Karen developed and currently teaches two courses in the Mohawk College Accessible Media Production graduate certificate program: Accessible Word and Powerpoint and Accessible PdF and PdF Forms.

Co-developed, authored, and delivered a certificate course for rehabilitation professionals on adaptive technology used by blind or visually disabled people.

**Northcentral Technical College, Wausau Wisconsin**
The following courses were developed, written and taught by Karen McCall as distance education courses:

- Assessment and Evaluation Methods for Adaptive Technology
- Concepts of Adaptive Technology
- ZoomText and Magic for Windows

PL_EXPERT0019

**APSEA/Mount St. Vincent's University**
Co-developed, authored and delivered a summer course on
adaptive technology for those of us who are blind or visually
disabled as part of the Teachers of the Visually Disabled master's
program.



**Note:** There are footnotes in this CV that may seem
unusual but are a technique I use to optimise the accessibility of Word
documents. The inline links make it easier for those with visual, learning or
cognitive disabilities to read without disrupting comprehension but are not
accessible in print. (This text uses a Paragraph Style to create an accessible
call out.)

Attachments to this accessible PDF:

- A complete list of conference presentations.
- A complete list of publications by Karen McCall.
- A summary of experience in accessible banking
- A list of organisations, past and present.

## Additional Experience

**Karlen Communications, Owner.** (2002-present) Accessible Document Design Consultant
and trainer (including Ontario Customer Service Standards and the Integrated Accessibility
Standards Regulations), educational and workplace accommodation, workshops and
training sessions on adaptive technology for people who are blind or visually disabled;
accessible and usable digital environment design, user interface design, usability testing,
product development and consulting.  A sample of individual projects include:

Karlen Communications is "An organisation in special consultative status with the
Economic and Social Council since 2017."

> **Government of Canada/Mohawk College (2022)**. Technical writer/subject matter
> expert for three tutorials: accessible PowerPoint, Excel and templates.

> **Government of Canada, Standards Council of Canada (2022)**. Updated a series of
> accessible digital content toolkit guides and checklists. Topics included: accessible
> Office documents, accessible infographics, accessible Visio content and accessible
> social media.

PL_EXPERT0020

**Microsoft Corporation (2022)**. Consulted on PDF accessibility.

**City of Brantford Ontario (2022)**. Provided accessible Word and PDF training to over 200 staff to comply with the AODA (Accessibility for Ontarians with Disabilities Act, 2005) and the IASR (Integrated Accessibility Standards Regulations, 2012).

**International Association of Accessibility Professionals (IAAP)/International Labour Organization (ILO)** (2021) provided training, short videos and sample documents on accessible Word and the basics of tagged accessible PDF documents.

**Knowbility** (2021) Created an online course of short videos, worksheets and a participants guide on the basics of tagged accessible PDF.

**Open Access Technologies, Inc**., (2018 to 2021) Senior Advisor, Accessible Document Design. Advise this Startup company on accessible document design for their online conversion platform/tools, accessible PDF and accessible Microsoft Office documents. Provide feedback on website accessibility and platform/tool accessibility for those with disabilities.

**City of Portland OR; Toronto District School Board, Toronto  ON; and International Labour Organization (ILO)**, 2020-2021; Zoom-based staff training on accessible Word, PowerPoint, PDF and PDF forms.

**Instructional Design Manager, Ryerson University, Distance Education Unit (Toronto, ON) (2000-2003)** Managed legacy course maintenance, facilitated course start-up each semester, worked on the instructional design process for unit, worked collaboratively with faculty, Program Directors, Coordinators and support staff to manage approximately 160 distance courses for DEU; this work involved negotiation, troubleshooting, problem solving and counselling skills.

PL_EXPERT0021

# Exhibit D

**Karen McCall, M.Ed.**

Karlen Communications

64 West River Street, Paris ON Canada N3L 2V1E-mail: info@karlencommunications.com

Phone:1- 519-442-2856

An Organization in special consultative status with the Economic and Social Council since 2017

## Publications – Books with ISBN Numbers

- A Primer for Accessible PowerPoint Presentation, 2022, ISBN 978-1-988936-04-8.
- End User Testing of PDF Documents, 2022, ISBN 978-1-988936-07-9.
- Survey Results: People Describing Themselves during Meetings/Presentations, 2022, ISBN 978-1-988936-06-2.
- Alt Text Survey 2022, ISBN 978-1-988936-07-9.
- Alt Text Survey 2021, ISBN 978-1-988936-05-5.
- Accessibility of PDF Forms Survey 2017, ISBN 978-1-988936-01-7.
- Accessible Fillable PDF Forms using Adobe Acrobat Pro DC, 2018, ISBN 978-1-988936-03-1
- Accessible PDF Remediators Survey 2017, ISBN 978-1-988936-00-0.
- Styles in Word: A Primer for Accessible Document Design, 2014, ISBN 978-0-9868085-9-3.
- Accessible and Usable PDF Documents: Techniques for Document Authors, Fourth Edition, 2017, ISBN 978-0-9868085-3-1.
- PDF and the user Experience Survey 2016, ISBN 978-0-9868085-8-6.
- PDF and the user Experience Survey 2015, ISBN 978-0-9868085-7-9.
- Emerging Trends in Specialized Transport in Rural Communities: Exposing the Myths, 2012, ISBN 978-0-9868085-5-5.
- Microsoft Outlook 2010 from the Keyboard, ISBN 978-0-9782675-5-1.
- Accessible Document Design Using Word 2010, ISBN 978-0-9868085-1-7.
- Microsoft Word 2007 from the Keyboard, ISBN 978-0-9781272-5-1.
- Accessible and Usable PDF Documents: Techniques for Document Authors (Third Edition)
  ISBN 978-0-9868085-0-0
- Accessible and Usable PDF Documents: Techniques for Document Authors (Second Edition), ISBN 978-0-9782675-2-0.
- Accessible and Useable PDF Documents: Techniques for Document Authors, ISBN 0-9738246-1-1.
- OneNote 2010 from the Keyboard, ISBN 978-0-9782675-9-9
- OneNote 2007 from the Keyboard, ISBN 978-0-9781272-9-9

PL_EXPERT0022

- Logical Document Structure Handbook: Word 2010, ISBN 978-0-9782675-4-4.
- Logical Document Structure Handbook: Word 2010 Legal Edition, ISBN 978-0-9782675-5-1 with techniques on accessible redacted documents.
- Logical Document Structure Handbook: Word 2007, ISBN 0-9738370-9-8.
- Logical Document Structure Handbook: Word 2007 Legal Edition, ISBN 978-0-9782675-3-7 with techniques on accessible redacted documents.
- Logical Document Structure Handbook: Word 2003, ISBN 0-9738370-3-9.
- Logical Document structure Handbook: PowerPoint 2007, ISBN 978-0-9782675-6-8.
- Logical Document structure Handbook: PowerPoint 2010, ISBN 978-0-9782675-7-5

<br>

- Microsoft OneNote 2010 from the Keyboard, ISBN 978-0-9782675-9-9.
- Microsoft OneNote 2007 from the Keyboard, ISBN **978-0-9781272-9-9.**
- Internet Explorer from the Keyboard, ISBN 0-9738370-7-1.
- Outlook 2003 from the Keyboard, ISBN 0-9781272-3-4.
- Word 2003 from the Keyboard (2003), ISBN 0-9781272-0-X.
- Create Daisy Books with eClipseWriter, ISBN 0-9738246-2-X.
- Reading Daisy Books with eClipseReader, ISBN 0-9738246-3-8.
- Screen Reading and Voice Recognition, ISBN 0-9738246-4-6.
- Using Microsoft OneNote, ISBN 0-9738246-5-4.
- Introduction to Tablet Technology, ISBN 0-9738246-6.
- Microsoft Outlook 2003 with JAWS, ISBN 0-9738246-7-0.
- Microsoft Word 2003 with JAWS: Introduction, ISBN 0-9738246-8-9.
- Microsoft Word 2003 with JAWS: Intermediate, ISBN 0-9738246-9-7.
- Microsoft Word 2003 with JAWS: Advanced, ISBN 0-9738370-0-4.
- Microsoft Internet Explorer with JAWS, ISBN 0-9738370-1-2.
- Firefox with JAWS, ISBN 0-9738370-2-0.
- The Box Came Today....Now What Do I Do? (Second Edition), ISBN 978-0-9782675-1-3.
- The Box Came Today...Now What Do I Do? : A Resource for CCTV Assessment and Training, ISBN 0-9738246-0-3.

## How To Tutorials (Free)

The following documents support the creation of accessible Office documents or provide information for those of us with disabilities on using specific tools in an Office application.

- Accessible PowerPoint Placeholders.
- Aligning Data in Tables.
- Basic Keyboard Commands.

PL_EXPERT0023

- Citations And Bibliography.
- Creating and Modifying an Index.
- Customize a Table of Contents.
- Disability Awareness Training.
- Footnotes And Endnotes.
- Import Export Styles.
- Tables and Columns in Accessible Document Design.
- Text Boxes and Accessible Document Design.
- Track Changes And Comments.
- Creating and Exploding Pie Charts in Excel 2010.
- Swapping Style Sets in Word 2007.
- Adding Accessible Images to Documents.
- Make the Internet Easier to See.
- Microsoft Document Imaging Tools.
- Complete List of Narrator Commands in Windows 8.
- Office 2013 Settings.

## Publications – Journals, and Conference Proceedings

- 
- **Rethinking Alt Text: How to Improve it, 2022, co-author,** Journal of Computers Helping People with Special Needs, Springer Publication, 2022.
- **PDF and the User Experience Survey**, (author), Journal of Computers Helping People with Special Needs, Springer Publication2016.
- **The Need to Globally Define an Inclusive Education Standard**, (author), Journal of Technology, 2016.
- **A Strategic Approach to Document Accessibility: Integrating PDF/UA into your Electronic Content**, (co-author), Journal of Computers Helping People with Special Needs, Springer Publication, 2014.
- **Legislation and Standards of Accessibility versus Intelligent Design,,** (author), Universal Learning Design Conference Proceedings, 2014.

## Publications - Articles and Book Chapters

- **Disability and the University: A Disabled Students' Manifesto**, Peter Lang, revised, 2022 or 2023. Author of a chapter on digital accessibility.
- **Disability and the University: A Disabled Students' Manifesto**, Peter Lang, 2017. Author of a chapter on digital accessibility.
- **"Special Edition: Using Microsoft Office Word 2007"** written by Faithe Wempen, QUE books. I wrote Appendix C on how to create more accessible Word 2007 documents. ISBN-10: 078973608X and ISBN-13: 978-0789736086.

PL_EXPERT0024

# Exhibit E

# PDF Expert Testimony Timesheet

| Date | Hours | Minutes | Description |
| --- | --- | --- | --- |
| 25-Sep-23 | 1 | | Examine Exhibit 4, compare it with Exhibit 3, provide initial results of any improvement in accessibility/or decrease in accessibility |
| 26-Sep-23 | 2 | | Polish the findings of Exhibit 4 compared to Exhibit 3, create table comparing levels of accessibility for all four iterations of the PDF form, minor language clarifications and double checking revision dates |
| Total | | 3 | hours of work |

# Exhibit F



Karen McCall

Karlen Communications

64 West River Street, Paris ON Canada N3L 2V1

E-mail: info@karlencommunications.com

Phone: 519-442-2856

**GST # 877802710RT00 01**

# Invoice 584

**Prepared for:**   Timothy Elder

Attorney

TRE Legal Practice

1155 Market Street, Tenth Floor

San Francisco, CA 94103

Phone: (415) 873-9199

Fax: (415) 952-9898

E-mail: telder@trelegal.com

www.trelegal.com

**Date:**   September 29, 2023

**Project:**   Written testimony as an expert witness on PDF accessibility/usability

| Activity | Description | Total |
|---|---|---|
| Examine a fourth iteration of a PDF form for overall accessibility and the ability of someone using a screen reader to fill it out independently.<br><br>Provide a signed written report detailing the findings. | 3 hours @ $225.00 USD per hour<br><br>An Excel timesheet is attached to this invoice. | $ 675.00 USD |
| **Total** | | **$ 675.00 USD** |

All work was done in Canada.



PL_EXPERT0043

# EXHIBIT C

# Expert Rebuttal Report of Eve L. Hill

## Qualifications

See **Exhibit 1** and included list of publications. I have been a consultant, federal government official, local government ADA Coordinator, lawyer, and professor in disability civil rights under the Americans with Disabilities Act (ADA) and other state and federal disability rights laws since 1993. I have co-written a textbook and treatise on disability civil rights law and policy and numerous articles on various aspects of disability law and policy.

## Other Cases

Though I regularly consult on interpretations of the ADA and the implementation of its regulations, I have not previously had occasion to testify in court based upon my experience. In approximately 2011, I was retained to offer expert testimony for a flight attendants' union in an arbitration regarding my opinion on reasonable accommodations under the employment provisions of Title I of the ADA. I did not ultimately testify or produce a report in that engagement. I have given expert testimony before legislative bodies.

## Statement of Compensation

I am charging a discounted rate of $675 for all work on this matter.

## Statement of Opinions and the Basis and Reasons

**Mr. Cris C. Vaughan is not an expert in whether auxiliary aids are effective in providing equally effective communication to consumers with disabilities.**

I have reviewed the qualifications of Mr. Cris Vaughan, a purported expert in "disabled access for persons with disabilities." (Expert Report of Cris C. Vaughan, attached as Exhibit A to Defendant County of Alameda's Initial Disclosure of Expert Witnesses (10/2/23) ("Vaughan Expert Report") ¶¶ 1-8). In coming to my conclusions, I reviewed the documents listed in Table 1, below, and paid particular attention to documents relevant to assessing whether Mr. Vaughan's purported expertise encompasses the specific questions on auxiliary aids and effective communications raised by this case, such as the following documents:

- Vaughan Expert Report
- Curriculum vitae of Cris C. Vaughan, attached to Vaughan's Expert Report
- Mr. Vaughan's consulting website: https://adaconsultantservices.com/about/
- Mr. Vaughan's law practice website: https://adalegaldefense.com/
- Amended Complaint, ECF No. 84
- Text of the ADA and its implementing regulations in 28 C.F.R. pt. 35.

Mr. Vaughan appears to have expertise in the field of physical access and technical construction-related requirements of the ADA and the California building code. His consulting website offers services of Exterior ADA Audits, ADA Plan Reviews, ADA

DocuSign Envelope ID: E87099D0-3F5B-4105-AFBB-B39846042E43

CASpE Valuation/Inspection Proposals, and Expert Witness Services, all related to the physical accessibility requirements of the laws for buildings. The courses he has taught relate exclusively to physical building accessibility issues. Nothing in Mr. Vaughan's qualifications shows that his expertise includes more than a lay understanding of how various auxiliary aids and services practically work to provide equally effective communications to blind individuals like Ms. Martinez. Mr. Vaughan has no disclosed expertise on the subject of equally effective communication for blind individuals beyond that which any other attorney who has litigated under the ADA might possess.

After reviewing Mr. Vaughan's report and supporting materials, I observe that, in several respects, he does not apply the correct standard contained in the applicable Title II regulations: 28 C.F.R. §§ 35.130, 35.160. First, Mr. Vaughan wrongly frames the question as whether Ms. Martinez had "meaningful access" to the benefit of filing an FBNS on March 29, 2019. (Vaughan Expert Report ¶ 14.)[1] The correct standard to consider is whether Ms. Martinez had "an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," 28 C.F.R. §35.160(b)(1), and whether the County provided communication to Ms. Martinez that was "*as effective as communications with others.*" 28 C.F.R. § 35.160(a)(1). Rather, Mr. Vaughan states merely that communications were *effective* without qualifying the level of effectiveness required or considering the factors used to measure that effectiveness.

In addition, although he notes their existence (Vaughan's Expert Report ¶ 24), Mr. Vaughan fails to properly apply ADA regulations that require that "[i]n determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). As explained in the ADA Title II Technical Assistance Manual published by the U.S. Department of Justice, "'[p]rimary consideration' means that the public entity *must honor the choice* [of the individual with a disability], *unless it can demonstrate that another equally effective means of communication is available*, or that use of the means chosen [by the individual with a disability] would result in a fundamental alteration in the service, program or activity or in undue financial and administrative burdens." ADA Title II Technical Assistance Manual § II-7.1100, https://archive.ada.gov/taman2.html#II-7.1100 (emphasis added). Instead, Mr. Vaughan states, incorrectly, that a public entity may disregard an individual's choice of auxiliary aid or service "so long as the auxiliary aid and service provided by the public entity is effective and is provided in an accessible format, in a timely manner, and is in such a way as to protect the privacy and independence of the individual with a disability." (Vaughan Expert Report ¶¶ 25-26.) Mr. Vaughan's approach

---

[1] "Meaningful access" has typically been applied by the Ninth Circuit to disparate impact/structural analysis and not to equally effective communications on an individualized basis. *See, e.g., Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738–39 (9th Cir. 2021). In any event, Mr. Vaughan does not explain what this standard is nor how he is applying it to the facts.

would eliminate the regulatory requirement to provide primary consideration to the choice of the person with a disability.

### A scribe is a common auxiliary aid provided by Title II entities to effectively communicate with blind people.

I have continually worked with the National Federation of the Blind, the leading organization of blind people and an authority on the communication needs of a wide range of blind individuals. I have worked at the Department of Justice, the federal agency charged with interpreting the ADA Effective Communication regulations at issue in this case. I have served as the official responsible for the District of Columbia government's compliance with the ADA. I have also spent a considerable career studying, writing about, teaching, and advising covered entities on their obligations under Title II of the ADA.

The use of a human scribe to complete paper forms that blind people are unable to legibly write on is a common and often appropriate auxiliary aid anticipated by the ADA statute, regulations, guidance and best practices. In order to achieve the effective communication standard under the Title II regulations, the County would be expected to provide such a scribe unless it can offer an equally effective alternative or establish an affirmative defense not at issue in this case.

### The County's offered auxiliary aids when Ms. Martinez went to the CRO in 2019 were not equally effective to her requested aid.

I have reviewed the auxiliary aids and services offered to Ms. Martinez when she attempted to file her FBNS forms at the County's Clerk Recorder Office (CRO) in 2019. The CRO refused to provide the human scribe services Ms. Martinez requested to fill in the FBNS form at the CRO and, instead, offered her a printable and mailable PDF form and self-addressed return envelope to be completed by Ms. Martinez at home.

I have compared the effectiveness of the proposed auxiliary aid offered by the CRO with Ms. Martinez's request for a human scribe in order to assess whether the CRO's offered aid was sufficient to "ensure that communication with applicants . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In addition, I have interviewed Ms. Martinez to assess her individual needs and the various factors contemplated by the regulatory standard: "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. §35.160(b)(2). In addition, I assessed whether the CRO's offered auxiliary aid constituted "another *equally effective* means of communication" to Ms. Martinez's requested scribe, to satisfy the primary consideration standard.

DocuSign Envelope ID: E87099D0-3F5B-4105-AFBB-B39846042E13

I have identified at least two "benefits" of the County's FBNS and CRO program and service that Ms. Martinez was unable to enjoy equally in accordance with the "equally effective communication" standard if relying upon the auxiliary aids offered to her by the County during her 2019 visits.

1. The auxiliary aid offered to Ms. Martinez by the County in 2019 did not allow Ms. Martinez to enjoy the same timeliness offered to other members of the public who could obtain their FBNS certificates on the same day as their visit to the Clerk's in person office.

2. The auxiliary aid offered by the County in 2019 did not enable Ms. Martinez to enjoy the benefit of paying for her FBNS fees by credit/debit card (filing by mail requires printed paper checks). See Response to Request No. 6 in Defendant County of Alameda's Response to Plaintiff Lisamaria Martinez's Requests for Admission (Set Three) (9/26/23); Response to Interrogatory No. 30 in Defendant County of Alameda's Response to Plaintiff Lisamaria Martinez's Interrogatories (Set Three) (9/26/23).

In 2019, non-disabled individuals could have enjoyed same-day service and the ability to pay with a credit/debit card at the Clerk's in person office. Ms. Martinez was not able to equally benefit from the service afforded to others as required by the standards in the Title II regulations. For Ms. Martinez, getting assistance with writing a paper check is disproportionately difficult when compared with the ease of using a credit or debit card. Further, as illustrated in this case, the value of getting real-time feedback from a clerk who can point out errors on the form for immediate correction is not available through the paper mailing filing.

### Mr. Vaughan has not shown that the County's alternative aids offered today on the computer are equally effective to the requested scribe.

I have reviewed Mr. Vaughan's report on measures taken by the County subsequent to Ms. Martinez's experiences at the CRO in 2019. (Vaughan Expert Report ¶¶ 16-20.) I note that there are significant gaps in Mr. Vaughan's details and analysis of this technology and the process for using it. For example, Mr. Vaughan does not discuss any information as to the "timeliness" of the assistance currently offered, as compared with the time delay experienced by similarly situated non-disabled users or by Ms. Martinez if given her requested scribe. Nor does Mr. Vaughan consider staffing issues or the process for getting a qualified individual to assist with entering the password or using the computer in the public viewing room. I note that there were factual allegations surrounding the 2019 incident in which a supervisor was unavailable for an extended period of time.

Mr. Vaughan's report describes how the County's process now works using a new kiosk with human assistance going back and forth clicking on a mouse for the individual with the disability, who then types without knowing exactly what they are entering. In light of this awkward back-and-forth process, I find his categorical conclusion in paragraphs 21 and 28 that this process satisfies the "equally effective communication" standard to be unsupported by evidence or analysis. Mr. Vaughan

DocuSign Envelope ID: E87099D0-3F5B-4105-AEBB-B39846042E13

does not evaluate whether the kiosk technology is an accessible format, whether it is provided in a timely manner equal to what a person not using the kiosk would experience, nor whether it protects privacy or independence.

Leaving aside these real-world considerations of staffing and qualifications, Mr. Vaughan relies primarily on his own personal use of the County's kiosk, as a sighted person with no documented familiarity with blindness or accessibility technologies for the blind.

Such "simulated" testing used alone has been criticized as an insufficient and problematic methodology in academic literature. *See, e.g.,*
- Cynthia L. Bennett and Daniela K. Rosner, *The Promise of Empathy: Design, Disability, and Knowing the "Other," in* Proceedings of the 2019 CHI Conference on Human Factors in Computing Systems, Association for Computing Machinery, Article 298 (May 4-9, 2019), https://doi.org/10.1145/3290605.3300528;
- Simeon Keates and Peter Olaf Looms, *The Role of Simulation in Designing for Universal Access, in* Universal Access in Human-Computer Interaction, Design and Development Methods for Universal Access 58-60 (C. Stephanidis and M. Antona eds., 2014), https://doi.org/10.1007/978-3-319-07437-5_6.

Nor did Mr. Vaughan provide sufficient details about, support for, or analysis of the testing methodology he used during his visit to the CRO on September 25, 2023. For example, did Mr. Vaughan engage at the CRO as an unscheduled "real-world" walk-in customer or was he provided a scheduled tour? Did he use a peer-reviewed or published testing methodology? Did he institute any controls or standards, or consider the potential for errors or problems in his methodology? I would expect a more rigorous testing process from an expert in effective communication and assistive technologies for the blind. Without further support for this as an acceptable testing methodology, having a sighted individual such as Mr. Vaughan with no expertise in technologies such as JAWS conduct a "test" by—as far as can be determined through the information provided—closing their eyes and doing what a sighted CRO staff member tells them to do is, in my judgment, insufficient support for concluding that the CRO's current kiosk setup meets the County's obligations under Title II of the ADA.

Given the facts presented to me, I would compare the timeliness and convenience of using the County's proposed kiosk-plus-staff-assistance auxiliary aid with the timeliness and convenience of the requested scribe to determine which of those approaches was closest to the timeliness and convenience of communications with non-disabled individuals. Whereas non-disabled individuals can complete their transaction after waiting in line only one time and having one interaction with a staff person, a blind individual must wait in line, be directed to the special kiosk with assistive technology installed, await staff assistance with the kiosk, go back and

forth with the staff assistant to enter the information, and then wait in line again to submit the completed form.

Further, the specific method of communication used by Ms. Martinez should have been considered as an additional factor. It is not normal for blind individuals to be guided to enter information in a blank on an electronic document, be forced to type the information, then be positioned to enter information in the next blank and so on. Ms. Martinez has attempted on at least one other occasion to use such an approach for her GRE testing accommodations. This approach was time consuming, awkward, and not effective for her.

Finally, the kiosk-plus-staff-assistance approach is not as effective, simple, and straightforward as the approach—a scribe—requested by Ms. Martinez, which deserves primary consideration.

## Documents and Materials Reviewed

| TABLE 1: LIST OF DOCUMENTS AND MATERIALS REVIEWED |
|---|
| Amended Complaint for Discrimination in Violation of The Americans with Disabilities Act, California Government Code § 11135, and The California Disabled Persons Act, ECF No. 84 |
| Defendant County of Alameda's Initial Disclosure of Expert Witness and Exhibit A (Expert Report) (10/02/23) |
| Defendant County of Alameda's Response to Plaintiff Lisamaria Martinez's Requests for Admission (set three) (9/26/23) |
| Defendant County of Alameda's Response to Plaintiffs Lisamaria Martinez's Interrogatories (set three) (9/26/23) |
| Declaration of Lisamaria Martinez in Support of Plaintiff's Motion for Partial Summary Judgment and Declaratory Judgment, ECF No. 45-1 |
| Declaration of Lucia Greco in Support of Plaintiff's Statement of Facts and Opposition to Defendant's Motion for Summary Judgment on Declaratory Relief, ECF No. 65-5 |
| Declaration of Matt Yankee in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Defendants' Motion for Summary Judgment, ECF No. 48-3 |
| Declaration of Matt Yankee in Support of Defendant County of Alameda's Opposition to Plaintiff's Motion for Summary Judgment on Declaratory Relief and County's Motion for Summary Judgment on Declaratory Relief, ECF No. 63-3 |
| Supplemental Declaration of Matt Yankee in Support of Defendant County of Alameda's Opposition to Plaintiff's Sur Reply in Support of Motion for Summary Judgment on Declaratory Relief, ECF No. 69-2 in Support of Defendant County of Alameda's Opposition to Plaintiff's Sur Reply in Support of Motion for Summary Judgment on Declaratory Relief, ECF No. 69-2 |

| |
|---|
| Letter from TRE Legal (11/14/19) (County_0001-10) |
| 9/28/23 Email from Jocelyn Cole to All Clerk-Recorder (County_0121) |
| Auditor-Controller Agency Employee Information Handbook (Sept. 2017) (County_0016-120) |
| Fictitious Name Statement form for Be Confident Be You Coaching LLC (County_0011) |
| 3/29/19 letter from Melissa Wilk to Be Confident Be You Coaching (County_0012) |
| JAWS Screenreader Software Instructions (County_0122) |
| Audio files re waiting for supervisor at CRO in 2019 (PL0001, 3, 5) |

## Exhibits

**Exhibit 1**: Curricula vitae of Eve L. Hill, including list of publications

## Signature

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____November 1, 2023_____ in _____Arlington, Virginia_____.



Eve L. Hill

# Exhibit 1

**EVE L. HILL**

**Brown Goldstein & Levy**
Partner (2017-present)
Systemic and individual litigation, advocacy, and education under ADA and other civil rights laws.

**Inclusivity Strategic Consulting** at Brown, Goldstein & Levy
Partner (2017-present)
Assist covered entities to achieve compliance with the ADA and other civil rights laws and to become more inclusive of people with disabilities by analyzing existing policies and practices and developing policies, practices, training curricula, and other tools.

**U.S. Department of Justice, Civil Rights Division**
Deputy Assistant Attorney General/Senior Counselor (2011-2017)
Member of the leadership team of the Civil Rights Division. Oversaw the Division's litigation, investigation, negotiations, rulemaking, and technical assistance under the ADA, Section 504 of the Rehabilitation Act, Title VI and Title IX of the Civil Rights Act of 1964, and U.S. Constitution. Supervised the Division's Disability Rights, Educational Opportunities, Federal Coordination and Compliance, and Special Litigation sections, and the American Indian Working Group.

**Brown Goldstein & Levy,** Of Counsel (2011)

**Burton Blatt Institute at Syracuse University,** Senior Vice President (2009-2011)
Senior manager responsible for disability research, education, and advocacy organization.  Supervised Disability Rights Bar Association; Southeast ADA Center; Southeast Technical Assistance and Continuing Education Center for Vocational Rehabilitation; Civil Rights Team; Research Department; Communications Program.

**DC Office of Disability Rights,** Director (2007-2008)
Developed new Cabinet-level office in the District of Columbia government to ensure compliance with the ADA and other federal and local disability rights laws. Worked with all agencies across DC government to implement disability policies and procedures.

**Disability Rights Legal Center/Loyola Law School,** Executive Director/Visiting Professor (1998-2007)
Managed all aspects of non-profit disability rights organization and on-campus for-credit law school externship.  Supervised Civil Rights Litigation Project (working with pro bono legal counsel); Disability Mediation Center; Cancer Legal Resource Center; Options Counseling and Lawyer Referral Service; Community Outreach Program; Learning Rights Project.

**Civil Rights Division, U.S. Department of Justice,** Supervisory Attorney, Disability Rights Section (1993-1998)
Supervised investigation and negotiation of settlements of over 350 complaints under ADA.  Created and implemented ADA Mediation Program.  Led ADA Building Code Certification Program.  Civil Rights Division Alternative Dispute Resolution Coordinator.

**Pierson Semmes & Bemis**, Litigation Associate (1989-1993)
Handled all aspects of complex litigation in state and federal courts.

## TEACHING EXPERIENCE

Loyola Law School
 Disability Rights Law
 Alternative Dispute Resolution
 Externship supervisor for disability rights, disability mediation, and special education clinical programs

Loyola Marymount University School of Education
 Special Education Law

Univ. of Southern California Gould School of Law
 Disability Rights Law

## OTHER RELEVANT EXPERIENCE

Testimony
- Equal Employment Opportunity Commission, Listening Session on Strategic Enforcement Plan, September 22, 2022.
- Senate Special Committee on Aging, Click Here: Accessible Federal Technology for People with Disabilities, Older Americans and Veterans, July 28, 2022.
- Council of the District of Columbia Committee of the Whole and Committee on Human Services, Public Roundtable on District of Columbia Department on Disability Services' Developmental Disabilities Administration Health Initiative Program Contract, July 23, 2019.
- Testimony to the U.S. Commission on Civil Rights, The School-to-Prison Pipeline: The Intersections of Students of Color with Disabilities, December 8, 2017, https://inclusivity.consulting/2017/12/08/schoolprison-pipeline-intersection-race-disability/
- Senate Judiciary Committee, Nomination of the Honorable Neil M. Gorsuch to be an Associate Justice of the Supreme Court of the United States, March 21, 2017.
- Senate Health Education Labor & Pensions Committee, "The ADA and Entertainment Technologies," May 14, 2013.
- Senate Foreign Relations Committee, U.N. Convention on the Rights of People with Disabilities, July 12, 2012.
- Senate Health Education Labor & Pensions Committee, "The Promise of Accessible Technology: Challenges and Opportunities," February 7, 2012.

Volunteer Experience
- Bazelon Center for Mental Health Law – Board Chair, 2020-present; Board Member, 2017-present.
- Gay Men's Chorus of Washington, DC – Board Member, 2017-present.
- Disability Rights Bar Association, 2017-2022.

## SELECTED AWARDS
 2023 TASH Outstanding Leadership in Law Award
 2020 COPAA Distinguished Service Award
 2014 National Disability Institute Allen Jensen Humanitarian Public Policy Award.
 2013 Cornell Law School Public Service Award.

## BAR ADMISSIONS
State Courts – Virginia; Maryland; California; District of Columbia; Maine.  Federal Courts – 4th Circuit;

9th Circuit; D.C. Circuit; D. Colo.; E.D. Mich.; C.D. Cal.; D.D.C.; D. Md.; U.S. Supreme Court.

**EDUCATION**
J.D. cum laude, Cornell Law School – 1989.
B.A. magna cum laude, Sweet Briar College - 1986.

**SELECTED PUBLICATIONS**
o "Higher Education's Next Great Challenge: Ensuring Full Inclusion for Students with Disabilities," Inst. for Ed. Leadership, https://iel.org/higher-education-inclusion-guide (2020)
o "Panel: Building Coalitions and the Disability Rights Movement," *Georgetown Journal on Poverty Law & Policy*, co-presenter Judith Heumann, 2020, https://www.law.georgetown.edu/poverty-journal/wp-content/uploads/sites/25/2020/06/02-Hill-Heuman-Remarks.pdf
o "Over-Incarceration Hurts People with Disabilities and Wastes Taxpayer Money. Here's How to Fix It," March 5, 2019, https://inclusivity.consulting/2019/03/05/over-incarceration-hurts-people-with-disabilities-and-wastes-taxpayer-money-heres-how-to-fix-it/
o "People with Disabilities Are Being Excluded from Mainstream Jobs – How to Make Sure Your Supply Chain Isn't Part of the Problem," October 5, 2018, https://inclusivity.consulting/2018/10/05/people-with-disabilities-are-being-excluded-from-mainstream-jobs-how-to-make-sure-your-supply-chain-isnt-part-of-the-problem/
o "The ADA and the American Dream," July 26, 2018, https://inclusivity.consulting/2018/07/26/the-ada-affirmative-action-and-the-american-dream/
o "Too Many Schools Are Failing Young People with Developmental Disabilities. Here's How to Fix it," June 29, 2018, https://inclusivity.consulting/2018/06/29/many-schools-failing-young-people-developmental-disabilities-heres-fix/
o "It's Past Time to Give Workers with Disabilities A Raise," June 24, 2018, https://inclusivity.consulting/2018/06/24/past-time-give-workers-disabilities-raise/
o "Technology Vendor Contracts and Accessibility: What Every Business Lawyer Should Know," Business *Law Today,* E. Hill, L. Feingold, April 19, 2018, https://businesslawtoday.org/2018/04/technology-vendor-contracts-accessibility-every-business-lawyer-know/
o "Four Years After a Landmark Settlement in Rhode Island, the Fight for Inclusion Continues," April 10, 2018, https://inclusivity.consulting/2018/04/10/four-years-landmark-settlement-rhode-island-fight-inclusion-continues/
o "Colleges' Obligations to Students with Mental Health Disabilities at Risk of Self-Harm," April 6, 2018, https://inclusivity.consulting/2018/04/06/colleges-obligations-students-mental-health-disabilities-risk-self-harm/
o "Five Reasons to Hire More People with Developmental Disabilities – Right Now," March 13, 2018, https://inclusivity.consulting/2018/03/13/five-reasons-hire-people-developmental-disabilities-right-now/
o "Policy Brief: What School Leaders Can Do To Prepare Youth With Disabilities For Work," February 13, 2018, https://inclusivity.consulting/2018/02/13/school-leaders-can-prepare-youth-disabilities-work/
o "Preparing Transition-Age Youth with Disabilities for Work: What School Leaders Need to Know About the New Legal Landscapes," Inst. for Ed. Leadership, E. Hill, R. Kline, C. Richards, 2018, https://iel.org/blog/what-school-leaders-can-do-prepare-youth-disabilities-work
o "Whither the Disability Rights Movement? The Future of Disability Rights Law," *ABA Human Rights Magazine*, Vol. 42 No. 4, 2017, https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/2016-17-vol-42/disability-rights-under-siege/whither-the-disability-rights-movement--the-future-of-disability/
o "Department of Justice Withdraws Guidance Documents," December 22, 2017,

https://inclusivity.consulting/2017/12/22/department-justice-withdraws-guidance-documents/

o "Five Strategies for Hiring Workers With Disabilities – And Boosting Your Bottom Line – in 2018, December 22, 2017, https://inclusivity.consulting/2017/12/22/five-strategies-hiring-workers-disabilities-boosting-bottom-line-2018/

o "DOJ Will No Longer Assist Covered Entities in Understanding the Law," December 1, 2017, https://inclusivity.consulting/2017/12/01/doj-will-no-longer-assist-covered-entities-understanding-law/

o "Inclusivity 101: Q&A with Eve Hill and Regina Kline," November 7, 2017, https://inclusivity.consulting/2017/11/07/inclusivity-101-qa-eve-hill-regina-kline/

o Take Care Blog, "Schools Failing Students with Disabilities – Still," https://takecareblog.com/blog/schools-failing-students-with-disabilities-still (2017)

o Take Care Blog, "ADA Education and Reform Act," https://takecareblog.com/blog/ada-education-and-reform-act (2017)

o Take Care Blog, "School Choice May Leave Students with Disabilities No Choice," https://takecareblog.com/blog/school-choice-may-leave-students-with-disabilities-no-choice (2017)

o Take Care Blog, "Criminal Justice Reform and Disability – The Overlooked Opportunity," https://takecareblog.com/blog/criminal-justice-reform-and-disability-the-overlooked-opportunity (2017)

o "The ADA, Disability and Identity," J. of the Am. Med. Assn., co-author D. Goldstein (2016), https://jamanetwork.com/journals/jama/article-abstract/2319175

o "So You've Hired a Lawyer with a Disability … Now What? Disability and Diversity," Journal of the Institute for Inclusion in the Legal Profession at 90 (2011), https://theiilp.com/Resources/Documents/IILPReview2011.pdf

o "Legal and Policy Implications of Cloud Computing," proceedings of the Human Computer Interaction International conference (July 2011), https://link.springer.com/chapter/10.1007/978-3-642-21672-5_52

o Contributor, Litigating Employment Discrimination Cases, (Friedman, 2010, 2011)

o "Cases & Materials on Disability Civil Rights Law & Policy," Thomson-West, co-authors P. Blanck, C. Siegal, M. Waterstone (2005, 2009)

o "Future of Disability Law and Advocacy and 'The Right to Live in the World,'" Second Jacobus tenBroek Disability Law Symposium, 15 Texas Journal on Civil Liberties and Civil Rights 1, co-author Peter Blanck (Fall 2009)

o "Future of Disability Rights:  Part Three—Statutes of Limitations in Americans with Disabilities Act Design and Construction Cases," 60 Syracuse Law Review 125, co-author Peter Blanck (2009)

o "Challenging Barriers," Los Angeles Lawyer at 31, co-author Sheila Khan-Variba (November 2005), https://www.lacba.org/docs/default-source/lal-back-issues/2005-issues/november-2005.pdf

o "Disability Civil Rights Law and Policy," Thomson-West Group, co-authors Peter Blanck, Charles Siegal, Michael Waterstone (January 2004)

o "Mediation of Disputes Under the Americans with Disabilities Act of 1990," 3 Disp. Resol. Mag. 16 (1997)