# Exhibit E

1    And she still insisted, and she had been doing that for
2 however long that she waited, and she was timing it, half an
3 hour, hour, 45 minutes, however long that she said.  It was
4 during the lunchtime.
5 **Q.**  Yeah.
6 **A.**  And that's when I said I would walk away.  I would remove
7 myself.  Keep my composure.  Keep my professionalism.  I didn't
8 want her to say, "She never came back."  So I -- that's -- that
9 was my explanation for saying, "You know what?  I'm not going
10 to come back.  I've already referred you to my supervisor and
11 she will take it from here.  I'm going to walk away."
12 **Q.**  It sounds like it was a frustrating encounter for everyone
13 that day.
14 **A.**  I don't think it had to be that way; but being spoken to
15 the way she did, threatening that she was -- because I was
16 discriminating her and against the ADA and I was -- I should
17 have been -- she was not a very nice person that day, and
18 while -- especially while I was trying to help other customers.
19    So she -- I would have liked her to have a seat, you know,
20 so that way we can separate, but she insisted on staying there.
21 She waited there for however long it took.  And then my
22 supervisor also consulted with her supervisor.  So there was
23 more time.  And that's the reason I chose to walk away.
24 **Q.**  So this encounter lasted 45 minutes, an hour, maybe more?
25 **A.**  Maybe more.

1  **Q.** How long would it have taken you to write on a blank FBNS
2  form all the details that are required to complete that form?
3  **A.** I would have completed it. I know how to complete a form.
4  I'm able to complete it. I know what goes where and what's
5  correct. Three to five minutes maybe to verify everything.
6  **Q.** So for 45 minutes to an hour, maybe more, you and
7  Ms. Martinez were sort of in this deadlock?
8  **A.** Yes, because all that she asked was for me to alter the
9  form.
10 **Q.** Had you ever been trained about the duties under the ADA
11 to provide auxiliary aids and services?
12 **A.** No.
13 **Q.** Okay. Did you believe that you -- it would be breaking
14 the law for a third party to assist Ms. Martinez in filling out
15 a blank form?
16 **A.** No.
17         **MR. GILBERT:** Vague. Overbroad.
18         **THE COURT:** Overruled.
19 **BY MS. STONER:**
20 **Q.** And actually, you didn't even believe it would be a
21 violation of the law for you to write on an FBNS form for
22 Ms. Martinez.
23 **A.** It is not -- we have never, ever completed blank forms,
24 especially fictitious business name forms that would stand up
25 in court for any reason. We have never completed blank forms.

1  **Q.**   Okay.
2  **A.**   And, actually, I want to just back up.
3         On the video, she said, "It's illegal for me -- for you
4  not to help me."
5         And I said, "It could be illegal for me to" -- or whatever
6  I said -- "It's illegal for me to fill out your form."
7         So I was just reverting back to what she had said.  She
8  was forcing, and she was threatening that I was discriminating
9  against her for the ADA.
10        So she said, "It's illegal for you not to help me."
11        And I said, "It's illegal, I could be breaking the law if
12 I do fill out your form that you have signed under penalty of
13 perjury," is the form I was referring to.
14 **Q.**   So your --
15 **A.**   So that's where this language came up.
16 **Q.**   Okay.  So your statement about the law was not based on
17 your understanding of the Government Code, but based on a
18 reaction to what Ms. Martinez had told you that day?
19 **A.**   Yes.  But there is a Government Code that does say that.
20 **Q.**   Okay.  That you found out about after that date?  That you
21 found out about after that date?
22 **A.**   (Nods head.)
23 **Q.**   Oh, you have to verbally answer.
24 **A.**   Yes.
25 **Q.**   Okay.  Sorry.

1   So as of March 29, 2019, what training had you received on
2   the policy that you're referencing that prevented you from
3   filling out the form?
4   **A.**   Additional training?
5   **Q.**   Any training.  What training -- well, let me go back to
6   that.
7       We've established that it wasn't because of the Government
8   Code.  It was because of your training that you believed you
9   could not complete the form; correct?
10          **MR. GILBERT:**  Vague.  Misstates testimony.
11          **THE COURT:**  Overruled.
12          **THE WITNESS:**  Yes.  I -- it was because of our
13  training that we were not to alter documents.
14  **BY MS. STONER:**
15  **Q.**   Okay.  And was that training pursuant to a policy of
16  the County, in your understanding?
17  **A.**   Yes.
18  **Q.**   Have you ever seen a formal written version of this
19  policy?
20  **A.**   No.
21  **Q.**   In 20 years, you've never seen a formal written version of
22  this policy?
23  **A.**   We do not have policies written out that way.  We are just
24  word of mouth and training --
25  **Q.**   Okay.

1  **A.**  -- that this is what we do; this is what we don't do.
2  **Q.**  So you've never seen, like, an official policy number or
3  title or document?
4  **A.**  Not to -- no, not that I recall.
5  **Q.**  And have you ever received a copy of this policy by
6  e-mail?
7  **A.**  No.  But it's understood, though, that this would cause
8  liability on the County if we did make changes to a signed
9  document and it ended up being incorrect.
10  **Q.**  But it's not your understanding that a policy such as that
11  is equivalent to a law, is it?
12         **MR. GILBERT:**  Objection.  Asked and answered.
13         **THE COURT:**  Overruled.
14         **THE WITNESS:**  I -- I take it as equivalent.  I work
15  for the government.  This is our policy.  And it's the same,
16  and I don't distinguish between the two of them.
17  **BY MS. STONER:**
18  **Q.**  Right.  Because it's not your job to interpret the law.
19  It's your job to follow the policies?
20  **A.**  True.  But it also is not my job to fill out forms that
21  are signed under penalty of perjury for customers.
22  **Q.**  And the policy is the reason why?  You're saying the
23  policy is the reason why you cannot do that; right?
24  **A.**  Yes.  But there also -- come to find out, there is a code
25  that says that.

1  **Q.**  We're going in circles on this issue, so I want to move
2  on.
3      What training did you receive prior to March 29, 2019, on
4  the auxiliary aid requirement under the Americans with
5  Disabilities Act?
6  **A.**  I don't know what you're referring to.
7  **Q.**  Okay.  So I'm assuming that means you did not -- you were
8  not given, by the County, any guidance from the Department of
9  Justice, like a technical assistance manual?
10 **A.**  No.
11 **Q.**  You were not --
12 **A.**  We were just told to assist customers to the counter, to
13 the best of our abilities, without breaking the law.
14 **Q.**  You were never given a document that said, you know,
15 "Auxiliary Aid Policy," anything like that?
16 **A.**  Not to my recollection.
17 **Q.**  What about a document that said "Effective Communication
18 Policy"?
19 **A.**  No.  Some things are just given.
20 **Q.**  Right.
21 **A.**  You know, we want to communicate with the customer; that
22 we have to communicate, either English language.  If someone is
23 hearing impaired, we have a person on-site that speaks American
24 sign language.  So the communication is there.
25 **Q.**  So it's your -- it's your desire to help people with

1  disabilities?
2  **A.**   Of course, mm-hmm.
3  **Q.**   But also, it's your obligation to follow the policies of
4  the County?
5  **A.**   Yes.  And it's common courtesy.
6  **Q.**   And the County never gave you a written policy that told
7  you what auxiliary aids you're able to offer prior to March 29,
8  2019?
9  **A.**   Not in paper form, but it is to the best of our ability.
10 We do everything possible that is -- that is within our power
11 to serve those with disabilities.
12 **Q.**   But had anyone from the County ever trained you or told
13 you, prior to March 29, 2019, that one of the ways you can
14 assist someone who is blind is by helping them complete a blank
15 form?
16 **A.**   Not a blank form, no.  And that did not come up that day.
17 **Q.**   Okay.  So if this -- so on the date that Ms. Martinez
18 approached you, were you aware of all the requirements of the
19 ADA?  Did you feel very well-trained in that regard?
20          **MR. GILBERT:**  Overbroad.  Vague.
21          **THE COURT:**  Overruled.
22          **THE WITNESS:**  Yes, I -- I -- we do our best to
23 accommodate those with disabilities --
24 **BY MS. STONER:**
25 **Q.**   Okay.

1  **Q.**   Gotcha.  All right.
2         **MS. STONER:**  One moment, please.  Let me just...
3              (Pause in proceedings.)
4  **BY MS. STONER:**
5  **Q.**   All right.  So as of today's date, if a blind user had
6  difficulty with the kiosk system and asked you to help them by
7  transcribing on a blank FBNS form, would you have the ability
8  to do that?
9         **MR. GILBERT:**  Speculation.
10        **THE COURT:**  Overruled.
11        **THE WITNESS:**  That -- to my understanding, that would
12 be the purpose of the kiosk, is to fill out the form
13 completely.  So my filling out another blank form would not be
14 necessary.
15 **BY MS. STONER:**
16 **Q.**   I'm not asking if it's necessary.  I'm asking, if it
17 became necessary, would you have the ability to?
18 **A.**   I would have to consult with my management whether or not
19 I would be able to.  But I would be physically able to.  I know
20 how to complete forms.  But whether or not we would be allowed
21 to would be a question with my management.  But I don't see why
22 it wouldn't.
23 **Q.**   Okay.  So, but as you sit here today, you've never
24 received clear instruction from management that if an
25 individual is unable to use the kiosk -- for example, if an

1  individual was deaf and blind and they were unable to listen to
2  the screen reader software -- you have never received training
3  from your supervisors that said you could assist by writing on
4  a blank FBNS form; is that correct?
5  **A.**   That has never come up, no, in training.
6         **MS. STONER:**  Thank you.
7         **THE COURT:**  Are you passing the witness?
8         **MS. STONER:**  I'll pass the witness.
9         **MR. ELDER:**  No, no, no.
10        **MS. STONER:**  Oh.
11        **MR. ELDER:**  Not yet.
12                  (Pause in proceedings.)
13        **MS. STONER:**  Yes, the witness is passed.
14        **THE COURT:**  All right.  Do you want to take back the
15 e-mail that you handed to her?  Is that still with her?
16                  (Pause in proceedings.)
17        **THE COURT:**  Is there any questioning from defendant?
18        **MR. GILBERT:**  Yes, Your Honor.  Thank you.
19                       **CROSS-EXAMINATION**
20 **BY MR. GILBERT:**
21 **Q.**   Just a moment, please.
22        Good afternoon, Ms. Moran.
23 **A.**   Good afternoon.
24 **Q.**   Or good morning, rather.
25        Now, we heard quite a bit about your interactions with

1  or they do not want to file or take the chance of coming back
2  and paying again, then, yes, they take the document with them.
3  **Q.**  So we heard, I think it's 4 minutes and 11 seconds on the
4  audiotape.  Was that the entirety of your interaction with
5  Ms. Martinez?
6  **A.**  No.
7  **Q.**  So let's start with when she first walks up to your
8  counter.
9  **A.**  Okay.
10 **Q.**  And just broad-brush strokes, how many times did she come
11 up to your counter did you have interactions with her?
12 **A.**  Just that once.  She never left my counter.
13 **Q.**  All right.
14 **A.**  But how many interactions?  Each time I went to go look
15 for a supervisor was another interaction.  So it could have
16 been three, three interactions.
17 **Q.**  So let's just kind of do broad-brush strokes.
18       So you have a -- she comes to your counter.  You have a --
19 she's there for a prolonged period of time?
20 **A.**  Yes.
21 **Q.**  At some point does a supervisor come and meet with her?
22 **A.**  Yes.
23 **Q.**  And who is that supervisor?
24 **A.**  Laura Briones.
25 **Q.**  Was it one or more than one supervisor?