# Exhibit H

1      **MATTHEW ALAN YANKEE**,

2      called as a witness for the Plaintiff, having been duly sworn,

3      testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  You have been sworn.

6                     **DIRECT EXAMINATION**

7      BY MS. STONER:

8      **Q.**   Good morning, Mr. Yankee.

9      **A.**   Good morning.

10     **Q.**   How are you doing today?

11     **A.**   Doing good.  How about you?

12     **Q.**   Good.

13           All right.  Will you actually please state your full legal

14     name for the record.

15     **A.**   Matthew Alan Yankee.

16     **Q.**   What is your current title?

17     **A.**   Assistant controller.

18     **Q.**   At the County of Alameda?

19     **A.**   Correct.

20     **Q.**   And what was your title in 2019?

21     **A.**   Division chief for the Clerk-Recorder's Office.

22     **Q.**   So is your new title a promotion?

23     **A.**   That's correct.

24     **Q.**   Help me understand the structure of the CRO.  And I'm

25     asking about the period of 2019, March of 2019 --

**YANKEE - DIRECT / STONER**

1    capacity.

2    **Q.**   Okay.  And then we have the clerk-recorders, like

3    Ms. Moran, at the desk?

4    **A.**   Correct.

5    **Q.**   And then, third, we have supervisors, like Ms. Briones?

6    **A.**   That's correct.

7    **Q.**   And then we have another layer of supervisors above

8    Ms. Briones; is that correct?

9    **A.**   That's correct.

10   **Q.**   And then you, in 2019, would have been above that?

11   **A.**   That's exactly correct, yes.

12   **Q.**   Okay.  Did you speak on behalf of the County of Alameda at

13   your deposition?

14   **A.**   I did, yes.

15   **Q.**   And let me back up a bit for the jury.

16        Were you deposed two times in this case?

17   **A.**   I was.

18   **Q.**   I'm very sorry.

19        Do you understand that at the second of your two

20   depositions, you were designated to speak on behalf of

21   the County as a corporate representative?

22   **A.**   Yes.

23   **Q.**   And yesterday -- and, sorry.  Going to that deposition, if

24   you'll recall, were you given a list of deposition topics that

25   you were asked to speak for the County on during your

**YANKEE - DIRECT / STONER**

1          persons claiming any kind of liability for improperly

2          transcribed information or improperly given advice."

3   **A.**   Okay.  So the question is, was I --

4   **Q.**   Was that one of the topics you spoke on?

5   **A.**   Yes.

6   **Q.**   Okay.  And another topic that I'm wondering if you spoke

7   on, which is fortunately a little bit more directly written, is

8   (as read):

9          "The training provided to the CRO employees on

10         the ADA and providing accommodations thereunder."

11  **A.**   Yes.

12  **Q.**   Okay.  Thank you.

13         And when we say "ADA," for today's testimony, you

14  understand that I mean the Americans with Disabilities Act?

15  **A.**   That's correct.

16  **Q.**   Not the American Dental Association.

17         Okay.  Earlier this week, did you hear your counsel tell

18  the judge that -- and plaintiff's counsel that you have been

19  present in court this week as the County of Alameda's corporate

20  representative?

21  **A.**   Yes.

22  **Q.**   Okay.  So you heard the testimony yesterday.  Do you

23  believe that Ms. Briones and Ms. Moran acted within the ADA

24  training that they had for the County?

25  **A.**   Yes.

1    **MR. GILBERT:**  Overbroad.

2    **THE COURT:**  Overruled.

3    **BY MS. STONER:**

4    **Q.**   And do you have any reason to dispute the testimony that

5    Ms. Moran and Ms. Briones gave that they were not trained on

6    auxiliary aids or services specifically under the ADA?

7    **MR. GILBERT:**  Misstates testimony.

8    **THE COURT:**  Overruled.

9    **THE WITNESS:**  The question is?

10   **BY MS. STONER:**

11   **Q.**   Yes.  Do you have any reason to dispute or disagree with

12   the testimony that Ms. Moran and Ms. Briones gave that they

13   were not specifically trained on auxiliary aids and services

14   under the ADA?

15   **MR. GILBERT:**  Misstates testimony.

16   **THE COURT:**  Overruled.

17   **THE WITNESS:**  I would not specifically dispute that.

18   **BY MS. STONER:**

19   **Q.**   When they spoke about the County's policy of not acting as

20   a transcriber, do you dispute their testimony that there was no

21   written policy in 2019?

22   **A.**   No written Clerk-Recorder policy, that's correct.

23   **Q.**   Okay.  And you don't dispute that the policy didn't have a

24   specific name?

25   **A.**   It wouldn't have been a specific name, no.  But as

**YANKEE - DIRECT / STONER**

1  I believe they testified, it's based on a state law; and

2  obviously, that state law has a code and everything, you know,

3  attached to it.

4  **Q.**   But the policy itself, it wasn't like an official policy

5  with a number?  You know, sometimes you see a policy document

6  might have a number.

7  **A.**   We don't number our policies, but no.

8  **Q.**   Okay.  Okay.  So it wasn't that kind of policy that has,

9  like, a written number as adopted by the Board of Supervisors

10  or anything like that?

11  **A.**   No, it was not.

12  **Q.**   Okay.  And does that policy apply to deposited and

13  non-deposited documents alike?

14  **A.**   The -- it would apply -- it would follow the state law.

15  So it would be deposited documents.  It would be documents in

16  our possession.

17  **Q.**   So it only applies to deposited documents?

18  **A.**   Broadly speaking, yes.  I mean, there may be nuances to

19  that if you ask specific questions; but broadly speaking, yes.

20  **Q.**   Okay.  We might get into that a little later, but we'll

21  move forward for now.

22        So does the policy apply to non-clerks?

23  **A.**   It would apply to all of our employees.

24  **Q.**   The front-line people that greet someone at check-in?

25  **A.**   Again, you know, we -- you're using the term "clerks"; and

**YANKEE - DIRECT / STONER**

1   **A.**   Yeah.

2   **Q.**   -- been discussing?

3   **A.**   That's it.

4   **Q.**   I think, hopefully, I've got it by now.

5        And do you understand the policy I just stated to comply

6   with the Americans with Disabilities Act?

7   **A.**   I do.

8   **Q.**   Okay.  And you're one of the key individuals at the

9   Clerk's Office responsible for training employees about

10  the County's policies with regard to the ADA?

11  **A.**   I'm typically not the one directly involved in training

12  the new employees.  That would be the front-line supervisors

13  that do that.  So have I personally trained most of the

14  employees?  No, I've not personally trained them.

15  **Q.**   But do you take responsibility for making sure that the

16  employees are properly trained as to --

17  **A.**   Yes.  I would oversee --

18  **Q.**   -- the ADA?

19       (Simultaneous speaking.  Stenographer interrupts for

20  clarification of the record.)

21  **BY MS. STONER:**

22  **Q.**   As to the ADA.

23  **A.**   Yeah.  Generally speaking, yes.

24  **Q.**   Okay.  Thank you.

25       And do you understand that sometimes the ADA requires a

1    no reason to think that we could not accommodate that request.

2    **Q.**    Was that ever offered to Ms. Martinez, to your knowledge?

3    **A.**    I don't believe it was offered, and I don't believe it was

4    asked for.  I don't believe that topic came up on either side.

5    **Q.**    Okay.  But from home, it would require accessing a PDF

6    document; is that correct?

7    **A.**    From home, correct.

8    **Q.**    And do you agree that Ms. Martinez went to the CRO on

9    March 29th, 2019, which is the first visit, intending to file

10   her FBNS form on that date?

11   **A.**    That's my understanding, yes.

12   **Q.**    And is it your understanding also that the County offers

13   business owners who have all the necessary information same-day

14   filing for FBNS forms?

15   **A.**    Yes.  If someone comes into our office, we would file it

16   at the time they come in, I mean, obviously, assuming that they

17   have proper payment, that the form's correct and all that.

18   **Q.**    Of course.  Assuming they meet the requirements?

19   **A.**    Right.

20   **Q.**    Okay.  So is it the County's position that requiring

21   Ms. Martinez to bring someone with her to complete same-day

22   filing would be an equal opportunity to file?

23          **MR. GILBERT:**  Calls for a legal conclusion.

24   Speculation.  Opinion.

25          **THE COURT:**  Sustained as to speculation.

**YANKEE - DIRECT / STONER**

1  **Q.**   And it's clear to you that federal law is a higher

2  authority than County policy?

3  **A.**   Yes.

4  **Q.**   Okay.  Now, is the County claiming that providing

5  transcriber service to Ms. Martinez as of March 29, 2019, would

6  have resulted in a fundamental alteration in the nature of a

7  service program or activity or undue financial and

8  administrative burden to the County?

9          **MR. GILBERT:**  Calls for a legal contention.

10  Relevance.  403.  Calls for a legal conclusion.

11          **THE COURT:**  Sustained.

12          **MR. GILBERT:**  Speculation.

13  **BY MS. STONER:**

14  **Q.**   Okay.  Did the County have a policy in 2019 that clerks

15  could not write on blank FBNS forms for any reason?

16  **A.**   That would be our general policy, yes.

17  **Q.**   Okay.  Okay.  In those circumstances where -- let me back

18  up.

19      Did you have access -- in 2019, did you have access to

20  County Counsel if you had questions about the ADA?

21  **A.**   Yes.

22      Let me -- just to clarify that, did we have access?  We

23  have contacts in County Counsel's Office.  If you're asking if

24  we have immediate access as in, like, a hotline that we could

25  call for on-the-spot guidance, that may not exist.  So I'm not

 1              **THE WITNESS:**  I'm sorry.

 2              **THE COURT:**  Overruled.

 3         You can answer.

 4              **THE WITNESS:**  I don't believe I expressed a personal

 5    view.  I expressed personally what I'm aware of.

 6         I'm not aware of anyone who's done that in our office, any

 7    staff member who's handwritten a form, but that's just that I'm

 8    aware of, my viewpoint.

 9    **BY MS. STONER:**

10    **Q.**  Has your personal view changed on whether it would be

11    proper or improper to do so?

12    **A.**  As a general policy, we would discourage staff from doing

13    that.  If a specific instance might require that and there's --

14    you know, we receive a thousand customers in person every week,

15    so there's a variety of special circumstances that may come up.

16         So may there be a scenario or some scenarios where that

17    might have to happen?  That's possible.  But as a general

18    policy, that hasn't changed.  We don't have clerks hand fill

19    out forms for customers.

20              **MS. STONER:**  Okay.  Thank you.

21         I'll pass the witness.

22              **THE COURT:**  All right.  At this point, we are going to

23    take our midmorning break for about 15 minutes.

24         So I'll ask my courtroom deputy to bring the jury to the

25    jury room.

**YANKEE - CROSS / GILBERT**

1   public document, is that a legal form?

2   **A.**   It is not.  That would be like a work order form for us.

3   **Q.**   Would that be something that a CRO representative could

4   assist me in filling out?

5   **A.**   Yes, absolutely.

6   **Q.**   Now, turning to a legal document, an FBNS form, generally,

7   what is the practice of the CRO's office in regards to filling

8   out blank forms?

9   **A.**   Generally, that's not something that we do.

10  **Q.**   And let's be really clear for a second.  If someone comes

11  in with a completed FBNS or business form, will the County ever

12  edit that completed form?

13  **A.**   We will never edit a form that's already been completed.

14  **Q.**   And then switching to a blank document, are there

15  occasions when a County may help prepare a blank new document,

16  legal form?

17  **A.**   There have been occasions, yes.

18  **Q.**   Can you explain to the jury, if the policy of the CRO is

19  generally not to do this but there are occasions that it

20  happens, how is that -- how do you reconcile those?  How does

21  that work?

22  **A.**   It would be on a case-by-case basis based on the unique

23  circumstances.

24      To put it in perspective, we file and record annually

25  anywhere from, on a slow year, a quarter of a million documents

1  to a large year, half a million documents.  So if our staff

2  were to be regularly filling out recorded and filed forms for

3  customers, that could potentially be an undue burden.

4      And while the FBN represents a single-page fairly simple

5  form, some of the documents that we file/record in our office

6  are dozens, if not even hundreds, of pages long and contain

7  complex financial information, legal parcel numbers, many

8  things that our staff would struggle to complete in a timely

9  basis.

10     So, generally speaking, it's not our policy to do this;

11 but on certain occasions where the supervisor or another

12 manager or even a staff member felt that it's necessary to do

13 so, we have that discretion.

14 **Q.**   Now, if an individual with a disability who is unable to

15 complete the form comes into the office and needs to complete a

16 form, would that be the type of exemption or unique situation

17 where the CRO might help fill out that form?

18 **A.**   Yes, that might be one of the circumstances where we do.

19 **Q.**   Now, we've also heard -- and let's tie this back a little

20 bit.

21     You mentioned that there's some computers that are

22 available at the CRO's office; is that right?

23 **A.**   That's correct.

24 **Q.**   And let me go back one step further.

25     You have the computers that the clerk-recorders use at the

1  counter; is that right?

2  **A.**   Correct.

3  **Q.**   Are there other computers that are available to the public

4  that are --

5  **A.**   Yes.  So we have self-service computers.

6  **Q.**   And where are those in proximity to what we're talking

7  about?

8  **A.**   I mean, they're on the same floor of the building.  They

9  would be, roughly speaking, about a distance from where I am to

10 if you would just exit those doors and make a left or right.

11 So, you know, a few second's walk away.

12 **Q.**   50 to 75 feet, roughly?

13 **A.**   Roughly, yeah.

14 **Q.**   Okay.  How long have those computers been around or have

15 there been computers available generally?

16 **A.**   I mean, I -- they predated me, and I would think that

17 they've been available since our building opened in '99.

18 **Q.**   Are those computers equipped with access to the materials

19 that people can use to prepare forms or legal forms for

20 submission to the CRO?

21 **A.**   It depends on the form.  Some of the more complex

22 recording forms, no, we don't do that; but for FBNs, yes.

23 **Q.**   Now, has the County tried to update its available forms,

24 how people can access them, over the years?

25 **A.**   Yes.

**YANKEE - CROSS / GILBERT**

1   **Q.**   Is it always -- are people always required to come into

2   the CRO in order to get the forms, or are they available some

3   other means?

4   **A.**   They're available on our website.

5   **Q.**   Okay.  And how long ago did they become available on your

6   website?

7   **A.**   Again, that predates me, so I could tell you at least

8   12-plus years.

9   **Q.**   Thank you.

10      Now, we've heard something about, I want to say, a

11  software suite.  Does that sound familiar?

12  **A.**   Yes.

13  **Q.**   Can you explain what that is, please?

14  **A.**   Yes.  So the -- all the functions that our office

15  performs, which includes recording documents, which includes

16  issuing marriage licenses, copies of birth, death, marriage

17  certificates, fictitious business names, notary notes, that's a

18  lot of record storage.  So we need a very complex record

19  management system.

20      We also need a portion of that system to account for all

21  the transactions that we do, which is to sell copies, the

22  recording fees, the transfer tax that we collect.  So this

23  software system is a one-size-fits-all type of thing.  It does

24  all those features.

25      And part of that also is the public access portion of it,

1   requests for proposals, which is where contractors can bid on

2   large County contracts, but those were not successful in

3   delivering a new system to us.

4        But that finally was successful.  We found a vendor.  In

5   fact, it was the same vendor; and they essentially upgraded our

6   existing software suite with their new software suite.  And

7   that process started in 2018 with the signing of the contract;

8   but it's a multiyear process that ran into significant

9   challenges throughout the pandemic.  In fact, it had not even

10  been completed before the pandemic started.

11  **Q.**   When was the new software finally implemented and rolled

12  out?

13  **A.**   It -- the online submission of FBNs, I believe, would have

14  been one of the last portions of it, and I believe that

15  occurred in December of 2022.

16       But it's also a constantly upgrading system.  So as other

17  counties, including our county, request additional features,

18  those are oftentimes integrated.  So we're on almost like a

19  constant upgrade system where, as new features become

20  available, we want to make sure that those are included in what

21  we offer so that customers can take advantage of them and our

22  staff can as well.

23  **Q.**   Now, let's be more specific to this case regarding the

24  suite.  Does this suite provide additional options for how

25  patrons can complete legal forms that need to be submitted to

**YANKEE - CROSS / GILBERT**

1    the CRO?

2              **MS. STONER:**  Objection.  403.

3              **THE COURT:**  What was the objection?

4              **MS. STONER:**  403.

5              **THE COURT:**  Overruled.

6              **THE WITNESS:**  Yes.  So prior to the system, there was

7    no way to electronically submit a fictitious business name

8    statement to us.  You'd have needed to print out the PDF and

9    either fill it out by hand or have filled it out before you

10   printed it and then physically brought the paper into our

11   office.  Whereas now, there's a portal whereas you can fill out

12   the form online and they're electronically transmitted to us.

13   And then all you would need to do is sign the form that we

14   would print out when you come to our office to finish the

15   transaction.

16   **BY MR. GILBERT:**

17   **Q.**   Thank you.

18        And as far as this process, is there other improvements

19   and aspects that are going on about improving the opportunities

20   to fill out forms both in the office and remote?

21   **A.**   Before this, we also did marriage license applications.

22   That was another one where people could fill out and submit

23   their marriage license application online.  So it's not limited

24   just to the fictitious business name statement.

25   **Q.**   Thank you.

**YANKEE - CROSS / GILBERT**

 1          And then is this software suite available in the kiosk at

 2     the CRO's office?

 3     **A.**     There's a portion of it.  It's called the public access

 4     portion of that larger software system.  And, yes, those are

 5     all available at the kiosks.

 6     **Q.**     Are there kiosks that are designated for use by disabled

 7     individuals?

 8     **A.**     Yes.

 9     **Q.**     And do those kiosks have any additional services or

10     equipment or software to further assist disabled individuals in

11     accessing those materials?

12     **A.**     Yes.  So we've also installed the JAWS software, which

13     I believe is Jobs Access -- I honestly forget the acronym, but

14     it's a screen reader type of software to assist individuals in

15     completing their forms.

16     **Q.**     And the JAWS software, is it your understanding that

17     that's intended to allow sight-impaired individuals to access

18     and complete PDFs?

19     **A.**     PDFs, as well as our interface with our online submission

20     form.

21     **Q.**     Now, as far as the kiosk and the JAWS software that you

22     were talking about, are disabled individuals required to fend

23     for themselves when they go there?  In other words, they just

24     show up at the CRO's office and here it is, deal with it --

25     **A.**     No, no.

**YANKEE - CROSS / GILBERT**

1  **Q.**   And then you mentioned, I think, moving the mouse.  What

2  were you referring to on that?

3  **A.**   Right.  So if a customer is having a hard time seeing

4  where the mouse is so that they can type in the appropriate

5  field, we can help guide the mouse and so that the cursor is in

6  the appropriate field for them to begin typing.

7  **Q.**   And is there any limits to what assistance would be

8  provided in preparing a new form that you can think of as

9  you're sitting here?

10  **A.**   I mean, as long as they're not asking us to do something

11  that's against a policy or law, we would help them.

12  **Q.**   So once a form is filled out, are there further measures

13  that the County takes in order to help a disabled individual or

14  even just any individual sign a form?

15  **A.**   Yeah.  We could either -- well, let me back up.

16      We would -- initially, you know, when we had those

17  situations occur, we could help guide someone's hand with the

18  pen to the appropriate signature line on the form.

19      Then I don't recall how many years ago, maybe two years

20  ago, we became aware of metal boxes, hollow metal boxes, for

21  lack of a better way to describe it, which someone who's sight

22  impaired can use to help guide them so they know to sign inside

23  the box that they can actually feel, so that they can use that

24  to help sign forms.

25  **Q.**   So I've seen, for example, where I go to use a credit card

YANKEE - REDIRECT / STONER

1   **A.**   Yes.

2   **Q.**   Thank you.

3        Now, does the CRO still allow electronic submissions of

4   forms?

5   **A.**   Yes.

6   **Q.**   And does it still allow mailing of forms?

7   **A.**   Yes.

8   **Q.**   So people can still record their forms by all of the means

9   that were otherwise available, and there's additional means now

10  that have been implemented by the County?

11  **A.**   Yes.

12  **Q.**   Are any of these methods scheduled to be prohibited or

13  ruled out or terminated or not continued?

14  **A.**   No.

15        **MR. GILBERT:**  Thank you.

16        Just a moment, please.

17                  (Pause in proceedings.)

18        **MR. GILBERT:**  Thank you, Your Honor.  Nothing further.

19        **THE COURT:**  Does plaintiff have any further questions

20  for this witness?

21        **MS. STONER:**  Yes, Your Honor.

22                  <u>REDIRECT EXAMINATION</u>

23  BY MS. STONER:

24  **Q.**   So I believe I heard you say "our office," "our system,"

25  "we" while you were testifying just a minute ago.  Is that

**YANKEE - REDIRECT / STONER**

1  representatives do.  So I can't comment whether that is or is

2  not illegal.  I wouldn't know.

3  **Q.**  Okay.  But you have no reason to believe that it is

4  illegal, as you said?

5  **A.**  I said I wouldn't know one way or -- I mean, it -- I mean,

6  common sense would make me think that, you know, there may be

7  concerns with someone making adjustments to a signed and

8  completed form.  I mean, obviously, if there's contractual

9  documents, checks, other things that are signed and you had

10 people changing, you know, a written instrument after it's been

11 executed, that could be a concern.

12     But, again, that's all beyond what occurred in our office

13 that day.  We specifically had that Government Code that we

14 rely on for the conduct of our employees.

15         **MS. STONER:**  Thank you.

16     Just one moment, please.

17             (Pause in proceedings.)

18 **BY MS. STONER:**

19 **Q.**  Okay.  Two weeks from now, if Ms. Martinez walks into the

20 CRO with an FBNS, would the CRO be willing to assist her in

21 completing it if she's unable to do so?

22         **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

23         **THE COURT:**  Yeah.  Sustained.

24 **BY MS. STONER:**

25 **Q.**  If Ms. Martinez walks into the CRO two weeks from now,

1   will the County agree to fill out a blank unsigned paper FBNS

2   form for her if needed to renew her FBNS?

3           **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

4           **THE COURT:**  Overruled.

5           **THE WITNESS:**  As I stated, it would be a case-by-case

6   basis.  It would be within the realm -- a blank one, it would

7   be within the realm of possibilities.

8       Again, our general policy would be not to do so; but in

9   evaluating her specific circumstances at that hypothetical

10  visit, that's potentially something that we could offer.

11  **BY MS. STONER:**

12  **Q.**  Did any clerks offer to transcribe information onto a

13  blank FBNS form for Ms. Martinez back on March 29th, 2019?

14          **MR. GILBERT:**  Speculation and foundation.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I'm not aware of that being either asked

17  for as an option or offered as an option.

18          **MS. STONER:**  Okay.  Thank you.

19      No further questions.

20          **THE COURT:**  Does defendant have any further questions

21  for the witness?

22          **MR. GILBERT:**  No, Your Honor.

23          **THE COURT:**  Thank you.  You may step down from the

24  witness stand.

25                          (Witness excused.)