# Exhibit J

1 functional vision.
2 **Q.** Would you be able to recognize my face if I was standing
3 in front of you?
4 **A.** No.
5 **Q.** Would you be able to recognize that there was an object in
6 front of you?
7 **A.** Yes.
8 **Q.** Are you able to see well enough to write on the blanks on
9 a paper form if you put your face up very close or did whatever
10 you could do to try to write on the paper form?
11 **A.** No.
12 **Q.** So for all of these tools that you have to complete a
13 paperwork task, how do you decide which is the right tool in a
14 particular situation?
15 **A.** It really comes down to what is the most efficient way at
16 the moment, and that could have to do with time. It could have
17 to do with the length of the document. What I mean by that is,
18 you know, if it's a few lines that need to be entered, it's a
19 lot simpler to have a reader or scribe assist me with that.
20 But, you know, if it's multiple pages and it's lengthy, that
21 would not be an efficient use of anybody's time and so, you
22 know, I would -- I would access a document like that a little
23 differently. But it does come down to efficiency for everyone
24 involved if I have to involve other people to help me.
25 **Q.** And if you wanted to access a document in a braille paper

1  **A.**   Oh.  Because I wanted to run a business that wasn't --
2  that was using a different title than my personal name, I
3  needed to file an FBN form to open up a bank account under the
4  title of my coaching business.  And so my understanding is that
5  I needed to fill out this form, make payments, submit it, and I
6  would get it returned to me.  And if -- when it gets returned,
7  then I'm told, you know, you have -- officially have this title
8  registered in the State of California doing life coaching
9  business and people could find you in public records.
10 **Q.**   And what -- at that time -- and I'm talking, you know,
11 prior to March 29th, 2019 -- what did you do to prepare to file
12 your FBNS form?
13 **A.**   It appeared to be a simple document, mainly because it was
14 short, and I had to go online and download a PDF of the
15 document.  So I had to search for it on the Alameda County
16 website and download it and then open it, read it using a
17 screen reader because I was on my computer, and fill it out and
18 then print it, sign it, and either mail it in or go in in
19 person and submit it.
20 **Q.**   Do you remember having any problems filling out that PDF
21 form?
22 **A.**   I do.  So it made the preparation of the document harder
23 and a longer event than I had hoped it to be.
24 **Q.**   And do you remember any specific issues that you had with
25 that form?

1  **A.**   Yes.

2  **Q.**   And what were they?

3  **A.**   When I opened up the PDF document and started to arrow
4  around the document to get a feel for what was on it, there
5  were no what we call proper tagging so that I could skim
6  through the document.  So screen reader users are very accustom
7  to using keystrokes to maybe jump from heading to heading and a
8  heading being visually -- my understanding of a heading is
9  usually a title of a section or chapter or a piece of
10 information.  A heading is larger and usually bolder than the
11 text following it.  So jumping around by headings gives me a
12 clearer idea of what's -- what sections I might have to look
13 closely at.

14      So that's an example of being able to skim through the
15 document and understand it before going through it from top to
16 bottom.

17      Because there were no proper tags, I did have to go top to
18 bottom, line by line, you know, getting through names of
19 people, dates, addresses, instructions, and then finally
20 getting to the part that appeared to have edit fields that I
21 could type in.  An edit field is like a blank box on a form
22 online that you can start typing in and put information in.

23      And as a screen reader, I have to press "enter" in that
24 edit field with JAWS so that I can tell JAWS, "Hey, I'm going
25 to write letters now and I need you to type them, not jump

1  around the screen." Right? If I started to write "Happy
2  Birthday" in an edit field, the "H" is going to take me to the
3  next heading unless I toggle JAWS and get it into a different
4  mode for writing.
5      So --
6  **Q.** So -- sorry. Go ahead.
7  **A.** So I had to -- I had difficulties knowing what edit field
8  belonged to what questions. So if it asked for my name, the
9  edit box didn't tell me that. I had to search around above,
10 below the edit box to figure out: Okay, is this edit field
11 below the word "name" associated with "name" or is it an edit
12 box above "street address" and it actually wants street
13 address? So there was that confusion.
14     And the biggest most clear memory I have was the check
15 boxes in a section of the form. There were a lot of check
16 boxes; and like the edit fields, I had no idea what they were
17 attached to, so I didn't know what to check.
18 **Q.** Okay. And do you -- have we preloaded the exhibits in
19 this case onto your laptop?
20 **A.** We have.
21 **Q.** And is Exhibit 22 on your laptop?
22 **A.** It is.
23 **Q.** I'm wondering if you could pull that up for a second and
24 take a look at it as you need to, and I want to ask you some
25 questions about this document when you have a minute.

1  **A.** Same thing.

2  **Q.** Again.

3      (Audio was played but not reported.)

4  **A.** That time I heard the number 31, but that's all I know
5  about that check box.

6  **Q.** Okay. So these check boxes and this experience that you
7  just walked us through, does this seem similar to the form that
8  you remember from 2019?

9  **A.** It does.

10 **Q.** Okay. At least as to the way that JAWS is behaving with
11 it; is that right?

12 **A.** Correct.

13 **Q.** I'm going to unplug this.

14     **MR. ELDER:** Michelle, you can take the screen back.

15     (Pause in proceedings.)

16 **BY MR. ELDER:**

17 **Q.** So after you encountered this form, and I presume you
18 said -- well, sorry.

19     I think you testified that you were unable to finish this
20 form on your own; is that right?

21 **A.** Correct.

22 **Q.** And then what did you do next?

23 **A.** So I needed to fill out the form so that I could print it,
24 sign it, and take it into the Clerk's Office as I had planned
25 to do the following day.

1    And so I had to take my laptop to my husband downstairs
2    and have him -- who he could see -- have him go through the
3    document on my laptop, ensure that I put the right information
4    in the right edit fields wherever I had any question, and then
5    check that check box.  And then after that was done, I had him
6    read through the document, make sure everything was good, and
7    then I printed it out to sign it.
8    **Q.**   How did you sign it?
9    **A.**   My husband likes to crease fold the paper right on the
10   line so that I have a nice tactile line to feel while signing
11   my name.
12   **Q.**   Okay.  Is your husband always available to help you at
13   home?
14   **A.**   Oh, no.
15   **Q.**   Does he have a job?
16   **A.**   Yes.
17   **Q.**   What does he do?
18   **A.**   He's a software engineer at Roadblocks.
19   **Q.**   Would you say he's busy?
20   **A.**   Very much so.
21   **Q.**   Did you eventually travel to the Clerk-Recorder's Office
22   on March 29th, 2019?
23   **A.**   I did.
24   **Q.**   And did you go, well, in person I presume?
25   **A.**   I'm sorry?

1  **A.**  I was.

2  **Q.**  Do you -- prior to this visit, had you been to the
3  Clerk's Office on many other times?

4  **A.**  I'm married so we had to file our marriage license there.
5  And I recall needing to get copies of my children's birth
6  certificates for their passports.

7      And the marriage license I went in with my husband with
8  the form.  And with the birth certificates, I was there alone
9  and, you know, completed a transaction in order to get the
10 copies of my children's birth certificate.

11 **Q.**  So at the time on March 29th, 2019, were you aware whether
12 there were blank, unsigned FBNS forms available in the
13 Clerk-Recorder's Office?

14 **A.**  I heard about blank forms available for the first time
15 this week.

16 **Q.**  So back in March 2019 you had no understanding that blank
17 forms were even an available option for a customer?

18 **A.**  I had no idea they existed as an option.

19 **Q.**  The first clerk that you encountered there at the
20 Clerk-Recorder's Office, after she told you that your form had
21 errors, did she ever offer to give you a blank FBNS form?

22 **A.**  No.

23 **Q.**  If she -- if that clerk had offered to fill out a blank
24 FBNS form with you, would you have accepted that offer?

25          **MR. GILBERT:**  Speculation.  Relevance.

1  **Q.**  Yes.
2  **A.**  Yes, I would absolutely feel comfortable signing my name
3  to that document.
4  **Q.**  And -- okay.  Thank you.
5      So my understanding is that that did not happen on this
6  first encounter on March 29, 2019?
7  **A.**  I was not offered a blank form as an option.  I was
8  repeatedly told by several individuals that they could not help
9  me make fixes or corrections to my form.
10 **Q.**  Okay.  Did you have to wait awhile while you were -- well,
11 how much time did you have to wait while you were waiting to
12 speak with the supervisor to escalate this issue?
13 **A.**  When I asked for a supervisor, I was told that she was out
14 to lunch.  And so -- and that Ms. Moran, the clerk behind the
15 counter, she didn't know when Ms. Briones would return.
16     So I went close to where I had previously been waiting for
17 my number to be called, which was up against a planter, and I
18 waited for quite a long time.  Like I said, I came in close to
19 the beginning of 1:00 o'clock, and throughout -- it was over an
20 hour that I waited.  And I would start to walk toward the
21 counter to get an update from Ms. Moran in between customers,
22 and she would see me coming and say things like, "Oh, she's not
23 here yet" or "I just checked and she's not here yet."
24     So at some point after an hour I did walk up to the
25 counter and stay there and said -- I asked Ms. Moran more

1  **Q.**   Did Laura Briones, the supervisor, ever offer to assist
2  you with filling out a blank, unsigned FBNS form there in the
3  office on that day March 29th, 2019?
4  **A.**   No.
5  **Q.**   If Ms. Briones, who is the supervisor, had pulled out a
6  blank FBNS form and asked you if she could help you to
7  transcribe information on that blank FBNS form that was
8  unsigned, would you have accepted that offer?
9  **A.**   100 percent, yes.
10 **Q.**   Would you have felt comfortable letting Ms. Briones act as
11 a transcriber for your information?
12 **A.**   Yes, I would consider her a trusted source.
13 **Q.**   Do you feel you would have been able to verify the
14 information?
15 **A.**   Yes.
16 **Q.**   And if you had satisfactorily verified the information to
17 the extent you were content with it, would you have been
18 willing to sign a blank form there in the office under penalty
19 of perjury?
20 **A.**   Yes.
21 **Q.**   So after this second conversation, I believe -- well,
22 there was discussion of a Go Back Letter.
23      What happened after this recorded conversation with
24 Ms. Briones?
25 **A.**   She offered multiple times to do a Go Back Letter for me

1   **Q.**   So am I -- so is the case, then, that Ms. He never came
2   out and offered that you might fill out a blank, unsigned form
3   there at the Clerk-Recorder's Office?
4   **A.**   Correct.  A blank form was never discussed by anybody with
5   me.
6   **Q.**   And if Ms. He had come out with a blank, unsigned FBNS
7   form and offered to act as a transcriber to write your
8   information onto that blank form, would you have accepted that
9   offer?
10  **A.**   Yes.
11  **Q.**   If you had felt -- would you have felt comfortable that
12  you could verify whatever information she wrote down on the
13  form?
14  **A.**   Yes.
15  **Q.**   If you had verified it to the extent you were content with
16  it, would you have felt signing that document under penalty of
17  perjury?
18  **A.**   Yes.
19  **Q.**   Did Ms. Briones ever return with your Go Back Letter?
20  **A.**   She did and she also let me know that she was providing me
21  with an envelope and she could put a name on the envelope.  I
22  don't know if she actually did; but she said if she put a name
23  on it, it would expedite it so that it got to a specific human
24  who could file it when received via mail.
25  **Q.**   Now, she didn't give you any kind of expedited postage

1  in order to pay by credit card, I had to be in person.  So I
2  had to go because I did not have another method of paying.  So
3  that is why I took some time and decided to go back in person
4  again and not have it mailed.
5      Also somewhere in the documents -- I also was told it
6  could take a matter of weeks, but I did know that Laura,
7  Ms. Briones, gave me that envelope to expedite things, but I
8  didn't -- I don't trust the mail.
9  **Q.**  If you had made a mistake on it, you know, like there
10 was -- let's say you made a mistake on it a second time, would
11 they have had to mail it back to you?
12 **A.**  Yes.
13 **Q.**  Okay.  So how did you then -- so I assume, then, did you
14 decide to go back again in person to refile on a second trip --
15 **A.**  Yes.
16 **Q.**  -- your corrected FBNS form?
17 **A.**  Yes.
18 **Q.**  Did anyone help you prepare the corrected FBNS form?
19 **A.**  Yes.
20 **Q.**  And who?
21 **A.**  I'm sorry?
22 **Q.**  Who helped you?
23 **A.**  Oh, I hired my reader transcriber, Ms. Grim, who testified
24 earlier this week.
25 **Q.**  Okay.  And how did you get down to the Clerk-Recorder's

1  **A.**  I received copies I believe.

2  **Q.**  So you received something showing that as of that day,

3  your FBNS form had been filed and you were ready for business?

4  **A.**  Yes.

5  **Q.**  Now, this was May of 2019. Does it sound accurate that

6  you -- hold on. Let's see, let me take a look at the date.

7  So before you filed your lawsuit in this case, did you

8  reach out to the County?

9  **A.**  I did.

10              **MR. GILBERT:**  Objection. Relevance.

11              **THE COURT:**  Sustained.

12                      (Pause in proceedings.)

13              **THE COURT:**  Sorry. I sustained the objection.

14              **MR. ELDER:**  Yes. I'm trying to consider that.

15  **BY MR. ELDER:**

16  **Q.**  Ms. Martinez, did you have concerns about whether other

17  blind people would be treated the way that you were treated?

18  **A.**  Absolutely.

19              **MR. GILBERT:**  Objection. Relevance. 403. Lay

20  opinion.

21              **THE COURT:**  Sustained.

22  **BY MR. ELDER:**

23  **Q.**  Ms. Martinez, did you have concerns about whether

24  the County would continue to violate rights of blind people in

25  the way that you believe they violated your rights?

1           **MR. GILBERT:** No, Your Honor. Thank you.

2           **THE COURT:** All right. Thank you.

3       I'll ask my courtroom deputy to please bring the jury back
4  into the courtroom.

5           (Proceedings were heard in the presence of the jury:)

6           **THE COURT:** Good afternoon, everyone. Please be
7  seated.

8       Please continue with your examination.

9  **BY MR. ELDER:**

10 **Q.** Sorry, Ms. Martinez, I'm going to skip ahead through some
11 material that I'm not going to ask you about.

12      Ms. Martinez, sitting here today, do you have an
13 understanding as to whether or not the County would be willing
14 to provide transcriber service for you if you were to return to
15 the CRO on your five-year anniversary for the renewal of your
16 FBNS form?

17          **MR. GILBERT:** Objection. Relevance. Speculation.
18 403.

19          **THE COURT:** Overruled.

20          **THE WITNESS:** I do have to return. It's been
21 five years, and I have no idea what to expect or if the County
22 has done anything. I've only heard contradictory information.

23 **BY MR. ELDER:**

24 **Q.** Did you hear Matt Yankee testify the other day?

25 **A.** I did.

1  **Q.** And did you hear his comment about the CRO being sort of
2  an intermediary, it was like he might have said library, and
3  that they don't have responsibility for the information that's
4  just passed along and published to the community?  I'm trying
5  to summarize without being able to say it verbatim.  Do you
6  recall anything like that in his testimony?
7  **A.** Yes.  I heard him say --
8      **MR. GILBERT:** Misstates facts.
9      **THE COURT:** Overruled.
10     **THE WITNESS:** I heard him say "library," that, yes,
11 the CRO acts like a library.
12 **BY MR. ELDER:**
13 **Q.** Does that give you any confidence that the County's taking
14 responsibility and will provide transcriber service for you on
15 your FBNS form if you return in a few weeks from now?
16     **MR. GILBERT:** Objection.  Relevance.
17     **THE COURT:** Overruled.
18     **THE WITNESS:** I'm hesitating because my library has
19 helped me fill out applications but the County hasn't.  So I
20 don't -- I don't have any confidence at all.
21 **BY MR. ELDER:**
22 **Q.** And you said that you had to pay Ms. Grim to drive you
23 back to the Clerk's Office on May 31st.  How much did you pay
24 her.
25 **A.** I paid her for four hours of service at $25 an hour, so

1  one-hour being face to face for being all the client
2  acquisition and administrative stuff, so that would be five
3  hours divided by 175.  I believe that's $35 an hour.
4  **BY MR. ELDER:**
5  **Q.**  And is $35 an hour an estimate of -- is that your estimate
6  of the value of what your time might be worth?
7  **A.**  Yeah.  I would say so, yes.
8  **Q.**  Okay.  Sitting here today on the five-year anniversary of
9  what happened to you, how are you feeling about the way
10 the County has treated you?
11         **MR. GILBERT:**  Asked and answered.
12         **THE COURT:**  Overruled.
13         **THE WITNESS:**  Today I'm tired.  I'm drained.  The last
14 five years have been really emotionally tough for me, and there
15 have been points in my business when handling business-related
16 documents that I get a lot of anxiety.  And that little voice
17 in your head that tells you, you know -- whispers in your head
18 and makes you doubt yourself has cropped up quite a lot.
19     And I just -- I just feel like it's been a really long
20 journey for something that I know could have been a really
21 simple equal-access issue if I was just given the transcribing
22 assistance that I had asked for, and I don't want other blind
23 people to have to deal with that.  We're in the 21st century
24 and, you know, this should not be happening.
25 **Q.**  And do you consider yourself a resilient person?

1 **A.** I do.

2 **Q.** Okay. We're on the five-year anniversary of the incident

3 on March 29th today. Do you have an understanding of whether

4 or not you're going to have to go back do the CRO before

5 March 31st, 2024?

6 **A.** Before March 31st?

7 **Q.** Yes. Sorry. Before May 31st, 2024.

8 **A.** I was going to say I'm a bit in trouble.

9     Yes, I do have to go back in order to file and pay by

10 credit card my FBN, at least that's my understanding. I have

11 not gone on the web lately to check if anything has changed.

12 **Q.** If you go in person sometime before May 2024 to renew your

13 FBNS form, would you be willing to have a County employee act

14 as a transcriber to fill out a blank FBNS form or renewal

15 document?

16     **MR. GILBERT:** Cumulative. Asked and answered.

17     **THE COURT:** Overruled.

18     **THE WITNESS:** Yes.

19 **BY MR. ELDER:**

20 **Q.** Have you heard about the proposed -- or sorry.

21     Have you heard about the computer kiosk system that

22 the County has constructed?

23 **A.** Yes.

24 **Q.** Have you tried to use it?

25 **A.** No.

| | |
|---|---|
| 1 | **Q.** But did you hear Mr. Clark's testimony about it in this |
| 2 | trial? |
| 3 | **A.** I did.  I did. |
| 4 | **Q.** Sitting here today, do you think you would opt to use the |
| 5 | computer Wizard system that the County has constructed as an |
| 6 | alternative to having a human transcriber fill out the paper |
| 7 | form? |
| 8 | **A.** No. |
| 9 | **MR. GILBERT:** Speculation.  Relevance. |
| 10 | **THE COURT:** Overruled. |
| 11 | **THE WITNESS:** No. |
| 12 | **MR. ELDER:** I think that may be all.  Hold on one |
| 13 | second. |
| 14 | (Pause in proceedings.) |
| 15 | **MR. ELDER:** I think rather than get into further |
| 16 | issue, Your Honor, we're going to pass the witness. |
| 17 | **THE COURT:** All right.  Thank you. |
| 18 | Now is a good time for us to break for lunch.  So I'm |
| 19 | going to ask my courtroom deputy to take the jury back into the |
| 20 | jury room. |
| 21 | (Proceedings were heard out of the presence of the jury:) |
| 22 | **THE COURT:** Before I let you all go, I think we need |
| 23 | to deal with the Eve Hill issue now. |
| 24 | To retrace what happened, the defendant's expert Vaughan |
| 25 | gave an opinion in paragraph 28 of his report that says, quote |