Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF + HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone:     (510) 999-7908
Facsimile:     (510) 999-7918

Attorneys for Defendants
COUNTY OF ALAMEDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LISAMARIA MARTINEZ,<br><br>                    Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA,<br><br>                    Defendant. | Case No.  20-cv-06570-TSH<br><br>**DECLARATION OF NICHOLAS D. FINE IN SUPPORT OF DEFENDANT COUNTY OF ALAMEDA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION**<br><br>DATE:        July 11, 2024<br>TIME:        10:00 a.m.<br>DEPT:        Courtroom E<br>JUDGE:      Hon. Thomas S. Hixson |

ORBACH HUFF + HENDERSON LLP

ORBACH HUFF + HENDERSON LLP

I, Nicholas D. Fine, declare as follows:

1.       I am an attorney at law duly licensed to practice before all the courts in the State of California and the United States District Court – Northern District of California.  I am an attorney with Orbach Huff + Henderson LLP and one of the attorneys of record for Defendant COUNTY OF ALAMEDA ("County").  If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this Declaration, except as to those matters that are stated on information and belief herein.

2.       This Declaration is submitted for the purpose of presenting evidence in support of the County's Opposition to Plaintiff LISAMARIA MARTINEZ's ("Plaintiff") Motion for Permanent Injunction ("Motion").

3.       Attached hereto as **Exhibit A** is a true and correct copy of relevant portions of the Transcript of Jury Trial Proceedings for the trial of this action, Volume 2, pages 195-361, dated March 27, 2024.

4.       Attached hereto as **Exhibit B** is a true and correct copy of relevant portions of the Transcript of Jury Trial Proceedings for the trial of  this action, Volume 3, pages 362-557, dated March 28, 2024.

5.       Attached hereto as **Exhibit C** is a true and correct copy of relevant portions of the Transcript of Jury Trial Proceedings for the trial of this action, Volume 4, pages 558-709, dated March 29, 2024.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 6th day June, 2024, at Pleasanton, California.

_____
Nicholas D. Fine

# EXHIBIT A

Volume 2

Pages 195 - 361

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

| | |
|---|---|
| LISAMARIA MARTINEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   NO. 3:20-CV-06570 TSH |
| | ) |
| COUNTY OF ALAMEDA, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Wednesday, March 27, 2024

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        TRE LEGAL PRACTICE
        1155 Market Street, Tenth Floor
        San Francisco, California 94103
    BY:  **TIMOTHY R. ELDER, ATTORNEY AT LAW**


        UNDAUNTED LAW FIRM, P.C.
        600 California Street, Seventh Floor
        San Francisco, California 94108
    BY:  **S. TOMIYO STONER, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter

 1 | **APPEARANCES**:  (CONTINUED)

 2 | For Defendant:

 3 |                              ORBACH HUFF & HENDERSON LLP
   |                              6200 Stoneridge Mall Road, Suite 225
   |                              Pleasanton, California 94588

 4 |                    BY:   **KEVIN E. GILBERT, ATTORNEY AT LAW**
   |                          **NICHOLAS D. FINE, ATTORNEY AT LAW**

 5 |

 6 |

   | Also Present:            **Lisamaria Martinez**
 7 |                          **Michelle Korosy, Paralegal**
   |                          **Matthew Yankee, County of Alameda**

```
 1    testimony as the truth about what the law is.  I will instruct

 2    you in the jury instructions about what the Americans with

 3    Disabilities Act requires.  But she is allowed to testify as to

 4    her personal understanding of what may have been required, and

 5    that's all that you're to take this testimony as.

 6           THE WITNESS:  Your question?

 7    BY MS. STONER:

 8    Q.   On March 29, 2019, were you aware that the Americans with

 9    Disabilities Act sometimes requires the CRO to provide

10    assistance to customers who are blind?

11    A.   If that is --

12           MR. GILBERT:  Misstates the law.

13           THE COURT:  Overruled.

14           THE WITNESS:  If that is the case, then it contradicts

15    the state law and our policy.  We would not complete a form

16    that is already signed under penalty of perjury, especially

17    particularly because the client could not verify visually what

18    we are changing.

19    BY MS. STONER:

20    Q.   Okay.  Let's back up.

21           On March 29, 2019, was it your understanding the CRO had

22    any obligation to provide any additional service to a customer

23    who is blind because of --

24    A.   My understanding --

25           MR. GILBERT:  Overbroad.  Incomplete hypothetical.
```

1        THE COURT:  Overruled.

2        THE WITNESS:  My understanding about the ADA is that

3    we accommodate to the best of our ability, and that includes

4    possibly walking someone to the counter that is blind,

5    communicating by writing if a person is deaf --

6    BY MS. STONER:

7    Q.   So as --

8    A.   -- but not to fill out, not to alter any documents.

9    Q.   Okay.  So as of March 29, 2019, you did understand that as

10   a County employee, you had certain obligations under the ADA to

11   provide services to customers who were blind that you would not

12   necessarily provide to customers who were not blind, such as

13   walking to the counter or passing notes --

14   A.   If a person is --

15   Q.   -- to someone who is deaf?

16   A.   -- able-bodied, they can walk to the counter on their own

17   strength, yes.

18        And if a person is deaf, there would be no reason -- not

19   deaf, or they can hear, there would be no reason to exchange

20   anything in writing.

21   Q.   Right.  And you understood on March 29, 2019, that you

22   would sometimes be obligated by the Americans with Disabilities

23   Act to provide some additional support?

24   A.   Provide any accommodations --

25        MR. GILBERT:  Misstates the law.

1          THE COURT:  Overruled.

2          THE WITNESS:  Provide any accommodations that are

3    possible without breaking the law.

4    BY MS. STONER:

5    Q.   Sure.

6         Okay.  I'm going to grab this binder real quick.

7         Do you remember having your deposition taken in this

8    matter?

9    A.   Yes.

10   Q.   And did you testify accurately during your deposition?

11   A.   To the best of my knowledge.

12   Q.   Truthfully?

13   A.   Mm-hmm, yes.

14          MS. STONER:  Okay.  I'd like to introduce the

15   recording of the encounter between you and Ms. Martinez.

16        Your Honor, I'd like to move to mark the file Exhibit 1A,

17   the digital recording.

18          THE COURT:  4A, do you mean?

19          MS. STONER:  4A.  I'm sorry.  4A.

20        (Trial Exhibit 4A marked for identification)

21          THE COURT:  Are you moving to admit it?

22          MS. STONER:  Yes.

23          THE COURT:  Is there any objection from the defense?

24          MR. GILBERT:  I think it needs a foundation first;

25   but, no, there's no objections to 4A.

1          **MR. GILBERT:**  No, Your Honor.  Thank you.

2          **THE COURT:**  Exhibit 4A is admitted.

3          (Trial Exhibit 4A received in evidence.)

4          **MS. STONER:**  Okay.  I'd like to play Exhibit 4A for

5    the jury.

6                    (Audio was played but not reported.)

7    BY MS. STONER:

8    **Q.**   All right.  So as that recording played, do you -- did you

9    hear yourself stating that "By filling it out, I'm breaking the

10   law"?

11   **A.**   Yes.

12   **Q.**   And when you said that -- when you said that, do you

13   believe that you were telling Ms. Martinez the truth?

14   **A.**   Yes.

15   **Q.**   And as you testify today, do you believe it would be

16   breaking the law to assist a blind customer by acting as a

17   transcriber on an FBNS form?

18   **A.**   As a -- as a signed application, a signed form.  She had

19   signed already that particular application under penalty of

20   perjury.  Yes, I cannot change or alter a document that's

21   already been signed.

22   **Q.**   Okay.  So you understand that you can't change or alter a

23   document that's already been signed, but what about a blank

24   FBNS form?

25   **A.**   That did not come into play.

**MORAN - DIRECT / STONER**

1  disabilities?

2  **A.**   Of course, mm-hmm.

3  **Q.**   But also, it's your obligation to follow the policies of

4  the County?

5  **A.**   Yes.  And it's common courtesy.

6  **Q.**   And the County never gave you a written policy that told

7  you what auxiliary aids you're able to offer prior to March 29,

8  2019?

9  **A.**   Not in paper form, but it is to the best of our ability.

10  We do everything possible that is -- that is within our power

11  to serve those with disabilities.

12  **Q.**   But had anyone from the County ever trained you or told

13  you, prior to March 29, 2019, that one of the ways you can

14  assist someone who is blind is by helping them complete a blank

15  form?

16  **A.**   Not a blank form, no.  And that did not come up that day.

17  **Q.**   Okay.  So if this -- so on the date that Ms. Martinez

18  approached you, were you aware of all the requirements of the

19  ADA?  Did you feel very well-trained in that regard?

20         **MR. GILBERT:**  Overbroad.  Vague.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  Yes, I -- I -- we do our best to

23  accommodate those with disabilities --

24  BY MS. STONER:

25  **Q.**   Okay.

**MORAN - DIRECT / STONER**

1    A.    -- short to writing pen on paper on a signed form.

2    Q.    Okay.  And when you say you do your best, though, that's

3    based on your understanding of the policies and not based on an

4    in-depth review of the ADA?

5    A.    Yes.

6    Q.    If this incident with Ms. Martinez were to occur today,

7    would you do anything differently?

8              MR. GILBERT:   Speculation.

9              THE COURT:   Overruled.

10             THE WITNESS:   We have now a kiosk on-site that is able

11   to read voice-activated information that will fill out a form.

12   So it's not an issue anymore.

13   BY MS. STONER:

14   Q.    So as of today, there is a kiosk that has a screen reader

15   installed?

16   A.    Yes.

17   Q.    And when did that kiosk go into place?

18   A.    I believe it was July of last year.

19   Q.    And do you remember receiving an e-mail from Jocelyn Cole

20   in around that time frame that indicated the instructions for

21   using the kiosk?

22   A.    Yes.

23   Q.    And at that time, did Ms. Cole reiterate to you it was

24   still the policy of the CRO that clerks were not to write on

25   documents?

1   **Q.**   Gotcha.  All right.

2            **MS. STONER:**  One moment, please.  Let me just...

3                    (Pause in proceedings.)

4   **BY MS. STONER:**

5   **Q.**   All right.  So as of today's date, if a blind user had

6   difficulty with the kiosk system and asked you to help them by

7   transcribing on a blank FBNS form, would you have the ability

8   to do that?

9            **MR. GILBERT:**  Speculation.

10           **THE COURT:**  Overruled.

11           **THE WITNESS:**  That -- to my understanding, that would

12  be the purpose of the kiosk, is to fill out the form

13  completely.  So my filling out another blank form would not be

14  necessary.

15  **BY MS. STONER:**

16  **Q.**   I'm not asking if it's necessary.  I'm asking, if it

17  became necessary, would you have the ability to?

18  **A.**   I would have to consult with my management whether or not

19  I would be able to.  But I would be physically able to.  I know

20  how to complete forms.  But whether or not we would be allowed

21  to would be a question with my management.  But I don't see why

22  it wouldn't.

23  **Q.**   Okay.  So, but as you sit here today, you've never

24  received clear instruction from management that if an

25  individual is unable to use the kiosk -- for example, if an

1  policy is similarly based on federal law?

2  **A.**   I -- I don't.

3  **Q.**   Is it your understanding that the County policies --

4  excuse me.  I'm sorry.

5       Is it your understanding that the County policies

6  literally echo and repeat the state and federal law on these

7  issues?

8  **A.**   I would understand so.

9  **Q.**   Thank you.

10      Now, let's go into a few more basics.  When did you first

11  start working at the County Recorder's Office?

12  **A.**   I started my first day on August 29th, 2005.

13  **Q.**   And, actually, that was a poor question by me.

14      When did you start working for the County of Alameda?  Was

15  that the same date?

16  **A.**   Same date, yes.

17  **Q.**   Have you worked continuously in the Clerk-Recorder's

18  Office that whole time?

19  **A.**   No.

20  **Q.**   Can you tell us very briefly your work history with the

21  County?

22  **A.**   When I started, it's been mentioned that our original

23  title was clerk recorder specialist, so we would rotate within

24  our four to five departments in our office.

25      But by the time I came -- and we would rotate three --

1   around three departments.  So when I would rotate around, by

2   the time it was my turn for the third rotation, we combined

3   with across the street.

4        So I went -- I worked in vitals general business, which is

5   the current department, and then I transferred to the indexing

6   where I cross-trained for eight months.  It should have been

7   six, but I stayed on due to staffing.

8        And then when my turn came around in 2009, I went across

9   the street to central payroll for nine months due to staffing,

10  and then maternity leave.

11  Q.   Have your job duties generally remained somewhat

12  consistent during the entirety of your employment with the

13  County?

14  A.   Yes.

15  Q.   And can you generally tell the jury what those job duties

16  encompass?

17  A.   In our vitals general business unit, we have three mini

18  departments.  They're separate.  We have the section that

19  issues birth, death, and marriage certificates that are already

20  filed.  Just copying them on paper and take the fee.

21       Then we have the marriage license department.  We issue

22  marriage licenses, perform ceremonies, and then record the

23  document on-site right there within five minutes of the

24  ceremony.

25       Then we have the general business unit, which is the

MORAN - CROSS / GILBERT

1  fictitious business name.  We do process servers, legal

2  document assistance, notary bonds, and that we forward on to

3  the state.

4  **Q.**   Thank you, ma'am.

5       Now, in those various roles, you mentioned you had,

6  I think, three rotations.  Was that the word you used?

7  **A.**   Yes.

8  **Q.**   Are you -- do you receive -- is that considered a training

9  rotation?

10  **A.**   It is.  And each time, we move up.  It was Auditor

11  Associate I, which you're hired at; and after each rotation, we

12  move up to II and then finally to III.

13  **Q.**   And during that process, are you also trained on the

14  Americans with Disabilities Act?

15  **A.**   Mostly in the vitals general business unit because it is

16  face-to-face customer contact.

17  **Q.**   And do you receive training about how to interact and how

18  to help individuals with disabilities?

19  **A.**   It was mostly on-the-job training from the time I started;

20  and then over the course of my tenure, we watch videos, and any

21  e-mails come through that update any policies, and then just

22  general interaction with the customers.

23  **Q.**   So let me see if I understand this right.  Is it fair to

24  say that you received training during your initial rotations on

25  how to interact with customers and compliance with the ADA?

1    **A.**    Yes.

2    **Q.**    And then you would receive additional training in each of

3    the subsequent assignments that would also encompass aspects of

4    the ADA?

5    **A.**    Not in our assignments as when we're not working in

6    customer contact.   Indexing is upstairs, and it's not customer

7    contact at all.

8    **Q.**    So you may not receive as much updates on the ADA, for

9    example, if you're back in a back office, not interacting with

10   the community?

11   **A.**    Yes.

12   **Q.**    But once you go back to a position that you're interacting

13   with the community and the patrons, would you again receive

14   regular updates on compliance with the various state and

15   federal laws, including the ADA?

16   **A.**    Yes.

17   **Q.**    Now, would that be something that you would receive

18   continually as a regular part of your job?

19   **A.**    Yes.  We do -- over occasion, the County will send out

20   training videos and say, "You're required to watch this by

21   such-and-such date," and those do have ADA concepts in them.

22   **Q.**    Now, you used the word, I think, "effective communication"

23   earlier.   What is it that you understand effective

24   communication to be?

25   **A.**    That we are understanding, speaking the same language.

1   Q.   Do you need to have some type of written document or case

2   law, or something like that, for you to be able to understand

3   what effective communication is?

4   A.   No.

5   Q.   Well, how is it that you're going to know how to interact

6   with a person without having something in writing that's handed

7   to you?

8   A.   It is just day-to-day training.

9   Q.   And generally, can you tell me what the training is as far

10  as how you should treat the patrons that come into the County?

11  A.   We -- most of my co-workers and I come from a banking

12  background, so we know how to greet people, smile, treat

13  customers cordially; and into that is also treating customers

14  with disabilities to the best of our ability without breaking

15  the law.

16  Q.   Now, what are you trained to do if you have a customer or

17  a patron that comes into the counter that has disabilities and

18  is having trouble communicating?

19  A.   It depends.  If -- if a customer is blind, then in this

20  case, we would do our best.  And what we do, actually, is if --

21  we will not complete any applications for them or change any

22  documents, but we try to find alternatives.

23       The alternative, the first thing we ask, "Did you bring

24  someone with you that you trust and that is able to complete

25  this form to -- so it can be submitted?"

1    that's signed -- previously signed under penalty of perjury or

2    that it's a legal -- a document that's, like, a legal nature, a

3    legal document.

4    **Q.**   So it sounds like the County had given you a lot of

5    training about its policies about not modifying documents; is

6    that correct?

7    **A.**   Yes.

8    **Q.**   And you'd been trained on that a number of times over the

9    years?

10   **A.**   Yes.

11   **Q.**   And the County hadn't specifically instructed you about

12   when the ADA did and didn't require you to assist in completing

13   a form.  It was just your own understanding of being helpful to

14   customers; is that correct?

15   **A.**   Well, we try to be as helpful as possible within our

16   capacity when it doesn't go into us doing something illegal or

17   modifying or altering a document that is potentially going to

18   be recorded or filed in our office.

19   **Q.**   And on that day, did you ask your supervisor for further

20   clarification on what you were required to do in that

21   situation?

22   **A.**   I did confirm with my supervisor -- specifically to

23   Ms. Martinez?

24   **Q.**   Yes, specifically to Ms. Martinez.

25   **A.**   I did.

BRIONES - DIRECT / STONER

1   Q.   And your supervisor likewise communicated to you that you

2   were following the policy of the County?

3   A.   Yes.

4   Q.   As we sit here today, if this incident were to occur,

5   would you do anything differently?

6   A.   If it was today?

7   Q.   Yes.

8   A.   Well, we have a software on one of our public kiosks that

9   allows an individual to be able to type -- see what's being

10  typed.  So if someone came in, we would direct them to that

11  public kiosk.

12  Q.   And if they used the kiosk, are they able to communicate a

13  change to a written form?

14  A.   Well, the --

15          MR. GILBERT:   Vague.

16          THE COURT:   Overruled.

17          THE WITNESS:   The kiosk just allows them to enter the

18  information so that it could be submitted and -- the

19  information could be submitted to us for review.

20  BY MS. STONER:

21  Q.   In the --

22  A.   So we wouldn't know if -- you know, the customer wouldn't

23  know if it needed correction because we wouldn't -- we're not

24  reviewing that document yet.

25  Q.   Okay.  Did Ms. Martinez explain to you that she could

BRIONES - DIRECT / STONER

1  verify information if you read it aloud back to her?

2  **A.**   I don't recall.

3  **Q.**   Okay.  We'll listen to another recording in a minute.

4       On that date -- or in today's world, now that you have the

5  kiosk, is an individual who is blind, or otherwise unable to

6  access print, able to communicate the information they need via

7  the form to the County?

8  **A.**   They're able to enter the information such that the form

9  can be submitted to our office, and then we could print it for

10  them.

11  **Q.**   So assuming the system works with the kiosk and the new

12  screen reader software, a person with a disability is able to

13  communicate both verbally and via the form today?

14  **A.**   Yes.

15  **Q.**   And so you understand that when they communicate via the

16  form, that is written communication to the County from the

17  individual with the disability?

18  **A.**   By them completing the form, yes.

19  **Q.**   So you understand that for Ms. Martinez to have

20  communicated her information to the County, she needed

21  something other than a printed form that she had to write on in

22  order to make that change so she could communicate the

23  information to the County on March 29, 2019?

24       **MR. GILBERT:**  Calls for lay opinion.  Legal

25  conclusion.

1          THE COURT:  Overruled.

2          THE WITNESS:  I don't think I understand.  Can you

3    repeat the question?

4    BY MS. STONER:

5    Q.   Yes.

6          So Ms. Martinez had information on March 29, 2019, that

7    she wanted to communicate to the County, namely, the change

8    that the County said she needed in order for her document to be

9    filed, but she was unable to do so because the print form was a

10   barrier to effective communication in printed form?

11   A.   The form was already completed, so we were unable to make

12   the changes for her.

13   Q.   Okay.  But what I am asking is:  You have previously

14   testified that today a blind user can theoretically use a kiosk

15   which will enable them to change the form at the CRO and will

16   enable them to communicate printed information back to the CRO;

17   is that correct?

18   A.   Yes.

19   Q.   And Ms. Martinez was trying to do the same thing, to

20   communicate written information back to the CRO; correct?

21          MR. GILBERT:  Speculation.

22          THE COURT:  Overruled.

23          THE WITNESS:  She was asking us to modify and correct

24   her form.

25   \\\

1   BY MS. STONER:

2   Q.    You've told me the reason that she was asking -- you told

3   me one thing she was asking for, but the purpose of

4   Ms. Martinez wanting to change the form was that so she could

5   communicate written information back to the County about her

6   business?

7              MR. GILBERT:   Speculation.   Asked and answered.

8              THE COURT:   Overruled.

9              THE WITNESS:   She -- she had filled out the form that

10  needed to be submitted --

11  BY MS. STONER: --

12  Q.    Okay.

13  A.    -- for her filing.

14        So that document, she had already filled it out.

15  Q.    Okay.

16  A.    So she --

17  Q.    So --

18  A.    I understand -- okay.   Go ahead.

19  Q.    Could you take -- so the issue that she had, the barrier

20  to communication, was that the form was not in an accessible

21  format to Ms. Martinez on that day; correct?

22             MR. GILBERT:   Calls for a legal conclusion.   Lay

23  opinion.

24             THE COURT:   Overruled.

25             THE WITNESS:   The form is available to any customer.

BRIONES - DIRECT / STONER

1   You know, we have it on our website.   We have it in person.

2   BY MS. STONER:

3   Q.   A blank printed form would have been available to any

4   sighted customer; is that correct?

5   A.   If they ask us for a blank form, we would provide it --

6   Q.   But the --

7   A.   -- to anyone.

8   Q.   -- blank printed form was not in a format that

9   Ms. Martinez could use on March 29, 2019, was it?

10  A.   It's available to her if she had asked for one.

11  Q.   So you're saying that on March 29, 2019, you would have

12  given her a blank paper form if she had asked?

13  A.   If she had asked for a blank one, I would have given her

14  one.

15  Q.   And it's your testimony that she could have written on

16  that form and submitted her information back to the County via

17  a printed form?

18  A.   She -- she could have filled it -- she could have asked

19  someone to fill it out, or she could have taken it home.

20  Q.   She did ask someone to fill it out.   She asked you to fill

21  it out.

22          THE COURT:   Don't interrupt the witness.

23      Sorry, that was directed to counsel, not to the court

24  reporter.

25          MS. STONER:   Sorry.

BRIONES - CROSS / GILBERT

1  Q.  Can you very briefly tell the County -- or tell the jury

2  about the different positions you've held at the County over

3  that period?

4  A.  Sure.  I've been a supervisor at the Clerk-Recorder's

5  Office.  I've been a customer service supervisor, recording

6  unit supervisor; and then currently I'm the vitals general

7  business supervisor.

8  Q.  So you're a little soft-spoken.  Can I talk you into

9  pulling the microphone --

10  A.  Oh, sure.

11  Q.  -- just a little bit closer to your mouth?

12  A.  Sorry.

13  Q.  That's okay.

14  A.  Is that better?

15  Q.  Much better.  Thank you.

16  A.  Okay.

17  Q.  So what is your current position?

18  A.  I'm a Clerk Recorder and Collections Supervisor II.

19  Q.  And how long have you been in that role?

20  A.  Approximately 18 years.

21  Q.  Now, through the course of your roughly a quarter century

22  with the County, that's a fair amount of time --

23  A.  Mm-hmm.

24  Q.  -- have you received training on how to do your job?

25  A.  Yes.

1   Q.   And do you receive training on the Americans with

2   Disabilities Act?

3   A.   We do.

4   Q.   And when would you first have received that training?

5   A.   When I first was hired with the County, and then we have

6   ongoing training.

7   Q.   And generally, just in concept, what can you tell us about

8   the training you receive about interacting with disabled

9   individuals?

10  A.   We're trained to assist persons with disabilities to the

11  best of our ability, depending on the situation and the

12  request, as long as it's something within our scope and

13  something that we can provide to the customer and it's not

14  something improper or illegal.

15  Q.   Now, are you taught whether or not providing -- or

16  conducting an illegal act would be considered a reasonable

17  accommodation if a disabled individual requested it?

18  A.   Can you repeat the question?

19  Q.   What are you taught in regards to if a disabled individual

20  comes in and demands that you do something that's illegal, that

21  you break the law?  What are you taught in that regard?

22  A.   Not to do it.

23  Q.   And is that based upon the County's policy?

24  A.   Yes.

25  Q.   And do you have an understanding that the County's policy

BRIONES - CROSS / GILBERT

1    is based upon state and federal law?

2    **A.**   Yes.

3    **Q.**   And do you have an understanding that the County's policy

4    and the state and federal law is adopted by a series of

5    attorneys both in the General Counsel's Office and the State of

6    California that they work with?

7    **A.**   Yes.

8    **Q.**   Now, you receive regular training updates on that as you

9    go through your career, don't you?

10   **A.**   We do.

11   **Q.**   And, in fact, as a supervisor, you also teach others about

12   that, don't you?

13   **A.**   Yes.  We -- I conduct training of new employees or ongoing

14   training as well.

15   **Q.**   Now, when you interacted with Ms. Martinez on

16   March 29, 2019, did you feel like you had a good grasp and

17   understanding of what was required under the Americans with

18   Disabilities Act when you were interacting with a disabled

19   individual?

20   **A.**   I did.

21   **Q.**   So then why would you go Google questions or issues after

22   speaking with Ms. Martinez?

23   **A.**   Just for my own research, to see if there was anything

24   else that I was missing, because I did -- I do want to be

25   helpful up to the point where, you know, I can in my capacity

BRIONES - REDIRECT / STONER

```
 1              MR. GILBERT:  Calls for a legal conclusion, lay

 2   opinion, relevance, and speculation.

 3              THE COURT:  Sustained.

 4   BY MS. STONER:

 5   Q.   In 2019, if Ms. Martinez had asked you to fill out a blank

 6   FBNS form on her behalf and then had you read it back so that

 7   she could verify its correctness, would you have done so?

 8              MR. GILBERT:  Speculation.

 9              THE COURT:  Overruled.

10              THE WITNESS:  I would not.

11   BY MS. STONER:

12   Q.   If she were to arrive in the CRO in a couple of weeks from

13   now, would you do that?

14   A.   I would direct her to the kiosk.

15   Q.   But would you write on a blank FBNS form?

16   A.   I would not, since we have the software for her to be able

17   to do it on her own.

18   Q.   And if the kiosk didn't work for Ms. Martinez or another

19   individual who is blind, would you then write on a blank FBNS

20   form for that person?

21              MR. GILBERT:  Incomplete hypothetical.  Speculation.

22              THE COURT:  Overruled.

23              THE WITNESS:  I would not.

24   BY MS. STONER:

25   Q.   In 2019, do you know if the FBNS form was available online
```

1

2                          <u>**CERTIFICATE OF REPORTER**</u>

3              I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6      DATE:  Wednesday, March 27, 2024

7

8

9

10     _____

11              Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

**Volume 3**

**Pages 362 - 557**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

LISAMARIA MARTINEZ,                 )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )   **NO. 3:20-CV-06570 TSH**
                                    )
COUNTY OF ALAMEDA,                  )
                                    )
            Defendant.              )
_____ )


                        San Francisco, California
                        Thursday, March 28, 2024



                **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**


**APPEARANCES**:

For Plaintiff:
                    TRE LEGAL PRACTICE
                    1155 Market Street, Tenth Floor
                    San Francisco, California 94103
            BY:  **TIMOTHY R. ELDER, ATTORNEY AT LAW**



                    UNDAUNTED LAW FIRM, P.C.
                    600 California Street, Seventh Floor
                    San Francisco, California 94108
            BY:  **S. TOMIYO STONER, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
1   APPEARANCES:  (CONTINUED)

2   For Defendant:
                                ORBACH HUFF & HENDERSON LLP
3                               6200 Stoneridge Mall Road, Suite 225
                                Pleasanton, California 94588
4                          BY:  KEVIN E. GILBERT, ATTORNEY AT LAW
                                NICHOLAS D. FINE, ATTORNEY AT LAW
5

6
    Also Present:            Lisamaria Martinez
7                            Michelle Korosy, Paralegal
                             Matthew Yankee, County of Alameda
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

YANKEE - DIRECT / STONER

1   **A.**   Yeah.

2   **Q.**   -- been discussing?

3   **A.**   That's it.

4   **Q.**   I think, hopefully, I've got it by now.

5        And do you understand the policy I just stated to comply

6   with the Americans with Disabilities Act?

7   **A.**   I do.

8   **Q.**   Okay.   And you're one of the key individuals at the

9   Clerk's Office responsible for training employees about

10  the County's policies with regard to the ADA?

11  **A.**   I'm typically not the one directly involved in training

12  the new employees.   That would be the front-line supervisors

13  that do that.   So have I personally trained most of the

14  employees?   No, I've not personally trained them.

15  **Q.**   But do you take responsibility for making sure that the

16  employees are properly trained as to --

17  **A.**   Yes.   I would oversee --

18  **Q.**   -- the ADA?

19       (Simultaneous speaking.   Stenographer interrupts for

20  clarification of the record.)

21  **BY MS. STONER:**

22  **Q.**   As to the ADA.

23  **A.**   Yeah.   Generally speaking, yes.

24  **Q.**   Okay.   Thank you.

25       And do you understand that sometimes the ADA requires a

YANKEE - DIRECT / STONER

1   public entity to furnish appropriate auxiliary aids and

2   services?

3   **A.**   Yes.

4   **Q.**   And do you know generally what auxiliary aids and services

5   are?

6   **A.**   Yes.  We've done so on multiple occasions.

7   **Q.**   Okay.  So I'm going to be asking a number of questions

8   about specific auxiliary aids and services.  I don't want this

9   to be a memory quiz.  Would it refresh your recollection about

10  the specifics of that document if I gave you Code 28 C.F.R.

11  35.104 to review?

12          **MR. GILBERT:**   Speculation.

13  **BY MS. STONER:**

14  **Q.**   I can ask -- you know what?  I can ask you the question;

15  and if needed, I have no issue providing it because this is not

16  intended to be a memory quiz.

17      Do you agree that auxiliary aids can include qualified

18  readers?

19          **MR. GILBERT:**   Calls for a legal conclusion.  Lay

20  opinion.  Relevance.  403.

21          **THE COURT:**   I'm going to overrule, but I'm also going

22  to caution the jury that the witness is being asked about his

23  personal understanding of the law.  You are not to take his

24  testimony as a truthful statement about what the law is.

25  The Court will instruct you on the law in the jury

1   instructions.   But the witness is just giving you his lay

2   understanding of what the law is, and that's all that this is.

3          THE WITNESS:   My understanding is that it could

4   include qualified readers.

5   BY MS. STONER:

6   Q.   And audio recordings?

7   A.   I believe so.

8   Q.   And brailled materials?

9   A.   Yes.

10  Q.   Screen reader software?

11  A.   Yes.

12  Q.   Large-print materials?

13  A.   Yes.

14  Q.   Other effective methods of making visually delivered

15  materials available to the individuals who are blind or have

16  low vision?

17  A.   Yes.

18  Q.   Acquisition or modification of equipment or devices?

19  A.   Yes.

20  Q.   And other similar services and actions?

21  A.   Yes.

22  Q.   Okay.  Do you dispute that the County of Alameda is a

23  public entity?

24  A.   No.  We are a public entity.

25  Q.   Do you dispute that Ms. Martinez fell within at least one

**YANKEE - DIRECT / STONER**

1   could very well be the same day that we receive it.

2      So I can't speak to how long the mail would take to get to

3   us; but as far as the transaction at our end, we would treat

4   that as essentially a same-day, high-priority item.

5   **Q.**   In your experience, which -- in your experience, does

6   the -- does the mail ever take less than one day to get from

7   one destination to another?

8   **A.**   No.

9   **Q.**   Okay.   And can we also agree that filing by mail, in 2019

10  at least, would have required the use of a PDF document?

11  **A.**   It would -- right.   You would have printed -- well,

12  potentially.   We could have also given a blank form.   So

13  someone could have received a blank form from our office and

14  had a paper copy that they filled out.   So not necessarily a

15  PDF, but it could have been a PDF.

16  **Q.**   Okay.   So two options.   Option one, that they could pick

17  up a blank form that's preprinted?

18  **A.**   Correct.

19  **Q.**   And that blank form, was that available in large print or

20  braille?

21  **A.**   I don't believe so.   Could we enlarge it if someone asked?

22  That's probably very likely that we could do that.   But do we

23  have them preprinted in a larger size?   No.   But we do have

24  larger copy paper.   If someone had asked us to take, you know,

25  the PDF and to blow it up onto bigger size paper, I would have

**YANKEE - DIRECT / STONER**

1   no reason to think that we could not accommodate that request.

2   **Q.**   Was that ever offered to Ms. Martinez, to your knowledge?

3   **A.**   I don't believe it was offered, and I don't believe it was

4   asked for.  I don't believe that topic came up on either side.

5   **Q.**   Okay.  But from home, it would require accessing a PDF

6   document; is that correct?

7   **A.**   From home, correct.

8   **Q.**   And do you agree that Ms. Martinez went to the CRO on

9   March 29th, 2019, which is the first visit, intending to file

10  her FBNS form on that date?

11  **A.**   That's my understanding, yes.

12  **Q.**   And is it your understanding also that the County offers

13  business owners who have all the necessary information same-day

14  filing for FBNS forms?

15  **A.**   Yes.  If someone comes into our office, we would file it

16  at the time they come in, I mean, obviously, assuming that they

17  have proper payment, that the form's correct and all that.

18  **Q.**   Of course.  Assuming they meet the requirements?

19  **A.**   Right.

20  **Q.**   Okay.  So is it the County's position that requiring

21  Ms. Martinez to bring someone with her to complete same-day

22  filing would be an equal opportunity to file?

23          **MR. GILBERT:**  Calls for a legal conclusion.

24  Speculation.  Opinion.

25          **THE COURT:**  Sustained as to speculation.

**YANKEE - DIRECT / STONER**

1   **Q.**   And so neither Ms. Martinez nor someone sighted would

2   necessarily be able to see that there are a variety of blank

3   forms immediately available?

4   **A.**   They would not likely see them.

5   **Q.**   All right.  Is it the County's position that it would be a

6   violation of law for a clerk to write on a blank form for

7   Ms. Martinez?

8        **MR. GILBERT:**  Calls for a legal conclusion.

9        **THE COURT:**  The witness has testified he can't testify

10   on behalf of the County.

11   **BY MS. STONER:**

12   **Q.**   Okay.  In your role working at the County, do you believe

13   it would be a violation of law for a clerk to write on a blank

14   form for Ms. Martinez?

15        **MR. GILBERT:**  Lay opinion.  Calls for a legal

16   conclusion.  Incomplete hypothetical.

17        **THE COURT:**  Overruled, but I'll instruct the jury that

18   he's giving his personal opinion and it's not to be taken as a

19   statement of what the law is.

20        **THE WITNESS:**  So if I understand the question, it is:

21   Do I personally believe it would be a violation of state law to

22   write on a blank -- for one of our employees to write on a

23   blank form?  I do not believe that would be a violation of

24   state law.

25   \\\

 1   sure in what context you're asking that question.  But do we

 2   have general contacts in the County Counsel's Office?  Yes, we

 3   do.

 4   **Q.**   Okay.  And do you have an ADA coordinator at the County of

 5   Alameda?

 6   **A.**   We do.

 7   **Q.**   Okay.  Were either of those resources consulted between

 8   March -- on March 29, 2019?

 9            **MR. GILBERT:**  Foundation.  Speculation.

10            **THE COURT:**  Sustained.

11   **BY MS. STONER:**

12   **Q.**   Do you know if either of those resources were contacted on

13   March 29, 2019?

14   **A.**   I do not know.  I was, again, not present that day.  I'm

15   not sure if any of the managers who were present that day

16   reached out to any of those individuals.

17   **Q.**   But as you testify today, you have no reason to believe --

18   you're not going to tell me that "We called County Counsel" or

19   "We called the ADA coordinator"?

20   **A.**   On that day, no.

21   **Q.**   Okay.  Do you remember what your counsel said during

22   opening statement about a vendor that was hired in 2018?

23   **A.**   I mean, I -- we did hire a vendor in 2018, but what

24   specific statement are you saying do I recall?

25   **Q.**   Okay.  That's fine, actually.  It's not about your

YANKEE - DIRECT / STONER

1    recollection.

2         You did hire a vendor in 2018?

3    A.   I believe it was 2018 the contract was executed, yes.

4    Q.   And was that vendor rolling out options for all patrons,

5    not just those with disabilities, or specifically for those

6    with disabilities?

7    A.   No.  The software suite was to upgrade our entire

8    Clerk-Recorder software.  So it would be our cashiering system,

9    our document management system, our archival functions,

10   essentially all the business activities that we do.

11   Q.   And in February of 2022, did you have designated terminals

12   or kiosks that would support accessible software?

13   A.   In February of 2022?  I don't recall if we did on that

14   specific date.  Likely not.  I believe, if my recollection is

15   correct, we first designated -- well, I should say that our

16   terminals are broadly accessible to the public.  We have some

17   that are standing, some that are sitting for folks who may not

18   be able to stand for long periods of time.  So I guess it would

19   depend on what specific accessibility you're asking about.

20        But we did have self-service kiosks.  We've had

21   self-service kiosks in a variety of positions for years.  We

22   can do things like increase the resolution on the screen and

23   all those sorts of things.

24        So it would be specifically -- I'm not sure what

25   accessibility function you're addressing.

1    Q.   Yes.   Okay.   Did -- at what point in time, to the best of

2    your recollection, was JAWS software installed on the kiosks in

3    the CRO?

4    A.   I believe that was first done in October of 2022.

5    Q.   And in 2022 when JAWS was installed, what would JAWS

6    access on that kiosk?   What type of document?

7    A.   We could bring up a variety of our forms on that.

8    Q.   What file format?   Sorry.

9    A.   It would -- I mean, the computer would be set up for

10   bringing up our Web forms.   However, we have IT on-site.   So if

11   someone were obviously having difficulty with JAWS and that,

12   they could probably access the document in a Word format, which

13   is the base format that we build the PDF off of, since they're

14   all also on our, you know, internal network drive as -- as Word

15   documents.   So there's a good chance that we could bring it up

16   that way as well.

17        I don't believe it was ever asked for, but I would assume

18   there's a variety of ways that our IT staff could bring those

19   documents up fast.

20   Q.   Does your IT staff have any specialized training in

21   accommodating persons with disabilities?

22        MR. GILBERT:   Speculation.   Foundation.

23        THE COURT:   Overruled.

24        THE WITNESS:   I'm not over -- or I don't manage our IT

25   unit; so I can't speak specifically to what type of training

1    they've received.

2    BY MS. STONER:

3    **Q.**    Okay.   But you can speak to the fact that the kiosks were

4    accessible to the public at large for a long time, but screen

5    reader software was only installed in October of 2022?

6    **A.**    Correct.

7    **Q.**    Is it your testimony that the County now allows the kiosk

8    to provide same-day service for people who rely on screen

9    readers to navigate print documents?

10   **A.**    You're -- yes, we do same day, but that doesn't mean that

11   we wouldn't have before.   Prior to having our screen reader

12   software installed, clerks or audit associates or any staff

13   member could assist and actually verbally read the forms out.

14       And I've actually done so myself to a sight-impaired

15   person before our screen reader software.   Or they use one of

16   our kiosks and I read each field and then directed the mouse to

17   the field for them to fill out and have them personally type

18   that in.

19       So while the software wasn't installed until October of

20   2022, we still certainly could read those forms in a different

21   way to sight-impaired people, if requested, and I can testify

22   that I have done so.

23   **Q.**    And when did you begin doing things that way?   When did

24   that become the policy of the Clerk-Recorder?

25   **A.**    I don't think there was a specific policy.   As I stated

**YANKEE - DIRECT / STONER**

1   before, we do everything that we possibly could to accommodate

2   the individual.   And this individual came in and specifically

3   asked for that accommodation, and we were glad to comply with

4   it.

5   **Q.**   Okay.   But when did that occur?   What date did that occur?

6   **A.**   I don't recall.   I mean --

7   **Q.**   Do you recall the year?

8   **A.**   I don't.   I mean, it would have been after Ms. Martinez

9   visited.

10  **Q.**   After Ms. Martinez visited.   Okay.

11       Okay.   So in 2023, was there a new FBNS wizard installed

12  on the computer kiosk?

13  **A.**   I believe it was first installed in December of 2022, in

14  fact, not 2023, in our internal kiosk and then rolled out to a

15  Web format so that folks could access it at home in -- later in

16  2023.

17  **Q.**   Okay.   So as you sit here today, are you completely

18  confident that the computer systems currently in place at the

19  CRO would enable a screen reader user to complete an FBNS at

20  the CRO and get it filed same day?

21              **MR. GILBERT:**   Vague.   Overbroad.

22              **THE COURT:**   Overruled.

23              **THE WITNESS:**   Am I completely confident the screen

24  reader software alone could do that?   I can't say I'm

25  completely confident, and that's why we have backups available.

YANKEE - DIRECT / STONER

1    Right?  So that's why staff can personally read, for instance,

2    the form and guide a sight-impaired person to the various

3    forms.  I think it's an excellent tool, but I wouldn't say we

4    exclusively rely upon that.

5    **BY MS. STONER:**

6    **Q.**   Okay.  If the computer kiosk system failed for any

7    reason -- technical issue, wasn't usable by the particular

8    individual in question, maybe they're deaf-blind, something

9    like that -- would you today allow a clerk to write on a blank

10   FBNS for a person with a disability?

11   **A.**   On a blank form?

12   **Q.**   Yes.

13   **A.**   If the kiosk failed?

14   **Q.**   Yes.

15   **A.**   Yes.

16   Q.   Okay.  Do you know what the budget of the County of

17   Alameda is?

18   A.   The entire County?

19           **MR. GILBERT:**  Overbroad.  Relevance.

20   **BY MS. STONER:**

21   Q.   Do you have a general sense of the -- you know what?

22   Actually --

23           **THE COURT:**  Overruled.

24   **BY MS. STONER:**

25   Q.   Do you have a general sense of the budget of the County of

YANKEE - DIRECT / STONER

1   Alameda?

2   **A.**   Generally.  I couldn't tell you the latest budget figure,

3   though.  I'm not involved in the overall County budget.

4   **Q.**   I'm not asking if it's -- I'm not asking a dollar amount,

5   but I'm asking:  Is it in the millions?  The hundred thousands?

6   The billions?

7            **MR. GILBERT:**  Foundation.  Speculation.

8            **THE COURT:**  Overruled.

9   **BY MS. STONER:**

10  **Q.**   If you know.

11  **A.**   I mean, I believe our agency has approved expenditures of,

12  I think, around 40 million.  So -- and we're a small part of

13  the County.  So I know it would certainly be millions.  I don't

14  know how much more.

15  **Q.**   Okay.  And are the sources of revenue received by

16  the County, do they include state funding?

17           **MR. GILBERT:**  Overbroad.  Relevance.  403 as to the

18  receipt by the County.

19           **THE COURT:**  Overruled.

20           **THE WITNESS:**  My understanding is that the County

21  receives state funds in some agencies.  I don't believe the

22  Clerk-Recorder's Office directly receives state funding unless

23  it would be a pass-through from the general fund.

24       But that being said, we're also what we refer to as a

25  net-negative County department, which means we bring in

YANKEE - DIRECT / STONER

1    revenues through a variety of sources, like transfer tax,

2    through recording fees.  So what we cost the County is less

3    than what the revenues we bring in.  So we actually put money

4    back into the general fund.

5        So if -- for instance, if they gave us $10 million from

6    the general fund for services, for example, we would actually

7    put back 20 million.

8        Those aren't exact numbers.  I'm just --

9    BY MS. STONER:

10   Q.   Okay.

11   A.   -- illustrating the point.

12   Q.   So if you gave me a dollar and I gave it back to you, have

13   I received a dollar from you?

14           MR. GILBERT:  Calls for a legal conclusion.

15           THE COURT:  Overruled.

16           THE WITNESS:  If you gave me a dollar and I gave it

17   back to you, I --

18   BY MS. STONER:

19   Q.   No, no, no.  If I ask you "Can I borrow a dollar?" and you

20   give me a dollar and then tomorrow I bring it back and I say,

21   "Thank you.  Here's your dollar and, in fact, I might even

22   throw on 25 cents for the courtesy," would you deny that you

23   gave me a dollar, that I received it from you?

24   A.   I would say the prior day I'd given you a dollar.

25   Q.   Yeah.

1   A.    Now, if you're trying to relate that to the budget and

2   say, you know, do we receive the money from the state first

3   before we replenish it later, I'm not sure that it works in

4   that same scenario.   I think that --

5   Q.    Before we proceed on this line of questioning, I do

6   want --

7            MR. GILBERT:   Objection, Your Honor.   Can Mr. Yankee

8   finish his answer?

9            THE COURT:   Yes.

10       Please finish your answer.

11           THE WITNESS:   So I want to speak to that because you

12  set that up with a timing thing; whereas, in day one we

13  receive -- I receive -- or you receive something from me and

14  then, day two, you pay it back let's say with interest; right?

15       I'm not saying that that's how the County operates or at

16  least how our budget operates, where day one we receive like an

17  injection of funds from the general fund and then, day two, we

18  send it back.

19       We very well may on a day-to-day basis have more general

20  fund revenue coming in.   We may never need to actually, for

21  lack of a better term, withdraw from a general fund account.

22       So I want to be very clear that the scenario you presented

23  is not necessarily how the budget operates.

24  BY MS. STONER:

25  Q.    Understood.   And let me back up a little bit more to you.

YANKEE - DIRECT / STONER

1      The general fund of the County of Alameda receives state

2  funding; correct?

3  **A.**   I wouldn't know specifically.   I know that we receive

4  grant funding in various programs.   How the general fund

5  ultimately is made up and what percentage, if any, comes from

6  the state, I couldn't definitively tell you.

7  **Q.**   Okay.   But the County -- or the Clerk-Recorder's Office

8  receives money from the general fund?

9  **A.**   Again, that's why I wanted to -- we're net negative.   We

10  actually send money back to the general fund.

11  **Q.**   So no money ever comes from the general fund into the

12  Clerk-Recorder's Office?

13          **MR. GILBERT:**   Overbroad.   Vague.

14          **THE COURT:**   Overruled.

15          **THE WITNESS:**   I wouldn't know specifically how -- if

16  we need to spend money, for instance, you know, is that coming

17  out of the general fund?   Is that coming -- how that's all --

18  how would you account for those dollars.   At the end of the

19  day, we send more back than we get from the general fund.

20  **BY MS. STONER:**

21  **Q.**   Okay.

22  **A.**   So we contribute to the general fund.   We make the general

23  fund bigger --

24  **Q.**   Okay.

25  **A.**   -- based on our operations.

1      Whether or not there's some type of do we have to make a

2  withdrawal from the general fund before we put money back, I

3  wouldn't know the specific timing of that.  I'm not in the

4  general accounting unit of our agency.  So that's a very

5  technical finance question I'm not prepared to answer.

6  **Q.**   Okay.  Would any document, including the budget of the

7  County of Alameda, which includes budget overviews and specific

8  projections as to the Clerk-Recorder's Office, refresh your

9  recollection on that point?

10 **A.**   It's not that I'm not remembering.  I mean, like I said,

11 we send money back to the general fund.  So I'm very clear that

12 we are a net-negative County department, which -- you know,

13 which means that we send money back, that we bring in more

14 revenue than we cost the County.  So we make the general fund

15 bigger, and that's happened on a consistent basis since I've

16 been there.

17      You're asking specifically how does the accounting work,

18 which is how are transfers made in and out; and there's no,

19 I believe, budget document that's going to illustrate that; or

20 if there is, it certainly isn't something I've seen before so I

21 wouldn't recollect something.

22          **MS. STONER:**  Okay.  Thank you.

23      One moment.

24                  (Pause in proceedings.)

25  \\\

YANKEE - DIRECT / STONER

BY MS. STONER:

Q.   Between 2019 and now, has your position changed at all as to whether it would be a violation of the County's policy to have a clerk write on a blank FBNS form for a customer with a disability who could not write themselves?

MR. GILBERT:   Misstates testimony.   Overbroad.   Vague. Incomplete hypothetical and speculation.

THE COURT:   Overruled.

THE WITNESS:   I would say our general policy has still been that we don't fill out blank forms.

Have -- my understanding is also that we've done so on some instances because we now have a way to independently have a customer verify what was entered in, specifically for FBN forms.

So that if a clerk were to type something into the -- their -- the writing -- you called it the Wizard -- that we could turn that around to a sighted person.   Someone who's not a sighted person, we could use the screen reader software to have that independently verify what was written.

BY MS. STONER:

Q.   My question is about handwriting.   Between 2019 and the present, has your understanding -- with regard to whether there should be an exception made to the policy for an individual who cannot write for themselves because of a disability, has your understanding changed between 2019 and now?

1          **MR. GILBERT:**  Vague.   Incomplete hypothetical.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  I'm not specifically understanding the

4     question you're asking.   Are you asking would we hand write a

5     form or use the kiosk on behalf of a customer?

6     **BY MS. STONER:**

7     **Q.**   I'm asking about handwriting.

8     **A.**   I don't recall, at least any instances that were brought

9     to my attention, where we had staff handwriting -- using their

10    own handwriting, write a blank form for a customer.

11          May that have happened at some point?   Like I said, we do

12    empower our managers to make a lot of those decisions.   And

13    since -- you know, in 2019, we discussed that I was a division

14    chief for the Clerk-Recorder's Office.   I'm an assistant

15    controller now, and so I'm far more removed from the day-to-day

16    activities of the Clerk-Recorder's Office.

17          So could that -- potentially could a manager have made a

18    decision at some point to have a clerk do that?   That's

19    possible.   So I wouldn't say it's out of the realm of

20    possibilities, but I'm not personally aware of that.

21    **Q.**   Okay.  So your personal view hasn't changed between 2019

22    and now with regard to the scenario I described?

23          **MR. GILBERT:**  Misstates testimony.

24          **THE WITNESS:**  I don't believe I expressed --

25          **THE COURT:**  Overruled.

1            THE WITNESS:  I'm sorry.

2            THE COURT:  Overruled.

3       You can answer.

4            THE WITNESS:  I don't believe I expressed a personal

5    view.  I expressed personally what I'm aware of.

6       I'm not aware of anyone who's done that in our office, any

7    staff member who's handwritten a form, but that's just that I'm

8    aware of, my viewpoint.

9    BY MS. STONER:

10   Q.   Has your personal view changed on whether it would be

11   proper or improper to do so?

12   A.   As a general policy, we would discourage staff from doing

13   that.  If a specific instance might require that and there's --

14   you know, we receive a thousand customers in person every week,

15   so there's a variety of special circumstances that may come up.

16       So may there be a scenario or some scenarios where that

17   might have to happen?  That's possible.  But as a general

18   policy, that hasn't changed.  We don't have clerks hand fill

19   out forms for customers.

20            MS. STONER:  Okay.  Thank you.

21       I'll pass the witness.

22            THE COURT:  All right.  At this point, we are going to

23   take our midmorning break for about 15 minutes.

24       So I'll ask my courtroom deputy to bring the jury to the

25   jury room.

**YANKEE - CROSS / GILBERT**

1   March 29th, 2019?

2   **A.**   I believe there was effective communication that day.

3   **Q.**   And because there was effective communication, would, in

4   your opinion, the County have been required to provide any

5   further accommodations or aids or auxiliary services?

6   **A.**   No.

7   **Q.**   Thank you.

8        Now, even though the County was not required to do so,

9   would the offer to allow an expedited mail-back of her FBNS

10  form been a type of accommodation?

11  **A.**   Yes.   That's not something we would have ordinarily done

12  to anyone mailing in something that needed corrections.   That

13  would have been a specific accommodation made for Ms. Martinez.

14  **Q.**   And that's not something that's offered to everyone else?

15  **A.**   Correct.

16  **Q.**   And the expedited process, how quickly would an expedited

17  return have been if she would have mailed it in?

18  **A.**   It would have depended on the mail; but once we received

19  it, that would have likely been a same day, if possible,

20  probably the latest, the following day if we couldn't get to it

21  the day we received the mail.

22  **Q.**   And we also heard a little bit about funding and budgets.

23       Now, how long have you been with the CRO division?

24  **A.**   I've been with the Auditor-Controller/Clerk-Recorder

25  agency for about 12 1/2 years.

**YANKEE - CROSS / GILBERT**

1  **Q.**  And is it fair to say that you are the highest ranking

2  employee in the Clerk-Recorder's Office for the County of

3  Alameda currently?

4  **A.**  Yeah.  The highest level civil service employee, yes.

5  **Q.**  And then there would be an elected official that serves

6  beside you?

7  **A.**  Correct.

8  **Q.**  And that's an elected position, but you would be a civil

9  service position?

10  **A.**  Yes.  And I believe she has a chief deputy that she gets

11  to appoint that's outside the civil service system.

12  **Q.**  Now, within that role, are you familiar with the CRO's

13  budget and financial operations?

14  **A.**  Yes.

15  **Q.**  And at any time since January of 2019 to the current, are

16  you aware of any time that the CRO's -- CRO's office has

17  received and utilized funds directly from the State of

18  California?

19  **A.**  Directly, no.

20  **Q.**  Thank you.

21  Now, let's step back and kind of do more broad picture, if

22  we could.

23  When did you first come to the County of Alameda?

24  **A.**  My employment began in November of 2011.

25  **Q.**  What was your position at that point?

**YANKEE - CROSS / GILBERT**

1    include me.  It may include managers below me.  It may include

2    Melissa Wilk, who's the elected official; and then it may

3    include representatives from other relevant county departments,

4    such as potentially County Counsel or the County

5    Administrator's Office, whichever departments it may touch.

6    **Q.**   Now, we've heard a little bit about written policies.  Are

7    all policies of the County of Alameda CRO required to be in

8    writing?

9    **A.**   No.

10   **Q.**   Are they in writing?

11   **A.**   Many are not.

12   **Q.**   So how does the policies of the CRO, how do they relate to

13   state and federal law, for example?

14   **A.**   Many of them are based directly on state and federal law,

15   which would make writing a policy rather redundant.  Oftentimes

16   the policy is the effective way to implement a federal or state

17   law, and that's oftentimes conveyed to employees through

18   on-the-job training that they're required to go through.

19   **Q.**   So if there was a state law on an issue that said "Thou

20   shall do this" or "Thou shall not do that," would that be

21   adopted by the County as the policy, or would there be a

22   separate written policy that would simply cut and paste it and

23   say, "Here's our policy which is the same"?

24   **A.**   It would essentially be the policy of what the state or

25   federal law is.

YANKEE - CROSS / GILBERT

1  Q.   So the County would simply rely upon the state or federal
2  law as its policy for the expectations of its employees?
3  A.   Essentially, yes.
4  Q.   Thank you.
5       Now, as far as those policies, how are the employees of
6  the CRO advised on those policies?
7  A.   It can be a variety of methods.  Typically, it's
8  on-the-job training.  Every new employee in our agency is
9  required to go through a six-month training program in three
10 separate units, and they work with experienced leads and
11 supervisors to make sure they can competently perform their
12 job.
13      Now, if there happens to be new policies that are
14 introduced, you know, outside of the training process, then
15 that would be communicated either through a staff meeting,
16 potentially an e-mail, a memorandum.  It could take a variety
17 of forms.
18 Q.   And does that training also include discussion and
19 direction on how to comply with the Americans with Disabilities
20 Act?
21 A.   It does, yes.
22 Q.   Now, does the County also have an ADA coordinator
23 that's --
24 A.   I believe every agency within the County does, in fact.
25 Q.   So does the CRO have its own?

1   **A.**   The CRO is a division of the

2   Auditor-Controller/Clerk-Recorder agency, and our agency does

3   have an ADA coordinator, correct.

4   **Q.**   And is that ADA coordinator someone who is available to

5   all the employees in the CRO?

6   **A.**   Yes.

7   **Q.**   Are they allowed to reach out and receive direction or

8   guidance from that individual as necessary?

9   **A.**   Yes.

10  **Q.**   And is there also regular training that's provided to the

11  CRO employees during the course of their employment?

12  **A.**   Yes.

13  **Q.**   Do they also receive initial training when they first

14  begin and they go through the rotations you talked about?

15  **A.**   Yes.

16  **Q.**   Now, continuing on, do you know who the CRO -- or, excuse

17  me -- who the ADA coordinator was when Ms. Martinez came in on

18  March 29th, 2019?

19  **A.**   I do.

20  **Q.**   Who was that individual?

21  **A.**   Sabrina Amador.

22  **Q.**   So that position was filled and there was somebody serving

23  in it at the time that Ms. Martinez came in?

24  **A.**   That's correct.

25  **Q.**   Thank you.

1   that as another accommodation that we could make.

2   **Q.**   Well, if there's effective communication and there's no

3   legal requirement for additional accommodations, why would the

4   CRO's office continue trying to provide additional help and

5   support?

6   **A.**   I mean, we try to go above and beyond what's just legally

7   required of us.   We strive for excellent customer service.

8   We're kind of proud of the fact that we have a 4.5 Yelp rating,

9   in fact, online, which for a government agency is fairly

10   impressive since we're not all that interesting.   So we really

11   do strive to provide the highest level of customer service.

12   **Q.**   It's impressive that you actually monitor your Yelp

13   ratings.

14   **A.**   We do and respond to customers.

15   **Q.**   Good.

16       Now, after you looked into this matter, did anyone ever

17   tell you that they were having trouble communicating with

18   Ms. Martinez?

19   **A.**   No.

20   **Q.**   Did anyone ever tell you that Ms. Martinez was having

21   difficulty communicating with anyone with the CRO?

22   **A.**   No.

23   **Q.**   Now, we talked a little bit ago about not modifying legal

24   forms, but let's turn to a specific, filling out blank forms.

25       Excuse me.

1    You mentioned earlier that the general policy -- well,

2    tell me -- tell me again, please, what is the general policy

3    regarding CROs completing blank forms if someone comes in?

4    **A.**   Right.   So the general policy is that we do not fill out

5    blank forms that are filed or recorded in our office.   That's

6    an important distinction because we do oftentimes fill out

7    forms that are not filed or recorded in our office.

8        And to help explain the difference, a document, if filed

9    or recorded, is a legal document that the submitter prepares.

10   And we essentially act as a giant bulletin board or a library

11   to these documents, but we don't act upon these documents.   We

12   don't take action on them.

13       That's very different than something like a marriage

14   license application, which is also something that we do, where

15   the County confers a license upon the individual based on the

16   information they provide to us.

17       So for many years, we've helped customers fill out

18   marriage license applications and review it with them and read

19   it back to them and all that.   But when we're dealing with a

20   form that's filed or recorded, it's incumbent upon the

21   submitter to prepare that, and we just act as the intermediary

22   to make sure it's communicated to the public.

23   **Q.**   Understood.   Thank you.

24       So turning back to our example, if I was to come in and,

25   for example, fill out a copy request, I want to get a copy of a

YANKEE - CROSS / GILBERT

1   public document, is that a legal form?

2   A.   It is not.   That would be like a work order form for us.

3   Q.   Would that be something that a CRO representative could

4   assist me in filling out?

5   A.   Yes, absolutely.

6   Q.   Now, turning to a legal document, an FBNS form, generally,

7   what is the practice of the CRO's office in regards to filling

8   out blank forms?

9   A.   Generally, that's not something that we do.

10  Q.   And let's be really clear for a second.   If someone comes

11  in with a completed FBNS or business form, will the County ever

12  edit that completed form?

13  A.   We will never edit a form that's already been completed.

14  Q.   And then switching to a blank document, are there

15  occasions when a County may help prepare a blank new document,

16  legal form?

17  A.   There have been occasions, yes.

18  Q.   Can you explain to the jury, if the policy of the CRO is

19  generally not to do this but there are occasions that it

20  happens, how is that -- how do you reconcile those?   How does

21  that work?

22  A.   It would be on a case-by-case basis based on the unique

23  circumstances.

24       To put it in perspective, we file and record annually

25  anywhere from, on a slow year, a quarter of a million documents

1    to a large year, half a million documents.  So if our staff

2    were to be regularly filling out recorded and filed forms for

3    customers, that could potentially be an undue burden.

4         And while the FBN represents a single-page fairly simple

5    form, some of the documents that we file/record in our office

6    are dozens, if not even hundreds, of pages long and contain

7    complex financial information, legal parcel numbers, many

8    things that our staff would struggle to complete in a timely

9    basis.

10        So, generally speaking, it's not our policy to do this;

11   but on certain occasions where the supervisor or another

12   manager or even a staff member felt that it's necessary to do

13   so, we have that discretion.

14   Q.   Now, if an individual with a disability who is unable to

15   complete the form comes into the office and needs to complete a

16   form, would that be the type of exemption or unique situation

17   where the CRO might help fill out that form?

18   A.   Yes, that might be one of the circumstances where we do.

19   Q.   Now, we've also heard -- and let's tie this back a little

20   bit.

21        You mentioned that there's some computers that are

22   available at the CRO's office; is that right?

23   A.   That's correct.

24   Q.   And let me go back one step further.

25        You have the computers that the clerk-recorders use at the

YANKEE - CROSS / GILBERT

```
 1   counter; is that right?

 2   A.    Correct.

 3   Q.    Are there other computers that are available to the public

 4   that are --

 5   A.    Yes.  So we have self-service computers.

 6   Q.    And where are those in proximity to what we're talking

 7   about?

 8   A.    I mean, they're on the same floor of the building.  They

 9   would be, roughly speaking, about a distance from where I am to

10   if you would just exit those doors and make a left or right.

11   So, you know, a few second's walk away.

12   Q.    50 to 75 feet, roughly?

13   A.    Roughly, yeah.

14   Q.    Okay.  How long have those computers been around or have

15   there been computers available generally?

16   A.    I mean, I -- they predated me, and I would think that

17   they've been available since our building opened in '99.

18   Q.    Are those computers equipped with access to the materials

19   that people can use to prepare forms or legal forms for

20   submission to the CRO?

21   A.    It depends on the form.  Some of the more complex

22   recording forms, no, we don't do that; but for FBNs, yes.

23   Q.    Now, has the County tried to update its available forms,

24   how people can access them, over the years?

25   A.    Yes.
```

**YANKEE - CROSS / GILBERT**

1  **Q.**   Is it always -- are people always required to come into

2  the CRO in order to get the forms, or are they available some

3  other means?

4  **A.**   They're available on our website.

5  **Q.**   Okay.  And how long ago did they become available on your

6  website?

7  **A.**   Again, that predates me, so I could tell you at least

8  12-plus years.

9  **Q.**   Thank you.

10      Now, we've heard something about, I want to say, a

11  software suite.  Does that sound familiar?

12  **A.**   Yes.

13  **Q.**   Can you explain what that is, please?

14  **A.**   Yes.  So the -- all the functions that our office

15  performs, which includes recording documents, which includes

16  issuing marriage licenses, copies of birth, death, marriage

17  certificates, fictitious business names, notary notes, that's a

18  lot of record storage.  So we need a very complex record

19  management system.

20      We also need a portion of that system to account for all

21  the transactions that we do, which is to sell copies, the

22  recording fees, the transfer tax that we collect.  So this

23  software system is a one-size-fits-all type of thing.  It does

24  all those features.

25      And part of that also is the public access portion of it,

YANKEE - CROSS / GILBERT

1    which is how we allow our customers to interface with the

2    system, such as the online submission of a fictitious business

3    name statement or searching our index or other varieties of

4    services they might want.

5    **Q.**    Has the County tried to update that system periodically

6    through the years?

7    **A.**    Yes.

8    **Q.**    And prior to Ms. Martinez coming in 2019, had there been

9    an effort by the County to update that software suite?

10   **A.**    Yes.   The contract for that was signed, I believe, the

11   prior year, in 2018.

12   **Q.**    Did that have anything to do with Ms. Martinez?

13   **A.**    No.

14   **Q.**    Now, can you explain, just in general terms, what that

15   contract encompassed and dealt with?

16   **A.**    It encompassed all those things I just spoke of.   We --

17   our old system, I believe, was initially, that we were using at

18   the time, was I believe put into place in 1999-ish time frame.

19   So we were running on a system that was close to 20 years old,

20   which for a software is very old; and it was leading to

21   problems, particularly as our office tried to implement new

22   statewide legislation that had additional requirements on it.

23   So it was very important that we update our software system.

24   So that was all put into place.

25         And, in fact, I believe we issued one or two prior

1  requests for proposals, which is where contractors can bid on

2  large County contracts, but those were not successful in

3  delivering a new system to us.

4       But that finally was successful.  We found a vendor.  In

5  fact, it was the same vendor; and they essentially upgraded our

6  existing software suite with their new software suite.  And

7  that process started in 2018 with the signing of the contract;

8  but it's a multiyear process that ran into significant

9  challenges throughout the pandemic.  In fact, it had not even

10 been completed before the pandemic started.

11 **Q.**  When was the new software finally implemented and rolled

12 out?

13 **A.**  It -- the online submission of FBNs, I believe, would have

14 been one of the last portions of it, and I believe that

15 occurred in December of 2022.

16      But it's also a constantly upgrading system.  So as other

17 counties, including our county, request additional features,

18 those are oftentimes integrated.  So we're on almost like a

19 constant upgrade system where, as new features become

20 available, we want to make sure that those are included in what

21 we offer so that customers can take advantage of them and our

22 staff can as well.

23 **Q.**  Now, let's be more specific to this case regarding the

24 suite.  Does this suite provide additional options for how

25 patrons can complete legal forms that need to be submitted to

1  the CRO?

2          MS. STONER:  Objection.  403.

3          THE COURT:  What was the objection?

4          MS. STONER:  403.

5          THE COURT:  Overruled.

6          THE WITNESS:  Yes.  So prior to the system, there was

7  no way to electronically submit a fictitious business name

8  statement to us.  You'd have needed to print out the PDF and

9  either fill it out by hand or have filled it out before you

10  printed it and then physically brought the paper into our

11  office.  Whereas now, there's a portal whereas you can fill out

12  the form online and they're electronically transmitted to us.

13  And then all you would need to do is sign the form that we

14  would print out when you come to our office to finish the

15  transaction.

16  BY MR. GILBERT:

17  Q.  Thank you.

18      And as far as this process, is there other improvements

19  and aspects that are going on about improving the opportunities

20  to fill out forms both in the office and remote?

21  A.  Before this, we also did marriage license applications.

22  That was another one where people could fill out and submit

23  their marriage license application online.  So it's not limited

24  just to the fictitious business name statement.

25  Q.  Thank you.

YANKEE - CROSS / GILBERT

1      And then is this software suite available in the kiosk at

2   the CRO's office?

3   **A.**   There's a portion of it.   It's called the public access

4   portion of that larger software system.   And, yes, those are

5   all available at the kiosks.

6   **Q.**   Are there kiosks that are designated for use by disabled

7   individuals?

8   **A.**   Yes.

9   **Q.**   And do those kiosks have any additional services or

10  equipment or software to further assist disabled individuals in

11  accessing those materials?

12  **A.**   Yes.   So we've also installed the JAWS software, which

13  I believe is Jobs Access -- I honestly forget the acronym, but

14  it's a screen reader type of software to assist individuals in

15  completing their forms.

16  **Q.**   And the JAWS software, is it your understanding that

17  that's intended to allow sight-impaired individuals to access

18  and complete PDFs?

19  **A.**   PDFs, as well as our interface with our online submission

20  form.

21  **Q.**   Now, as far as the kiosk and the JAWS software that you

22  were talking about, are disabled individuals required to fend

23  for themselves when they go there?   In other words, they just

24  show up at the CRO's office and here it is, deal with it --

25  **A.**   No, no.

1    Q.    -- or is there some other type of help or assistance that

2    comes into play?

3              MS. STONER:   Objection.   Leading.

4              THE COURT:   Overruled.

5              THE WITNESS:   No.   We absolutely provide assistance.

6    That's -- in fact, we have a unit of our Clerk-Recorder's

7    Office specifically called the Customer Service Unit, and those

8    individuals are trained to help guide customers through the

9    process and, if customers identify that they may have specific

10   needs, to help them go through the process, and that may be a

11   variety of things.

12        We've had customers come in and indicate that they are

13   hard of hearing and may need to schedule a sign language

14   translator for a wedding ceremony in our office; or it could be

15   someone who was in an accident and didn't have use of their

16   hands and couldn't type at a kiosk and so we've helped type

17   searches for them.

18        So they're all trained to do that and help -- can help

19   guide any customer throughout our process.

20   BY MR. GILBERT:

21   Q.   What are employees of the CRO taught regarding assisting a

22   disabled individual in using the kiosk?

23   A.   They should provide as much help as they can, answer

24   questions.   And then if the kiosk, you know, encounters a

25   technical error, they can do certain things like help guide the

YANKEE - CROSS / GILBERT

1   mouse to various parts of the form or to read aloud parts of

2   what they're seeing on the screen if the screen reader software

3   isn't working.

4   **Q.**   So let me go through that and kind of break it down.

5        Is it -- are CRO employees advised that if a disabled

6   individual needs assistance on the kiosk, that someone from the

7   CRO, whether it's the -- I think you called it the assistance

8   division.   Was that --

9   **A.**   Customer Service Unit.

10  **Q.**   Customer Service Unit, they would go and actually

11  physically be with and assist that individual?

12  **A.**   Yes.

13  **Q.**   And would they stay with them for the entirety of their

14  duration while they're trying to complete these forms?

15  **A.**   If that's what the customer needs, yes.

16  **Q.**   And during that process, I think you mentioned that the

17  Customer Service Unit, they might read the forms or read the

18  words that are on the screen if there's problems with the JAWS

19  software.

20  **A.**   Yes.

21  **Q.**   And even if the -- if a customer doesn't want to use the

22  JAWS software, can they just simply ask someone from the

23  Customer Assistance Unit just to read the form to them and tell

24  them what they're looking at?

25  **A.**   Yes.

**YANKEE - CROSS / GILBERT**

1   Q.   And then you mentioned, I think, moving the mouse.   What

2   were you referring to on that?

3   A.   Right.   So if a customer is having a hard time seeing

4   where the mouse is so that they can type in the appropriate

5   field, we can help guide the mouse and so that the cursor is in

6   the appropriate field for them to begin typing.

7   Q.   And is there any limits to what assistance would be

8   provided in preparing a new form that you can think of as

9   you're sitting here?

10  A.   I mean, as long as they're not asking us to do something

11  that's against a policy or law, we would help them.

12  Q.   So once a form is filled out, are there further measures

13  that the County takes in order to help a disabled individual or

14  even just any individual sign a form?

15  A.   Yeah.   We could either -- well, let me back up.

16       We would -- initially, you know, when we had those

17  situations occur, we could help guide someone's hand with the

18  pen to the appropriate signature line on the form.

19       Then I don't recall how many years ago, maybe two years

20  ago, we became aware of metal boxes, hollow metal boxes, for

21  lack of a better way to describe it, which someone who's sight

22  impaired can use to help guide them so they know to sign inside

23  the box that they can actually feel, so that they can use that

24  to help sign forms.

25  Q.   So I've seen, for example, where I go to use a credit card

**YANKEE - CROSS / GILBERT**

```
 1    at a -- they've got the little square box that you sign in the

 2    credit card machine.

 3    A.    Yes.

 4    Q.    Is that the kind of template you're talking about?

 5    A.    Similar, yes.  It's taller so that it's easier to feel.

 6    Q.    So you would put that on the actual form so the

 7    sight-impaired individual could feel where they would need to

 8    sign?

 9    A.    Correct.

10    Q.    How would the sight-impaired individual verify the

11    information on the form before they signed it?

12    A.    Well, if they -- are you speaking of a form that was

13    completed in our office?

14    Q.    Yes, sir.

15    A.    We have, like I said, the JAWS software which allows for

16    an independent way to verify what it is they typed in.  So they

17    could listen to it before it's printed out and then know what

18    it is that they're signing.

19    Q.    And they could also, in the alternative, have someone from

20    the CRO read them the content of the form?

21    A.    They could, yes.

22    Q.    And these are discretions that the CRO staff has

23    currently, and has for at least the last however long since

24    this new software was implemented, to be able to provide

25    assistance to patrons?
```

YANKEE - REDIRECT / STONER

1    A.    Yes.

2    Q.    Thank you.

3          Now, does the CRO still allow electronic submissions of

4    forms?

5    A.    Yes.

6    Q.    And does it still allow mailing of forms?

7    A.    Yes.

8    Q.    So people can still record their forms by all of the means

9    that were otherwise available, and there's additional means now

10   that have been implemented by the County?

11   A.    Yes.

12   Q.    Are any of these methods scheduled to be prohibited or

13   ruled out or terminated or not continued?

14   A.    No.

15         MR. GILBERT:  Thank you.

16   Just a moment, please.

17                      (Pause in proceedings.)

18         MR. GILBERT:  Thank you, Your Honor.  Nothing further.

19         THE COURT:  Does plaintiff have any further questions

20   for this witness?

21         MS. STONER:  Yes, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MS. STONER:

24   Q.   So I believe I heard you say "our office," "our system,"

25   "we" while you were testifying just a minute ago.  Is that

**YANKEE - REDIRECT / STONER**

1    the dedicated kiosk for -- specifically for those with

2    disabilities did not exist on March 29th, 2019; correct?

3    **A.**   Correct.  It was not specifically designated, but

4    obviously, it was broadly available.

5    **Q.**   Okay.  And the same question as to May 31st, 2019.

6    **A.**   Correct.

7    **Q.**   And you're not -- are you telling the jury today that it

8    is illegal for a clerk to write on a blank FBNS form?

9    **A.**   I don't believe I said that.

10            **MR. GILBERT:**   Asked and answered.

11            **THE COURT:**   Overruled.

12            **THE WITNESS:**   I said that we can't modify a completed

13   form.  I don't believe I ever said it was illegal for us to

14   fill out a blank form.

15   **BY MS. STONER:**

16   **Q.**   Okay.  And you're not telling the jury today that it's

17   illegal for a third party to write on a completed FBNS form,

18   are you?

19   **A.**   What I've stated before is that we interpret Government

20   Code 27203, Subsection (d), to apply to our staff.  Now,

21   whether or not there are other laws that would preclude

22   individuals from making adjustments, edits, modifications to a

23   legal form that's been signed under penalty of perjury, that

24   may -- very well may exist or may not exist, but that's beyond

25   our scope.  We care about what our employees and our

YANKEE - REDIRECT / STONER

1  representatives do.  So I can't comment whether that is or is

2  not illegal.  I wouldn't know.

3  **Q.**   Okay.  But you have no reason to believe that it is

4  illegal, as you said?

5  **A.**   I said I wouldn't know one way or -- I mean, it -- I mean,

6  common sense would make me think that, you know, there may be

7  concerns with someone making adjustments to a signed and

8  completed form.  I mean, obviously, if there's contractual

9  documents, checks, other things that are signed and you had

10  people changing, you know, a written instrument after it's been

11  executed, that could be a concern.

12      But, again, that's all beyond what occurred in our office

13  that day.  We specifically had that Government Code that we

14  rely on for the conduct of our employees.

15          **MS. STONER:**  Thank you.

16      Just one moment, please.

17              (Pause in proceedings.)

18  **BY MS. STONER:**

19  **Q.**   Okay.  Two weeks from now, if Ms. Martinez walks into the

20  CRO with an FBNS, would the CRO be willing to assist her in

21  completing it if she's unable to do so?

22          **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

23          **THE COURT:**  Yeah.  Sustained.

24  **BY MS. STONER:**

25  **Q.**   If Ms. Martinez walks into the CRO two weeks from now,

YANKEE - REDIRECT / STONER

1  will the County agree to fill out a blank unsigned paper FBNS

2  form for her if needed to renew her FBNS?

3          MR. GILBERT:  Speculation.  Incomplete hypothetical.

4          THE COURT:  Overruled.

5          THE WITNESS:  As I stated, it would be a case-by-case

6  basis.  It would be within the realm -- a blank one, it would

7  be within the realm of possibilities.

8      Again, our general policy would be not to do so; but in

9  evaluating her specific circumstances at that hypothetical

10 visit, that's potentially something that we could offer.

11 BY MS. STONER:

12 Q.  Did any clerks offer to transcribe information onto a

13 blank FBNS form for Ms. Martinez back on March 29th, 2019?

14          MR. GILBERT:  Speculation and foundation.

15          THE COURT:  Overruled.

16          THE WITNESS:  I'm not aware of that being either asked

17 for as an option or offered as an option.

18          MS. STONER:  Okay.  Thank you.

19      No further questions.

20          THE COURT:  Does defendant have any further questions

21 for the witness?

22          MR. GILBERT:  No, Your Honor.

23          THE COURT:  Thank you.  You may step down from the

24 witness stand.

25                      (Witness excused.)

GRECO - DIRECT / ELDER

1           THE COURT:  Good afternoon, everyone.  Please be

2   seated.

3       Plaintiff, please call your next witness.

4           MR. ELDER:  Your Honor, plaintiff calls Lucy Greco.

5       May Ms. Korosy bring her to the courtroom?

6           THE COURT:  Yes.

7           MR. ELDER:  Okay.

8    (Witness enters the courtroom and steps forward to be sworn.)

9           THE COURT:  And if you would escort her to the witness

10   stand, that would be appreciated.

11                      (Pause in proceedings.)

12          THE CLERK:  Ms. Greco, I am the Courtroom Deputy, and

13   I'm going to swear you in.  So if you could raise your right

14   hand, please.

15                          LUCIA GRECO,

16   called as a witness for the Plaintiff, having been duly sworn,

17   testified as follows:

18          THE WITNESS:  I do.

19          THE CLERK:  Thank you.  You have been sworn.

20                     DIRECT EXAMINATION

21   BY MR. ELDER:

22   Q.   Good afternoon, Ms. Greco.

23   A.   Good afternoon.

24   Q.   Could you please speak your full legal name for the

25   record?

**GRECO - DIRECT / ELDER**

1   A.   Sure.   My legal name is Lucia Greco.

2   Q.   And where do you reside?

3   A.   I live in Berkeley.

4   Q.   Are you blind?

5   A.   Yes, I am totally blind.

6   Q.   And when you say "totally blind," what do you mean?

7   A.   I have no light perception and no usable vision.

8   Q.   And are there degrees of blindness?

9   A.   Many, many, many different degrees.

10  Q.   Okay.   How are you currently employed?

11  A.   I am a digital accessibility expert for the University of

12  California.

13  Q.   And are you associated with a particular campus or

14  UC-wide, or what is the nature of your position?

15  A.   My primary campus is Berkeley, but my role expands across

16  the entire University of California.

17  Q.   Do you operate a small business in addition to your

18  full-time day job?

19  A.   Yes.   I have a small consulting business.

20  Q.   And in December of 2022, did you determine that you had a

21  need to file what was known as an FBNS form with the

22  County of Alameda?

23  A.   Yes.

24  Q.   And did Ms. Martinez's counsel contact you and ask you to

25  share any experiences that you might have with filing the FBNS

1    form at the Oakland Clerk-Recorder's Office?

2    A.    Yes.

3    Q.    And did you, in fact, go to the Oakland Clerk-Recorder's

4    Office on approximately December 15th, 2022, to file an FBNS

5    form for your business?

6    A.    Yes, I did.

7    Q.    Now, when you first arrived at the CRO or the

8    Clerk's Office, what did you do?

9    A.    When I located the right part of the office to go to, I

10   approached the desk.  Because it was a fairly empty time, I was

11   able to go directly to the desk and requested the form.

12   Q.    And what did you say?

13   A.    I told them I would need the FBNS, and they handed me the

14   form on a thing.  And I said, "Would I be able to get some

15   assistance to fill this form out," as I was not able to fill it

16   out independently.

17   Q.    And so you asked for assistance.  Did they offer to do

18   anything for you?

19   A.    Yes.  She said to hold on a minute and she would be -- she

20   would give me a hand.

21   Q.    And did she offer to do anything more specific after that?

22   A.    She proceeded to ask me the questions on the form and

23   start filling it out until we got to one question I wasn't

24   certain of the answer to.

25   Q.    So as to writing on this blank FBNS form, this act of

**GRECO - DIRECT / ELDER**

1   transcribing where you were speaking answers and she was

2   writing things down --

3   **A.**   Correct, yes.

4   **Q.**   -- did she offer that first, or did you ask for that

5   first?

6   **A.**   I asked for assistance, and she said, "One moment.  I'll

7   give you a hand."

8   **Q.**   So you asked for assistance generally?

9   **A.**   Correct, yes.

10  **Q.**   And then she offered to write and transcribe the

11  information you spoke onto the form; is that right?

12          **MR. GILBERT:**   Objection.   Leading.

13          **THE COURT:**   Sustained.

14          **THE WITNESS:**   I asked for assistance --

15          **THE COURT:**   Wait.

16      You need to rephrase the question.

17          **MR. ELDER:**   Yeah.

18  **Q.**   Did you -- your first inquiry of them, did you -- did you

19  specifically ask for assistance with transcribing information

20  you spoke onto the paper form?

21  **A.**   I believe my actual request was "Can I get some assistance

22  filling this out, please, as I am not able to see the form and

23  I am not able to write on the form?"

24  **Q.**   And did she then offer to transcribe the information onto

25  the form for you?

GRECO - DIRECT / ELDER

1   A.    Her words were she would help me.

2   Q.    Okay.  Did the clerk there at the counter listen to the

3   words that you were speaking?

4   A.    Yes.

5   Q.    And did she then write down those words onto the paper?

6   A.    Yes.

7   Q.    I think you mentioned you had to make a call to verify

8   some information; is that right?

9   A.    Correct.  I wasn't aware of what type of business I was

10  requiring, so I needed to check with my husband what we put on

11  our taxes.

12  Q.    And did you then return to the counter to finish your

13  form?

14  A.    Correct, yes.

15  Q.    So that whole process of speaking information, then

16  writing it down, you asking your husband for some information,

17  then coming back to the counter, about how long would you

18  estimate it took for you to transcribe all of the information

19  onto your paper form?

20  A.    At most, 15 minutes or less.

21  Q.    And specifically, that process of just -- not the complete

22  filing of the form, but just that step of transcribing

23  information onto the paper form, listening to it, that exchange

24  of filling out the form, how much time would you estimate that

25  step took?

**GRECO - DIRECT / ELDER**

1   **A.**   That's -- that portion, I think, took probably 10 to

2   15 minutes, like I said.

3   **Q.**   Okay.   Did you encounter more than one clerk that day in

4   this process of going through your form?

5   **A.**   Yes.   When I returned to the counter after making my phone

6   call, there was another clerk there.   And I indicated that I

7   had been working with a lady, and the gentleman said, "One

8   moment," and the lady came back and said, "I'll help you finish

9   now."

10  **Q.**   Did anyone ever interrupt the process and say that this

11  shouldn't continue?

12  **A.**   No, in no way.

13  **Q.**   Do you recall signing a declaration in this case?

14  **A.**   The only signature I recall was when I went over to the

15  other side of the building to actually file the form.

16  **Q.**   Apologies.   Do you recall in this litigation that --

17  **A.**   Oh.

18  **Q.**   -- you signed a declaration, which is testimony under oath

19  in writing?

20  **A.**   Oh, about this -- about these incidences, yes, I did.

21  **Q.**   And do you recall in your declaration stating that you

22  estimated that the --

23          **MR. GILBERT:**   Objection.   Hearsay.

24          **THE COURT:**   Yeah.   Sustained.

25  \\\

1    BY MR. ELDER:

2    Q.   Ms. Greco, do you recall another occasion stating that it

3    only took five minutes --

4              MR. GILBERT:   Objection.   Hearsay.

5    BY MR. ELDER:

6    Q.   -- to work with the clerk --

7              THE COURT:   Sustained.

8    BY MR. ELDER:

9    Q.   -- to fill out the form?

10             THE COURT:   Sustained.

11   BY MR. ELDER:

12   Q.   How confident you are -- how confident are you, sitting

13   here today, Ms. Greco, that 10 to 15 minutes was the correct

14   estimate of the time it took back in December of 2022?

15   A.   I am -- I mean, I -- it was a long time ago.   I'm not

16   100 percent confident that it was 10 to 15, which is why I'm

17   saying 10 to 15; but from approaching the desk to walking over

18   to the other side was 10 to 15 minutes.

19   Q.   When you say "walking to the other side," what does that

20   mean?

21   A.   That's where I went to actually process the paperwork and

22   submit it to the actual Clerk's Office.

23   Q.   Aah, I see.

24        So if we removed that portion of the time from when you

25   left that first counter to actually go, like, file the form and

GRECO - DIRECT / ELDER

1   pay, let's talk just about the time when you were at the

2   check-in counter completing the information in the form.

3        How much time would you estimate that -- just that segment

4   of time there at the check-in counter completing that form, how

5   much time do you estimate that took?

6   A.   Between the both times when I was speaking to the woman,

7   that would be about five minutes.

8   Q.   Okay.  Thank you.

9        And I think you said -- did it -- you engaged with a few

10  people that day between the check-in counter and then the

11  filing counter where you paid your money and got your

12  paperwork; is that right?

13  A.   Correct, yes.

14  Q.   And did anyone ever stop and suggest that something --

15  that they shouldn't be helping you transcribe your information

16  onto your form?

17  A.   Absolutely not.

18  Q.   Okay.  Were you able to verify that the information that

19  you had verbally dictated to them on the form was correct?

20  A.   Yes.

21  Q.   How did you do that?

22  A.   Once I was over at the side where the actual clerk's desk

23  was to file it, it was read back to me, and I confirmed that

24  that was correct.

25  Q.   And did you feel comfortable that you had verified

**GRECO - DIRECT / ELDER**

1   sufficient for you to sign under penalty of perjury that the

2   information was accurate?

3   **A.**   Absolutely.

4   **Q.**   Okay.  And after you had verified the accuracy of the

5   information transcribed onto your form, to the extent you were

6   content with it, did they assist you in putting your signature

7   onto the form?

8   **A.**   Yes.  I requested that they help me find the spot with my

9   hand, and I signed with my -- I signed, myself, on the form.

10  **Q.**   Did you pay your filing fee?

11  **A.**   Yes, I did.  I paid it in cash.

12  **Q.**   And were you able to file your FBNS form on that same day

13  that you arrived at the Clerk's Office?

14  **A.**   Absolutely.

15  **Q.**   Were you happy with the service that you received that

16  day?

17  **A.**   Yes.

18  **Q.**   Were there any problems?

19  **A.**   No.

20  **Q.**   Now, if the County had an electronic version of the FBNS

21  form on a computer with the JAWS screen reader there in the

22  CRO, would you have preferred to use that option instead of the

23  service that you received from the human clerk?

24  **A.**   No.

25  **Q.**   And why is that?

GRECO - CROSS / GILBERT

1    take any more of your time today.

2         No further questions.  We'll pass the witness.

3              THE COURT:  Does defendant have any questions for the

4    witness?

5              MR. GILBERT:  Yes, please, Your Honor.

6              THE COURT:  Please go ahead.

7                        CROSS-EXAMINATION

8    BY MR. GILBERT:

9    Q.   Good afternoon, ma'am.  How are you?

10   A.   Good.  Thank you.

11   Q.   So I want to go back just for a second.

12        When did you head into the Clerk-Recorder's Office to

13   record your FBNS form?  Do you recall?

14   A.   If you're referring to actually submitting the

15   paperwork --

16   Q.   Yes, ma'am.

17   A.   -- that was approximately 2:15 that afternoon.

18   Q.   Would it -- do you recall approximately the month and

19   year?

20   A.   That would be December 15th, 2022.

21   Q.   Excellent memory.

22        And did you go to the County of Alameda's Clerk-Recorder's

23   Office to do this?

24   A.   I believe that was the office I was at, yes.

25   Q.   Now, when you went in, I think you mentioned that when you

GRECO - CROSS / GILBERT

1    first went in, you said that you wanted to complete a form for

2    an FBNS; is that right?

3    A.    Correct.

4    Q.    Did you have a pre-completed form when you went in?

5    A.    No, I did not.

6    Q.    Was there anything that you were asking the Clerk-Recorder

7    to modify or edit that you had completed before coming to the

8    office?

9    A.    No, I did not.

10   Q.    So when you came in, you didn't have a pre-completed form.

11   You were just asking for assistance in how to complete a new

12   form?

13   A.    Correct.

14   Q.    Did you find that the Clerk-Recorder's staff were helpful

15   to you?

16   A.    Absolutely.

17   Q.    Did you find that they were trying to accommodate you and

18   provide you with assistance?

19   A.    100 percent.

20   Q.    And were they polite in their interactions?

21   A.    Yes.

22   Q.    And did you find that you were able to complete the

23   services that you needed based upon the Clerk-Recorder's

24   programs and services that they made available to you at that

25   time?

1    **A.**    Yes.

2    **Q.**    And were you satisfied that you had received the services

3    that you needed and were able to complete your FBNS form at

4    that time without any problems?

5    **A.**    Yes.

6              **MR. GILBERT:**   Thank you very much.

7              **THE COURT:**   Does plaintiff have further questions for

8    the witness?

9              **MR. ELDER:**   One.

10                          **REDIRECT EXAMINATION**

11   **BY MR. ELDER:**

12   **Q.**    Just to clarify, Ms. Greco, the County clerk offered to

13   act as a transcriber for you; is that right?

14   **A.**    She offered to assist me, yes.

15             **MR. ELDER:**   Thank you.   No further questions.

16             **THE COURT:**   Any further questions from defendant?

17             **MR. GILBERT:**   Just a moment, Your Honor.

18                          (Pause in proceedings.)

19             **MR. GILBERT:**   No, Your Honor.   Thank you.

20             **THE COURT:**   All right.   Thank you, ma'am.   You can

21   stand down from the witness stand.

22        If you can please assist her, that would be appreciated.

23   Thank you.

24                          (Witness excused.)

25             **THE COURT:**   I would like to take a brief -- I would

1   number one complaint I hear about sighted people is how

2   difficult it is to understand the screen readers.

3        So I think one of my complaints that I have in my -- when

4   I'm working with people is often from family members of the

5   person I'm working with that say they don't understand where or

6   what or how their relative is using the computer to help them,

7   especially on web pages, where the way that JAWS gives you

8   information about web pages is even more opaque to a sighted

9   user.

10  Q.   And did you go to inspect the Clerk-Recorder's facility

11  and computer kiosk in around August of 2023?

12  A.   Yes.

13  Q.   And did you have an opportunity to sit down and look at

14  the computer kiosk with the Web wizard or the software suite on

15  it?

16  A.   Yes.

17  Q.   And did you have a chance to look at the keyboard that was

18  there at the computer?

19  A.   Yes.

20  Q.   For a blind user, could you describe what is the

21  significance of a keyboard layout?

22  A.   So many applications -- there's so many applications that

23  do so many things that all the common combinations of

24  keystrokes are used up.  So, for example, if I want to do

25  something in Word to save a document, I might do control S or I

```
 1  what was the first step in that process?
 2          THE COURT:  Hold on, Counsel.  I don't mean to
 3  interrupt, but what's being shown on the screen is not
 4  Exhibit 11A.
 5          MR. ELDER:  Oh.  What...
 6                  (Pause in proceedings.)
 7          THE COURT:  There we go.  Thank you.  Please continue,
 8  Counsel.
 9  BY MR. ELDER:
10  Q.   Okay.  Can you see this?  Does this Photo 11A look like
11  the -- what you just --
12  A.   Yes.
13  Q.   -- described?
14       Thank you.  And when you first arrived that day, what was
15  the first step in the process of beginning to fill in an FBNS
16  form?
17  A.   So we walked into this area and walked to the back.  In
18  the center of the picture is an open door.  This was normally
19  an entered -- an entrance into the building; but at that
20  doorway, they had put a desk across the entranceway.  And we
21  walked up to that desk and checked in and said why we were
22  there.
23       You can see a person standing there checking in at the
24  moment.  It's a little dark in that picture, but that's the
25  person that was right before us when we went there.
```

CLARK - DIRECT / ELDER

1              There's a row of chairs also along the side.   It looks
2      like this is designed to handle a large number of people in the
3      waiting area; but the day we were there, there was only a few
4      people in front of us.
5      Q.    Okay.   And when you say "we," who was with you?
6      A.    You were.
7      Q.    Okay.   And did I go to the counter and ask to complete an
8      FBNS -- an FBNS form using the computer kiosk for my business?
9      A.    Yes.
10     Q.    And then what happened next?
11     A.    We were asked to stand to the side of the door there just
12     in front of that glassy area while the staff operating the door
13     tried to figure out what was the next step.   They asked us to
14     wait for a few minutes and they would tell us what we would do
15     next.
16             After about five minutes or so, they came and said they
17     had notified a supervisor that we were there and asked us to
18     proceed around the corner of the building, into the building
19     itself, for the next step in the process.
20     Q.    And where did we -- where did we go next?
21     A.    So we walked back across that atrium to the -- in the
22     front there, you can see these red tape lines for, you know,
23     guiding you in.   So we walked back to that front of the picture
24     and then went outside onto the street, walked to the corner,
25     turned the corner, turned again into the building.

1    And then once we in the building, we were told to go to

2   the first room on the right, which turns out to be their public

3   terminals, public -- I'm not quite sure what exactly they were

4   calling that room.  But then we were told to check in there in

5   that room where the supervisor would then help us with the rest

6   of the process.

7   **Q.**   Okay.  I'd like to show you what's been marked as 11D.

8   This is another photo probably in your tab there.

9   **A.**   I'm ready.

10  **Q.**   And does this photo -- well, sorry.

11       What is this a photo of?

12  **A.**   This is a photo of the room that had the kiosk in it.

13  It's showing the door that we entered to come in.  The kiosk is

14  immediately behind us.

15       And it's also showing a staff room where they have

16  somebody who's over-- there's a glass partition and a room

17  where somebody is overseeing that room, and it's available to

18  answer questions if people are having trouble with the

19  computers.

20  **Q.**   And so once -- sorry.

21       Does this -- does this photo reflect an accurate depiction

22  of the facility that you inspected that day?

23  **A.**   Yes.

24       **MR. ELDER:**  And, Your Honor, we would move this into

25  evidence and would ask to publish it to the jury.

```
 1              THE COURT:  Any objection?

 2              MR. GILBERT:  To 11D, no.

 3              THE COURT:  11D, as in "dog."

 4              MR. GILBERT:  No, Your Honor.

 5              THE COURT:  Okay.  Exhibit 11D is admitted, and you

 6   may publish it to the jury.

 7          (Trial Exhibit 11D received in evidence.)

 8              MR. GILBERT:  Your Honor, just to confirm,

 9   Exhibit A -- 11A and 11D have been admitted?

10              THE COURT:  11A, as in "apple," and 11D, as in "dog,"

11   have been admitted.

12              MR. GILBERT:  Thank you.

13   BY MR. ELDER:

14   Q.   Okay.  Are you able to see this on the screen now,

15   Mr. Clark?

16   A.   Yes.

17   Q.   Is this what you just described?

18   A.   Yes.

19   Q.   Did -- was there a -- you said there was a process of

20   meeting the supervisor at some kind of a station; is that

21   right?

22   A.   We met the supervisor at this window.  I think what's not

23   in this picture immediately to the right of that is a doorway

24   into that room.

25          So we came into this room, we stopped at this glass
```

1   partition, explained who we were and why we were there, and

2   they said just a moment, the supervisor will be with us, and he

3   came out through that door and then met with us.

4   **Q.**    Okay.   And do you recall how long did we wait for the

5   supervisor?

6   **A.**    Probably two or three minutes.

7   **Q.**    Okay.   And then once the supervisor arrived, what happened

8   next?

9   **A.**    He went with us to the kiosk that has the financial

10  fictitious business name wizard on it and the JAWS software,

11  made sure it was on, and signed in.   I think there's a sign-in

12  process to get to the particular page.   And said, "Looks like

13  everything was running," and then let us know to contact him if

14  we had any questions.

15  **Q.**    And did he have to activate the JAWS program?

16  **A.**    I don't remember.   I think so.   I think they have -- when

17  the computer came on, they had to start JAWS up.

18  Q.    Okay.   I'd like to show you what's been marked as

19  Photo 11C.   11C, Charlie.   It should be in your tab.

20  A.    Yes, I see it.

21  Q.    Okay.   And what is this a photo of?

22  A.    This is a photo of the room.   In the upper center of the

23  picture are you, me, and the supervisor in front of the kiosk.

24  You can see the door that I mentioned in the other one that

25  wasn't in the picture where he came from.   And then there's a

1  bunch of other workstations around the room that we never were

2  involved with.

3  **Q.**   Does it seem to depict what you saw that day?

4  **A.**   Yes.

5          **MR. ELDER:**  Your Honor, I'd move to admit Exhibit 11C

6  and publish to the jury.

7          **THE COURT:**  Any objection?

8          **MR. GILBERT:**  No, Your Honor.

9          **THE COURT:**  Exhibit 11C is admitted, and you may

10 publish it to the jury.

11      (Trial Exhibit 11C received in evidence.)

12 **BY MR. ELDER:**

13 **Q.**   And can you see this --

14 **A.**   Yes.

15 **Q.**   -- photo?

16      Okay.  Thank you.

17      So once the computer was signed in and the JAWS screen

18 reader was running, were there any other steps that happened

19 before the -- before you and I started using the computer?

20 **A.**   No.  I mean, the supervisor did say, "Here you go.  Let me

21 know if you have any questions."  I think he gave us a phone

22 number or way to get ahold of him, and then left us to our

23 devices.

24 **Q.**   Were there -- did he plug headphones in?

25 **A.**   No.

**CLARK - DIRECT / ELDER**

1  Q.   And then did you have to help submit that form through

2  their -- through their Web wizard?

3  A.   Yes.   There were places in that form that I had to fill

4  out.

5  Q.   Okay.   And then after that had been submitted through the

6  FBNS software suite wizard, what happened next in the process?

7  A.   We notified the supervisor that we had completed the

8  process and were ready for the next step.   We waited a minute

9  or so for him to come back.   And I don't remember -- we had to

10 wait for him to come back to give us a ticket, and the ticket

11 was our place in line for the next step.

12      And then once we were given that ticket, we left the room

13 and went to the next room to finish the process.

14 Q.   And that ticket, was that checking in at the supervisor

15 station in the photo that we saw in 11D?

16 A.   They -- yes.   They gave us the ticket there.   I don't know

17 what the normal process for getting the ticket was -- would be.

18 Q.   And so were we given a ticket with a number?

19 A.   Yes.

20 Q.   And then what was the next step in that process?

21 A.   So he guided us out of the room into the main lobby area

22 where they have looks like a dozen counters, told us what our

23 ticket number was.

24      As we entered the room, they actually called that ticket

25 number and told us to proceed to, I think, Counter 7 or 8 with

CLARK - DIRECT / ELDER

1   the forms.

2   Q.   Okay.   I'd like to show you what is marked as Exhibit 11B,

3   boy.

4   A.   Okay.

5   Q.   And what is this a photo of?

6   A.   This is a photo of the room that has the counters.

7   Q.   And does it reflect what you saw that day?

8   A.   Yes.

9        MR. ELDER:   I'd move Exhibit 11B into evidence and be

10  published to the jury.

11       THE COURT:   Any objection?

12       MR. GILBERT:   No, Your Honor.

13       THE COURT:   Exhibit 11B is admitted, and you may

14  publish it to the jury.

15       (Trial Exhibit 11B received in evidence.)

16  BY MR. ELDER:

17  Q.   And can you now see this?

18  A.   Not yet.   There we go.   Yes.

19  Q.   Okay.   And so was the number called?

20  A.   Yes, as we walked into the room.   The supervisor had not

21  actually left at that point.

22  Q.   Okay.   And then at some point did we approach the counter?

23  A.   Yes.   The supervisor took us to that counter --

24  Q.   Okay.

25  A.   -- because it was called as we walked in.

**CLARK - DIRECT / ELDER**

1    Q.    And what was the next step in the process, as you recall?

2    A.    We told them who you were.  They pulled the form up on

3    their computer screen, read back the form to us to make sure

4    that the information was correct.  It wasn't.  Your business

5    name was wrong on the form.

6          We corrected -- we told them that was wrong -- or you told

7    them it was wrong, and then they corrected that, printed the

8    form, and asked for your payment.

9    Q.    Okay.  And then -- I'm sorry.  Did you say -- did they

10   print out the corrected form?

11   A.    I don't know.  They did something on the computer.

12   I think she wandered back to a printer, and there was some --

13   some movement behind the counter that I'm not aware of that I

14   couldn't see, but I think she picked up a form from the

15   printer.  Yes, she had to print the form out because she

16   brought it back for you to sign.

17   Q.    Okay.  And after the information had been verified, the

18   form had been printed, did I sign it?

19   A.    Yes.

20   Q.    And in your assessment, were you given information about

21   the experiences of Lucy Greco in receiving transcriber services

22   at the Clerk-Recorder's Office?

23   A.    I was after this visit.

24   Q.    Okay.  But before you wrote your final report?

25   A.    But before I wrote my report.

**CLARK - CROSS / GILBERT**

1  you walked in the door?

2  A.   No.

3  Q.   So you went there for the purpose of creating a new form?

4  A.   I went there to examine the form that was there.

5  Q.   And just to be clear, at no time did you or Mr. Elder ever

6  demand anyone at the CRO edit a previously signed or completed

7  form, did you?

8  A.   No.

9  Q.   Thank you.

10       Now, when you were shown to the kiosk, that was a kiosk

11  that was set aside especially available to the disabled

12  individuals; is that right?

13  A.   Yes.

14  Q.   And, in fact, when you were shown there, the supervisor

15  offered to provide assistance to you in utilizing it, didn't

16  he?

17  A.   He did, but that was -- the purpose was for us to figure

18  out if a blind person could independently complete the form.

19  Q.   But you were offered assistance and you rejected that

20  assistance?

21  A.   Yes.

22  Q.   And you understood that the County's typical operations on

23  a day-to-day basis is that they will offer to provide

24  assistance in using that kiosk for anyone who needs it?

25  A.   I was not aware of that at the time we made the visit.   I

1   was later given the policy form for how to deal with that

2   particular kiosk, but was not aware of that at the day -- on

3   the day of the visit.

4   Q.   And when you went through and were testing the system out,

5   you and Mr. Elder were typing in random phrases and things in

6   various forms just to test it out, weren't you?

7   A.   We were typing in relevant information to his business.  I

8   wouldn't say we were just randomly making up addresses.  We

9   were using his actual information.

10  Q.   But that might have been part of the reason why the

11  address was incorrect was because of the testing and the work

12  that you were doing?

13  A.   Very likely, yes.

14  Q.   Now, ultimately, Mr. Elder was able to complete an FBNS

15  form using that machine, wasn't he?

16  A.   Not without my help.

17  Q.   Well, did he ultimately complete an FBNS form that was

18  recorded in the Clerk-Recorder's Office?

19  A.   He did, yes.

20  Q.   And it was properly completed and it was recorded on that

21  day, wasn't it?

22  A.   Yes.

23  Q.   And after he completed at the kiosk and went to the

24  counter, at that point the information was independently

25  verified to him before he signed it, didn't he?

**CLARK - CROSS / GILBERT**

1   **A.**   Yes.

2   **Q.**   And once that information was verified, he was asked to

3   sign it under penalty of perjury, wasn't he?

4   **A.**   Yes.

5   **Q.**   And at no point did any clerk-recorder ever edit a

6   completed and signed form that you observed, did you?

7   **A.**   Yes, I agree.

8   **Q.**   Now, I want to focus on your expertise.  It sounds like

9   you've got quite a bit of experience in helping employees to

10  maximize their potential in the workplace.  Is that a fair

11  statement of your job?

12  **A.**   Yes.

13  **Q.**   Now, that's independent and separate from the ADA, isn't

14  it?

15  **A.**   I am hired because people have made reasonable

16  accommodations often at their job sites because of requirements

17  of the ADA.

18  **Q.**   Well, let's be very specific.  You do not evaluate whether

19  something is compliant with the ADA, do you?

20  **A.**   I do not.

21  **Q.**   And, in fact, you don't even know if any of the standards

22  that you utilize are even endorsed or even within the ADA?

23  **A.**   What I know -- the ADA I don't think addresses Web

24  accessibility.  There are other standards that say, "Hey,

25  look" -- the ADA says, "Look, we need to make things accessible

**CLARK - CROSS / GILBERT**

1  standard if what you're trying to do is accomplish a goal of

2  making it work.

3  **Q.**   Let me see if I can go through this.   Let me see if I

4  understand it.

5       You went to the County's facilities and inspected their

6  hardware and software; is that right?

7  **A.**   Yes.

8  **Q.**   And they had a nice newer desktop model machine that was

9  available and designated for disabled access?

10  **A.**   Yes.

11  **Q.**   And that was a very expensive nice machine that's

12  dedicated for public use; is that right?

13  **A.**   Yes.

14  **Q.**   And it had also been equipped with very qualified and

15  competent software to be able to access material and fill and

16  complete forms on that machine, hadn't it?

17  **A.**   Yes.

18  **Q.**   And, in fact, it was equipped with JAWS.   And I think I

19  heard you say earlier JAWS was one of the more expensive and

20  more wildly utilized screen reading programs.

21  **A.**   Yes.

22  **Q.**   And the County went out and purchased all this, put it

23  together, and had it available, functioning properly when you

24  went to inspect it, didn't it?

25  **A.**   No.

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, March 29, 2024

7

8

9

10   _____

11          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
         CSR No. 7445, Official United States Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

**Volume 4**

**Pages 558 - 709**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

```
LISAMARIA MARTINEZ,            )
                               )
          Plaintiff,           )
                               )
  VS.                          )   NO. 3:20-CV-06570 TSH
                               )
COUNTY OF ALAMEDA, MELISSA     )
WILK, in her individual        )
capacity, EVA HE, in her       )
individual capacity, MARIA     )
LAURA BRIONES, in her          )
individual capacity,           )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Friday, March 29, 2024

**<u>TRANSCRIPT OF JURY TRIAL PROCEEDINGS</u>**


For Plaintiff:

        TRE LEGAL PRACTICE
        1155 Market Street, Tenth Floor
        San Francisco, California 94103
    **BY:  TIMOTHY R. ELDER, ATTORNEY AT LAW**

        UNDAUNTED LAW FIRM, P.C.
        600 California Street, Seventh Floor
        San Francisco, California 94108
    **BY:  S. TOMIYO STONER, ATTORNEY AT LAW**

    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Kelly Shainline, RPR, CRR, CSR No. 13476
           Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff:
                             UNDAUNTED LAW FIRM, P.C.
 3                           600 California Street, Seventh Floor
                             San Francisco, California 94108
 4                      BY:  S. TOMIYO STONER, ATTORNEY AT LAW

 5
     For Defendant:
 6                           ORBACH HUFF & HENDERSON LLP
                             6200 Stoneridge Mall Road, Suite 225
 7                           Pleasanton, California 94588
                        BY:  KEVIN E. GILBERT, ATTORNEY AT LAW
 8                           NICHOLAS D. FINE, ATTORNEY AT LAW

 9
10   Also Present:           Lisamaria Martinez
                             Michelle Korosy, Paralegal
11                           Matthew Yankee, County of Alameda

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  Overruled.

2    THE WITNESS:  Since I had corrections that needed to

3  be made on the form, I didn't quite understand how extensive it

4  could be.  If I were told that it would be easier to transcribe

5  it and that way I could receive assistance, absolutely.  It was

6  just a one-page document.

7  BY MR. ELDER:

8  Q.   Would you have felt comfortable having the clerk that you

9  spoke with transcribe your information for you onto a blank,

10  unsigned form?

11  A.   Yes.  She's a trusted source.

12  Q.   Okay.  When you said "trusted source," what do you mean by

13  that?

14  A.   Meaning she is a staff person of a government entity

15  and -- or any staff person who does assist me I believe is a

16  trusted source because, you know, they are doing their job and

17  they're helping a blind person with assistance.  They're

18  usually trained on helping people with disabilities.  So,

19  again, most people want to help.

20      I would not randomly ask someone off the street to help me

21  fill out a form or just a random person in the lobby of the CRO

22  because I don't know who they are.

23  Q.   If a clerk had acted as a transcriber to fill out your

24  information on the form, how would you have verified that what

25  the clerk wrote down was accurate?

1   **A.**    Great question.   I, throughout the entire process, repeat

2   what information is needed and on areas that tend to or might

3   be confusing.   For instance, I used to live on Herringbone

4   Court and people always want to know how to spell

5   "Herringbone."   So I would spell it out after saying it, and I

6   would spell it multiple ways -- or multiple times, sorry -- and

7   then ask them to spell back what they wrote.

8        Numbers often get repeated as being written for the, you

9   know, same concept.   You know, I might say 123 Main Street but

10   someone might repeat back that they wrote 213, and I'll go,

11   "Wait a minute.   Can you read that again?"   And they go, "Oh,

12   no, I'm sorry.   I didn't -- I said '213,' but I wrote '123.'"

13   And then I'll say, "You know, are you sure?"

14        Then when the form is completed before signing or if I

15   have to, you know, write in initials and resign because a

16   document had changes, then I would ask the transcriber to

17   please from top to bottom read through all the information, and

18   I would have them stop at the tricky points and reconfirm that

19   things were entered correctly.   And that is how I verify

20   information that is transcribed onto documents.

21   **Q.**   If the clerk-recorder that helped you on that first

22   encounter, if you had been able to verify that what they had

23   written down was correct, would you have felt comfortable

24   signing that document under penalty of perjury?

25   **A.**   A blank form that was filled out?

1    **Q.**    Yes.

2    **A.**    Yes, I would absolutely feel comfortable signing my name

3    to that document.

4    **Q.**    And -- okay.   Thank you.

5         So my understanding is that that did not happen on this

6    first encounter on March 29, 2019?

7    **A.**    I was not offered a blank form as an option.   I was

8    repeatedly told by several individuals that they could not help

9    me make fixes or corrections to my form.

10   **Q.**    Okay.   Did you have to wait awhile while you were -- well,

11   how much time did you have to wait while you were waiting to

12   speak with the supervisor to escalate this issue?

13   **A.**    When I asked for a supervisor, I was told that she was out

14   to lunch.   And so -- and that Ms. Moran, the clerk behind the

15   counter, she didn't know when Ms. Briones would return.

16        So I went close to where I had previously been waiting for

17   my number to be called, which was up against a planter, and I

18   waited for quite a long time.   Like I said, I came in close to

19   the beginning of 1:00 o'clock, and throughout -- it was over an

20   hour that I waited.   And I would start to walk toward the

21   counter to get an update from Ms. Moran in between customers,

22   and she would see me coming and say things like, "Oh, she's not

23   here yet" or "I just checked and she's not here yet."

24        So at some point after an hour I did walk up to the

25   counter and stay there and said -- I asked Ms. Moran more

1   Q.   Did Laura Briones, the supervisor, ever offer to assist

2   you with filling out a blank, unsigned FBNS form there in the

3   office on that day March 29th, 2019?

4   A.   No.

5   Q.   If Ms. Briones, who is the supervisor, had pulled out a

6   blank FBNS form and asked you if she could help you to

7   transcribe information on that blank FBNS form that was

8   unsigned, would you have accepted that offer?

9   A.   100 percent, yes.

10  Q.   Would you have felt comfortable letting Ms. Briones act as

11  a transcriber for your information?

12  A.   Yes, I would consider her a trusted source.

13  Q.   Do you feel you would have been able to verify the

14  information?

15  A.   Yes.

16  Q.   And if you had satisfactorily verified the information to

17  the extent you were content with it, would you have been

18  willing to sign a blank form there in the office under penalty

19  of perjury?

20  A.   Yes.

21  Q.   So after this second conversation, I believe -- well,

22  there was discussion of a Go Back Letter.

23       What happened after this recorded conversation with

24  Ms. Briones?

25  A.   She offered multiple times to do a Go Back Letter for me

MARTINEZ - DIRECT / ELDER

1   time?

2   **A.**   After that point, five years later I'm having a difficult

3   time remembering when it was I spoke to the gentleman.  I don't

4   recall if it was before or after Ms. Briones' conversation,

5   but --

6   **Q.**   Are you -- are you confident that that gentleman was the

7   one -- was the only person you -- the only customer you spoke

8   to that day?

9   **A.**   Yes.

10  **Q.**   Okay.  So while you were waiting for your Go Back Letter,

11  what were you feeling?

12  **A.**   I was feeling frustrated and overwhelmed and tired,

13  exhausted emotionally.  I really didn't think I was going to

14  spend that much time at the CRO.

15  **Q.**   Had you, since you didn't get anywhere with -- well, since

16  you -- Ms. Briones didn't -- wasn't assisting you with

17  correcting the form, did you try to escalate it to a third

18  level up the management chain?

19  **A.**   I did.

20  **Q.**   And do you remember who that third-level manager was?

21  **A.**   Eva Hill -- or He.  Sorry.  Eva He.

22  **Q.**   And had you requested to speak to Eva He?

23  **A.**   Yes.

24  **Q.**   Did Eva He ever come out and speak to you?

25  **A.**   No.  I was told that she was not there.

1  Q.   And did you hear his comment about the CRO being sort of

2  an intermediary, it was like he might have said library, and

3  that they don't have responsibility for the information that's

4  just passed along and published to the community?  I'm trying

5  to summarize without being able to say it verbatim.  Do you

6  recall anything like that in his testimony?

7  A.   Yes.  I heard him say --

8          MR. GILBERT:  Misstates facts.

9          THE COURT:  Overruled.

10         THE WITNESS:  I heard him say "library," that, yes,

11 the CRO acts like a library.

12 BY MR. ELDER:

13 Q.   Does that give you any confidence that the County's taking

14 responsibility and will provide transcriber service for you on

15 your FBNS form if you return in a few weeks from now?

16         MR. GILBERT:  Objection.  Relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  I'm hesitating because my library has

19 helped me fill out applications but the County hasn't.  So I

20 don't -- I don't have any confidence at all.

21 BY MR. ELDER:

22 Q.   And you said that you had to pay Ms. Grim to drive you

23 back to the Clerk's Office on May 31st.  How much did you pay

24 her.

25 A.   I paid her for four hours of service at $25 an hour, so

1    $100.

2    **Q.**    And did you have to spend some extra time to come back to

3    the CRO beyond that first trip where you weren't able to get

4    same day service on that day?

5    **A.**    Could you repeat the question, please?

6    **Q.**    Yeah, sorry.  It's a little bit weird.

7         In -- so you weren't able to file your form on March 29th,

8    2019; right?

9    **A.**    Correct.

10   **Q.**    You had to come back a second time, fill out a new form,

11   second trip.  Did that take up some of your time?

12   **A.**    It did.

13   **Q.**    And in terms of trying to understand any kind of dollar

14   value for what your time might be worth, how much -- if I came

15   to you and said, "I'd like some sessions of life coaching," how

16   much would you charge me for life coaching per hour?

17              **MR. GILBERT:**  Objection.  Rule 26.  Rule 37.  403.

18              **THE COURT:**  Overruled.

19              **THE WITNESS:**  So I offer coaching -- life coaching for

20   individuals on a -- like a package of sessions, and so one

21   session one hour is $175.

22   **BY MR. ELDER:**

23   **Q.**    And do you have other pricing schemes or different -- I

24   mean, is it always that price or are there variations?

25   **A.**    Yeah, I do have different pricing.  I often do group

1   coaching to make it a lot more affordable.  So that is offered

2   at a lower cost.  And if someone who clearly wants coaching

3   talks to me and we decide it's a good fit but they can't afford

4   individual coaching, I will offer it at a sliding scale.

5   **Q.**   Now, is there any uncompensated time that goes into

6   preparation or work needed for a one-hour of paid session?

7   **A.**   Tons.

8   **Q.**   Okay.  And can you estimate how much unpaid or

9   uncompensated time you spend preparing for one of these paid

10  one-hour sessions?

11  **A.**   Yeah.  So, you know, there's a lot of client acquisition,

12  engagement, audience building, e-mails, administrative stuff.

13  I would say that for every one hour of -- one hour of coaching,

14  I probably put in four hours of uncompensated time.

15  **Q.**   So can you estimate on an hourly basis about how much you

16  receive on your time for that 175?  If you're doing one-hour --

17  **A.**   Right.

18  **Q.**   -- of paid time and four hours of paid unpaid prep time,

19  what would you estimate your sort of take away is on an hourly

20  basis for that work?

21  **A.**   Right.

22          **MR. GILBERT:**  Objection.  Relevance.  Rule 37.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  So in order to essentially pay me for my

25  uncompensated time, that for one -- that's five hours of

1   one-hour being face to face for being all the client

2   acquisition and administrative stuff, so that would be five

3   hours divided by 175.   I believe that's $35 an hour.

4   BY MR. ELDER:

5   Q.   And is $35 an hour an estimate of -- is that your estimate

6   of the value of what your time might be worth?

7   A.   Yeah.   I would say so, yes.

8   Q.   Okay.   Sitting here today on the five-year anniversary of

9   what happened to you, how are you feeling about the way

10  the County has treated you?

11          MR. GILBERT:   Asked and answered.

12          THE COURT:   Overruled.

13          THE WITNESS:   Today I'm tired.   I'm drained.   The last

14  five years have been really emotionally tough for me, and there

15  have been points in my business when handling business-related

16  documents that I get a lot of anxiety.   And that little voice

17  in your head that tells you, you know -- whispers in your head

18  and makes you doubt yourself has cropped up quite a lot.

19      And I just -- I just feel like it's been a really long

20  journey for something that I know could have been a really

21  simple equal-access issue if I was just given the transcribing

22  assistance that I had asked for, and I don't want other blind

23  people to have to deal with that.   We're in the 21st century

24  and, you know, this should not be happening.

25  Q.   And do you consider yourself a resilient person?

1    **A.**    I do.

2    **Q.**    Okay.  We're on the five-year anniversary of the incident

3    on March 29th today.  Do you have an understanding of whether

4    or not you're going to have to go back do the CRO before

5    March 31st, 2024?

6    **A.**    Before March 31st?

7    **Q.**    Yes.  Sorry.  Before May 31st, 2024.

8    **A.**    I was going to say I'm a bit in trouble.

9          Yes, I do have to go back in order to file and pay by

10    credit card my FBN, at least that's my understanding.  I have

11    not gone on the web lately to check if anything has changed.

12    **Q.**    If you go in person sometime before May 2024 to renew your

13    FBNS form, would you be willing to have a County employee act

14    as a transcriber to fill out a blank FBNS form or renewal

15    document?

16              **MR. GILBERT:**  Cumulative.  Asked and answered.

17              **THE COURT:**  Overruled.

18              **THE WITNESS:**  Yes.

19    BY MR. ELDER:

20    **Q.**    Have you heard about the proposed -- or sorry.

21          Have you heard about the computer kiosk system that

22    the County has constructed?

23    **A.**    Yes.

24    **Q.**    Have you tried to use it?

25    **A.**    No.

1
2
3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Friday, March 29, 2024

8
9
10
11    _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                   U.S. Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25