1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8    LISAMARIA MARTINEZ,                    Case No.  20-cv-06570-TSH

9                 Plaintiff,
                                            **ORDER GRANTING IN PART AND**
10         v.                               **DENYING IN PART MOTION FOR**
                                            **PERMANENT INJUNCTION**
11   COUNTY OF ALAMEDA,
                                            Re: Dkt. No. 200
12                Defendant.

13

14                              **I.    INTRODUCTION**

15         Plaintiff Lisamaria Martinez brings this motion for a permanent injunction to order

16   Defendant County of Alameda to 1) make its online PDF forms independently accessible to blind

17   individuals using screen readers, 2) remediate its online Fictional Business Name Statement

18   ("FBNS") Web Access form for use with screen readers, 3) "provide transcriber services as

19   auxiliary aids or services to write on blank paper forms when a blind individual requests assistance

20   with correcting or filling out a paper form handled by the CRO," and 4) provide appropriate

21   training on auxiliary aids and effective communication under federal law and regulations.  Mot. at

22   21–24, ECF No. 200.  Defendant filed an Opposition (ECF No. 204) and Plaintiff filed a Reply

23   (ECF No. 205).  The Court held a hearing on July 24, 2024, and now issues this order.  For the

24   reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion.[1]

25

26

27   _____

28   [1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 6,
     16.

## II.   BACKGROUND

On March 29, 2019, Ms. Martinez, who is blind, visited the County of Alameda Clerk-Recorder's Office ("CRO") to file a fictitious business name statement ("FBNS") for her small business.  Trial Transcript ("TT") at 212–14, 575, 598–99.[2]  CRO clerk Angelina Moran reviewed Ms. Martinez's form and told her corrections were required before Ms. Martinez could file it.  *Id.* at 218, 601–02.  Ms. Martinez requested assistance in making the corrections because she is blind, but Ms. Moran told her she could not assist because it was the CRO's policy that CRO employees could not fill out or alter forms.  *Id.* at 227–28, 602; ECF No. 191-4, Admitted Ex. 4A (Audio of Plaintiff's interaction with Angelina Moran) at 01:55–02:07.  Ms. Martinez then spoke with CRO supervisor Maria Laura Briones, who also declined to make the changes under the same policy.  TT at 290–91, 629; ECF No. 191-4, Admitted Ex. 4C (Audio of Plaintiff's first interaction with Laura Briones) at 03:58–04:33.

Plaintiff filed this case on September 18, 2020, alleging five causes of action: (1) violation of Title II of the Americans with Disabilities Act ("ADA"), (2) violation of Title V of the ADA, (3) violation of the Unruh Civil Rights Act, (4) violation of the Disabled Persons Act, and (5) Declaratory Relief.  ECF No. 1.  On August 11, 2022, the Court granted Defendants' motion for summary judgment as to Ms. Martinez's Title V claim.[3]  ECF No. 54.  Plaintiff filed an amended complaint on July 10, 2023, alleging five causes of action: (1) violation of Title II of the ADA, (2) violation of Title V of the ADA,[4] (3) violation of California Government[5] Code section 11135, (4) violation of the Disabled Persons Act, and (5) Declaratory Relief.  ECF No. 84.

---

[2]  The trial transcript is spread across six volumes, with one volume for each day of trial and continuous pagination across all six volumes.  Citations herein are to the multi-volume transcript page numbers.  *See* ECF Nos. 168 (Transcript Vol. 1, pages 1–194), 169 (Vol. 2, pages 195–361), 174 (Vol. 3, pages 362–557), 177 (Vol. 4, pages 558–709), 178 (Vol. 5, pages 710–847), and 189 (Vol. 6, pages 848–95).

[3]  Plaintiff filed this case against Defendants County of Alameda, Melissa Wilk, Eva He, and Maria Laura Briones.  ECF Nos. 1, 84.  On March 1, 2024, the parties filed a stipulation to dismiss the individual defendants, leaving Alameda County as the sole remaining defendant.  ECF No. 125.  In this order, the Court refers to "Defendants" for events that took place prior to the dismissal of the individual defendants.

[4]  Plaintiff included her Title V claim "for completeness of the record," acknowledging the Court's prior summary judgment order.  ECF No. 84 at 9 n.1.

[5]  The amended complaint referred to California Civil Code section 11135, but the parties agree that was an error.  TT at 12.

1    In March and April 2024, the Court held a jury trial.  After a six-day trial, the jury returned

2    a verdict.  ECF No. 176.  The jury found that Plaintiff "prove[d] by a preponderance of the

3    evidence that Defendant . . . violated her rights under the [ADA] on March 29, 2019," and that this

4    violation occurred because of Defendant's deliberate indifference to Plaintiff's federally protected

5    rights.  Verdict Form at 2, Questions 1–2, ECF No. 176.  The jury awarded damages of $30,500 to

6    Plaintiff under the ADA and under the California Disabled Persons Act.  *Id.* at 3, Questions 3–4.

7    The jury also found that Defendant's violation of the ADA "occurred in a program or activity that

8    is conducted, operated, or administered by the state or by any state agency, is funded directly by

9    the state, or receives any financial assistance from the state[.]"  *Id.* at 3, Question 5.  Finally, the

10   jury found Plaintiff had not proved by a preponderance of the evidence that the CRO "will likely

11   in the future violate its legal obligations described in Final Instructions Nos. 11 and 12 with

12   respect to individuals with a disability of blindness or visual impairment in the same type of way

13   that [the jury] found[.]"  *Id.* at 4, Question 6; *see* Final Jury Instructions at 12–14, ECF No. 165.

14   On May 16, 2024, Plaintiff moved for a permanent injunction.  ECF No. 200.[6]

### III.  LEGAL STANDARD

16   "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court

17   may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury;

18   (2) that remedies available at law, such as monetary damages, are inadequate to compensate for

19   that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

20   remedy in equity is warranted; and (4) that the public interest would not be disserved by a

21   permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The Ninth

22   Circuit has combined the first two prongs of the *eBay* test into one, holding that "[a]n injunction is

23   appropriate when the party seeking relief demonstrates . . . (1) [that] it is likely to suffer

24   irreparable injury that cannot be redressed by an award of damages; (2) that 'considering the

25

26   _____

27   [6] Between the jury verdict and this order, Plaintiff's fifth cause of action for a "declaration . . . in
     order that each of the parties may know their respective rights and duties" (ECF No. 84 ¶ 101) has
     been fully adjudicated.  In addition, Plaintiff never requested any specific form of declaratory
28   relief beyond the questions set forth in the jury verdict and the request for injunctive relief that is
     addressed in this order, so any such request has been waived.

United States District Court
Northern District of California

United States District Court
Northern District of California

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted'; and (3) 'that the public interest would not be disserved by a permanent injunction.'" *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (quoting *eBay*, 547 U.S. at 391). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

## IV. DISCUSSION

### A. Advisory Verdict

The Seventh Amendment to the United States Constitution preserves the right to a jury trial for legal claims but not for equitable claims, such as a claim for injunctive relief. *See* U.S. Const. amend. VII; *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001). "[W]hen the legal and equitable issues overlap and the evidence is intertwined," however, "the district court must take care not to impinge on the right to a jury." *Danjaq*, 263 F.3d at 962. In cases involving overlapping legal and equitable claims, "the legal claims involved in the action must be determined prior to any final court determination of . . . [the] equitable claims." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962). "In an action not triable of right by a jury, the court, on motion or on its own . . . may try any issue with an advisory jury[.]" Fed. R. Civ. P. 39(c)(1).

"[T]he court is free to accept or reject the advisory jury's findings, but is obligated to make its own independent assessment of the issues submitted to the advisory jury." *Hansen v. Safeway, Inc.*, No. 10-cv-0377-RS, 2010 WL 2593611, at *3 (N.D. Cal. June 22, 2010) (citing *Ashland v. Ling–Temco–Vought, Inc.*, 711 F.2d 1431, 1439 (9th Cir.1983)). "[T]he Court still is required, pursuant to Rule 52(a), to make its own findings of fact and conclusions of law." *Hansen*, 2010 WL 2593611, at *3. *See also Huser v. Santa Fe Pomeroy, Inc.*, 513 F.2d 1298, 1299 (9th Cir. 1975) (district judge was not required to accept jury's finding that that there was no contributory negligence where jury's verdict was advisory).

Plaintiff filed a motion to bifurcate the trial in September 2023. ECF No. 94. Plaintiff proposed bifurcating the trial into two phases: a jury trial to determine whether Defendant had violated the ADA in 2019 and whether Plaintiff was entitled to damages for any such violations, and a bench trial or hearing to determine the appropriate equitable relief in the event of a jury

verdict in Plaintiff's favor.  *Id.* at 3.  Defendants disagreed, arguing that they had a jury trial right in the proposed second phase of the trial.  ECF No. 95 at 7.  The Court denied Plaintiff's motion to bifurcate, reasoning that "[e]ven if there is no jury trial right, the Court can send that issue to the jury for an advisory verdict.  Indeed, the Court can send that issue to the jury, and then in post-trial motions the parties can argue whether the jury's verdict on that issue was advisory or binding."  Order on Mot. to Bifurcate at 5, ECF No. 98.

Following a six-day trial, the jury returned a verdict, finding that that Plaintiff had "prove[d] by a preponderance of the evidence that Defendant . . . violated her rights under the [ADA] on March 29, 2019."  Jury Verdict Form at 2, Question 1, ECF No. 176.  The sixth and final question of the verdict form reads:

> Did Plaintiff prove by a preponderance of the evidence that the Defendant's Clerk Recorder's Office will likely in the future violate its legal obligations described in Final Instructions Nos. 11 and 12 with respect to individuals with a disability of blindness or visual impairment in the same type of way that you found?

Verdict Form at 4, Question 6.  The verdict form directed the jury to answer this question only if the jury also found that the County had violated Plaintiff's rights under the ADA on March 29, 2019.  *See* Verdict Form at 1, 3.  The final jury question has no bearing on Plaintiff's legal claims, which concern whether Plaintiff's rights were violated under the ADA or California law on March 29, 2019.  Rather, this question solely goes to the issue of whether an injunction should issue.  *See* Order on Mot. to Bifurcate at 5 (describing the issue in the proposed second phase as: "if the jury finds liability based on what happened in 2019, do the changes Defendants made in 2022 resolve the legal violation such that there is no ongoing violation to enjoin?").

Accordingly, because there is no right to a jury trial for equitable claims, the Court finds the jury's verdict as to Question 6 of the Verdict Form was advisory.  In considering Plaintiff's motion for a permanent injunction, the Court thus conducts an independent assessment into whether an injunction should issue, and states findings of fact and conclusions of law as follows.[7]

---

[7] Plaintiff contends the Court cannot rely on Question No. 6 of the Verdict Form because it improperly implies that Plaintiff has the burden to prove that a future violation of the ADA is likely, rather than that Defendant has the burden to prove that a future violation will not occur. Mot. at 19.  The Court notes Plaintiff did not object to Question 5 of the Court's Proposed Verdict

United States District Court
Northern District of California

**B.    Findings of Fact[8]**

### 1.    Terminology

1. A "transcriber" or "reader" is a sighted individual who reads written documents or information for a blind individual and fills out information at the direction of the blind individual.  A reader or transcriber "take[s] . . . print information . . . and tell[s] the blind person what's there so they can make whatever decisions they need to make."  TT at 514-115.  At trial, some witnesses alternately referred to such individuals as "scribes" or "reader scribe[s]."  *See id.* at 497, 636.

2. At trial, witnesses and counsel referred to the services transcribers provide as "transcriber service(s)," "scribe services," "transcribing," or "scribing."  *See, e.g.*, *id.* at 408, 497, 657, 792.[9]

3. A "screen reader" or screen-reading software or technology is a piece of software that allows people who are blind or visually impaired to access a computer without using a monitor or mouse.  *Id.* at 339–40, 582.  A screen reader is downloaded to a computer or other device and provides text-to-speech output at the direction of the user.  *Id.* at 339–40, 582.

### 2.    Background on Screen Readers

4. Screen readers use keyboard commands to allow users to navigate by topic and by link on documents or web pages that are created to be useable and available to screen readers.  *Id.* at 339–40.  These commands allow users to move between different elements on a document or web page, *e.g.*, by moving from form field to form field or graphic to graphic.

---

Form, which was adapted into Question No. 6 of the final verdict form and which puts the onus on Plaintiff to prove that the CRO would again violate its legal obligations.  *See* ECF Nos. 123 at 3 (Court's Proposed Verdict Form), 132 at 4 (Joint Objections to Court's Proposed Verdict Form).  However, because Question No. 6 of the jury verdict is advisory, the Court conducts its own analysis as to each injunctive relief factor.

[8] Plaintiff has attached to her Motion certain documents that were not presented at trial, including copies of expert reports (Exs. A–C to Mot.), a defense exhibit that was not admitted in evidence (Ex. D to Mot.), and an email between Defendant's counsel and Plaintiff's counsel (Ex. K to Mot.).  Because these documents were not presented at trial, the Court declines to consider them in making its findings of fact.

[9] For consistency and clarity, the Court refers to such individuals as "transcribers" and to the services they provide as "transcriber services."

*Id.*

5. PDFs that contain different elements must be "tagged" properly to be useable to screen reader users. *Id.* at 341–42. Tags group pieces of text together and categorize them as one element. Users of screen readers can jump to or navigate between tagged elements (*e.g.*, from heading to heading or paragraph to paragraph). *Id.* at 341.

6. Proper tagging allows a screen reader user to "skim" a document or skip to a specific location in the document. *Id.* at 590. *See also id.* at 594, 596.

7. If the tags are not in the right order, the screen reader may inadvertently jump around within a page or between pages, rather than reading the document in a logical order. *Id.* at 341–43.

8. If a PDF does not have tags or is improperly tagged, a person who is dependent on a screen reader cannot reliably know where they are in a document. *Id.*

9. A PDF document that does not contain any navigation tools for screen readers whatsoever will read as "Blank." *Id.* at 340–41. Other documents will simply read all the words on the page or will read nothing at all. *Id.* at 340.

10. JAWS (an acronym for "Job Access with Speech," *see id.* at 337) is the market leader in screen reading software. *Id.* at 513.

11. JAWS is one of the more expensive screen readers available for purchase. *Id.* at 525.

12. Some other screen readers include NVDA, which is free, Supernova, and Voiceover. *Id.* at 343, 513, 525–26.

13. Using a screen reader is learned skill. *Id.* at 514. Not all blind people know how to use the JAWS screen reader. *Id.*

14. Sighted individuals using a typical computer without a screen reader navigate by moving the focus (also called a cursor, or mouse), around on the screen. *Id.* at 520. With a typical cursor, sighted individuals can move the cursor around and click on places on the screen to do different things. *Id.*

15. For sighted individuals using a traditional mouse, the movement of the cursor provides visual feedback to indicate that they are in the right place. In contrast, a blind individual

United States District Court
Northern District of California

United States District Court
Northern District of California

does not receive any feedback to know whether they are moving a traditional mouse in the right place. *Id.*

16. Instead of a cursor that physically moves around a visual screen, screen readers use custom keystrokes or keyboard shortcuts (e.g., holding down one key and pressing a letter) to execute different commands. *Id.* at 524. These commands allow screen reader users, *inter alia*, to move around a screen (e.g., going to the bottom of a page or beginning of a line), to change settings within a document (e.g., switching to review mode), and to find out information on the screen that is conveyed visually to sighted individuals (e.g., identifying what page number a document is on). *Id.* at 521.

17. Because most keystroke combinations already serve a different function for sighted users, the custom keyboard shortcuts in JAWS and other screen readers often involve the insert key. *Id.* at 523–24.

18. The location of the insert key varies across different keyboards. *Id.* at 524. Accordingly, it would be very difficult for a blind user to walk up to an unfamiliar keyboard and start using JAWS, even if that individual typically uses JAWS. *Id.*

19. The JAWS cursor is not always connected to the mouse or typing cursor. *Id.* at 522. Some JAWS commands, such as checking the page number, will typically disconnect the focus from where a JAWS user is typing on the screen. *Id.* at 521–22. To a sighted user, this will look like the user's mouse is moving around, even though JAWS is conveying underlying information and the blind person's location within the document has not changed. *Id.*

20. Because screen readers do not use a cursor that provides visual information on a screen, the location of the JAWS cursor or blind person's focus would not be obvious to a sighted person watching a blind person use JAWS. *Id.* at 521–22.

21. If a blind person were to sit at a computer and "drive" JAWS with keyboard commands and a sighted person were to stand next to that person watching the screen and controlling the mouse, it would not necessarily be clear to either user where the other's cursors were located or what they were doing. *Id.* at 522.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 3. Plaintiff's Background

22. Ms. Martinez resides in Union City, California. *Id.* at 575. The Court takes judicial notice of the fact that Union City is in Alameda County. Fed. R. Evid. 201(b).

23. Ms. Martinez is blind and has been blind since she was five years old. TT at 575. Ms. Martinez has some limited residual vision, but she does not see well enough to write on the blanks of a paper form no matter how closely she looks at the paper. *Id.* at 586–87.

24. Ms. Martinez has previously worked as a part-time contractor for a training center for the blind and held several positions over the course of ten years at the San Francisco Lighthouse for the Blind. *Id.* at 576–78.

25. During her last five years with the San Francisco Lighthouse for the Blind, Ms. Martinez was director of community services, a role in which she oversaw various programs. *Id.* at 577–78.

26. In 2019, Ms. Martinez filed Articles of Organization and other business documents to start a life coaching business. *Id.* at 580.

27. Ms. Martinez is currently employed as a certified life coach and has been seeing clients for her business since 2019. *Id.* at 580–81.

28. For her prior work as a director and in the nonprofit space, Ms. Martinez often needed to read print or visual materials. *Id.* at 581.[10]

29. Ms. Martinez uses several different methods to access and read written materials. These methods include reading braille documents whenever possible; using screen reading software to read documents such as Excel spreadsheets; and engaging a reader and transcriber to read through print materials and to show Ms. Martinez where to sign documents that required a signature and were provided to her on a printed form. *Id.* at 581–82.

---

[10] Throughout this order the Court uses "read" and "view" to mean taking in and interpreting information presented in a written or visual format, whether accessed visually or with the aid of tools such as brailled documents, screen readers or other text-to-speech output. This terminology reflects language used throughout Plaintiff's testimony and in various questions posed at trial. *Id.* at 582–83; *see also id.* at 336 (referring to a publication by one expert entitled "Reading PDF Documents with Adobe Reader 6.0, A Guide for People with Disabilities").

30. Ms. Martinez uses several techniques to take notes. *Id.* at 583. These techniques include braille note takers or displays, which allow the user to input braille using braille dots and patterns and to feel the braille that the user has just typed; braille-input keyboards; Bluetooth keyboards that a sighted person might use; audio recordings via the voice memo iPhone application; and hard-copy braille, which involves using a slate and stylus to punch out the dots to form braille letters. *Id.* at 584–85.

31. Ms. Martinez uses a two-finger double tap gesture to toggle audio recording on and off on her phone. *Id.* at 585.

### 4.    Transcriber Services

32. To verify that information transcribed on a form is accurate when receiving transcriber services, Ms. Martinez repeats required information throughout the transcription process and repeats information for areas that may be confusing, e.g., spelling out words that the transcriber may not know how to spell and asking the transcriber to spell back what they have written. *Id.* at 611–12. When a form is completed, or if Ms. Martinez has to write in initials and re-sign because a document has changes, she asks the transcriber to read through all the information from top to bottom, and to "stop at the tricky points and reconfirm that things were entered correctly." *Id.* at 612.

33. Ms. Martinez has received transcriber services from numerous government agencies. *Id.* at 604–08.

34. Ms. Martinez receives transcriber services from the California Department of Motor Vehicles ("DMV") to fill out forms whenever she needs to renew her state ID. *Id.* at 604–06. Ms. Martinez testified that DMV employees "would read . . . what the form said was needed, and then [she] would provide that information and they would write it into the blank spaces." *Id.* at 606. In receiving transcriber services at the DMV, Ms. Martinez has been able to verify to her satisfaction the accuracy of transcription by DMV employees. *Id.*

35. Ms. Martinez has also received transcriber services from the City of Union City and the State of California when filing documents related to her life-coaching business. *Id.* at 608,

609. Specifically, Ms. Martinez has received transcriber services to file a zoning application to do business out of her home, to update and renew her business license each year, and to document a change of address. *Id.* at 608.

36. Ms. Martinez also regularly received transcriber services at the San Francisco Muni office, which previously required disabled users to provide proof of continuing disability every three years to obtain a disability discount for San Francisco's municipal transit system. *Id.* at 607–08.

37. Ms. Martinez has also received transcriber services from the Social Security Administration. *Id.* at 606.

38. Outside of receiving government services, Ms. Martinez testified that she receives transcriber services "[a]ll the time" to fill out questionnaires and forms at Kaiser, where she has been a patient for decades. *Id.* at 609.

### 5. Background on Alameda County Clerk-Recorder's Office

39. The CRO is located in Oakland, California. *Id.* at 281.

40. The County receives funding from the State of California. ECF No. 147 (Stipulation "that the County of Alameda has received funding or financial assistance from the State of California for the relevant period.")

41. The CRO receives funding from the County of Alameda. TT at 422–423, 425 (acknowledging that the CRO receives money from the County's general fund).

42. There are blank, unsigned, preprinted FBNS forms in the CRO. *Id.* at 386.

43. The CRO has a unit called the Customer Service Unit, whose employees are trained to guide customers through the process of accessing the CRO's services. *Id.* at 459.

### 6. Fictitious Business Name Statement

44. A fictitious business name statement ("FBNS" or "FBNS form") is a form that is filed with the County of Alameda that provides notice to the public that a company is doing business under another name. *Id.* at 251.

45. The FBNS must be renewed every five years. *Id.* at 637.

46. Customers attempting to file forms at the CRO often have errors that cause their forms to

be rejected.  *Id.* at 286.

47. It is common for a customer to step to the side and modify a document that has been

    rejected.  *Id.* at 286.

48. If a CRO clerk[11] misses a problem with a customer's form upon the clerk's initial review

    of the form, the clerk will exchange it back and forth with the customer until the form is

    complete and correct.  *Id.* at 220.  This happens on a regular basis.  *Id.*

49. Business owners who can supply the information on an FBNS form are able to receive

    same-day service and file their forms at the CRO, even if their forms initially contained

    errors.  *Id.* at 286–87, 387; Admitted Ex. 4C at 05:51–06:13; 06:24–06:53.

    **7.    Plaintiff's Completion of the FBNS Form Prior to Visiting the CRO**

50. Ms. Martinez was required to file an FBNS to open a bank account for her life-coaching

    business.  TT at 588–89; Admitted Ex. 4A at 02:40–02:49.

51. In addition to filing an FBNS form in person at the CRO, an individual could mail in their

    completed FBNS form along with a check or money order in the amount of the filing fee.

    TT at 599.  Ms. Martinez decided to go in-person so she could pay by credit card, rather

    than with a paper check or money order, and so she could ask questions and fix anything

    that may not be filled out completely correctly as a new business owner.  *Id.*

52. Prior to March 29, 2019, Ms. Martinez attempted to complete the FBNS form on her

    computer to take to the CRO for filing.  TT at 589, 597.

53. To prepare to file the form, Ms. Martinez downloaded the FBNS form from the Alameda

    County website, read it using a screen reader on her computer, filled it out, printed and

    signed it.  *Id.* at 589.

54. Ms. Martinez encountered difficulties filling out the PDF FBNS form she had downloaded

    from the county website.  *Id.* at 589.  Ms. Martinez was able to fill out some, but not all, of

    the form's edit fields independently.  *Id.* at 595.

---

[11] The Court uses the term "clerk" loosely to refer to a clerical series of positions called Auditor Associate I, II, and III (previously known as clerk recorder specialists), or to temporary employees who are working as an auditor associate in an acting capacity.  *See* TT at 209, 373.

United States District Court
Northern District of California

United States District Court
Northern District of California

55. The PDF FBNS form Ms. Martinez had downloaded was missing "tags" that would otherwise allow her to skim through the document by jumping from heading to heading. *Id.* at 590. Ms. Martinez was also unable to discern which edit field belonged to which question, requiring her to search around the edit boxes to determine whether an edit field was associated with text above or below the box. *Id.* at 591. Ms. Martinez recalled that one section of the form had several check boxes, but that she had no idea what each check box was attached to and was thus unable to determine which box to check. *Id.*

56. Plaintiff was unable to finish the PDF FBNS form on her own. *Id.* at 595, 596.

57. Plaintiff took her laptop to her husband, who is sighted, to have him "ensure that [she] put the right information in the right edit fields whenever [she] had [a] question, and then check that check box." *Id.* at 598.

58. Ms. Martinez had her husband read through the document and then printed it out to sign it. *Id.* at 598.

59. Ms. Martinez's husband creased the paper on the signature line of the FBNS form so that Ms. Martinez had a tactile line to feel while signing her name. *Id.* at 598.

60. Ms. Martinez's husband works as a software engineer and is not always available to help her at home. *Id.* at 598.

61. At trial, Ms. Martinez walked through a PDF of the Alameda County FBNS form using JAWS software.[12] Using JAWS software to navigate and read the text of the form out loud, Plaintiff and her counsel used various shortcuts to toggle through different elements of the FBNS form. These shortcuts included pressing "H" to jump to a heading; pressing "E" to jump to an edit field, which read the instruction or text corresponding to that edit

---

[12] The PDF FBNS form Ms. Martinez read at trial had a revision date of April 2021. *Id.* at 592; *see* ECF No. 191-11, Admitted Ex. 22. The version of the FBNS form Plaintiff accessed in March 2019 would have been revised in October 2018. TT at 595; *see* ECF No. 191-10, Admitted Ex. 21. However, the version of the October 2018 FBNS PDF produced in this litigation had been flattened, meaning that accessibility features would have been removed. TT at 572–73; *see also id.* at 346, 355 (testimony by expert in making forms usable to blind individuals that the version of the October 2018 PDF FBNS form expert had reviewed did not contain form fields and would need to be printed out to be filled out). Although the April 2021 version of the FBNS form is not the exact form Ms. Martinez filled out in 2019, it behaved similarly using JAWS to the version Ms. Martinez filled out in 2019. *Id.* at 592, 594–95, 597.

field; and pushing "X" to take the user to the next check box. *Id.* at 591–97.

62. If a check box is properly tagged, JAWS will read the label attached to the check box, e.g., "Check box not checked, 'cat.'" *Id.* at 596.

63. When Plaintiff's counsel pressed the letter "X" on the FBNS form read at trial, JAWS correctly identified the presence of a check box, but was unable to identify what the check box was for. Instead, the JAWS screen reader read: "29 graphic check box not checked." *Id.* at 596. When Plaintiff's counsel pressed the letter "X" to toggle to other check boxes, JAWS recognized that another check box was unchecked, but did not read any non-numerical text or label associated with those check boxes. *Id.* at 596–97.

**8.    Plaintiff's March 29, 2019 Visit to the Alameda County Clerk-Recorder's Office**

  **a.    Plaintiff's Initial Interaction with Frontline CRO Clerks**

64. On March 29, 2019, Ms. Martinez visited the CRO to file an FBNS form for her life-coaching business. *Id.* at 598–99.

65. Ms. Martinez took BART to the CRO and arrived at the CRO around 1pm on March 29, 2019.[13] *Id.* at 599; Admitted Ex. 4C at 00:38–00:40.

66. Ms. Martinez brought with her the FBNS form that she had previously completed and signed at home with her husband's assistance as well as a copy of the Articles of Organization for her coaching business, which was set up as an LLC. TT at 217, 316–17, 627–28; Admitted Ex. 4C at 06:14-6:22; ECF Nos. 191-1, 191-4, and 191-5, Admitted Exs. 1 (Initial Completed FBNS Form), 4C (Audio of Plaintiff's interaction with Laura Briones), 5 (Articles of Organization).

67. Ms. Martinez went to the CRO by herself. Admitted Ex. 4C at 00:53-01:02; TT at 274. Ms. Martinez was using a white cane and was wearing sunglasses. TT at 603. Ms. Martinez had previously visited the CRO alone to obtain copies of her children's birth certificates. *Id.* at 610.

---

[13] "BART" refers to Bay Area Rapid Transit, a public transit rail system that serves the San Francisco Bay Area.

68. When Ms. Martinez arrived at the CRO, she approached a desk near the entrance and informed the person at the desk that she needed to file an FBNS form. *Id.* at 600. The person at the desk told her she was in the right place and gave her a number to walk up to the correct counter when her number was called. *Id.* The person at the desk gave Ms. Martinez a verbal description of the area's layout for her to orient herself and told Ms. Martinez to wait for her number to be called. *Id.* Ms. Martinez stood near a planter until her number was called. *Id.*

69. After her number was called, Ms. Martinez made her way to the counter and handed her paperwork to the clerk behind the counter. *Id.* at 601. The clerk behind the counter was Angelina Moran. *Id.* at 214–15, 613.

70. Ms. Moran has been employed with the CRO for 19 years. *Id.* at 208. Ms. Moran has been a clerk for most of that time. *Id.* at 209. Ms. Moran's current job title is Auditor Associate III. *Id.*

71. Ms. Martinez informed Ms. Moran that she wanted to file an FBNS form and had a few questions because she was not sure she had completed it correctly. *Id.* at 601.

72. Ms. Moran reviewed Ms. Martinez's completed FBNS form and informed Ms. Martinez that her form contained two mistakes, which Ms. Martinez would need to fix to file her FBNS. *Id.* at 601–02; Admitted Ex. 4A at 02:06-02:42.

73. Ms. Moran orally identified the errors on Ms. Martinez's FBNS form. TT at 602. Since Ms. Martinez was the sole owner of her coaching business, which was set up as an LLC, the CRO would accept a filing as either an individual or as an LLC. *Id.* at 218. Because Ms. Martinez had written "LLC" at the top of the form, Ms. Moran directed her to complete the rest of the form "as if she was filing an LLC." *Id.*

74. For the CRO to accept the form, Section C1 of the FBNS, labeled "Registrant/Corp/LLC," would need to be changed from Ms. Martinez's own name to the name of her LLC. *Id.* at 217–18; *see* ECF No. 191-1, Admitted Ex. 1 (Initial Completed FBNS Form). The State of Organization of the LLC would also need to be added in the space below, which Ms.

Martinez had left blank.[14]

75. Ms. Martinez asked Ms. Moran to assist her in making the corrections on her form so she could pay and file the form.  TT at 220, 602.

76. Ms. Moran informed Ms. Martinez that she could not help her make the required corrections.  *Id.* at 227–28, 602.

77. Ms. Moran refused to provide Ms. Martinez with the assistance she requested because Ms. Moran was not allowed to alter a signed document and because the FBNS was "considered a form."  *Id.* at 227–28, 602; Admitted Ex. 4A at 1:56–2:00.

78. Ms. Moran did not offer to assist Ms. Martinez with filling out a blank, unsigned FBNS form or offer to give Ms. Martinez a blank form.  TT at 610.

79. When Ms. Martinez asked Ms. Moran for clarification as to what the errors were and what section she was missing, Ms. Moran did not identify the section of the form by its alphanumeric identifier or form field description.  Admitted Ex. 4A at 01:59-02:41. Instead, Ms. Moran repeatedly used words like "here" and "there," which refer to spatial locations on the page, to describe where changes needed to be made.  *Id.* at 02:09-02:14, 02:33-02:36, 02:37-02:41.

### b.    Escalation to CRO Supervisors

80. Ms. Martinez asked Ms. Moran to speak with a supervisor based on Ms. Martinez's understanding that a supervisor will provide assistance in situations where frontline staff are hesitant to fill out or correct a form.  TT at 602–03, 613.

81. Ms. Moran informed Ms. Martinez that her supervisor was on her lunch break, and that Ms. Moran did not know when she would return.  *Id.* at 613.

82. Ms. Martinez stood where she had previously waited for her number to be called.  *Id.* at 613.  Ms. Martinez waited over an hour for Ms. Moran's supervisor to return.  *Id.*;

---

[14] Ms. Martinez also wrote "Founder" under "Title" next to her signature, rather than an officer title such as "CEO" or "President."  TT at 218, 219, 265; ECF No. 191-2, Admitted Ex. 2 ("Go Back Letter").  Although this edit was included in the "Go Back Letter" Ms. Martinez ultimately received on March 29, 2019, there is no evidence that CRO staff orally communicated this to Ms. Martinez during her March 29 visit to the CRO.  *See* ECF No. 191-4, Admitted Ex. 4 (Referenced Audio Files); TT at 219.

United States District Court
Northern District of California

Admitted Ex. 4A at 00:00–00:05.

83. While waiting for Ms. Moran's supervisor, Ms. Martinez asked Ms. Moran if she was sure she could not assist Ms. Martinez in making the corrections to her FBNS form. TT at 613–14; Admitted Ex. 4A at 01:52–01:57. Ms. Moran responded that she would not make corrections to or fill out the FBNS form. Admitted Ex. 4A at 01:55–2:07; TT at 614.

84. At trial, Ms. Moran maintained that Ms. Martinez only asked her to alter the document and not to fill out a blank form. TT at 227–28, 230. However, Ms. Martinez asked Ms. Moran to "fill out" the form. Admitted Ex. 4A at 1:53–1:56 ("You're sure you won't reconsider helping me fill out this one line that isn't filled out?"). Likewise, Ms. Moran told Ms. Martinez that she would not fill out the form. Admitted Ex. 4A at 2:03–2:07 ("I am not gonna fill it out. I can tell you what's wrong with it"); 2:58–3:02 ("It is legal that we do not fill this out."); 03:03–03:09 ("You're saying that I'm not helping you, but yet, by me filling out your form, I'm breaking the law.").

85. Ms. Martinez repeatedly asked Ms. Moran for the legal authority preventing her from providing the services Ms. Martinez had requested. Admitted Ex. 4A at 02:55-03:13.

86. While waiting for Ms. Moran's supervisor, Ms. Martinez spoke to a customer who had just completed his transaction. TT at 615. That customer had a mistake on his form and was told to cross it out and write in the correct information in the proper section. *Id.*

87. When Ms. Moran's supervisor, Laura Briones, returned to the CRO, Ms. Martinez asked permission to record the conversation. Ms. Briones declined permission to record. *Id.* at 625; Admitted Ex. 4C at 00:00–00:06.

88. Ms. Martinez failed to turn off the recording. TT at 625; Admitted Ex. 4C at 00:05–00:10.

89. Ms. Briones has been employed with the CRO since August 1999. TT at 285. Ms. Briones's current job title is Clerk Recorder and Collections Supervisor II, a position she has held for about 18 years. *Id.*

90. Ms. Martinez told Ms. Briones that her form had some mistakes and that she needed someone to assist her in filling it out because she could not read the print form, and that she had previously asked Ms. Moran for assistance. Admitted Ex. 4C at 00:10-00:32.

17

91. Ms. Briones asked Ms. Martinez if someone was accompanying her. *Id.* at 00:49–00:53.

92. Ms. Briones told Ms. Martinez that because the FBNS is a legal form, the CRO needs the business owner to fill it out. *Id.* at 01:41-1:51. Ms. Martinez responded that she was the business owner, and she could not physically fill the form out because she cannot read and write print. *Id.* at 1:51-1:58.

93. Ms. Martinez repeated her request for sighted assistance and explained that she needed someone to help her fill the FBNS form out correctly so that she could file it. *Id.* at 02:08-02:24.

94. Ms. Martinez explicitly asked Ms. Briones for assistance in "filling out" the FBNS form. *Id.* at 00:13–00:27 (audio from March 29, 2019 of Ms. Martinez telling Ms. Briones "I filled it out to the best of my ability, and apparently I need to fix it, so I asked Angelina [Moran] if she could assist in filling it out for me."), 01:52–01:57 ("I cannot physically fill it out because I can't write print, I can't read print), 02:15–02:21 ("all I need is you, or anybody, to help me fill this form out correctly"), 04:23–04:31 (Ms. Briones "I'm saying this is a legal document that is to [be] filled out by the business owner . . . or whoever they designate . . ." Ms. Martinez's response, "Which is me, and I'm designating you"), 08:01–08:07 ("I'm still gonna need someone to help me fill out the form to get it correct").

95. Ms. Briones told Ms. Martinez that no one at the CRO could fill out Ms. Martinez's FBNS form because they were not business owners and the FBNS is a legal form, which the person filling it out signs under penalty of perjury, attesting that the information is true and correct. *Id.* at 02:25–2:51; *see also id.* at 07:16–07:23.

96. Ms. Martinez told Ms. Briones that if she were to assist her and read back what she wrote, Ms. Martinez would be able to verify the information under penalty of perjury. *Id.* at 02:41-02:45, 03:51-03:57.

97. Ms. Briones explicitly told Ms. Martinez that the CRO could not "fill out" the FBNS form. *Id.* at 01:42–1:50 ("because this is a business form and it's a legal form, we do need the business owner to fill it out"), 02:35–02:52 ("the person filling it out is basically signing under penalty of perjury that the information is true and correct. . . . I'm not a business

18

owner.  For anyone in this office to fill it out would not be . . ."), 04:23–04:31 ("I'm saying this is a legal document that is to [be] filled out by the business owner"), 07:16–07:19 ("I cannot fill this out for you").

98. Ms. Martinez repeatedly asked for a letter from Ms. Briones in writing stating that she would not provide sighted assistance and explaining why the CRO refused to provide sighted assistance.  *Id.* at 03:19–03:30, 04:50–04:59, 07:18–07:26; 07:32–07:44; 07:48–07:52, 08:07–08:15.

99. Ms. Briones offered Ms. Moran an envelope and a "Go Back Letter," which would consist of a paper letter listing the corrections Ms. Martinez would need to make to her FBNS form.  *Id.* at 02:59–03:09, 07:39–07:47; TT at 629–630.  Ms. Briones told Ms. Martinez she could then "get [the form] corrected" and mail it to the CRO.  Admitted Ex. 4C at 02:59–03:09.  Ms. Martinez replied that she would need sighted assistance whether she received it in the CRO or at home.  *Id.* at 03:11–03:17.

100.     Ms. Briones gave Ms. Martinez an envelope with the option for her to mail in her corrected FBNS form to the CRO and offered to write her name or the name of a CRO staff member on it to expedite the filing once it arrived at the CRO.  *Id.* at 03:38–03:45; TT at 322.  An expedited envelope would take priority over other filings received in the mail. TT at 322.

101.     Ms. Martinez repeatedly asked Ms. Moran and Ms. Briones why they wouldn't help her fill out the form and what authority prevented the CRO from doing so.  TT at 628; ECF No. 191-4, Admitted Ex. 4C at 02:27–02:31, 02:50–02:57, 04:56–05:01, 07:22–07:26, 07:30–07:35, 07:39–07:43, 08:07–08:12.

102.     Ms. Briones said the CRO could help her with filling out non-legal documents such as requesting a copy, but that the CRO could not help with the FBNS because it is a legal document to be filled out by the business owner or whoever they designate.  Admitted Ex. 4C at 03:58–04:33.

103.     Ms. Martinez told Ms. Briones she was trying to designate Ms. Briones and that they could fill out and fix the form together.  *Id.* at 4:34–5:20.

104.    Ms. Briones did not offer to assist Ms. Martinez with filling out a blank, unsigned FBNS form.  TT at 629.

105.    Ms. Briones testified that if Ms. Martinez had specifically asked Ms. Briones to fill out a blank FBNS form on her behalf and read it back to verify its correctness, Ms. Briones would not have done so.  *Id.* at 328.

106.    Ms. Briones contacted her supervisor, Eva He, by phone after her initial interaction with Ms. Martinez.  TT at 302; ECF No. 191-4, Admitted Ex. 4D (Audio of second interaction between Plaintiff and Laura Briones).

107.    Ms. He confirmed that Ms. Briones was following the County's policy in refusing to correct or fill out Ms. Martinez's FBNS form.  TT at 302–03.

108.    Ms. Briones googled "ADA accommodation" after her initial interaction with Ms. Martinez.  *Id.* at 297.

109.    Ms. Briones believed Ms. Martinez's statements on what she believed the ADA to provide were contrary to what Ms. Briones had been trained on.  *Id.* at 315.

110.    Ms. Briones gave Ms. Martinez a printed Go Back Letter explaining the deficiencies with Ms. Martinez's FBNS form.  *Id.* at 288, 292, 630.

111.    The Go Back Letter did not include the reasons CRO staff refused to assist Ms. Martinez via transcription.  *See* ECF No. 191-2, Admitted Ex. 2 (Go Back Letter).

112.    Before she left the CRO on March 29, Ms. Martinez took down information for Ms. Briones and Ms. He.  Admitted Ex. 4D at 00:00–00:29.

113.    Ms. Briones told Ms. Martinez that based on her conversation with Ms. He, the CRO could inform Ms. Martinez what information was missing from the form, but that the service Ms. Martinez had requested was "illegal" and "not an accommodation."  *Id.* at 00:30-01:09.

114.    Ms. Martinez did not personally speak with Ms. He on March 29, 2019.  Ms. Martinez asked Ms. Briones to check if Ms. He was still in the office because she wanted to ask Ms. He what legal authority prevented the CRO from providing the assistance she had requested.  *Id.* at 1:04-1:35.  Ms. Briones said Ms. He might have left for the day.  *Id.*

United States District Court
Northern District of California

1    Ms. Briones did not directly respond to Ms. Martinez's request to speak with her and

2    ended the conversation.  *Id.*

3    115.    No one informed Ms. Martinez on March 29, 2019 that there were blank forms

4    available in the CRO.  TT at 610.  No CRO employee offered Ms. Martinez a blank form

5    as an option on March 29, 2019.  *Id.* at 613.

6    116.    Ms. Martinez first learned blank forms were available at the CRO during the trial.

7    *Id.* at 610.

8    117.    Ms. Martinez would be comfortable having either Ms. Moran or Ms. Briones

9    transcribe her information onto a blank, unsigned form because Ms. Martinez considers a

10   CRO clerk or supervisor to be a "trusted source" as staff of a government entity, in contrast

11   to "a random person" "off the street . . . or . . . in the lobby of the CRO[.]"  *Id.* at 611, 629.

12   118.    At no point on March 29, 2019, was Ms. Martinez able to file her FBNS form.  *Id.*

13   at 290–91.

14   **9.    Plaintiff's May 31, 2019 Visit to the CRO**

15   119.    After her March 2019 visit to the CRO, Ms. Martinez hired Emily Grim as a reader

16   transcriber to help her prepare a corrected FBNS form.  *Id.* at 638.

17   120.    Ms. Martinez has hired Ms. Grim from time to time to help with her business

18   paperwork, drive her children to school, to sort her mail, and to act as a reader or

19   transcriber to write information on paper forms that Ms. Martinez cannot complete by

20   herself.  *Id.* at 278–79.

21   121.    On May 31, 2019, Ms. Martinez returned to the CRO with her corrected FBNS

22   form and brought Ms. Grim to accompany her.  *Id.* at 281, 638–39.

23   122.    On May 31, 2019, Ms. Martinez and Ms. Grim walked into the CRO; Ms. Martinez

24   went up to a desk, took a number, and approached the counter when her number was

25   called.  *Id.* at 639.

26   123.    Ms. Grim stood back when Ms. Martinez approached the counter.  Ms. Martinez

27   noted that the public often talks to Ms. Grim and asks her questions about Ms. Martinez.

28   *Id.* at 639–40.  This is not Ms. Grim's job.  *Id.*

21

124.    Ms. Moran was the clerk at the counter on May 31, 2019.  *Id.* at 264.

125.    After Ms. Martinez handed Ms. Moran her corrected FBNS form, Ms. Moran typed
something and asked Ms. Martinez to verify that everything on the monitor was correct.
*Id.* at 642.

126.    Ms. Martinez reminded Ms. Moran that she was blind and asked Ms. Moran to read
her the information on the monitor.  *Id.* at 642–43.  Ms. Moran did not read the information
for her.  *Id.* at 643.  Rather, Ms. Moran told her she knew Ms. Martinez was blind and
turned the monitor to Ms. Grim to read.  *Id.* at 642–43.

127.    Ms. Martinez then asked Ms. Grim to read what was on the screen.  *Id.* at 643.  Ms.
Grim read everything that was on the monitor.  *Id.*  Ms. Martinez double checked spellings
and things she had questions about.  *Id.*  When Ms. Martinez had verified the information
for its accuracy, she informed Ms. Moran that everything was verified and correct.  *Id.*

128.    Ms. Martinez's FBNS form was filed at the CRO on May 31, 2019.  *Id.* at 266.

**10.    CRO's JAWS-Equipped Computer Kiosk**

129.    The CRO has long had self-service kiosks available for the public to use, which
were not equipped with JAWS or other screen reading software.  *Id.* at 417.

130.    In or about October 2022, the CRO installed JAWS screen-reading software on an
on-site computer kiosk ("the JAWS-equipped computer kiosk" or "JAWS-equipped
kiosk") to help blind and visually impaired customers to fill out forms.  *Id.* at 418–19.

131.    Matthew Yankee is the Assistant Controller of the County of Alameda.  *Id.* at 371.
The Assistant Controller is the highest ranking non-elected CRO employee.  *Id.* at 433.

132.    In 2019, Mr. Yankee was Division Chief for the Clerk-Recorder's Office.  *Id.*  The
Division Chief is two levels of supervisor above Ms. Briones, who is herself a supervisor.
*Id.* at 373.

133.    Mr. Yankee is not typically directly involved in training new CRO employees.  *Id.*
at 379.

134.    In December 2022, the County rolled out a new FBNS "wizard" for its internal
public computer kiosks.  *Id.* at 420.  In 2023, the FBNS wizard was rolled out to a web

United States District Court
Northern District of California

format for CRO patrons to access from home.  *Id.*

135.    The JAWS-equipped computer kiosk pulls up the County's Web forms.  *Id.* at 418.

136.    If a person were having difficulty with JAWS, they could "probably" access the document in a Word format by contacting IT, which the CRO has on-site.  *Id.* at 418.

137.    To verify information on a form using the JAWS-equipped kiosk alone, the user would listen to JAWS read out the document before it is printed, so that the patron knows what they are signing.  *Id.* at 462.  In the alternative, a patron who used the JAWS-equipped kiosk to fill out the form could have someone from the CRO read the contents of the form to them.  *Id.*

138.    A public kiosk at the CRO allows a user to enter information for it to be submitted to the County for review.  *Id.* at 303.  It does not allow the user to edit the form for corrections after the CRO reviews it.  *Id.*

139.    Ms. Briones would direct any blind patron to the JAWS-equipped kiosk today.  *Id.* 303.  Ms. Moran has not personally assisted a blind customer in using the kiosk.  *Id.* at 241.

140.    If Ms. Martinez were to come into the CRO and ask Ms. Briones to help her fill out a blank FBNS form, Ms. Briones would direct her to the JAWS-equipped kiosk.  *Id.* at 328.

141.    Mr. Yankee was not completely confident that the screen reader software alone would enable a screen reader user to complete an FBNS at the CRO and have it filed the same day.  *Id.* at 420.

142.    Mr. Yankee testified that the CRO does not exclusively rely on the JAWS-equipped kiosk and screen reader software.  *Id.* at 420–21.

143.    CRO clerks were not trained on what to do if a blind individual is unable to use the kiosk.  *Id.* at 242–43.

**11.    Evaluation of JAWS-Equipped Computer Kiosk and FBNS Web Wizard by Plaintiff's Expert Steven Clark**

144.    In August 2023, Plaintiff's expert Steven Clark conducted an evaluation and audit

of the process of filling out an FBNS form at the CRO using the CRO's JAWS-equipped computer kiosk. *Id.* at 526–28.

145.    Mr. Clark was qualified to testify as an expert in the field of making forms usable to blind individuals, including in the use of JAWS and screen readers. *Id.* at 518–19.

146.    Mr. Clark, who is sighted, was accompanied by Plaintiff's counsel Timothy Elder, who is blind. *Id.* at 529.

147.    After they arrived at the CRO in August 2023, Mr. Elder went to the counter and asked to complete an FBNS form using the JAWS-equipped computer kiosk for his business. *Id.* at 529.

148.    CRO staff initially directed Mr. Clark and Mr. Elder to check in in a room that contained multiple public kiosk terminals. *Id.* at 530. From there, they were informed that a supervisor would help them with the rest of the process and directed to another room. *Id.*

149.    The room with the JAWS-equipped kiosk was adjacent to a staff room that is separated from the rest of the room by a glass partition/window. *Id.* When Mr. Clark visited, someone was working behind the partition to answer questions. *Id.*

150.    The supervisor went with Mr. Clark and Mr. Elder to a kiosk equipped with the FBNS wizard and JAWS software, made sure it was on, and signed in. *Id.* at 532. The supervisor told Mr. Clark and Mr. Elder to contact him if they had any questions. *Id.*

151.    Mr. Clark observed as Mr. Elder began filling in the form, which was already on the screen. *Id.* at 534. Mr. Clark also used the JAWS-equipped kiosk himself. *Id.*

152.    When Mr. Clark used JAWS on the form, it was not clear what information was being asked for in some of the form fields. *Id.*

153.    Mr. Clark described the FBNS wizard as "not a well-behaved program" using JAWS software. *Id.*

154.    Mr. Clark observed that Mr. Elder was not able to figure out what the form was asking for independently. *Id.* Mr. Clark had to take over to see if he could figure out what information was being asked for using advanced JAWS commands to determine whether a blind person would have been able to do so independently. *Id.* at 534–35.

155.    The form was ultimately submitted through the CRO's FBNS web wizard, but Mr. Clark had to fill out certain places in the form.  *Id.* at 538.

156.    After submitting the FBNS form, the supervisor gave Mr. Clark and Mr. Elder a ticket and guided them into the main lobby, which had several counters.  *Id.* at 538.  They proceeded to the counter when their number was called.  *Id.* at 538–39.

157.    At the counter, the CRO clerk pulled up the form on the computer screen and read the form back to make sure the information was correct.  *Id.* at 540.  There was an error. *Id.*  Mr. Elder told the clerk the information was incorrect, and the clerk corrected it, printed the form for Mr. Elder to sign, and asked for payment.  *Id.*

158.    Mr. Clark also assessed and reviewed the FBNS wizard form from his home computer web browser.  *Id.* at 535.

159.    Using JAWS, the FBNS wizard behaved identically on Mr. Clark's home computer as on the computer at the CRO.  *Id.*

160.    Mr. Clark determined that the FBNS wizard form could not be filled out independently by an average JAWS user.  *Id.* at 536.

161.    The FBNS wizard form did not provide sufficient information for an average JAWS user to be able to complete the form and be sure the information was correct before submitting it.  *Id.* at 536–37.

162.    Mr. Clark estimates that it would take 10 to 15 minutes for a blind and sighted person working together to fill out the FBNS wizard form with JAWS and a mouse.  *Id.* at 537.

**12.    CRO Visit by Lucia Greco**

163.    On or around December 15, 2022, Berkeley resident Lucia Greco visited the CRO to complete an FBNS form for her consulting business.  *Id.* at 489–90.

164.    Ms. Greco is blind.  *Id.* at 489.

165.    After Ms. Greco arrived at the CRO, she approached the desk and informed the clerk she would need the FBNS form.  *Id.* at 490.  The CRO clerk working that day handed her the form.  *Id.*  Ms. Greco asked the clerk for assistance to fill out the form, since she

1    was not able to fill it out independently.  *Id.*

2    166.    After Ms. Greco asked for assistance, the clerk read out the questions on the form

3    and began filling it out for Ms. Greco.  *Id.* at 490, 492.

4    167.    At one point, Ms. Greco was not sure of the answer to one of the questions on the

5    form.  *Id.* at 490, 492.  Ms. Greco asked her husband for the information, then returned to

6    the counter to finish her form.  *Id.* at 490, 492.

7    168.    Ms. Greco is confident that she had sufficiently verified the information the CRO

8    clerk had transcribed onto her FBNS form to sign under penalty of perjury that the

9    information was accurate.  *Id.* at 495–96.

10    169.    After Ms. Greco verified the accuracy of the information, she requested that the

11    CRO clerk help her find the signature line with her hand, and Ms. Greco signed the form.

12    *Id.* at 496.

13    170.    Ms. Greco then paid the filing fee and was able to file her FBNS form the same day

14    that she visited the CRO.  *Id.*

15    171.    Ms. Greco testified that the process of speaking with the clerk and transcribing the

16    information on a paper FBNS form took about five minutes, and that the entire process

17    from approaching the desk to walking across the CRO to process the paperwork took 10 to

18    15 minutes.  *Id.* at 494–95.

19    172.    Ms. Greco would prefer to use a transcriber over filling out an electronic version of

20    the FBNS form on a computer equipped with JAWS, because she has depended on

21    transcribers her entire life and because using a transcriber is easier for her.  *Id.* at 496–97.

22    173.    Ms. Greco explained that to file a form using a public computer equipped with

23    JAWS, she would have to pull up the right file, make sure the field labels are correct, print

24    the document without being able to visually confirm that the document pulled from the

25    printer was the one she had filled out, make sure the form is not upside-down, and finally

26    receive assistance to sign the form.  *Id.* at 497.

27    **13.    Accessibility of CRO's PDF FBNS Forms**

28    174.    Expert witness Karen McCall reviewed four versions of the two-page FBNS form

available on the CRO website, with revision dates of October 2018, April 2021, November 2022, and December 2022 (Exhibits 21, 22, 23 and 24, respectively).  *Id.* at 343, 348–49. *See* ECF Nos. 191-10–191-13, Admitted Exs. 21–24.

175.    Ms. McCall was qualified as an expert in making PDFs and PDF forms usable to screen reader users, including those who are blind.  TT at 339.

176.    Each of the PDFs Ms. McCall reviewed is a two-page document, consisting of the FBNS form on page 1 and instructions for completing the form on page 2.  ECF Nos. 191-10–191-13, Admitted Exs. 21–24.

177.    Each version of the PDF FBNS form Ms. McCall reviewed had problems with tagging that made it "impossible" for a screen reader user to reliably navigate and complete the form.  TT at 346–48.

178.    In each version of the PDF, certain items were missing tags and certain items were tagged in correctly.  *Id.* at 346.

179.    Exhibit 21, the version of the October 2018 PDF FBNS form that Ms. McCall reviewed, contained tags for both pages, but did not contain form fields.  *Id.* at 346.  This means that an individual would need to print Exhibit 21 out to fill it out.  *Id.* at 355.  A screen reader user would not be able to fill out the PDF online.  *Id.* at 346.  Exhibit 21 did not include any "heading" or "list" tags; rather, everything was one paragraph tag, meaning that users would have to start listening from the top of the document and could not jump to a particular section.  *Id.* at 346–47.

180.    The October 2018, April 2021, and November 2022 PDF FBNS forms each had a problem with a series of check boxes around the middle of the page.  *Id.* at 347–48.  When a screen reader user lands on those check boxes, the user would only hear "Check box not checked," and would not hear any of the text associated with each check box.  *Id.* at 347.

181.    The April 2021 PDF included form fields that were not connected to the tags, meaning that a screen reader user would not be able to go through the form fields and know where they are in the form.  *Id.* at 347.

182.    The first page of the November 2022 and December 2022 FBNS forms (Admitted

Exs. 23 and 24) was not tagged at all, meaning that screen reader users attempting to read those forms would start at the top of the second page. *Id.* at 349.  An individual who is "dependent on a screen reader would open [either of these documents], land at the top of page 2, and not realize that this was a two-page document, a form and the instructions. They would think they had just opened the instructions." *Id.* at 350.

183.    It is possible to create a PDF form that does not have the infirmities Ms. McCall identified.  *Id.* at 350.

184.    The County updated its online PDF FBNS form again in March 2024, the month of trial.  *See id.* at 350.  The latest revision of the PDF FBNS form did not remove any of the barriers to usability identified in earlier versions of the PDF FBNS form.  *Id.* at 351.

**14.    CRO Policies**

185.    In 2019, the County had a policy that CRO employees could not write on blank FBNS forms at the request of a person with a disability for any reason.  This general policy has not changed.  *Id.* at 296, 415, 429.

186.    No CRO employee who testified at trial would make corrections or alterations to a signed form, including to a signed FBNS form.  *Id.* at 221, 226, 296.  *See also id.* at 399, 444, 451.

187.    There is conflicting evidence as to whether CRO employees are allowed to transcribe on blank forms for blind or visually impaired patrons.

188.    There are some circumstances under which at least one CRO employee will assist a blind customer in filling out a FBNS form by providing transcriber services on a blank form.  *Id.* at 490, 492.

189.    Mr. Yankee, who was present throughout the trial as the County's representative, testified that he did not recall any instances where staff had handwritten on a blank form for a customer.  *Id.* at 428.  However, according to Mr. Yankee, the CRO "empower[s] [its] managers to make a lot of those decisions." *Id.*  He also testified that if an individual with a disability who is unable to complete a form comes into the CRO and needs to complete a form, "that might be one of the circumstances" in which the CRO would complete the

1    form.  *Id*. at 452.

2    190.    Ms. Moran's supervisor and manager Laura Briones would not complete a blank

3    FBNS form for Ms. Martinez or another blind customer, even if the kiosk was not

4    working.  *Id.* at 328.

5    191.    Ms. Moran knows how to complete forms and would physically be able to

6    complete a form for a blind individual.  *Id.* at 242.  Ms. Moran could complete and verify

7    an FBNS form in three to five minutes.  *Id.* at 230.

8    192.    Ms. Moran and Ms. Briones would not complete blank FBNS forms for Ms.

9    Martinez or other blind individuals today.  *Id.* at 230–31, 328.

10   193.    Ms. Moran treats the County's policies as "equivalent" to the law.  *Id.* at 237.  Ms.

11   Moran testified, "I work for the government.  This is our policy.  And it's the same [as a

12   law], and I don't distinguish between the two of them."  *Id.*

13   194.    Ms. Moran believes that the CRO "would not" write on a blank FBNS form.  *Id.* at

14   231.  It was her belief that the CRO "[has] never, ever completed blank forms, especially

15   fictitious business name forms that would stand up in court for any reason.  We have never

16   completed blank forms."  *Id.* at 230.

17   195.    Ms. Moran believes she would have to consult with management about whether she

18   could transcribe on a blank FBNS form if a blind customer had difficulty with the kiosk

19   system.  *Id.* at 242.

20   196.    Ms. Moran believed that because the CRO did not have a JAWS-equipped kiosk in

21   March 2019 to take information and make an acceptable form, the CRO's "only option[]

22   was to offer th[e] suggestion, 'Did you bring someone with you?'"  *Id.* at 274.

23   197.    Mr. Yankee testified that he would allow a clerk to write on a blank FBNS form for

24   a person with a disability if the kiosk failed.  *Id.* at 421.  Mr. Yankee described providing a

25   transcriber as "within the realm of possibilities."  *Id.* at 481–82.

26   198.    No evidence presented at trial indicates that the County has any policies that would

27   ever require a CRO employee to assist a blind customer in filling out an FBNS form or any

28   other form by providing transcriber services.

United States District Court
Northern District of California

199.    None of the clerks or supervisors with whom Ms. Martinez interacted at her March 29, 2019 visit to the CRO informed her the CRO had blank forms or offered to fill out a blank FBNS form for Ms. Martinez.  *Id.* at 610, 613, 629, 632.

200.    Ms. Briones received training on the ADA when she was first hired with the County, and the County provides ongoing training on the ADA.  *Id.* at 313.

201.    The County trains CRO staff "to assist persons with disabilities to the best of [their] ability, depending on the situation and the request, as long as it's something within [the CRO's] scope and something [they] can provide to the customer and it's not something improper or illegal."  *Id.* at 313.

202.    Ms. Briones conducts training of new employees and ongoing training.  *Id.* at 314.

203.    The CRO does not maintain written ADA policies or policies related to auxiliary aids and services under the ADA.  *Id.* at 236, 376.

204.    On March 29, 2019, Ms. Briones did not know what an auxiliary aid or service was.  *Id.* 298.

205.    Ms. Moran did not receive formal written policies regarding the ADA or the auxiliary aids to be provided for blind or visually impaired customers.  *Id.* at 236–39.

206.    The County of Alameda has an ADA coordinator.  *Id.* at 416.

207.    No evidence was presented at trial to indicate that any CRO employee contacted the ADA coordinator on March 29, 2019.  *Id.* at 416.

**C.    Conclusions of Law[15]**

In her first cause of action, Ms. Martinez alleged a claim for violation of Title II of the ADA, 42 U.S.C. §§ 12102 et seq.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  In her third cause of action, Ms. Martinez alleged a

---

[15] To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Tri–Tron Int'l v. Velto*, 525 F.2d 432, 435 (9th Cir. 1975).

1   claim for violation of California Government Code § 11135 ("Section 11135").  Section 11135

2   "incorporates the protections and prohibitions of the ADA and its implementing regulations."

3   *Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061, 1084 (C.D. Cal. 2015); *see* Cal. Gov't

4   Code § 11135(b).[16]

5       "[I]mplementing regulations for Title II provide that a public entity must 'take appropriate

6   steps to ensure that communications' with disabled persons 'are as effective as communications

7   with others.'"  *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (citing 28 C.F.R. §

8   35.160(a)).  These regulations provide that:

> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
>
> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

18  28 C.F.R. § 35.160(b).

19      The ADA provides for enforcement through the same remedies and procedures set forth in

20  Section 505 of the Rehabilitation Act of 1973, which authorizes enforcement through injunctive

21  relief.  42 U.S.C. § 12133; *see* 29 U.S.C. § 794a.  *See also Lonberg v. City of Riverside*, 97-cv-

22  237-SGL, 2007 WL 2005177, *7 (C.D. Cal. May 16, 2007) ("The ADA states that the remedies

____

[16] In her fourth cause of action, Ms. Martinez alleged a violation of the California Disabled Persons Act ("DPA").  The DPA states that "[a] violation of the right of an individual under the Americans with Disabilities Act of 1990 . . . also constitutes a violation of this section."  Cal. Civ. Code § 54(c).  California Civil Code section 55 states that "[a]ny person who is aggrieved or potentially aggrieved by a violation of Section 54 . . . of this code . . . may bring an action to enjoin the violation."  Plaintiff's amended complaint states that she "seeks no relief whatsoever under Cal. Civ. Code § 55."  ECF No. 84 ¶ 97; *see also id.*, prayer for relief subparagraph (b) (seeking injunctive relief only under the ADA and California Government Code § 11135).  Consistent with the amended complaint, Plaintiff's motion for a permanent injunction makes no mention of the DPA.

and procedures set forth in section 505 of the Rehabilitation Act are the remedies available to any person alleging discrimination under the ADA.  42 U.S.C. § 12133.  Section 505 of the Rehabilitation Act, in turn, states that a person who is being discriminated against is entitled to injunctive relief.").  Plaintiff's Section 11135 claim likewise authorizes injunctive relief.  *See* Cal. Gov't Code § 11139 (providing for enforcement "by a civil action for equitable relief[.]").  Plaintiff treats her federal and state law claims as equivalent for the purposes of injunctive relief; neither party contends that Plaintiff must satisfy different standards to be entitled to injunctive relief for her ADA and Section 11135 claims.  *See* Mot. at 8; Opp'n at 4.

### 1.    Inferences Drawn from Jury Verdict

District courts may "dr[a]w inferences from the verdicts to determine the issues that the presumptively rational jurors must have determined, and then use[] those implicit findings of fact as the basis for judgment as to certain issues."  *Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997).

In her motion, Plaintiff characterizes Defendant's provision of PDF forms that Ms. Martinez could not independently complete as an "ongoing violation[]" by Defendant.  Mot. at 1.  However, the jury's finding that Defendant violated the ADA was limited to Defendant's conduct on March 29, 2019.  Verdict Form at 2, Question 1 (asking: "Did Plaintiff Lisamaria Martinez prove by a preponderance of the evidence that Defendant Alameda County violated her rights under the Americans with Disabilities Act *on March 29, 2019*?") (emphasis added).  The jury did not make a finding that Defendant violated her rights under the ADA on any other date.  *See generally* Verdict Form.

Similarly, Final Instruction No. 8 told the jury:

> Plaintiff Lisamaria Martinez asserts three claims.  First, that *on March 29, 2019* Defendant Alameda County violated the Americans with Disabilities Act.  Second, that *on the same day* Defendant violated the California Disabled Persons Act.  Third, that *on the same day* Defendant violated California Government Code section 11135.  The plaintiff has the burden of proving these claims.
>
> The Defendant denies those claims.

ECF No. 165 (emphasis added).  And Final Instruction No. 9 told the jury in relevant part:

1<br>2<br>3<br>4<br>5<br>6

> The Court has admitted evidence concerning measures the Defendant's Clerk Recorder's Office has taken after March 29, 2019, such as implementing new software, a dedicated kiosk for individuals with disabilities to use that software, online FBNS forms, newer versions of FBNS forms, and new business practices. *This evidence is irrelevant to* whether Defendant violated the Americans with Disabilities Act, the California Disabled Persons Act, or California Government Code section 11135 *on March 29, 2019.* You must not consider this evidence in determining whether Defendant is liable on any of Plaintiff's claims. The Court has admitted this evidence for the limited purpose of determining whether an injunction should issue.

7  *Id.* (emphasis added).

8    During the jury's deliberations, the jury submitted a jury question, asking whether "ADA

9  experience appl[ies] to online services[.]"  ECF No. 170 at 1 (Jury Note No. 1).  In its answer, the

10  Court stated that Plaintiff "alleges that Defendant County of Alameda violated the Americans with

11  Disabilities Act with regard to her attempt to file the FBNS form *in-person on March 29, 2019.*"

12  ECF No. 173 (emphasis added).  Plaintiff visited the CRO and was denied transcriber services on

13  March 29, 2019; she downloaded and completed the PDF FBNS form prior to that date.  Thus, the

14  jury's finding that Defendant violated the ADA on March 29, 2019 could not have concerned the

15  PDF form Plaintiff had attempted to complete at home on an earlier date.

16    Plaintiff's pretrial filings made clear that the alleged violation was limited to her March 29

17  visit to the CRO.  *See* ECF Nos. 108 at 1 (Question 1 of Pl.'s Proposed Jury Verdict Form, asking

18  whether Ms. Martinez proved that the County "violated Title II of the ADA by failing to provide

19  an auxiliary aid or service she required to file her FBNS form on March 29, 2019 at the Oakland

20  facility?"); 106 at 7 (Plaintiff's Proposed Instruction No. 3, stating that to prevail on her ADA

21  claim, Plaintiff "must show that: . . . On March 29, 2019, the County failed to provide Ms.

22  Martinez[] with a requested auxiliary aid or service; and . . . Ms. Martinez did not receive an

23  auxiliary aid or service that was necessary to afford [her] an equal opportunity on March 29, 2019

24  to participate in, and enjoy the benefits of, filing completed forms at the CRO or being advised by

25  the CRO of forms' technical deficiencies"), *id.* at 19 (Plaintiff's Proposed Instruction No. 10,

26  stating Plaintiff "seeks damages only for Defendant's actions associated with her March 29, 2019

27  visit to the CRO" and explaining that "the primary claim involves a discrete decision in March

28  2019.").  After the Court filed its proposed verdict form, neither party objected to Question 1,

United States District Court<br>Northern District of California

33

1   which asked the Court to consider only whether the County violated Ms. Martinez's rights under

2   the ADA on March 29, 2019.  *See* ECF Nos. 123 at 2 (Court's Proposed Verdict Form); 132 (Joint

3   Objections to the Court's Proposed Verdict Form).  Question 1 of the Court's Proposed Verdict

4   Form remained unchanged at trial.  *See* Verdict Form at 2.

5       Ms. Martinez could well have asserted claims that began with the difficulties she

6   encountered in completing the PDF FBNS form and culminated in her March 29, 2019 visit to the

7   CRO.  But those were not the claims Plaintiff asserted in her amended complaint, nor were they

8   the claims presented to the jury.  Plaintiff alleged that she was unable to sign the form she had

9   downloaded and had to request assistance from a sighted person.  Amended Compl. ¶¶ 14–15,

10  ECF No. 84.  However, Plaintiff's claims were limited to Defendant's alleged failure to give

11  primary consideration to the auxiliary aid or service Ms. Martinez had requested – assistance

12  completing paperwork.  *See* Amended Compl. ¶¶ 44–52.  Plaintiff did not claim that Defendant

13  violated the ADA by maintaining inaccessible PDF forms.  Because the jury found Plaintiff

14  violated the ADA on March 29, 2019 alone, its answer to Question 1 of the Verdict Form cannot

15  be a finding that Defendant violated the ADA by having PDF FBNS forms that Ms. Martinez was

16  not able to complete independently.

17      **2.      Factors for Permanent Injunctive Relief**

18          **a.      Plaintiff Has Demonstrated That She Has Suffered an Irreparable Injury**

19

20      "An irreparable harm is one that cannot be redressed by a legal or equitable remedy

21  following trial."  *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D.

22  Cal. 2004) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)).

23      Plaintiff contends the jury's finding that a violation of the ADA has occurred requires the

24  Court to find irreparable harm.  Mot. at 9–10.  Defendant argues the Supreme Court's holding in

25  *Winter* has supplanted any such presumption.  Opp'n at 6–7, 6 n.3.  The Ninth Circuit has not fully

26  resolved the question of whether a finding of a civil rights violation creates a presumption of

27  irreparable harm.  *Compare Southwest Fair Hous. Council v. WG Scottsdale LLC*, No. 19-cv-

28  00180-TUC-RM, 2022 WL 3923526, at *2 (D. Ariz. Aug. 31, 2022) (declining to apply *eBay*

United States District Court
Northern District of California

United States District Court
Northern District of California

factors following jury verdict for plaintiff in FHA case because FHA specifically provides for injunctive relief), *aff'd*, No. 22-16345, 2023 WL 6820681 (9th Cir. Oct. 17, 2023), *with Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 963 (N.D. Cal. 2013) (considering motion for preliminary injunction and rejecting notion that a violation of the ADA creates a presumption of irreparable harm).  Regardless of whether such a presumption exists, *Winter* precludes the Court from dispensing with the irreparable harm requirement altogether.  *See Winter*, 555 U.S. at 22, 32 (confirming irreparable injury requirement for preliminary injunctive relief and explaining that *Winter* factors apply to both preliminary and permanent injunctive relief).  *See also Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, No. 09-cv-5191-CRB, 2010 WL 475361, at *6 (N.D. Cal. Feb. 4, 2010) ("[t]o the extent prior Ninth Circuit case law concluded that irreparable harm need not be shown in certain statutory contexts, that case law is in conflict with *Winter*"), *aff'd*, 630 F.3d 1153 (9th Cir. 2011).

The Court finds Plaintiff has demonstrated that she has suffered an irreparable injury regardless of whether such a presumption exists.  Plaintiff must return to the CRO every five years to renew her FBNS form to maintain her coaching business.  The jury found the County violated the ADA when its CRO failed to provide transcriber services to Plaintiff.  Although Defendant makes much of the fact that Ms. Greco and Mr. Elder received transcriber services when they visited the CRO to complete an FBNS form (*see* Opp'n at 12–13), the provision of such services by CRO employees is discretionary at best.  To this day, the CRO maintains a general policy that employees cannot write on forms, blank or otherwise.  The same CRO employees who denied Ms. Martinez transcriber services in March 2019 still would not complete a blank FBNS form for her today.  Meanwhile, the alternatives to transcription the CRO currently provides fail to ensure effective communication and an equal opportunity to enjoy the benefits of the CRO's services.  *See* 28 C.F.R. § 35.160(b).  The CRO's PDF FBNS forms contain numerous barriers to usability for blind individuals using screen reading software; a typical JAWS user would not be able to complete and submit the online FBNS form independently using the JAWS-equipped kiosk, even if the CRO's keyboard were familiar to the user; and it would take at least twice as long for a blind and sighted person working together to fill out the FBNS web form using JAWS and a mouse as it

1  would for a CRO clerk to provide transcriber services.

2      In the absence of a permanent injunction, Ms. Martinez thus faces the prospect of returning

3  to the CRO and again being denied the auxiliary aids and services the jury found necessary to

4  afford her an equal opportunity to enjoy the benefits of the CRO's services.  *See Antoninetti v.*

5  *Chipotle Mexican Grill Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010) (holding plaintiff demonstrated

6  irreparable injury where defendant restaurant chain violated ADA guideline regarding counter

7  height, policies did not ameliorate violation, and prior stipulation indicated that plaintiff planned

8  to visit restaurant in the future).

9      Accordingly, the Court finds Plaintiff has demonstrated irreparable harm.

### b.    Plaintiff Has Demonstrated that Remedies Available at Law Are Inadequate to Compensate for Her Injury

12     Defendant contends that Plaintiff's request for injunctive relief is moot, arguing that the

13  testimony of Ms. Greco and Mr. Clark "confirm[s] that the CRO will satisfactorily accommodate

14  persons with vision disabilities seeking to complete and file an FBNS in the CRO."  Opp'n at 17–

15  18.  However, "[v]oluntary cessation of illegal conduct does not render a challenge to that conduct

16  moot unless '(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim

17  relief or events have completely and irrevocably eradicated the effects of the alleged violation."

18  *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (quoting *Barnes v.*

19  *Healy*, 980 F.2d 572, 580 (9th Cir. 1992)).  A defendant has a "'heavy burden' to show 'that the

20  challenged conduct cannot reasonably be expected to start up again.'"  *Hernandez v. County of*

21  *Monterey*, 110 F. Supp. 3d 929, 955 (N.D. Cal. 2015) (quoting *Friends of the Earth, Inc. v.*

22  *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)).

23     The Court is unpersuaded that the violation of the ADA the jury found has ceased, let

24  alone that it will not be repeated.  The alternatives to transcription the CRO provides fall

25  dramatically short of ensuring effective communication.  Meanwhile, neither party has provided

26  any evidence that the County would ever *require* a CRO employee to provide transcriber services

27  to assist a blind customer in filling out a blank FBNS form or any other form.  Nor is it clear that

28  CRO employees will consistently assist blind customers by providing transcriber services as a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    matter of practice.  The CRO clerk and clerk recorder supervisor with whom Ms. Martinez

2    interacted in March 2019 indicated they do *not* believe they have discretion to act as a transcriber

3    to help a blind or visually impaired patron complete a blank FBNS form, nor did they have any

4    recollection of the CRO ever providing such services in the 44 years they have collectively

5    worked at the CRO.  The fact that there are some circumstances under which at least some CRO

6    employees will act as a transcriber to assist a blind customer in filling out a FBNS form does not

7    obviate the reasonable expectation that the ADA violation Ms. Martinez experienced will reoccur.

8    *See Cupolo*, 5 F. Supp. 2d at 1084 (finding transit system's new policies and procedures did not

9    moot plaintiffs' request for injunctive relief due to a reasonable expectation that the harm would

10   repeat).  Plaintiff's claims for injunctive relief thus remain live.

11          Defendant further contends that Plaintiff's legal remedy is adequate because the jury

12   awarded Plaintiff $30,500 in damages for her ADA and DPA claims.  Opp'n at 14–15.  However,

13   that argument is illogical because an award of monetary damages does not ensure that Ms.

14   Martinez will not face an identical ADA violation in the future; only an injunction can do that.

15   Further, a remedy of monetary damages is inadequate to compensate for a violation of civil rights.

16   *See City of Riverside v. Rivera*, 477 U.S. 561, 562 (1986) (noting "a civil rights plaintiff seeks to

17   vindicate important civil and constitutional rights that cannot be valued solely in monetary

18   terms.").  Moreover, Plaintiff was required to prove intentional discrimination by Defendant to

19   recover monetary damages for her ADA claim.  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138

20   (9th Cir. 2001) (establishing deliberate indifference standard for intentional discrimination under

21   the ADA).  It would be paradoxical for a jury's finding of intentional discrimination to foreclose

22   the possibility of permanent injunctive relief simply because that finding authorized an award of

23   damages.  *See also Cassidy v. Indiana Dep't of Corr.*, 59 F. Supp. 2d 787, 793 (S.D. Ind. 1999)

24   (noting "'the full spectrum of legal and equitable remedies' are available [under the ADA], at least

25   when the plaintiff proves an intentional violation.") (quoting *Gorman v. Bartch,* 152 F.3d 907, 908

26   (8th Cir. 1998)), *aff'd*, 199 F.3d 374 (7th Cir. 2000).  Here, the jury found that Defendant had

27   violated the ADA, which authorizes both legal and equitable remedies.  The Court finds the

28   evidence presented at trial indicates that Ms. Martinez is likely to face that same violation when

United States District Court
Northern District of California

1  she returns to the CRO to renew her FBNS form.  Accordingly, the Court finds Plaintiff is likely

2  to suffer an irreparable injury that cannot be redressed by monetary damages.

### c.  A Remedy in Equity Is Warranted Considering the Balance of Hardships Between the Plaintiff and Defendant

5  The balance of hardships tips sharply in Plaintiff's favor.  When analyzing this element,

6  courts "must balance the competing claims of injury and must consider the effect on each party of

7  the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24; *see also Int'l Jensen,*

8  *Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).  In assessing whether a plaintiff

9  establishes a balance of equities that tips in their favor, "the district court has a 'duty . . . to

10  balance the interests of all parties and weigh the damage to each.'"  *Stormans, Inc. v. Selecky*, 586

11  F.3d 1109, 1138 (9th Cir. 2009) (alteration in original) (citation omitted).

12  Defendant argues Plaintiff cannot show she would suffer any hardship if an injunction does

13  not issue.  Defendant contends there is no evidence presented at trial that the violation the jury

14  found will ever occur again.  Opp'n at 12, 14.  But the evidence presented at trial indicates that the

15  County's compliance with the ADA is discretionary at best.  The CRO's JAWS-equipped kiosk,

16  web and PDF forms each fall dramatically short of ensuring effective communication.  Although

17  Defendant claims an injunction is unnecessary because at least one other blind customer received

18  transcriber services to complete a blank FBNS form, Defendant provided no evidence indicating

19  that CRO employees are always or even usually willing provide transcriber services to blind or

20  visually impaired customers.  Meanwhile, Ms. Martinez will need to return to the CRO every five

21  years to renew her FBNS.  Absent an injunction, Ms. Martinez will continue to suffer the risk that

22  when she returns to the CRO, she will face the same violation she experienced on March 29, 2019.

23  An injunction requiring Defendant to comply with the ADA would impose a minimal

24  burden on Defendant.  Defendant claims it already provides transcriber services.  Opp'n at 8

25  (claiming "CRO clerks will complete a blank, unsigned FBNS for a sight-impaired individual who

26  requests such assistance as an auxiliary aid or service.").  *See Cupolo*, 5 F. Supp. 2d at 1085

27  ("Plaintiffs' proposed injunction largely requires BART to do what it says it is already planning to

28  do.  Given BART's past neglect of elevator maintenance, an injunction is an appropriate

mechanism to ensure that competing priorities do not continue to overwhelm BART's obligation to comply with the ADA."). The imposition of an affirmative requirement for the CRO to provide transcriber services to assist with the completion of forms for blind and visually impaired CRO customers would pose a minimal burden on the County. Such a requirement would impose little to no financial burden on the County, and the evidence produced at trial indicates both that it would take just minutes for a CRO clerk to transcribe and verify an FBNS form for a blind customer and that several government agencies at multiple levels of government consistently provide transcriber services to blind patrons.

Defendant's reliance on *Rizzo v. Goode*, 423 U.S. 362 (1976), for its contention that principles of federalism weigh against granting injunctive relief, is misplaced. The Court in *Rizzo* held that the district court departed from applicable principles of federalism by "inject[ing] itself . . . into the [department's] internal disciplinary affairs" when it granted an injunction ordering a police department to impose a comprehensive program for addressing police misconduct allegations. *Id.* at 380. Here, an injunction would impose no such burden on the County. Plaintiff does not seek any injunctive relief that would limit the CRO's ability to manage its own internal affairs. Rather, Plaintiff asks the Court for an order requiring the CRO to assist blind and visually impaired customers in receiving a service that the County created the CRO to provide.

Accordingly, the Court finds that a remedy in equity is warranted considering the balance of hardships between the Plaintiff and Defendant.

### d. The Public Interest Would Not Be Disserved by a Permanent Injunction

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "[T]he public has an interest in ensuring the eradication of discrimination on the basis of disabilities." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011). Moreover "[t]his public interest is served by requiring entities to take steps to 'assure equality of opportunity' for people with disabilities." *Id.* (quoting 42 U.S.C. § 12101(a)[(7)]).

39

United States District Court
Northern District of California

1    Here, the public clearly has an interest in ensuring that the County's compliance with the

2    ADA is mandatory, rather than merely discretionary.  Defendant's argument that an injunction

3    would run counter to the public interest by unduly "interven[ing] in the activities of the County,"

4    Opp'n at 16, is unavailing.  A permanent injunction requiring Defendant to comply with the ADA

5    would not intrude into the core activities of Alameda County.  Rather, a permanent injunction

6    "assure[s] equality of opportunity" for blind and visually impaired residents by allowing them to

7    obtain the same timely services to file forms at their county clerk-recorder's office that their

8    sighted neighbors and colleagues already enjoy.  *See Enyart*, 630 F.3d at 1167.

9    Accordingly, the Court finds the public interest would be served by a permanent

10   injunction.

11   **D.    Scope of Injunction**

12   Federal Rule of Civil Procedure 65(d) requires any order granting an injunction to

13   "describe in reasonable detail – and not by referring to the complaint or other document – the act

14   or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(c).  In deciding the scope of an injunction,

15   a federal court must limit the remedy "to the inadequacy that produced the injury in fact that the

16   plaintiff has established."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citing *Missouri v. Jenkins*,

17   515 U.S. 70, 88 (1995)).

18   Plaintiff asks the Court to order Defendant to 1) "provide transcriber services as auxiliary

19   aids or services to write on blank paper forms when a blind individual requests assistance with

20   correcting or filling out a paper form handled by the CRO," 2) make its online PDF forms

21   independently accessible to blind individuals using screen readers, 3) remediate its online FBNS

22   Web Access form for use with screen readers, and 4) provide appropriate training on auxiliary aids

23   and effective communication under federal law and regulations.  Mot. at 21–24.

24   **1.    Beneficiaries of the Injunction**

25   As a preliminary matter, an individual with a disability has standing to request injunctive

26   relief for the benefit of all similarly situated individuals.  *See Fortyune v. American Multi-Cinema,*

27   *Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (affirming permanent injunction requiring movie theater

28   chain to modify policies to give companions of wheelchair users priority to use companion seats

1  following grant of summary judgment to individual patron.).

2          **2.      Relief Ordered**

3          To ensure compliance with Title II of the ADA, public entities must "take appropriate

4  steps to ensure that communications with" disabled persons "are as effective as communications

5  with others." 28 C.F.R. § 35.160(a). These steps include "furnish[ing] appropriate auxiliary aids

6  and services" "necessary to ensure effective communication[.]" 28 C.F.R. §§ 35.160(b)(1), (2).

7  The auxiliary aids and services the CRO currently offers blind patrons do not satisfy this standard.

8  Each of the auxiliary aids Defendant provides as a matter of policy fails to ensure effective

9  communication for blind and visually impaired CRO customers, and ultimately fails to afford such

10  customers an equal opportunity to enjoy the benefits of the CRO. *See* 28 C.F.R. § 35.160(b)(1).

11  The CRO's JAWS-equipped kiosk, online and PDF forms fall dramatically short of ensuring

12  effective communication. Defendant's suggestion that the CRO's file-by-mail service – which

13  involves a print form, print mail, and the inclusion of a paper check or money order – provides

14  another option for blind patrons does not merit serious consideration. *See* Opp'n at 8, 11. Blind

15  customers obviously cannot read a printed form; the JAWS-equipped kiosk and online and PDF

16  forms, bad as they are, at least acknowledged that reality. Although the County now maintains it

17  provides transcriber services, the provision of such services for blind and visually impaired

18  customers is discretionary at best, if not merely a service some CRO clerks provide in spite of the

19  "general policy" forbidding the practice.

20          Defendant proposes that if the Court enters an injunction, it should be limited to ordering

21  the County to continue maintaining its JAWS-equipped kiosk and providing human assistance to

22  blind and visually impaired patrons who seek to use the kiosk to complete an FBNS in the CRO.

23  Opp'n at 2. The Court disagrees. Not only does the JAWS-equipped kiosk fail to ensure effective

24  communication, but Defendant's proposed injunction dispenses with the ADA's primary

25  consideration requirement by requiring blind patrons who wish to complete a form in the CRO to

26  use the JAWS-equipped kiosk in the first instance. *See* 28 C.F.R. § 35.160(b)(2) (requiring a

27  public entity to "give primary consideration to the requests of individuals with disabilities" "[i]n

28  determining what types of auxiliary aids and services are necessary").

41

### a.    Provision of Transcriber Services

The evidence at trial establishes that transcriber services constitute an auxiliary aid or service that would ensure effective communication with blind patrons.  Ms. Greco's testimony and Mr. Clark's testimony establish that transcriber services for blind patrons, at least for a relatively short form such as an FBNS form, are effective, efficient, and not burdensome for the CRO.  The Court will therefore require transcriber services in the permanent injunction.  The Court will not limit the required transcriber services to solely filling out a blank paper form.  Ms. Martinez's and Mr. Clark's testimony made clear that transcriber services are also needed to ensure that information is correctly entered into the CRO's computer system.[17]

At trial and at the hearing on this motion, Defendant maintained that Plaintiff only asked for CRO employees to fix the form she had already completed and signed, rather than specifically asking for transcriber services on a blank form.  A blind patron cannot be expected to know that there are blank paper forms in the office and to specifically ask for one.  Requests such as the one Ms. Martinez made should thus be understood as a request for transcriber services.  Defendant cannot require patrons to invoke magic words to receive such services.  *See, e.g.*, *Boston Hous. Auth. v. Bridgewaters*, 452 Mass. 833, 847–48 (2009) (in Fair Housing Amendments Act context, holding no magic words are required for a disabled tenant to request a reasonable accommodation, but that they must "make the request in a manner that a reasonable person could understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability"); *Brooker v. Altoona Hous. Auth.*, No. 3:11-CV-95, 2013 WL 2896814, at *10 (W.D. Pa. June 12, 2013) ("An individual seeking reasonable accommodations for a disability need not use 'magic' words.").

---

[17] On summary judgment, the Court was unable to "issue an order that is specific to scribe services" because the relevant provision of the ADA "is written at a high level of generality, and the Court does not see how it can determine *as a matter of law* that one very specific form of accommodation is or is not required."  ECF No. 83 (emphasis added).  The Court noted that the type of auxiliary aids required to be provided involves a fact intensive inquiry "often ill-suited for summary judgment."  *Id.* (quoting *Brown v. Department of Public Safety and Correctional Services*, 383 F. Supp. 3d 519, 557 (D. Md. 2019)).  With the full record presented at trial, including evidence that Defendant's auxiliary aids and services other than transcriber services come nowhere close to satisfying the ADA, the Court now has an appropriate factual record to make this determination.

United States District Court
Northern District of California

1    Defendant contends any injunction must be limited to addressing the FBNS form alone, as

2 it is the only form at issue in this matter.  Opp'n at 20–21.  Under Title II's implementing

3 regulations, a public entity is not required "to take any action that it can demonstrate would result

4 in a fundamental alteration in the nature of a service, program, or activity or in undue financial and

5 administrative burdens."  28 C.F.R. § 35.164.  The public entity bears the burden of proving that

6 compliance would result in a fundamental alteration or undue burden.  *Id.*  Defendant contends

7 that although the County did not assert an undue burden or fundamental alteration defense relative

8 to the FBNS form, it would do so if Plaintiff were to demand that the CRO provide transcriber

9 services for lengthier and more complicated documents.  Opp'n at 21.  In response, Plaintiff asks

10 the Court to order the CRO to provide human transcribers, except for forms for which Defendant

11 can document an undue burden or fundamental alteration.  Reply at 14.  Plaintiff notes that most

12 of the forms listed on the CRO's website, such as marriage, birth and death certificates, resemble

13 an FBNS form.  *Id.*  The Court finds Plaintiff's suggestion reasonable.  Although Ms. Martinez's

14 claims stem from her attempt to file an FBNS form in 2019, there is nothing unique about the

15 FBNS form, as opposed to other legal forms of potentially similar length and complexity, upon

16 which the jury's verdict was based.  The CRO's general policy bars clerks from writing on all

17 forms, blind patrons would be equally unable to fill out any print form, and the shortcomings of

18 the auxiliary aids and services the CRO provides also apply equally to all forms.  Accordingly, to

19 the extent Defendant complies with the ADA by providing transcriber services on blank CRO

20 forms, it shall do so for all forms except those for which Defendant can document a fundamental

21 alteration or undue burden.

22    The Court adds two caveats.  One of Defendant's arguments at trial was that altering an

23 already-completed and signed form violates California Government Code section 27203(d), which

24 states that "[a]ny recorder to whom an instrument proved or acknowledged according to law or

25 any paper or notice which may by law be recorded is delivered for record is liable to the party

26 aggrieved for the amount of the damages occasioned thereby, if he or she . . . [a]lters, changes,

27 obliterates, or inserts any new matter in any records deposited in the recorder's office, unless the

28 recorder is correcting an indexing error.  The recorder may make marginal notations on records as

43

1    part of the recording process."  The Court declines to reach the merits of that argument.  The

2    evidence at trial shows that providing transcriber services for a blank form (Ms. Greco) or a

3    completed but unsigned form (Mr. Elder) is sufficient to provide effective communication under

4    the ADA.  The Court will therefore not require the CRO to make alterations or corrections to an

5    already-signed form.

6          Second, the Court's permanent injunction is based on the evidence presented at trial.

7    Technology continues to change over time, and in the future there may well be other auxiliary aids

8    or services, aside from transcriber services, that the County could provide to satisfy its obligations

9    under Title II of the ADA.  However, none of the other auxiliary aids or services Defendant

10   currently offers satisfies this standard.  The evidence at trial is that transcriber services are the only

11   effective auxiliary aid or service that the CRO has ever offered for blind patrons.  Accordingly,

12   barring a prospective shift in technology, CRO employees, including clerks and clerk recorder

13   supervisors who provide frontline assistance to customers, must fill out blank forms and provide

14   other transcriber services for blind and visually impaired patrons.  Pursuant to Federal Rule of

15   Civil Procedure 60(b), if Defendant implements new technology that satisfies the ADA and

16   renders a continued injunction to provide transcriber services inequitable or otherwise

17   inappropriate, Defendant may move for relief from the Court's permanent injunction.

18                   **b.**        **Remediation of PDF and Web Access Forms**

19         Plaintiff seeks an injunction mandating that Defendant remediate the tagging of its online

20   PDF forms and FBNS Web Access form to be accessible to the public for use at home and

21   elsewhere.  Mot. at 21–22.  This would require Defendants to "tag" the forms so they could be

22   read with screen readers.  *Id.*  However, as discussed above, the jury's finding that Defendant

23   violated Plaintiff's rights under the ADA was limited to Plaintiff's in-person denial of transcriber

24   services on March 29, 2019.  Because the jury did not find that PDF or Web Access forms

25   violated the ADA, the Court denies Plaintiff's request to order Defendant to modify PDF forms on

26   the CRO's website.  The Court's permanent injunction is limited to remedying the legal violation

27   Plaintiff proved at trial.

28

United States District Court
Northern District of California

### c.    Training on Auxiliary Aids and Effective Communication

Plaintiff asks this Court to order Defendant to provide appropriate training on auxiliary aids and effective communication under federal law and regulations.  Mot. at 23–24.  Plaintiff argues that mandating staff training as part of the injunction will compel the CRO to "comply with the ADA moving forward, avoid repeating past violations, and cease the arbitrary delivery of ADA-mandated assistance."  Mot. at 23.  The County asserts that it provides extensive training to its staff, who "generally understand their obligations under the ADA, the concept of effective communications, and the corresponding use of auxiliary aids and services."  Opp'n at 9.  Defendant also noted that the CRO employees have access to an ADA coordinator, who can guide them on ADA compliance.  *Id.*  Plaintiff contends the County's training is insufficient because it allows staff to exercise discretion when accommodating individuals with disabilities.  Reply at 15.

In crafting injunctive relief to remedy violations of the ADA, courts in this circuit have ordered training to help effectuate other aspects of an injunction where a defendant's failure to provide adequate training itself violated the ADA.  *See Huezo v. Los Angeles Cmty. Coll. Dist.*, 672 F. Supp. 2d 1045, 1058, 1063 (C.D. Cal. 2008) (granting permanent injunction requiring defendant school district to "train . . . facility staff, teachers, and . . . counselors in the use and placement of accessible desks and equipment" where district's "programmatic response to" pervasive inaccessibility and failure to define responsibilities vis-à-vis disabled students violated 28 C.F.R. § 35.150(a) (requiring public entities to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.")).

There is some evidence that the CRO failed to clearly define the responsibilities of its employees toward patrons with disabilities.  Defendant offered no evidence that CRO clerks are trained on assisting blind patrons with using the JAWS-equipped kiosk, and Mr. Yankee's testimony that CRO clerks have discretion to transcribe on blank forms is certainly at odds with the testimony of his subordinates.  At trial, CRO employees also appeared to have limited familiarity with Title II's auxiliary aids and services requirements.  However, the CRO's ongoing failure to ensure effective communication is not grounded in its failure to train CRO staff.  More

fundamentally, the CRO currently maintains a general policy against allowing CRO staff to write on forms, regardless of whether a patron is blind or visually impaired.  It is this policy, rather than CRO training practices, that violates the ADA.  While the CRO will need to communicate changes in policy to CRO staff to ensure compliance with Title II of the ADA, CRO clerks do not necessarily have to be instructed on auxiliary aids and effective communication to put those changes into effect.  Accordingly, the Court denies Plaintiff's request for Defendant to provide staff training on auxiliary aids and services.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for a permanent injunction.  The Court hereby enters a **PERMANENT INJUNCTION ORDERING** Defendant Alameda County's Clerk-Recorder's Office to provide transcriber services to any blind or visually impaired individual who requests assistance with a CRO form, unless Defendant can document a fundamental alteration or undue burden with respect to a particular form.  This injunction does not require the CRO to make alterations or corrections to an already-signed form.

**IT IS SO ORDERED.**

Dated: January 17, 2025

THOMAS S. HIXSON
United States Magistrate Judge