Kevin E. Gilbert, Esq. (SBN: 209236)
kgilbert@ohhlegal.com
Nicholas D. Fine, Esq. (SBN: 285017)
nfine@ohhlegal.com
**ORBACH HUFF & HENDERSON LLP**
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone:     (510) 999-7908
Facsimile:      (510) 999-7918

Attorneys for Defendant
COUNTY OF ALAMEDA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LISAMARIA MARTINEZ,<br><br>              Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA,<br><br>              Defendant. | Case No.  20-cv-06570-TSH<br><br>**DEFENDANT COUNTY OF ALAMEDA'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL**<br><br>DATE:      March 27, 2025<br>TIME:      10:00 a.m.<br>DEPT:     Courtroom E, 15th Floor<br>JUDGE:   Magistrate Thomas S. Hixson |

ORBACH HUFF & HENDERSON LLP

**TABLE OF CONTENTS**

**Page(s)**

I.  NOTICE OF MOTION ................................................................................................ 1

II.  INTRODUCTION .................................................................................................... 1

III.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................. 3

IV.  LEGAL STANDARD ............................................................................................... 3

V.  THE COUNTY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ............... 4

    A.  There Was Effective Communication Between the CRO and Plaintiff .................... 4

    B.  The CRO Nevertheless Provided Plaintiff with a Reasonable Auxiliary Aid/Service ................ 7

    C.  Plaintiff Did Not Establish Deliberate Indifference .......................................... 9

    D.  Plaintiff Is Not Entitled to Monetary Damages Under the DPA .......................... 11

    E.  Plaintiff Did Not Establish the "State Funding" Element of Her Claim Under Government Code Section 11135 .................................................................. 15

VI.  ALTERNATIVELY, THE COUNTY IS ENTITLED TO A NEW TRIAL ................... 17

    A.  The Verdict Was Contrary to the Clear Weight of the Evidence ......................... 17

    B.  The Court Improperly Responded to the Jury's Sole Question, Which Misled the Jury Regarding the Nature of Plaintiff's Claims .......................................... 18

    C.  The Jury Instructions Were Insufficient and Stripped the County of a Fair Trial ........... 21

        1.  The Court Improperly Instructed the Jury Regarding the Program, Service, or Activity at Issue ............................................................................ 21

        2.  The Court Improperly Instructed the Jury Regarding Deliberate Indifference ............. 23

    D.  The Court Erred in Granting Permanent Injunctive Relief ................................. 23

VII.  CONCLUSION ...................................................................................................... 25

ORBACH HUFF & HENDERSON LLP

Defendant's Renewed Motion for Judgment as a Matter of Law or in the alternative, New Trial [20-cv-06570-TSH]

1

**TABLE OF AUTHORITIES**

2
                                                                                        **Page(s)**

3    <u>**Federal Cases**</u>

4

5    *Anderson v. Liberty Lobby, Inc.*,
         477 U.S. 242 (1986).......................................................................................................3, 4

6
     *Armstrong v. Schwarzenegger*,
7        622 F.3d 1058 (9th Cir. 2010) ...........................................................................................5

8    *Bateman v. Mnemonics, Inc.*,
         79 F.3d 1532 (11th Cir. 1996) .........................................................................................21

9
     *Bax v. Doctors Medical Center of Modesto, Inc.*,
10       52 F.4th 858 (9th Cir. 2022)...............................................................................................5

11   *Bax v. Doctors Medical Center of Modesto, Inc.*,
         2021 WL 3733113 (E.D. Cal. Aug. 24, 2021)...................................................................5

12
     *Bollenbach v. U.S.*,
13       326 U.S. 607 (1946) .........................................................................................................19

14   *Brady v. Southern R. Co.*,
         320 U.S. 476 (1943) ...........................................................................................................4

15
     *Bryan Cnty. v. Brown*,
16       520 U.S. 397, (1997) ...................................................................................................10, 23

17
     *City of Rialto v. U.S. Dep't of Def., et al.*,
18       2005 WL 5519062 (C.D. Cal. Aug. 16, 2005)................................................................14

19   *Cropp v. Larimer Cnty., Colorado*,
         793 F.App'x 771 (10th Cir. 2019).................................................................................5, 24
20
     *Dunlap v. Liberty Nat. Prod., Inc.*,
21       878 F.3d 794 (9th Cir. 2017) ..............................................................................................4

22   *Dunn v. City of Los Angeles*,
         No. 15-0413, 2017 WL 7726710 (C.D. Cal. Apr. 26, 2017) ...........................................12
23
     *Dupree v. Younger*,
24       598 U.S. 729 (2023)............................................................................................................3

25   *Duvall v. County of Kitsap*,
         260 F.3d 1124 (9th Cir. 2001) ..................................................................................9, 10, 23
26
     *Escriba v. Foster Poultry Farms, Inc.*,
27       743 F.3d 1236 (9th Cir. 2014) ............................................................................................4

28

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

1

## TABLE OF AUTHORITIES

2

Page(s)

3

*Experience Hendrix L.L.C. v. Hendrixlicensing.com LTD,*
    762 F.3d 829 (9th Cir. 2014) ........................................................................... 4

4

5

*Folkerts v. City of Waverly, Iowa,*
    707 F.3d 975 (8th Cir.2013) ........................................................................... 5

6

*Golden Gate Transactional Indep. Serv., Inc. v. Cal.,*
    2019 WL 1718691 (C.D. Cal. Jan. 22, 2019) ............................................... 23

7

8

*Hardie v. Nat'l Collegiate Athletic Ass'n.,*
    97 F.Supp.3d 1163 (S.D. Cal. 2015) ............................................................... 5

9

10

*Kirola v. City and County of San Francisco,*
    74 F.Supp.3d 1187 (N.D. Cal. 2014) ............................................................. 16

11

*Kirola v. City and County of San Francisco,*
    860 F.3d 1164 (9th Cir. 2017) ....................................................................... 16

12

13

*L.W. v. Grubbs,*
    92 F.3d 894 (9th Cir. 1996) .................................................................... 10, 23

14

15

*Lonberg v. City of Riverside,*
    300 F.Supp.2d 942 (C.D. Cal. 2004) ...................................................... 11, 14

16

*Mark H. v. Lemahieu,*
    513 F.3d 922 (9th Cir. 2008) ...................................................................... 9, 23

17

18

*Masson v. New Yorker Magazine, Inc.,*
    85 F.3d 1394 (9th Cir. 1996) ......................................................................... 21

19

*Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon,*
    254 F.3d 846 (9th Cir. 2001) ......................................................................... 23

20

21

*Molski v. M.J. Cable, Inc.,*
    481 F.3d 724 (9th Cir. 2007) .................................................................... 4, 17

22

23

*Montgomery Ward & Co. v. Duncan,*
    311 U.S. 243 (1940) .................................................................................. 4, 17

24

25

*Murphy v. City of Long Beach,*
    914 F.2d 183 (9th Cir. 1990) ........................................................................... 4

26

*Passantino v. Johnson & Johnson Consumer Prods.,*
    212 F.3d 493 ................................................................................................. 17

27

28

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

*Payan v. Los Angeles Cnty. Coll. Dist.*,
4   2019 WL 9047062 (C.D. Cal. Apr. 23, 2019) ............................................................ 4

5   *Poway Unified Sch. Dist. v. K.C. ex rel. Cheng*,
    2014 WL 129086 (S.D. Cal. Jan. 14, 2014) ............................................................ 5
6

7   *San Francisco Taxi Coalition v. City and County of San Francisco*,
    979 F.3d 1220 (9th Cir. 2020) .................................................................................. 16

8   *Sarfaty v. City of Los Angeles*,
9   765 F.App'x 280 (9th Cir. 2019) .............................................................................. 12

10  *Sarfaty v. City of Los Angeles*,
    2017 WL 6551234 (C.D. Cal. 2017) ........................................................................ 12
11

12  *Silva v. Baptist Health South Florida, Inc.*,
    856 F.3d 824 (11th Cir. 2017) ............................................................................... 6, 7

13  *Thorsted v. Kelly*,
    858 F.2d 571 (9th Cir. 1988) ............................................................................... 21, 23
14

15  *U.S. v. Warren*,
    25 F.3d 890 (9th Cir. 1994) ...................................................................................... 19
16

17  *United States v. Beltran-Rios*,
    878 F.2d 1208 (9th Cir. 1989) .................................................................................. 21

18  *United States v. Delgado-Martinez*,
19  11 F.App'x 965 (9th Cir. 2001) ................................................................................ 19

20  *Updike v. Multnomah Cnty.*,
    870 F.3d 939 (9th Cir. 2017) ............................................................................ *passim*
21

22  *Where Do We Go Berkeley v. Cal. Dep't of Transportation*,
    32 F.4th 852 (9th Cir. 2022) ................................................................................. 7, 22

23  **State Cases**

24  *Brennon B. v. Sup. Ct.*,
    57 Cal.App.5th 367 (2020) ....................................................................................... 12
25

26  *Carter v. City of Los Angeles*,
    224 Cal.App.4th 808 (2014) ..................................................................................... 12

27  *Eastburn v. Reg'l Fire Prot, Auth.*,
28  31 Cal.4th 1175 (2003) ............................................................................................. 14

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

# TABLE OF AUTHORITIES

**Page(s)**

*People for the Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Bd.*,
  125 Cal.App.4th 871 (2005) ............................................................................................. 13

*Wells v. One2One Learning Foundation*,
  39 Cal.4th 1164 (2006) ............................................................................................ 12, 13

**Federal Statutes**

42 U.S.C. section:
  12132 ........................................................................................................... 1, 7, 21, 22

**State Statutes**

Civil Code section:
  14 ................................................................................................................. 13, 14, 15
  54-55.3 ................................................................................................................. 1, 3
  54.3 ............................................................................................................ 11, 12, 14
  54.3(a) .............................................................................................................. 11, 12
  1714 ...................................................................................................................... 14

Government Code section:
  11135 ............................................................................................................. *passim*
  11135(a) ........................................................................................................... 15, 16
  12900 .................................................................................................................... 13

**Federal Rules**

Federal Rule of Civil Procedure Rule:
  50 ...................................................................................................................... 3, 4
  50(a) ....................................................................................................................... 3
  50(b) ...................................................................................................................... 1, 3
  50(b)(1)-(3) ................................................................................................................ 4
  59 ........................................................................................................................ 1, 4
  59(a) .................................................................................................................... 4, 17

**Federal Regulations**

28 Code of Federal Regulations section:
  35.160 ........................................................................................................ 1, 5, 7, 21, 22
  35.160(a)(1) ............................................................................................................ 5, 24
  35.160(b) ................................................................................................................. 25
  35.160(b)(1) ............................................................................................................... 4
  36.303 ...................................................................................................................... 5

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

## I.    NOTICE OF MOTION

PLEASE TAKE NOTICE that on March 27, 2025, at 10:00 a.m. in Courtroom E, 15th Floor, before Magistrate Judge Thomas S. Hixson of the above-referenced Court, Defendant COUNTY OF ALAMEDA ("County" or "Defendant") will renew its motion for judgment as a matter of law against Plaintiff LISAMARIA MARTINEZ ("Plaintiff") pursuant to Federal Rules of Civil Procedure, Rule 50(b) ("Renewed Motion for Judgment").  In the alternative, the County will move for a new trial pursuant to Federal Rules of Civil Procedure Rule 59 ("New Trial Motion").[1]

Said Renewed Motion for Judgment will request the Court summarily adjudicate the entirety of Plaintiff's claims, notwithstanding the verdict, including entering judgment in favor of the County and against Plaintiff.  The alternative New Trial Motion will request the Court find the jury verdict is contrary to the weight of the evidence and that for reasons of procedural error, the County was not given a fair trial and is entitled to a new trial.

Both Motions will be based upon this Notice, the Memorandum of Points and Authorities herein below, the Declaration of Nicholas D. Fine and the exhibits attached thereto, the record in evidence at trial, and the pleadings and other papers on file in this action, together with such other oral and documentary evidence as may be received by the Court.

## II.    INTRODUCTION

Plaintiff's claim under Title II of the ADA (42 U.S.C. § 12132) alleged that the County violated 28 C.F.R. section 35.160 by failing to supply Plaintiff with an auxiliary aid or service that would ensure "effective communication" between Plaintiff and the CRO, when Plaintiff attempted to file an FBNS on March 29, 2019. The jury ultimately found for Plaintiff on that claim, as well as her derivative claims under Government Code section 11135 ("section 11135") and the California Disabled Persons Act ("DPA") (Cal. Civ. Code §§ 54-55.3).  However, as discussed herein, the jury's verdict is not supported by the evidence and judgment must be entered in favor of the County as a matter of law.  Indeed, the evidence presented at trial confirmed that the communication between Plaintiff and the CRO was nothing less than fluent, let alone "effective," and neither the applicable law nor the testimony at trial supports the notion that the FBNS form itself constituted the

---

[1] Collectively, the Renewed Motion for Judgment and New Trial Motion are referred to herein as the "Motions."

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

"communication," particularly where the FBNS does not "communicate" anything at all to the County. As such, no auxiliary aid or service was required in the first place. Further, even if an auxiliary aid or service was required, which it was not, the CRO nevertheless went above and beyond to provide Plaintiff with appropriate auxiliary aids and Plaintiff indisputably received all of the benefits of the CRO's programs, services, and activities that she sought, such that the County is entitled to judgment.

For the same reasons, Plaintiff did not establish deliberate indifference at trial. CRO clerk Laura Briones did everything in her power to assist Plaintiff and offered Plaintiff multiple services that are not generally offered to CRO customers, including the provision of written instructions on how to correct the technical deficiencies in Plaintiff's FBNS, as well as the expedited mail filing of Plaintiff's corrected FBNS. This does not even remotely suggest that Ms. Briones intended to expose Plaintiff to an unreasonable risk. To the contrary, while Plaintiff disagreed with the County's interpretation of the applicable law and the CRO's corresponding policy of not altering signed forms for customers, she testified that she has no "hard feelings" against the CRO's clerks because she understood they were just "doing their job as they were instructed to do." Furthermore, the County is entitled to judgment on Plaintiff's derivative claims under section 11135 and the DPA for the additional and independent reasons that Plaintiff failed to prove the CRO received state funding or financial assistance at the time of the incident, as required by section 11135, and because monetary damages under the DPA are not available as against a public entity pursuant to established California precedent. For these reasons, the County is entitled to judgment as a matter of law on the entirety of Plaintiff's claims.

In the alternative, the County is entitled to a new trial where the jury's verdict was against the weight of the evidence and the County was not afforded a fair trial due to procedural errors. Specifically, the Court failed to properly respond to the jury's sole question about whether the ADA applies "online." Instead of appropriately informing the jury that the ADA's "online" application was irrelevant to Plaintiff's claims, the Court provided the jury with a convoluted substantive response which likely confused the jury and misled them to believe Plaintiff was prosecuting a claim for violation of her ADA rights in the "online" context, which she was not. Additionally, the jury instructions failed to inform the jury of the specific County program, service, or activity in which Plaintiff claims she was denied participation due to her disability and failed to provide the jury with sufficient information concerning the "deliberate indifference" standard. For these reasons, in the event the Court does not grant the County judgment as a matter of law, the County is entitled to a new trial.

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

## III. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Trial on Plaintiff's Amended Complaint (and specifically, Plaintiff's First Cause of Action for Violation of Title II of the ADA, Third Cause of Action for Violation of Cal. Civil Code § 11135, and Fourth Cause of Action for Violation of the Disabled Persons Act ("DPA") (Cal. Civ. Code §§ 54-55.3)) began on March 27, 2024. Following the close of Plaintiff's case-in-chief, the County made an oral Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a), which the Court denied without prejudice to the County bringing the present Renewed Motion for Judgment pursuant to Rule 50(b). See Declaration of Nicholas D. Fine ("Fine Dec."), ¶ 5, Ex. C (TT, Vol. 4, at 701:2-706:17).

Trial ended with the jury's verdict on April 2, 2024. See Dkt. 190 (Jury Verdict). With respect to the first five questions in the Verdict Form, the jury found that Plaintiff had proved by a preponderance of the evidence that the County violated Plaintiff's rights under Title II of the ADA on March 29, 2019, that the violation occurred because of the County's deliberate indifference to Plaintiff's rights, that the violation occurred in a program or activity that is funded directly by the state or receives state financial assistance (for purposes of section 11135), and that Plaintiff is entitled to recover $30,500 from the County under the ADA and DPA. Id., at pp. 2-3. However, in response to Question 6, in what the Court has ruled to be an advisory verdict, the jury determined that Plaintiff did *not* prove by a preponderance of the evidence that the County is likely to violate its legal obligations in the future in the same manner the jury found. Id., at p. 4; see Dkt. 208, 4:7-5:25.

Plaintiff filed a Motion for Permanent Injunction on May 16, 2024 (Dkt. 200), which the County opposed. On January 17, 2025, the Court issued an order granting in part and denying in part the Motion for Permanent Injunction (Dkt. 208) and entered Judgment in favor of Plaintiff (Dkt. 209).

## IV. LEGAL STANDARD

Federal Rule of Civil Procedure 50 allows a party to renew a motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). Generally, the standard for review on a motion for judgment as a matter of law "largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986). Specifically, "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,*

1    477 U.S. at 250, citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943).  "A jury's verdict must be

2    upheld if it is supported by *substantial evidence* that is adequate to support the jury's findings, even if contrary

3    findings are also possible." *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017) (emphasis

4    added), quoting *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (citation omitted).

5    In ruling on the Renewed Motion for Judgment, the court may:  "(1) allow judgment on the verdict, if the jury

6    returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P.

7    50(b)(1)-(3).

8        Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion, grant a new trial on all

9    or some of the issues – and to any party – as follows:  (A) after a jury trial, for any reason for which a new trial

10   has heretofore been granted in an action at law in federal court …" Id., Rule 59(a).  Historically recognized

11   grounds include claims "that the verdict is against the weight of the evidence, that the damages are excessive,

12   or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724,

13   729 (9th Cir. 2007), quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  "Unlike with a

14   Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view

15   the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence

16   and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com LTD*, 762 F.3d

17   829, 842 (9th Cir. 2014).  The district court has "the duty ... to weigh the evidence as the court saw it, and to set

18   aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious

19   opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach*, 914 F.2d

20   183, 187 (9th Cir. 1990) (internal quotation and citation omitted); *Molski*, 481 F.3d at 729.

21   **V.    THE COUNTY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

22        **A.    There Was Effective Communication Between the CRO and Plaintiff**

23        Because Plaintiff's Title II claim is premised on the County's alleged failure to provide an auxiliary aid

24   or service, the first step in the analysis is to determine whether the communication between Plaintiff and the

25   CRO was ineffective, such that an auxiliary aid or service was required in the first place.  28 C.F.R. §

26   35.160(b)(1); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 958 (9th Cir. 2017); *Payan v. Los Angeles Cnty. Coll.*

27   *Dist.*, 2019 WL 9047062, at *2 (C.D. Cal. Apr. 23, 2019) ("…§ 35.160(b)(1) contemplates a narrower focus

28   into whether 'auxiliary aids and services' are 'necessary' to ensure that disabled students receive the same

ORBACH HUFF & HENDERSON LLP

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

benefits as their peers.").  Notably, the ADA does not require "perfect communication" – it only requires "effective communication," meaning a level of communication *substantially equal* to that afforded to non-disabled individuals.  28 C.F.R. § 35.160(a)(1); *Updike*, 870 F.3d at 958; *Cropp v. Larimer Cnty., Colorado*, 793 F.App'x 771, 783-84 (10th Cir. 2019).  Throughout this litigation, the Court failed to provide the parties with any clear guidance regarding what constitutes "effective communication" under Title II of the ADA or whether the "effective communication" requirement extends beyond the "communication" itself and applies to the contents of forms such as the FBNS.

While there is a dearth of authority interpreting the effective communication requirement under Title II, opinions interpreting the analogous effective communication provision in Title III of the ADA provide significant guidance.  *Poway Unified Sch. Dist. v. K.C. ex rel. Cheng*, 2014 WL 129086, at *7 (S.D. Cal. Jan. 14, 2014) ("Title III … of the ADA has similar regulations concerning effective communication to the hearing impaired as Title II … of the ADA."); *compare* 28 C.F.R. § 35.160 (Title II) with 28 C.F.R. § 36.303 (Title III); see also *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 984 (8th Cir.2013) (applying analysis of Title III effective communication claim to Title II effective communication claim); *Hardie v. Nat'l Collegiate Athletic Ass'n.*, 97 F.Supp.4th 1163, 1168 (S.D. Cal. 2015) ("The most similarly worded antidiscrimination statute to Title II is Title III of the ADA which prohibits discrimination against disabled persons in places of public accommodation."); *Bax v. Doctors Medical Center of Modesto, Inc.*, 2021 WL 3733113, at *35 (E.D. Cal. Aug. 24, 2021) ("Similar to the provisions of Title III of the ADA and Section 504 of the Rehabilitation Act, the implementing regulations for Title II of the ADA provide that '[a] public entity shall take appropriate steps to ensure that communications' with disabled persons 'are as effective as communications with others.'").[2]

Indeed, *Bax*, which is a Title III action, relied heavily on *Updike*, a Title II action, to set forth the standard for "effective communication," stating that "[a]ssessing whether an entity 'provided appropriate auxiliary aids where necessary' to afford effective communication 'is a fact-intensive exercise.'"  *Bax v. Doctors Medical Center of Modesto, Inc.*, 52 F.4th 858, 867 (2022), quoting *Updike v. Multnomah Cnty.*, 870 F.3d 939, 958 (9th Cir. 2017).  "The trier of fact must 'weigh [several] factors,' including 'the method of

---

[2] While there is a discrete difference between the effective communication requirements in Title II and Title III, in that Title II contains a "primary consideration" rule that Title III does not, they nonetheless share a substantive standard of liability.  *Bax v. Doctors Medical Center of Modesto, Inc.*, 52 F.4th 858, 868 (9th Cir. 2022); see also *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1067 (9th Cir. 2010).

communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.'" *Id.*, quoting *Updike*, 870 F.3d at 950. "The requirement that entities provide effective communication therefore 'does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it." *Id.*, citing *Silva v. Baptist Health South Florida, Inc.*, 856 F.3d 824, 835 (11th Cir. 2017) and *Updike*, 870 F.3d at 958 (holding that the plaintiff was not "necessarily … entitled to have an ASL interpreter as a matter of course to achieve effective communication," because "whether the County provided auxiliary aids where necessary is a fact-intensive exercise"). "Rather, the test is whether an individual has received an auxiliary aid sufficient to prevent any 'real hinderance' in her ability to exchange information." *Id.*, citing *Silva*, 856 F.3d at 833-835. The "focus" of the ADA's effective communication requirement is "on the communication itself, not on the downstream consequences of communication difficulties, which could be remote, attenuated, ambiguous, or fortuitous." *Silva*, 856 F.3d at 834.

With respect to the "focus" of the effective communication requirement – the communications between Plaintiff and CRO staff – the evidence and testimony at trial confirmed they were clearly effective. First and foremost, Plaintiff's own audio recordings of her March 29, 2019, visit to the CRO reflected Plaintiff and the CRO staff members speaking to each other fluently, with no hinderance in their ability to exchange information. Fine Dec., ¶¶ 6-8, Exs. D-F (three recordings played at trial). Further, witness testimony supported the recordings. Ms. Moran testified that she could understand Plaintiff, that Plaintiff appeared to understand her, and that there was no communication barrier between them. Id., ¶ 3, Ex. A (TT, Vol. 2, 260:2-262:21). Ms. Briones, the other CRO clerk who interacted with Plaintiff on March 29, 2019, provided identical testimony. Id., ¶ 3, Ex. A (TT, Vol. 2, 291:3-7, 293:14-294:3, 319:18-321:19). For her part, Plaintiff testified that she understood and was able to communicate clearly with both Ms. Moran and Ms. Briones. Id., ¶ 5, Ex. C (TT, Vol. 4, 635:23-636:6 ["Both Ms. Moran and Ms. Briones verbally told me what was needing to be fixed and corrected on my form, so I had an understanding of what to do."]). Thus, Ms. Moran, Ms. Briones and Plaintiff all provided consistent testimony; there was effective communication between them, such that no auxiliary aid or service was required, and the "substantial evidence" necessary to uphold the jury's verdict does not exist.

///

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

To the extent Plaintiff contends that the paper FBNS was, in and of itself, a "communication" that Plaintiff was unable to effectively convey to the County on account of her disability, she is wrong for multiple reasons. First, despite many years of searching, neither Plaintiff nor the County has been able to locate any primary authority interpreting Title II to provide that the "effective communication" requirement goes beyond the actual communications between the person with a disability and the public entity, and somehow extends to requiring the physical act of completing or modifying forms for persons with disabilities. The authority that is available indicates the exact opposite, as discussed above. *Silva*, 856 F.3d at 834 (the "focus" of the ADA's effective communication requirement is "on the communication itself, not on the downstream consequences of alleged communication difficulties…"). Second, the FBNS cannot be a "communication" to the County because it does not convey any information to the County. Fine Dec., ¶¶ 3-4, Ex. A (TT, Vol. 2, 318:7-319:3); Ex. B (TT, Vol. 3, 468:7-470:14). Rather, the CRO essentially acts as a library for FBNS's, facilitating public availability, and has no interest in the content of the form so long as it complies with California state law. Id. As such, there is no basis to suggest that the FBNS itself constituted the allegedly ineffective communication.

**B.    The CRO Nevertheless Provided Plaintiff with a Reasonable Auxiliary Aid/Service**

Even assuming for argument's sake that the communications between Plaintiff and the CRO were not effective, such that the CRO was required to provide Plaintiff with an auxiliary aid or service, the CRO did exactly that and there can be no dispute that Plaintiff received all of the benefits of the CRO's programs, services, or activities that she sought. To be clear, the jury did not receive all of the information it needed to make this determination, in that the Court never instructed the jury on the *specific* program, service, or activity which served as the basis of Plaintiff's ADA claim, nor defined its scope.[3] Rather, the Court provided the jury

---

[3] Plaintiff's Title II claim is brought under 42 U.S.C. § 12132, which prohibits a public entity from excluding a person with a disability from participation in, or denying that person, the "benefits of the services, programs, or activities of a public entity." The regulation on which Plaintiff relies, 28 C.F.R. § 35.160, provides that a "public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." Accordingly, the service, program, or activity on which the plaintiff's ADA claim is premised must be *specifically defined*. See *Where Do We Go Berkeley v. Cal. Dep't of Transportation*, 32 F.4th 852, 860 (9th Cir. 2022) ("The district court never explicitly described the scope of Caltrans's 'program' that serves as the basis for Plaintiffs' ADA claim," and the vague definition the district court used "tells us little about what Caltrans's programs do and do not entail – and therefore what could be a 'reasonable modification' of that program."). As discussed further below, the jury instructions here did *not* describe or define the scope of the specific program, service, or activity on which Plaintiff's Title II claim is based.

ORBACH HUFF & HENDERSON LLP

only with a vague description of two "services, programs, or benefits" provided by the CRO, including "filing completed forms at the Clerk Recorder's Office" and "the Clerk Recorder's Office advising patrons of forms' technical deficiencies…" Dkt. 165 (Jury Instructions), at 12:19-21. However, even under these broad descriptions of two CRO "services, programs, or benefits," the evidence at trial confirmed that the CRO took numerous steps to ensure Plaintiff's access to and participation in both.

First, with respect to "advising patrons of forms' technical deficiencies," Plaintiff testified at trial that "[b]oth Ms. Moran and Ms. Briones verbally told me what was needing to be fixed and corrected on my form, so I had an understanding of what to do." Fine Dec., ¶ 5, Ex. C (TT, Vol. 4, 635:23-636:6). Indeed, Ms. Moran and Ms. Briones echoed this testimony, confirming that they both explained to Plaintiff the technical deficiencies in her form which had to be corrected before it could be filed, just as they do for all other customers, and that communication was clearly effective where Plaintiff admits she "had an understanding of what to do." Id., ¶¶ 3, 5, 6-8, Ex. A (TT, Vol. 2, 254:21-24, 294:16-25, 319:18-21); Ex. C (TT, Vol. 4, 635:23-636:6); Exs. D-F [3 audio recordings played at trial]). In fact, Ms. Briones went further than that and did something the CRO does not ordinarily do for customers who visit the physical CRO to file an FBNS – she provided Plaintiff with written instructions regarding the technical deficiencies in Plaintiff's FBNS which needed to be corrected before it could be filed, along with a self-addressed envelope so that Plaintiff could mail in her corrected FBNS, and offered to expedite the filing of Plaintiff's FBNS as soon as the CRO received it in the mail. Id., ¶¶ 3-5, Ex. A (TT, Vol. 2, 288:2-8, 322:4-325:7); Ex. B (TT, Vol. 3 445:1-447:6); Ex. C (TT, Vol. 4, 635:23-636:6). Plaintiff acknowledged Ms. Briones' efforts in Plaintiff's trial testimony, stating that Ms. Briones "carefully went through the entire form and made sure that everything was done perfectly and so that I could fold it up and include payment and mail back the form." Id., ¶ 5, Ex. C (TT, Vol. 4, at 635:23-636:6). Thus, Plaintiff not only received the *exact* same service that other customers do, in that she had the technical deficiencies in her form explained to her, but the CRO also provided her with additional services that are *not* generally available to other customers, to allow Plaintiff to correct and file her form expeditiously.

Second, with respect to "filing completed forms at the Clerk Recorder's Office," Plaintiff admits she used the auxiliary aids and services Ms. Briones provided, including the Go Back Letter[4], to complete a new

---

[4] Ms. Briones would have provided Plaintiff with an electronic version of the Go Back Letter had Plaintiff requested it. Id., ¶ 3, Ex. A (TT, Vol. 2 at 323:4-23).

1    and corrected FBNS, which she was then able to file without issue on May 31, 2019.  Id., ¶ 5, Ex. C (TT, Vol. 4

2    at 635:23-636:10, 637:13-18, 644:10-11).  Accordingly, Plaintiff received the benefit of the CRO's services,

3    programs, and activities that she sought.  While Plaintiff argues that she was discriminated against because she

4    had to wait longer to file her FBNS, she admits that she *voluntarily waited over two months* to return to the

5    CRO to file her corrected FBNS, on her own accord.  Id., ¶ 5, Ex. C (TT, Vol. 4, at 636:11-639:3).  Further, the

6    reasons Plaintiff proffered for waiting so long are nonsensical, primarily being her contentions that she was

7    simply too upset and too busy to return to the CRO immediately.  Id., ¶ 5, Ex. C (TT, Vol. 4, at 636:11-637:9).

8    The problem with this explanation is that Plaintiff did not *need* to return to the CRO at all given that Ms.

9    Briones provided Plaintiff with a self-addressed envelope and offered Plaintiff expedited mail-filing service,

10   which Mr. Yankee testified would have likely resulted in Plaintiff's corrected FBNS being filed the same day

11   the CRO received it in the mail.  Id., ¶ 4, Ex. B (TT, Vol. 3, at 385:20-386:4, 432:16-21).  To the extent

12   Plaintiff testified that she does not "trust the mail" (id., ¶ 5, Ex. C (TT, Vol. 4, 637:19-638:12)), that also does

13   not make sense where Plaintiff and the CRO could have mailed the FBNS to each other a dozen times or more

14   by the time Plaintiff decided to file her corrected FBNS on May 31, 2019, even if USPS were to lose one or

15   two.  Clearly, time was not an issue to Plaintiff.

16        For these reasons, Plaintiff was provided with reasonable auxiliary aids and services and, in any event,

17   received *all* of the benefits of the CRO's programs, services, or activities that she sought.  Accordingly,

18   pursuant to the evidence presented at trial, Plaintiff's Title II claim fails as a matter of law and the jury's verdict

19   cannot be upheld.

20        **C.    Plaintiff Did Not Establish Deliberate Indifference**

21        Even assuming for argument's sake that the County violated the ADA, which it did not, the evidence at

22   trial did not even come close to establishing that the County acted with deliberate indifference, as required for

23   Plaintiff to be entitled to monetary damages under the ADA.  *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir.

24   2008), quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  Again, the problem likely

25   resulted from the jury instructions, which failed to adequately describe the deliberate indifference standard.  See

26   Dkt. 165, at 16.  While the instructions informed the jury that deliberate indifference requires conduct that is

27   more than negligent, and involves an element of deliberateness, the jury of laypeople was not provided with

28   any guidance on the relevant difference between negligence and deliberateness or the type of deliberate

ORBACH HUFF & HENDERSON LLP

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

conduct required to give rise to deliberate indifference. Id.  In fact, more than *gross negligence* is required to establish deliberate indifference (*L.W. v. Grubbs*, 92 F.3d 894, 899-900 (9th Cir. 1996)), which is a "stringent standard of fault" (*Bryan Cnty. v. Brown*, 520 U.S. 397, 410, (1997)), but the jury did not know that.  Nor did the jury know that deliberate indifference requires that a state actor "recognize[] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff" (*L.W.*, 92 F.3d at 899-900), or that "deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course" (*Duvall*, 260 F.3d at 1139-40).

These ended up being crucial omissions from the jury instructions given Plaintiff's own testimony. Indeed, the only government actors Plaintiff interacted with on the day of the incident were Ms. Moran and Ms. Briones, and Plaintiff testified that she has no "hard feelings" against either of them because "[t]hey were doing their job as they were instructed to do" and that they were merely acting pursuant to the CRO's policy.[5]  Fine Dec., ¶ 5, Ex. C (TT, Vol. 4, 643:25-644:9).  Doing one's job is a far cry from intentionally exposing Plaintiff to an unreasonable risk.  This is particularly true when you consider that Ms. Briones went as far as to conduct research on Google to determine if the ADA required her to provide the transcriber services Plaintiff was demanding, while Plaintiff was still in the CRO, but was unable to locate any relevant information.  Id., ¶ 3, Ex. A (TT, Vol. 2, 297:17-298:14, 314:21-315:19).  She then did everything in her power to help Plaintiff, including ensuring Plaintiff received both verbal and written directions regarding how to correct her FBNS (the Go Back Letter), as well as offering Plaintiff expedited mail-filing service, as discussed.  The Go Back Letter and the offer of expedited mail filing are not offered to all CRO customers; Ms. Briones offered them specially to Plaintiff, which contradicts any notion of deliberate indifference.  Id., ¶¶ 3-5, Ex. A (TT, Vol. 2, 288:2-8, 322:4-325:7); Ex. B (TT, Vol. 3 445:1-447:6); Ex. C (TT, Vol. 4, 635:23-636:6).

Further, Plaintiff made no attempt at trial to establish that the CRO's policy itself constituted deliberate indifference; and nor could it.  As Mr. Yankee testified, the CRO's policy was premised on the County's

---

[5] At the time of the Incident, the CRO had a policy prohibiting its clerks from filling out or modifying forms for customers which are filed or recorded in the CRO.  Id., ¶4, Ex. B (TT, Vol. 3, at 399:4-14, 415:14-16, 449:23-451:9).  However, CRO clerks are now permitted to fill out a blank FBNS for a customer with a disability (and other forms), if the person with a disability requests such assistance as an auxiliary aid/service.  Id., ¶ 4, Ex. B (TT, Vol. 3, 427:2-428:20, 429:10-19, 451:14-452:18).  The Court has also ordered the CRO to provide such assistance by way of a Permanent Injunction.  See Dkt. 208.

- 10 -

ORBACH HUFF & HENDERSON LLP

interpretation of state and federal law, with the County making a good faith effort to comply with federal law and not run afoul of state law.  Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, at 376:23-379:7, 436:12-437:3).  While the County still contends its legal interpretation of the ADA is correct, the simple fact it may be incorrect does not mean the County was deliberately indifferent to Plaintiff's rights.  To the contrary, an incorrect interpretation of the law is far more akin to bureaucratic slippage constituting negligence, rather than deliberate action or inaction.  *Updike*, 870 F.3d at 952 ("This case reflects an absence of effective communication and coordination between the County's pretrial services and employees at OJD about the need for an interpreter at Updike's arraignment.  While it is regrettable that it appears that Updike spent an extra night in jail that he likely would not have had to spend had he been provided an ASL interpreter the first time he appeared before Judge Dailey, there is no evidence that the State deliberately failed to order an interpreter at the January 15, 2013, arraignment. Instead, the evidence shows 'bureaucratic slippage that constitutes negligence rather than deliberate action or inaction.'").

For these reasons, substantial evidence does not support the jury's verdict and Plaintiff is not entitled to monetary damages under the ADA, as she failed to establish deliberate indifference.

**D.    Plaintiff Is Not Entitled to Monetary Damages Under the DPA**

The jury awarded Plaintiff monetary damages under the DPA, pursuant to California Civil Code section 54.3(a).  Dkt. 190, at 3.  The County argued extensively prior to trial that monetary damages are not available under the DPA as against a public entity, which Plaintiff disputed.  The Court resolved this dispute in its Order Re Jury Instructions and Verdict Form, stating, "[t]he Court does not believe the Ninth Circuit has resolved whether public entities can be liable for damages under the California Disabled Persons Act.  The Court finds the opinion in *Lonberg v. City of Riverside*, 300 F.Supp.2d 942, 946-49 (C.D. Cal. 2004), persuasive and will follow it."  Dkt. 161 (Order Re Jury Instructions and Verdict Form), at 6:21-26; see also *Lonberg*, 300 F.Supp.2d at 949 ("the court concludes that Section 54.3 encompasses liability by public entities, including City").  Respectfully, it was error for this Court to rely on *Lonberg*, which was wrongly decided, disapproved of by a different judge in the Central District less than two years later, and which contradicts the applicable state law authorities.  The County is not subject to monetary damages under the DPA and the jury's verdict in this regard cannot be upheld.

///

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

The penalty and damages provisions of the DPA are contained within Civil Code section 54.3(a) and authorize a plaintiff to seek damages in only limited situations for a violation of the rights established in the preceding provisions of the DPA.  In relevant part, section 54.3(a) provides that "[a]ny person or persons, firm or corporation" who violates the DPA is subject to monetary damages under the DPA.  Cal. Civ. Code § 54.3(a), emphasis added.  Thus, section 54.3 is limited in its application to a "person or persons, firm or corporation," which does not include public entities.  The County does not fall into any of these categories and therefore cannot be liable for DPA damages.

Indeed, in the *Carter/Fahmie* (*Carter v. City of Los Angeles*, 224 Cal.App.4th 808 (2014)) matter, which involved a class action litigation based upon allegations that the City of Los Angeles violated Title II of the ADA, the Unruh Civil Rights Act, and the DPA, the California Court of Appeal agreed with the trial court that statutory damages are improper and unavailable as against a public entity, under both the DPA and Unruh Act. *Carter/Fahmie*, 224 Cal.App.4th at 825; see also *Brennon B. v. Sup. Ct.*, 57 Cal.App.5th 367, 389-390 (2020); *Dunn v. City of Los Angeles*, No. 15-0413, 2017 WL 7726710, at *3–4 (C.D. Cal. Apr. 26, 2017). Specifically, the Court of Appeal agreed with the trial court's conclusion that "no California court would likely consider a municipal entity to be liable under the Unruh Civil Rights Act or the Disabled Persons Act…" *Carter/Fahmie*, 224 Cal.App.4th at 825.  Thus, damages under section 54.3 of the DPA are not recoverable as against a public entity.

Relying on *Carter/Fahmie*, federal courts have reached the same conclusion.  *Sarfaty v. City of Los Angeles*, 2017 WL 6551234 (C.D. Cal. 2017) (citing *Carter/Fahmie* for the proposition that damages under section 54.3 are unavailable as against a public entity and stating, "[t]he test of the [DPA] also indicates that the City is not liable for damages under this section" and "[b]ecause the most relevant state court authority indicates that damages are not available under Section 54.3, the Plaintiffs' claims fail as a matter of law.").[6]

Notably, courts have routinely interpreted the provisions of the DPA, Unruh Act, and the False Claims Act concurrently.  *Carter/Fahmie*, 224 Cal.App.4th at 824-826 (discussing DPA and Unruh concurrently). Thus, the California Supreme Court's decision in *Wells v. One2One Learning Foundation*, 39 Cal.4th 1164

---

[6] Although the Ninth Circuit subsequently reversed *Sarfaty* with respect to the district court's dismissal of the plaintiff's claims for injunctive relief and damages under the ADA, the Ninth Circuit did not disturb the district court's dismissal of the plaintiff's state law damages claim.  *Sarfaty v. City of Los Angeles*, 765 F.App'x 280, 282 (9th Cir. 2019).

ORBACH HUFF & HENDERSON LLP

(2006) is instructive, as it is an authoritative declaration of California law on whether a statute considers a governmental entity a "person," albeit in the context of a claim under the California False Claims Act ("CFCA"). In *Wells*, a school district asserted that it and other public school districts were not "persons" under the CFCA. In determining whether the public entity was a "person" under the CFCA, the court noted that in other statutory contexts "the Legislature has demonstrated that similar definitions of 'persons' do not include public entities, and that legislators know how to include such entities directly when they intend to do so." *Id.,* at 1190-1191; see also *People for the Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Bd.*, 125 Cal.App.4th 871, 905 (2005) (holding that the Legislature would have included public advisory board in its definition had it intended to cover it). In reaching that conclusion, the *Wells* Court examined the California Fair Employment and Housing Act ("FEHA") (Cal. Gov. Code § 12900, *et seq*.), which defines "person" to "include one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, and receivers or other fiduciaries." *Wells,* 39 Cal.4th at 1191.

Clearly, that definition does not include governmental entities. On the other hand, elsewhere in the FEHA, an "employer" is defined, as "any *person* regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, *the state or any political or civil subdivision of the state, and cities*, except as otherwise specified." *Id*., emph. added. The *Wells* Court concluded that the legislature intentionally added governmental entities in the definition of "employer," but not in the definition of "person" or "persons" and found that this "conceptual separation" of "persons" from governmental entities was an additional indication that the CFCA's definition of "person" was not meant to include governmental entities. *Id.* Further, the *Wells* Court also noted that when the CFCA was originally introduced in the California Assembly, the definition of covered "persons" did explicitly include governmental entities, but such references were eliminated before the law was adopted. *Id*., at 1191-1192. Therefore, the Court held that "the language, structure, and history of the ... CFCA ... strongly suggest that public entities, including public school districts, are not 'persons' subject to suit under the law's provisions." *Id.*, at 1193.

Similarly, section 14 of the Civil Code, which is applicable to the DPA and the entire Civil Code generally, defines a "person" as "a corporation as well as a natural person." Significantly, when section 14 was originally enacted in 1872, a "person" was defined as "not only human beings, but bodies politic or corporate."

ORBACH HUFF & HENDERSON LLP

1    In 1874, all references to "bodies politic" were removed, and the definition of a "person" was limited to natural

2    persons and corporations, confirming the intentional exclusion of public entities from the definition of a

3    "person." The Legislature has made no efforts in the century thereafter to broaden the definition to include

4    public entities. Civil Code section 54.3 must be read in harmony with *Wells'* rationale and the explicit

5    exclusion by the Legislature of public entities under section 14 of the Civil Code. Accordingly, it is clear that

6    the Legislature expressly intended to exclude public entities from the definition of "person" in the referenced

7    enactments. Because section 54.3 does not apply to public entities, Plaintiff cannot recover statutory

8    damages/penalties from the County under the DPA.

9         As for *Lonberg v. City of Riverside*, 300 F.Supp.2d 942, 947 (C.D. Cal. 2004), a different judge from

10   the same District disagreed with *Lonberg* less than two years later, and the reason for that disagreement is

11   crucial to this analysis. *City of Rialto v. U.S. Dep't of Def., et al.*, 2005 WL 5519062, at *7 (C.D. Cal. Aug. 16,

12   2005), *aff'd in part sub nom. City of Rialto v. U.S. Dep't of Def.*, 274 F. App'x 515 (9th Cir. 2008). In *Lonberg*,

13   the district court came to the incorrect conclusion that "because Section 54.3 is a general statute, California

14   rules of statutory construction would seem to dictate that it be applied to the City." *Lonberg*, 300 F.Supp.2d at

15   947-948. That is in direct conflict with California Supreme Court jurisprudence. As noted in *City of Rialto*,

16   "*Lonberg* cited older California authority" in evaluating governmental immunity and failed to consider more

17   recent pronouncements, including *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal.4th 1175, 1183 (2003). *City of

18   Rialto*, 2005 WL 5519062, at *6. In *Eastburn*, the California Supreme Court analyzed another "general"

19   statute, to determine whether "the general tort provisions of Civil Code section 1714" give rise to direct tort

20   liability against public entities. *Eastburn*, 31 Cal.4th at 1183-1185. In holding that section 1714 is *not* a

21   sufficient statutory basis for direct tort liability against a public entity, the Court held that "direct tort liability of

22   public entities must be based on a *specific* statute declaring them to be liable, or at least creating some *specific*

23   duty of care" on the part of the public entity. *Id.*, at 1183. Accordingly, *Lonberg* is simply incorrect in its

24   reliance on the principle that "liability is deemed 'provided by statute' if a statute defines the tort in general

25   terms" (*Lonberg*, 300 F.Supp.2d at 947-948), and contradicts California law regarding the interpretation of a

26   California statute. Nowhere in section 54.3 is there a specific declaration that public entities are liable under the

27   statute, nor is there any duty expressly imposed on public entities. See generally, Cal. Civ. Code § 54.3. Much

28   to the contrary, as just discussed, the Legislature *removed* public entities from the definition of "person" in

ORBACH HUFF & HENDERSON LLP

- 14 -

1   Civil Code section 14, which reflects an intention to *exclude* public entities from liability.

2   **E.    Plaintiff Did Not Establish the "State Funding" Element of Her Claim Under**

3   **Government Code Section 11135**

4   Plaintiff conceded prior to trial that her claim under section 11135 is derivative of her claim under Title

5   II of the ADA.  See Dkt. 109 (Plaintiff's Trial Brief), at 1:3-11.  However, to establish a violation of section

6   11135, Plaintiff must not only establish a violation of the ADA, but also that the CRO's FBNS program was

7   directly funded by the State of California or received financial assistance from the State of California at the

8   time of the incident giving rise to this action.  Gov. Code § 11135(a) (prohibiting discrimination in "any

9   program or activity that is conducted, operated, or administered by the state or by any state agency, is funded

10  directly by the state, or receives any financial assistance from the state").  Though eight different witnesses

11  offered testimony at trial, only one provided testimony concerning whether the CRO received state funding at

12  the time of the March 29, 2019, incident – Matt Yankee, the Assistant Controller for the County.  *None* of the

13  other witnesses provided any evidence in any way related to the issue of state funding, nor did *any* of the

14  exhibits.  Thus, the *only* evidence the jury could have used to analyze the state funding element of section

15  11135 is the testimony of Mr. Yankee, which certainly did not establish the CRO received state funding at the

16  time of the incident, let alone the FBNS program.

17  Much to the contrary, Mr. Yankee testified: "*I don't believe the Clerk-Recorder's Office directly*

18  *receives state funding* unless it would be a pass-through from the general fund.  But that being said, we're also

19  what we refer to as a net-negative County department, which means we bring in revenues through a variety of

20  sources, like transfer tax, through recording fees.  So what we cost the County is less than what the revenues we

21  bring in.  So we actually put money back into the general fund."  Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, 422:15-

22  423:4).  Mr. Yankee was also asked, "at any time since January of 2019 to the current, are you aware of any

23  time that the CRO's – CRO's office has received and utilized funds directly from the State of California?"  Id.,

24  ¶ 4, Ex. B (TT, Vol. 3, 433:15-18).  He responded, "[d]irectly, no."  Id., ¶ 4, Ex. B (TT, Vol. 3, 433:15-19).

25  While Plaintiff's counsel attempted to get Mr. Yankee to admit that the CRO does in fact receive

26  money from the County's General Fund even though the CRO may send more money back to the General

27  Fund later, Mr. Yankee made it expressly clear that *he does not know* if the CRO receives money from the

28  General Fund at all, and that the CRO may never actually need to do so.  Id., ¶ 4, Ex. B (TT, Vol. 3, 423:12-

ORBACH HUFF & HENDERSON LLP

424:4) ("Now if you're trying to relate that to the budget and say, you know, do we receive the money from the state first before we replenish it later, I'm not sure that it works in that same scenario."), 424:5-23 ("We may never need to actually, for lack of a better term, withdraw from a general fund account."), see also 425:11-19. In fact, Mr. Yankee testified *that he does not even know whether the County's General Fund receives money directly from the State.*  Id., ¶ 4, Ex. B (TT, Vol. 3, 424:25-425:6).  As Mr. Yankee testified, he is not a member of the "general accounting unit" of the CRO, simply did not have this knowledge, and Plaintiff called no other witnesses on this issue.  Id., ¶ 4, Ex. B (TT, Vol. 3, 425:11-426:5).

This testimony does not constitute "substantial evidence" that the CRO or its FBNS program received state funding at the time of the incident and judgment must be entered in favor of the County on Plaintiff's claim under section 11135.  To the extent Plaintiff will point to the stipulation the parties filed on March 26, 2024, which provided that "the parties stipulate that the County of Alameda has received funding or financial assistance from the State of California for the relevant period" (Dkt. 147 [Stipulation Regarding Element of Claim Under Government Code Section 11135]), that stipulation is *not* sufficient to establish the state funding element of section 11135.  Again, it is not enough that the *County in general* may have received state financial assistance; Plaintiff must establish that the *CRO's FBNS program* was directly funded by the State of California or received financial assistance from the State of California at the time of the incident giving rise to this action.  Gov. Code § 11135(a); *San Francisco Taxi Coalition v. City and County of San Francisco*, 979 F.3d 1220, 1227-1228 (9th Cir. 2020) (rejecting claim under section 11135 for failure to allege state funding of specific program at issue and stating, "the state's infusion of money into one arm of local government does not necessarily reach all limbs and digits of that government and thus it does not extend the state's anti-discrimination law to every local government activity."); *Kirola v. City and County of San Francisco*, 74 F.Supp.3d 1187, 1249 (N.D. Cal. 2014) (rejecting claim under section 11135 and stating, "there is no evidence that each of the *specific programs to which she was allegedly denied access* is state-funded or otherwise receives financial assistance from the state") (emph. added) (reversed in part, on other grounds, in *Kirola v. City and County of San Francisco*, 860 F.3d 1164 (9th Cir. 2017)).  Accordingly, a stipulation that the *County*

1   *in general* received state funding is completely meaningless to the analysis, particularly where the stipulation

2   does not even specify whether the state funding was received into the General Fund or some other account.[7]

3       The stipulation does not save Plaintiff's claim under section 11135 and judgment must be entered in

4   favor of the County.

## VI.    ALTERNATIVELY, THE COUNTY IS ENTITLED TO A NEW TRIAL

6       In the event the Court is not inclined to enter judgment in favor of the County, the County is entitled to

7   a new trial where the verdict was contrary to the clear weight of the evidence.  Fed. R. Civ. P. 59(a); *Molski,*

8   481 F.3d at 729.  Further, for multiple procedural reasons, the County was not provided a fair trial.  Fed. R. Civ.

9   P. 59(a);  *Molski,* 481 F.3d at 729 (new trial required where, "for other reasons, the trial was not fair to the party

10  moving").

### A.    The Verdict Was Contrary to the Clear Weight of the Evidence

12      As noted above, one historically recognized ground for a new trial is "that the verdict is against the

13  weight of the evidence."  *Molski,* 481 F.3d at 729 (trial court may grant new trial where "verdict is contrary to

14  the clear weight of the evidence"); *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940); *Passantino*

15  *v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n. 15 (9th Cir. 2000).  For all of the same reasons

16  discussed above, the jury's verdict (regarding Questions 1 through 5 of the Verdict Form) is against the clear

17  weight of the evidence, particularly where the evidence demonstrated that:  (1) the CRO effectively

18  communicated with Plaintiff on March 29, 2019; (2) the CRO nevertheless provided Plaintiff with appropriate

19  auxiliary aids and services and Plaintiff indisputably accessed all of the CRO's programs, services, and

20  activities that she sought; (3) there was no deliberate indifference on the part of the CRO; and (4) the CRO did

21  not receive state funding at the time of the incident.  Accordingly, if the County is not entitled to judgment, it is

22  certainly entitled to a new trial.

---

23  [7] The same deficiencies exist in the syllogism set forth in the Court's Order on Plaintiff's Motion for Permanent

24  Injunction, in the "Findings of Fact."  Specifically, the Court found that the "County receives funding from the State of California," and that the "CRO receives funding from the County of Alameda" and the County's

25  "general fund."  Dkt. 208, 11:15-19.  However, even if both of those statements are true, that does not establish that the CRO, let alone the CRO's FBNS program, received funding or financial assistance from the State of

26  California at the time of the subject incident to support liability under section 11135.  Indeed, those statements do not even establish that the money the County receives from the State is received into the County's general

27  fund.  It would be entirely inappropriate to impose liability under section 11135 on the basis that the County *in general* receives money from the State of California and that the CRO *in general* receives money from the

28  County's general fund.

ORBACH HUFF & HENDERSON LLP

**B.    The Court Improperly Responded to the Jury's Sole Question, Which Misled the**
**Jury Regarding the Nature of Plaintiff's Claims**

During deliberations, on April 2, 2024, the Court received a "Note from the Jury," which contained

what would ultimately be the jury's sole question before reaching a verdict.  Dkt. 170 (Note from the Jury No.

1).  The question stated, "Does ADA experience apply to online services?"  Id.  In response to this simple

question, and over the County's objections, the Court crafted a long and convoluted response which cross-

referenced two questions in the Verdict Form and three separate jury instructions, and which would be nothing

less than cryptic to a jury of laypeople.  See Dkt. 173 (Answer to Jury Question No. 1).  Specifically, the Court

stated:

> In answering Question 1 on the verdict form: Plaintiff Lisamaria Martinez alleges that
> Defendant County of Alameda violated the Americans with Disabilities Act with regard to her
> attempt to file the FBNS form in-person on March 29, 2019.
>      In answering Question 6 on the verdict form: Final Instruction No. 21 states that if you
> find in favor of the Plaintiff on her claims under the Americans with Disabilities Act, the
> California Disabled Persons Act, or California Government Code section 11135, then the Court
> must determine whether to issue an injunction against further violations of those laws. It states
> that you must decide whether the Defendant's Clerk Recorder's Office will likely in the future
> violate its legal obligations described in Final Instructions Nos. 11 and 12 with respect to
> individuals with a disability of blindness or visual impairment in the same type of way that you
> found. The requirements of the Americans with Disabilities Act described in Final Instructions
> Nos. 11 and 12 apply to the services, programs, or activities of a public entity, regardless of
> whether they are provided in-person or online.
>      In giving this answer, I am not implying that the Defendant violated its legal
> obligations on March 29, 2019.  Whether or not it did is for you to decide.

Id.[8]  This was not a proper response to the jury's question because it misled them into believing that they were

to adjudicate a claim which never existed – that the County allegedly violated Plaintiff's rights under the ADA

relative to "online" access.  The response also would have confused a jury of laypeople, who would not have

understood why the Court provided different responses applicable to two different questions in the Verdict

Form, without explaining why.

---

[8] Question 1 on the Verdict Form asked the jury whether Plaintiff proved "by a preponderance of the evidence"
that the County "violated her rights under the Americans with Disabilities Act on March 29, 2019."  Dkt. 190,
at 2:3-6.  Question 6 of the Verdict Form asked the jury whether Plaintiff proved "by a preponderance of the
evidence" that the CRO "will likely in the future violate its legal obligations described in Final Instructions
Nos. 11 and 12 with respect to individuals with a disability of blindness or visual impairment in the same type
of way that you found."  Id., at 3:4-7.

ORBACH HUFF & HENDERSON LLP

ORBACH HUFF & HENDERSON LLP

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. U.S.*, 326 U.S. 607, 613 (1946).  Thus, when responding to a question from the jury, the district court's response must not be "misleading or confusing, [and must not] inadequately guide[] the jury's deliberations, or improperly intrude[] on the fact-finding process."  *United States v. Delgado-Martinez*, 11 F.App'x 965, 966 (9th Cir. 2001), citing *U.S. v. Warren*, 25 F.3d 890, 898 (9th Cir. 1994).  The Court's response here misled and confused the jury.  Indeed, the Court's response was prejudicial to the County and misled the jury to believe they were adjudicating a claim which never existed.  To be clear, Plaintiff's claims in this action have *always* pertained to her *in-person* visit to the CRO on March 29, 2019.  See generally, Dkt. 84 (Plaintiff's Amended Complaint); see also Dkt. 109 (Plaintiff's Trial Brief), at 1:2-21.  Plaintiff's "Theory of the Case," as she stated just two months prior to trial, was "[w]hether the County of Alameda failed to provide effective communication needed to ensure that Plaintiff Lisamaria Martinez had an equal opportunity to enjoy the *benefits of filing forms and being advised of any deficiencies at the CRO on March 29, 2019* when it refused her request for a reader/scribe to act as an auxiliary aid or service."  See Dkt. 109, at 1:14-17 (emph. added).  Plaintiff has *never* maintained a claim that the County discriminated against her via the County's website, electronic forms, or any other online activities. Id.  This is exactly what the Court should have conveyed to the jury in responding to their question – that the ADA's application "online" is and was irrelevant.[9]  Instead, by providing a long and convoluted response, the Court led the jury to believe that the

---

[9] Even with respect to Question 6 in the Verdict Form, which asked the jury to decide if the County is likely to violate its legal obligations again, in the same manner the jury found, the ADA's application "online" has no relevance.  The CRO's policy changes since the incident – relative to completing FBNS's and other forms – do not rely upon online access and disabled individuals do not need online access at all.  This was evident from Mr. Yankee's testimony about the CRO's new kiosk accommodation, which involves a computer kiosk in the physical CRO, reserved for use by persons with disabilities, equipped with Jobs Access with Speech ("JAWS") screen-reader software, and on which a disabled user can access either a fillable PDF of the FBNS or the CRO's FBNS software wizard.  Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, at 458:1-20).  However, as Mr. Yankee testified, the person with a disability need not rely on the JAWS software nor the "online" accessibility of the FBNS, whatsoever, because a CRO employee will read the form to the person with a disability and guide the individual through the entire form by moving the mouse to the correct location of the form for the individual to enter his or her information.  Id., ¶ 4, Ex. B (TT, Vol. 3, at 458:21-461:11).  The jury also heard evidence that a person with a disability need not use the kiosk at all because CRO clerks are permitted to function as a transcriber and complete a blank, unsigned FBNS (and other forms) for a person with a disability who requests such assistance as an auxiliary aid/service.  Id., ¶¶ 3-4, Ex. A (TT, Vol. 2, 226:15-25, 242:4-22); Ex. B (TT, Vol. 3, 407:12-24, 419:3-421:15, 427:2-428:20, 429:10-19, 449:23-452:18, 480:7-14, 481:24-482:10).

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ADA's application "online" was in fact relevant to Plaintiff's claims, and that the County could be held liable for violating Plaintiff's ADA rights "online."

The Court's decision to provide two responses to the Jury's question, applicable to two different questions in the Verdict Form (Questions 1 and 6), did not cure the misleading nature of the response, it only would have further confused a jury of laypeople. While the Court did indicate, relative to Question 1 of the Verdict Form, that Plaintiff's claim under the ADA pertains "to her attempt to file the FBNS form in-person on March 29, 2019" (Dkt. 173, at 1:16-18), the jury was never provided with an explanation as to why they were also given a second response applicable to Question 6 of the Verdict Form. Nor did the Court's response expressly state that the answer applicable to Question 6 *was not applicable* to Question 1, or vice versa. This is problematic where the jury did not specify that its question pertained to either Question 1 or Question 6 of the Verdict Form, and instead merely asked a general question concerning the ADA's applicability online. Thus, the jury was almost certainly confused when the Court provided two responses applicable to two different Verdict Form questions, without ever explaining why the Court did so. As a result, it simply cannot be assumed the jury understood that the Court's statement in the second paragraph of the response regarding the ADA applying "in-person or online" *did not apply to Question 1 of the Verdict Form*, particularly because the jury was never told otherwise. And, given the circumstances, the jury had every reason to interpret the Court's response to mean that Plaintiff was asserting a claim under the ADA regarding "online" access. Indeed, the second paragraph of the Court's response, which contained the reference to the ADA's applicability "online," also referenced Jury Instructions Nos. 11 and 12, *which set forth the applicable law the jury was to follow in adjudicating Question 1 on the Verdict Form* regarding Title II of the ADA and its effective communication requirement. See Dkt. 165, at 12-13. Further, Plaintiff presented two expert witnesses dedicated solely to testifying about the "online" accessibility of the CRO's FBNS PDF (and various versions thereof) and the CRO's FBNS software wizard, which likely encouraged the jury to misunderstand the Court's response and believe that Plaintiff's ADA claim somehow pertained to online access.[10] See, e.g., Fine Dec., ¶¶ 3-4, Exs. A-B (TT, Vol. 2, 333:2-361:14; Vol. 3, 506:22-554:17).

---

[10] The County did not pursue an ADA "online" accessibility expert specifically because "online" accessibility had no relevance to Plaintiff's ADA claim or to the reasonableness or effectiveness of the additional auxiliary aids and services the CRO now offers.

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

By providing a long and confusing response to the jury's question, the Court misled the jury into believing that Plaintiff's ADA claim pertained to the CRO's online forms and services, instead of Plaintiff's in-person experience at the CRO on March 29, 2019.  The jury should have been informed that whether the ADA applies "online" is not relevant to Plaintiff's claims, which was the *only* appropriate response to the jury's question under the circumstances.[11]  For this reason, and because the jury was misled on the most important question on the Verdict Form regarding ADA liability, the County is entitled to a new trial.

## C.    The Jury Instructions Were Insufficient and Stripped the County of a Fair Trial

### 1.    The Court Improperly Instructed the Jury Regarding the Program, Service, or Activity at Issue

A new trial may be required when the court offers incorrect jury instructions that "infect[] the deliberative process of the jury with regard to its evaluation of the" claims presented.  *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1549 (11th Cir. 1996).  And, although the "court's formulation of the jury instructions" is within the discretion of the court (*Masson v. New Yorker Magazine, Inc.,* 85 F.3d 1394, 1397 (9th Cir. 1996)), the instructions may be successfully challenged where "the instructions, considered as a whole, were inadequate or misleading."  *Id.*; *United States v. Beltran-Rios*, 878 F.2d 1208, 1214 (9th Cir. 1989).  The court must determine "whether, considering the charges as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading."  *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir. 1988).

As briefly mentioned above, Plaintiff's Title II claim is brought under 42 U.S.C. section 12132, which prohibits a public entity from excluding a person with a disability from participation in, or denying that person, the "benefits of the services, programs, or activities of a public entity," and 28 C.F.R. section 35.160, which requires public entities to furnish appropriate auxiliary aids and services where necessary to afford individuals

---

[11] Notably, in the Court's Order on Plaintiff's Motion for Permanent Injunction, the Court spent over two pages explaining that the only "alleged violation" relevant at trial was "limited to [Plaintiff's] March 29 visit to the CRO," and that Plaintiff did not bring claims related to online accessibility.  Dkt. 208, 32:9-34:16.  The Court also referenced the jury's question regarding whether the "ADA experience appl[ies] to online services" and noted that the Court stated in response that Plaintiff "alleges that Defendant County of Alameda violated the Americans with Disabilities Act with regard to her attempt to file the FBNS form *in-person on March 29, 2019*." Dkt. 208, 33:8-12.  If that was *all* the Court had stated in response to the jury's question, it would have been entirely appropriate.  Unfortunately, the Court stated *much* more in response to the jury's question, as discussed above, which only served to confuse and mislead the jury.

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

1   with disabilities an equal opportunity to participate in and enjoy "the benefits of, a service, program, or activity

2   of a public entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.160.  Thus, the Ninth Circuit has held that the service,

3   program, or activity on which the plaintiff's Title II claim is premised must be specifically defined.  *Where Do*

4   *We Go Berkeley*, 32 F.4th at 860 ("The district court never explicitly described the scope of Caltrans's

5   'program' that serves as the basis for Plaintiffs' ADA claim," and the nonspecific definition the district court

6   used "tells us little about what Caltrans's programs do and do not entail – and therefore what could be a

7   'reasonable modification' of that program.").

8           The Jury Instructions here failed to provide the jury with the *specific* program, service, or activity on

9   which Plaintiff's Title II claim was premised.  See generally Dkt. 165.  Rather, the Court vaguely instructed the

10  jury of two activities the Court previously found to "qualify as services, programs, or benefits provided by the

11  Defendants," including "filing completed forms at the Clerk Recorder's Office and the Clerk Recorder's Office

12  advising patrons of forms' technical deficiencies."  See Dkt. 165, at 12:19-21.  The Court did not inform the

13  jury whether Plaintiff was actually alleging exclusion from or discrimination in one or both of these "services,

14  programs or benefits," nor did the Court define the scope of either.  Accordingly, the jury was left without clear

15  guidance to determine whether Plaintiff experienced discrimination in that "program, service, or activity,"

16  whether there was effective communication for purposes of that "program, service, or activity," and if not, the

17  type of auxiliary aid or service which would have allowed Plaintiff to participate in that "program, service, or

18  activity."  Further, this is yet another reason the jury likely believed Plaintiff's claim to involve the "online"

19  accessibility of the CRO's services and forms (in addition to the reasons discussed above), as the Court's

20  description of the CRO's two "services, programs or benefits" did not specify that they applied *in-person*, and

21  not "online."

22          It is not sufficient to vaguely describe two CRO "services, programs or benefits," without explaining

23  whether Plaintiff's ADA claim specifically pertained to one or both, and without defining the scope of either.[12]

24  As such, the Jury Instructions were inadequate and misleading.

25

26  [12] For example, it is not within the scope of the CRO's service of advising patrons of forms' technical

27  deficiencies to also ensure and guarantee that patrons who need to correct such technical deficiencies are able to
    do so that same day, in the CRO.  As Ms. Briones testified, nondisabled customers are not always able to

28  correct technical deficiencies and file their forms the same day the CRO advises them of those technical
    deficiencies, for a variety of reasons.  Fine Dec., ¶ 3, Ex. A (TT, Vol. 2, 286:4-20).  This would have been

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP

### 2.    The Court Improperly Instructed the Jury Regarding Deliberate Indifference

As discussed above, the jury instructions failed to adequately describe the deliberate indifference standard, which a plaintiff must satisfy to be entitled to monetary damages under the ADA.  *Mark H.*, 513 F.3d at 938; *Duvall*, 260 F.3d at 1138.  With respect to deliberate indifference, the jury instructions informed the jury that deliberate indifference requires conduct that is more than negligent, and involves an element of deliberateness, but provided no guidance on what "deliberateness" means in this context or how such deliberateness differs from negligence.  See Dkt. 165, at 16.  The jury was not informed that deliberate indifference is a "stringent standard of fault" which requires conduct that is *more* than grossly negligent.  *L. W.*, 92 F.3d at 899-900; *Bryan Cnty.*, 520 U.S. at 410.  The jury was likewise not informed that deliberate indifference requires that a state actor "recognize[] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff" (*L.W.*, 92 F.3d at 899-900), or that "deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course" (*Duvall*, 260 F.3d at 1139-40).  These are significant points of law which laypeople would require to understand the boundaries of deliberate indifference.  The omission of such information resulted in jury instructions which failed to fairly and adequately cover the issues presented.  *Thorsted*, 858 F.2d at 573.

### D.    The Court Erred in Granting Permanent Injunctive Relief

Respectfully, the Court erred in granting injunctive relief (see Dkt. 208), for several reasons.  First and foremost, there was simply *no evidence* presented at trial that Plaintiff faced a *real and immediate threat* of repeated injury in the future if an injunction did not issue.  *Golden Gate Transactional Indep. Serv., Inc. v. Cal.*, 2019 WL 1718691, at *5 (C.D. Cal. Jan. 22, 2019); *Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001).  Rather, the *only evidence* that was presented at trial in this regard, in the form of two of Plaintiff's own witnesses, Lucia Greco and Steven Clark, confirmed that the same alleged violation has not occurred again and will not occur again.  Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, 490:17-492:12, 494:23-496:19, 499:14-500:5 (Greco), 540:1-19, 544:23-545:7 (Clark)).  Indeed, both testified that they visited the CRO since Plaintiff's March 29, 2019, incident, and that in both instances, the CRO provided persons with vision

_____

relevant to the jury's analysis of whether Plaintiff was excluded from or denied the benefits of the program, service, or activity at issue.

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

disabilities transcriber services to complete an FBNS. Id. No contrary evidence was presented at trial. While the Court appears to have relied on the *remote* possibility a violation could occur again in granting injunctive relief, premised almost exclusively on the testimony of two low level CRO employees (Moran and Briones) who clearly did not have a comprehensive understanding of the CRO's policy changes since the incident, that is not the type of real and immediate danger of irreparable injury necessary to support an injunction. As Mr. Yankee testified, CRO clerks have discretion to fill out/complete blank, unsigned FBNS forms for customers with disabilities who request such assistance as an accommodation/auxiliary aid or service. Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, 407:12-24, 419:3-421:15, 427:2-428:20, 429:10-19, 449:23-452:18, 481:24-482:10). That is exactly what has happened since the March 29, 2019, incident underlying this action, as Plaintiff's own witnesses confirmed at trial.[13]

Second, while the Court faulted the CRO for "barriers" to the usability of the CRO's electronic FBNS forms, those "barriers" pertained exclusively to compatibility issues between the electronic FBNS forms and screen reader software such as JAWS. Dkt. 208, 35:13-36:1. However, as Mr. Yankee explained during trial, customers with vision disabilities using the CRO's kiosk need not use screen reader software at all, as CRO employees will read the FBNS to/for the person with a disability and provide all of the assistance necessary to complete the FBNS. Fine Dec., ¶ 4, Ex. B (TT, Vol. 3, 416:21-418:19, 452:19-461:11). Moreover, while the Court noted that "it would take at least twice as long for a blind and sighted person working together to fill out the FBNS web form using JAWS and a mouse as it would for a CRO clerk to provide transcriber services" (Dkt. 208, 35:13-36:1), that is not the relevant inquiry under the ADA. That one auxiliary aid or service might require slightly more time than another auxiliary aid or service does not render one reasonable and the other unreasonable. All that matters is whether the auxiliary aid or service provided allows for a level of communication *substantially equal* to that afforded to non-disabled individuals. 28 C.F.R., § 35.160(a)(1); *Updike*, 870 F.3d at 958; *Cropp*, 793 F.App'x at 783-84. The CRO's kiosk accommodation allows for a level of communication which is substantially equal to that afforded to non-disabled individuals, and no contrary evidence was presented at trial. Thus, the Court relied upon an incorrect standard in granting an injunction.

---

[13] To the extent CRO employees like Moran or Briones may, in the future, be uncertain of their obligations to persons with vision disabilities requesting transcriber services on CRO forms, they are trained to contact their supervisor(s), who will ensure the individual with a vision disability receives the transcriber services he or she is requesting. Fine Dec., ¶¶ 3-4, Ex. A (TT, Vol. 2, 302:19-25); Ex. B (TT, Vol. 3, 451:18-452:13).

ORBACH HUFF & HENDERSON LLP

Third, because the Court's Order requires the CRO "to provide transcriber services to any blind or visually impaired individual who requests assistance with a CRO form" (Dkt. 208, 46:11-13), the Order is arguably contrary to federal law and improperly supplants the CRO's obligation under the ADA to give "primary consideration" to the requested auxiliary aid/service of the person with a disability. 28 C.F.R. § 35.160(b). Not all persons with disabilities prefer the same type of assistance as Plaintiff; some may prefer to be more independent and fill out the FBNS themselves using the kiosk and human assistance. However, based on the Court's Order, it is unclear if the County is permitted to provide any type of assistance other than transcriber services to persons with vision disabilities who request assistance in completing CRO forms.

## VII.    CONCLUSION

For the reasons discussed herein, the County respectfully requests that the Court grant this Motion, in its entirety, set aside the jury's verdict, and enter judgment as a matter of law in favor of the County. In the alternative, the County requests that the Court order a new trial be held.


Dated: February 14, 2025        Respectfully submitted,
                                **ORBACH HUFF & HENDERSON LLP**

                                By:  _/s/ Nicholas D. Fine_
                                     Kevin E. Gilbert
                                     Nicholas D. Fine
                                     Attorneys for Defendant
                                     COUNTY OF ALAMEDA

Defendant's Renewed Motion for Judgment as a Matter of Law or, in the alternative, New Trial [20-cv-06570-TSH]

ORBACH HUFF & HENDERSON LLP