# EXHIBIT A

Volume 2

Pages 195 - 361

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

```
LISAMARIA MARTINEZ,            )
                               )
           Plaintiff,          )
                               )
  VS.                          )   NO. 3:20-CV-06570 TSH
                               )
COUNTY OF ALAMEDA,             )
                               )
           Defendant.          )
_____)
```

San Francisco, California
Wednesday, March 27, 2024


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**


**APPEARANCES**:

For Plaintiff:
> TRE LEGAL PRACTICE
> 1155 Market Street, Tenth Floor
> San Francisco, California 94103
> **BY:  TIMOTHY R. ELDER, ATTORNEY AT LAW**


> UNDAUNTED LAW FIRM, P.C.
> 600 California Street, Seventh Floor
> San Francisco, California 94108
> **BY:  S. TOMIYO STONER, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Defendant:

3                           ORBACH HUFF & HENDERSON LLP
                            6200 Stoneridge Mall Road, Suite 225
                            Pleasanton, California 94588
4               BY:  **KEVIN E. GILBERT, ATTORNEY AT LAW**
                     **NICHOLAS D. FINE, ATTORNEY AT LAW**
5

6
    Also Present:        **Lisamaria Martinez**
7                        **Michelle Korosy, Paralegal**
                         **Matthew Yankee, County of Alameda**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2

 3   Wednesday, March 27, 2024 - Volume 2

 4
```

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **MORAN, ANGELINA** | | |
| (SWORN) | 208 | 2 |
| Direct Examination by Ms. Stoner | 208 | 2 |
| Cross-Examination by Mr. Gilbert | 243 | 2 |
| Redirect Examination by Ms. Stoner | 266 | 2 |
| **GRIM, EMILY** | | |
| (SWORN) | 277 | 2 |
| Direct Examination by Mr. Elder | 277 | 2 |
| **BRIONES, MARIA LAURA** | | |
| (SWORN) | 284 | 2 |
| Direct Examination by Ms. Stoner | 285 | 2 |
| Cross-Examination by Mr. Gilbert | 311 | 2 |
| Redirect Examination by Ms. Stoner | 325 | 2 |
| **MCCALL, KAREN RUTH (APPEARING VIA ZOOM)** | | |
| (SWORN) | 333 | 2 |
| Direct Examination by Ms. Stoner | 333 | 2 |
| Cross-Examination by Mr. Gilbert | 352 | 2 |
| Redirect Examination by Ms. Stoner | 358 | 2 |

1                    **I N D E X**

2                  **E X H I B I T S**

3  **TRIAL EXHIBITS**                          **IDEN**   **EVID**   **VOL.**

4   1                                                     216      2

5   2                                                     288      2

6   3                                                     265      2

7   4A                                           223      226      2

8   4C                                                    290      2

9   4D                                                    290      2

10  21                                                    344      2

11  22                                                    345      2

12  23                                                    346      2

13  24                                                    349      2

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Wednesday - March 27, 2024**</u>                    <u>**9:44 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE CLERK:**  Good morning, everyone. |
| 6 | We are here in Civil Action 20-6570, Martinez vs. |
| 7 | County of Alameda.  The Honorable Thomas S. Hixson presiding. |
| 8 | Counsel, please state your appearances for the record. |
| 9 | Let's start with plaintiff's counsel, please. |
| 10 | **MR. ELDER:**  Good morning, Your Honor.  Timothy Elder |
| 11 | for plaintiff Lisamaria Martinez.  With me is Tomiyo Stoner and |
| 12 | paralegal Michelle Korosy. |
| 13 | **THE COURT:**  Good morning. |
| 14 | **THE OFFICIAL REPORTER:**  His mic is not on. |
| 15 | **THE CLERK:**  It's on.  It should be. |
| 16 | **MR. ELDER:**  Check, check.  Yeah, I don't hear it. |
| 17 | **THE CLERK:**  Well, try it again. |
| 18 | **MR. ELDER:**  There it is.  There you go.  It needed to |
| 19 | wake up. |
| 20 | Do you need me to repeat that? |
| 21 | **THE CLERK:**  Please. |
| 22 | **MR. ELDER:**  Good morning.  My name is Timothy Elder |
| 23 | for the plaintiff, Lisamaria Martinez.  With me is Tomiyo |
| 24 | Stoner and paralegal Michelle Korosy. |
| 25 | **THE COURT:**  Good morning. |

PROCEEDINGS

1              **MR. ELDER:**  Good morning.

2              **MR. GILBERT:**  Good morning, Your Honor.  Kevin

3    Gilbert, also joined by Nicholas Fine for defendant,

4    County of Alameda; and also joining us is Matt Yankee, the

5    representative for the County.

6              **THE COURT:**  Good morning.

7         I appreciate the parties' trial briefs regarding the

8    plaintiff's deposition transcripts.

9         And thank you, Plaintiff, for lodging those with

10   the Court.  I have had the opportunity to review the

11   certifications.

12        The rule that governs the use of depositions at trial is

13   Federal Rule of Civil Procedure 32, and Rule 32(d)(2) states

14   that (as read):

15             "An objection based on disqualification of the

16        officer before whom a deposition is to be taken is

17        waived if not made before the deposition begins; or

18        promptly after the basis for disqualification becomes

19        known or, with reasonable diligence, could have been

20        known."

21        And Rule 32(d)(4) states that (as read):

22             "An objection to how the officer transcribed the

23        testimony -- or prepared, signed, certified, sealed,

24        endorsed, sent, or otherwise dealt with the

25        deposition -- is waived unless a motion to suppress

**PROCEEDINGS**

1       is made promptly after the error or irregularity

2       becomes known or, with reasonable diligence, could

3       have been known."

4       I find that defendant's objections to these depositions

5   have been waived pursuant to Rule 32(d)(2) and (d)(4).

6       Is there anything else we should -- let me first ask,

7   anything else we should take up before we bring in the jury?

8           **MR. ELDER:**  Not from plaintiff, Your Honor.

9           **THE COURT:**  And from defendant?

10          **MR. GILBERT:**  Yes, Your Honor.  I believe there's one

11  additional issue.

12      During plaintiff's opening yesterday, they appeared to

13  advance a damages claim that encompassed lost wages,

14  transportation costs, and other financial costs and monetary

15  aspects.  And just to be clear, we are not disputing that

16  plaintiff has a garden-variety emotional distress claim.  We

17  have objected to that based upon the -- based upon the state

18  law which we believe precludes it, but that's a different

19  issue.

20      The defendants contend that the ancillary monetary

21  claim -- the lost wages, the transportation costs, the

22  incidental additional costs for filing, things like that --

23  have been waived and are not properly before the Court.

24      The plaintiff's initial disclosure did not include any

25  such damages claim.  Instead, the damages were simply

**PROCEEDINGS**

1  described -- and I'm paraphrasing for purposes of time --

2  compensatory damages based upon humiliation, indignity, shock,

3  and emotional distress, and then statutory damages, and then

4  attorneys' fees.  Those same components were also echoed in

5  plaintiff's pre-litigation government claim.

6      At no point during the litigation has plaintiff ever

7  amended her disclosures for the purpose of including claims for

8  lost monetary damages associated with lost profits for her

9  consulting business, the transportation cost, the lost -- or

10 additional filing fee cost, and other components that we heard

11 about only for the first time during opening statements

12 yesterday.

13     We would ask that those aspects be stricken, that the jury

14 be instructed that there's no such claims for such monetary

15 damages in this case, and that any inquiry of witnesses on

16 those aspects not be allowed because they are not relevant to

17 the claims that have been asserted and they're likely to cause

18 confusion under 403 as they are not proper claims in this case.

19         **THE COURT:**  Why isn't this an untimely motion in

20 limine?

21         **MR. GILBERT:**  Because, Your Honor, I'm not going to

22 file a motion in limine to exclude a claim that's never been

23 made.  Plaintiff never raised the issue, never sought these

24 damages.  They weren't identified.  I'm not going to file a

25 motion in limine that says, "Your Honor, I'm asking you to

1    preclude a claim that plaintiff has never made, that there's no

2    dispute that it's not asserted, that there's never been a

3    disclosure on it, that there's never been discovery on it."

4         The first time it came up was during opening argument

5    yesterday.  Had plaintiff -- there's no way for me to foresee

6    that plaintiff was going to try and backdoor a claim that was

7    expressly excluded from their government claim and their

8    Rule 26 disclosures.

9         And I'm not going to mire the Court down in making

10   frivolous motions in limine to exclude claims' aspects,

11   arguments, and components that simply aren't being asserted.

12   That's absolutely improper for me to do that; and, in fact,

13   there's multiple case law that say that that is a poor use of

14   judicial resources to submit numerous unnecessary motions, such

15   as a prophylactic motion to exclude a claim that's never been

16   asserted.

17        **THE COURT:**  In my experience, defendants file motions

18   in limine all the time saying that plaintiff should not be

19   allowed to advance undisclosed damages theories.

20        Let me hear from plaintiff.

21        **MR. ELDER:**  So, Your Honor, I think -- I can't say for

22   certain that we haven't disclosed this in any of our

23   disclosures over time just because I'm just hearing about this

24   right now.

25        I will say we have definitely disclosed compensatory

**PROCEEDINGS**

1    damages, which can include both out-of-pocket economics and

2    emotional distress.

3        If defendants want to stipulate that her out-of-pocket

4    damages are no greater than the $4,000 that were disclosed, we

5    could, you know, limit our testimony and just have an agreement

6    that her out-of-pockets are $4,000 or less and then proceed.

7    But they've definitely been on notice that there were the

8    statutory damages that could encompass any of these things.

9    But we're presenting the evidence to justify the $4,000, which

10   is the statutory damages under the Unruh Act.

11       I believe now, because we've dismissed the Unruh Act, it's

12   now subject to the DPA statutory damage, which is a thousand

13   dollars.  We'd be happy to stipulate that she's -- her

14   out-of-pockets are no greater than that $1,000 as well.

15       We're talking about a few -- the testimony will be that

16   there's four hours of time driving and filling out the

17   replacement form at a rate of $25 an hour.  That's $25 an hour

18   for Ms. Grim's time.

19       And then we're not really making a lost wages claim so

20   much as the value of her time that she lost is estimated by the

21   value of what she earns in her business, which we disclosed is

22   $35 an hour as she estimates.  She's going to testify that's

23   what she estimates her time is likely worth, not that she

24   necessarily lost that amount of business directly.

25       But that's what the evidence will be, and I think it's all

1    within the $1,000 statutory limit.  We'd be happy to do

2    either -- do it either way.

3        THE COURT:  Here's what I think:  Based on the opening

4    statement, I don't have a clear sense of what damages plaintiff

5    is seeking.  Appropriately for an opening statement, it was

6    described at a high level of generality, not in a lot of

7    detail, and it sounds like we'll be getting more detail later.

8        And, second, defendant has asserted that plaintiff is

9    seeking damages that were not disclosed, but you have not yet

10   demonstrated to me that that is the case; for example, by

11   filing with the Court her previous disclosures and showing that

12   what she's seeking now is beyond those disclosures.

13       And it sounds like plaintiff may be willing to talk with

14   the defense.  I would like the parties to meet and confer to

15   see if you can reach an agreement or stipulation about the

16   damages; and then if you're not able to, I would ask the

17   defendant to file a motion that you believe is appropriate to

18   demonstrate that plaintiff is seeking damages beyond what was

19   disclosed pretrial.

20       Right now you've made that argument to me, but you haven't

21   fleshed it out and demonstrated that to be true.  So if you

22   would like to make that motion, please go ahead and do so.

23       But I do want the parties to meet and confer to see if

24   you're able to resolve this and if it turns out not really to

25   be an issue in dispute.

1      Does that give defendant appropriate guidance?

2          **MR. GILBERT:**  The problem is that -- yes, it does to a

3  certain extent.

4      And, for the record, we have previously lodged the initial

5  disclosures and the supplemental disclosures to the Court, so

6  the Court has them, when we were addressing the disputes about

7  witnesses that had been properly disclosed.

8      The issue that remains that we'll have to deal with today

9  is, for example, Ms. Grim was one of the individuals who drove

10  Ms. Martinez to the CRO's office for the rerecording of the

11  FBNS.  If there is testimony about the cost of the services --

12  we heard that there was a per-mile or a per-hour charge, I

13  can't remember what it was, yesterday during opening

14  statements.  If those type of questions come up, I suspect that

15  there will be objections from the County about relevance and

16  403.

17      I just want to make sure that the Court is aware that this

18  is the context in which we're objecting so those issues can be

19  addressed, if necessary.

20          **THE COURT:**  Expenses that were incurred in general

21  I think could be part of the showing of a denial of access

22  under the statute, even if they're not technically sought as

23  damages.  I would expect plaintiff to clarify in closing

24  argument exactly what you're seeking as damages.

25      Are you intending to do that?

**PROCEEDINGS**

1          **MR. ELDER:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  And, again, just lodging the

3   initial disclosures at some point in the record and then

4   asserting to me now that things stated in opening were beyond

5   that, I don't think that's sufficient to develop an argument in

6   front of me that I'm capable of ruling right on the spot, in

7   particular because I don't think the opening statement provided

8   a lot of detail about the damages plaintiff is seeking.

9          So I'm not prepared to start excluding testimony that may

10  touch on the subject of damages.  But, again, Defendant, you

11  can go ahead and file any motion you want.  And I do encourage

12  the parties to meet and confer to see if you're able to resolve

13  this dispute.

14          **MR. GILBERT:**  Thank you, Your Honor.

15          **THE COURT:**  And with that, Rose, please bring in the

16  jury.

17          (Proceedings were heard in the presence of the jury.)

18          **THE COURT:**  Good morning, everyone.  Please be seated.

19          Members of the jury, I have another instruction for you.

20          During the course of these proceedings, you may observe

21  individuals that appear to be listening to audio output from a

22  computer or mobile device while they are in the courtroom,

23  including possibly while they're on the witness stand.

24          This is one of the ways that a blind or visually impaired

25  user may review documents, with the software on the device

**MORAN - DIRECT / STONER**

1  generating a text-to-speech output.

2     At this time, I ask plaintiff to call their first witness.

3        **MS. STONER:**  Thank you.

4     Thank you, Your Honor.

5     We'll call Ms. Moran, Ms. Angelina Moran.

6   (Witness enters the courtroom and steps forward to be sworn.)

7        **THE COURT:**  Please have a seat.

8     I'm going to move the computer monitor so I can see the

9  witness.

10        **THE CLERK:**  Can you raise your right hand, please.

11                     <u>**ANGELINA MORAN**</u>,

12  called as a witness for the Plaintiff, having been duly sworn,

13  testified as follows:

14        **THE WITNESS:**  Yes.

15        **THE CLERK:**  Thank you.  You have been sworn.

16                  <u>**DIRECT EXAMINATION**</u>

17  BY MS. STONER:

18  **Q.**   Good morning.  Will you please state your name for the

19  record?

20  **A.**   Angelina Moran.

21  **Q.**   And where are you employed?

22  **A.**   At the Alameda County Clerk-Recorder's Office.

23  **Q.**   How long have you been employed there?

24  **A.**   It will be 20 years next year.  19 years.

25  **Q.**   And what is your current job title?

 1   **A.**   My current job title is Auditor Associate III.

 2   **Q.**   And auditor associate was previously known as clerk

 3   recorder specialist?

 4   **A.**   Yes.

 5   **Q.**   And you've been a clerk recorder specialist for the

 6   majority of your time at the County of Alameda?

 7   **A.**   Yes.

 8   **Q.**   Is it your role to file forms such as FBNS forms?

 9   **A.**   Yes.

10   **Q.**   And I want to make sure I'm correct here.  There's some

11   different terminology at play.

12        When I say "filed," what does that mean to you?

13   **A.**   That means that we accepted it, accepted payment, and it

14   is in the system.

15   **Q.**   Okay.  And if I say "recorded," what does that mean to

16   you?

17   **A.**   We use the title "recorded" for more property documents.

18   **Q.**   Okay.  So the term "recorded" doesn't really apply to FBNS

19   forms?

20   **A.**   Right.

21        **MR. GILBERT:**  Calls for a legal conclusion.

22        **MS. STONER:**  Okay.

23        **THE COURT:**  Overruled.

24   BY MS. STONER:

25   **Q.**   And do you know, as we stand here today, exactly and

 1   precisely -- and I'm not asking you to define it; I'm asking

 2   you if you know -- what "deposited" means as a legal term in

 3   relation to Government Code 27203?

 4          **MR. GILBERT:**  Calls for a legal conclusion.

 5          **MS. STONER:**  I'm asking if she understands.

 6          **THE COURT:**  Let me first instruct the jury.

 7        The witness is being asked about her understanding of a

 8   legal requirement.  You're not to take that as the truth about

 9   what the law is, but the witness is allowed to testify about

10   what her understanding of the law may be, and that's all that

11   you're getting.

12          **MS. STONER:**  Thank you, Your Honor.

13          **THE WITNESS:**  At the time a customer comes up to the

14   counter if it's in-office, in-person, and they hand over a

15   fictitious business name that they intend on filing --

16   **BY MS. STONER:**

17   **Q.**   I actually just --

18   **A.**   -- it is deposited.

19   **Q.**   -- asked the question of do you -- are you --

20          **MR. GILBERT:**  Objection, Your Honor.  We'd ask that

21   the witness be allowed to finish her answer before being

22   interrupted.

23          **THE COURT:**  Yes.  Sustained.

24          **THE WITNESS:**  Okay.  So at the counter, we ask "What

25   are you here to do?"

1        And the customer would say, "I'm here to file a fictitious

2   business name."

3        So they hand over the application for review.  That is

4   considered deposited.  Or in the case of by mail, it's when the

5   mail arrives at our office and we've opened it up and reviewed

6   it for either completion or necessary to mail back for

7   correction.

8   **BY MS. STONER:**

9   **Q.**   Okay.  And that is your understanding based on what?

10  **A.**   Just the process.

11  **Q.**   Okay.  Have you studied Government Code 27203?

12  **A.**   I have -- I have been notified that that's what we follow.

13  And I did look at the code; but as far as the details of it, I

14  haven't thoroughly studied it.

15  **Q.**   And when did you look at the code?

16  **A.**   Just recently --

17  **Q.**   Okay.

18  **A.**   -- when it was brought up.

19  **Q.**   Not prior to March 29, 2019?

20  **A.**   No.

21  **Q.**   When a customer comes in with an FBNS form, do you simply

22  stamp it and put it in the file, regardless of whether there

23  are errors?

24  **A.**   No.

25  **Q.**   What do you do first before you accept a file?

MORAN - DIRECT / STONER

1   **A.**   In person?

2   **Q.**   Yes.

3   **A.**   Okay.  So the customer hands over the fictitious business

4   name.  We review it.  So all the sections need to have been

5   completed and they need to match.

6        And so what that means is, if a customer files as an LLC,

7   the LLC information needs to be in Section C.  And then there's

8   boxes to be checked as the -- how they're filing.  So we have

9   an option for LLC there.  So the LLC matches the information,

10   plus the -- how they're -- how they're filing.

11        If they chose, for example, a partnership, then they could

12   not have chosen LLC or individual.  They would have had to

13   include two individuals for a partnership, or they would have

14   had to check LLC.

15        I lost my train of thought there.

16   **Q.**   So it's your job that before a document is filed, you make

17   sure all the information is complete and correct?

18   **A.**   Yes.

19   **Q.**   And what do you do if at the counter a business owner

20   brings in a form that is not properly completed?

21        **MR. GILBERT:**  Objection.  Overbroad.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  So we discuss it with the customer.

24   First of all, "How are you filing?"  If they -- we find a lot

25   of times, they wrote their own name because they're the owner

1    of a corporation or an LLC.  So they'll write their name in the

2    box where the name of the LLC should have been or the

3    corporation, and then we would still need their signature at

4    the bottom and a title.

5        So we discuss what their intentions are.  And I said,

6    "Okay.  Well, if you're filing as a corporation, your

7    corporation name goes here, and then you need to check the

8    appropriate box.  If you're filing as a corporation, check that

9    box."  And I hand it back to them so they can make the

10   corrections at the counter.

11   **BY MS. STONER:**

12   **Q.**   That's the same mistake Ms. Martinez made on March 29,

13   2019?

14   **A.**   Along the same lines, yes.  She was filing an LLC.

15   **Q.**   Okay.  And so that's a very common situation that occurs?

16   **A.**   Yes.

17   **Q.**   All right.  And so if a person is able to write and read

18   on paper themselves, what happens next once you inform them of

19   the error?

20   **A.**   Oh, they make the correction on the spot.

21   **Q.**   Just right there at the --

22   **A.**   Yes.

23   **Q.**   -- CRO?

24   **A.**   Mm-hmm.

25   **Q.**   And so on March 29, 2019, my client came in with a form

1   that had an error similar to the one you just described?

2   A.   Yes, mm-hmm.

3        MS. STONER:  And, Your Honor, I'd like to introduce

4   Exhibit Number 1.

5        Counsel, any objection?

6        MR. GILBERT:  I think we need to set a foundation

7   first, have her look at it, but no objection to it being

8   admitted.

9   BY MS. STONER:

10  Q.   Okay.  So on March 29, 2019, did my client bring a paper

11  form and show that to you?

12  A.   Yes.

13  Q.   And if I showed you a copy of that paper form, do you

14  think you'd be able to identify it and --

15  A.   Yes.

16  Q.   -- aver to its accuracy?

17  A.   Yes.

18  Q.   Would you be able to tell me if it's a true and correct

19  copy?

20  A.   Sure.

21  Q.   Okay.

22       THE COURT:  I believe that the witness has in front of

23  her the binders with the parties' exhibits.

24       MS. STONER:  Great.

25       THE COURT:  Do you have one that says "Plaintiff's

1    Trial Exhibits"?

2                    **THE WITNESS:**  Yes.

3                    **MS. STONER:**  Perfect.

4                    **THE COURT:**  Great.

5    **BY MS. STONER:**

6    **Q.**   Will you go ahead --

7                    **THE COURT:**  Please tell her what tab to look at.

8                    **MS. STONER:**  Yes.

9    **Q.**   Please look at Tab Number 1.

10   **A.**   I'm sorry?

11   **Q.**   Tab Number 1.

12   **A.**   Tab Number 1.

13                   **MS. STONER:**  Great.  Thank you, Your Honor.

14   **Q.**   Okay.  And have you reviewed that document?

15   **A.**   Yes.

16   **Q.**   And do you agree that's an accurate copy of what

17   Ms. Martinez brought to you that day?

18   **A.**   I believe so.

19                   **MS. STONER:**  Okay.  Your Honor, I'd like permission to

20   show the jury Exhibit Number 1.

21                   **THE COURT:**  Do you move the admission of Exhibit 1?

22                   **MS. STONER:**  Yes, I move the admission of Exhibit 1.

23                   **THE COURT:**  Any objection?

24                   **MR. GILBERT:**  No, Your Honor.

25                   **THE COURT:**  Admitted.

```
 1              MS. STONER:  Thank you.

 2              THE COURT:  And you may show it to the jury.

 3          (Trial Exhibit 1 received in evidence.)

 4   BY MS. STONER:

 5   Q.   So while we pull it up, I'll just ask you if you recall;

 6   and if not, we can look at the document.

 7          Were there just two small errors on the form?

 8   A.   Three errors.

 9   Q.   What were the -- what were the three errors?

10   A.   She has her individual name in Section C1.

11   Q.   Okay.

12   A.   She did not --

13   Q.   That's --

14   A.   Oh, I'm sorry.  This is M2 --

15   Q.   Yeah.  I think you're --

16   A.   -- in label 1.

17   Q.   -- looking at a different exhibit.

18   A.   Okay.  So you said --

19   Q.   We're looking at Tab 1.  Is that --

20   A.   Tab 1.

21   Q.   That document says --

22   A.   And this says --

23   Q.   -- March 29 --

24          (Simultaneous speaking.  Stenographer interrupts for

25   clarification of the record.)
```

1   BY MS. STONER:

2   **Q.**   Is the document you're looking at, does it say March 29,

3   20 -- or is it the document that was unfiled and submitted

4   March 29, 2019?

5   **A.**   Unfiled.  And it's Exhibit M2.

6   **Q.**   Okay.  Perfect.

7                       (Pause in proceedings.)

8   BY MS. STONER:

9   **Q.**   Okay.  So this is the same exhibit that you're looking at?

10  **A.**   Yes.

11  **Q.**   Perfect.

12       Technology.

13       Okay.  So there are some -- there are some errors on the

14  form.  Why don't you walk me through what they are.

15  **A.**   Okay.  So she has, in Section A, "Be Confident Be You

16  Coaching LLC."  That is an LLC title.  LLCs, Inc.s, corps. are

17  all reserved words, so we would need to see the articles of

18  organization for the LLC.

19       But the error is, in Section C1, she has her personal

20  name.

21  **Q.**   Okay.

22  **A.**   So she's already notified -- she's already stated that she

23  is an LLC, so her LLC name should be in Section C1.

24  **Q.**   Okay.  And what's the second error?

25  **A.**   If it's a corporation or LLC, she should state the state

1  of incorporation, and that's underneath the address.

2  **Q.**   Okay.  Okay.  And then what's the third issue?

3  **A.**   And then the title at the signature line in Section F, she

4  has "Founder."

5  **Q.**   Okay.  So, interesting.

6       So on the date of Ms. Martinez's visit to the CRO, do you

7  remember discussing two errors with her?

8  **A.**   We may have gone back and forth as to how she wanted to

9  file.  So she has an individual name there.  So that would have

10  been up to her to file either as an individual or as an LLC;

11  but since she stated LLC at the top, I was going in that

12  direction to guide her to fill out as if she was filing an LLC.

13  **Q.**   Understood.

14       So if she were to have, at the counter, changed her name

15  from Lisamaria Martinez and then put "Be Confident Be You

16  Coaching LLC" --

17  **A.**   Yes.

18  **Q.**   -- at that time, the box below, if corporation, would have

19  become wrong because now that she's a corporation, she needs to

20  add this additional detail?

21  **A.**   LLC.

22  **Q.**   Or LLC.  I'm sorry.

23       So now that she's an LLC, she needs to add this detail of

24  the state; right?

25  **A.**   Yes.

**MORAN - DIRECT / STONER**

1  **Q.**   So if she had made the correction at home, if she had gone

2  home and simply corrected her name and the check box, would you

3  have accepted the form?

4  **A.**   Not -- no.  The third error is the founder title.

5  **Q.**   Right.  And did you discuss that with her on that day?

6  **A.**   I don't know if we'd gotten that far.

7  **Q.**   Because most likely, if she had made the changes to

8  indicate she was an LLC, that would have then flagged the issue

9  of title for you?

10  **A.**   Yes.

11  **Q.**   Okay.  And if she had done the two corrections you had

12  indicated and simply put the form in the mail, you would have

13  rejected it?

14  **A.**   Yes.

15  **Q.**   And is this a frequent occurrence, that sometimes someone

16  puts in a piece of information and then it kind of changes the

17  rest of the form so that you have additional changes for them?

18  **A.**   Yes.  We have a long list of items that can be necessary

19  to notify the customer for changes on our Go Back Letters.

20  **Q.**   And it's frequent that when a person who is able to read

21  and write text is in your -- the CRO's office, when they

22  indicate that there's one error, you tell them to make one

23  change, they may present the form and you may again reject it

24  because there's another change that needs to be made?

25  **A.**   We --

1          **MR. GILBERT:** Objection. Speculation.

2          **THE COURT:** Overruled.

3          **THE WITNESS:** We are thorough, so if even we miss

4    something the first time around, we would exchange it back and

5    forth until it's complete and correct.

6    **BY MS. STONER:**

7    **Q.** And is that something that happens on a regular basis?

8    **A.** Yes.

9    **Q.** When Ms. Martinez had the errors, did she ask you to

10   transcribe something on the form for her?

11   **A.** Absolutely, yes.

12   **Q.** And were you aware that she made that request because

13   she's blind and, therefore, couldn't change the paper form

14   herself?

15   **A.** Yes.

16   **Q.** On March 29, 2019 -- and I'm asking about on that date,

17   not now -- were you aware the ADA, the Americans with

18   Disabilities Act, sometimes requires the CRO to provide

19   additional assistance to patrons who are blind?

20          **MR. GILBERT:** Misstates the law. Calls for a legal

21   conclusion. 403.

22          **THE COURT:** Overruled.

23      But I am going to instruct the jury that, once again, the

24   witness is being asked for her understanding as someone who is

25   not a legal expert about the law. So you're not to take her

 1   testimony as the truth about what the law is.  I will instruct

 2   you in the jury instructions about what the Americans with

 3   Disabilities Act requires.  But she is allowed to testify as to

 4   her personal understanding of what may have been required, and

 5   that's all that you're to take this testimony as.

 6        **THE WITNESS:**  Your question?

 7   **BY MS. STONER:**

 8   **Q.**   On March 29, 2019, were you aware that the Americans with

 9   Disabilities Act sometimes requires the CRO to provide

10   assistance to customers who are blind?

11   **A.**   If that is --

12        **MR. GILBERT:**  Misstates the law.

13        **THE COURT:**  Overruled.

14        **THE WITNESS:**  If that is the case, then it contradicts

15   the state law and our policy.  We would not complete a form

16   that is already signed under penalty of perjury, especially

17   particularly because the client could not verify visually what

18   we are changing.

19   **BY MS. STONER:**

20   **Q.**   Okay.  Let's back up.

21        On March 29, 2019, was it your understanding the CRO had

22   any obligation to provide any additional service to a customer

23   who is blind because of --

24   **A.**   My understanding --

25        **MR. GILBERT:**  Overbroad.  Incomplete hypothetical.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  My understanding about the ADA is that

3    we accommodate to the best of our ability, and that includes

4    possibly walking someone to the counter that is blind,

5    communicating by writing if a person is deaf --

6    BY MS. STONER:

7    **Q.**   So as --

8    **A.**   -- but not to fill out, not to alter any documents.

9    **Q.**   Okay.  So as of March 29, 2019, you did understand that as

10   a County employee, you had certain obligations under the ADA to

11   provide services to customers who were blind that you would not

12   necessarily provide to customers who were not blind, such as

13   walking to the counter or passing notes --

14   **A.**   If a person is --

15   **Q.**   -- to someone who is deaf?

16   **A.**   -- able-bodied, they can walk to the counter on their own

17   strength, yes.

18          And if a person is deaf, there would be no reason -- not

19   deaf, or they can hear, there would be no reason to exchange

20   anything in writing.

21   **Q.**   Right.  And you understood on March 29, 2019, that you

22   would sometimes be obligated by the Americans with Disabilities

23   Act to provide some additional support?

24   **A.**   Provide any accommodations --

25          **MR. GILBERT:**  Misstates the law.

1          THE COURT:  Overruled.

2          THE WITNESS:  Provide any accommodations that are

3   possible without breaking the law.

4   BY MS. STONER:

5   Q.   Sure.

6        Okay.  I'm going to grab this binder real quick.

7        Do you remember having your deposition taken in this

8   matter?

9   A.   Yes.

10  Q.   And did you testify accurately during your deposition?

11  A.   To the best of my knowledge.

12  Q.   Truthfully?

13  A.   Mm-hmm, yes.

14         MS. STONER:  Okay.  I'd like to introduce the

15  recording of the encounter between you and Ms. Martinez.

16       Your Honor, I'd like to move to mark the file Exhibit 1A,

17  the digital recording.

18         THE COURT:  4A, do you mean?

19         MS. STONER:  4A.  I'm sorry.  4A.

20       (Trial Exhibit 4A marked for identification)

21         THE COURT:  Are you moving to admit it?

22       MS. STONER:  Yes.

23         THE COURT:  Is there any objection from the defense?

24         MR. GILBERT:  I think it needs a foundation first;

25  but, no, there's no objections to 4A.

1    **THE COURT:**  Is there any foundation that you can lay?

2    **MS. STONER:**  She was -- I mean, I -- she could listen

3    to it, and I could lay a foundation that way.

4    **THE COURT:**  Okay.

5    **MS. STONER:**  How --

6    **THE COURT:**  Counsel, if there's no -- we would need to

7    do that outside the presence of the jury.  Are you really

8    standing on foundation?

9    **MR. GILBERT:**  Your Honor, she's already been provided

10   it.  She's listened to it before.  I think just the basic

11   question of "Have you had the opportunity to review the

12   document -- or the audio?"

13   **MS. STONER:**  Okay.

14   **MR. GILBERT:**  "What do you understand it to be?"  So

15   the jury has it in context.

16   **THE COURT:**  Thank you.

17   **MS. STONER:**  Okay.  Thanks.

18   **Q.**   So have you previously had the opportunity to listen to a

19   recording of the encounter between you and Ms. Martinez on

20   March 29, 2019?

21   **A.**   Yes.

22   **Q.**   And in that recording, is that recording, to the best of

23   your understanding, true and accurate?

24   **A.**   Yes.

25   **MS. STONER:**  Now I move to admit 4C.

 1          THE COURT:  Any objection?

 2          MR. GILBERT:  No objection, with the caveat that there

 3   also needs to be an instruction that the -- I believe this is

 4   the one that's been edited by plaintiff's counsel to remove

 5   time and gaps in it.  So that needs to be clear.  But

 6   otherwise, no objection.

 7          THE COURT:  That's correct, that you've edited it to

 8   remove gaps; is that --

 9          MS. STONER:  Yes.  Sorry.  And it's 4A, for the

10   record.

11          THE COURT:  Which one are you moving to admit?

12          MS. STONER:  4A.

13          THE COURT:  4A.

14      Okay.  So you're moving to admit an edited version of the

15   recording; is that correct?

16          MS. STONER:  One moment.

17   **Q.**   When you listened to the recording, did you hear some

18   beeps on the recording?

19   **A.**   I don't remember.

20          MS. STONER:  Okay.  Yes, I will move to admit 4A, the

21   edited version, if there's no objection from counsel.

22          THE COURT:  And to be clear to the jury, that's been

23   edited to remove gaps; correct?

24          MS. STONER:  Thank you.

25          THE COURT:  Any objection?

```
 1              MR. GILBERT:  No, Your Honor.  Thank you.

 2              THE COURT:  Exhibit 4A is admitted.

 3         (Trial Exhibit 4A received in evidence.)

 4              MS. STONER:  Okay.  I'd like to play Exhibit 4A for

 5    the jury.

 6                   (Audio was played but not reported.)

 7    BY MS. STONER:

 8    Q.   All right.  So as that recording played, do you -- did you

 9    hear yourself stating that "By filling it out, I'm breaking the

10    law"?

11    A.   Yes.

12    Q.   And when you said that -- when you said that, do you

13    believe that you were telling Ms. Martinez the truth?

14    A.   Yes.

15    Q.   And as you testify today, do you believe it would be

16    breaking the law to assist a blind customer by acting as a

17    transcriber on an FBNS form?

18    A.   As a -- as a signed application, a signed form.  She had

19    signed already that particular application under penalty of

20    perjury.  Yes, I cannot change or alter a document that's

21    already been signed.

22    Q.   Okay.  So you understand that you can't change or alter a

23    document that's already been signed, but what about a blank

24    FBNS form?

25    A.   That did not come into play.
```

1   **Q.**   But I'm asking --

2   **A.**   She did not ask me --

3   **Q.**   I'm asking --

4   **A.**   -- to change -- or she did not offer to sign a new form.

5   **Q.**   But I'm asking the question.  Do you believe it would be a

6   violation of the law to write on a blank FBNS form?

7   **A.**   It would not be signed under penalty of perjury, so, no.

8   **Q.**   So it would not be a violation of law to transcribe on a

9   blank FBNS form?

10  **A.**   Right.

11          **MR. GILBERT:**  Objection.  Calls for a legal

12  conclusion.

13          **THE COURT:**  Overruled.

14      I've already instructed the jury that any questions about

15  the law are just about the witness's personal understanding of

16  the law and the jury is not to take that as a truthful

17  description of what the law is.

18  **BY MS. STONER:**

19  **Q.**   And were there blank FBNS forms at the CRO on that day?

20  **A.**   Yes.

21  **Q.**   Yet you felt, following the policy of the County,

22  following the chain of command, that you were not allowed to

23  assist Ms. Martinez on that day?

24  **A.**   I'm not allowed to alter a signed document.  That is what

25  she was asking.  Even in the video, she said, "So you cannot

1   help me change this form?"  And I said, "No, I cannot help you

2   alter this form."

3   **Q.**   Did you ever offer to transcribe a blank form for her?

4   **A.**   She was very rude that day.  I -- as I was waiting for my

5   supervisor to come back from lunch, I said, "While we're

6   waiting, if I can help other customers," because they were

7   backing up, I said, "Would you like to have a seat?"

8        She said, "No.  I'm going to stand here.  I'm going to

9   wait here."

10       I said, "Okay.  Fine."

11       So I helped a customer.  While I was helping the customer,

12  focusing on that customer, going back and forth like in the

13  exchange like a normal transaction, she would speak to the

14  customer -- and she did it twice -- and say, "See, that's

15  discrimination.  That's discrimination."  So while I was trying

16  to do a cash transaction, she was speaking to the customer

17  making them feel uncomfortable.

18       I went again to go search for a supervisor, came back to

19  her, and I said, "She is back from lunch.  She will be right

20  with you.  Let me help one more customer while we're waiting

21  for her to come out."

22       She did the same thing.  So that's when, I can explain

23  what the video was when I said, "Look, I've already told my

24  supervisor.  There's nothing else I can do for you.  I am not

25  going to alter your document."

**MORAN - DIRECT / STONER**

1    And she still insisted, and she had been doing that for

2 however long that she waited, and she was timing it, half an

3 hour, hour, 45 minutes, however long that she said.  It was

4 during the lunchtime.

5 **Q.**    Yeah.

6 **A.**    And that's when I said I would walk away.  I would remove

7 myself.  Keep my composure.  Keep my professionalism.  I didn't

8 want her to say, "She never came back."  So I -- that's -- that

9 was my explanation for saying, "You know what?  I'm not going

10 to come back.  I've already referred you to my supervisor and

11 she will take it from here.  I'm going to walk away."

12 **Q.**    It sounds like it was a frustrating encounter for everyone

13 that day.

14 **A.**    I don't think it had to be that way; but being spoken to

15 the way she did, threatening that she was -- because I was

16 discriminating her and against the ADA and I was -- I should

17 have been -- she was not a very nice person that day, and

18 while -- especially while I was trying to help other customers.

19    So she -- I would have liked her to have a seat, you know,

20 so that way we can separate, but she insisted on staying there.

21 She waited there for however long it took.  And then my

22 supervisor also consulted with her supervisor.  So there was

23 more time.  And that's the reason I chose to walk away.

24 **Q.**    So this encounter lasted 45 minutes, an hour, maybe more?

25 **A.**    Maybe more.

1  Q.   How long would it have taken you to write on a blank FBNS

2  form all the details that are required to complete that form?

3  A.   I would have completed it.  I know how to complete a form.

4  I'm able to complete it.  I know what goes where and what's

5  correct.  Three to five minutes maybe to verify everything.

6  Q.   So for 45 minutes to an hour, maybe more, you and

7  Ms. Martinez were sort of in this deadlock?

8  A.   Yes, because all that she asked was for me to alter the

9  form.

10  Q.   Had you ever been trained about the duties under the ADA

11  to provide auxiliary aids and services?

12  A.   No.

13  Q.   Okay.  Did you believe that you -- it would be breaking

14  the law for a third party to assist Ms. Martinez in filling out

15  a blank form?

16  A.   No.

17           MR. GILBERT:  Vague.  Overbroad.

18           THE COURT:  Overruled.

19  BY MS. STONER:

20  Q.   And actually, you didn't even believe it would be a

21  violation of the law for you to write on an FBNS form for

22  Ms. Martinez.

23  A.   It is not -- we have never, ever completed blank forms,

24  especially fictitious business name forms that would stand up

25  in court for any reason.  We have never completed blank forms.

1       But what was happening that day was the disagreement about

2   a signed form under penalty of perjury to make alterations.

3   **Q.**   But as far as you know, it wouldn't be a violation of any

4   law for you to write on a blank FBNS form?

5   **A.**   I -- I have never come into that situation.  We would not

6   do that, so it's kind of...

7   **Q.**   Okay.  Let me refresh your recollection on that.

8       During the deposition, did you -- were you asked if it

9   would be violating a law to fill out a blank FBNS form?

10  **A.**   I do not believe --

11          **MR. GILBERT:**  Hearsay.

12          **THE WITNESS:**  -- that I was asked that question.

13          **MR. GILBERT:**  Objection.  Hearsay.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  I do not believe I was asked that

16  question.  If I was, I do not remember.

17  **BY MS. STONER:**

18  **Q.**   Okay.

19  **A.**   What he -- what I do remember is that he asked me about my

20  education and my job experience and then asked me if I can

21  scribble, if I was capable of scribbling on a piece of paper.

22  **Q.**   Okay.

23          **MS. STONER:**  Your Honor, may I read -- we had an issue

24  with the deposition transcripts.  May I read from this

25  deposition transcript into evidence?

1          THE COURT:  Can you show it to her at the same time?

2          MS. STONER:  Yes.

3                    (Pause in proceedings.)

4   BY MS. STONER:

5   Q.  Ms. Moran --

6          MS. STONER:  May I approach?

7          THE COURT:  And then if you can tell me the page and

8   the line that you intend to read to see if there's any

9   objection.

10         MS. STONER:  Yes.  Deposition of Angelina Moran,

11  January 24th, 2022, page 51, lines 7 through 15.

12         THE COURT:  Thank you.

13         MS. STONER:  May I approach?

14         THE COURT:  You may approach.

15         THE WITNESS:  (Witness examines document.)

16  Understood.  Mm-hmm.

17  BY MS. STONER:

18  Q.  All right.  So do you have any reason to dispute the

19  accuracy of that deposition testimony?

20  A.  No.

21  Q.  Okay.  So the question was (as read):

22         "When customers ask you" --

23         MR. GILBERT:  Objection, Your Honor.  Hearsay.

24         THE COURT:  Overruled.

25  \\\

MORAN - DIRECT / STONER

1    BY MS. STONER:

2    Q.    (as read):

3          -- "to fix an FBNS form for them, do you tell them

4          that it would be breaking the law?"

5    A.    I don't get there.  Actually, if I -- if a customer comes

6    and says, "Oh, just go ahead and make the change for me," and I

7    said, "No, I'm not allowed to," and I hand back the application

8    to them.  It never gets to the point where we are speaking

9    about legal liability unless it escalates.  So customers are

10   normally pretty good about just understanding that I cannot

11   make the change.

12   Q.    Okay.  But on January 24th, 2022, did you testify "It's

13   not illegal.  It's against our policy due to liability issues

14   that would arise"?

15           MR. GILBERT:  Objection, Your Honor.  Hearsay.

16           THE COURT:  Overruled.

17           THE WITNESS:  I do remember saying that, and I do

18   remember not distinguishing between the two of them.

19        But come to find out, there is a code that says that it is

20   illegal for me to alter documents.

21   BY MS. STONER:

22   Q.    When did you find out about that code?

23   A.    During this.

24   Q.    During this litigation?

25   A.    Yes, mm-hmm.

1    **Q.**   Okay.  But your belief that you could not fill out the

2    form was not consistent with your knowledge -- let me back up.

3         At the time of March 29, 2019, you did not have knowledge

4    of that Government Code section, but you did have knowledge of

5    the County's policy; correct?

6    **A.**   Yes.

7    **Q.**   And the County's policy that you followed on that day was

8    what?

9    **A.**   That I cannot alter documents.

10   **Q.**   And you received training on that topic from Ms. Moran?

11   **A.**   I'm sorry?

12   **Q.**   Did you receive training on that topic from Ms. Moran?

13        **THE COURT:**  That's the witness.

14   **BY MS. STONER:**

15   **Q.**   I'm sorry.  From Ms. Briones.

16   **A.**   Did I receive training --

17   **Q.**   Yes.

18   **A.**   -- on that topic?

19   **Q.**   From Ms. Briones.  Of the policy.

20   **A.**   Are you asking about a specific time?

21   **Q.**   Okay.  Let's back up.

22        So you mentioned a County policy that's -- that precluded

23   you, in your opinion, from assisting Ms. Martinez that day;

24   correct?

25   **A.**   Yes.

**MORAN - DIRECT / STONER**

1    **Q.**    Okay.

2    **A.**    And, actually, I want to just back up.

3    On the video, she said, "It's illegal for me -- for you

4    not to help me."

5    And I said, "It could be illegal for me to" -- or whatever

6    I said -- "It's illegal for me to fill out your form."

7    So I was just reverting back to what she had said.  She

8    was forcing, and she was threatening that I was discriminating

9    against her for the ADA.

10    So she said, "It's illegal for you not to help me."

11    And I said, "It's illegal, I could be breaking the law if

12    I do fill out your form that you have signed under penalty of

13    perjury," is the form I was referring to.

14    **Q.**    So your --

15    **A.**    So that's where this language came up.

16    **Q.**    Okay.  So your statement about the law was not based on

17    your understanding of the Government Code, but based on a

18    reaction to what Ms. Martinez had told you that day?

19    **A.**    Yes.  But there is a Government Code that does say that.

20    **Q.**    Okay.  That you found out about after that date?  That you

21    found out about after that date?

22    **A.**    (Nods head.)

23    **Q.**    Oh, you have to verbally answer.

24    **A.**    Yes.

25    **Q.**    Okay.  Sorry.

1      So as of March 29, 2019, what training had you received on

2  the policy that you're referencing that prevented you from

3  filling out the form?

4  **A.**   Additional training?

5  **Q.**   Any training.  What training -- well, let me go back to

6  that.

7      We've established that it wasn't because of the Government

8  Code.  It was because of your training that you believed you

9  could not complete the form; correct?

10         **MR. GILBERT:**  Vague.  Misstates testimony.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  Yes.  I -- it was because of our

13  training that we were not to alter documents.

14  **BY MS. STONER:**

15  **Q.**   Okay.  And was that training pursuant to a policy of

16  the County, in your understanding?

17  **A.**   Yes.

18  **Q.**   Have you ever seen a formal written version of this

19  policy?

20  **A.**   No.

21  **Q.**   In 20 years, you've never seen a formal written version of

22  this policy?

23  **A.**   We do not have policies written out that way.  We are just

24  word of mouth and training --

25  **Q.**   Okay.

1   **A.**   -- that this is what we do; this is what we don't do.

2   **Q.**   So you've never seen, like, an official policy number or

3   title or document?

4   **A.**   Not to -- no, not that I recall.

5   **Q.**   And have you ever received a copy of this policy by

6   e-mail?

7   **A.**   No.  But it's understood, though, that this would cause

8   liability on the County if we did make changes to a signed

9   document and it ended up being incorrect.

10  **Q.**   But it's not your understanding that a policy such as that

11  is equivalent to a law, is it?

12          **MR. GILBERT:**  Objection.  Asked and answered.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  I -- I take it as equivalent.  I work

15  for the government.  This is our policy.  And it's the same,

16  and I don't distinguish between the two of them.

17  **BY MS. STONER:**

18  **Q.**   Right.  Because it's not your job to interpret the law.

19  It's your job to follow the policies?

20  **A.**   True.  But it also is not my job to fill out forms that

21  are signed under penalty of perjury for customers.

22  **Q.**   And the policy is the reason why?  You're saying the

23  policy is the reason why you cannot do that; right?

24  **A.**   Yes.  But there also -- come to find out, there is a code

25  that says that.

1  **Q.**   We're going in circles on this issue, so I want to move

2  on.

3      What training did you receive prior to March 29, 2019, on

4  the auxiliary aid requirement under the Americans with

5  Disabilities Act?

6  **A.**   I don't know what you're referring to.

7  **Q.**   Okay.  So I'm assuming that means you did not -- you were

8  not given, by the County, any guidance from the Department of

9  Justice, like a technical assistance manual?

10  **A.**   No.

11  **Q.**   You were not --

12  **A.**   We were just told to assist customers to the counter, to

13  the best of our abilities, without breaking the law.

14  **Q.**   You were never given a document that said, you know,

15  "Auxiliary Aid Policy," anything like that?

16  **A.**   Not to my recollection.

17  **Q.**   What about a document that said "Effective Communication

18  Policy"?

19  **A.**   No.  Some things are just given.

20  **Q.**   Right.

21  **A.**   You know, we want to communicate with the customer; that

22  we have to communicate, either English language.  If someone is

23  hearing impaired, we have a person on-site that speaks American

24  sign language.  So the communication is there.

25  **Q.**   So it's your -- it's your desire to help people with

MORAN - DIRECT / STONER

1  disabilities?

2  **A.**    Of course, mm-hmm.

3  **Q.**    But also, it's your obligation to follow the policies of

4  the County?

5  **A.**    Yes.  And it's common courtesy.

6  **Q.**    And the County never gave you a written policy that told

7  you what auxiliary aids you're able to offer prior to March 29,

8  2019?

9  **A.**    Not in paper form, but it is to the best of our ability.

10  We do everything possible that is -- that is within our power

11  to serve those with disabilities.

12  **Q.**    But had anyone from the County ever trained you or told

13  you, prior to March 29, 2019, that one of the ways you can

14  assist someone who is blind is by helping them complete a blank

15  form?

16  **A.**    Not a blank form, no.  And that did not come up that day.

17  **Q.**    Okay.  So if this -- so on the date that Ms. Martinez

18  approached you, were you aware of all the requirements of the

19  ADA?  Did you feel very well-trained in that regard?

20        **MR. GILBERT:**  Overbroad.  Vague.

21        **THE COURT:**  Overruled.

22        **THE WITNESS:**  Yes, I -- I -- we do our best to

23  accommodate those with disabilities --

24  BY MS. STONER:

25  **Q.**    Okay.

MORAN - DIRECT / STONER

1    A.    -- short to writing pen on paper on a signed form.

2    Q.    Okay.  And when you say you do your best, though, that's

3    based on your understanding of the policies and not based on an

4    in-depth review of the ADA?

5    A.    Yes.

6    Q.    If this incident with Ms. Martinez were to occur today,

7    would you do anything differently?

8            MR. GILBERT:    Speculation.

9            THE COURT:    Overruled.

10           THE WITNESS:    We have now a kiosk on-site that is able

11   to read voice-activated information that will fill out a form.

12   So it's not an issue anymore.

13   BY MS. STONER:

14   Q.    So as of today, there is a kiosk that has a screen reader

15   installed?

16   A.    Yes.

17   Q.    And when did that kiosk go into place?

18   A.    I believe it was July of last year.

19   Q.    And do you remember receiving an e-mail from Jocelyn Cole

20   in around that time frame that indicated the instructions for

21   using the kiosk?

22   A.    Yes.

23   Q.    And at that time, did Ms. Cole reiterate to you it was

24   still the policy of the CRO that clerks were not to write on

25   documents?

1   **A.**   It's been a while since I read that e-mail.

2   **Q.**   I can -- I can give you a copy to refresh your

3   recollection.

4       **THE COURT:**   Please pass it up to me.  You can hand it

5   to my courtroom deputy.

6               (Pause in proceedings.)

7   **BY MS. STONER:**

8   **Q.**   Is that a true and correct copy of the e-mail you

9   received?

10  **A.**   I'll say yes.

11  **Q.**   Okay.  And based on the e-mail and the information

12  contained therein, your understanding is that as of today's

13  date, it's still the policy that clerks are not to assist blind

14  customers by filling out blank FBNS forms?

15  **A.**   I don't know about blank FBNS forms.  The question was a

16  "signed-under-penalty-of-perjury" form.

17  **Q.**   Okay.  And in terms of the kiosk system that is now in

18  place, have you ever -- have you ever personally assisted a

19  blind customer in using it?

20  **A.**   No.

21  **Q.**   Okay.  All right.

22  **A.**   It's not my department, though.  I'm behind the counter.

23  And it's in a different section of the Recorder's Department.

24  It's in the public files.  So I would get the final document at

25  my counter.

```
 1   Q.   Gotcha.  All right.

 2            MS. STONER:  One moment, please.  Let me just...

 3                 (Pause in proceedings.)

 4   BY MS. STONER:

 5   Q.   All right.  So as of today's date, if a blind user had

 6   difficulty with the kiosk system and asked you to help them by

 7   transcribing on a blank FBNS form, would you have the ability

 8   to do that?

 9            MR. GILBERT:  Speculation.

10            THE COURT:  Overruled.

11            THE WITNESS:  That -- to my understanding, that would

12   be the purpose of the kiosk, is to fill out the form

13   completely.  So my filling out another blank form would not be

14   necessary.

15   BY MS. STONER:

16   Q.   I'm not asking if it's necessary.  I'm asking, if it

17   became necessary, would you have the ability to?

18   A.   I would have to consult with my management whether or not

19   I would be able to.  But I would be physically able to.  I know

20   how to complete forms.  But whether or not we would be allowed

21   to would be a question with my management.  But I don't see why

22   it wouldn't.

23   Q.   Okay.  So, but as you sit here today, you've never

24   received clear instruction from management that if an

25   individual is unable to use the kiosk -- for example, if an
```

 1    individual was deaf and blind and they were unable to listen to

 2    the screen reader software -- you have never received training

 3    from your supervisors that said you could assist by writing on

 4    a blank FBNS form; is that correct?

 5    **A.**    That has never come up, no, in training.

 6              **MS. STONER:**  Thank you.

 7              **THE COURT:**  Are you passing the witness?

 8              **MS. STONER:**  I'll pass the witness.

 9              **MR. ELDER:**  No, no, no.

10              **MS. STONER:**  Oh.

11              **MR. ELDER:**  Not yet.

12                        (Pause in proceedings.)

13              **MS. STONER:**  Yes, the witness is passed.

14              **THE COURT:**  All right.  Do you want to take back the

15    e-mail that you handed to her?  Is that still with her?

16                        (Pause in proceedings.)

17              **THE COURT:**  Is there any questioning from defendant?

18              **MR. GILBERT:**  Yes, Your Honor.  Thank you.

19                        <u>**CROSS-EXAMINATION**</u>

20    BY MR. GILBERT:

21    **Q.**    Just a moment, please.

22          Good afternoon, Ms. Moran.

23    **A.**    Good afternoon.

24    **Q.**    Or good morning, rather.

25          Now, we heard quite a bit about your interactions with

1   Ms. Martinez.  I want to focus on a few basic questions before

2   we get into more mundane things.

3        You interacted with Ms. Martinez directly on March 29th,

4   2019; is that correct?

5   **A.**   Yes.

6   **Q.**   Was the entirety of your interaction with her reflected on

7   the audio that we heard this morning?

8   **A.**   No.

9   **Q.**   Now, what did she ask you to do in regards to the FBNS

10  document that was brought in?

11  **A.**   I notified her of the corrections that needed to be made,

12  and she asked me, rather sternly, to change the document.

13  **Q.**   Did she ask you to do anything else other than modify that

14  document?

15  **A.**   No.

16  **Q.**   Had that document already been completed and signed when

17  it was brought in to you?

18  **A.**   Yes.

19  **Q.**   And based upon your understanding of the County's policy,

20  are you allowed to make that change?

21  **A.**   No.

22  **Q.**   Now, do you have an understanding of whether the County's

23  policy is based on state law?

24  **A.**   Yes, as a government office.

25  **Q.**   And do you have an understanding of whether the County's

1    policy is similarly based on federal law?

2    **A.**   I -- I don't.

3    **Q.**   Is it your understanding that the County policies --

4    excuse me.  I'm sorry.

5        Is it your understanding that the County policies

6    literally echo and repeat the state and federal law on these

7    issues?

8    **A.**   I would understand so.

9    **Q.**   Thank you.

10       Now, let's go into a few more basics.  When did you first

11   start working at the County Recorder's Office?

12   **A.**   I started my first day on August 29th, 2005.

13   **Q.**   And, actually, that was a poor question by me.

14       When did you start working for the County of Alameda?  Was

15   that the same date?

16   **A.**   Same date, yes.

17   **Q.**   Have you worked continuously in the Clerk-Recorder's

18   Office that whole time?

19   **A.**   No.

20   **Q.**   Can you tell us very briefly your work history with the

21   County?

22   **A.**   When I started, it's been mentioned that our original

23   title was clerk recorder specialist, so we would rotate within

24   our four to five departments in our office.

25       But by the time I came -- and we would rotate three --

1    around three departments.  So when I would rotate around, by

2    the time it was my turn for the third rotation, we combined

3    with across the street.

4         So I went -- I worked in vitals general business, which is

5    the current department, and then I transferred to the indexing

6    where I cross-trained for eight months.  It should have been

7    six, but I stayed on due to staffing.

8         And then when my turn came around in 2009, I went across

9    the street to central payroll for nine months due to staffing,

10   and then maternity leave.

11   Q.    Have your job duties generally remained somewhat

12   consistent during the entirety of your employment with the

13   County?

14   A.    Yes.

15   Q.    And can you generally tell the jury what those job duties

16   encompass?

17   A.    In our vitals general business unit, we have three mini

18   departments.  They're separate.  We have the section that

19   issues birth, death, and marriage certificates that are already

20   filed.  Just copying them on paper and take the fee.

21        Then we have the marriage license department.  We issue

22   marriage licenses, perform ceremonies, and then record the

23   document on-site right there within five minutes of the

24   ceremony.

25        Then we have the general business unit, which is the

1    fictitious business name.  We do process servers, legal

2    document assistance, notary bonds, and that we forward on to

3    the state.

4    Q.    Thank you, ma'am.

5          Now, in those various roles, you mentioned you had,

6    I think, three rotations.  Was that the word you used?

7    A.    Yes.

8    Q.    Are you -- do you receive -- is that considered a training

9    rotation?

10   A.    It is.  And each time, we move up.  It was Auditor

11   Associate I, which you're hired at; and after each rotation, we

12   move up to II and then finally to III.

13   Q.    And during that process, are you also trained on the

14   Americans with Disabilities Act?

15   A.    Mostly in the vitals general business unit because it is

16   face-to-face customer contact.

17   Q.    And do you receive training about how to interact and how

18   to help individuals with disabilities?

19   A.    It was mostly on-the-job training from the time I started;

20   and then over the course of my tenure, we watch videos, and any

21   e-mails come through that update any policies, and then just

22   general interaction with the customers.

23   Q.    So let me see if I understand this right.  Is it fair to

24   say that you received training during your initial rotations on

25   how to interact with customers and compliance with the ADA?

**MORAN - CROSS / GILBERT**

1  **A.**    Yes.

2  **Q.**    And then you would receive additional training in each of

3  the subsequent assignments that would also encompass aspects of

4  the ADA?

5  **A.**    Not in our assignments as when we're not working in

6  customer contact.    Indexing is upstairs, and it's not customer

7  contact at all.

8  **Q.**    So you may not receive as much updates on the ADA, for

9  example, if you're back in a back office, not interacting with

10  the community?

11  **A.**    Yes.

12  **Q.**    But once you go back to a position that you're interacting

13  with the community and the patrons, would you again receive

14  regular updates on compliance with the various state and

15  federal laws, including the ADA?

16  **A.**    Yes.

17  **Q.**    Now, would that be something that you would receive

18  continually as a regular part of your job?

19  **A.**    Yes.    We do -- over occasion, the County will send out

20  training videos and say, "You're required to watch this by

21  such-and-such date," and those do have ADA concepts in them.

22  **Q.**    Now, you used the word, I think, "effective communication"

23  earlier.    What is it that you understand effective

24  communication to be?

25  **A.**    That we are understanding, speaking the same language.

1  Q.   Do you need to have some type of written document or case

2  law, or something like that, for you to be able to understand

3  what effective communication is?

4  A.   No.

5  Q.   Well, how is it that you're going to know how to interact

6  with a person without having something in writing that's handed

7  to you?

8  A.   It is just day-to-day training.

9  Q.   And generally, can you tell me what the training is as far

10  as how you should treat the patrons that come into the County?

11  A.   We -- most of my co-workers and I come from a banking

12  background, so we know how to greet people, smile, treat

13  customers cordially; and into that is also treating customers

14  with disabilities to the best of our ability without breaking

15  the law.

16  Q.   Now, what are you trained to do if you have a customer or

17  a patron that comes into the counter that has disabilities and

18  is having trouble communicating?

19  A.   It depends.  If -- if a customer is blind, then in this

20  case, we would do our best.  And what we do, actually, is if --

21  we will not complete any applications for them or change any

22  documents, but we try to find alternatives.

23       The alternative, the first thing we ask, "Did you bring

24  someone with you that you trust and that is able to complete

25  this form to -- so it can be submitted?"

1     If someone is deaf, we communicate by writing.  We do also

2  have someone that speaks American sign language on-site; and if

3  they're there on that day, I would call them.

4  **Q.**  Thank you.

5     Now turning to this particular incident, were you working

6  on March 29, 2019?

7  **A.**  Yes.

8  **Q.**  And can you tell me, how is it that Ms. Martinez ended up

9  at your counter?

10  **A.**  She checked in at the front counter where they issue

11  numbers; and when I called her number, she came up to my front

12  counter.  She made her way.  But I was notified by someone -- I

13  don't remember that day -- that I was going to encounter a

14  blind person.

15  **Q.**  Thank you.

16     **MR. GILBERT:**  Your Honor, may I display Exhibit 1

17  that's been previously admitted?

18     **THE COURT:**  Yes.

19     **MR. GILBERT:**  Thank you.

20  **Q.**  So if I could ask you to turn to Exhibit 1, which is in

21  front of you, in theory, if I can figure out how to use a

22  computer.

23     So we're looking at Exhibit 1.  Can you tell us what this

24  is, please?

25  **A.**  This is a fictitious business name statement.

**MORAN - CROSS / GILBERT**

1  Q.   What is a fictitious business name statement?

2  A.   It is a paper form that is filed that is used to show the

3  public -- this is for public notice -- that these names are

4  being used in the County in order to avoid duplicate names.

5       The -- we have -- made three copies that we issue to the

6  customer on the spot.  One of them is for the bank.  The bank

7  does require a fictitious business name statement to show that

8  this customer has done the required due diligence to show that

9  he is a business, intending on running a business.

10 Q.   Thank you.

11      Now, does this document actually create a business or a

12 corporation or an LLC?

13 A.   This document does not create a corporation or LLC.  This

14 just files in the County of Alameda.  A corporation or LLC is

15 filed in -- at a state level.  And it can be any state, but

16 more than likely it is California.

17 Q.   So I've blown up the box up in the upper left corner.

18 Now, at the bottom of the blowup on the screen, there's a

19 section that says (as read):

20          "If corporation or LLC, print state of

21      incorporation."

22      What does that reference?

23 A.   The state where the LLC is filed.

24 Q.   And would that be something that would need to be

25 completed to show that this business is already in existence

1  and had already been formed and filed with the state?

2  **A.**   Yes.  In fact, we do ask customers that.  Sometimes they

3  just come in and check "LLC."  We ask them, "Have you filed

4  with the state to say that you are an LLC?"  And they would

5  answer.

6  **Q.**   And in this instance -- if somebody was to come in and

7  file an FBNS form and they didn't have that information, would

8  that be something that would preclude the filing of the FBNS

9  form?

10  **A.**   Yes.  We could not file it without that information.

11  **Q.**   Thank you.

12      Now, turning to the top line, the business name is

13  referenced as Be Confident Be You Coaching LLC.  Is the

14  addition of the words "LLC" at the end of that significant?

15  **A.**   Yes.  We would not file that without proof that the

16  customer is, in fact, an L- -- registered with the state.

17  **Q.**   Did you get to the point of requesting or verifying if

18  there was proof of an LLC with Ms. Martinez on this particular

19  day?

20  **A.**   I don't recall.  I may have.  That is front and center,

21  and that would have been a big issue where we would have

22  declined it had she not been filed with the state.

23  **Q.**   Now, the fact that there's an LLC there, does that raise a

24  red flag on this particular form?

25  **A.**   Yes.

**MORAN - CROSS / GILBERT**

1  Q.   How come?

2  A.   Because in Section D, she checked "Individual."

3  Q.   So I've blown up Section D.  Why is that a concern or a

4  red flag for a CRO?

5  A.   Those two items need to be -- need to match.

6  Q.   And I keep using acronyms.  Let me just make sure we're on

7  the same page.

8      CRO, is that an appropriate term to use for the

9  Clerk-Recorder's Office?

10  A.   Yes.

11  Q.   And then the individuals who work in the CRO, would they

12  just be the CRO staff or CRO?  Is that the right way to

13  reference them?

14  A.   We have come to use CRO just recently.  We've always just

15  said the whole Clerk-Recorder's Office.

16  Q.   Fair enough.

17      And then we've also talked about a franchise business name

18  statement.

19  A.   Fictitious.

20  Q.   Thank you.

21  A.   You're welcome.

22  Q.   And that would be -- FBNS would be the acronym for that?

23  A.   That's fine.

24  Q.   Thank you.

25      So the fact that this is referenced in Section D as an

1    individual, that would be a concern or a problem in here?

2    **A.**    Yes.  We would refuse the document as is.

3    **Q.**    Why can't you simply just go over and scribble it out and

4    check the box next to it?

5    **A.**    This document was signed under penalty of perjury and

6    presented as such.

7    **Q.**    So let's look at that for a second.

8         So when Ms. Martinez came in -- I've blown up the section

9    from the bottom of the page that has a signature.  And there's

10   a statement that reads (as read):

11            "I declare that all information in this statement

12        is true and correct."

13        And then there's a statement about that it's a misdemeanor

14   to knowingly submit false or misleading information.

15   **A.**    Yes.

16   **Q.**    Why is the fact that it's signed significant to you?

17   **A.**    I cannot alter any documents where the customer has signed

18   already attesting to that statement.

19   **Q.**    Can a customer modify their own documents?

20   **A.**    Yes.

21   **Q.**    And when you were meeting with Ms. Martinez, did you point

22   out the deficiencies that you noted in the form during that

23   meeting?

24   **A.**    As -- yes, I did.

25   **Q.**    And did you suggest to her any possible way that she could

1  modify the form or take action or do something?

2  **A.**    All -- I did say, "Do you have someone with you that can

3  help you change this form?"

4  **Q.**    Now, how often do people come in with incorrectly

5  completed forms?

6  **A.**    It is unfamiliar to a lot of people unless they've done it

7  five or ten times; and even then, they may need a correction.

8  So first-time filers normally need corrections.  I would say

9  that happens a lot.

10  **Q.**    Now, I'm assuming that everybody who can see always

11  corrects and fixes the forms on the spot, don't they?

12  **A.**    Yes.

13  **Q.**    So everybody who comes in who can see, they'll always fix

14  it, and you'll always file the corrected form on the spot?

15  **A.**    As much as we can, unless there's information that they do

16  not know at the time.

17  **Q.**    Are there occasions where people who can see, even though

18  they're able to make the edits, they're not able to correct the

19  form?

20  **A.**    Yes.

21  **Q.**    And can you tell us about that, please?

22  **A.**    There are couriers that come in on behalf of the

23  customers, and they are not able to make corrections on the

24  form either.  So at that time, we will send a Go Back Letter,

25  if requested, to -- back with the courier.

1  **Q.**  Are there also patrons who come in who may not, for

2  example, understand the legal significance of how to answer the

3  questions?

4  **A.**  Yes.  We refer those to -- for legal advice.  We have

5  three or four different types of partnerships, and they say,

6  "Which one works for me?"

7       "I cannot offer you that information," I tell them, and

8  that would be legal advice.

9       We do give a little handout about definitions; and if it's

10  sufficient, they may just check a box and, in a hurry, and file

11  it.

12       But I say, "If there's any alterations or any corrections

13  that you need to make to this document and you find out as soon

14  as you leave, you come back and you pay again and you start

15  over."

16  **Q.**  Now, what if somebody comes in and they recognize that

17  "Hey, I didn't put my Articles of Incorporation date on here"?

18  Is that something, if they don't have the date, that they can

19  figure out right then and there, or do they have to leave and

20  go get it from the state and come back?

21  **A.**  We don't ask for the date of the articles when they were

22  filed.  It's just the date when they started using the

23  fictitious business name.

24  **Q.**  Thank you.

25  **A.**  But if there is any information that they are not sure of

1  or they do not want to file or take the chance of coming back

2  and paying again, then, yes, they take the document with them.

3  Q.   So we heard, I think it's 4 minutes and 11 seconds on the

4  audiotape.  Was that the entirety of your interaction with

5  Ms. Martinez?

6  A.   No.

7  Q.   So let's start with when she first walks up to your

8  counter.

9  A.   Okay.

10 Q.   And just broad-brush strokes, how many times did she come

11 up to your counter did you have interactions with her?

12 A.   Just that once.  She never left my counter.

13 Q.   All right.

14 A.   But how many interactions?  Each time I went to go look

15 for a supervisor was another interaction.  So it could have

16 been three, three interactions.

17 Q.   So let's just kind of do broad-brush strokes.

18     So you have a -- she comes to your counter.  You have a --

19 she's there for a prolonged period of time?

20 A.   Yes.

21 Q.   At some point does a supervisor come and meet with her?

22 A.   Yes.

23 Q.   And who is that supervisor?

24 A.   Laura Briones.

25 Q.   Was it one or more than one supervisor?

1    **A.**    One.

2    **Q.**    Were you present when Ms. Briones met with Ms. Martinez?

3    **A.**    No.  I had walked away by then.

4    **Q.**    Okay.  Were you able to see or at least pay attention, to

5    know how long that meeting possibly lasted?

6    **A.**    I would not doubt it was no less than two hours.

7    **Q.**    Okay.  Now, the two hours, are you referencing the meeting

8    between Ms. Martinez and Ms. Briones or the total time?

9    **A.**    No.  Just from the total amount.

10   **Q.**    The total time that Ms. Martinez is at the counter?

11   **A.**    Yes.

12   **Q.**    Thank you.

13          So starting with when Ms. Martinez first comes up to your

14   counter, can you please tell the jury what happens?  How does

15   the interaction go?  How's the process?

16   **A.**    So I call the number, and the customer comes up to the

17   counter.  And I had been notified that she -- that I would help

18   a blind woman.

19          And she came.  And I was just a little thrown off because

20   she made her way on her own, and it wasn't my picture of a

21   blind person, but that's okay.  She was just legally blind,

22   I believe, and not totally blind where she couldn't make her

23   way around.

24          So she came up to my counter, and I looked at the

25   application.  I said, "Hello.  How are you today?"  Normal

1    greeting.  And I said, "What would you like to do?"  Along

2    those lines.

3          She said, "I want to file a fictitious business name."

4          I looked at her application and noticed that there were

5    corrections that needed to be made.  And I handed the

6    application back to her, like I normally would, not knowing

7    how -- to what extent she was blind because she had made her

8    way to the counter on her own.

9          And she said, "I'm blind.  I cannot complete it."

10         I said, "Well, is there someone else with you?  Because I

11   cannot make alterations."

12         And she said, "Yes, you can."

13         And I said, "No, I can't."

14         So we went back and forth along those lines for a little

15   while.

16         And I said, "Look, we're not getting anywhere.  Let me get

17   a supervisor."

18         She may have asked for a supervisor also.  I'm not sure

19   who asked for one first, but we did know that this needed to

20   escalate.

21   **Q.**   Thank you.

22         Now, during that initial discussion, did you take the time

23   to try and explain to Ms. Martinez why you were prohibited from

24   modifying the completed legal form?

25   **A.**   I just told her, "I'm not allowed to make alterations to a

1    completed document."

2    Q.   Tell me about your interaction and your discussion with

3    Ms. Martinez.  Could you understand the words she was saying?

4    A.   Yes.

5    Q.   And were you having back-and-forth with her where you were

6    saying things and she was responding to your statements?

7    A.   Yes.

8    Q.   Did you have the impression that she understood what you

9    were saying?

10   A.   Yes.

11   Q.   Did you have any understanding or inkling that there was

12   any type of communication barrier between the two of you?

13   A.   No.

14   Q.   Did you have the understanding that there was effective

15   communication between you and Ms. Martinez?

16   A.   Yes.

17   Q.   Did you understand that she was asking you to modify a

18   completed legal form?

19   A.   Yes.

20   Q.   And when you explained to her that you were legally

21   precluded from doing so, did Ms. Martinez respond to you in a

22   way that led you to believe that she fully understood and had

23   received that communication effectively?

24   A.   Yes.

25   Q.   What did she do that led you to believe that she

**MORAN - CROSS / GILBERT**

1  understood your comments and your response to her?

2  **A.**    She said that "Can't you just fill out the form for me?

3  Can't you just" -- either fill out or correct; but either way,

4  I was going to touch the document that she was asking me to do.

5  **Q.**    So after your initial conversation with Ms. Martinez

6  becomes unproductive, I think at that point you mentioned that

7  you were going to request a supervisor?

8  **A.**    Yes.

9  **Q.**    Had you requested a supervisor previously, or was that the

10  time when you did?

11  **A.**    I think that was -- that was the time.

12  **Q.**    Okay.  Where did Ms. Martinez go at that point?

13  **A.**    She did not leave the counter.

14  **Q.**    Did she stay at your counter at that point?

15  **A.**    Yes.

16  **Q.**    And at that point did you continue to try and serve other

17  patrons?

18  **A.**    I did.

19  **Q.**    Can you tell us how that went with Ms. Martinez at the

20  counter, please?

21  **A.**    At the time that I was -- that she insisted that she stay

22  there, she said, "I am not leaving.  I am not moving."

23      I said, "Okay.  Well, I have to help other customers.

24  They are backing up."

25      And according to her own time, it could have been a half

**MORAN - CROSS / GILBERT**

1  an hour.  That is a long time for customers to wait; and it is

2  discourteous, especially if she will not have a seat.  I

3  offered her a seat.  "Please have a seat."

4       She said, "No.  I'm going to stay here."

5       I said, "Okay.  Well, I'm going to try to help customers."

6       While the customer was at my counter and I was trying to

7  go over and do the exchange like normal, she would tell the

8  other customers, "See, that's discrimination.  See, that's

9  discrimination."  So it was a very tense time.

10      Then I said, "Okay.  Let me go see how the supervisor is

11  coming along."  So I said, "Okay.  Great.  Now" -- you know,

12  over time, I'm not sure exactly what happened, what -- in what

13  order, but I said, "Okay.  Finally Laura's back from lunch.

14  She will be with you shortly.  Would you like to have a seat?"

15      "No."

16      I said, "Okay.  I'm going to try to help one other

17  customer before I" -- you know, at least to see how that goes.

18      She again told the next customer, "See, that's

19  discrimination."

20      I said, "Okay.  Well, I'm not going to able to help any

21  customers," and that's why I walked away.

22  Q.  Now, when you say the comment "See, that's

23  discrimination," who was saying that?

24  A.  Ms. Martinez to the client at my counter.

25  Q.  And she was telling the client that the client was

1   discriminating --

2   **A.**   Yes.

3   **Q.**   -- against her?

4   **A.**   No.  That I was discriminating against her.  So she was

5   speaking to the client of my behavior.

6   **Q.**   What was your understanding of what Ms. Martinez was

7   complaining about your discriminating behavior?

8   **A.**   Because I would hand the fictitious business name

9   statement that the customer had provided back to him or her and

10   asked him or her to make the necessary corrections, and it was

11   just an exchange, and he handed it back to me.

12   **Q.**   So let me be very clear.  Have you ever made modifications

13   to a completed legal form in your role as a CRO?

14   **A.**   No.

15   **Q.**   Thank you.

16       How would you characterize Ms. Martinez's conduct towards

17   you and the other patrons at the CRO that day?

18   **A.**   It -- it --

19       **MS. STONER:**  Objection.  402.

20       **THE COURT:**  Overruled.

21       **THE WITNESS:**  I -- I believe she was very rude to me,

22   to my supervisor, at the least.  But to make other customers

23   wait and then comment at the counter while I was trying to help

24   other customers was over the top.

25   \\\

**MORAN - CROSS / GILBERT**

1  BY MR. GILBERT:

2  **Q.**   Did you do everything in your power that day to assist

3  Ms. Martinez?

4  **A.**   Yes.

5  **Q.**   Did you see Ms. Martinez at a later date?

6  **A.**   Yes.

7  **Q.**   And can you tell us, what was that?

8  **A.**   Oh, she came back to file the -- that F- -- fictitious

9  business name that she had originally attempted to file on that

10  day.

11  **Q.**   If I could ask you to turn to what's been premarked

12  Exhibit 3, please.

13  **A.**   (Witness examines document.)   Yes.

14  **Q.**   Do you recognize that document?

15  **A.**   Yes.

16  **Q.**   What does that appear to be?

17  **A.**   That is the filed fictitious business name on May 31st.

18  **Q.**   And who was that filed or presented by?

19  **A.**   Ms. Martinez.

20  **Q.**   Was that actually filed?

21  **A.**   Yes.  All the necessary corrections were made --

22  **Q.**   Okay.

23  **A.**   -- and it was acceptable.

24  **Q.**   That was received in the CRO's office --

25  **A.**   Yes.

1  Q.    -- and it was accepted, recorded, and filed?

2  A.    Yes.

3  Q.    Thank you.

4         MR. GILBERT:  Your Honor, we would ask that Exhibit 3

5  be received into evidence, and I request permission to publish.

6         THE COURT:  Any objection?

7         MS. STONER:  No.

8         THE COURT:  Okay.  The exhibit is admitted, and you

9  may show it to the jury.

10         MR. GILBERT:  Thank you.

11      (Trial Exhibit 3 received in evidence.)

12         MR. GILBERT:  There we go.

13  Q.    So can you walk us through, what are we looking at here?

14  A.    So the name in Section A is the same.

15      And then in Section C1, she put the correct LLC, since she

16  is -- that was her intent, to file as the LLC.

17      She did put the state of organization, which is in

18  reference to LLCs.

19      She marked Section D.  Instead of "Individual" in

20  Section D, she put "N/A," that she had not started business

21  yet.

22      And then she put the correct title.  This had to be an

23  officer title and "founder" was not acceptable.

24  Q.    Thank you.

25      So as of the date that this was presented, she had not

MORAN - REDIRECT / STONER

1  started business operations by that point?

2  **A.**   Yes.  That's what she's stating on the form.

3  **Q.**   And, again, this is a document that there's an attestation

4  that it's truthful and lawful?

5  **A.**   Yes.

6  **Q.**   Thank you.

7      And can you tell the jury what day is this ultimately

8  recorded in the Clerk-Recorder's Office?

9  **A.**   That same day.  As soon as we press "enter," it is

10  uploaded into our online system.

11          **MR. GILBERT:**  Thank you very much.

12      May I have just a moment, Your Honor?

13          **THE COURT:**  Sure.

14                    (Pause in proceedings.)

15          **MR. GILBERT:**  Thank you, Your Honor.  Nothing further.

16          **THE COURT:**  All right.  Thank you.

17      Does plaintiff have any further questions for the witness?

18          **MS. STONER:**  Just a few more questions.  And I'll be

19  jumping around a bit to discuss a couple of the things that

20  we've talked about.

21                    <u>REDIRECT EXAMINATION</u>

22  BY MS. STONER:

23  **Q.**   So you are from a banking background.  Would you agree

24  that it would be hard to do business without a bank account?

25  **A.**   Then you wouldn't be a member of that bank.

1  **Q.**   Right.  That bank would not let you open an account

2  without having the proper business paperwork in order; correct?

3  **A.**   Are you talking business or personal?

4  **Q.**   Business.

5  **A.**   I -- I wasn't in -- I was a teller.

6  **Q.**   Okay.

7  **A.**   So I wasn't a new accounts --

8  **Q.**   Okay.

9  **A.**   -- person.

10 **Q.**   Okay.  But you understand that not having your paperwork

11 completed with the County couldn't be an obstacle to doing

12 business with a bank account?  Fair to say?

13 **A.**   Yes.

14 **Q.**   So going back to March 29, 2019, were you aware on that

15 date there were FBNS forms that were blank in the office?

16 **A.**   Yes.  We have supplies that are blank FBNS forms.

17 **Q.**   And on March 29, 2019, did you offer a blank FBNS form to

18 Ms. Martinez?

19 **A.**   No.

20 **Q.**   And a little bit ago, you testified about some reasons

21 that sometimes a sighted person might not be able to complete

22 their FBNS form or make modifications to it at the counter.  Do

23 you remember that?

24 **A.**   Yes.

25 **Q.**   Something like they're a courier or they're not the owner

1  of the business; correct?

2  **A.**   Yes, or there's information that they do not know on the

3  spot.

4  **Q.**   Was it your understanding on March 29, 2019, that any of

5  the reasons you've discussed today that a sighted person cannot

6  modify their FBNS form applied to Ms. Martinez?

7  **A.**   No.  She just insisted that I make the corrections.

8  **Q.**   Okay.  Your counsel asked you about effective

9  communication.  And I want to know, is it your understanding

10  that effective communication involves communication both to and

11  from an individual with disability?

12  **A.**   Our communication was by language only.  So --

13  **Q.**   Okay.

14  **A.**   -- we were both speaking English.

15  **Q.**   All right.

16        **MS. STONER:**  And, Your Honor, I'd like to ask some

17  questions about the demonstrative that we showed in opening

18  with the two images, the two graphic images.  May I display

19  that to the jury?

20        **THE COURT:**  It's not in evidence.

21        **MS. STONER:**  I'm not intending to move it into

22  evidence.

23        **THE COURT:**  Then you can't show it to the jury.

24        **MS. STONER:**  Okay.  But can we -- all right.  Can we

25  show -- yeah, can we show it to the witness?

```
 1          THE COURT:  Any objection?

 2          MR. GILBERT:  Yes.  It exceeds the scope of direct --

 3  or my examination of her, first of all; second of all,

 4  relevance; third, 403 and confusion of issues.

 5          THE COURT:  I'm going to overrule.  You can show it to

 6  the witness, but not to the jury because it's not in evidence.

 7          MS. STONER:  Okay.

 8  Q.  I'd like to show you an image --

 9          MS. STONER:  May I approach?

10          THE COURT:  Yes.

11  BY MS. STONER:

12  Q.  Do you see the image that I've presented that shows two

13  graphic representations of the concept of effective

14  communication?

15  A.  To and from?

16  Q.  Yes.

17  A.  Okay.

18  Q.  So you understood what Ms. Martinez said verbally;

19  correct?

20  A.  Yes.

21  Q.  And she appeared to understand what you said verbally;

22  correct?

23  A.  Yes.  Yes.

24  Q.  But when you -- when she attempted to communicate with

25  the County via a paper form, the County was unable to receive
```

**MORAN - REDIRECT / STONER**

1    her communication and file that document; correct?

2          **MR. GILBERT:**  Misstates facts.  Calls for a legal

3    conclusion.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  So you're saying we're communicating by

6    the form?

7    **BY MS. STONER:**

8    **Q.**   Correct.

9    **A.**   There was effective communication that the form was not

10   completed correctly.

11   **Q.**   Right.  And was she able to communicate effectively to the

12   County via the written form?

13   **A.**   Saying that she could not correct the form by hand because

14   she could not see the form.

15   **Q.**   So that's your testimony, that she was not able to correct

16   the form by hand because she could not see the form?

17   **A.**   Is that your --

18   **Q.**   Yes.

19   **A.**   -- your point?

20   **Q.**   No, no, no.  My question to you is whether she was able to

21   convey effectively written information about her business

22   sufficient to have her document filed on that day.

23         **MR. GILBERT:**  Objection, Your Honor.  Calls for a

24   legal conclusion.  403.

25         **THE COURT:**  Overruled.

1          **THE WITNESS:**  I just -- I'm just asking what you're

2     asking.  So you're saying because she presented this form and I

3     did not accept it as is, then that is ineffective

4     communication?

5     **BY MS. STONER:**

6     **Q.**   I'm -- yes.  I am asking you:  Is it your understanding

7     that Ms. Martinez was able to effectively, using a written

8     form, communicate with the County regarding the details of her

9     business on March 29th, 2019?

10    **A.**   From her side, she did not communicate effectively.

11    **Q.**   Thank you.

12         Is it your understanding that it's the obligation of the

13    person with the disability to provide effective communication

14    or that it's the obligation and responsibility of the County to

15    provide effective communication?

16         **MR. GILBERT:**  Calls for a legal conclusion.

17    Relevance.

18         **THE COURT:**  Overruled.  She can give her

19    understanding.

20         **THE WITNESS:**  I -- if you can ask the question again.

21    I had a thought, but I'm...

22    **BY MS. STONER:**

23    **Q.**   Okay.  Is it your understanding -- and, again, I'm asking

24    about your understanding, not about the state of the law --

25    that it is the obligation of a person with a disability to

MORAN - REDIRECT / STONER

1  provide effective communication, or is it your understanding

2  that it's the responsibility of the County to provide effective

3  communication?

4          **MR. GILBERT:**  Calls for a legal conclusion.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  I do not know how to answer that.  I --

7  I can say that it's up to the client to do her best to

8  communicate.  Because how can we get communication from someone

9  that is not communicating?

10  **BY MS. STONER:**

11  **Q.**   But it's not your testimony that Ms. Martinez wasn't

12  attempting to file her form on that day?

13  **A.**   I -- I'm not understanding the question.

14  **Q.**   It's not your testimony that Ms. Martinez was refusing to

15  give you the information needed --

16  **A.**   No, she was --

17  **Q.**   -- to correctly file her form?

18  **A.**   -- there at the counter.

19       She just could not make the alterations herself because of

20  her disability.

21  **Q.**   But she wasn't refusing to tell you the information

22  needed?

23  **A.**   Oh, you're saying that she -- I -- for me to make the

24  corrections, she would tell me what needed --

25  **Q.**   Yes.

**MORAN - REDIRECT / STONER**

1   A.   -- to be corrected?

2   Q.   Yes.

3   A.   So that is effective communication if I understand what

4   she's saying, but I still cannot change the -- change the

5   document.

6   Q.   But she was not able to -- yes.

7        But she was not refusing in any way to give you the

8   information you or someone else would have needed to modify

9   that form so that it could be submitted and filed that day?

10  A.   I -- I know what changes needed to be made.  So she -- and

11  if I told her what changes needed to be made and then she could

12  have repeated them back to me what changes needed to be made,

13  so there was effective communication as to what needed to be

14  done.

15  Q.   Okay.  So if Ms. Martinez had brought someone sighted with

16  her on March 29, 2019, would you have objected to that person

17  making the changes that Ms. Martinez verbally communicated onto

18  that document?

19  A.   No.

20  Q.   Would you have accused that person of committing perjury?

21  A.   No.

22  Q.   Would you have accused that person of breaking the law?

23  A.   No.

24  Q.   Would you encourage someone to do either of those two

25  things?

```
 1   A.   I would --
 2             MR. GILBERT:  It's vague as to those things.
 3             THE COURT:  Yeah, sustained.
 4   BY MS. STONER:
 5   Q.   Okay.  Would you encourage someone else to commit perjury
 6   or otherwise break the law?
 7   A.   No.
 8   Q.   So, therefore, on that date, another person could have
 9   altered the document for Ms. Martinez if she had brought
10   someone sighted with her?
11             MR. GILBERT:  Overbroad.  Vague as to "other person."
12             THE COURT:  Overruled.
13             THE WITNESS:  As long as I didn't make the changes,
14   she could request assistance.
15   BY MS. STONER:
16   Q.   So Ms. Martinez -- it's your position that it was
17   Ms. Martinez's obligation to bring someone with her to assist
18   her rather than the County's obligation to supply a mechanism
19   for written effective communication?
20   A.   At that time, we did not have a kiosk that is able to take
21   the information and make a form that is acceptable.  So that
22   was our only option, was to offer that suggestion, "Did you
23   bring someone with you?"
24   Q.   So as of that date, the County did not have any auxiliary
25   aid or service that would have allowed -- the County was not
```

**PROCEEDINGS**

1  supplying any auxiliary aid or service that would have allowed

2  Ms. Martinez to supply different written information to

3  the County?

4  **A.**   No.  But this --

5  **Q.**   Thank you.

6  **A.**   -- had not --

7  **Q.**   Thank you.

8  **A.**   -- come up yet.

9          **MS. STONER:**  No further questions.

10         **THE WITNESS:**  Okay.

11         **THE COURT:**  Any further questions from defendant?

12         **MR. GILBERT:**  No, Your Honor.  Thank you.

13         **THE COURT:**  Thank you, ma'am.  You may step down.

14         **THE WITNESS:**  Thank you.

15                    (Witness excused.)

16         **THE COURT:**  All right.  At this time we should take

17  our midmorning break.  Let's break for 15 minutes.

18     Rose, can you please bring the jury to the jury room.

19   (Proceedings were heard out of the presence of the jury.)

20         **THE COURT:**  Close the door.

21     Counsel, please be seated.

22     Is there anything we need to discuss before the next

23  witness is called?

24     Plaintiff?

25         **MS. STONER:**  No, Your Honor.

1          **THE COURT:**  Defendant?

2          **MR. GILBERT:**  Your Honor, I'm not quite sure about the

3    scope of examination as far as asking people their

4    understanding and interpretation of the law.  I think that

5    that's inappropriate questions.  You know, I don't want to keep

6    objecting, and I'm hoping the Court can kind of shed light on

7    its decision for --

8          **THE COURT:**  I think my rulings on the objections have

9    set forth the guidance that's needed.  I don't -- I think what

10   I've done is perfectly clear.

11         **MS. STONER:**  Thank you, Your Honor.

12         **THE COURT:**  With that, I think we will take a

13   15-minute recess and then come back.

14         **MR. GILBERT:**  Thank you, Your Honor.

15         **THE CLERK:**  Thank you, everyone.  We're off the

16   record.

17              (Recess taken at 11:24 a.m.)

18           (Proceedings resumed at 11:53 a.m.)

19      (Proceedings were heard out of the presence of the jury.)

20         **THE CLERK:**  All right, everyone.  We're back on the

21   record in Civil Action 20-6570.  The Honorable Thomas S. Hixson

22   presiding.

23       You may go ahead, Judge.

24         **THE COURT:**  All right.  And at this time, I'll ask my

25   courtroom deputy to bring the jury back into the courtroom.

```
 1          (Proceedings were heard in the presence of the jury.)

 2          THE COURT:  All right.  Everyone, please be seated.

 3      Plaintiff, please call your next witness.

 4          MR. ELDER:  Your Honor, we call Emily Grim.  May she

 5  approach the stand?

 6          THE COURT:  Yes, please.

 7     (Witness enters the courtroom and steps forward to be sworn.)

 8          THE COURT:  Ma'am, please sit in this chair right

 9  here.

10          THE CLERK:  Can you raise your right hand, please.

11                           EMILY GRIM,

12  called as a witness for the Plaintiff, having been duly sworn,

13  testified as follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Thank you.  You have been sworn.

16                      DIRECT EXAMINATION

17  BY MR. ELDER:

18  Q.   Good morning.  Good morning, Ms. Grim.  Can you hear me?

19  A.   Good morning.

20  Q.   Good morning.  Hi.  Can you hear me?  It sounds like it.

21  A.   Yeah.

22  Q.   Okay.  I just want to make sure our microphones are

23  working.

24      Now, could you state your name for the record?

25  A.   Emily Grim.
```

GRIM - DIRECT / ELDER

1   **Q.**   And where do you currently live?

2   **A.**   Union City --

3   **Q.**   Okay.

4   **A.**   -- California.

5   **Q.**   And do you know the plaintiff in this case, Lisamaria

6   Martinez?

7   **A.**   I do.

8   **Q.**   Is she sitting at the table over there?

9   **A.**   Yes.

10   **Q.**   Okay.  And how did you come to know Ms. Martinez?

11   **A.**   I came to know her from helping her with her business

12   paperwork and also driving her children to school.

13   **Q.**   Has her family hired you to be a driver or reader or

14   transcriber from time to time?

15   **A.**   Yes.

16   **Q.**   Have you ever helped Ms. Martinez in sorting her mail?

17   **A.**   Yes.

18   **Q.**   Why do you help Ms. Martinez with her mail?

19   **A.**   Because I am able to read it and sort it for her.

20   **Q.**   Is it your understanding that she can't do that for

21   herself?

22   **A.**   Yes.

23   **Q.**   Do you ever help Ms. Martinez to act as a transcriber to

24   write information on paper forms that she can't fill out for

25   herself?

1  **A.**   Yes.

2  **Q.**   I think you said filling out a business form.  Have you

3  ever -- well, what business forms have you helped Ms. Martinez

4  complete, to the best of your recollection?

5  **A.**   Business license, various different paperwork.

6  **Q.**   Okay.  And have you ever been hired to drive Ms. Martinez

7  to some of her appointments?

8  **A.**   Yes.

9  **Q.**   How much does Ms. Martinez pay you for your time in doing

10  these services?

11         **MR. GILBERT:**  Objection.  Relevance.

12         **THE COURT:**  Overruled.

13  **BY MR. ELDER:**

14  **Q.**   Could you repeat your answer, please?

15  **A.**   $25 an hour.

16  **Q.**   $25 an hour.  About how long have you been providing these

17  sorts of services for Ms. Martinez?

18  **A.**   Approximately six years.  Five, six years.

19  **Q.**   Okay.  And when Ms. Martinez needs a driver, when she

20  needs to hire you to be a driver, about how much time in

21  advance does she typically contact you to arrange that?

22  **A.**   Five to seven days.  Normally, about a week.

23  **Q.**   Okay.  Now, I'd like to ask you about some things that

24  happened in May of 2019, so almost five years ago.  I'm just

25  going to ask you to do your best to recall what you can.

1   **A.**   Okay.

2   **Q.**   Now, around May of 2019, did Ms. Martinez ask you to

3   assist her as she was preparing an FBNS form?

4   **A.**   Yes.

5           **MR. ELDER:**  And can we -- so I believe Exhibit 3 is

6   already in evidence.  May we --

7           **THE CLERK:**  That's correct.

8           **MR. ELDER:**  -- publish it to the witness and the jury?

9           **THE COURT:**  Yes.

10          **MR. ELDER:**  Okay.  Michelle, could you bring up

11  Exhibit 3?

12  **Q.**   And are you able to see this document in front of you now?

13          **MS. STONER:**  Is it in the binder in front of her?

14  **BY MR. ELDER:**

15  **Q.**   Oh, you have it in the -- but you can see it on the

16  screen; is that right?

17  **A.**   I can see it, yes.

18  **Q.**   Now --

19  **A.**   I can't see it on here.  There's nothing here but...

20  **Q.**   Okay.

21  **A.**   I can see it over there.

22          **MR. ELDER:**  Okay.  Should we turn the witness's --

23          **THE COURT:**  Do you have a binder in front of you --

24          **THE WITNESS:**  I do.

25          **THE COURT:**  -- that's labeled "Plaintiff's Exhibits"?

```
 1            THE WITNESS:  Yes.
 2    BY MR. ELDER:
 3    Q.    Yeah.  Tab Number 3 ought to correspond with this document
 4    if you want to look at it in the paper form.
 5    A.    (Witness examines document.)
 6       (Stenographer interrupts for clarification of the record.)
 7    Q.    Sorry.  Sometimes you have to get kind of close to the
 8    mic.
 9          And could you say that again?
10    A.    I'm familiar with this form.
11    Q.    Does this form look like the FBNS form that you helped
12    Ms. Martinez prepare back in May of 2019?
13    A.    Yes.
14    Q.    And then on May 31st, 2019, did you drive Ms. Martinez to
15    the Clerk-Recorder's Office in Oakland?
16    A.    Yes.
17    Q.    And what was your understanding of the reason for this
18    trip?
19    A.    For her to file her business name.
20    Q.    Okay.  And did you accompany Ms. Martinez into the
21    Clerk-Recorder's Office building that day?
22    A.    Yes.
23    Q.    So if you could, just briefly walk me through what
24    happened as the two of you walked through the door of the
25    building?
```

GRIM - DIRECT / ELDER

1    **A.**    We took a number, you know, waited our turn; and when we

2    were called, Ms. Martinez, she recognized a voice that -- she

3    had been to the Court Recorder's house to fill out her business

4    application once before; and so she recognized a voice, as we

5    walked in, of somebody who helped her on a different day.

6    **Q.**    Okay.  And then, ultimately, was Ms. Martinez's FBNS form

7    filed --

8    **A.**    Yes.

9    **Q.**    -- that day?

10   **A.**    Yes.

11   **Q.**    And do you recall roughly about how much time you were

12   paid for for the time to help her prepare this, to drive to the

13   Clerk's Office, your time there, and then the time driving back

14   to her house?

15   **A.**    Approximately four hours.

16   **Q.**    And that was at $25 an hour?

17   **A.**    Yes.

18             **MR. ELDER:**  Okay.  One second, Your Honor.

19                         (Pause in proceedings.)

20             **MR. ELDER:**  No further questions, Your Honor.

21             **THE COURT:**  Thank you.

22        Any questions from defendant?

23             **MR. GILBERT:**  No, Your Honor.  Thank you.

24             **THE COURT:**  Thank you, ma'am.  You may stand down.

25             **THE WITNESS:**  Thank you.

PROCEEDINGS

```
 1                        (Witness excused.)

 2           THE COURT:  Would you like to call your next witness

 3    now or after the lunch break?

 4           MS. STONER:  I believe we should break for lunch.

 5           THE COURT:  All right.  Let's break for 45 minutes for

 6    lunch.

 7       Rose, can you please take the jury to the jury room.

 8       (Proceedings were heard out of the presence of the jury.)

 9           THE COURT:  All right.  Let's go off the record, and

10    everyone should be back by 12:55, and we'll resume then.

11       Thank you, Counsel.

12           MR. GILBERT:  Thank you, Your Honor.

13           THE CLERK:  Thank you, everyone.  Court is in recess.

14                 (Luncheon recess taken at 12:07 p.m.)

15    AFTERNOON SESSION                              1:02 p.m.

16       (Proceedings were heard out of the presence of the jury.)

17           THE COURT:  Hi.  Good afternoon.  Please be seated.

18           THE CLERK:  All right.  Recalling Civil

19    Action 20-6570, Martinez vs. County of Alameda, et al.

20    The Honorable Thomas S. Hixson presiding.

21       Go ahead, Judge.

22           THE COURT:  Let's bring back in the jury.

23           MS. STONER:  Your Honor, before we bring back in the

24    jury, I have one quick scheduling matter to address.

25           THE COURT:  Okay.
```

PROCEEDINGS

1          **MS. STONER:**  I just wanted to inform the Court that

2    we'll be calling Ms. Briones; but then, if possible, we'd like

3    to take our break at -- following that questioning so that the

4    Zoom witness can have time to get set up and have that

5    equipment switch during the break.

6          **THE COURT:**  So after we finish with Ms. Briones, you'd

7    like to take the afternoon break at that point?

8          **MS. STONER:**  If possible.

9          **THE COURT:**  Sure.  That's fine.

10          **MS. STONER:**  Thank you, Your Honor.

11      (Proceedings were heard in the presence of the jury.)

12          **THE COURT:**  Good afternoon, everyone.  Please be

13    seated.

14      Plaintiff, please call your next witness.

15          **MS. STONER:**  Your Honor, we'd like to call

16    Ms. Briones.

17    (Witness enters the courtroom and steps forward to be sworn.)

18          **THE COURT:**  Hi.  Good afternoon, ma'am.  Please have a

19    seat in the witness stand.

20          **THE CLERK:**  Please raise your right hand.

21                      **MARIA LAURA BRIONES**,

22    called as a witness for the Plaintiff, having been duly sworn,

23    testified as follows:

24          **THE WITNESS:**  I do.

25          **THE CLERK:**  Thank you.

1          <u>DIRECT EXAMINATION</u>

2     **BY MS. STONER:**

3     **Q.**   Will you please state --

4              **THE COURT:**  Go ahead, please.

5     **BY MS. STONER:**

6     **Q.**   Will you please state your name for the record?

7     **A.**   Maria Laura Briones.

8     **Q.**   And where are you employed?

9     **A.**   The County of Alameda with the Auditor-Controller Agency.

10    **Q.**   Also known as the Clerk-Recorder's Office?

11    **A.**   Yes.

12    **Q.**   And how long have you been employed there?

13    **A.**   Since August of 1999.

14    **Q.**   And while I ask questions of you, I'm going to be

15    referring to the office as the CRO.  Do you understand that?

16    **A.**   Yes.  That's fine.

17    **Q.**   Perfect.

18         What is your current job title?

19    **A.**   I'm a Clerk Recorder and Collections Supervisor II.

20    **Q.**   And how long have you been in that role?

21    **A.**   It's going on about 18 years.

22    **Q.**   Great.

23         Does your role include supervising the filing of

24    documents, including FBNS forms?

25    **A.**   Yes.

BRIONES - DIRECT / STONER

1   Q.   And do you train employees to fill -- regarding the filing

2   of FBNS forms?

3   A.   I do.

4   Q.   And do you agree that it's an almost daily occurrence that

5   customers attempting to file forms have errors that cause their

6   forms to be rejected?

7   A.   Yes, they do.

8   Q.   Then sometimes at the CRO have you observed that a

9   customer will have a document rejected, then step to the side

10  and modify the document?

11  A.   It is a common occurrence, yes.

12  Q.   And sometimes will the clerk again reject the document

13  perhaps for a different reason?

14  A.   It's possible, yes.

15  Q.   And then the business owner will again make a change right

16  there at the CRO?

17  A.   Sometimes they will, and sometimes they need to come back

18  on a different day because they won't have the answer, or it

19  could be that we're asking for something else to fulfill the

20  requirement and they don't have it with them at that time.

21  Q.   Okay.  And do you agree that the business owners that do

22  have the information and that can make the change themselves

23  are able to receive same-day service after they've modified

24  their firm -- their forms at the CRO?

25  A.   Can you repeat the question?

1    **Q.**    Yes, and I'll do a better job this time.

2        Do you agree that business owners who are able to supply

3    the information right on the forms themselves are able to

4    receive same-day service and file their forms that day at the

5    CRO?

6    **A.**    Yes, they can.

7    **Q.**    And regarding language here, I want to get a little bit of

8    clarification.

9        When a document is rejected, does that mean the document

10    is unrecordable?

11    **A.**    Yes.  It means that we are not able to accept it for

12    filing or recording.

13    **Q.**    And when an FBNS form is rejected, it means it was

14    examined and deemed not acceptable?

15    **A.**    Correct.

16    **Q.**    When a document is deemed acceptable for filing, do you

17    collect payment at that time?

18    **A.**    We do.

19    **Q.**    And on March 29, 2019, were you present when Ms. Martinez

20    attempted to file her FBNS form?

21    **A.**    I was.

22        **MS. STONER:**  Your Honor, Counsel, I'd like to

23    exhibit -- or I would like to introduce Exhibit Number 2, the

24    Go Back Letter.

25        **THE COURT:**  Can you lay some foundation?

```
1           MS. STONER:  Yes, I will.
2    Q.   On March 29, 2019, did you write a letter to Ms. Martinez
3    explaining deficiencies with her form?
4    A.   Yes.
5    Q.   Okay.  And will you turn to Tab 2 in the binder.
6         In reviewing that document, does that appear to be a true
7    and correct copy of the letter you prepared?
8    A.   It appears to be, yes, correct.
9           MS. STONER:  Your Honor, Counsel, I move that Exhibit
10   Number 2 be entered into evidence.
11          THE COURT:  Any objection?
12          MR. GILBERT:  Just a moment.
13   No, Your Honor.
14          THE COURT:  Exhibit 2 is admitted.
15   (Trial Exhibit 2 received in evidence.)
16          MS. STONER:  And may I publish it to the jury?
17          THE COURT:  Yes.
18          MS. STONER:  Thank you.
19       And this letter here on the screen, is there any way to
20   enlarge it?
21   Q.   This letter on the screen shows that you rejected
22   Ms. Martinez's document on March 29th, 2019; is that correct?
23   A.   Yes.
24   Q.   Meaning it was rejected and not filed?
25   A.   Correct.
```

BRIONES - DIRECT / STONER

1   **Q.**   Okay.   This letter shows that no fee had been paid by

2   Ms. Martinez; is that correct?

3   **A.**   Correct.

4   **Q.**   And the reason no fee was collected, was that because

5   Ms. Martinez did not have payment that day?

6   **A.**   No.

7   **Q.**   It was because the form was rejected?

8   **A.**   Yes.

9   **Q.**   On the date of the incident on March 29, 2019, have you

10  ever heard recordings of what occurred on that day?

11  **A.**   No, I had not.

12      **MS. STONER:**   Okay.   Then, Mr. Gilbert, Mr. Fine, do

13  you have any objection to her hearing the recording outside the

14  presence of the jury, or will we stipulate to its admissibility

15  for 4C?

16      **MR. GILBERT:**   4C and 4D have already been provided to

17  the witness.   She's already had a chance to listen to them.   So

18  I think if you ask her if she's listened to them and if they're

19  accurate, I think she'll lay the foundation.

20      **MS. STONER:**   Okay.

21  **Q.**   Have you had a chance to review an audio file of the

22  incident on March 29, 2019?

23  **A.**   I have.

24  **Q.**   And you listened to two recordings?

25  **A.**   Two, mm-hmm.

BRIONES - DIRECT / STONER

1    Q.   And, to your knowledge, was that identified as Exhibit 4C

2    and 4D for you?

3    A.   Yes.

4    Q.   Okay.  And listening to those recordings, did those appear

5    to be accurate recordings of what -- of at least the portion

6    that is recorded?

7    A.   The portion I heard, yes.

8    Q.   Okay.

9    A.   Mm-hmm.

10         MS. STONER:  Your Honor, Counsel, I'd like to

11   introduce Exhibit 4 and publish it to the jury.

12         THE COURT:  Are you moving to enter 4C and 4D?

13         MS. STONER:  4C and 4D, yes.

14         THE COURT:  Any objection?

15         MR. GILBERT:  No objection to 4C and 4D, the two audio

16   files.

17         THE COURT:  Okay.  Exhibit 4C, as in "cat," and 4D, as

18   in "dog," are admitted, and you may publish them to the jury.

19      (Trial Exhibits 4C and 4D received in evidence.)

20         MS. STONER:  Thank you, Your Honor.

21      I'll begin by playing 4C.  And I apologize.  This is a bit

22   of a lengthy recording, about eight minutes long.

23              (Audio was played but not reported.)

24   BY MS. STONER:

25   Q.  So after that recording, or any time in that day, were you

**BRIONES - DIRECT / STONER**

1   able to help Ms. Martinez get her form filed?

2   **A.**   No.

3   **Q.**   And did you eventually come to understand that

4   Ms. Martinez was the business owner?

5   **A.**   She told me she was.

6   **Q.**   And did you have any reason to doubt that?

7   **A.**   No.

8   **Q.**   And if she had been sighted, would she have been able to

9   step to the side and make those changes on the document herself

10  and have her form potentially filed that day?

11  **A.**   If she was able to verify the information on the form

12  because, ultimately, it's a legal form.  But this form was

13  signed under penalty of perjury.

14  **Q.**   Right.

15  **A.**   So if she would be able to verify the information, then,

16  you know, she would have been able to -- and say it's correct

17  and submit it to us, then we would have been -- and it met all

18  the requirements, we would have been able to accept it.

19  **Q.**   Which she could have done if she could see; right?

20  **A.**   If she could verify the information.

21  **Q.**   Okay.  But do you understand in the interaction she was

22  asking for a letter?  Correct?

23  **A.**   Well, she was -- she was demanding that I make the

24  corrections for her, and I'm not sure what type of letter I can

25  give her other than our rejection letter.  Because we did

1  examine her document and it was deemed unacceptable; and in

2  cases where that happens, we do provide a rejection letter.

3  Q.   And that's something you provide to all types of people on

4  a daily basis?

5  A.   We can, yes.  Mm-hmm.

6  Q.   But were you understanding that she was asking you for a

7  letter that listed the reasons for the denial of the

8  accommodation she requested?

9  A.   We weren't denying her -- what she was asking was not

10  something that was reasonable.  So I wasn't denying her

11  anything other than me trying to assist her and provide the

12  services that I could.

13  Q.   But on that date, did you offer to Ms. Martinez in a

14  written form the reasons why the County would not allow you to

15  make those modifications to the form?

16  A.   I just provided her with the rejection letter, which is

17  what I was instructed to do and what we typically do in our

18  office.

19  Q.   So you were following the policy of the County?

20  A.   I was following our policy.

21  Q.   Okay.  And when you gave her a rejection letter, it was a

22  standard rejection letter that would have been given to any

23  sighted person in a similar situation, such as a courier or

24  someone else who's unable to file the form at the time?

25  A.   Well, if someone asked us for a letter, but we typically

1  do a rejection letter.  If the filing is submitted by mail and

2  it's deemed unacceptable, we do create a rejection letter and

3  mail it back.

4  **Q.**   And the letter you gave her, was it a printed copy?

5  **A.**   Yes.

6  **Q.**   Was it your understanding on that day that she had

7  sufficient vision to be able to read printed copies?

8  **A.**   Just based on what she was telling me that she needed, she

9  was blind and was unable to fix the form.

10  **Q.**   Okay.  And so from that, did you -- were you able to infer

11  that she also couldn't read a standard size print document?

12  **A.**   I would -- I was thinking that she probably couldn't see

13  what was being written or what was on the form.

14  **Q.**   Okay.  And during the interaction that you had with

15  Ms. Martinez, is it safe to say that she was having some

16  difficulty communicating the required changes via the printed

17  paper form back to the County?

18  **A.**   No.

19  **Q.**   Okay.  Let me back that up.

20      So you spoke with Ms. Martinez verbally?

21  **A.**   Mm-hmm.

22  **Q.**   And she appeared to understand the words you were saying?

23  **A.**   We both -- I under- --

24  **Q.**   Back and forth?

25  **A.**   I was able to understand her, and she was able to

1  understand me.

2  **Q.**    Verbally?

3  **A.**    Yes.

4  Q.    When it came to the printed document, she needed to convey

5  some different information to the County via the printed form

6  before the County could accept her filing; is that correct?

7           MR. GILBERT:  Vague.

8           THE COURT:  Overruled.

9           THE WITNESS:  I -- I don't understand the question.

10  BY MS. STONER:

11  Q.    Okay.  We'll back it up even more.

12      A form is a type of communication between the person

13  filling it out and the person receiving the information;

14  correct?

15  A.    Mm-hmm.

16  **Q.**    And Ms. Martinez, in filling out the form, had attempted

17  to communicate some information to the County about her

18  business?

19           **MR. GILBERT:**  Speculation.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  So she was -- we reviewed the form, and

22  we -- I verbally told her what was wrong with the form, and

23  that was the way we communicated so that she understood what

24  was missing and needed corrections on that -- on her form that

25  was being presented.

**BRIONES - DIRECT / STONER**

**BY MS. STONER:**

**Q.**   Because the form, as it was, was not able to be accepted by the County?

**A.**   Correct.

**Q.**   But if Ms. Martinez had been able to communicate via handwritten change the correct name of her business entity, the correct -- check the boxes, do whatever else needed to be done, if she was able to make that communication in writing via that form, you would have been able to accept the changes?

**A.**   But the form was already filled out.

**Q.**   Correct.  But if she -- the difficulty Ms. Martinez had in communicating was not a difficulty communicating verbally.  It was a difficulty completing and submitting the form with the information the County needed to accept it?

**A.**   I don't see how it -- it was -- how that could be, that she had difficulty communicating on the form.

**Q.**   How do you -- how does information get into a form?  Typed?  Handwritten?

**A.**   Handwritten.

**Q.**   Okay.  And Ms. Martinez was not able to write the changes, because of her disability, onto the form?

**A.**   She herself couldn't, correct.

**Q.**   Okay.  And she asked for sighted assistance.  She asked for someone who could see, who could write, to help her that day?

BRIONES - DIRECT / STONER

1   A.   Well, she asked -- she de- -- she asked me or Angelina

2   Moran, but neither one of us can do that for her.

3   Q.   Well, of course you're both capable of writing, but you

4   were prohibited by the County policy?

5   A.   We're capable of writing, but it would be against our

6   policy, the CRO policy, to do so.

7   Q.   So the reason you could not help her is because of the

8   policy and not anything else?

9   A.   Well, it's a document that's signed under penalty of

10  perjury, and we would be altering or modifying that document,

11  which is also, you know, illegal.

12  Q.   Was Ms. Martinez asking you to sign a document on her

13  behalf?

14  A.   No.

15  Q.   And was Ms. Martinez asking you to change one of the

16  accepted, filed documents at the Recorder's Office?

17  A.   She asked -- can you repeat it?

18  Q.   Sure.

19       So the Recorder -- when a document's filed with the

20  Recorder, it gets a number, it gets cashiered; is that correct?

21  A.   Yes.

22  Q.   Can you explain that a little bit more for the jury?  So

23  if a business form is presented, if an FBNS form is presented,

24  everything is proper, you approve it, then what happens next?

25  A.   If -- once it's presented to us and it's reviewed and

1   examined and deemed acceptable for filing, we do proceed with

2   filing it in our office, and it gets a file number, we collect

3   payment, and then it gets entered -- will be entered into our

4   system.

5        It creates an index with -- along with the business name

6   and the file number, and ultimately, that filing will be

7   digitized into our system and it'll become public record.

8   **Q.**   Okay.  And Ms. Martinez was not asking you to modify any

9   document that had that file number on it, was she?

10  **A.**   No.

11  **Q.**   And Ms. Martinez told you that she would be unable to fill

12  the form even at her home by herself?

13  **A.**   I believe she did.

14  **Q.**   And she also told you about the ADA and said that she was

15  entitled to this service under the ADA; is that correct?

16  **A.**   Yes.

17  **Q.**   Did you Google something about the ADA when you -- in

18  between speaking with her?

19  **A.**   I did.  I -- I just wanted to check and see if there was

20  anything different.  You know, that I had a basic understanding

21  of what she was asking me to do, and I knew that it was not

22  something I could do, but I did Google just "ADA accommodation"

23  just to make sure.

24  **Q.**   But on that day on March 29, 2019, you weren't exactly

25  sure what the ADA required you to do and what the limits were

1    of the ADA specifically?

2    A.    Well, I knew what she was asking me to do was not

3    something I could do.

4    Q.    Because of the County policy?

5    A.    That, but also I don't want to modify a form that's

6    already been signed without the customer verifying what is

7    being written.

8    Q.    But in --

9    A.    And it's altering a document that's signed.

10   Q.    But in terms of your understanding of the obligations of

11   the ADA, had the County provided you on March 29, 2019,

12   everything you needed to be completely certain of what the ADA

13   required of you on that day?

14   A.    Well, I -- I based it on the policy of our office.

15   Q.    Okay.  Thank you.

16          On that day of March 29, 2019, did you know what an

17   auxiliary aid or an auxiliary service was?

18   A.    On that date?

19   Q.    Correct.

20   A.    No.

21   Q.    Did you know that a public entity's own staff does not

22   always need to provide the assistance directly under the ADA?

23          MR. GILBERT:  Misstates the law.

24          THE COURT:  Overruled.

25          THE WITNESS:  I'm not understanding your question.

1  BY MS. STONER:

2  Q.   Okay.  I think you previously mentioned about -- actually,

3  I'm not sure you did mention about -- did you -- have you ever

4  provided a sign language interpreter in your office?  I believe

5  it was actually Ms. Moran that mentioned this.

6  A.   Oh, we have.

7  Q.   Okay.  And is a sign language interpreter someone that's a

8  clerk?

9  A.   We do have an employee that is a sign language

10  interpreter.

11  Q.   Is it a clerk?

12  A.   An employee.

13  Q.   But not a clerk?

14  A.   Well, it's the same thing.  It's an employee in our

15  office.

16  Q.   What's the employee's job title?

17  A.   It's an auditor associate.

18  Q.   Okay.  So you have an auditor associate that happens to

19  speak American sign language?

20  A.   Yes.

21  Q.   Okay.  Did you, at that -- as of March 29, 2019, have any

22  understanding that sometimes public entities hire outside

23  interpreters to come interpret on behalf of people who are

24  deaf?

25  A.   I'm not aware.  I mean, it's possible that if we needed a

**BRIONES - DIRECT / STONER**

1    translator, we would be able to get one.

2    **Q.**  Do you ever have foreign language translators come to the

3    office to assist customers?

4    **A.**  From the outside, or employees, or --

5    **Q.**  Ever, in any capacity.

6    **A.**  We have employees who are translators, and then we have a

7    language line.

8    **Q.**  Okay.  So the language line, that goes to people who are

9    not employees of the County; correct?

10    **A.**  Correct.

11    **Q.**  And regarding the modifications to the written form for

12    Ms. Martinez, did you have any objection to a third party

13    making modifications to the form on behalf of Ms. Martinez?

14    **A.**  She could have asked someone that was not a County

15    employee to help her fill out the form.

16    **Q.**  If she had asked me, because I'm not an employee of the

17    County, would you have any objection to me making the change?

18    **A.**  No.

19    **Q.**  Okay.  And on that date, was it also possible to use a

20    blank FBN form and to fill it out from scratch?

21    **A.**  She didn't ask me to do that.

22    **Q.**  But was it possible?

23    **A.**  I mean, she could have told me what to write, but I

24    wouldn't feel comfortable because she wouldn't be able to

25    verify what I was typing --

1  **Q.**   Okay.

2  **A.**   -- writing on the form.

3  **Q.**   Okay.  But the County had never given you any instruction

4  that you may be required to assist an individual by writing

5  information on a form; is that correct?

6  **A.**   It depends on the form.

7  **Q.**   Okay.  So you're aware on that date, on March 29, 2019,

8  you're aware that sometimes an individual needs assistance and

9  you can write on a blank form for that individual?

10  **A.**   Not a blank form, but a form -- like, let's say, they're

11  requesting a copy of an OP -- a public record copy.  We can --

12  you know, it's not a document that's filed or recorded in our

13  office.  It's not a form.

14  **Q.**   Okay.  And had you been trained that that was a

15  requirement based on the ADA on March 29, 2019?

16  **A.**   Can you repeat it?

17  **Q.**   Yeah.

18      On March 29, 2019, when you're talking about assisting

19  with a blank form of some kind, was it your understanding that

20  that was required by the effective communication requirement of

21  the ADA?

22  **A.**   We would be providing that assistance if we could

23  within --

24  **Q.**   Okay.

25  **A.**   You know, as long as it's not something that is a document

 1  that's signed -- previously signed under penalty of perjury or

 2  that it's a legal -- a document that's, like, a legal nature, a

 3  legal document.

 4  Q.   So it sounds like the County had given you a lot of

 5  training about its policies about not modifying documents; is

 6  that correct?

 7  A.   Yes.

 8  Q.   And you'd been trained on that a number of times over the

 9  years?

10  A.   Yes.

11  Q.   And the County hadn't specifically instructed you about

12  when the ADA did and didn't require you to assist in completing

13  a form.  It was just your own understanding of being helpful to

14  customers; is that correct?

15  A.   Well, we try to be as helpful as possible within our

16  capacity when it doesn't go into us doing something illegal or

17  modifying or altering a document that is potentially going to

18  be recorded or filed in our office.

19  Q.   And on that day, did you ask your supervisor for further

20  clarification on what you were required to do in that

21  situation?

22  A.   I did confirm with my supervisor -- specifically to

23  Ms. Martinez?

24  Q.   Yes, specifically to Ms. Martinez.

25  A.   I did.

1   Q.   And your supervisor likewise communicated to you that you

2   were following the policy of the County?

3   A.   Yes.

4   Q.   As we sit here today, if this incident were to occur,

5   would you do anything differently?

6   A.   If it was today?

7   Q.   Yes.

8   A.   Well, we have a software on one of our public kiosks that

9   allows an individual to be able to type -- see what's being

10  typed.  So if someone came in, we would direct them to that

11  public kiosk.

12  Q.   And if they used the kiosk, are they able to communicate a

13  change to a written form?

14  A.   Well, the --

15          MR. GILBERT:   Vague.

16          THE COURT:   Overruled.

17          THE WITNESS:   The kiosk just allows them to enter the

18  information so that it could be submitted and -- the

19  information could be submitted to us for review.

20  BY MS. STONER:

21  Q.   In the --

22  A.   So we wouldn't know if -- you know, the customer wouldn't

23  know if it needed correction because we wouldn't -- we're not

24  reviewing that document yet.

25  Q.   Okay.  Did Ms. Martinez explain to you that she could

1    verify information if you read it aloud back to her?

2    **A.**    I don't recall.

3    **Q.**    Okay.   We'll listen to another recording in a minute.

4         On that date -- or in today's world, now that you have the

5    kiosk, is an individual who is blind, or otherwise unable to

6    access print, able to communicate the information they need via

7    the form to the County?

8    **A.**    They're able to enter the information such that the form

9    can be submitted to our office, and then we could print it for

10   them.

11   **Q.**    So assuming the system works with the kiosk and the new

12   screen reader software, a person with a disability is able to

13   communicate both verbally and via the form today?

14   **A.**    Yes.

15   **Q.**    And so you understand that when they communicate via the

16   form, that is written communication to the County from the

17   individual with the disability?

18   **A.**    By them completing the form, yes.

19   **Q.**    So you understand that for Ms. Martinez to have

20   communicated her information to the County, she needed

21   something other than a printed form that she had to write on in

22   order to make that change so she could communicate the

23   information to the County on March 29, 2019?

24        **MR. GILBERT:**   Calls for lay opinion.   Legal

25   conclusion.

1          THE COURT:  Overruled.

2          THE WITNESS:  I don't think I understand.  Can you

3    repeat the question?

4    BY MS. STONER:

5    Q.   Yes.

6         So Ms. Martinez had information on March 29, 2019, that

7    she wanted to communicate to the County, namely, the change

8    that the County said she needed in order for her document to be

9    filed, but she was unable to do so because the print form was a

10   barrier to effective communication in printed form?

11   A.   The form was already completed, so we were unable to make

12   the changes for her.

13   Q.   Okay.  But what I am asking is:  You have previously

14   testified that today a blind user can theoretically use a kiosk

15   which will enable them to change the form at the CRO and will

16   enable them to communicate printed information back to the CRO;

17   is that correct?

18   A.   Yes.

19   Q.   And Ms. Martinez was trying to do the same thing, to

20   communicate written information back to the CRO; correct?

21          MR. GILBERT:  Speculation.

22          THE COURT:  Overruled.

23          THE WITNESS:  She was asking us to modify and correct

24   her form.

25   \\\

1    BY MS. STONER:

2    Q.    You've told me the reason that she was asking -- you told

3    me one thing she was asking for, but the purpose of

4    Ms. Martinez wanting to change the form was that so she could

5    communicate written information back to the County about her

6    business?

7                MR. GILBERT:  Speculation.  Asked and answered.

8                THE COURT:  Overruled.

9                THE WITNESS:  She -- she had filled out the form that

10   needed to be submitted --

11   BY MS. STONER: --

12   Q.    Okay.

13   A.    -- for her filing.

14         So that document, she had already filled it out.

15   Q.    Okay.

16   A.    So she --

17   Q.    So --

18   A.    I understand -- okay.  Go ahead.

19   Q.    Could you take -- so the issue that she had, the barrier

20   to communication, was that the form was not in an accessible

21   format to Ms. Martinez on that day; correct?

22                MR. GILBERT:  Calls for a legal conclusion.  Lay

23   opinion.

24                THE COURT:  Overruled.

25                THE WITNESS:  The form is available to any customer.

1   You know, we have it on our website.  We have it in person.

2   BY MS. STONER:

3   Q.   A blank printed form would have been available to any

4   sighted customer; is that correct?

5   A.   If they ask us for a blank form, we would provide it --

6   Q.   But the --

7   A.   -- to anyone.

8   Q.   -- blank printed form was not in a format that

9   Ms. Martinez could use on March 29, 2019, was it?

10  A.   It's available to her if she had asked for one.

11  Q.   So you're saying that on March 29, 2019, you would have

12  given her a blank paper form if she had asked?

13  A.   If she had asked for a blank one, I would have given her

14  one.

15  Q.   And it's your testimony that she could have written on

16  that form and submitted her information back to the County via

17  a printed form?

18  A.   She -- she could have filled it -- she could have asked

19  someone to fill it out, or she could have taken it home.

20  Q.   She did ask someone to fill it out.  She asked you to fill

21  it out.

22         THE COURT:  Don't interrupt the witness.

23     Sorry, that was directed to counsel, not to the court

24  reporter.

25         MS. STONER:  Sorry.

1            THE WITNESS:  What she was asking of myself and

2    Angelina was to make the corrections for her.  She didn't ask

3    me for a blank form.  She simply asked -- you know, she

4    understood the corrections that needed to be made, and she

5    asked us to make the corrections for her.

6    BY MS. STONER:

7    Q.   And did you offer to make the corrections on a blank form

8    on that day?

9    A.   I didn't.

10   Q.   Had the County ever told you -- you testified earlier that

11   you had helped some people fill out forms in the past.  So

12   the County had told you that it was an option to write on paper

13   for a customer with a disability on a certain type of form;

14   correct?

15   A.   No.  The forms that we have are like applications or

16   instructions.  So that's something that we do.  Like, if it's

17   a -- if someone needs instructions, you know, we are able to

18   write information, we're able to provide resources, we're able

19   to provide blank forms.

20   Q.   So on March 29, 2019, the concept of writing on a piece of

21   paper -- not an FBNS form, but a piece of paper -- to

22   accommodate a customer with a disability was not totally

23   unknown to you?

24   A.   The concept -- can you repeat the question?

25   Q.   Yes.

**BRIONES - DIRECT / STONER**

1          On March 29th, 2019, the concept of writing on a piece of

2    paper to accommodate a person with a disability was not unknown

3    to you?

4          **MR. GILBERT:**  Vague.  Overbroad.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  I mean, if someone were to ask for

7    directions on how to get to BART, for example, I would be able

8    to write instructions.

9          **MS. STONER:**  All right.  So we have admitted 4D as an

10   exhibit, and I would now like to publish it to the jury.

11         **THE COURT:**  Okay.

12         **MS. STONER:**  We'll go ahead and we'll listen to 4D.

13              (Audio was played but not reported.)

14   **BY MS. STONER:**

15   **Q.**   So on that date, March 29, 2019, you did not know what

16   exactly the ADA required of you with regard to Ms. Martinez; is

17   that correct?

18   **A.**   I have a basic understanding of the ADA guidelines, and

19   what she was asking me to do was not a reasonable

20   accommodation.

21   **Q.**   So you understood the ADA guidelines to be about

22   reasonable accommodations?

23   **A.**   Yes.

24   **Q.**   And what was the basis of that understanding?

25   **A.**   Well, it's just because we deal with customers, you know,

1  similarly to -- that have disabilities, and we try to assist

2  them the best way we can with -- up to the point where it's not

3  something that we're able to do.  So we do encounter that in

4  the office.

5  **Q.**  But the County had not provided you with -- when you

6  talked to Ms. Martinez on March 29, 2019, you were not able to

7  say, "This is which section of the ADA I think exempts me from

8  giving you the assistance you've requested," were you?

9  **A.**  I -- I knew it's not something that I could do because it

10  didn't fall within a reasonable accommodation.

11  **Q.**  And do you know what section of the ADA that's in?

12  **A.**  No.

13  **Q.**  And as you sit here today, can you tell me what the test

14  is, the legal test, for a reasonable accommodation?

15  **A.**  I don't -- I don't know.

16  **Q.**  And so you couldn't have told me that on March 29, 2019?

17  **A.**  A test?

18  **Q.**  Correct.  What's the legal standard for a reasonable

19  accommodation?

20  **A.**  I couldn't, no.

21  **Q.**  And what's the legal standard for effective communication?

22  **A.**  The legal standard for effective?  It could be verbal.  It

23  could be written.

24  **Q.**  Okay.  But you couldn't tell me which code section, or you

25  haven't read -- you haven't read the law with regard to that,

1  as we sit here today, have you?

2  **A.**   I have not.

3  **Q.**   And what about requirements for auxiliary aids?  As we sit

4  here today, can you tell me exactly what the ADA says about

5  auxiliary aids and services?

6  **A.**   I know that there's some auxiliary aids, like braille,

7  read -- and something that could read out loud, and the ability

8  to -- for a person to type in information and know what's being

9  typed on the screen.

10  **Q.**   And on March 29th, 2019, did you know about screen

11  readers?

12  **A.**   No.

13            MS. STONER:  I'll pass the witness.  Thank you.

14            THE COURT:  All right.  Any questions from the County?

15            MR. GILBERT:  Yes.  Thank you, Your Honor.

16                       <u>CROSS-EXAMINATION</u>

17  BY MR. GILBERT:

18  **Q.**   Good afternoon, ma'am.

19  **A.**   Good afternoon.

20  **Q.**   How you doing?

21  **A.**   Okay.

22  **Q.**   So let's go back to a few more basics before we go into

23  details, if we could.

24        How long have you been working with the County?

25  **A.**   I'm going on 25 years.

1    **Q.**    Can you very briefly tell the County -- or tell the jury

2    about the different positions you've held at the County over

3    that period?

4    **A.**    Sure.  I've been a supervisor at the Clerk-Recorder's

5    Office.  I've been a customer service supervisor, recording

6    unit supervisor; and then currently I'm the vitals general

7    business supervisor.

8    **Q.**    So you're a little soft-spoken.  Can I talk you into

9    pulling the microphone --

10   **A.**    Oh, sure.

11   **Q.**    -- just a little bit closer to your mouth?

12   **A.**    Sorry.

13   **Q.**    That's okay.

14   **A.**    Is that better?

15   **Q.**    Much better.  Thank you.

16   **A.**    Okay.

17   **Q.**    So what is your current position?

18   **A.**    I'm a Clerk Recorder and Collections Supervisor II.

19   **Q.**    And how long have you been in that role?

20   **A.**    Approximately 18 years.

21   **Q.**    Now, through the course of your roughly a quarter century

22   with the County, that's a fair amount of time --

23   **A.**    Mm-hmm.

24   **Q.**    -- have you received training on how to do your job?

25   **A.**    Yes.

BRIONES - CROSS / GILBERT

1   **Q.**  And do you receive training on the Americans with
2  Disabilities Act?
3   **A.**  We do.
4   **Q.**  And when would you first have received that training?
5   **A.**  When I first was hired with the County, and then we have
6  ongoing training.
7   **Q.**  And generally, just in concept, what can you tell us about
8  the training you receive about interacting with disabled
9  individuals?
10  **A.**  We're trained to assist persons with disabilities to the
11  best of our ability, depending on the situation and the
12  request, as long as it's something within our scope and
13  something that we can provide to the customer and it's not
14  something improper or illegal.
15  **Q.**  Now, are you taught whether or not providing -- or
16  conducting an illegal act would be considered a reasonable
17  accommodation if a disabled individual requested it?
18  **A.**  Can you repeat the question?
19  **Q.**  What are you taught in regards to if a disabled individual
20  comes in and demands that you do something that's illegal, that
21  you break the law?  What are you taught in that regard?
22  **A.**  Not to do it.
23  **Q.**  And is that based upon the County's policy?
24  **A.**  Yes.
25  **Q.**  And do you have an understanding that the County's policy

1    is based upon state and federal law?

2    **A.**   Yes.

3    **Q.**   And do you have an understanding that the County's policy

4    and the state and federal law is adopted by a series of

5    attorneys both in the General Counsel's Office and the State of

6    California that they work with?

7    **A.**   Yes.

8    **Q.**   Now, you receive regular training updates on that as you

9    go through your career, don't you?

10   **A.**   We do.

11   **Q.**   And, in fact, as a supervisor, you also teach others about

12   that, don't you?

13   **A.**   Yes.   We -- I conduct training of new employees or ongoing

14   training as well.

15   **Q.**   Now, when you interacted with Ms. Martinez on

16   March 29, 2019, did you feel like you had a good grasp and

17   understanding of what was required under the Americans with

18   Disabilities Act when you were interacting with a disabled

19   individual?

20   **A.**   I did.

21   **Q.**   So then why would you go Google questions or issues after

22   speaking with Ms. Martinez?

23   **A.**   Just for my own research, to see if there was anything

24   else that I was missing, because I did -- I do want to be

25   helpful up to the point where, you know, I can in my capacity

1   and up to the point where it's not something I'm doing

2   illegally or outside our policy.

3   **Q.**   And when you were searching on Google, were you trying to

4   find possible avenues where you could provide assistance to

5   Ms. Martinez?

6   **A.**   Yes.

7   **Q.**   Did you find anything that would have allowed you to

8   modify a previously completed legal document?

9   **A.**   I did not.

10  **Q.**   Now, did Ms. Martinez's statements on what she understood

11  and believed the ADA to provide, did that seem contrary to what

12  you had been trained on?

13  **A.**   Yes.

14  **Q.**   And did you also try and look that up when you were doing

15  a Google search on that day?

16  **A.**   No.

17  **Q.**   Okay.  Did you find anything that would have supported

18  Ms. Martinez's statements about what she was demanding?

19  **A.**   I did not.

20  **Q.**   Okay.  Excuse me.

21      So turning back to March 29, 2019 --

22  **A.**   Mm-hmm.

23  **Q.**   -- are you the first person that has interaction with

24  Ms. Martinez in the CRO?

25  **A.**   No.

**BRIONES - CROSS / GILBERT**

1  **Q.**   How is it that you end up having interaction with her?

2  **A.**   Angelina Moran, who is an employee that I supervise,

3  informed me about Ms. Martinez -- Ms. Martinez's situation and

4  that she asked to speak to a supervisor.

5  **Q.**   Did you go and personally respond to Ms. Martinez's

6  request?

7  **A.**   I went outside to speak with her.  I did.

8  **Q.**   Did you meet with Ms. Martinez yourself?

9  **A.**   Yes.

10 **Q.**   Where did you meet with her?

11 **A.**   At the counter -- at the counter where she was standing.

12 **Q.**   And was this at Ms. Moran's workstation?

13 **A.**   It was.

14 **Q.**   And can you tell us what happened during that interaction,

15 please?

16 **A.**   Ms. Martinez and I were discussing her trying to file her

17 FBN in our office.  And she did inform me that it was filled

18 out incorrectly.  She misunderstood some of the instructions.

19 And she was asking if I could help her make the corrections so

20 she could file the form that day.

21 **Q.**   So I'm displaying what's been previously admitted as

22 Exhibit 1.  And if you want to turn to Exhibit 1 in your

23 binder, please, this is the initial fictitious business name

24 statement.

25     Is this something that you were able to look at and review

1   during your discussions with Ms. Martinez?

2   **A.**   Yes.  Yes.

3   **Q.**   Did you note any deficiencies on this form when you

4   reviewed it?

5   **A.**   Yes.

6   **Q.**   And what were the deficiencies?

7   **A.**   Well, her fictitious business name has LLC in the title,

8   and it contradicts the registered owner's information because

9   the registrant name -- the name of the LLC should be included

10  in the registrant box and not the individual's name.  And also,

11  the business being conducted by contradicts the name of the

12  business.

13  **Q.**   Thank you.

14       Now, did there seem to be any trouble in what Ms. Martinez

15  was trying to convey through this document?

16  **A.**   Can you repeat the question?

17  **Q.**   Well, let me put it this way:  We heard a line of

18  questioning a minute ago about whether communication is in

19  written or oral and how you should interpret documents.

20       So have you ever seen anything in the law that says that

21  when people are effectively communicating orally, that you

22  should resort to written communication to see if there's a

23  secondary meaning or secondary communication?

24  **A.**   No.

25  **Q.**   Nor have I, but let's assume that existed.

1          Is it fair for me to interpret this that she is clearly

2    conveying to you that she wants to register her business about

3    Be Confident Be Coaching -- and I've zoomed in on the screen

4    for the jury -- where she wants to register it as an LLC with

5    the business to be conducted by her as an individual?

6    **A.**    Can you repeat the question?

7    **Q.**    So as I read this document, what Ms. Martinez is conveying

8    to the world in her document -- let's go first -- step back.

9          An FBNS form is taken and received and recorded by the

10   CRO; correct?

11   **A.**    Correct.

12   **Q.**    And CRO basically just puts it online, makes it available

13   for the rest of the world to look at, doesn't it?

14   **A.**    Yes.

15   **Q.**    So it really doesn't convey anything to the CRO office,

16   does it?

17   **A.**    No.

18   **Q.**    We don't send anything out; we don't take any action with

19   the information that's on it.  It literally is just, we're just

20   publishing it, is all we're doing; is that right?

21   **A.**    We're accepting it and putting it in our -- as part of our

22   record.

23   **Q.**    So there is no information in this form that's being

24   conveyed to the County where the County is going to take action

25   and conduct further efforts or steps on, is there?

BRIONES - CROSS / GILBERT

1    A.    No.

2    Q.    That's correct?

3    A.    Correct.

4    Q.    Thank you.

5         And what she's conveying, if I'm reading this form right,

6    even if there was a message that she was trying to convey, is

7    that looking at Box D where she's checked an individual, is

8    that her understanding and her intention is that she's going to

9    operate this business as an individual, is what she was

10   conveying and intending to do?

11   A.    Correct.

12   Q.    Now, even though she conveyed that clearly, can an

13   individual operate an LLC legally in the state of California?

14   A.    It goes against the filing instructions, so, no.

15   Q.    It would have to be corrected.  An LLC would have to be

16   operated by an LLC?

17   A.    Yes.

18   Q.    Thank you.

19        Did you explain to Ms. Martinez what was wrong with the

20   form?

21   A.    I did.

22   Q.    And we heard on the audio it seemed -- I think I stopped

23   counting at her yelling "no" at you, I think I stopped counting

24   about 18 times.  Did she really yell "no" and interrupt you

25   that many times?

1              **MS. STONER:**  Objection.

2              **THE WITNESS:**  Yes.

3    **BY MR. GILBERT:**

4    **Q.**   How did you interpret your interactions with

5    Ms. Martinez --

6              **THE COURT:**  Overruled.

7    **BY MR. GILBERT:**

8    **Q.**   -- and how she treated you?

9       (Stenographer interrupts for clarification of the record.)

10   **BY MR. GILBERT:**

11   **Q.**   How did you interpret your interactions with Ms. Martinez

12   and how she treated you?

13   **A.**   Well, she was quite rude to me, didn't let me speak at

14   times, and was accusing me of being -- discriminating against

15   her, and she was very demanding.  And I did feel like -- by her

16   accusing me of discrimination, I did feel bullied and thinking

17   she wanted me to do -- make the corrections for her.  So I felt

18   bullied.

19       But I've had experience, you know, extensive experience

20   with customers, and I tried to remain calm and professional

21   during my interaction with her.

22   **Q.**   Did you try and take the time and explain to Ms. Martinez

23   what was wrong with her form?

24   **A.**   I tried, if she would let me.

25   **Q.**   Now, as far as the discussion that you and her were

1   engaged in while she's at the counter with you, did you feel

2   that she understood what you were saying to her?

3   A.   I did.

4   Q.   Did you understand what she was saying to you?

5   A.   I did.

6   Q.   Did you understand there to be any problems in

7   communication between the two of you?

8   A.   No issues.

9   Q.   Now, when you would make a statement, when she would

10  respond, did she appear to be responding materially to the

11  things you were saying?

12  A.   Yes.

13  Q.   And did that tend to suggest to you that she understood

14  the statement you had made and that she had understood it,

15  heard it, and interpreted it properly?

16  A.   Correct.

17  Q.   Did you believe your communication with Ms. Martinez was

18  effective and that both of you understood and heard each other?

19  A.   Yes.

20  Q.   Now, ultimately, what did Ms. Martinez ask you to do to

21  this FBNS form?

22  A.   She asked me to make the corrections for her.

23  Q.   Have you ever modified a completed legal form for anyone

24  in your role as a CRO?

25  A.   Never.

1   Q.   Why not?

2   A.   It's -- it goes against our County policy, and it's

3   illegal for us to do so.

4   Q.   Thank you.

5        Now, we also heard a moment ago there was -- on the tape,

6   there was a discussion where you offered to expedite a return

7   by mail.

8   A.   Mm-hmm, yes.

9   Q.   What does that mean?

10  A.   I gave her the option -- I gave her an envelope with the

11  option for her to mail in her corrected fictitious business

12  name to our office, and I could put my name on it or one of my

13  staff, and once we receive it, we can help expedite her filing

14  if we received it in the mail.

15  Q.   And if it's expedited, does that mean that you process

16  it -- you take priority?  You do it first?

17  A.   It takes priority over other filings that we receive in

18  the mail.

19  Q.   Did Ms. Martinez take you up on that offer to expedite the

20  processing?

21  A.   She did not.

22  Q.   Thank you.

23       Now, we also heard some discussion of a Go Back Letter and

24  Ms. Martinez demanding that you give her a letter of what was

25  wrong.

1        Did you ultimately prepare a letter of what was wrong with
2    her form?
3    **A.**   I did.
4    **Q.**   Now, we saw Exhibit 2 previously, and I'll present it
5    again.  It's already been admitted.  The one that was presented
6    earlier was a little blurry, so I wanted to have a more clear
7    version of it.
8        Can you tell the jury, please, what is a Go Back Letter?
9    **A.**   A Go Back Letter is also referred to as a rejection
10   letter, and it's a notice that we provide to the customers when
11   their filing is deemed not acceptable for filing, and we
12   provide the reasons why the filing is not acceptable and what
13   they can do to make the corrections so that it is acceptable.
14   **Q.**   Is this something that you would hand to people so they
15   would have it and be able to use it as a guideline and to be
16   able to access while they're preparing their updated form?
17   **A.**   Yes.
18   **Q.**   If this is requested electronically, is this a form or a
19   response that the County has previously sent out electronically
20   to people?
21   **A.**   We can -- we can send it electronically, if requested.
22   **Q.**   And is that something the County is willing to do?
23   **A.**   Yes.
24   **Q.**   Now, let's go to the specific FBNS.
25       I've zoomed in on the section in the middle that talks

1    about -- there's a series of checkmarks.

2        What are these checkmarks and what do each represent?  And

3    I don't need you to go through each one.  I just need a general

4    of what are these -- why are these here?

5    **A.**    On our rejection letter template, we have the common

6    reasons why a filing is rejected, and we check off the boxes

7    pertaining to that specific filing.  And then we also add in --

8    have the ability to add in further instructions or information

9    to help the customer better understand what's needed to be

10   corrected or fixed in order to resubmit for our office to

11   accept it.

12   **Q.**    Thank you.

13       And it looks like -- on this form, it looks like every box

14   is checked on the side.

15   **A.**    Mm-hmm, yes.

16   **Q.**    And was that intended to help point out to Ms. Martinez

17   "This is exactly what you need to do to get this form approved

18   and recorded"?

19   **A.**    Yes.

20   **Q.**    And you also offered to expedite so she could send back

21   this form and the corrected form and you would expedite it?

22   **A.**    I offered her a return envelope so in case she didn't want

23   to come back in the office, as well as the ability for me to

24   expedite it in the office.

25   **Q.**    Thank you.

1    **MR. GILBERT:**  Just a moment, Your Honor.

2                        (Pause in proceedings.)

3    **BY MR. GILBERT:**

4    **Q.**   Did Ms. Martinez ever request you provide her with the

5    Go Back Letter electronically or any other materials

6    electronically?

7    **A.**   She did not.

8         **MR. GILBERT:**  Thank you.

9    Nothing further, Your Honor.

10        **THE COURT:**  Does plaintiff have any further questions?

11        **MS. STONER:**  Yes, Your Honor.

12                   **REDIRECT EXAMINATION**

13   **BY MS. STONER:**

14   **Q.**   Just a few questions.

15        I'd like to go back and pull up Exhibit 1 again.

16        Sorry.  I'm sorry.  Actually, you can just look at it in

17   Tab 1 in the binder.

18   **A.**   Okay.

19   **Q.**   I don't think the jury needs to see it.  Just you can

20   look.

21        Okay.  So reviewing that letter -- or reviewing that

22   submitted -- unsubmitted FBNS form, the 2019 form, is it clear

23   to you that there was a disconnect between what Ms. Martinez

24   was trying to say about her business and what the County could

25   correctly input into their system about the business?

1   **A.**   Not a disconnect.

2   **Q.**   Okay.  So, in other words -- actually, I do need the

3   exhibit.

4       In other words, Ms. Martinez wrote her name where her

5   company name should have gone in Form 1C; is that correct?

6   **A.**   Correct.

7   **Q.**   Okay.  And Ms. Martinez was, it appears, not understanding

8   that her company name should go there instead of her individual

9   name.  Is that fair to say?

10   **A.**   The name of the LLC would go in the registrant box --

11   **Q.**   Correct.

12   **A.**   -- correct.

13   **Q.**   And Ms. Martinez, on March 29, 2019, was unable to change

14   the document to correctly communicate her business name in

15   Field 1C; is that correct?

16   **A.**   She was unable to make the correction.

17   **Q.**   Yes.  Thank you.

18   **A.**   Mm-hmm.

19   **Q.**   In 2019, during your Google search, did you see any

20   documents from the Department of Justice regarding auxiliary

21   aids and services?

22   **A.**   No.

23   **Q.**   Did you come across anything at all that involved

24   technical assistance manuals from the Department of Justice?

25   **A.**   I did not, no.

1  **Q.**   For -- did you come across an ADA technical assistance

2  manual on effective communication?

3  **A.**   No.

4  **Q.**   Did you see the ADA toolkit for state and local

5  government?

6  **A.**   No.  My search was brief.

7  **Q.**   Do you remember what term you searched for?

8  **A.**   I don't recall specifically, no.

9  **Q.**   Okay.  During that search, did you become aware of the

10  requirement that when a public entity is claiming an undue

11  burden, they must provide a written statement of the reasons

12  for reaching that conclusion?

13  **A.**   No.

14  **Q.**   Okay.  You mentioned many of the clerks you supervise have

15  experience as bank tellers; is that correct?

16  **A.**   Bank tellers?

17  **Q.**   Yes.

18  **A.**   It's possible.

19  **Q.**   Okay.  Ms. Moran testified she was previously a bank

20  teller.  Do you have any reason to dispute that?

21  **A.**   No.

22  **Q.**   Okay.  When you go to a bank and you have a check and it's

23  in someone else's name --

24  **A.**   Okay.

25  **Q.**   -- would you be allowed to make a deposit?

1          **MR. GILBERT:**  Calls for a legal conclusion, lay

2    opinion, relevance, and speculation.

3          **THE COURT:**  Sustained.

4    **BY MS. STONER:**

5    **Q.**   In 2019, if Ms. Martinez had asked you to fill out a blank

6    FBNS form on her behalf and then had you read it back so that

7    she could verify its correctness, would you have done so?

8          **MR. GILBERT:**   Speculation.

9          **THE COURT:**   Overruled.

10         **THE WITNESS:**   I would not.

11   **BY MS. STONER:**

12   **Q.**   If she were to arrive in the CRO in a couple of weeks from

13   now, would you do that?

14   **A.**   I would direct her to the kiosk.

15   **Q.**   But would you write on a blank FBNS form?

16   **A.**   I would not, since we have the software for her to be able

17   to do it on her own.

18   **Q.**   And if the kiosk didn't work for Ms. Martinez or another

19   individual who is blind, would you then write on a blank FBNS

20   form for that person?

21         **MR. GILBERT:**   Incomplete hypothetical.   Speculation.

22         **THE COURT:**   Overruled.

23         **THE WITNESS:**   I would not.

24   **BY MS. STONER:**

25   **Q.**   In 2019, do you know if the FBNS form was available online

1    to the general public?

2    **A.**    Yes.

3    **Q.**    And do you know if that was in a format that could be used

4    by a screen reader user?

5    **A.**    I didn't -- I don't know.

6    **Q.**    So in 2019, you do not know if the PDF form online was

7    accessible to Ms. Martinez?

8    **A.**    It's accessible to the public.

9    **Q.**    Was it usable to Ms. Martinez in 2019?

10    **A.**    I don't know.

11    　　　　**MS. STONER:**  Okay.  Thank you.

12    　　No further questions.

13    　　　　**THE COURT:**  Any further questions from the defendant?

14    　　　　**MR. GILBERT:**  No, Your Honor.  Thank you.

15    　　　　**THE COURT:**  All right.  Thank you, ma'am.  You may

16    step down.

17    　　　　**THE WITNESS:**  Okay.  Thanks.

18    　　　　　　　　　　(Witness excused.)

19    　　　　**THE COURT:**  We're going to take our midafternoon

20    break, and I'll ask my courtroom deputy to bring the jury into

21    the jury room.

22    　　(Proceedings were heard out of the presence of the jury.)

23    　　　　**THE COURT:**  Counsel, I understand the next witness

24    will be by Zoom; is that correct?

25    　　　　**MS. STONER:**  Yes, Your Honor.

1          **THE COURT:**  Federal Rule of Civil Procedure 43 states

2     that (as read):

3          "For good cause and compelling circumstances and

4     with appropriate safeguards, the Court may permit

5     testimony in open court by contemporaneous

6     transmission from a different location."

7     What are the good cause and compelling circumstances?

8          **MS. STONER:**  Yes, Your Honor.  Ms. McCall is visually

9     impaired, and she lives in Paris, Ontario, Canada.

10          **THE COURT:**  Any objection from the defense to the

11     remote appearance?

12          **MR. GILBERT:**  No, Your Honor.

13          **THE COURT:**  I find that this constitutes good cause

14     and compelling circumstances, and I find that the Court's use

15     of the Zoom platform provides appropriate safeguards and,

16     therefore, this remote testimony is appropriate under Rule 43.

17          **MS. STONER:**  Thank you, Your Honor.

18          **MR. GILBERT:**  Your Honor, the only thing I would ask

19     is that there be -- when -- unlike a regular courtroom where we

20     just start the examination, I do think there needs to be a

21     question of "Is there anybody else in the room?" and just that

22     kind of clarification so, that way, the jury has a clear

23     understanding that no one's passing questions and that there's

24     a clear record of that, that the witness will state that.

25          **THE COURT:**  I think that's a good idea.  So please do

 1    that, Plaintiff.

 2         MS. STONER:  Okay.  Your Honor, one more thing about

 3    Ms. McCall.  Similar to Ms. Martinez, she has audio of the

 4    exhibits that we're going to have her review.  I'd like to

 5    introduce Exhibits Numbers 21, 22, 23, and 24 through

 6    Ms. McCall, and she is the party that is best able to

 7    authenticate those, but she will not be able to authenticate

 8    them if I show them visually.  She would need to authenticate

 9    them using her screen reader.

10         THE COURT:  So she would use her screen reader to

11    authenticate them.  Would she be able to state what exhibit

12    numbers they are?

13         MS. STONER:  Yes.

14         THE COURT:  Well, I'll wait to see; but in general,

15    that sounds fine.

16         MS. STONER:  Okay.  All right.  Thank you, Your Honor.

17         THE COURT:  Let's take our 15-minute break and come

18    back around 2:30.

19         MR. GILBERT:  Your Honor, how long are we going today?

20         THE COURT:  We're going to stop at 3:30.

21         MR. GILBERT:  Thank you.

22         THE CLERK:  We're off the record, and court is in

23    recess for a 15-minute break.

24                   (Recess taken at 2:16 p.m.)

25                   (Proceedings resumed at 2:50 p.m.)

PROCEEDINGS

```
 1        (Proceedings were heard out of the presence of the jury.)

 2        THE COURT:  Good afternoon.  Please be seated,

 3   everyone.

 4        THE CLERK:  All right.  Recalling Civil

 5   Action 20-6570, Martinez vs. the County of Alameda.

 6   The Honorable Thomas S. Hixson presiding.

 7        Go ahead, Judge.

 8        THE COURT:  All right.  At this time, I will ask my

 9   courtroom deputy to bring the jury back into the courtroom.

10        (Proceedings were heard in the presence of the jury.)

11        THE COURT:  Good afternoon, everyone.  Please be

12   seated.

13        Plaintiff, please call your next witness.

14        MS. STONER:  Plaintiff will call Karen McCall.

15              (Pause in proceedings.)

16        THE CLERK:  She's been sworn already.

17        THE COURT:  Oh, she has been sworn already?

18        THE CLERK:  Yeah.  She's been sworn already; right?

19        MS. STONER:  No.  This is her --

20        THE COURT:  No.  Please swear her in then.

21        THE CLERK:  Sorry.  I thought she had.

22        Ms. McCall, can you hear me?  This is the courtroom

23   deputy.

24        THE WITNESS:  Yes, I can.

25        THE CLERK:  Okay.  Can you raise your right hand,
```

McCALL - DIRECT / STONER

1  please.

2                  **KAREN RUTH McCALL**,

3  called as a witness for the Plaintiff, having been duly sworn,

4  testified as follows via Zoom:

5          THE WITNESS:  I do.

6          THE CLERK:  Thank you.  You have been sworn.

7                  **DIRECT EXAMINATION**

8  BY MS. STONER:

9  Q.    Good afternoon, Ms. McCall.  Can you hear me okay?

10 A.    I can.

11 Q.    Great.

12       Will you please --

13          THE COURT:  Is it possible to turn up the volume?

14          THE CLERK:  Ask her if she can turn it up a little

15 bit.

16 BY MS. STONER:

17 Q.    Ms. McCall, could you increase the volume slightly?

18 A.    Yes.

19          MR. GILBERT:  It would have to be on her microphone

20 setting.

21          THE WITNESS:  Is that better?

22          THE CLERK:  Can she put it up a little bit more?

23          MS. STONER:  A bit more, please.

24          THE WITNESS:  How is that?

25          THE COURT:  That's better.  Thank you.

McCALL - DIRECT / STONER

1   BY MS. STONER:

2   Q.    That's good.    Thank you.

3   A.    Thank you.

4   Q.    Will you please state your name for the record?

5   A.    Karen Ruth McCall.

6   Q.    And where are you physically located today?

7   A.    Paris, Ontario, Canada.

8   Q.    And you're testifying via Zoom today because of a hardship

9   in traveling to California for this purpose?

10  A.    Yes.

11  Q.    And do you understand the testimony you're giving today is

12  the same as if you were live in court?

13  A.    I do.

14  Q.    And you understand that, therefore, it's important that

15  you not have anyone else in the room with you, not be attentive

16  to other materials unrelated to this matter; correct?

17  A.    Correct.

18  Q.    And I see that you're wearing headphones.

19  A.    Yes.

20  Q.    Can you verify for the Court that you're not listening to

21  anything during this testimony other than screen readers of

22  documents we're discussing today?

23  A.    I'm only listening to what's on Zoom.

24  Q.    Okay.    Perfect.    Thank you.    And what's on Zoom.

25        And have you been provided four documents in advance by --

1  that are exhibits -- that are exhibits -- intended exhibits in

2  this trial?

3  **A.**   I have.

4  **Q.**   Okay.   And are those the only four documents you have

5  access to at this point?

6  **A.**   Those are the only exhibits I have access to.

7  **Q.**   Okay.   Thank you.

8      All right.   I'd like to start by asking you about your

9  educational background.   What is your educational history?

10  **A.**   I have a four-year Honors Bachelor of Arts degree from the

11  University of Toronto, I have a Bachelor of Education degree

12  from the University of Windsor, Ontario, and I have a Master's

13  of Adult Education from the Ontario Institute for Studies in

14  Education at the University of Toronto.

15  **Q.**   And do you also have a visual disability?

16  **A.**   I do.

17  **Q.**   Can you describe that for the Court and the jury?

18  **A.**   I am blind, but I have some functional vision.

19  **Q.**   Are you legally blind?

20  **A.**   I am.

21  **Q.**   And how long have you been legally blind?

22  **A.**   Since I was 14 years old.

23  **Q.**   What work have you done in testing whether PDF documents

24  can be used by people with disabilities?

25  **A.**   I've done work for the past 24 years remediating or fixing

1    PDF documents, testing PDF documents, giving advice to people

2    who want to fix their own PDF documents, and providing training

3    for groups of people or individuals who want to learn how to

4    make their own PDFs available for people with disabilities.

5    **Q.**   And you said "disabilities."  Do you mean all

6    disabilities?

7    **A.**   Yes.  I -- my work involves ensuring that digital content

8    is as usable as possible by people of all disabilities.

9    **Q.**   And does that specifically include screen reader users?

10   **A.**   Yes.

11   **Q.**   And screen reader users are often those who are blind?

12   **A.**   Yes.

13   **Q.**   On behalf of Adobe, did you create a user guide called

14   "Reading PDF Documents with Adobe Reader 6.0, A Guide for

15   People with Disabilities"?

16   **A.**   I did.

17   **Q.**   And on behalf of Adobe, did you create another user guide

18   called "Creating Accessible Adobe PDF Documents with Adobe

19   Acrobat Pro 6.0"?

20   **A.**   I did.

21   **Q.**   And were these official guides used by Adobe to promote

22   usability of PDFs by those with disabilities?

23   **A.**   Yes.

24   **Q.**   And what is your professional experience with Adobe

25   Acrobat DC?

1   **A.**   I have been a beta tester for Adobe since Acrobat 5, and I

2   continue to beta test Adobe Acrobat Pro DC, which means that I

3   provide them feedback and advice on making sure that the user

4   interface, the application itself is usable by people with

5   disabilities but, also, that the PDFs that are created have

6   the -- are accessible and that Acrobat has the tools to make

7   them -- sorry -- usable.

8   **Q.**   Usable.  Okay.

9       And you just used the word "accessible."  But when you say

10   "accessible," that's an industry standard, not a legal standard

11   that you're using; correct?

12   **A.**   Yes.

13   **Q.**   Okay.  And those standards specifically include screen

14   reader users?

15   **A.**   Yes.

16   **Q.**   And does that specifically include users of a particular

17   type of screen reader software that's known as JAWS?

18   **A.**   It does include that group.

19   **Q.**   And JAWS, J-A-W-S, that's some kind of acronym; right?

20   **A.**   It is.  It stands for Job Access With Speech.

21   **Q.**   Great.

22       And have you created -- have you created training

23   curriculum on behalf of Adobe?

24   **A.**   I have.  I created a handbook for participants in the

25   training.  I created the trainer handbook.  I created sample

McCALL - DIRECT / STONER

1    files for them to work through, as well as a final quiz and

2    some short videos demonstrating techniques on improving the

3    usability and availability of PDF documents for people with

4    disabilities.

5    **Q.**    And that curriculum was used by Adobe Premier clients?

6            **MR. GILBERT:**    Objection, Your Honor.    Leading.

7    **BY MS. STONER:**

8    **Q.**    Was that --

9            **THE COURT:**    You can rephrase.

10   **BY MS. STONER:**

11   **Q.**    Was that used by Adobe Premier clients?

12   **A.**    It was, and still is, and is often presented at

13   conferences by Adobe Systems --

14   **Q.**    Have you --

15   **A.**    -- as --

16   **Q.**    -- done any work with the ISO as it relates to making PDFs

17   usable for people who are blind?

18   **A.**    I have.    I am a Canadian delegate to the ISO, the

19   International Standards Organization, committee that creates

20   the technical specifications for PDF documents themselves, as

21   well as the ISO committee that creates the technical

22   specifications for PDFs so that they are available and usable

23   for people with disabilities.

24   **Q.**    And, I'm sorry.    Just to back up a bit, what is the I- --

25   ISO, I-S-O?

1    **A.**   The International Standards Organization.

2    **Q.**   What organizations or entities use the standards you have

3    helped to develop?

4    **A.**   Government entities, large and small corporations, and

5    large and small businesses.

6    **Q.**   And did you test the PDF FBNS in this case using reliable

7    principles and methods accepted in your field?

8    **A.**   Yes.

9         **MS. STONER:**  Your Honor, I'll move to have Ms. McCall

10   qualified as an expert witness as to making PDFs and PDF forms

11   usable to screen reader users, including those who are blind.

12        **THE COURT:**  Any objection from the defense?

13        **MR. GILBERT:**  No, Your Honor.

14        **THE COURT:**  Okay.  She may proceed as an expert in

15   that field.

16        **MS. STONER:**  Thank you.

17   **Q.**   Just backing up, can you explain a bit to the jury what

18   screen reader technology is?

19   **A.**   Screen readers allow people who are blind or visually

20   disabled to access a computer.

21     So think of someone using a computer without being able to

22   use a monitor or a mouse.  Everything that I do on a computer

23   is read back to me.  Every keystroke, the words that I type,

24   when I move around an Internet browser or a word processing

25   application, everything that I do, as long as the documents and

McCALL - DIRECT / STONER

1    the user interface are made usable by those of us with

2    disabilities, I can access my computer and create things or

3    send e-mails or browse the Internet.

4    Q.    And it reads the information out loud?

5    A.    It does.

6    Q.    And a screen reader user is navigating without the benefit

7    of a monitor or a mouse; is that correct?

8    A.    Yes.

9    Q.    How do screen reader users navigate through a page without

10   being able to point and click?

11   A.    We have keyboard commands; and, again, as long as a

12   document or a web page is created to be usable and available to

13   us, we can navigate by topic, we can navigate by link.  If

14   there are form fields in the document, we can navigate by form

15   field.  If there are graphics in a document, we can move from

16   graphic to graphic or table to table.

17          So we have specific keyboard commands that, when the

18   documents and user interfaces are designed to be usable by us,

19   we have access to them.

20   Q.    Without those navigation tools, is it similar to a sighted

21   user just being presented by a series of words on a page?

22   A.    It can be, or what we'll hear in the case of PDF documents

23   is simply "Blank" or nothing at all.

24   Q.    Okay.  So when it comes to a PDF document, does a screen

25   reader like JAWS read every piece of information on a PDF

1  document automatically if nothing is done to the document?

2  **A.**  No.

3  **Q.**  What does it read?

4  **A.**  It says "Blank."

5  **Q.**  Okay.  And when you can read a PDF document using a screen

6  reader, what kind of content is it picking up?

7  **A.**  Anything that is tagged.  So in order to make a PDF

8  document available for us, there have to be these containers

9  called tags.  So, for example, a paragraph is one type of

10  container.

11      Navigational points, for example, if you have something

12  that's bold and large and you make it a heading, then we will

13  be able to navigate from heading to heading.

14      For example, on the forms that I looked at, there were

15  pieces of text that were large, especially in the instructions.

16  One of them said "Requirement for Statement," and it was

17  incorrectly tagged so it wasn't a navigational point.  So I

18  would have to read the entire document up to that point in

19  order to even know that that section of the document exists.

20      And if I read further and I wanted to go back, I would

21  have to start at the top of the document and read back down

22  without the correct containers and without the navigational

23  points.

24  **Q.**  So bottom line, without tags or without correct tags, a

25  PDF document -- is a PDF document useful to a screen reader

1    user at all?

2              **MR. GILBERT:**  Objection.  Leading.

3              **THE COURT:**  Overruled.

4              **THE WITNESS:**  No, because we can't reliably know where

5    we are.  Things can be read out of order.  Things can be

6    repeated and we think we're stuck.  So there are a whole number

7    of issues that we encounter if a PDF isn't tagged and tagged

8    correctly.

9    BY MS. STONER:

10   **Q.**    And are there widely available standards that can walk

11   someone through how to do proper tagging on a PDF document?

12   **A.**    There are some interpretations in plain language versions

13   of the ISO technical specifications that are available.

14   **Q.**    What did you do to examine the County of Alameda's PDF

15   FBNS forms in this case?

16   **A.**    I did what I would normally do, which is to open the PDF

17   documents.  I immediately go to what is called the tags tree,

18   and that is where all of the tags are located.  And I can move

19   through the document tag by tag, and there's highlight on the

20   page that shows me what content is in the container, is in the

21   tag.

22         So I go down the tags tree, and I make sure that every

23   piece of content that should be identified to a screen reader

24   is identified to a screen reader and that the tag is correct.

25         And while I'm doing that, I'm also looking at whether the

McCALL - DIRECT / STONER

1    document -- whether the tags are in the logical reading order

2    for the document so I'm not jumping around from the top of the

3    page to the middle of the page to the next page and back to the

4    first page.

5        So I start by going down the tags tree, making sure that

6    all of the tags are correct.

7        The next thing that I do is I look at the document

8    properties to make sure that everything in the document

9    properties adheres to the ISO standard, and then I test it with

10   a screen reader, and often I test it with both JAWS and NVDA.

11   **Q.**   Okay.  Thank you.

12       And is this analysis called a PDF audit?

13   **A.**   Yes.

14   **Q.**   And is this commonly done in your field?

15   **A.**   Yes.

16   **Q.**   Did you perform a PDF audit on December 21st, 2022,

17   looking at the County of Alameda's PDF FBNS forms?

18   **A.**   Yes, I did.

19   **Q.**   And did you test three versions of the FBNS form at that

20   time?

21   **A.**   Yes, I did.

22   **Q.**   Okay.  And are you able to access the document Exhibit 21

23   and review it now?

24   **A.**   No, I'm not.  I was given it ahead of time; but if you ask

25   me about it, I will be able to speak to it.

1  Q.   Oh, because you've dis- -- yes.   Okay.   I understand.

2       Have you reviewed the document entitled Exhibit 21 at a

3  prior time and verified its accuracy?

4  A.   Yes.

5  Q.   Okay.   And when you reviewed Exhibit 21, was it a true and

6  correct copy of the October 2018 FBNS form for the County of

7  Alameda CRO?

8  A.   That was the revision date in the upper left corner.

9           MS. STONER:   Great.   Okay.

10      Your Honor, I'd like to move to introduce Exhibit 21 into

11  evidence.

12          THE COURT:   Any objection?

13          MR. GILBERT:   No.

14          THE COURT:   Exhibit 21 is admitted.

15      (Trial Exhibit 21 received in evidence.)

16  BY MS. STONER:

17  Q.   Okay.   Same question regarding Exhibit 22.   Would you

18  answer everything the same way with regard to Exhibit 22 as you

19  did for 21?

20  A.   Yes, although I believe it had a different revision date

21  in the upper left corner.

22  Q.   And was that revision date April of 2021?

23  A.   Yes.

24  Q.   Okay.   And on Exhibit 22, were there actually two

25  different dates in that exhibit, one that said 2018 and one

McCALL - DIRECT / STONER

1   that said April of 2021?

2   A.   Yes.

3   Q.   Okay.   Thank you.

4   A.   Page 2 had a different revision date.

5            MS. STONER:   Okay.   Thank you.

6        Your Honor, I'd like to move to introduce Exhibit 22 into

7   evidence.

8            THE COURT:   Any objection?

9            MR. GILBERT:   Yes, Your Honor.   Relevance, foundation,

10  and 403.

11           THE COURT:   Overruled.   Exhibit 22 is admitted.

12       (Trial Exhibit 22 received in evidence.)

13  BY MS. STONER:

14  Q.   And as to Exhibit 23, we'll walk through, again, the

15  process.

16       Prior to this date, did you have the opportunity to review

17  the document of Exhibit 23?

18  A.   Yes, I did.

19  Q.   And based on your review, was that a true and correct copy

20  of the November 2022 revision of the FBNS form?

21  A.   Yes.

22           MS. STONER:   Your Honor, I'd like to move to introduce

23  Exhibit 23 into evidence.

24           THE COURT:   Any objection?

25           MR. GILBERT:   Yes.   Foundation.   Speculation.

1    Cumulative.    403.

2         THE COURT:   Overruled.   Exhibit 23 is admitted.

3         (Trial Exhibit 23 received in evidence.)

4    BY MS. STONER:

5    Q.    In performing the PDF audit, did you -- did you examine

6    Exhibit 21, Exhibit 22, and Exhibit 23 on December 21st, 2022?

7    A.    Yes.

8    Q.    And in performing your PDF audit, did you identify any

9    issues that would prevent a screen reader user from being able

10   to complete the document independently?

11   A.    Yes.

12   Q.    Did you find that on each version of the form, certain

13   items were missing tags?

14   A.    Yes.

15   Q.    Did you find on each version of the form, certain tags

16   were incorrect?

17   A.    Yes.

18   Q.    Can you tell me in practical terms from the user-side

19   experience some of the problems you encountered?

20   A.    With Exhibit 21, there were tags for both pages, but there

21   were no form fields.   So nobody would be able to fill that out

22   online.

23        The problem with the tags was that there were no heading

24   tags; there were no list tags.   Everything was a paragraph tag.

25   So everything was -- had an equal role in the document.   So if

1   you wanted to read it and -- you would always have to start

2   from the top and go to the place where you wanted to go.

3        With Exhibit 22, there were form fields on page 1, but

4   they weren't connected to the tags.  The tags were still

5   incorrect, but the form fields were not connected to the tags.

6   So you couldn't, using a screen reader, reliably go through the

7   form fields and know where you are.  Because they're not

8   connected, you could easily go from first name to address back

9   to first name.

10       There was also a problem with a series of check boxes

11  around the middle of the page.  And when you land on them with

12  a screen reader, all you hear is "Check box not checked."  You

13  didn't hear any of the text associated with them.

14       When I looked at the tags, again, there was no connection

15  between those check boxes and the tags tree, but some of the

16  text was lumped together.  So if you had -- and I can't

17  remember the exact language, but if you had something like a

18  check box for dog, a check box for cat, and a check box for

19  bird, what you would hear is "Check box not checked, cat, dog,

20  bird."  So things would be consolidated and not separated the

21  way that they should be --

22  Q.   So, in other words --

23  A.   -- or --

24  Q.   In other words, in each version of the document, did

25  issues with tagging make it impossible for a screen reader user

1    to reliably navigate and complete the form?

2    A.    Yes.

3    Q.    And just to be clear, that applies to Exhibit 21?

4    A.    Yes.

5    Q.    22?

6    A.    Yes.

7    Q.    And 23?

8    A.    Yes.

9    Q.    And specifically on Exhibit 22, you noted forms with check

10   boxes?

11   A.    Yes.

12   Q.    Did you perform another PDF audit on or about

13   September 26, 2023?

14   A.    Yes.

15   Q.    And did you perform that document [sic] on what you've

16   been previously provided as Exhibit 24?

17   A.    Yes.

18   Q.    Okay.  And in reviewing Exhibit 20 -- sorry.

19        In reviewing Exhibit 24, is that a true and correct copy

20   of the December 2022 FBNS form for the County of Alameda?

21   A.    Yes.

22           MS. STONER:  Your Honor, I'd like to move to introduce

23   Exhibit 24 as an exhibit.

24           THE COURT:  Any objection?

25           MR. GILBERT:  No objection to 24.

1              THE COURT:  Exhibit 24 is admitted.

2          (Trial Exhibit 24 received in evidence.)

3  BY MS. STONER:

4  Q.    So in testing these multiple versions of the form, did you

5  find the later versions any more usable than the earlier

6  versions?

7  A.    No.

8  Q.    So in the 2022 FBNS, there were still problems with the

9  items being untagged?

10  A.    Yes.

11  Q.    And there were still problems with items being incorrectly

12  tagged?

13  A.    Yes.

14  Q.    And in Exhibit 24, were there any new barriers or problems

15  that weren't present in the earlier versions of the form?

16  A.    In Exhibit 23 and 24, the first page of the form was not

17  tagged at all.  So when you opened the form, you started on the

18  top -- at the top of the second page; and the screen readers,

19  because there's no tags for the first page, they don't even see

20  it.

21          In fact, I looked at it again today.  I opened both 23 and

22  24.  My screen reader started on page 2.  I asked my screen

23  reader for a list of the form fields.  It told me there were no

24  form fields.  The only reason I know that there were some on

25  page 1 was because I do have some functional vision.

1    So anyone who was dependent on a screen reader would open

2    both Exhibits 23 and 24, land at the top of page 2, and not

3    realize that this was a two-page document, a form and the

4    instructions.   They would think they had just opened the

5    instructions.

6    Q.    And is it possible to create a PDF form that does not have

7    these issues?

8    A.    Yes.

9    Q.    And have you looked into any other versions posted more --

10   let me ask it this way:  Did you look within the last week or

11   so at the document that's currently on the County of Alameda's

12   website?

13   A.    Yes.   I downloaded the current version this morning.

14   Q.    Did you notice --

15   A.    It has --

16   Q.    Okay.   And the current version, is that the same one that

17   would have been in place last week?

18   A.    Last week, there was a revision date of 1/24 on that one;

19   and when I downloaded the version this morning, there was a

20   revision date on the first page of 3/24.

21   Q.    So the form was revised this month on the website?

22   A.    Yes.

23   Q.    And were you able to look at that new form that's on the

24   website today?

25   A.    Yes, I was.

1    Q.    And was -- had any of the barriers been removed?

2    A.    No.

3    Q.    Are you confident in the accuracy of your work product?

4    A.    I am.

5    Q.    Do you think any qualified expert could reasonably

6    disagree about your key findings here today?

7    A.    No.

8    Q.    And during your deposition, did you have a little bit of

9    difficulty testifying as to the percentage accuracy of your

10    opinions?

11    A.    Yes.

12    Q.    Can you explain why?

13    A.    It's not a tangible measurement.  I work to the standards.

14    And to try and apply a percentage to a document is -- I would

15    have to consider, like, what am I -- what am I measuring?  Is

16    it the number of tags?  Is it the number of tags that are

17    correct?  Is it that someone with a screen reader and screen

18    magnification or just someone using a screen reader, someone

19    using voice recognition?  There are so many variables, which is

20    why we have the standard.  We work to the standard.

21        And that's what -- that's what I've adhered to for the

22    past -- well, the standard came into effect in 2008, and then

23    the second standard came into effect in 2012.  So as long as

24    we've had the standard that I'm a member of creating, I use --

25    I use the standard.

1    And to try and identify a percentage is like saying that

2  I'm coming up to a building that has a ramp and there's a

3  washroom on the third floor that's accessible and a washroom on

4  the fifth floor that's accessible but then there's a conference

5  room on the first floor that's accessible.  What percentage of

6  that building is usable by someone in a wheelchair?  I can't --

7  I can't even begin to think of how I would create a percentage.

8  Q.    Okay.  But you have no doubt in your mind that in each of

9  the documents, the FBNS forms from the County of Alameda that

10 you have reviewed, there was no way for a screen reader user to

11 reliably complete the form independently?

12 A.    Yes.

13         MS. STONER:  Thank you.

14    I'll pass the witness.

15         THE COURT:  Any questions from the defense?

16         MR. GILBERT:  Yes.  Thank you, Your Honor.

17                 CROSS-EXAMINATION

18 BY MR. GILBERT:

19 Q.    Good afternoon, ma'am.

20 A.    Good afternoon.

21 Q.    Is it fair to say that your focus is on providing maximum

22 usability for PDF forms?

23 A.    Yes.  That -- that's the standard.

24 Q.    And I notice you used the word "usability" rather than

25 "accessibility."  You agree that usability, in what you're

1    trying to foster, exceeds all legal requirements that are in

2    place in the state of California and the United States of

3    America, doesn't it?

4           **MS. STONER:**  Objection, Your Honor.

5           **THE COURT:**  Sustained.

6    **BY MR. GILBERT:**

7    **Q.**   Well, let's be clear.  You agree that there is no

8    usability requirements under the Americans with Disabilities

9    Act, is there?

10   **A.**   I was advised that I wasn't allowed to say the word

11   "accessibility," and so I substituted the word "usability" in

12   my testimony today.

13   **Q.**   Well, thank you, ma'am.

14        Let's be clear.  You admit that you're not offering an

15   opinion on whether the ADA actually requires any of the

16   accessibility or usability features that you're talking about

17   in your opinions?

18   **A.**   I'm here to address the availability and -- and -- of the

19   PDF documents.  I have no legal opinion.

20   **Q.**   But you're not here to render an opinion on whether the

21   ADA actually requires any of these usability features that

22   you're providing opinions on, are you?

23   **A.**   I don't have a legal opinion.

24   **Q.**   And, in fact, you would agree that the Americans with

25   Disabilities Act has never adopted the ISO standard that you're

1  relying on, has it?

2  **A.**   Not to my knowledge.

3  **Q.**   And, in fact, there's another standard called WCAG 2.0

4  that's widely utilized in the United States of America, isn't

5  there?

6  **A.**   Yes, and it is an ISO standard.

7  **Q.**   And you did not do any analysis under the WCAG standards,

8  did you?

9  **A.**   At the time, I didn't.   But I looked at the PDF techniques

10  for WCAG 2.0, 2.1, and 2.2.   Not all of the success criteria

11  from WCAG applied to PDF documents, but the criteria that do

12  provide information on how to meet those WCAG or Web content

13  accessibility guideline criteria and demonstrate some

14  techniques.   And at the bottom of each page of the 23 PDF

15  techniques for the various versions of WCAG, they circle back

16  to the ISO standards, referring to what part of the ISO

17  standards for PDF those specific success criteria apply to.

18  **Q.**   Let's focus on a bigger picture.

19       You agree that the Americans with Disabilities Act has

20  never adopted or implemented WCAG as the applicable standard,

21  has it?

22  **A.**   Not to my knowledge.

23  **Q.**   And the Americans with Disabilities Act has never

24  implemented or adopted ISO as the applicability standard, has

25  it?

1   **A.**   Not to my knowledge.   Again, I have no legal opinion.

2   **Q.**   And in doing your evaluation, you never actually spoke

3   with any sight-impaired users to see if they were actually able

4   to complete the County's forms, did you?

5   **A.**   That isn't typically a part of an audit.

6   **Q.**   Well, in fact, I think you testified earlier that

7   Exhibit 21, in your opinion, could not be filled out by a

8   disabled individual who's sight impaired.   Isn't that what you

9   said a few moments ago?

10   **A.**   You would have to print Exhibit 21 out in order to fill it

11   out.   It cannot be filled out online.

12   **Q.**   Isn't it true that Ms. Martinez actually accessed and

13   completed Exhibit 21 and filled it out, which led to her filing

14   of the completed FBNS in May of 2019?

15          **MS. STONER:**   Objection, Your Honor.

16          **THE COURT:**   Overruled.

17          **THE WITNESS:**   I have no idea which version of the PDF

18   form Ms. Martinez filled out.   My task was to look at the

19   three, and then four, PDF documents to determine their

20   availability to people using a screen reader.

21   **BY MR. GILBERT:**

22   **Q.**   Well, during your discussions with Mr. Elder when he was

23   telling you what to testify about --

24          **MS. STONER:**   Objection, Your Honor.

25   \\\

1    BY MR. GILBERT:

2    Q.    -- he told you that Ms. Martinez had completed the form at

3    home prior to May of 2019, didn't he?

4            THE COURT:   I'm going to overrule the objection.

5            MS. STONER:   May we have a sidebar?

6            THE COURT:   No.

7            THE WITNESS:   I have no idea which version of the form

8    Ms. Martinez filled out.

9    BY MR. GILBERT:

10   Q.    But you understood that she had used a version of the form

11   and was able to complete it online?

12   A.    I understand she had a version of the form but that she

13   also needed assistance.

14   Q.    And she completed that in 2019, which means that it would

15   have to have been the 20 -- Exhibit 21, because all the other

16   versions were implemented after that date, weren't they?

17   A.    I don't know what existed prior to Exhibit 21.

18   Q.    And you didn't consider any other scenarios in whether

19   these forms were usable -- and using your word "usable" -- such

20   as, for example, if somebody assisted in locating fields in a

21   form or used a kiosk, for example, at a Clerk's Office, in

22   determining whether they were usable, did you?

23   A.    No.

24   Q.    Your sole purpose was in trying to determine are they the

25   maximum usable possible to a disabled individual?

1  **A.**   My task was to use the international standard for PDF to

2  determine whether they were available to someone using a screen

3  reader.

4  **Q.**   And that's the international standard from?

5  **A.**   The International Standards Organization, ISO 32000-1:2008

6  and ISO 14289-1:2014.

7  **Q.**   And just to be clear, that's the standard that the

8  United States of America and the federal government has refused

9  to adopt and implement as the standard in the United States of

10  America, isn't it?

11  **A.**   I have no opinion on that statement.

12  **Q.**   Well, you're an expert in this area, aren't you?

13  **A.**   I'm an expert in PDF.  I am not an expert in American law.

14  **Q.**   Well, you're an expert in PDF and the applicable

15  standards, and you're an expert in the applicable standards as

16  they're utilized in America where you're testifying as an

17  expert, aren't you?

18  **A.**   I'm testifying to whether the PDFs meet the international

19  standard, whether someone who is using a screen reader can

20  reliably fill out the form.

21  **Q.**   And you never spoke to even a single disabled individual

22  who's been able to access it and use those forms, did you?

23  **A.**   I did not.

24        **MR. GILBERT:**   Thank you.

25        Nothing further, Your Honor.

1      THE COURT:  Any further questions from plaintiff?

2      MS. STONER:  Very brief.

3                    REDIRECT EXAMINATION

4  BY MS. STONER:

5  Q.   Ms. McCall, are you a disabled individual?

6  A.   I am, and I use a screen reader.

7  Q.   And although you said you have some vision, do you

8  primarily navigate by screen reader or primarily navigate by

9  sight?

10 A.   When I'm using a computer --

11    (Stenographer interrupts for clarification of the record.)

12 A.   -- I am primarily using a screen reader, and I have --

13 Q.   Oh, I'm sorry.

14    Do we need to read back the question, Ms. McCall, so you

15 can repeat your answer?

16 A.   Yes, please.

17    (Record read as follows:

18        "QUESTION:  And although you said you have

19        some vision, do you primarily navigate by

20        screen reader or primarily navigate by

21        sight?")

22        THE WITNESS:  When I use a computer, it's primarily by

23 screen reader, and I have for over a decade.

24 BY MS. STONER:

25 Q.   Okay.  And in looking at Exhibit 22, was the revision date

PROCEEDINGS

1  on that 10/18?

2  **A.**   (Witness examines document.)

3  **Q.**   Oh, I'm sorry.   Exhibit 21.

4  **A.**   I believe on page 2 it was 10/18.   I think there was a

5  different -- if I remember, there was a different revision date

6  on page 1.

7  **Q.**   Okay.   So just to clarify, there's -- just to go back, on

8  Exhibit 2020 -- I'm sorry -- Exhibit 22, is it correct to say

9  that the form fields have a revision date of 4/21 but the

10  instructions have a different revision date of 10/18?

11  **A.**   Yes.

12           **MS. STONER:**   Okay.   Thank you.

13      No further questions.

14           **THE COURT:**   Does the defense have any further

15  questions?

16           **MR. GILBERT:**   No.   Thank you, Your Honor.

17           **THE COURT:**   All right.   Thank you, ma'am.

18           **THE WITNESS:**   Thank you.

19                    (Witness excused.)

20           **MS. STONER:**   Thank you.

21           **THE COURT:**   All right.   I think we can adjourn for the

22  day.

23      I will ask my courtroom deputy to bring the jury into the

24  jury room.

25      (Proceedings were heard out of the presence of the jury.)

PROCEEDINGS

1          THE CLERK:  May I let them go, judge?

2          THE COURT:  I think we're done for the day.  So, yes,

3    they can go.

4                    (Pause in proceedings.)

5          THE COURT:  Is there anything plaintiff would like to

6    discuss outside the presence of the jury before we reconvene

7    tomorrow morning?

8          MR. ELDER:  Yes, Your Honor, just briefly.

9      So I know that the -- whether Ms. Hill is allowed to

10   testify or not is still up for some discussion; but in the

11   event that she is able to testify at the end of the case in

12   rebuttal, I think she will need to testify via Zoom.  And I'm

13   wondering if we can reach a stipulation to that now or look

14   into it, because she's traveling and attending some mediations

15   and I just want to make sure she's ready to go and there isn't

16   some delay or something.

17         THE COURT:  Do you know where she would be located?

18         MR. ELDER:  I don't.  I know it involves a flight.

19         THE COURT:  I see.  Well, then I think you should

20   provide what information is available to you to the defense and

21   the parties should meet and confer about that.

22         MR. ELDER:  Okay.

23         THE COURT:  Anything else?

24         MS. STONER:  Your Honor, I believe counsel for

25   defendant told the witness today that -- or said "When

PROCEEDINGS

1  Mr. Elder instructed you what to testify to."  Is that -- did I

2  hear that correctly?

3           THE COURT:  I don't recall if that's what was said.

4           MS. STONER:  Okay.  I'll review the transcript.  I may

5  have misheard something.  Thank you.

6           THE COURT:  All right.  Anything that the defense

7  would like to raise before we reconvene tomorrow morning?

8           MR. GILBERT:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  Thank you, Counsel.

10          MS. STONER:  Thank you, Your Honor.

11          THE COURT:  The matter is submitted.  We'll be back

12  tomorrow morning at 9:00 a.m.

13          THE CLERK:  Thank you, everyone.  We're off the record

14  and court is in recess.

15                  (Proceedings adjourned at 3:34 p.m.)

16                            ---o0o---

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, March 27, 2024

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter