# EXHIBIT B

Volume 3

Pages 362 - 557

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

```
LISAMARIA MARTINEZ,              )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )   NO. 3:20-CV-06570 TSH
                                 )
COUNTY OF ALAMEDA,               )
                                 )
            Defendant.           )
_____  )
```

San Francisco, California
Thursday, March 28, 2024


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**


**APPEARANCES**:

For Plaintiff:
                    TRE LEGAL PRACTICE
                    1155 Market Street, Tenth Floor
                    San Francisco, California 94103
               BY:  **TIMOTHY R. ELDER, ATTORNEY AT LAW**


                    UNDAUNTED LAW FIRM, P.C.
                    600 California Street, Seventh Floor
                    San Francisco, California 94108
               BY:  **S. TOMIYO STONER, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
1    APPEARANCES:  (CONTINUED)

2    For Defendant:
                             ORBACH HUFF & HENDERSON LLP
3                            6200 Stoneridge Mall Road, Suite 225
                             Pleasanton, California 94588
4                    BY:   KEVIN E. GILBERT, ATTORNEY AT LAW
                           NICHOLAS D. FINE, ATTORNEY AT LAW
5

6
     Also Present:         Lisamaria Martinez
7                          Michelle Korosy, Paralegal
                           Matthew Yankee, County of Alameda
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   Thursday, March 28, 2024 - Volume 3

 4
```

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **YANKEE, MATTHEW ALAN** | | |
| (SWORN) | 371 | 3 |
| Direct Examination by Ms. Stoner | 371 | 3 |
| Cross-Examination by Mr. Gilbert | 430 | 3 |
| Redirect Examination by Ms. Stoner | 463 | 3 |
| | | |
| **GRECO, LUCIA** | | |
| (SWORN) | 488 | 3 |
| Direct Examination by Mr. Elder | 488 | 3 |
| Cross-Examination by Mr. Gilbert | 498 | 3 |
| Redirect Examination by Mr. Elder | 500 | 3 |
| | | |
| **CLARK, STEVEN** | | |
| (SWORN) | 506 | 3 |
| Direct Examination by Mr. Elder | 507 | 3 |
| Cross-Examination by Mr. Gilbert | 542 | 3 |
| Redirect Examination by Mr. Elder | 553 | 3 |

```
                        E X H I B I T S
```

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 11A | | 527 | 3 |
| 11D | | 531 | 3 |
| 11C | | 533 | 3 |
| 11B | | 539 | 3 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday - March 28, 2024**                                      **9:23 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURT:**  Hi.  Good morning.  Please be seated. |
| 6 | **THE CLERK:**  All right.  Let's see.  Is my mic on?  Let |
| 7 | me see. |
| 8 | Good morning, everyone.  We are here in Civil |
| 9 | Action 20-6570, Martinez vs. County of Alameda, et al., |
| 10 | the Honorable Thomas S. Hixson presiding. |
| 11 | Go ahead, Judge. |
| 12 | **THE COURT:**  All right.  I have reviewed the transcript |
| 13 | from yesterday afternoon, and when we bring the jury in, I plan |
| 14 | to tell them the following: |
| 15 | Members of the jury, yesterday afternoon during |
| 16 | defendant's cross-examination of Karen McCall, defense counsel |
| 17 | began a question by saying (as read): |
| 18 | "Well, during your discussions with Mr. Elder |
| 19 | when he was telling you what to testify about --" |
| 20 | And then plaintiff's counsel objected.  I should have |
| 21 | sustained the objection, and I sustain it now. |
| 22 | I instruct you to disregard the statement by defendant's |
| 23 | counsel that plaintiff's counsel supposedly told McCall what to |
| 24 | testify about. |
| 25 | Does plaintiff want me to do anything further with respect |

1  to this issue?

2          **MS. STONER:**  No, Your Honor.

3          **THE COURT:**  Is there anything plaintiff would like to

4  raise before we bring in the jury this morning?

5          **MR. ELDER:**  Yes, just quickly, Your Honor.

6      There was an issue with Eve Hill.  So we initially had

7  scheduled her for the beginning of the case.  And I understand

8  you didn't -- you didn't know, at the time that we asked, that

9  it was -- it was -- she was a rebuttal witness, but part of

10 that was for her scheduling.

11     She had a preexisting mediation at JAMS Arbitration

12 Mediation Services in Washington, D.C., scheduled for Friday.

13 She's able to step out of it to testify in this proceeding; but

14 it would be a hardship, both in her ethical responsibility and

15 in her travel, to be here in person if she is called to testify

16 on Friday.  I understand that it's a pending issue and she may

17 not be allowed to testify.  But if she is allowed to testify,

18 it would be a hardship for her to testify in person on Friday.

19     So I'm happy to do what we need do to make sure this gets

20 resolved and if she's -- either scheduling her first thing on

21 Monday or some other thing.  I just need -- I need time to work

22 with her to handle this or submit a declaration or anything

23 like that.

24          **THE COURT:**  I've excluded her from plaintiff's

25 case-in-chief and tentatively ruled she can't be a rebuttal

**PROCEEDINGS**

1   witness because the expert she's rebutting is not testifying;

2   but I've left open the possibility of changing my mind on that,

3   depending on what evidence defendants put in.

4        With that as background, if the witness is in a distant

5   location, then my general thought is that under Rule 43, it

6   would be permissible for her to testify by Zoom.

7        Does that address your question?

8            **MR. ELDER:**  It does.

9            **THE COURT:**  Okay.  Anything else plaintiff wants to

10  raise before we bring in the jury?

11           **MR. ELDER:**  Do we have a stipulation on the state

12  funding issue before we start Mr. Yankee's testimony?

13           **THE COURT:**  I did not check the docket, so I didn't

14  see if something was filed last night or this morning.

15           **MR. GILBERT:**  The answer is no, we do not have final

16  approval from the County on the language that the Court has

17  proposed.  We're checking with the County again this morning to

18  find out if that language is acceptable.

19       I can tell you there's been some heartache about the

20  specific language the Court has proposed as it relates to

21  possible expansion beyond this case.  So -- and I appreciate

22  that the Court is trying to narrow an issue.  And that's all I

23  can tell you right now.

24           **THE COURT:**  A stipulation is purely voluntary.  The

25  defendant doesn't have to enter into it.  Until you have a

**PROCEEDINGS**

 1  stipulation, you don't have a stipulation, Plaintiff; so do

 2  what you need to do.

 3          **MR. ELDER:**  Thank you, Your Honor.

 4          **THE COURT:**  Does defendant have anything you'd like to

 5  raise before we bring the jury in?

 6          **MR. GILBERT:**  Your Honor, we do object to any remote

 7  testimony from Ms. Hill if she was ultimately able to testify.

 8  I think that any argument about hardship and any evaluation of

 9  that needs to be addressed only after the Court has decided

10  whether she is able to testify.

11      I'm happy to go into the analysis of hardship and the

12  application of the principles in Rule 43, as well as the legal

13  comments on the importance of in-person testimony to assure

14  accuracy and honesty in the -- and to allow the jurors to

15  actually evaluate the witness's credibility and demeanor.

16      And, in fact, there's been numerous not only cases, but

17  the legislative comments in enacting the authority for remote

18  testimony expressed concern about remote witnesses:  You don't

19  know who's in the room.  You don't know what influences there

20  are, if there's other factors.  The jury can't see the

21  non-verbal communication, how a person sits, how they move at

22  certain questions.  There are credibility determinations that

23  courts have found to have been critical in evaluating whether a

24  witness is credible and should be believed.

25      As to the witness yesterday, we had no objection to the

1    remote appearance.  It was a disabled individual who would have

2    significant difficulty traveling.

3        That is obviously not the case with Ms. Hill.  Ms. Hill is

4    not disabled.  In fact, we know that she can travel because she

5    was physically in court on Monday and watching the proceedings.

6    Either Monday or Tuesday.  I can't remember which day.  I'm

7    sorry.  So -- and she is simply not here for her own

8    convenience.  She scheduled other matters and taken priorities

9    that she believes are more important than her duties as an

10   expert in this case.

11       Her prioritization of other matters does not constitute

12   good cause or justify relaxing or otherwise ignoring the

13   standards that are in place for in-person court testimony.  If

14   that was the case, then every witness would simply say, "I'm

15   away and it's more convenient for me.  I don't want to

16   reschedule a vacation," or "I don't need to come in because

17   Zoom is there," but that is not what Rule 43 and the

18   legislative intent and the cases interpreted have addressed.

19       So I do believe that a remote appearance for Ms. Hill, if

20   she was allowed to testify, is inappropriate; but I do believe

21   that any decision on that issue should be reserved until after

22   she's decided whether or not she will actually be allowed to

23   testify.

24           THE COURT:  Well, I don't agree that conflicting case

25   obligations is merely a matter of witness convenience; but as

**PROCEEDINGS**

1  of yet, I have not stated that she will be able to testify.  So

2  all of this is a bit hypothetical at this point.

3       At this time, I'll ask my courtroom deputy to bring the

4  jury back into the courtroom.

5       (Proceedings were heard in the presence of the jury.)

6       **THE COURT:**  Good morning, everyone.  Please be seated.

7       Members of the jury, yesterday afternoon during

8  defendant's cross-examination of Karen McCall, defense counsel

9  began a question by saying (as read):

10          "Well, during your discussions with Mr. Elder

11      when he was telling you what to testify about --"

12      And then plaintiff's counsel objected.

13      I should have sustained the objection, and I sustain it

14  now.  I instruct you to disregard the statement by defendant's

15  counsel that plaintiff's counsel supposedly told McCall what to

16  testify about.

17      Plaintiff, please call your next witness.

18      **MS. STONER:**  We'd like to call Matt Yankee.

19          (Witness steps forward to be sworn.)

20      **THE CLERK:**  Good morning, Mr. Yankee.  How are you?

21      **THE WITNESS:**  Good.

22      **THE CLERK:**  Okay.  Can you raise your right hand,

23  please.

24  \\\

25  \\\

1          **MATTHEW ALAN YANKEE**,

2     called as a witness for the Plaintiff, having been duly sworn,

3     testified as follows:

4               **THE WITNESS:**  I do.

5               **THE CLERK:**  Thank you.  You have been sworn.

6                    **DIRECT EXAMINATION**

7     BY MS. STONER:

8     **Q.**   Good morning, Mr. Yankee.

9     **A.**   Good morning.

10    **Q.**   How are you doing today?

11    **A.**   Doing good.  How about you?

12    **Q.**   Good.

13         All right.  Will you actually please state your full legal

14    name for the record.

15    **A.**   Matthew Alan Yankee.

16    **Q.**   What is your current title?

17    **A.**   Assistant controller.

18    **Q.**   At the County of Alameda?

19    **A.**   Correct.

20    **Q.**   And what was your title in 2019?

21    **A.**   Division chief for the Clerk-Recorder's Office.

22    **Q.**   So is your new title a promotion?

23    **A.**   That's correct.

24    **Q.**   Help me understand the structure of the CRO.  And I'm

25    asking about the period of 2019, March of 2019 --

**YANKEE - DIRECT / STONER**

1  **A.**    Mm-hmm.

2  **Q.**    -- as it may have changed.

3      First, at the front line, we have the clerk-recorders like

4  Ms. Moran; is that correct?

5  **A.**    Not really.  So --

6  **Q.**    Okay.

7  **A.**    -- when you enter the lobby, we have a -- what we call the

8  information desk, and that's where the customer would come in

9  and let us know what service they need.

10      Then they would receive a -- like a ticket for whatever

11  service it is they need, and they would wait in the queue until

12  their number is called, then go to that particular service area

13  to help -- for the clerk to help them with whatever it is they

14  need.

15  **Q.**    Okay.  That information desk person, are they

16  considered -- actually, let me ask you this way:  Do they have

17  any authority to file documents, record documents, anything

18  like that?

19  **A.**    They do not do that at the information desk, no.

20  **Q.**    Okay.  And does the information desk person -- are they

21  considered a clerk of the County?

22  **A.**    Yes.  I mean, we use that as a loose term.  We use the

23  clerical series called Auditor Associate I, II, and III; and

24  it's typically staffed by either an Auditor Associate I, II,

25  or III or a temporary employee who serves in that acting

YANKEE - DIRECT / STONER

1    capacity.

2    **Q.**    Okay.  And then we have the clerk-recorders, like

3    Ms. Moran, at the desk?

4    **A.**    Correct.

5    **Q.**    And then, third, we have supervisors, like Ms. Briones?

6    **A.**    That's correct.

7    **Q.**    And then we have another layer of supervisors above

8    Ms. Briones; is that correct?

9    **A.**    That's correct.

10   **Q.**    And then you, in 2019, would have been above that?

11   **A.**    That's exactly correct, yes.

12   **Q.**    Okay.  Did you speak on behalf of the County of Alameda at

13   your deposition?

14   **A.**    I did, yes.

15   **Q.**    And let me back up a bit for the jury.

16         Were you deposed two times in this case?

17   **A.**    I was.

18   **Q.**    I'm very sorry.

19         Do you understand that at the second of your two

20   depositions, you were designated to speak on behalf of

21   the County as a corporate representative?

22   **A.**    Yes.

23   **Q.**    And yesterday -- and, sorry.  Going to that deposition, if

24   you'll recall, were you given a list of deposition topics that

25   you were asked to speak for the County on during your

**YANKEE - DIRECT / STONER**

1  deposition?

2  **A.**   I don't recall if I was provided a list or not.

3  **Q.**   Okay.

4  **A.**   It's been a few years.

5  **Q.**   But do you remember if you were designated to speak on

6  behalf of the County of Alameda on absolutely anything or if it

7  was just confined to kind of a list of topics?

8  **A.**   I mean, I suspect it would have been confined to the

9  Clerk-Recorder's Office and related matters.

10  **Q.**   Okay.  Would you have any reason to dispute that one of

11  the previous topics you spoke about was -- I'm quoting

12  (as read):

13          "The reason for the development of and training

14      of CRO employees on the policy prohibiting CRO

15      employees from providing manual assistance, writing

16      information on paper forms, including any history of

17      persons claiming any kind of liability for improperly

18      transcribed information or improperly given advice"?

19  **A.**   The question was?  I'm sorry.  That was --

20  **Q.**   Yeah, I'm so sorry.  I didn't write this topic.  The way

21  the topic is written, it says (as read):

22          "The reasons for the development of and training

23      of CRO employees on the policy prohibiting CRO

24      employees from providing manual assistance, writing

25      information on paper forms, including any history of

1          persons claiming any kind of liability for improperly

2          transcribed information or improperly given advice."

3     A.   Okay.  So the question is, was I --

4     Q.   Was that one of the topics you spoke on?

5     A.   Yes.

6     Q.   Okay.  And another topic that I'm wondering if you spoke

7     on, which is fortunately a little bit more directly written, is

8     (as read):

9               "The training provided to the CRO employees on

10         the ADA and providing accommodations thereunder."

11    A.   Yes.

12    Q.   Okay.  Thank you.

13         And when we say "ADA," for today's testimony, you

14    understand that I mean the Americans with Disabilities Act?

15    A.   That's correct.

16    Q.   Not the American Dental Association.

17         Okay.  Earlier this week, did you hear your counsel tell

18    the judge that -- and plaintiff's counsel that you have been

19    present in court this week as the County of Alameda's corporate

20    representative?

21    A.   Yes.

22    Q.   Okay.  So you heard the testimony yesterday.  Do you

23    believe that Ms. Briones and Ms. Moran acted within the ADA

24    training that they had for the County?

25    A.   Yes.

1          **MR. GILBERT:**  Overbroad.

2          **THE COURT:**  Overruled.

3  **BY MS. STONER:**

4  **Q.**   And do you have any reason to dispute the testimony that

5  Ms. Moran and Ms. Briones gave that they were not trained on

6  auxiliary aids or services specifically under the ADA?

7          **MR. GILBERT:**  Misstates testimony.

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  The question is?

10  **BY MS. STONER:**

11  **Q.**   Yes.  Do you have any reason to dispute or disagree with

12  the testimony that Ms. Moran and Ms. Briones gave that they

13  were not specifically trained on auxiliary aids and services

14  under the ADA?

15          **MR. GILBERT:**  Misstates testimony.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  I would not specifically dispute that.

18  **BY MS. STONER:**

19  **Q.**   When they spoke about the County's policy of not acting as

20  a transcriber, do you dispute their testimony that there was no

21  written policy in 2019?

22  **A.**   No written Clerk-Recorder policy, that's correct.

23  **Q.**   Okay.  And you don't dispute that the policy didn't have a

24  specific name?

25  **A.**   It wouldn't have been a specific name, no.  But as

1    I believe they testified, it's based on a state law; and

2    obviously, that state law has a code and everything, you know,

3    attached to it.

4    Q.    But the policy itself, it wasn't like an official policy

5    with a number?  You know, sometimes you see a policy document

6    might have a number.

7    A.    We don't number our policies, but no.

8    Q.    Okay.  Okay.  So it wasn't that kind of policy that has,

9    like, a written number as adopted by the Board of Supervisors

10   or anything like that?

11   A.    No, it was not.

12   Q.    Okay.  And does that policy apply to deposited and

13   non-deposited documents alike?

14   A.    The -- it would apply -- it would follow the state law.

15   So it would be deposited documents.  It would be documents in

16   our possession.

17   Q.    So it only applies to deposited documents?

18   A.    Broadly speaking, yes.  I mean, there may be nuances to

19   that if you ask specific questions; but broadly speaking, yes.

20   Q.    Okay.  We might get into that a little later, but we'll

21   move forward for now.

22         So does the policy apply to non-clerks?

23   A.    It would apply to all of our employees.

24   Q.    The front-line people that greet someone at check-in?

25   A.    Again, you know, we -- you're using the term "clerks"; and

YANKEE - DIRECT / STONER

1   "clerks" is not an official term that we use.  I mean,

2   technically, the clerk is Melissa Wilk, who's the elected

3   clerk.  I know we kind of use that as an informal thing, but

4   does it apply to all Clerk-Recorder employees?  Yes.

5   **Q.**   Okay.  Even those that don't generally have a

6   responsibility of touching documents or recording documents or

7   filing documents?

8   **A.**   Correct.  So no one would be able to --

9   **Q.**   Okay.

10  **A.**   -- modify documents.

11  **Q.**   Does the policy apply to non-employees, such as Ms. Grim

12  who you heard from yesterday?

13  **A.**   It would not.

14  **Q.**   Okay.  It wouldn't.

15      What about where an agency, such as an ASL interpreter

16  agency, comes in and provides a service?  Are they bound by

17  that policy?

18  **A.**   No, because it would be specifically related to

19  Clerk-Recorder employees.

20  **Q.**   Okay.  So yesterday we heard, I think at length, that it

21  is the County's policy that clerks are directed to provide

22  whatever assistance they can to members of the public

23  requesting services, except if that type of request would

24  violate a law or existing policy within the office.

25      Is that a correct statement of what we've --

**YANKEE - DIRECT / STONER**

1    **A.**    Yeah.

2    **Q.**    -- been discussing?

3    **A.**    That's it.

4    **Q.**    I think, hopefully, I've got it by now.

5          And do you understand the policy I just stated to comply

6    with the Americans with Disabilities Act?

7    **A.**    I do.

8    **Q.**    Okay.  And you're one of the key individuals at the

9    Clerk's Office responsible for training employees about

10   the County's policies with regard to the ADA?

11   **A.**    I'm typically not the one directly involved in training

12   the new employees.  That would be the front-line supervisors

13   that do that.  So have I personally trained most of the

14   employees?  No, I've not personally trained them.

15   **Q.**    But do you take responsibility for making sure that the

16   employees are properly trained as to --

17   **A.**    Yes.  I would oversee --

18   **Q.**    -- the ADA?

19          (Simultaneous speaking.  Stenographer interrupts for

20   clarification of the record.)

21   **BY MS. STONER:**

22   **Q.**    As to the ADA.

23   **A.**    Yeah.  Generally speaking, yes.

24   **Q.**    Okay.  Thank you.

25          And do you understand that sometimes the ADA requires a

1  public entity to furnish appropriate auxiliary aids and

2  services?

3  **A.**    Yes.

4  **Q.**    And do you know generally what auxiliary aids and services

5  are?

6  **A.**    Yes.  We've done so on multiple occasions.

7  **Q.**    Okay.  So I'm going to be asking a number of questions

8  about specific auxiliary aids and services.  I don't want this

9  to be a memory quiz.  Would it refresh your recollection about

10 the specifics of that document if I gave you Code 28 C.F.R.

11 35.104 to review?

12        **MR. GILBERT:**  Speculation.

13 **BY MS. STONER:**

14 **Q.**  I can ask -- you know what?  I can ask you the question;

15 and if needed, I have no issue providing it because this is not

16 intended to be a memory quiz.

17      Do you agree that auxiliary aids can include qualified

18 readers?

19        **MR. GILBERT:**  Calls for a legal conclusion.  Lay

20 opinion.  Relevance.  403.

21        **THE COURT:**  I'm going to overrule, but I'm also going

22 to caution the jury that the witness is being asked about his

23 personal understanding of the law.  You are not to take his

24 testimony as a truthful statement about what the law is.

25 The Court will instruct you on the law in the jury

1   instructions.  But the witness is just giving you his lay

2   understanding of what the law is, and that's all that this is.

3              THE WITNESS:  My understanding is that it could

4   include qualified readers.

5   BY MS. STONER:

6   Q.    And audio recordings?

7   A.    I believe so.

8   Q.    And brailled materials?

9   A.    Yes.

10  Q.    Screen reader software?

11  A.    Yes.

12  Q.    Large-print materials?

13  A.    Yes.

14  Q.    Other effective methods of making visually delivered

15  materials available to the individuals who are blind or have

16  low vision?

17  A.    Yes.

18  Q.    Acquisition or modification of equipment or devices?

19  A.    Yes.

20  Q.    And other similar services and actions?

21  A.    Yes.

22  Q.    Okay.  Do you dispute that the County of Alameda is a

23  public entity?

24  A.    No.  We are a public entity.

25  Q.    Do you dispute that Ms. Martinez fell within at least one

1    of the following categories -- one, an applicant; two, a

2    participant; three, a companion; or, four, a member of the

3    public -- on March 29, 2019?

4    **A.**    I believe she would fall under one of those categories.

5    **Q.**    Do you know which?

6    **A.**    She obviously is a member of the public.  She may fall

7    into multiple categories since she was doing a business

8    transaction with us.

9    **Q.**    Okay.  Do you understand that what Ms. Martinez wanted to

10   do on March 29th, 2019, was to file a form at the CRO?

11   **A.**    Yes.

12   **Q.**    And so now do you have any reason to disagree with the

13   following statement (as read):

14           "The ADA requires the County of Alameda shall

15        furnish appropriate auxiliary aids and services,

16        where necessary, to afford Ms. Martinez an equal

17        opportunity to file a form at the CRO"?

18        **MR. GILBERT:**  Calls for a legal conclusion.  403.

19   Calls for lay opinion.  Incorrect statement of the law.

20   Misrepresents facts.

21        **THE COURT:**  I'm going to overrule the objections, but

22   I give the jury the same instruction, that he's just being

23   asked about his understanding of the law.  You're not to take

24   that as a truthful statement about what the law is.  He's just

25   giving you his personal understanding.

1    **THE WITNESS:**  My personal understanding would be

2    that -- that we have to provide reasonable accommodations to

3    allow her to conduct the business transaction that she's trying

4    to do.

5    **BY MS. STONER:**

6    **Q.**   Okay.  So you used the phrase "reasonable accommodations."

7    Do you know if the phrase "reasonable accommodations" appears

8    anywhere within Title II of the ADA regulating public entities?

9    **A.**   I don't know one way or the other.

10   **Q.**   Okay.  Do you have any reason to disagree that

11   providing -- when considering which accommodations or auxiliary

12   aids to provide to Ms. Martinez, the County would be required

13   to give primary consideration to Ms. Martinez's request?

14       **MR. GILBERT:**  Calls for a legal conclusion.  Calls for

15   lay opinion.

16       **THE COURT:**  Overruled.

17    I give the jury the same instructions that I gave before.

18       **THE WITNESS:**  I wouldn't be an expert in that

19   particular question.  I mean, I would say that as a general

20   practice, we certainly defer to what the customer is asking us

21   as a reasonable accommodation, and we try to do our best to

22   provide it unless there's a specific reason why we cannot, such

23   as in this case.

24   **BY MS. STONER:**

25   **Q.**   Okay.  So you would agree that the public entity's

1  obligation is to, first, consider the request -- the specific

2  request the individual is making?

3          MR. GILBERT:  Calls for a legal conclusion.  Calls for

4  lay opinion.  403.

5          THE COURT:  Overruled, but with the same instructions.

6          THE WITNESS:  Yes.

7  BY MS. STONER:

8  Q.  Okay.  And do you dispute that it was the County's

9  obligation, not Ms. Martinez's own obligation, to provide any

10 auxiliary aids needed to facilitate communication?

11         MR. GILBERT:  Calls for lay opinion.  Calls for a

12 legal conclusion.

13         THE COURT:  Overruled, but with the same instructions.

14         THE WITNESS:  Yes.

15 BY MS. STONER:

16 Q.  Going to May 31st, 2019, is it your opinion that it would

17 have been acceptable under the ADA for the County to rely on

18 Ms. Martinez to bring someone like Ms. Grim to provide services

19 to facilitate her filing of a form?

20         MR. GILBERT:  Calls for expert opinion.  Calls for lay

21 opinion.  Incomplete hypothetical.  Relevance.  403.

22         THE COURT:  Overruled, but with the same instruction.

23         THE WITNESS:  Can you repeat the question?  Because I

24 was confused if you were asking about --

25 \\\

1  BY MS. STONER:

2  **Q.**  Okay.

3  **A.**  -- her first appearance or her second appearance.

4  **Q.**  I might break this down.

5     So asking about her second appearance on May 31st, 2019,

6  do you recall the testimony yesterday from Ms. Grim that she

7  accompanied Ms. Martinez?

8  **A.**  I do.

9  **Q.**  Okay.  And in your opinion, is it acceptable under the ADA

10  for the County to rely on Ms. Martinez to bring someone like

11  Ms. Grim with her to transact business with the County?

12  **A.**  I would say --

13     **MR. GILBERT:**  Calls for lay opinion.  Incomplete

14  hypothetical.

15     **THE COURT:**  Overruled, but with the same instructions,

16  that he's being asked for his personal opinion.

17     **THE WITNESS:**  My understanding would be that we cannot

18  require someone to bring someone else in.

19  BY MS. STONER:

20  **Q.**  Can we agree that filing by mail is not same-day filing at

21  the CRO's office?

22  **A.**  It would depend how long the mail took to get to us.

23     In this particular instance, I believe Ms. Briones

24  testified that she would expedite it.  So, essentially, once we

25  would receive it, that would be to the front of the line and

1    could very well be the same day that we receive it.

2        So I can't speak to how long the mail would take to get to

3    us; but as far as the transaction at our end, we would treat

4    that as essentially a same-day, high-priority item.

5    **Q.**    In your experience, which -- in your experience, does

6    the -- does the mail ever take less than one day to get from

7    one destination to another?

8    **A.**    No.

9    **Q.**    Okay.  And can we also agree that filing by mail, in 2019

10   at least, would have required the use of a PDF document?

11   **A.**    It would -- right.  You would have printed -- well,

12   potentially.  We could have also given a blank form.  So

13   someone could have received a blank form from our office and

14   had a paper copy that they filled out.  So not necessarily a

15   PDF, but it could have been a PDF.

16   **Q.**    Okay.  So two options.  Option one, that they could pick

17   up a blank form that's preprinted?

18   **A.**    Correct.

19   **Q.**    And that blank form, was that available in large print or

20   braille?

21   **A.**    I don't believe so.  Could we enlarge it if someone asked?

22   That's probably very likely that we could do that.  But do we

23   have them preprinted in a larger size?  No.  But we do have

24   larger copy paper.  If someone had asked us to take, you know,

25   the PDF and to blow it up onto bigger size paper, I would have

1    no reason to think that we could not accommodate that request.

2    Q.    Was that ever offered to Ms. Martinez, to your knowledge?

3    A.    I don't believe it was offered, and I don't believe it was

4    asked for.  I don't believe that topic came up on either side.

5    Q.    Okay.  But from home, it would require accessing a PDF

6    document; is that correct?

7    A.    From home, correct.

8    Q.    And do you agree that Ms. Martinez went to the CRO on

9    March 29th, 2019, which is the first visit, intending to file

10   her FBNS form on that date?

11   A.    That's my understanding, yes.

12   Q.    And is it your understanding also that the County offers

13   business owners who have all the necessary information same-day

14   filing for FBNS forms?

15   A.    Yes.  If someone comes into our office, we would file it

16   at the time they come in, I mean, obviously, assuming that they

17   have proper payment, that the form's correct and all that.

18   Q.    Of course.  Assuming they meet the requirements?

19   A.    Right.

20   Q.    Okay.  So is it the County's position that requiring

21   Ms. Martinez to bring someone with her to complete same-day

22   filing would be an equal opportunity to file?

23        MR. GILBERT:  Calls for a legal conclusion.

24   Speculation.  Opinion.

25        THE COURT:  Sustained as to speculation.

1          **MS. STONER:**  I can rephrase.

2     **Q.**   Okay.  When Ms. Martinez, on May 31st, 2019, brought

3     Ms. Grim with her to help her file, is it the County's position

4     that she was on equal footing to a person who had sight and

5     could write on documents on their own behalf?

6          **MR. GILBERT:**  Vague.  Calls for a legal conclusion and

7     opinion testimony.

8          **THE COURT:**  Sustained.

9        Can you lay a foundation that he is authorized to testify

10    on behalf of the County?

11         **MS. STONER:**  Yes.  May we do a sidebar?

12         **THE COURT:**  Let's take a recess.  And I would like my

13    courtroom deputy to bring the jury back into the jury room.

14         **MS. STONER:**  Okay.  Thank you.

15      (Proceedings were heard out of the presence of the jury.)

16         **THE COURT:**  All right.  The jury is back in the jury

17    room.

18       I don't think there is such a thing as a Rule 30(b)(6)

19    trial witness.

20         **MS. STONER:**  Your Honor, I would direct the Court --

21    so this is -- this may be an unsettled question of law, which

22    is why I asked to address it outside the presence of the jury.

23       *Brazos* -- B-r-a-z-o-s -- *River Authority vs. GE Ionics,*

24    *Inc.*, 469 F.3d 416, that's a Fifth Circuit case that states

25    that corporate reps may be called to testify at trial even when

1  they don't have personal knowledge.

2       And two other courts in this district have come to the

3  same conclusion.  One of them is in Judge Tigar's court, and

4  it's *Corcoran vs. CVS Pharmacy, Inc*.  And the quote on that is

5  (as read):

6            "It is the Court's view that persons who have

7            been designated to testify on behalf of the

8            corporation may be examined on specifically

9            articulated topics, whether the representative

10           obtained the information by personal experience or

11           upon investigation in their corporate capacity."

12      And I believe that was at trial.

13      And then there's also this case *Shenwick v. Twitter, Inc*.

14  That's from March 31st of 2021, which also cited to *Brazos*.

15      But I think for the clarity of the record and for making

16  sure we conduct this trial fairly, I would be -- you know,

17  would be very interested to hear the Court's perspective on

18  that scope of examination.

19           **THE COURT:**  I -- you've listed on your witness list a

20  corporate representative for County of Alameda, and I take that

21  to be Mr. Yankee.  Is that right?

22           **MS. STONER:**  Correct.

23           **THE COURT:**  Can you then lay a foundation in his

24  testimony that he is here today in the capacity of a corporate

25  representative for the County of Alameda?  I mean, earlier he

 1  said he was here to attend the trial in that capacity.

 2          **MS. STONER:**  Okay.

 3          **THE COURT:**  But I would like some foundation that as a

 4  witness on the witness stand, he has been designated to be the

 5  representative of the County of Alameda.

 6          **MS. STONER:**  Okay.  Okay.

 7          **THE COURT:**  All righty.  Well, thank you.

 8      And with that, I think we can bring the jury back in.

 9          **MR. GILBERT:**  Your Honor, just for the record, we do

10  have significant concerns with many of these lines of

11  questioning.  Case law is replete with references that legal

12  questions are inappropriate to a witness, either at deposition

13  or in trial.  In state law, the case is *Rifkin*.  I can't

14  remember the federal case off the top of my head.

15      But the purpose of witnesses is to elicit facts, not legal

16  contentions.  The questions that have been asked so far of

17  actually not only this witness but others are:  Is it your

18  opinion that you've complied with the ADA by doing X, Y, and Z?

19  And the Court has allowed the questions.

20      I think that's absolutely improper because that does go to

21  the direct legal issues that are the province of the jury.

22      The factual underlings -- what does the witness know, what

23  is the basis of their decision, what was their involvement --

24  I think is absolutely appropriate; but going to the next

25  question of "What is your legal contention?" I think is

**YANKEE - DIRECT / STONER**

1   absolutely improper to ask in front of a jury.  And I want to

2   make sure the record is clear on that, whether it's as an

3   individual or as a representative.

4        But I also believe that a 30(b)(6) is a method by which to

5   obtain discovery.  It is not a method to designate somebody at

6   trial and then have them do a bait and switch while they're on

7   the stand and say, "We've noticed you by name, but now we're

8   going to change in the middle of the testimony and have you

9   testify as a corporate representative on what the corporation

10  believes" because that's a different issue.

11       And specifically when we're talking about a public entity,

12  the public entity speaks through its board.  What its legal

13  position is on matters goes through the board, not through a

14  witness, not through an individual.  It cannot.  That is

15  precluded by both state and federal law because the board makes

16  the decisions, not an individual.

17       So legal contentions and questions from a representative

18  have never been allowed and are absolutely inappropriate on

19  that basis.

20       Thank you, Your Honor.

21       **THE COURT:**  There were two objections in there, or at

22  least I distill those comments down to two objections.

23       One is about whether he can be asked questions about ADA

24  compliance.  I think he can give his personal opinion on that

25  because that relates to deliberate indifference.  Someone's

**YANKEE - DIRECT / STONER**

1   understanding of what the ADA requires and whether they made

2   their best efforts to comply with the ADA and whether they

3   think that they did, I believe that's relevant to the

4   deliberate indifference inquiry.

5        Certainly, if someone testified that he thought they did

6   not comply with the ADA, that would tend to favor a finding of

7   deliberate indifference; and I think, conversely, testimony

8   that someone thought that they were complying with it would

9   point the other direction on deliberate indifference.

10       And as to whether he can testify on behalf of the County,

11  that's why we took this recess.  And I take it that plaintiff's

12  counsel is going to ask the witness whether he has been

13  designated to testify here today on behalf of the County, and

14  the witness will just need to truthfully answer that question,

15  and his answer is what it is.

16       If he says "Yes," then I will allow him to testify on

17  behalf of the County if he says he's been designated in that

18  capacity; and if he says, "No," then he can't.  I don't know

19  what the witness is going to say.  I've just indicated what

20  question I want plaintiff's counsel to ask.

21           **MR. GILBERT:**  Thank you.

22           **MS. STONER:**  Your Honor, if he says "No," that he's

23  not designated to testify on behalf of the County, what

24  mechanism does plaintiff have for examining the intentions of

25  the County in this trial?

1          THE COURT:  Well, the witness list should have people

2     listed by name because a witness is someone who takes the

3     stand.  You've listed him by name, and you can ask him

4     questions.  But if he says he's not designated to testify on

5     behalf of the County, I don't think he can answer questions

6     about what the County's position is because he would say that

7     he's not -- that testimony would imply he's not competent to

8     give those answers.

9          MS. STONER:  Okay.  Okay.  All right.  Thanks.

10          THE CLERK:  Want me to get the jury?

11          THE COURT:  Let me check with the parties.

12     Anything further from plaintiff before we bring back the

13     jury?

14          MS. STONER:  No.  Thank you, Your Honor.

15          THE COURT:  Anything further from the defense?

16          MR. GILBERT:  No.  Thank you.

17          THE COURT:  All right.  Let's bring back the jury,

18     please.

19     (Proceedings were heard in the presence of the jury.)

20          THE COURT:  All right.  Please be seated, everyone.

21     BY MS. STONER:

22     Q.  Mr. Yankee, for the purposes of this trial, are you able

23     to testify as to the County's reasons for denying Ms. Martinez

24     a transcriber service?

25          MR. GILBERT:  Overbroad.  Assumes facts.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I -- I'm not sure I understand what

3    you're asking by "the County's position."

4          Can I speak about, generally, what our -- what our agency

5    did and why we did it?  Yes.  Can I speak about official County

6    positions?  I'm not an elected official.  The

7    Board of Supervisors sets policy -- overall, you know, policy

8    for the County.  I'm not aware that they've taken any vote to

9    give me any of those responsibilities.

10         So I can -- I can speak to County policy and my

11   understanding of them.  I don't believe I can speak on behalf

12   of the Board of Supervisors or any elected official, since I've

13   not been told by any of them that I have that authority.

14         Does that help answer your question?

15   **BY MS. STONER:**

16   **Q.**   It does.  It does.

17         So in 2019, was the County Board of Supervisors consulted

18   about Ms. Martinez's request for accommodation?

19         **MR. GILBERT:**  Speculation.  Foundation.

20         **THE COURT:**  Overruled.

21         **THE WITNESS:**  In 2019, was the Board of Supervisors --

22   I know -- are you talking before or after Ms. Martinez filed

23   her lawsuit?

24   **BY MS. STONER:**

25   **Q.**   Oh, good question.  Before -- let's say on -- as of

1   May 31, 2019.

2   **A.**   And when was her lawsuit filed?

3   **Q.**   Her lawsuit was filed in -- her lawsuit wasn't filed for

4   quite some time.

5       But let's say for May 31st, 2019, which is the last date

6   that she visited the Clerk-Recorder's Office, the date she

7   filed her form.  As of that date, had the Board of Supervisors

8   in any way been consulted about this matter with Ms. Martinez?

9   **A.**   My understanding is they have not -- had not.

10  **Q.**   And had the elected been advised of the situation or asked

11  about the situation?

12      **MR. GILBERT:**  Speculation.  Foundation.

13  **BY MS. STONER:**

14  **Q.**   By -- by you.

15      **THE COURT:**  Overruled.

16      **THE WITNESS:**  She may have been.  I know I was --

17  you're talking prior to the May visit?

18  **BY MS. STONER:**

19  **Q.**   Correct.  I'm talking about May 31, 2019, or before.  On

20  that date or before that date.

21  **A.**   I believe the elected official may have been involved in

22  some of the discussions after her visit in March.  So that

23  would be prior to the May.

24  **Q.**   Okay.

25  **A.**   The elected Auditor-Controller Clerk-Recorder.

**YANKEE - DIRECT / STONER**

1    **Q.**    And --

2    **A.**    I can't say for sure one way or another.  Potentially.

3    **Q.**    Were you present in any of those discussions?

4    **A.**    Let me answer this way.  Was the elected official brought

5    into the discussions about this?  Yes.  Do I remember the exact

6    date that those discussions occurred?  No.  And that's why I'm

7    having a hard time answering your question whether or not it

8    was before or after a certain date in May.

9        You know, this was five years ago.  So I know discussions

10   with the elected official took place.  I don't recall the date

11   of those discussions.

12   **Q.**    Okay.  And were you present during those discussions?

13   **A.**    Yes.

14   **Q.**    Okay.  And in terms of the County's, you know, position

15   with regard to the ADA, have you been involved in the

16   decision-making process regarding the auxiliary aids and

17   services specific to Ms. Martinez?  Not general County policy,

18   but specific to Ms. Martinez.

19           **MR. GILBERT:**  Overbroad.  Vague.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  I was not present on the day that she

22   came in, and I was not part of -- in March, I was not part of

23   that decision-making process.  I was told via text message,

24   I think, shortly after Ms. Martinez's visit.  But I did not

25   personally have any involvement in what services or what

1   accommodations were specifically made that day.

2   BY MS. STONER:

3   Q.   Okay.  But in terms of the County's understanding of the

4   law, the County's decision-making specifically with regard to

5   Ms. Martinez, is there someone who you think would be better

6   equipped to testify about the County's positions than you?

7           MR. GILBERT:  Speculation.

8           THE COURT:  Sustained.

9   BY MS. STONER:

10  Q.   Okay.  If Ms. Martinez -- I'll go back, actually.

11          Who was the person who had the most direct role in

12  evaluating Ms. Martinez's request vis-à-vis the ADA's

13  requirements and the requirements of the County?

14          MR. GILBERT:  Vague as to the request.  Vague as to

15  time.  Overbroad.

16          THE COURT:  Sustained.

17  BY MS. STONER:

18  Q.   Between March 29th, 2019, and May 31st, 2019, who in

19  the County was involved in determining whether Ms. Martinez's

20  request would be honored?

21          MR. GILBERT:  Vague as to the request during that time

22  period that's being referenced.

23          THE COURT:  Overruled.

24          THE WITNESS:  I'm not aware that Ms. Martinez had a

25  pending request during that time period.  My understanding is

1    she came in on March -- in March; that she was -- you know,

2    I think there was a lot of testimony about, you know, how that

3    discussion took place, what materials she was given that she

4    left with.

5        I'm not aware of a pending, like, request that was waiting

6    to have some type of reply from the County on.  I don't think

7    we knew what date she was going to return or if she was going

8    to return at all.  So in that way, I'm confused by your

9    question.

10   BY MS. STONER:

11   Q.   Sure.  Did anything about Ms. Martinez's visit on

12   March 29th, 2019, leave anyone in the County in doubt of her

13   intention to file an FBNS form at some point?

14        MR. GILBERT:  Speculation.  Overbroad.  Foundation.

15        THE COURT:  Sustained.

16   BY MS. STONER:

17   Q.   Okay.  Do you have any reason to believe, based on your

18   knowledge, that Ms. Martinez left the CRO on March 29th, 2019,

19   abandoning her plan to file an FBNS?

20        MR. GILBERT:  Vague.

21        THE COURT:  Overruled.

22        THE WITNESS:  I don't have any reason to believe that

23   she planned not to file or -- or to file.  I didn't speak

24   specifically with Ms. Martinez.  I didn't hear the audio

25   recording, in fact, until you played them the other day; so I

1  couldn't speak to what I understood her intent to be one way or

2  the other.

3  **BY MS. STONER:**

4  **Q.**   Okay.  And so in that time frame, beginning at the moment

5  Ms. Martinez first made the request on March 29th, 2019, and

6  ending on May 31st, 2019, when her FBNS form was filed, were

7  you, Matt Yankee, individually, involved in evaluating her

8  request under the ADA and the County's policies with regard to

9  the same?

10  **A.**   I understand that she -- you know, what she was

11  requesting.  And we discussed our policy in relation to that

12  specific request, and it was determined that the policy that we

13  had, that we do not modify forms that have been pre-signed, is

14  the correct policy and one that we should maintain.

15  **Q.**   Okay.  Thank you.

16      And are you able to speak on behalf of the County today as

17  to that policy and the reasons it was -- it was or was not

18  modified?

19  **A.**   When you say -- again, when you say -- I can speak on

20  behalf of the Clerk-Recorder's Office.  Can I speak on behalf

21  of the County?  "The County" is very broad.

22  **Q.**   Okay.

23  **A.**   It involves Social Services and the Fire Department.  I

24  can't speak to what those agencies do.  I can speak to our

25  specific agency's application of that, and I can speak to that

1    policy in regards to that.

2    **Q.**    Thank you very much.

3        In determining which auxiliary aids and services were

4    necessary to provide to Ms. Martinez or others requesting a

5    transcriber, did you review any of the following documents?

6    Did you review the Department of Justice Title II Technical

7    Assistance Resources for State and Local Governments and People

8    With Disabilities?

9        **MR. GILBERT:**  Misstates the law.  Calls for a legal

10   conclusion.

11       **THE COURT:**  Overruled.

12       **THE WITNESS:**  You're asking if I reviewed that

13   specific document in what time period?

14   **BY MS. STONER:**

15   **Q.**    Prior to May 31st, 2019.

16   **A.**    I did not.

17   **Q.**    And have you reviewed it subsequently?

18   **A.**    I know, through the deposition process, that your

19   attorneys have presented a variety of documents, and that very

20   well may have been one of them.  So I can't say whether or not

21   I've seen it or reviewed it at some point since; but prior to

22   May, I did not.

23   **Q.**    Okay.  I'll ask you to turn to Tab 12 in the binder.  Have

24   you reviewed this document?

25   **A.**    I mean, as a standalone document like this, no.  I mean,

1   was it included in other documents?  Again, you know, I would

2   answer that I was given, you know, many, many pages of

3   documents; and whether or not this paragraph may have been in

4   those at some point that I've seen, I couldn't answer one way

5   or another.

6   Q.   Okay.  Same question as to Exhibit 13.

7   A.   And my response would essentially be the same.  I couldn't

8   recall specifically if these paragraphs were in a larger

9   document I've seen over several years.

10  Q.   And I'll correct the record.  That's not an exhibit,

11  Tab 12 -- Tab 12, 13.

12      Have you ever reviewed Department of Justice guidance

13  entitled "General Effective Communication Requirements Under

14  Title II of the ADA"?

15  A.   Again, my response would have to be the same.  Had I

16  reviewed it prior to May of 2019?  No.  Have I seen it since

17  then?  Potentially.  Again, I wouldn't know or recall offhand.

18  Q.   And if you'll turn to Tab 14, I'm going to ask you the

19  same question, if you've seen that document before, if you're

20  familiar with it.

21  A.   And, again, I would give you the same response.  I, again,

22  have seen a lot of these documents since this process has

23  played out.  I don't recall the specific titles of each of

24  those documents.

25  Q.   And during that same time frame, did you consult the

 1  policies of the Judicial Council of California?

 2         MR. GILBERT:  Vague.  Overbroad.

 3         THE COURT:  Sustained.

 4  BY MS. STONER:

 5  Q.   Okay.  Do you have, as we sit here today, any reason to

 6  dispute that the County was required by the ADA to give primary

 7  consideration to Ms. Martinez's request on March 29, 2019?

 8         MR. GILBERT:  Calls for a legal conclusion.  Calls for

 9  a lay opinion.

10         THE COURT:  Overruled.

11      And, again, I'll caution the jury that the witness is

12  being asked for his personal understanding with respect to that

13  subject, and his testimony is not to be taken as a statement of

14  what the law is.

15         THE WITNESS:  Do I know the legal definition of

16  "primary consideration"?  Can I speak on that?  I can't.

17      Do -- as I've said before, we do our best to defer to what

18  the customer has asked as a reasonable accommodation; and

19  unless there's some, you know, reason that we can't do that,

20  that's what we try to defer to.

21         MS. STONER:  Okay.  And I'd like to play a clip from

22  Exhibit 4C.  It may take just a moment.  I'm sorry.

23         THE COURT:  Is that 4C, as in "cat"?

24         MS. STONER:  4C, as in "cat," yes.

25             (Audio was played but not reported.)

 1   BY MS. STONER:

 2   Q.   And do you now understand that the request Ms. Martinez

 3   made was for a sighted person to assist her by writing what she

 4   directed them to write, reading it back for accuracy?

 5   A.   My understanding is that what she requested was for

 6   someone to make edits onto a signed form, which conflicts with

 7   a state law that would prohibit our staff from doing so.  So

 8   that's why we could not specifically honor that request.

 9   Q.   And you agreed that only your staff is prohibited from

10   modifying those documents; correct?

11   A.   Yes.

12            MR. GILBERT:  Calls for a legal conclusion.

13            MS. STONER:  Okay.

14            THE COURT:  Overruled.

15            MS. STONER:  Well, that was his testimony.  Sorry.

16        So let's listen, again, to a similar clip, 4C, Exhibit 4C,

17   the very next slide.

18            (Audio was played but not reported.)

19   BY MS. STONER:

20   Q.   Did you just hear Ms. Martinez ask for anybody to provide

21   sighted assistance?

22   A.   Can you replay the clip?

23   Q.   Yes.

24            (Audio was played but not reported.)

25            THE WITNESS:  Yes, I heard her say that.

1     BY MS. STONER:

2     Q.    And did she say "Fill out this form correctly" or "change

3     my form"?

4     A.    I believe she said, "Fill out this form" -- I mean,

5     whatever it is that she's just said I would agree is what she

6     said.  I don't recall the exact wording.

7     Q.    For the clarity of the record, I am going to play it

8     again --

9     A.    Okay.

10    Q.    -- and then we can make sure that testimony gets clear on

11    the record.

12            MS. STONER:  One more time, please.

13                (Audio was played but not reported.)

14            THE WITNESS:  Okay.  So can you repeat the question

15    now?

16    BY MS. STONER:

17    Q.    Did she ask for someone to fill out the form correctly?

18    A.    She said "Fill out this form correctly," is what I believe

19    I heard.

20            MS. STONER:  May we hear it one more time?

21                (Audio was played but not reported.)

22            THE WITNESS:  So we would have interpreted that as

23    literally this form, the actual form that she has in front of

24    her, which would be the completed form.  So that is what I

25    would interpret that request to be.  Not a form or a blank

1  version of this form.  She said "this form," which in her hand

2  she would have had a form, and that would be the -- what I

3  would understand that request to be.

4  **BY MS. STONER:**

5  **Q.**   So it's your testimony that as she made that request, she

6  was gesturing to the form and holding it and saying "this

7  form"?

8  **A.**   I don't know.  I mean, you're asking me to comment on

9  something when I wasn't --

10 **Q.**   Understood.

11 **A.**   -- in the workplace that day.

12      But as I listen to it now, that's how I would interpret

13 that as.

14 **Q.**   Okay.  But do you also think it's a reasonable

15 interpretation of "this form" to mean this FBNS?

16      **MR. GILBERT:**  Calls for a legal conclusion.

17 Speculation.

18      **THE COURT:**  Sustained.

19 **BY MS. STONER:**

20 **Q.**   Is it your testimony that anybody offered Ms. Martinez a

21 blank form and she said "No"?

22 **A.**   I don't -- I don't believe that that took place.

23 **Q.**   Given that Ms. Martinez has -- given that Ms. Martinez is

24 blind, would she have been able to notice that there's FBNS

25 forms that are blank somewhere?

1    **A.**    I mean, my understanding would be that she filled out the

2    blank form on our website; so she would certainly know that we

3    have the blank form.

4    **Q.**    Let me back up.

5        Where are the blank forms kept in the CRO?

6    **A.**    I mean, they're in a variety of spaces.  I mean, we have

7    a, you know, copy room.  You know, I'm not sure if there would

8    have been ones at the front desk.  And if we didn't have an

9    actual copy, we certainly could make a copy within a matter of

10    seconds or minutes.

11    **Q.**    So sometimes when you walk into an agency, they might have

12    like a wall that displays all the different forms.  Have you

13    ever seen that --

14    **A.**    Yes.

15    **Q.**    -- at the DMV?

16        Okay.

17    **A.**    We would have that at the information desk.  So if someone

18    comes in and wants to fill out a form, they would say "I'm here

19    for" whatever service it is they want, and then the information

20    desk would provide them that form.

21        So I would assume at the time that we would have had those

22    forms blank and available at the information desk.

23    **Q.**    So is that behind the counter of the information desk?  Is

24    that where it would be?

25    **A.**    Mm-hmm, yes.

1  **Q.**   And so neither Ms. Martinez nor someone sighted would

2  necessarily be able to see that there are a variety of blank

3  forms immediately available?

4  **A.**   They would not likely see them.

5  **Q.**   All right.  Is it the County's position that it would be a

6  violation of law for a clerk to write on a blank form for

7  Ms. Martinez?

8           **MR. GILBERT:**  Calls for a legal conclusion.

9           **THE COURT:**  The witness has testified he can't testify

10  on behalf of the County.

11  **BY MS. STONER:**

12  **Q.**   Okay.  In your role working at the County, do you believe

13  it would be a violation of law for a clerk to write on a blank

14  form for Ms. Martinez?

15           **MR. GILBERT:**  Lay opinion.  Calls for a legal

16  conclusion.  Incomplete hypothetical.

17           **THE COURT:**  Overruled, but I'll instruct the jury that

18  he's giving his personal opinion and it's not to be taken as a

19  statement of what the law is.

20           **THE WITNESS:**  So if I understand the question, it is:

21  Do I personally believe it would be a violation of state law to

22  write on a blank -- for one of our employees to write on a

23  blank form?  I do not believe that would be a violation of

24  state law.

25  \\\

1   BY MS. STONER:

2   Q.   Okay.  Does the County sometimes use a third-party

3   language line to facilitate communication with those who speak

4   uncommon languages?

5   A.   We do, yes.

6   Q.   And do they sometimes use third parties to provide sign

7   language interpreters?

8   A.   We have, yes.

9   Q.   Is there any reason why they couldn't use a third party to

10  provide transcriber services?

11        MR. GILBERT:  Vague.  Incomplete hypothetical.

12  Speculation.  Calls for a legal conclusion.

13        THE COURT:  Overruled.

14        THE WITNESS:  I wouldn't know offhand.  I would have

15  to, you know, obviously research that particular policy

16  direction more closely before I give you a definitive answer.

17  BY MS. STONER:

18  Q.   Okay.  Regarding the question of whether Ms. Martinez

19  would have accepted the assistance of someone completing a

20  blank form for her, did she spend well over an hour, even two

21  hours, at the Clerk's Office that day?

22        MR. GILBERT:  Speculation.

23        THE COURT:  Overruled.

24        THE WITNESS:  I don't know the exact time period, but

25  my understanding, based on the prior testimony, that she spent

1  a considerable amount of time.  It sounded like it could have

2  been over an hour.

3  **BY MS. STONER:**

4  **Q.**   And could she have had a blank form completed in under

5  ten minutes?

6          **MR. GILBERT:**  Speculation.

7          **THE COURT:**  Overruled.

8          **THE WITNESS:**  Could -- I would imagine that a blank

9  form could be completed in under ten minutes.

10 **BY MS. STONER:**

11 **Q.**   If a request for assistance by a person with a disability

12 violates a County policy but not a law, does the County direct

13 its employees to deny the request?

14         **MR. GILBERT:**  Incomplete hypothetical.  Speculation.

15         **THE COURT:**  Again, he's testified he can't testify on

16 behalf of the County.

17 **BY MS. STONER:**

18 **Q.**   Okay.  Would you instruct a clerk who is asking you about

19 providing assistance who says something that's not a violation

20 of law but is a violation of a County policy and asks you if

21 you can -- if that person can complete that request, how would

22 you direct that employee to proceed?

23         **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

24         **THE COURT:**  Overruled.

25         **THE WITNESS:**  I believe I would need to evaluate that

 1    on a case-by-case basis; specifically, what the request is, how

 2    it may violate the County policy, how those interact.  So

 3    without knowing a specific instance and all the background

 4    information, we could, potentially, or maybe not.

 5    **BY MS. STONER:**

 6    **Q.**   So you might instruct a clerk who approaches you with a

 7    request that doesn't violate any law at all that they should

 8    deny the request simply because it violates a County policy?

 9          **MR. GILBERT:**  Speculation.  Misstates testimony.

10    Incomplete hypothetical.

11          **THE COURT:**  Sustained.

12    **BY MS. STONER:**

13    **Q.**    In some cases, would you direct a clerk employee who is

14    asking you to deny a request by a person with a disability

15    because it violates a policy even where it violates no law?

16          **MR. GILBERT:**  Incomplete hypothetical.  Speculation.

17    Asked and answered.  Incom- --

18          **THE COURT:**  Overruled.

19          **MR. GILBERT:**  Assumes facts.

20          **THE WITNESS:**  Again, it would depend on the background

21    information.  Let me give you an example why.

22         You know, you're asking specifically would I direct a

23    County employee, my understanding is, to not fill a request

24    based on a County policy if that County policy isn't based in

25    state law.

**YANKEE - DIRECT / STONER**

1      Okay.  There's a variety of reasons why a policy might --

2   may exist.  It may not be a state law, but it may be a federal

3   law; it may be a County ordinance; it may be case law from a

4   prior trial that hasn't been codified into state law.

5      So it would -- like I said, it would have to -- we would

6   need to research why that policy exists, how it came to be.

7   Many of the policies predate me, even though I've been there

8   for over a decade.

9      So I can't give you a definitive answer because, again, it

10  would depend on a case-by-case basis on a specific policy.

11  **BY MS. STONER:**

12  **Q.**   Okay.  And I understand that you may not in the moment

13  have the exact knowledge of what every law requires, and I'm

14  not expecting that of you.

15     But I am asking you, if you knew that a request did not

16  violate a law but it did violate a policy, would you instruct

17  the clerk to deny that request?

18  **A.**   Right, and that would be my answer.  I said it would

19  depend on the policy and the reasons that that policy exists.

20     So there's a variety of reasons a policy may exist that

21  are outside of state law but have -- may have very solid legal

22  grounds for the policy existing.  Like I said, for instance, a

23  prior case that was decided and set a precedent.

24     So I don't know why every policy exists and the background

25  for it.  Those are things we need to research, and that's why I

 1 | answered it would be a case-by-case basis.

 2 | **Q.**   So in some situations, you would advise an employee to

 3 | deny a request even without having any knowledge whatsoever

 4 | that the request violates a law or legal precedent or ordinance

 5 | or state law or county code or minutes from the

 6 | Board of Supervisors simply because there is a policy that

 7 | contradicts that request?

 8 |         **MR. GILBERT:**  Objection.  Misstates testimony.

 9 | Argumentative.  Asked and answered.  Calls for a legal

10 | conclusion.  Incomplete hypothetical and speculation.

11 |         **THE COURT:**  Sustained.

12 | **BY MS. STONER:**

13 | **Q.**   Okay.  So we discussed today that it is not, in your

14 | belief, a violation of a law for someone to write on an FBNS

15 | form.

16 |         **MR. GILBERT:**  Misstates testimony.

17 |         **THE COURT:**  Overruled.

18 | **BY MS. STONER:**

19 | **Q.**   If you were requested by an employee to do that, would it

20 | still violate the County policy to do so?

21 | **A.**   Let me clarify.  The specific law that prohibits

22 | clerk-recorders or employees from doing this, I believe it's

23 | Government Code 27203.  It states we can't alter or modify --

24 |         **THE OFFICIAL REPORTER:**  Pull the microphone closer to

25 | you, please.

1          THE WITNESS:  Sure.

2          THE OFFICIAL REPORTER:  Government Code?

3          THE WITNESS:  Code 27203, I think Subsection (d),

4    specifically relates to Clerk-Recorder employees and why we

5    can't modify forms that are deposited in our office.

6          Now, whether or not there are additional laws that may

7    preclude other individuals that are not Clerk-Recorder

8    employees from modifying a form that's been pre-signed, a legal

9    form that's been executed, for instance, I can't speak to that

10   because that goes beyond what we would have had to research for

11   our policy.

12         But Government Code 27203, Subsection (d), is what

13   specifically applies to our employees.

14         Whether or not there are other laws that may preclude

15   individuals who are not Clerk-Recorder employees or

16   representatives of our office from doing so, I wouldn't know --

17   BY MS. STONER:

18   Q.   Okay.

19   A.   -- because we never had to research that far.

20   Q.   Okay.  If the County had a policy that prohibited animals

21   from being inside of its buildings, is it your understanding

22   that denying a service animal request would not violate the ADA

23   because there's a County policy to the contrary?

24         MR. GILBERT:  Incomplete hypothetical.  Vague.

25   Speculation.  Calls for a legal conclusion.

1    THE COURT:  Overruled.  I'll let the witness give his

2   personal understanding.

3    THE WITNESS:  I think you asked -- used -- no offense,

4   but I believe you used a lot of negatives in this.  I'm not

5   exactly -- are you asking if we have a policy that prohibited

6   animals but someone tried to bring a service animal in, would

7   we let them bring the service animal in?  And the answer would

8   be:  Yes, we would.

9   BY MS. STONER:

10  Q.    Okay.  So in some situations, you agree it's appropriate

11  to relax a policy to accommodate a person with a disability?

12    MR. GILBERT:  Misstates testimony.

13    THE COURT:  Overruled.

14    THE WITNESS:  I'm not -- I would imagine if there is a

15  policy that exists -- and I wouldn't -- I don't know off the

16  top of my head -- my guess would be that that exemption is

17  probably already built into it because I think that's a fairly

18  universally known thing.  I've seen it on signs to, you know,

19  various stores that say, you know, "No animals are allowed

20  except for service animals."

21    So you're asking me about a policy, specific wording.  I'm

22  not prepared to answer what that would be.

23  BY MS. STONER:

24  Q.    Okay.  And it's clear to you the ADA is a federal law?

25  A.    Yes.

1   Q.   And it's clear to you that federal law is a higher

2   authority than County policy?

3   A.   Yes.

4   Q.   Okay.  Now, is the County claiming that providing

5   transcriber service to Ms. Martinez as of March 29, 2019, would

6   have resulted in a fundamental alteration in the nature of a

7   service program or activity or undue financial and

8   administrative burden to the County?

9        MR. GILBERT:  Calls for a legal contention.

10  Relevance.  403.  Calls for a legal conclusion.

11       THE COURT:  Sustained.

12       MR. GILBERT:  Speculation.

13  BY MS. STONER:

14  Q.   Okay.  Did the County have a policy in 2019 that clerks

15  could not write on blank FBNS forms for any reason?

16  A.   That would be our general policy, yes.

17  Q.   Okay.  Okay.  In those circumstances where -- let me back

18  up.

19       Did you have access -- in 2019, did you have access to

20  County Counsel if you had questions about the ADA?

21  A.   Yes.

22       Let me -- just to clarify that, did we have access?  We

23  have contacts in County Counsel's Office.  If you're asking if

24  we have immediate access as in, like, a hotline that we could

25  call for on-the-spot guidance, that may not exist.  So I'm not

1  sure in what context you're asking that question.  But do we

2  have general contacts in the County Counsel's Office?  Yes, we

3  do.

4  **Q.**  Okay.  And do you have an ADA coordinator at the County of

5  Alameda?

6  **A.**  We do.

7  **Q.**  Okay.  Were either of those resources consulted between

8  March -- on March 29, 2019?

9       **MR. GILBERT:**  Foundation.  Speculation.

10      **THE COURT:**  Sustained.

11 **BY MS. STONER:**

12 **Q.**  Do you know if either of those resources were contacted on

13 March 29, 2019?

14 **A.**  I do not know.  I was, again, not present that day.  I'm

15 not sure if any of the managers who were present that day

16 reached out to any of those individuals.

17 **Q.**  But as you testify today, you have no reason to believe --

18 you're not going to tell me that "We called County Counsel" or

19 "We called the ADA coordinator"?

20 **A.**  On that day, no.

21 **Q.**  Okay.  Do you remember what your counsel said during

22 opening statement about a vendor that was hired in 2018?

23 **A.**  I mean, I -- we did hire a vendor in 2018, but what

24 specific statement are you saying do I recall?

25 **Q.**  Okay.  That's fine, actually.  It's not about your

1    recollection.

2         You did hire a vendor in 2018?

3    A.   I believe it was 2018 the contract was executed, yes.

4    Q.   And was that vendor rolling out options for all patrons,

5    not just those with disabilities, or specifically for those

6    with disabilities?

7    A.   No.  The software suite was to upgrade our entire

8    Clerk-Recorder software.  So it would be our cashiering system,

9    our document management system, our archival functions,

10   essentially all the business activities that we do.

11   Q.   And in February of 2022, did you have designated terminals

12   or kiosks that would support accessible software?

13   A.   In February of 2022?  I don't recall if we did on that

14   specific date.  Likely not.  I believe, if my recollection is

15   correct, we first designated -- well, I should say that our

16   terminals are broadly accessible to the public.  We have some

17   that are standing, some that are sitting for folks who may not

18   be able to stand for long periods of time.  So I guess it would

19   depend on what specific accessibility you're asking about.

20        But we did have self-service kiosks.  We've had

21   self-service kiosks in a variety of positions for years.  We

22   can do things like increase the resolution on the screen and

23   all those sorts of things.

24        So it would be specifically -- I'm not sure what

25   accessibility function you're addressing.

1  Q.   Yes.   Okay.   Did -- at what point in time, to the best of

2  your recollection, was JAWS software installed on the kiosks in

3  the CRO?

4  A.   I believe that was first done in October of 2022.

5  Q.   And in 2022 when JAWS was installed, what would JAWS

6  access on that kiosk?   What type of document?

7  A.   We could bring up a variety of our forms on that.

8  Q.   What file format?   Sorry.

9  A.   It would -- I mean, the computer would be set up for

10 bringing up our Web forms.   However, we have IT on-site.   So if

11 someone were obviously having difficulty with JAWS and that,

12 they could probably access the document in a Word format, which

13 is the base format that we build the PDF off of, since they're

14 all also on our, you know, internal network drive as -- as Word

15 documents.   So there's a good chance that we could bring it up

16 that way as well.

17      I don't believe it was ever asked for, but I would assume

18 there's a variety of ways that our IT staff could bring those

19 documents up fast.

20 Q.   Does your IT staff have any specialized training in

21 accommodating persons with disabilities?

22      MR. GILBERT:   Speculation.   Foundation.

23      THE COURT:   Overruled.

24      THE WITNESS:   I'm not over -- or I don't manage our IT

25 unit; so I can't speak specifically to what type of training

YANKEE - DIRECT / STONER

1    they've received.

2    **BY MS. STONER:**

3    **Q.**    Okay.    But you can speak to the fact that the kiosks were

4    accessible to the public at large for a long time, but screen

5    reader software was only installed in October of 2022?

6    **A.**    Correct.

7    **Q.**    Is it your testimony that the County now allows the kiosk

8    to provide same-day service for people who rely on screen

9    readers to navigate print documents?

10   **A.**    You're -- yes, we do same day, but that doesn't mean that

11   we wouldn't have before.    Prior to having our screen reader

12   software installed, clerks or audit associates or any staff

13   member could assist and actually verbally read the forms out.

14       And I've actually done so myself to a sight-impaired

15   person before our screen reader software.    Or they use one of

16   our kiosks and I read each field and then directed the mouse to

17   the field for them to fill out and have them personally type

18   that in.

19       So while the software wasn't installed until October of

20   2022, we still certainly could read those forms in a different

21   way to sight-impaired people, if requested, and I can testify

22   that I have done so.

23   **Q.**    And when did you begin doing things that way?    When did

24   that become the policy of the Clerk-Recorder?

25   **A.**    I don't think there was a specific policy.    As I stated

YANKEE - DIRECT / STONER

1  before, we do everything that we possibly could to accommodate

2  the individual.  And this individual came in and specifically

3  asked for that accommodation, and we were glad to comply with

4  it.

5  Q.   Okay.  But when did that occur?  What date did that occur?

6  A.   I don't recall.  I mean --

7  Q.   Do you recall the year?

8  A.   I don't.  I mean, it would have been after Ms. Martinez

9  visited.

10  Q.   After Ms. Martinez visited.  Okay.

11       Okay.  So in 2023, was there a new FBNS wizard installed

12  on the computer kiosk?

13  A.   I believe it was first installed in December of 2022, in

14  fact, not 2023, in our internal kiosk and then rolled out to a

15  Web format so that folks could access it at home in -- later in

16  2023.

17  Q.   Okay.  So as you sit here today, are you completely

18  confident that the computer systems currently in place at the

19  CRO would enable a screen reader user to complete an FBNS at

20  the CRO and get it filed same day?

21           MR. GILBERT:  Vague.  Overbroad.

22           THE COURT:  Overruled.

23           THE WITNESS:  Am I completely confident the screen

24  reader software alone could do that?  I can't say I'm

25  completely confident, and that's why we have backups available.

1    Right?  So that's why staff can personally read, for instance,

2    the form and guide a sight-impaired person to the various

3    forms.  I think it's an excellent tool, but I wouldn't say we

4    exclusively rely upon that.

5    **BY MS. STONER:**

6    **Q.**   Okay.  If the computer kiosk system failed for any

7    reason -- technical issue, wasn't usable by the particular

8    individual in question, maybe they're deaf-blind, something

9    like that -- would you today allow a clerk to write on a blank

10   FBNS for a person with a disability?

11   **A.**   On a blank form?

12   **Q.**   Yes.

13   **A.**   If the kiosk failed?

14   **Q.**   Yes.

15   **A.**   Yes.

16   **Q.**   Okay.  Do you know what the budget of the County of

17   Alameda is?

18   **A.**   The entire County?

19           **MR. GILBERT:**  Overbroad.  Relevance.

20   **BY MS. STONER:**

21   **Q.**   Do you have a general sense of the -- you know what?

22   Actually --

23           **THE COURT:**  Overruled.

24   **BY MS. STONER:**

25   **Q.**   Do you have a general sense of the budget of the County of

1    Alameda?

2    **A.**    Generally.  I couldn't tell you the latest budget figure,

3    though.  I'm not involved in the overall County budget.

4    **Q.**    I'm not asking if it's -- I'm not asking a dollar amount,

5    but I'm asking:  Is it in the millions?  The hundred thousands?

6    The billions?

7            **MR. GILBERT:**  Foundation.  Speculation.

8            **THE COURT:**  Overruled.

9    **BY MS. STONER:**

10    **Q.**    If you know.

11    **A.**    I mean, I believe our agency has approved expenditures of,

12    I think, around 40 million.  So -- and we're a small part of

13    the County.  So I know it would certainly be millions.  I don't

14    know how much more.

15    **Q.**    Okay.  And are the sources of revenue received by

16    the County, do they include state funding?

17            **MR. GILBERT:**  Overbroad.  Relevance.  403 as to the

18    receipt by the County.

19            **THE COURT:**  Overruled.

20            **THE WITNESS:**  My understanding is that the County

21    receives state funds in some agencies.  I don't believe the

22    Clerk-Recorder's Office directly receives state funding unless

23    it would be a pass-through from the general fund.

24        But that being said, we're also what we refer to as a

25    net-negative County department, which means we bring in

YANKEE - DIRECT / STONER

1    revenues through a variety of sources, like transfer tax,

2    through recording fees.  So what we cost the County is less

3    than what the revenues we bring in.  So we actually put money

4    back into the general fund.

5         So if -- for instance, if they gave us $10 million from

6    the general fund for services, for example, we would actually

7    put back 20 million.

8         Those aren't exact numbers.  I'm just --

9    **BY MS. STONER:**

10   **Q.**   Okay.

11   **A.**   -- illustrating the point.

12   **Q.**   So if you gave me a dollar and I gave it back to you, have

13   I received a dollar from you?

14            **MR. GILBERT:**  Calls for a legal conclusion.

15            **THE COURT:**  Overruled.

16            **THE WITNESS:**  If you gave me a dollar and I gave it

17   back to you, I --

18   **BY MS. STONER:**

19   **Q.**   No, no, no.  If I ask you "Can I borrow a dollar?" and you

20   give me a dollar and then tomorrow I bring it back and I say,

21   "Thank you.  Here's your dollar and, in fact, I might even

22   throw on 25 cents for the courtesy," would you deny that you

23   gave me a dollar, that I received it from you?

24   **A.**   I would say the prior day I'd given you a dollar.

25   **Q.**   Yeah.

1   A.   Now, if you're trying to relate that to the budget and

2   say, you know, do we receive the money from the state first

3   before we replenish it later, I'm not sure that it works in

4   that same scenario.   I think that --

5   Q.   Before we proceed on this line of questioning, I do

6   want --

7          MR. GILBERT:   Objection, Your Honor.   Can Mr. Yankee

8   finish his answer?

9          THE COURT:   Yes.

10      Please finish your answer.

11          THE WITNESS:   So I want to speak to that because you

12  set that up with a timing thing; whereas, in day one we

13  receive -- I receive -- or you receive something from me and

14  then, day two, you pay it back let's say with interest; right?

15      I'm not saying that that's how the County operates or at

16  least how our budget operates, where day one we receive like an

17  injection of funds from the general fund and then, day two, we

18  send it back.

19      We very well may on a day-to-day basis have more general

20  fund revenue coming in.   We may never need to actually, for

21  lack of a better term, withdraw from a general fund account.

22      So I want to be very clear that the scenario you presented

23  is not necessarily how the budget operates.

24  BY MS. STONER:

25  Q.   Understood.   And let me back up a little bit more to you.

1          The general fund of the County of Alameda receives state

2    funding; correct?

3    **A.**   I wouldn't know specifically.   I know that we receive

4    grant funding in various programs.   How the general fund

5    ultimately is made up and what percentage, if any, comes from

6    the state, I couldn't definitively tell you.

7    **Q.**   Okay.   But the County -- or the Clerk-Recorder's Office

8    receives money from the general fund?

9    **A.**   Again, that's why I wanted to -- we're net negative.   We

10   actually send money back to the general fund.

11   **Q.**   So no money ever comes from the general fund into the

12   Clerk-Recorder's Office?

13          **MR. GILBERT:**   Overbroad.   Vague.

14          **THE COURT:**   Overruled.

15          **THE WITNESS:**   I wouldn't know specifically how -- if

16   we need to spend money, for instance, you know, is that coming

17   out of the general fund?   Is that coming -- how that's all --

18   how would you account for those dollars.   At the end of the

19   day, we send more back than we get from the general fund.

20   **BY MS. STONER:**

21   **Q.**   Okay.

22   **A.**   So we contribute to the general fund.   We make the general

23   fund bigger --

24   **Q.**   Okay.

25   **A.**   -- based on our operations.

1    Whether or not there's some type of do we have to make a

2    withdrawal from the general fund before we put money back, I

3    wouldn't know the specific timing of that.  I'm not in the

4    general accounting unit of our agency.  So that's a very

5    technical finance question I'm not prepared to answer.

6    Q.   Okay.  Would any document, including the budget of the

7    County of Alameda, which includes budget overviews and specific

8    projections as to the Clerk-Recorder's Office, refresh your

9    recollection on that point?

10   A.   It's not that I'm not remembering.  I mean, like I said,

11   we send money back to the general fund.  So I'm very clear that

12   we are a net-negative County department, which -- you know,

13   which means that we send money back, that we bring in more

14   revenue than we cost the County.  So we make the general fund

15   bigger, and that's happened on a consistent basis since I've

16   been there.

17        You're asking specifically how does the accounting work,

18   which is how are transfers made in and out; and there's no,

19   I believe, budget document that's going to illustrate that; or

20   if there is, it certainly isn't something I've seen before so I

21   wouldn't recollect something.

22            MS. STONER:  Okay.  Thank you.

23        One moment.

24                    (Pause in proceedings.)

25   \\\

1    BY MS. STONER:

2    Q.    Between 2019 and now, has your position changed at all as

3    to whether it would be a violation of the County's policy to

4    have a clerk write on a blank FBNS form for a customer with a

5    disability who could not write themselves?

6              MR. GILBERT:    Misstates testimony.    Overbroad.    Vague.

7    Incomplete hypothetical and speculation.

8              THE COURT:    Overruled.

9              THE WITNESS:    I would say our general policy has still

10   been that we don't fill out blank forms.

11        Have -- my understanding is also that we've done so on

12   some instances because we now have a way to independently have

13   a customer verify what was entered in, specifically for FBN

14   forms.

15        So that if a clerk were to type something into the --

16   their -- the writing -- you called it the Wizard -- that we

17   could turn that around to a sighted person.    Someone who's not

18   a sighted person, we could use the screen reader software to

19   have that independently verify what was written.

20   BY MS. STONER:

21   Q.    My question is about handwriting.    Between 2019 and the

22   present, has your understanding -- with regard to whether there

23   should be an exception made to the policy for an individual who

24   cannot write for themselves because of a disability, has your

25   understanding changed between 2019 and now?

1          MR. GILBERT:  Vague.   Incomplete hypothetical.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm not specifically understanding the

4     question you're asking.   Are you asking would we hand write a

5     form or use the kiosk on behalf of a customer?

6     BY MS. STONER:

7     Q.    I'm asking about handwriting.

8     A.    I don't recall, at least any instances that were brought

9     to my attention, where we had staff handwriting -- using their

10    own handwriting, write a blank form for a customer.

11          May that have happened at some point?   Like I said, we do

12    empower our managers to make a lot of those decisions.   And

13    since -- you know, in 2019, we discussed that I was a division

14    chief for the Clerk-Recorder's Office.   I'm an assistant

15    controller now, and so I'm far more removed from the day-to-day

16    activities of the Clerk-Recorder's Office.

17          So could that -- potentially could a manager have made a

18    decision at some point to have a clerk do that?   That's

19    possible.   So I wouldn't say it's out of the realm of

20    possibilities, but I'm not personally aware of that.

21    Q.    Okay.  So your personal view hasn't changed between 2019

22    and now with regard to the scenario I described?

23          MR. GILBERT:  Misstates testimony.

24          THE WITNESS:  I don't believe I expressed --

25          THE COURT:  Overruled.

1          THE WITNESS:  I'm sorry.

2          THE COURT:  Overruled.

3      You can answer.

4          THE WITNESS:  I don't believe I expressed a personal

5  view.  I expressed personally what I'm aware of.

6      I'm not aware of anyone who's done that in our office, any

7  staff member who's handwritten a form, but that's just that I'm

8  aware of, my viewpoint.

9  BY MS. STONER:

10 Q.    Has your personal view changed on whether it would be

11 proper or improper to do so?

12 A.    As a general policy, we would discourage staff from doing

13 that.  If a specific instance might require that and there's --

14 you know, we receive a thousand customers in person every week,

15 so there's a variety of special circumstances that may come up.

16     So may there be a scenario or some scenarios where that

17 might have to happen?  That's possible.  But as a general

18 policy, that hasn't changed.  We don't have clerks hand fill

19 out forms for customers.

20         MS. STONER:  Okay.  Thank you.

21     I'll pass the witness.

22         THE COURT:  All right.  At this point, we are going to

23 take our midmorning break for about 15 minutes.

24     So I'll ask my courtroom deputy to bring the jury to the

25 jury room.

1      (Proceedings were heard out of the presence of the jury.)

2          **THE COURT:**  And with that, we will go off the record

3  and recess.  We'll be back in 15 minutes.

4                  (Recess taken at 10:49 a.m.)

5              (Proceedings resumed at 11:08 a.m.)

6        (Proceedings were heard out of the presence of the jury.)

7          **THE COURT:**  Good morning, everyone.  Please be seated.

8          **MR. GILBERT:**  Your Honor, so the record reflects, we

9  have asked Mr. Martinez to retake the stand if that's okay.  I

10  mean, Mr. Yankee.  I'm sorry.

11          **THE COURT:**  Yes, he should be on the stand.

12          **MR. GILBERT:**  Sorry.

13                  (Pause in proceedings.)

14          **THE COURT:**  All right.  At this time, I'll ask my

15  courtroom deputy to bring the jury back into the jury room --

16  or, sorry -- back into the courtroom.

17      (Proceedings were heard in the presence of the jury.)

18          **THE COURT:**  Good morning, everyone.  Please be seated.

19      The jury is now back in the courtroom.

20      Does the defendant have questions for the witness?

21          **MR. GILBERT:**  Yes, Your Honor.  Thank you.

22                  **CROSS-EXAMINATION**

23  BY MR. GILBERT:

24  **Q.**   Good morning, sir.

25  **A.**   Good morning.

1   Q.   Before we get into kind of the more mundane details, I

2   want to kind of focus on a few clear big-picture issues.

3        What is it that -- as the assistant controller of the

4   CRO's office, what is your understanding of what the ADA

5   requires and addresses in regards to patrons like Ms. Martinez

6   coming in to record documents?

7   A.   My understanding is that the general principle of the ADA

8   is to ensure that there is effective communication between both

9   parties.

10  Q.   And if there is effective communication, based upon your

11  understanding of the ADA, do you even get to a discussion of

12  auxiliary aids and services or all the other questions that

13  we've been hearing over the last hour?

14  A.   No.  If there's effective communication, that would be the

15  goal.

16  Q.   Now, based upon -- did you conduct an inquiry into

17  Ms. Martinez's visit on March 29th, 2019?

18  A.   I did, yes.

19  Q.   And did you speak with and interview the people that were

20  directly involved, with the exception of Ms. Martinez?

21  A.   Yes, the County employees who were involved.

22  Q.   And based upon those discussions and your review of the

23  materials, did you have an opinion as to whether or not there

24  was effective communication between Ms. Martinez and the

25  individuals at the CRO that she interacted with on

1   March 29th, 2019?

2   **A.**   I believe there was effective communication that day.

3   **Q.**   And because there was effective communication, would, in

4   your opinion, the County have been required to provide any

5   further accommodations or aids or auxiliary services?

6   **A.**   No.

7   **Q.**   Thank you.

8        Now, even though the County was not required to do so,

9   would the offer to allow an expedited mail-back of her FBNS

10  form been a type of accommodation?

11  **A.**   Yes.  That's not something we would have ordinarily done

12  to anyone mailing in something that needed corrections.  That

13  would have been a specific accommodation made for Ms. Martinez.

14  **Q.**   And that's not something that's offered to everyone else?

15  **A.**   Correct.

16  **Q.**   And the expedited process, how quickly would an expedited

17  return have been if she would have mailed it in?

18  **A.**   It would have depended on the mail; but once we received

19  it, that would have likely been a same day, if possible,

20  probably the latest, the following day if we couldn't get to it

21  the day we received the mail.

22  **Q.**   And we also heard a little bit about funding and budgets.

23       Now, how long have you been with the CRO division?

24  **A.**   I've been with the Auditor-Controller/Clerk-Recorder

25  agency for about 12 1/2 years.

YANKEE - CROSS / GILBERT

1   Q.   And is it fair to say that you are the highest ranking

2   employee in the Clerk-Recorder's Office for the County of

3   Alameda currently?

4   A.   Yeah.   The highest level civil service employee, yes.

5   Q.   And then there would be an elected official that serves

6   beside you?

7   A.   Correct.

8   Q.   And that's an elected position, but you would be a civil

9   service position?

10   A.   Yes.   And I believe she has a chief deputy that she gets

11   to appoint that's outside the civil service system.

12   Q.   Now, within that role, are you familiar with the CRO's

13   budget and financial operations?

14   A.   Yes.

15   Q.   And at any time since January of 2019 to the current, are

16   you aware of any time that the CRO's -- CRO's office has

17   received and utilized funds directly from the State of

18   California?

19   A.   Directly, no.

20   Q.   Thank you.

21       Now, let's step back and kind of do more broad picture, if

22   we could.

23       When did you first come to the County of Alameda?

24   A.   My employment began in November of 2011.

25   Q.   What was your position at that point?

**YANKEE - CROSS / GILBERT**

1    **A.**    Assistant County Clerk-Recorder.

2    **Q.**    So let's kind of go big brush -- broad-brush strokes.

3        Tell us how your employment path, how you ended up getting

4    to become your current position.

5    **A.**    I started, as I said, as Assistant County Clerk-Recorder

6    in 2011 and was in that position until 2015 when I was promoted

7    to the Division Chief position for the Clerk-Recorder's Office

8    in, I believe, 2020.

9        I began serving in an acting role as an Assistant Clerk --

10   as an Assistant Controller; and then in 2021, I was permanently

11   appointed to the Assistant Controller position that I'm

12   currently in.

13   **Q.**    Before we go a little farther, do me favor.  You're a

14   little soft-spoken.  Will you pull that microphone a little

15   closer to you and speak a little more into it so we can hear

16   you a little better, please?

17   **A.**    Yes.

18   **Q.**    And make sure and pause for a second, give each other a

19   chance so the court reporter doesn't have smoke coming off her

20   fingers.

21       Now, before coming to the Clerk-Recorder's Office at the

22   County of Alameda, had you had similar experience elsewhere?

23   **A.**    Yes.

24   **Q.**    Can you tell us about that, please.

25   **A.**    Yes.  I had worked for local government in the state of

1   Michigan.  I began my career in the public sector in Washtenaw

2   County.  I'll actually spell that so it's in the record

3   correctly.  It's W-a-s-h-t-e-n-a-w.  I worked there for a few

4   years.

5        Then I worked for the City of Berkley, Michigan -- that's

6   not California; it's Michigan -- as a Deputy City Clerk there.

7        And then I returned to Washtenaw County and worked there

8   for a few years before I came out here.  And during my

9   employment with my last job with Washtenaw County, I served in

10  the County Clerk Register of Deeds, Elections and

11  Administration Division, as their Elections Director.

12  **Q.**  So it sounds like you've got quite a bit of experience

13  working in these fields.

14  **A.**  Yes.

15  **Q.**  What kind of educational background do you have in order

16  to qualify you to serve in these positions?

17  **A.**  I have a bachelor's degree in community development,

18  public administration.

19  **Q.**  Now, moving on a little bit, within your role in the CRO,

20  are you also familiar with the policies that are implemented

21  and adopted by the CRO's division?

22  **A.**  Yes.

23  **Q.**  Tell us how that works, please.

24  **A.**  Broadly speaking, if we need to adopt a new policy, we

25  will discuss it with the management team, which would likely

1   include me.  It may include managers below me.  It may include

2   Melissa Wilk, who's the elected official; and then it may

3   include representatives from other relevant county departments,

4   such as potentially County Counsel or the County

5   Administrator's Office, whichever departments it may touch.

6   Q.   Now, we've heard a little bit about written policies.  Are

7   all policies of the County of Alameda CRO required to be in

8   writing?

9   A.   No.

10  Q.   Are they in writing?

11  A.   Many are not.

12  Q.   So how does the policies of the CRO, how do they relate to

13  state and federal law, for example?

14  A.   Many of them are based directly on state and federal law,

15  which would make writing a policy rather redundant.  Oftentimes

16  the policy is the effective way to implement a federal or state

17  law, and that's oftentimes conveyed to employees through

18  on-the-job training that they're required to go through.

19  Q.   So if there was a state law on an issue that said "Thou

20  shall do this" or "Thou shall not do that," would that be

21  adopted by the County as the policy, or would there be a

22  separate written policy that would simply cut and paste it and

23  say, "Here's our policy which is the same"?

24  A.   It would essentially be the policy of what the state or

25  federal law is.

1  Q.    So the County would simply rely upon the state or federal
2  law as its policy for the expectations of its employees?
3  A.    Essentially, yes.
4  Q.    Thank you.
5        Now, as far as those policies, how are the employees of
6  the CRO advised on those policies?
7  A.    It can be a variety of methods.  Typically, it's
8  on-the-job training.  Every new employee in our agency is
9  required to go through a six-month training program in three
10  separate units, and they work with experienced leads and
11  supervisors to make sure they can competently perform their
12  job.
13        Now, if there happens to be new policies that are
14  introduced, you know, outside of the training process, then
15  that would be communicated either through a staff meeting,
16  potentially an e-mail, a memorandum.  It could take a variety
17  of forms.
18  Q.    And does that training also include discussion and
19  direction on how to comply with the Americans with Disabilities
20  Act?
21  A.    It does, yes.
22  Q.    Now, does the County also have an ADA coordinator
23  that's --
24  A.    I believe every agency within the County does, in fact.
25  Q.    So does the CRO have its own?

1   **A.**    The CRO is a division of the

2   Auditor-Controller/Clerk-Recorder agency, and our agency does

3   have an ADA coordinator, correct.

4   **Q.**    And is that ADA coordinator someone who is available to

5   all the employees in the CRO?

6   **A.**    Yes.

7   **Q.**    Are they allowed to reach out and receive direction or

8   guidance from that individual as necessary?

9   **A.**    Yes.

10  **Q.**    And is there also regular training that's provided to the

11  CRO employees during the course of their employment?

12  **A.**    Yes.

13  **Q.**    Do they also receive initial training when they first

14  begin and they go through the rotations you talked about?

15  **A.**    Yes.

16  **Q.**    Now, continuing on, do you know who the CRO -- or, excuse

17  me -- who the ADA coordinator was when Ms. Martinez came in on

18  March 29th, 2019?

19  **A.**    I do.

20  **Q.**    Who was that individual?

21  **A.**    Sabrina Amador.

22  **Q.**    So that position was filled and there was somebody serving

23  in it at the time that Ms. Martinez came in?

24  **A.**    That's correct.

25  **Q.**    Thank you.

1          Now, who is Jocelyn Cole?

2     **A.**   She is the current division chief of the Clerk-Recorder's

3     Office.  So she was promoted into that position when I became

4     the assistant controller.  And prior to that, she was one of

5     two assistant county clerk-recorders.

6     **Q.**   So let's go back a step.

7          Were you physically in the office on March 29th, 2019,

8     when Ms. Martinez came in?

9     **A.**   I was not.

10    **Q.**   Where were you?

11    **A.**   I was on vacation in Los Angeles.

12    **Q.**   You actually got to leave the office.

13    **A.**   Yes, I got to leave the office that day.

14    **Q.**   So who was in charge of the program at that point?

15    **A.**   It would have been our two assistant county

16    clerk-recorders, which would have been Eva He and Jocelyn Cole.

17    **Q.**   Thank you.

18         Now, we've heard about Jocelyn just a minute ago.

19         At some point did you receive information about an

20    incident that occurred on March 29th, 2019?

21    **A.**   I did.

22    **Q.**   And what were you advised about it?

23    **A.**   I received a --

24         **MS. STONER:**  I'm sorry.

25         **THE WITNESS:**  I received a text message from Jocelyn

1  Cole, I believe, shortly after the incident took place which

2  briefly summarized that Ms. Martinez had come in, had requested

3  that staff modify her form, and that we didn't do so.  That was

4  the general summary of the incident.

5  **BY MR. GILBERT:**

6  **Q.**  Did you have an understanding --

7          **MS. STONER:**  I had a hearsay objection, Your Honor.

8  The mic may not have picked it up.

9          **THE COURT:**  I didn't hear your objection.

10         **MS. STONER:**  Okay.  Objection.  Hearsay.

11         **THE COURT:**  I'll sustain the objection.

12     I instruct the jury to ignore the witness's previous

13  answer about the content of the communication from Ms. Cole.

14  **BY MR. GILBERT:**

15  **Q.**  Did Ms. Cole have any involvement, that you're aware of,

16  in the subject incident?

17  **A.**  If I recall, I believe at some point Ms. Briones brought

18  it to Ms. Cole's attention.  I don't recall at what point that

19  may have occurred, though.

20  **Q.**  And at that point, was there any type of preliminary

21  investigation or review to find out what had happened and what

22  actions had been taken by the CRO individuals?

23  **A.**  Yes.  Upon my return from my vacation, I contacted the

24  various employees who were involved and likely brought

25  Melissa Wilk up to speed on it as well and, I think,

1   Kevin Hing, who was the chief deputy auditor at the time.

2   **Q.**   Why would this have been a matter that you would have

3   wanted to look into?

4   **A.**   Because Ms. Martinez had threatened litigation, and

5   I believe the prior audio that we heard captured that.  And so

6   those are things that the County takes very seriously and wants

7   to make sure that we have a proper collection of the facts.

8   **Q.**   And did the County also evaluate at that point why its CRO

9   representatives had declined to modify the completed form?

10  **A.**   Yes.

11  **Q.**   And what was the understanding at the conclusion of that

12  investigation of why that form was not modified?

13  **A.**   The conclusion was that the employees were following our

14  policy that was based on the state law that said that we could

15  not modify forms deposited in the Clerk-Recorder's Office.

16        **MR. GILBERT:**   Your Honor, I'd like to approach the

17  witness and provide him what will be marked as defense next

18  exhibit.

19        **MS. STONER:**   Objection, Your Honor.  Lacks foundation.

20  402.  403.  And misstates -- and is a legal conclusion.

21        **THE COURT:**   I'm going to sustain the objection.

22  **BY MR. GILBERT:**

23  **Q.**   Mr. Martinez -- I'm sorry.

24        Mr. Yankee, we've heard some discussion about a Government

25  Code.

**YANKEE - CROSS / GILBERT**

1   **A.**    Mm-hmm.

2   **Q.**    How is it that you become aware of Government Codes in

3   your position?

4   **A.**    It depends if it was one that's existing or new.  In this

5   case, I believe this Government Code has existed for quite some

6   time.  I believe it predates my employment with the County of

7   Alameda.  So as far as my training when I became, you know,

8   first employed with the agency, I remember being trained on it.

9   **Q.**    And what Government Code are you referencing?

10  **A.**    This would be Government Code 27203, I believe it is,

11  Subsection (d), and it is what prohibits our staff from

12  modifying or deleting forms deposited in our office.

13  **Q.**    What is your understanding of the ramifications of

14  violating that provision by a CRO employee?

15  **A.**    I know it's a criminal offense.  I don't recall the

16  specific offense that it is without seeing the...

17  **Q.**    So just to be clear, your understanding of the law under

18  Government Code 27203 is that an employee of the County who

19  modifies a legal form that's deposited for recording with

20  the County can be found criminally liable if they modify that

21  form?

22  **A.**    Correct.

23  **Q.**    And is there a specific provision or section within

24  that statute that you are familiar with that you're relying

25  upon?

**YANKEE - CROSS / GILBERT**

1    **A.**    That would be the -- I'm sorry.  I don't understand the

2    question.

3    **Q.**    Thank you.

4         Do you know if there's a subsection specifically one way

5    or the other?

6    **A.**    I believe it's 27203, Subsection (d).

7    **Q.**    Thank you.

8         And is that a section or law that all the recorders in the

9    CRO's office are trained and taught about?

10   **A.**    Absolutely.

11   **Q.**    Are they taught about it by statute, name, or number, or

12   are they taught about it by concept or some other way?

13   **A.**    Probably a mix.  I'm not sure if every supervisor

14   specifically references that code, but they would all certainly

15   be trained in it in concept.

16   **Q.**    Now, it also talks about depositing.  And when something

17   is delivered -- actually, it doesn't use the -- what does it

18   mean to be deposited?

19   **A.**    It would -- I would say that that is when a document comes

20   into our possession, and that could be an in-person or it could

21   be by mail.  So in person, it would be when it's handed

22   physically to us, now we have physical custody of it in our

23   hands; or if it's by mail, it's when that would be delivered by

24   mail; or if it's an electronically recorded document, it would

25   be when that transmission is completed and then in our software

1  system.

2  **Q.**   If a patron comes into the CRO's office and brings in a

3  completed form for recording and they present that to a CRO

4  individual, when the CRO representative receives it and takes

5  it in their hand, is that deposited with the CRO?

6  **A.**   Yes, it is.

7  **Q.**   Now, can a form be undeposited?

8  **A.**   Absolutely.

9  **Q.**   Can you tell the jury about what that means and what it

10  would look like?

11  **A.**   Sure.  So in an in-person transaction, it would be if the

12  document is handed back to the customer; and that could be

13  because a correction is needed or the customer might not have

14  adequate payment for it and we can't complete the transaction.

15      If it's a mailed-in document, that would be when we

16  complete our Go Back Letter and return it back to the customer

17  for either proper payment or corrections.  And then, obviously,

18  if they send it back to us, then it would be redeposited again.

19  **Q.**   Does the County modify any completed legal forms for

20  anybody?

21  **A.**   No.

22  **Q.**   And does it matter whether the person requesting the

23  service of modifying a completed form is disabled or not?

24  **A.**   No.  We never do it.

25  **Q.**   Thank you.

1          Now, we also heard a little bit about a Go Back Letter.

2    What is a Go Back Letter?

3    **A.**    It's sometimes referred to as a rejection letter.  It's

4    typically a form generated where the clerks can indicate the

5    errors on what was submitted and with instructions for the

6    customer to make the corrections and then return it to us so

7    that the transaction can be completed.

8    **Q.**    And here, we've seen the Go Back Letter which was

9    previously marked as Exhibit 2.  If I could ask you to turn to

10   that, please.

11   **A.**    Okay.

12   **Q.**    And if my computer was working, I would be displaying it,

13   but user error.

14          So on the Go Back Letter, there seems to be quite a bit of

15   checkmarks on that.

16   **A.**    Yes.

17   **Q.**    I have it up on the screen.  Let me blow up the section

18   with the checkmarks.

19          What are the checkmarks on the Go Back Letter intended to

20   represent?

21   **A.**    Those would be, essentially, bullet points that we wanted

22   to bring attention to for the customer so that they know what

23   it is needs to be fixed so that their transaction can be

24   completed.

25   **Q.**    And is the understanding that if a patron takes and

1  follows the direction of this Go Back Letter, they would submit

2  the corrected form and the Go Back Letter and that would assure

3  their recording of their document?

4  **A.**   Yes.

5  **Q.**   Now, going through this one, have you also previously

6  reviewed Exhibit 1, the original FBNS form that was submitted

7  by Ms. Martinez?

8  **A.**   Yes, I've seen it.

9  **Q.**   Does the Go Back Letter address all of the deficiencies

10  that were noted in the original FBNS form that was incorrectly

11  completed by Ms. Martinez?

12  **A.**   Yes.

13  **Q.**   And if Mr. -- Ms. Martinez had complied with all the

14  checkmarks on the Go Back Letter, would her corrected FBNS have

15  been accepted and recorded?

16  **A.**   Provided she included the proper payment with it, yes.

17  **Q.**   And that would have been actually the first checkmark, the

18  fee requirement of $40?

19  **A.**   Correct.

20  **Q.**   Perfect.

21      Now, are Go Back Letters generated for every patron who

22  comes in and has a rejected filing?

23  **A.**   No.  Typically, we use Go Back Letters when there's not a

24  person-to-person transaction.  So it's typically reserved for

25  use when we get documents mailed to us.

**YANKEE - CROSS / GILBERT**

1  **Q.**  Well, why would a Go Back Letter be used in this situation

2  with Ms. Martinez?

3  **A.**  My understanding is that Ms. Martinez asked for a Go Back

4  Letter to be provided to her, in addition to the verbal

5  instructions that we gave her, so that she could ensure that

6  all the corrections were made on her FBNS form.

7  **Q.**  Now, you mentioned the verbal instructions.  Are verbal

8  responses and directions from the CRO typical if a form is

9  deficient and needs to be modified?

10  **A.**  Very typical, yes.

11  **Q.**  And is that something that the CRO's office provides to

12  everybody?

13  **A.**  Yes.

14  **Q.**  And how are those comments or directions provided

15  generally to most patrons?

16  **A.**  Face-to-face contact through speech.

17  **Q.**  Verbally directly?

18  **A.**  Yeah.

19  **Q.**  And that would be just the verbal communication, effective

20  communication --

21  **A.**  Correct.

22  **Q.**  -- at the counter?

23  **A.**  Correct.

24  **Q.**  And that would be the same communication that was provided

25  to Ms. Martinez when she came in on March 29th, 2019?

1   A.   Yes.

2   Q.   And then, so in addition to having the direct effective

3   communication where Ms. Martinez was speaking directly with

4   Ms. Briones and --

5   A.   Moran.

6   Q.   -- Moran -- thank you -- she also received written

7   communication on this as well; is that right?

8   A.   That's right.

9   Q.   Now, does the clerk also offer to provide these Go Back

10  Letters electronically?

11  A.   If someone were to request that, we would absolutely send

12  via e-mail as well.

13  Q.   And is that something that the Clerk's Office has done on

14  other occasions?

15  A.   I wouldn't know, but that's certainly something we would

16  do.  I can't see why we wouldn't.

17  Q.   Now, we also have heard that I think Ms. Briones offered

18  to allow Ms. Martinez to mail in the corrected form and have it

19  expedited.  Is that a service that's offered to everybody that

20  comes into the Clerk-Recorder's Office?

21  A.   It is not.

22  Q.   Well, why was it appropriate for Ms. Briones to offer that

23  service to Ms. Martinez?

24  A.   That -- Ms. Briones felt that that was an appropriate step

25  to take to help accommodate Ms. Martinez that day and offered

1    that as another accommodation that we could make.

2    **Q.**    Well, if there's effective communication and there's no

3    legal requirement for additional accommodations, why would the

4    CRO's office continue trying to provide additional help and

5    support?

6    **A.**    I mean, we try to go above and beyond what's just legally

7    required of us.    We strive for excellent customer service.

8    We're kind of proud of the fact that we have a 4.5 Yelp rating,

9    in fact, online, which for a government agency is fairly

10   impressive since we're not all that interesting.    So we really

11   do strive to provide the highest level of customer service.

12   **Q.**    It's impressive that you actually monitor your Yelp

13   ratings.

14   **A.**    We do and respond to customers.

15   **Q.**    Good.

16        Now, after you looked into this matter, did anyone ever

17   tell you that they were having trouble communicating with

18   Ms. Martinez?

19   **A.**    No.

20   **Q.**    Did anyone ever tell you that Ms. Martinez was having

21   difficulty communicating with anyone with the CRO?

22   **A.**    No.

23   **Q.**    Now, we talked a little bit ago about not modifying legal

24   forms, but let's turn to a specific, filling out blank forms.

25        Excuse me.

1      You mentioned earlier that the general policy -- well,

2   tell me -- tell me again, please, what is the general policy

3   regarding CROs completing blank forms if someone comes in?

4   **A.**   Right.   So the general policy is that we do not fill out

5   blank forms that are filed or recorded in our office.   That's

6   an important distinction because we do oftentimes fill out

7   forms that are not filed or recorded in our office.

8      And to help explain the difference, a document, if filed

9   or recorded, is a legal document that the submitter prepares.

10  And we essentially act as a giant bulletin board or a library

11  to these documents, but we don't act upon these documents.   We

12  don't take action on them.

13     That's very different than something like a marriage

14  license application, which is also something that we do, where

15  the County confers a license upon the individual based on the

16  information they provide to us.

17     So for many years, we've helped customers fill out

18  marriage license applications and review it with them and read

19  it back to them and all that.   But when we're dealing with a

20  form that's filed or recorded, it's incumbent upon the

21  submitter to prepare that, and we just act as the intermediary

22  to make sure it's communicated to the public.

23  **Q.**   Understood.   Thank you.

24     So turning back to our example, if I was to come in and,

25  for example, fill out a copy request, I want to get a copy of a

YANKEE - CROSS / GILBERT

1  public document, is that a legal form?

2  **A.**    It is not.    That would be like a work order form for us.

3  **Q.**    Would that be something that a CRO representative could

4  assist me in filling out?

5  **A.**    Yes, absolutely.

6  **Q.**    Now, turning to a legal document, an FBNS form, generally,

7  what is the practice of the CRO's office in regards to filling

8  out blank forms?

9  **A.**    Generally, that's not something that we do.

10  **Q.**    And let's be really clear for a second.    If someone comes

11  in with a completed FBNS or business form, will the County ever

12  edit that completed form?

13  **A.**    We will never edit a form that's already been completed.

14  **Q.**    And then switching to a blank document, are there

15  occasions when a County may help prepare a blank new document,

16  legal form?

17  **A.**    There have been occasions, yes.

18  **Q.**    Can you explain to the jury, if the policy of the CRO is

19  generally not to do this but there are occasions that it

20  happens, how is that -- how do you reconcile those?    How does

21  that work?

22  **A.**    It would be on a case-by-case basis based on the unique

23  circumstances.

24      To put it in perspective, we file and record annually

25  anywhere from, on a slow year, a quarter of a million documents

1  to a large year, half a million documents.  So if our staff

2  were to be regularly filling out recorded and filed forms for

3  customers, that could potentially be an undue burden.

4      And while the FBN represents a single-page fairly simple

5  form, some of the documents that we file/record in our office

6  are dozens, if not even hundreds, of pages long and contain

7  complex financial information, legal parcel numbers, many

8  things that our staff would struggle to complete in a timely

9  basis.

10     So, generally speaking, it's not our policy to do this;

11 but on certain occasions where the supervisor or another

12 manager or even a staff member felt that it's necessary to do

13 so, we have that discretion.

14 Q.   Now, if an individual with a disability who is unable to

15 complete the form comes into the office and needs to complete a

16 form, would that be the type of exemption or unique situation

17 where the CRO might help fill out that form?

18 A.   Yes, that might be one of the circumstances where we do.

19 Q.   Now, we've also heard -- and let's tie this back a little

20 bit.

21     You mentioned that there's some computers that are

22 available at the CRO's office; is that right?

23 A.   That's correct.

24 Q.   And let me go back one step further.

25     You have the computers that the clerk-recorders use at the

YANKEE - CROSS / GILBERT

1    counter; is that right?

2    A.    Correct.

3    Q.    Are there other computers that are available to the public

4    that are --

5    A.    Yes.   So we have self-service computers.

6    Q.    And where are those in proximity to what we're talking

7    about?

8    A.    I mean, they're on the same floor of the building.   They

9    would be, roughly speaking, about a distance from where I am to

10   if you would just exit those doors and make a left or right.

11   So, you know, a few second's walk away.

12   Q.    50 to 75 feet, roughly?

13   A.    Roughly, yeah.

14   Q.    Okay.   How long have those computers been around or have

15   there been computers available generally?

16   A.    I mean, I -- they predated me, and I would think that

17   they've been available since our building opened in '99.

18   Q.    Are those computers equipped with access to the materials

19   that people can use to prepare forms or legal forms for

20   submission to the CRO?

21   A.    It depends on the form.   Some of the more complex

22   recording forms, no, we don't do that; but for FBNs, yes.

23   Q.    Now, has the County tried to update its available forms,

24   how people can access them, over the years?

25   A.    Yes.

**YANKEE - CROSS / GILBERT**

1   **Q.**   Is it always -- are people always required to come into

2   the CRO in order to get the forms, or are they available some

3   other means?

4   **A.**   They're available on our website.

5   **Q.**   Okay.   And how long ago did they become available on your

6   website?

7   **A.**   Again, that predates me, so I could tell you at least

8   12-plus years.

9   **Q.**   Thank you.

10      Now, we've heard something about, I want to say, a

11   software suite.   Does that sound familiar?

12   **A.**   Yes.

13   **Q.**   Can you explain what that is, please?

14   **A.**   Yes.   So the -- all the functions that our office

15   performs, which includes recording documents, which includes

16   issuing marriage licenses, copies of birth, death, marriage

17   certificates, fictitious business names, notary notes, that's a

18   lot of record storage.   So we need a very complex record

19   management system.

20      We also need a portion of that system to account for all

21   the transactions that we do, which is to sell copies, the

22   recording fees, the transfer tax that we collect.   So this

23   software system is a one-size-fits-all type of thing.   It does

24   all those features.

25      And part of that also is the public access portion of it,

1    which is how we allow our customers to interface with the

2    system, such as the online submission of a fictitious business

3    name statement or searching our index or other varieties of

4    services they might want.

5    **Q.**   Has the County tried to update that system periodically

6    through the years?

7    **A.**   Yes.

8    **Q.**   And prior to Ms. Martinez coming in 2019, had there been

9    an effort by the County to update that software suite?

10   **A.**   Yes.   The contract for that was signed, I believe, the

11   prior year, in 2018.

12   **Q.**   Did that have anything to do with Ms. Martinez?

13   **A.**   No.

14   **Q.**   Now, can you explain, just in general terms, what that

15   contract encompassed and dealt with?

16   **A.**   It encompassed all those things I just spoke of.   We --

17   our old system, I believe, was initially, that we were using at

18   the time, was I believe put into place in 1999-ish time frame.

19   So we were running on a system that was close to 20 years old,

20   which for a software is very old; and it was leading to

21   problems, particularly as our office tried to implement new

22   statewide legislation that had additional requirements on it.

23   So it was very important that we update our software system.

24   So that was all put into place.

25          And, in fact, I believe we issued one or two prior

1    requests for proposals, which is where contractors can bid on

2    large County contracts, but those were not successful in

3    delivering a new system to us.

4        But that finally was successful.  We found a vendor.  In

5    fact, it was the same vendor; and they essentially upgraded our

6    existing software suite with their new software suite.  And

7    that process started in 2018 with the signing of the contract;

8    but it's a multiyear process that ran into significant

9    challenges throughout the pandemic.  In fact, it had not even

10   been completed before the pandemic started.

11   Q.   When was the new software finally implemented and rolled

12   out?

13   A.   It -- the online submission of FBNs, I believe, would have

14   been one of the last portions of it, and I believe that

15   occurred in December of 2022.

16       But it's also a constantly upgrading system.  So as other

17   counties, including our county, request additional features,

18   those are oftentimes integrated.  So we're on almost like a

19   constant upgrade system where, as new features become

20   available, we want to make sure that those are included in what

21   we offer so that customers can take advantage of them and our

22   staff can as well.

23   Q.   Now, let's be more specific to this case regarding the

24   suite.  Does this suite provide additional options for how

25   patrons can complete legal forms that need to be submitted to

1    the CRO?

2               MS. STONER:  Objection.  403.

3               THE COURT:  What was the objection?

4               MS. STONER:  403.

5               THE COURT:  Overruled.

6               THE WITNESS:  Yes.  So prior to the system, there was

7    no way to electronically submit a fictitious business name

8    statement to us.  You'd have needed to print out the PDF and

9    either fill it out by hand or have filled it out before you

10   printed it and then physically brought the paper into our

11   office.  Whereas now, there's a portal whereas you can fill out

12   the form online and they're electronically transmitted to us.

13   And then all you would need to do is sign the form that we

14   would print out when you come to our office to finish the

15   transaction.

16   BY MR. GILBERT:

17   Q.   Thank you.

18        And as far as this process, is there other improvements

19   and aspects that are going on about improving the opportunities

20   to fill out forms both in the office and remote?

21   A.   Before this, we also did marriage license applications.

22   That was another one where people could fill out and submit

23   their marriage license application online.  So it's not limited

24   just to the fictitious business name statement.

25   Q.   Thank you.

YANKEE - CROSS / GILBERT

1        And then is this software suite available in the kiosk at

2   the CRO's office?

3   **A.**    There's a portion of it.    It's called the public access

4   portion of that larger software system.    And, yes, those are

5   all available at the kiosks.

6   **Q.**    Are there kiosks that are designated for use by disabled

7   individuals?

8   **A.**    Yes.

9   **Q.**    And do those kiosks have any additional services or

10  equipment or software to further assist disabled individuals in

11  accessing those materials?

12  **A.**    Yes.    So we've also installed the JAWS software, which

13  I believe is Jobs Access -- I honestly forget the acronym, but

14  it's a screen reader type of software to assist individuals in

15  completing their forms.

16  **Q.**    And the JAWS software, is it your understanding that

17  that's intended to allow sight-impaired individuals to access

18  and complete PDFs?

19  **A.**    PDFs, as well as our interface with our online submission

20  form.

21  **Q.**    Now, as far as the kiosk and the JAWS software that you

22  were talking about, are disabled individuals required to fend

23  for themselves when they go there?    In other words, they just

24  show up at the CRO's office and here it is, deal with it --

25  **A.**    No, no.

**YANKEE - CROSS / GILBERT**

1  **Q.**    -- or is there some other type of help or assistance that

2  comes into play?

3            **MS. STONER:**  Objection.  Leading.

4            **THE COURT:**  Overruled.

5            **THE WITNESS:**  No.  We absolutely provide assistance.

6  That's -- in fact, we have a unit of our Clerk-Recorder's

7  Office specifically called the Customer Service Unit, and those

8  individuals are trained to help guide customers through the

9  process and, if customers identify that they may have specific

10 needs, to help them go through the process, and that may be a

11 variety of things.

12        We've had customers come in and indicate that they are

13 hard of hearing and may need to schedule a sign language

14 translator for a wedding ceremony in our office; or it could be

15 someone who was in an accident and didn't have use of their

16 hands and couldn't type at a kiosk and so we've helped type

17 searches for them.

18        So they're all trained to do that and help -- can help

19 guide any customer throughout our process.

20 **BY MR. GILBERT:**

21 **Q.**  What are employees of the CRO taught regarding assisting a

22 disabled individual in using the kiosk?

23 **A.**  They should provide as much help as they can, answer

24 questions.  And then if the kiosk, you know, encounters a

25 technical error, they can do certain things like help guide the

1   mouse to various parts of the form or to read aloud parts of

2   what they're seeing on the screen if the screen reader software

3   isn't working.

4   **Q.**   So let me go through that and kind of break it down.

5        Is it -- are CRO employees advised that if a disabled

6   individual needs assistance on the kiosk, that someone from the

7   CRO, whether it's the -- I think you called it the assistance

8   division.   Was that --

9   **A.**   Customer Service Unit.

10  **Q.**   Customer Service Unit, they would go and actually

11  physically be with and assist that individual?

12  **A.**   Yes.

13  **Q.**   And would they stay with them for the entirety of their

14  duration while they're trying to complete these forms?

15  **A.**   If that's what the customer needs, yes.

16  **Q.**   And during that process, I think you mentioned that the

17  Customer Service Unit, they might read the forms or read the

18  words that are on the screen if there's problems with the JAWS

19  software.

20  **A.**   Yes.

21  **Q.**   And even if the -- if a customer doesn't want to use the

22  JAWS software, can they just simply ask someone from the

23  Customer Assistance Unit just to read the form to them and tell

24  them what they're looking at?

25  **A.**   Yes.

**YANKEE - CROSS / GILBERT**

1  Q.  And then you mentioned, I think, moving the mouse.  What

2  were you referring to on that?

3  A.  Right.  So if a customer is having a hard time seeing

4  where the mouse is so that they can type in the appropriate

5  field, we can help guide the mouse and so that the cursor is in

6  the appropriate field for them to begin typing.

7  Q.  And is there any limits to what assistance would be

8  provided in preparing a new form that you can think of as

9  you're sitting here?

10  A.  I mean, as long as they're not asking us to do something

11  that's against a policy or law, we would help them.

12  Q.  So once a form is filled out, are there further measures

13  that the County takes in order to help a disabled individual or

14  even just any individual sign a form?

15  A.  Yeah.  We could either -- well, let me back up.

16      We would -- initially, you know, when we had those

17  situations occur, we could help guide someone's hand with the

18  pen to the appropriate signature line on the form.

19      Then I don't recall how many years ago, maybe two years

20  ago, we became aware of metal boxes, hollow metal boxes, for

21  lack of a better way to describe it, which someone who's sight

22  impaired can use to help guide them so they know to sign inside

23  the box that they can actually feel, so that they can use that

24  to help sign forms.

25  Q.  So I've seen, for example, where I go to use a credit card

**YANKEE - CROSS / GILBERT**

1    at a -- they've got the little square box that you sign in the

2    credit card machine.

3    **A.**    Yes.

4    **Q.**    Is that the kind of template you're talking about?

5    **A.**    Similar, yes.  It's taller so that it's easier to feel.

6    **Q.**    So you would put that on the actual form so the

7    sight-impaired individual could feel where they would need to

8    sign?

9    **A.**    Correct.

10   **Q.**    How would the sight-impaired individual verify the

11   information on the form before they signed it?

12   **A.**    Well, if they -- are you speaking of a form that was

13   completed in our office?

14   **Q.**    Yes, sir.

15   **A.**    We have, like I said, the JAWS software which allows for

16   an independent way to verify what it is they typed in.  So they

17   could listen to it before it's printed out and then know what

18   it is that they're signing.

19   **Q.**    And they could also, in the alternative, have someone from

20   the CRO read them the content of the form?

21   **A.**    They could, yes.

22   **Q.**    And these are discretions that the CRO staff has

23   currently, and has for at least the last however long since

24   this new software was implemented, to be able to provide

25   assistance to patrons?

YANKEE - REDIRECT / STONER

1   **A.**   Yes.

2   **Q.**   Thank you.

3        Now, does the CRO still allow electronic submissions of

4   forms?

5   **A.**   Yes.

6   **Q.**   And does it still allow mailing of forms?

7   **A.**   Yes.

8   **Q.**   So people can still record their forms by all of the means

9   that were otherwise available, and there's additional means now

10  that have been implemented by the County?

11  **A.**   Yes.

12  **Q.**   Are any of these methods scheduled to be prohibited or

13  ruled out or terminated or not continued?

14  **A.**   No.

15       **MR. GILBERT:**  Thank you.

16       Just a moment, please.

17                  (Pause in proceedings.)

18       **MR. GILBERT:**  Thank you, Your Honor.  Nothing further.

19       **THE COURT:**  Does plaintiff have any further questions

20  for this witness?

21       **MS. STONER:**  Yes, Your Honor.

22                  <u>REDIRECT EXAMINATION</u>

23  BY MS. STONER:

24  **Q.**   So I believe I heard you say "our office," "our system,"

25  "we" while you were testifying just a minute ago.  Is that

1    fair?

2    **A.**   Yes.

3    **Q.**   Are you testifying today as a representative of

4    the County?

5    **A.**   I believe you called me as the wit- -- I mean, I'm not

6    sure what -- I'm an employee of the -- of the County.

7    **Q.**   Correct.  Are you here today to speak on behalf of

8    the County?

9    **A.**   On behalf of the County?

10   **Q.**   Yes.

11   **A.**   I can speak on the Clerk -- behalf of the Clerk-Recorder's

12   Office, the policy and the stuff we do.  When you refer to

13   "the County," the County is a much bigger entity than me or any

14   of my authority.

15   **Q.**   Okay.  Are you here today to speak on behalf of the CRO?

16   **A.**   My understanding is yes, I mean, with the caveat that if

17   there's specific, you know, questions that may be beyond my

18   authority, then obviously I can't necessarily speak on those.

19   **Q.**   So you can speak as to some questions, but not to others?

20           **MR. GILBERT:**  Overbroad.  Speculation.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  I'm a management employee for the

23   Auditor-Controller/Clerk-Recorder agency, so I can speak on

24   items that I'm personally familiar with in that role.

25       If you ask me why the County has a specific policy or

1  something broader than that, that would be beyond the agency.

2  That would be the County as a whole, which is run by the Board

3  of Supervisors.

4  **BY MS. STONER:**

5  **Q.**   Did you just speak on behalf of the CRO with regard to

6  Government Code 27203(d)?

7  **A.**   Yes.

8  **Q.**   And could you do so with regard to the Americans with

9  Disabilities Act?

10  **A.**   To the best of my ability.

11  **Q.**   Okay.  So the testimony that you gave today, is there

12  anything that would change if you were testifying more

13  expressly on behalf of the County from your personal opinion?

14       **MR. GILBERT:**  Speculation.  Overbroad.

15       **THE COURT:**  Sustained.

16  **BY MS. STONER:**

17  **Q.**   Okay.  Is there any -- is there any question that I asked

18  about the ADA that you would have answered differently if I had

19  asked you in the framework of are you testifying that it's

20  the County's position --

21       **MR. GILBERT:**  Speculation.

22  **BY MS. STONER:**

23  **Q.**   -- rather than your personal position?

24       **THE COURT:**  I'm going to sustain that.

25  \\\

**BY MS. STONER:**

**Q.**   Okay.  The accessible kiosks that you've talked about when your counsel was questioning you, were any of those in place during Ms. Martinez's visit?

**A.**   The kiosks were all set up and have been for well over a decade.  What level of accessibility they have, that has changed over time.

**Q.**   Okay.  And were all of those new accessibility features that you discussed, such as JAWS and the Customer Service Unit, did those all come into place well after 2019?

**A.**   No.  Customer Service Unit came into play well beyond my employment with the County.  It's been one of our functional units.

**Q.**   So it's your position that Ms. Martinez experienced the Customer Service Unit?

**A.**   In part of her visit.  Most people interact with more than one unit.  They start with the Customer Service Unit, and then they proceed to another unit.

So in this case, likely she interacted with our Customer Service Unit when she first came in, and then she interacted with our Vitals General Business Unit when she tried to complete her transaction for filing her fictitious business name statement.

**Q.**   Okay.  With regard to effective communication between Ms. Martinez and the County on March 29th, 2019, you conducted

1    an inquiry as to whether there was effective communication?

2    A.   Yes.

3    Q.   And did your inquiry conclude that there was effective

4    communication between Ms. Martinez and the CRO employees

5    without any auxiliary aids or services?

6    A.   Yes.

7    Q.   And what was the basis of that conclusion?

8    A.   The basis of the conclusion is that we were able to

9    understand what it is that Ms. Martinez wanted to accomplish in

10   the office and we were able to communicate effectively back --

11   our employees were able to communicate effectively back to

12   Ms. Martinez the issues with the form that she was trying to

13   submit, and that whole communication back and forth was

14   effective.

15   Q.   Did you ever analyze communication via written form

16   between Ms. Martinez and the County during that inquiry?

17            MR. GILBERT:  Vague as to which communication was by

18   written form.

19            MS. STONER:  We'll back up.

20            THE COURT:  Overruled.

21   BY MS. STONER:

22   Q.   Okay.  Go ahead.

23   A.   I'm not aware of Ms. Martinez writing things down aside

24   from the actual form itself.

25   Q.   Okay.  So if I write something on a piece of paper and

1  pass it to you in written format, do you agree that that's a

2  communication from me to you?

3  **A.**   Yes.

4        **MR. GILBERT:**  Incomplete hypothetical.

5        **THE COURT:**  Overruled.

6  **BY MS. STONER:**

7  **Q.**  And if -- if Ms. Martinez writes something on the form and

8  hands it to a clerk-recorder, is it your understanding that

9  that is a written communication between Ms. Martinez and the

10 clerk-recorder?

11       **MR. GILBERT:**  Incomplete hypothetical.

12       **THE COURT:**  Overruled.

13       **THE WITNESS:**  I'm not sure I necessarily agree, and

14 I'll tell you why.

15       Because Business and Professions Code 17900 speaks to

16 the -- what the goal of a fictitious business name statement

17 is.  It's not a communication to the County.  We don't do

18 anything with the form, which I tried to explain earlier in my

19 testimony.  Whereas for a marriage license form, you are

20 communicating something to us.  You're communicating

21 information we need to issue you a marriage license.

22       Or to put it in a different perspective, let's say you go

23 to the library and you ask for a library card, submit -- you

24 know, you need an application for a library card.  Well, you're

25 telling the library what it is you need.  But every book that

YANKEE - REDIRECT / STONER

1    is published that's on the shelves of the library, that's not a

2    communication from the author to the library.  That's to the

3    general readership.

4         So we act as like a bulletin board, and that's, you know,

5    a virtual or a recorded bulletin board -- right? -- for

6    statements.  And so the fictitious business name statement

7    is -- we're just facilitating the public availability of it,

8    but it's really a communication to members of the public, not

9    to us.

10   BY MS. STONER:

11   Q.   Like a bulletin board?

12   A.   Right.

13   Q.   Anyone can post anything on the bulletin board?

14   A.   Within general parameters.

15   Q.   Well, the County -- if the County is like a bulletin

16   board, would the County allow just any posting to go up, or

17   would they require certain things to occur before they would

18   allow the posting to be made?

19        MR. GILBERT:  Vague.  Overbroad.  Incomplete

20   hypothetical.

21        THE COURT:  Overruled.

22        THE WITNESS:  It would depend on the -- if you're

23   saying a bulletin board like, let's say, we happen to have a

24   bulletin board in the lobby, I would imagine that the County

25   may have policies that say you can't put hate speech, you can't

1    put pornography.   There are certain things that wouldn't be

2    allowed.

3         In the case of a fictitious business name form, there's a

4    later Business and Profession Code -- I want to say it's

5    Business and Profession Code 17910, but I might be off on the

6    end numbers -- that says that there's certain things that

7    the County clerk cannot accept for filing if there's an error

8    on it.  So that would make us have to reject it.

9         But, broadly speaking, we don't care about the substance

10   of the fictitious business name statement.  For instance, if

11   Ms. Martinez and another member of the public both tried to

12   file a fictitious business name statement for the same business

13   name, that's not something we would reject one way or the other

14   since we don't look at the substance in that regard.

15   BY MS. STONER:

16   Q.   But we just looked at the Go Back Letter, if you'll recall

17   that exhibit that had all those check boxes.

18   A.   Mm-hmm.

19   Q.   So was the County refusing to accept Ms. Martinez's form

20   for the reasons that were stated on those check boxes --

21   A.   Yes.

22   Q.   -- we reviewed?

23        And the County -- was Ms. Martinez able to modify her form

24   in a way that communicated with the County that would allow

25   Ms. Martinez to pass through the County's filtering system?

1          MR. GILBERT:  Vague.  Speculation.  Foundation.

2          THE COURT:  Overruled.

3          THE WITNESS:  Obviously, she was not successful that

4    day.  But, again, that's not something that we would fix on a

5    pre-completed form.

6    BY MS. STONER:

7    Q.   Okay.  To give another example, so suppose there is an

8    online posting space, something kind of like maybe Craigslist

9    was back in the day.  So if Ms. Martinez was unable to make a

10   post because it wasn't accessible to her, do you agree that she

11   would have been unable to communicate through the County?

12         MR. GILBERT:  Vague as to "communicate."

13         THE COURT:  Sustained.

14   BY MS. STONER:

15   Q.   Okay.  To ask another way, Ms. Martinez was unable to file

16   her form and communicate with the broader audience of

17   the County of Alameda?

18   A.   With the public, correct.

19   Q.   With the public.

20   A.   Yes.

21   Q.   And the reason that she was unable to do so is because

22   the County reviewed her form and found inadequacies?

23   A.   Correct.

24   Q.   And the reason that she was unable to change the form or

25   submit a new form that addressed those inadequacies was because

1    of her difficulty communicating in writing the changes

2    the County wanted, to the County?

3    **A.**   Well, she had a difficulty putting them on the form.  You

4    use the term "the County wanted" as if this is something that

5    we want or don't want.  It's a state law that we shall not

6    accept it if there's certain deficiencies.  It has really

7    nothing to do with what we want or don't want.

8    **Q.**   Okay.  But Ms. Martinez was attempting to communicate

9    items addressing the deficiencies identified by the County via

10   a written form?

11   **A.**   Can you re- -- repeat that?

12   **Q.**   Yes.  So the County had identified some deficiencies.

13   Ms. Martinez was attempting to remedy those deficiencies on a

14   printed form so that the County could then again review the

15   form; is that correct?

16           **MR. GILBERT:**  Speculation as Ms. Martinez's intent.

17           **THE COURT:**  Overruled.

18           **THE WITNESS:**  My understanding is that is what she

19   wanted to accomplish.

20   **BY MS. STONER:**

21   **Q.**   Okay.  And when you assessed whether there was effective

22   communication, you never assessed whether a person who is blind

23   is able to effectively complete written forms in a manner that

24   addresses concerns raised by the County that prevent the form

25   from being filed?

1  **A.**   Is that a statement or a question?  I don't under- --

2  where's the question in there?

3         **MS. STONER:**  Could you read back the question.

4      (Record read as follows:

5         "QUESTION:  And when you assessed whether

6         there was effective communication, you never

7         assessed whether a person who is blind is able

8         to effectively complete written forms in a

9         manner that addresses concerns raised by

10        the County that prevent the form from being

11        filed?")

12 **BY MS. STONER:**

13 **Q.**   New question.

14     When you assess whether there is effective communication,

15 did you ever assess whether the County was able to receive

16 information from a person who is blind via the written form?

17 **A.**   I think our investigation focused on whether or not staff

18 appropriately rejected Ms. Martinez's request to modify an

19 existing form; and that, as I've stated before, complies -- is

20 an action we have to take due to a state law.

21     You know, I understand that the assertion being made is

22 that somehow conflicts with the ADA, and probably, largely,

23 that's why we're all here, is because there may be some

24 ambiguity in that.

25     But we maintain that the actions we took were to prevent,

1  you know, any of our employees from facing criminal liability

2  for modifying a form in violation of Government Code 2720 --

3  27203, Subsection (d).

4  **Q.**   And regarding your inquiry, was there ever any assessment

5  of whether there was effective communication via the online PDF

6  in 2019?

7          **MR. GILBERT:**  Vague.

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  I don't believe at that time we did any

10  real research into the PDF at that time.

11  **BY MS. STONER:**

12  **Q.**   Okay.  And if -- based on your inquiry on March 29th,

13  2019, did anybody reach out to the ADA coordinator to obtain

14  advice on that day?

15          **MR. GILBERT:**  Speculation.

16          **THE COURT:**  Yeah.  Sustained.

17  **BY MS. STONER:**

18  **Q.**   Okay.  In your inquiry, did you ask if the ADA coordinator

19  was contacted on March 29, 2019, regarding Ms. Martinez's

20  request?

21  **A.**   Honestly, I don't recall.

22  **Q.**   You don't recall whether you inquired?

23  **A.**   I don't recall whether I inquired.

24  **Q.**   So you're not even sure you inquired as to whether the ADA

25  coordinator was contacted on March 29, 2019, or not?

**YANKEE - REDIRECT / STONER**

1   A.   That's correct; I don't recall.

2   Q.   Okay.  Now, you discussed a little bit that Ms. Martinez

3   was offered same-day expedited services by mail; is that

4   correct?

5   A.   Right.  Expedited services by mail.

6   Q.   Is that --

7   A.   That we would do it as soon as we can, based on delivery

8   of the mail.

9   Q.   Is that something that was part of your inquiry on

10  March -- regarding March 29, 2019?  Is the information you

11  obtained regarding the expedited service request part of your

12  inquiry for March -- on what happened on March 29, 2019?

13  A.   Did I learn about that at the time of my inquiry?

14  Q.   Yes.

15  A.   I don't recall if I learned about it then or at what point

16  I learned that that was something that was offered to her

17  initially.

18       I know I heard it just the other day when we played the

19  audio recording.  And that's what expedited service is, is

20  that, on occasions, when staff offers that to employees, they

21  can expedite if they put, you know, attention to a specific

22  staff member, we'll make sure that they take care of that right

23  away as if it was essentially an in-person transaction versus

24  sitting in the backlog that may or may not exist of mail.

25  I think at the time it was probably about a two- to three-week

1   backlog of mail.

2   **Q.**   But as you sit here today, you're not testifying that when

3   you performed the inquiry regarding the events of

4   March 29, 2019, at that time you felt confident Ms. Martinez

5   could have received expedited service?

6   **A.**   Are you asking if I was personally aware --

7   **Q.**   Right.

8   **A.**   -- that that was offered to her?

9        I don't recall if I was made personally aware of that or

10  not.

11  **Q.**   Okay.  And did I hear you say that some CRO policies are

12  written in law?  I'm sorry.  Are -- please let me rephrase the

13  question.

14       Did I hear you say that some CRO policies are written?

15  **A.**   Some would be.

16  **Q.**   Okay.  But not the one we're talking about today?

17  **A.**   Correct.

18  **Q.**   Is "filed" different from "recorded"?

19  **A.**   It's essentially the same thing.  Just the context of the

20  type of document oftentimes.

21  **Q.**   Okay.

22  **A.**   It's essentially they're putting them into our official

23  record.  So we issue a unique identification number so that

24  that one document can be identified either by number, and then

25  we index that document and image it so that it's in our system.

1   So it's the same process if you want to call it "file" or

2   "recorded."

3   Q.   Okay.  The document that Ms. Martinez had on March 19th --

4   or March 29, 2019, did it have a unique file number on it?

5   A.   It did not.

6   Q.   And when you say "recorded," is that referring to a

7   specific type of document that's different from an FBNS form?

8   A.   It's used in different contexts.  I think they might

9   record a certified copy of a birth certificate, might, say,

10  record a real estate instrument; but the process through the

11  system is the same where we index it, image it, and assign a

12  unique identification number to the document.

13  Q.   So is it fair to say that on March [sic] 31st, 2019, when

14  Ms. Martinez's document was filed and received a unique number,

15  that it was a recorded document as of that day?

16  A.   As, I'm sorry, of the May?

17  Q.   May 31st.

18  A.   Yeah.  Filed/recorded, yes.  It was part of our system.

19  Q.   It was a recorded document?

20  A.   Yeah.  But when it was in March, it never received that --

21  that file number.

22  Q.   Okay.  And do you understand Government Code 27203(d) to

23  apply to records?

24  A.   To apply to records?

25  Q.   Yes.

YANKEE - REDIRECT / STONER

1  **A.**    Yes.

2  **Q.**    Okay.  You used the phrase "undue burden."  Are you aware

3  that that has a specific definition relating to the ADA?

4  **A.**    Did I use the phrase "undue burden"?  I don't recall, but

5  I may have.

6  **Q.**    If you used the phrase "undue burden," were you intending

7  to use it in regard to the specific definition it has under the

8  ADA?

9  **A.**    Again, I don't --

10 **Q.**    Let's back up.

11 **A.**    -- recall saying "undue burden."

12 **Q.**    Okay.  Are you aware -- do you understand the phrase

13 "undue burden" has a specific technical meaning under the ADA?

14         **MR. GILBERT:**  Objection.  Relevance.  403.  Exceeds

15 the scope of direct.

16         **THE COURT:**  Sustained.

17 BY MS. STONER:

18 **Q.**    When an FBNS document is rejected, it is not deposited;

19 correct?

20         **MR. GILBERT:**  Vague.  Incomplete hypothetical.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  I would say when it's rejected, it would

23 be -- the best way I would say is it's undeposited.  It was

24 deposited and it no longer is after it's rejected.

25 \\\

1  BY MS. STONER:

2  Q.   Does the word "undeposited" appear anywhere in Government

3  Code 27203?

4  A.   I don't believe the term "undeposited" does, with the

5  prefix.

6  Q.   Okay.  Is a blank unsigned form deposited?

7  A.   A blank unsigned form deposited?  No.

8  Q.   Okay.  Are you claiming that there was an undue burden for

9  the CRO to provide Ms. Martinez the service she requested?

10 A.   What I specifically stated was that I believe that the

11 service that she requested, which is to have us modify a

12 completed form, would be in violation of Government Code 27203,

13 Subsection (d), and that's the primary reason why that service

14 could not be completed by our staff that day.

15 Q.   So the reason the service couldn't be completed by the

16 staff that day was not because it would pose an undue burden to

17 do so?

18 A.   Right.  The focus of the investigation was on that

19 specific state law.  We didn't have to get into other secondary

20 or tertiary reasons why we couldn't perform the function.

21 Q.   Okay.  And the computer kiosk with JAWS was not available

22 on March 29th, 2019; correct?

23 A.   The computer kiosk was.  With JAWS, it was not.  JAWS was

24 not loaded onto that kiosk, but the kiosk existed otherwise.

25 Q.   The kiosk existed for members of the general public, but

1   the dedicated kiosk for -- specifically for those with

2   disabilities did not exist on March 29th, 2019; correct?

3   **A.**    Correct.  It was not specifically designated, but

4   obviously, it was broadly available.

5   **Q.**    Okay.  And the same question as to May 31st, 2019.

6   **A.**    Correct.

7   **Q.**    And you're not -- are you telling the jury today that it

8   is illegal for a clerk to write on a blank FBNS form?

9   **A.**    I don't believe I said that.

10           **MR. GILBERT:**    Asked and answered.

11           **THE COURT:**    Overruled.

12           **THE WITNESS:**    I said that we can't modify a completed

13   form.  I don't believe I ever said it was illegal for us to

14   fill out a blank form.

15   **BY MS. STONER:**

16   **Q.**    Okay.  And you're not telling the jury today that it's

17   illegal for a third party to write on a completed FBNS form,

18   are you?

19   **A.**    What I've stated before is that we interpret Government

20   Code 27203, Subsection (d), to apply to our staff.  Now,

21   whether or not there are other laws that would preclude

22   individuals from making adjustments, edits, modifications to a

23   legal form that's been signed under penalty of perjury, that

24   may -- very well may exist or may not exist, but that's beyond

25   our scope.  We care about what our employees and our

 1  representatives do.  So I can't comment whether that is or is

 2  not illegal.  I wouldn't know.

 3  **Q.**   Okay.  But you have no reason to believe that it is

 4  illegal, as you said?

 5  **A.**   I said I wouldn't know one way or -- I mean, it -- I mean,

 6  common sense would make me think that, you know, there may be

 7  concerns with someone making adjustments to a signed and

 8  completed form.  I mean, obviously, if there's contractual

 9  documents, checks, other things that are signed and you had

10  people changing, you know, a written instrument after it's been

11  executed, that could be a concern.

12      But, again, that's all beyond what occurred in our office

13  that day.  We specifically had that Government Code that we

14  rely on for the conduct of our employees.

15          **MS. STONER:**  Thank you.

16      Just one moment, please.

17              (Pause in proceedings.)

18  **BY MS. STONER:**

19  **Q.**   Okay.  Two weeks from now, if Ms. Martinez walks into the

20  CRO with an FBNS, would the CRO be willing to assist her in

21  completing it if she's unable to do so?

22          **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

23          **THE COURT:**  Yeah.  Sustained.

24  **BY MS. STONER:**

25  **Q.**   If Ms. Martinez walks into the CRO two weeks from now,

1  will the County agree to fill out a blank unsigned paper FBNS

2  form for her if needed to renew her FBNS?

3          **MR. GILBERT:**  Speculation.  Incomplete hypothetical.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  As I stated, it would be a case-by-case

6  basis.  It would be within the realm -- a blank one, it would

7  be within the realm of possibilities.

8      Again, our general policy would be not to do so; but in

9  evaluating her specific circumstances at that hypothetical

10 visit, that's potentially something that we could offer.

11 **BY MS. STONER:**

12 **Q.**  Did any clerks offer to transcribe information onto a

13 blank FBNS form for Ms. Martinez back on March 29th, 2019?

14          **MR. GILBERT:**  Speculation and foundation.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I'm not aware of that being either asked

17 for as an option or offered as an option.

18          **MS. STONER:**  Okay.  Thank you.

19     No further questions.

20          **THE COURT:**  Does defendant have any further questions

21 for the witness?

22          **MR. GILBERT:**  No, Your Honor.

23          **THE COURT:**  Thank you.  You may step down from the

24 witness stand.

25                      (Witness excused.)

1          **THE COURT:**  At this point, we will take our lunch

2     break for about 45 minutes.

3        And I'll ask my courtroom deputy to bring the jurors to

4     the jury room.

5       (Proceedings were heard out of the presence of the jury.)

6          **THE COURT:**  Is there anything plaintiff would like to

7     discuss outside the presence of the jury before the next

8     witness?

9             **MR. ELDER:**  Yes, Your Honor.

10       Just while it's fresh in everyone's memory, I believe

11    Mr. Gilbert widely opened the door to the testimony of Eve Hill

12    in his direct examination of Mr. Yankee.

13        Within the first four minutes of his opening questions, he

14    asked Mr. Yankee his opinion of whether the County had complied

15    with the ADA and whether effective communication had been

16    achieved.  That was opinion testimony, and we wish to rebut it

17    with Ms. Hill's disclosed testimony about effective

18    communication and how counties step by step go through this

19    process.

20          **THE COURT:**  What portions of her disclosed opinions do

21    you believe would be that rebuttal?

22          **MR. ELDER:**  Yes.  There's a portion about the

23    effectiveness of how -- how a County looks at effective

24    communication and the process for that.

25        I believe Mr. Gilbert also asked Mr. Yankee if he believed

**PROCEEDINGS**

 1  any other auxiliary aids were necessary or legally required;

 2  and in this case, a transcriber may have been an auxiliary

 3  aid -- an additional auxiliary aid that was necessary because

 4  it's commonly given in these types of situations.

 5      So I would suggest that a review of the transcript would

 6  show that it is both the opinion that auxiliary aids are

 7  common -- that transcribers are a common form of auxiliary aid,

 8  and it's also some of the testimony in the third and fourth

 9  categories of her opinion dealing with effective communication

10  and how governments analyze that process.

11          **THE COURT:**  How would the County like to respond?

12          **MR. GILBERT:**  So I think we need to respond to a few

13  points.

14      First, I'll refer the Court to Ms. Hill's actual depo

15  transcript of her actual testimony, and we've lodged the

16  original.  At page 126, line 5 through 10, the question is (as

17  read):

18      **"QUESTION:**  So you would say you're not really expressing

19      affirmative opinions in this matter.  Your opinions are

20      more that Mr. Vaughan is wrong.  Is that a -- is that

21      accurate?

22      **"ANSWER:**  My opinion is that Mr. Vaughan has not

23      demonstrated that his opinion is supported."

24      That was Ms. Hill's exact testimony, first of all, and

25  that is the context by which her opinions need to be evaluated,

 1    under her own admission, responding to Mr. Vaughan.  That's the

 2    first point.

 3         The second point, the County did not open the door.  We

 4    objected to any line of questioning during Mr. Yankee's

 5    testimony on multiple occasions that those were inappropriate

 6    legal questions about what the ADA requires and what

 7    the County -- how it interprets the ADA and its obligations.

 8    The Court consistently overruled the County's objections to

 9    that.

10         Plaintiff opened that door, not the County.  We responded

11    to the questions posed by plaintiff.  Plaintiff cannot ask a

12    question, raise an issue, and then when the County responds to

13    the issue raised by plaintiff and defends itself, then say

14    the County has somehow waived an argument or opened a door.

15    That is absolutely not what the law provides.  And nor does any

16    of this trigger anything that would justify rebuttal opinion

17    from Ms. Hill, whose sole purposes was to address Mr. Vaughan.

18         And, again, that's at page 126, line 5 through 10, and I

19    would encourage the Court to actually open the transcript and

20    read that.

21         **THE COURT:**  Would plaintiff like to respond?

22         **MR. ELDER:**  Yes.

23         So that was a soundbite in deposition, and she didn't say

24    she didn't have any other opinions.  She said -- she just

25    expressed her opinion involving Mr. Vaughan.

1    Second, if you look at her disclosed report, which is the

2    full disclosure of her opinions in this matter that she was

3    offering, it's beyond Mr. Vaughan.  It deals with whether a

4    transcriber can be an auxiliary aid and how common it is for

5    government entities to use it, and she expressed opinions about

6    some of the procedures that government entities do when dealing

7    with an effective communication analysis.

8         **THE COURT:**  Well, regardless of which side asked the

9    questions, I don't believe that Mr. Yankee provided any

10   testimony about whether scribes are common or not common

11   auxiliary aids provided by Title II entities.  I'll take a look

12   at the remainder of her report.

13       If you want to be able to call Ms. Hill in rebuttal, then

14   I would like -- if plaintiff wants to do that, I would like you

15   to file something that directly lines up portions of

16   Mr. Yankee's testimony with the paragraphs in her disclosed

17   opinions.

18       There is the outstanding issue, which is under Rule 26,

19   whether you can have a rebuttal expert rebut lay witness

20   testimony.  The language of the rule suggests no; but if you

21   think you can, you should put in some legal authorities about

22   that as well.

23       **MR. ELDER:**  Okay.  Thank you, Your Honor.

24       I don't think this will happen today but -- because we

25   don't have the transcript until later this evening, but we

**PROCEEDINGS**

 1   can -- we will aim to do this tomorrow.

 2          **THE COURT:**  Okay.  Thank you.

 3      And, obviously, the County can file a response.

 4      Anything that the defendant would like to raise outside

 5   the presence of the jury before we have the next witness?

 6          **MR. GILBERT:**  No, Your Honor.  Thank you.

 7          **THE COURT:**  All right.  Thank you, Counsel.

 8   We will take a recess and come back in about 45 minutes.

 9          **MR. ELDER:**  I'm sorry.  Did you say 30?

10          **THE COURT:**  What?

11          **MR. ELDER:**  30 minutes?

12          **THE COURT:**  I meant to say 45 minutes.

13          **MR. ELDER:**  45.  Okay.  Thank you.

14              (Luncheon recess taken at  12:25 p.m.)

15   **Afternoon Session**                          **1:25 p.m.**

16      (Proceedings were heard out of the presence of the jury.)

17          **THE COURT:**  Good afternoon, everyone.  Please be

18   seated.

19          **THE CLERK:**  All right, everyone, good afternoon.

20      Recalling 20-6570, Martinez vs. the County of Alameda,

21   et al., the Honorable Thomas S. Hixson presiding.

22      Go right ahead, Judge.

23          **THE COURT:**  At this time, I'll ask my courtroom deputy

24   to bring the jury back into the courtroom.

25      (Proceedings were heard in the presence of the jury.)

**GRECO - DIRECT / ELDER**

 1          **THE COURT:**  Good afternoon, everyone.  Please be

 2   seated.

 3       Plaintiff, please call your next witness.

 4          **MR. ELDER:**  Your Honor, plaintiff calls Lucy Greco.

 5       May Ms. Korosy bring her to the courtroom?

 6          **THE COURT:**  Yes.

 7          **MR. ELDER:**  Okay.

 8    (Witness enters the courtroom and steps forward to be sworn.)

 9          **THE COURT:**  And if you would escort her to the witness

10   stand, that would be appreciated.

11                      (Pause in proceedings.)

12          **THE CLERK:**  Ms. Greco, I am the Courtroom Deputy, and

13   I'm going to swear you in.  So if you could raise your right

14   hand, please.

15                      **LUCIA GRECO,**

16   called as a witness for the Plaintiff, having been duly sworn,

17   testified as follows:

18          **THE WITNESS:**  I do.

19          **THE CLERK:**  Thank you.  You have been sworn.

20                   **DIRECT EXAMINATION**

21   **BY MR. ELDER:**

22   **Q.**    Good afternoon, Ms. Greco.

23   **A.**    Good afternoon.

24   **Q.**    Could you please speak your full legal name for the

25   record?

**GRECO - DIRECT / ELDER**

1   **A.**   Sure.   My legal name is Lucia Greco.

2   **Q.**   And where do you reside?

3   **A.**   I live in Berkeley.

4   **Q.**   Are you blind?

5   **A.**   Yes, I am totally blind.

6   **Q.**   And when you say "totally blind," what do you mean?

7   **A.**   I have no light perception and no usable vision.

8   **Q.**   And are there degrees of blindness?

9   **A.**   Many, many, many different degrees.

10  **Q.**   Okay.   How are you currently employed?

11  **A.**   I am a digital accessibility expert for the University of

12  California.

13  **Q.**   And are you associated with a particular campus or

14  UC-wide, or what is the nature of your position?

15  **A.**   My primary campus is Berkeley, but my role expands across

16  the entire University of California.

17  **Q.**   Do you operate a small business in addition to your

18  full-time day job?

19  **A.**   Yes.   I have a small consulting business.

20  **Q.**   And in December of 2022, did you determine that you had a

21  need to file what was known as an FBNS form with the

22  County of Alameda?

23  **A.**   Yes.

24  **Q.**   And did Ms. Martinez's counsel contact you and ask you to

25  share any experiences that you might have with filing the FBNS

1    form at the Oakland Clerk-Recorder's Office?

2    A.    Yes.

3    Q.    And did you, in fact, go to the Oakland Clerk-Recorder's

4    Office on approximately December 15th, 2022, to file an FBNS

5    form for your business?

6    A.    Yes, I did.

7    Q.    Now, when you first arrived at the CRO or the

8    Clerk's Office, what did you do?

9    A.    When I located the right part of the office to go to, I

10   approached the desk.  Because it was a fairly empty time, I was

11   able to go directly to the desk and requested the form.

12   Q.    And what did you say?

13   A.    I told them I would need the FBNS, and they handed me the

14   form on a thing.  And I said, "Would I be able to get some

15   assistance to fill this form out," as I was not able to fill it

16   out independently.

17   Q.    And so you asked for assistance.  Did they offer to do

18   anything for you?

19   A.    Yes.  She said to hold on a minute and she would be -- she

20   would give me a hand.

21   Q.    And did she offer to do anything more specific after that?

22   A.    She proceeded to ask me the questions on the form and

23   start filling it out until we got to one question I wasn't

24   certain of the answer to.

25   Q.    So as to writing on this blank FBNS form, this act of

 1  transcribing where you were speaking answers and she was

 2  writing things down --

 3  **A.**   Correct, yes.

 4  **Q.**   -- did she offer that first, or did you ask for that

 5  first?

 6  **A.**   I asked for assistance, and she said, "One moment.  I'll

 7  give you a hand."

 8  **Q.**   So you asked for assistance generally?

 9  **A.**   Correct, yes.

10  **Q.**   And then she offered to write and transcribe the

11  information you spoke onto the form; is that right?

12          **MR. GILBERT:**   Objection.   Leading.

13          **THE COURT:**   Sustained.

14          **THE WITNESS:**   I asked for assistance --

15          **THE COURT:**   Wait.

16     You need to rephrase the question.

17          **MR. ELDER:**   Yeah.

18  **Q.**   Did you -- your first inquiry of them, did you -- did you

19  specifically ask for assistance with transcribing information

20  you spoke onto the paper form?

21  **A.**   I believe my actual request was "Can I get some assistance

22  filling this out, please, as I am not able to see the form and

23  I am not able to write on the form?"

24  **Q.**   And did she then offer to transcribe the information onto

25  the form for you?

**GRECO - DIRECT / ELDER**

1  A.    Her words were she would help me.

2  Q.    Okay.  Did the clerk there at the counter listen to the

3  words that you were speaking?

4  A.    Yes.

5  Q.    And did she then write down those words onto the paper?

6  A.    Yes.

7  Q.    I think you mentioned you had to make a call to verify

8  some information; is that right?

9  A.    Correct.  I wasn't aware of what type of business I was

10  requiring, so I needed to check with my husband what we put on

11  our taxes.

12  Q.    And did you then return to the counter to finish your

13  form?

14  A.    Correct, yes.

15  Q.    So that whole process of speaking information, then

16  writing it down, you asking your husband for some information,

17  then coming back to the counter, about how long would you

18  estimate it took for you to transcribe all of the information

19  onto your paper form?

20  A.    At most, 15 minutes or less.

21  Q.    And specifically, that process of just -- not the complete

22  filing of the form, but just that step of transcribing

23  information onto the paper form, listening to it, that exchange

24  of filling out the form, how much time would you estimate that

25  step took?

**GRECO - DIRECT / ELDER**

1 **A.**   That's -- that portion, I think, took probably 10 to

2 15 minutes, like I said.

3 **Q.**   Okay.  Did you encounter more than one clerk that day in

4 this process of going through your form?

5 **A.**   Yes.  When I returned to the counter after making my phone

6 call, there was another clerk there.  And I indicated that I

7 had been working with a lady, and the gentleman said, "One

8 moment," and the lady came back and said, "I'll help you finish

9 now."

10 **Q.**   Did anyone ever interrupt the process and say that this

11 shouldn't continue?

12 **A.**   No, in no way.

13 **Q.**   Do you recall signing a declaration in this case?

14 **A.**   The only signature I recall was when I went over to the

15 other side of the building to actually file the form.

16 **Q.**   Apologies.  Do you recall in this litigation that --

17 **A.**   Oh.

18 **Q.**   -- you signed a declaration, which is testimony under oath

19 in writing?

20 **A.**   Oh, about this -- about these incidences, yes, I did.

21 **Q.**   And do you recall in your declaration stating that you

22 estimated that the --

23         **MR. GILBERT:**  Objection.  Hearsay.

24         **THE COURT:**  Yeah.  Sustained.

25 \\\

1    BY MR. ELDER:

2    Q.    Ms. Greco, do you recall another occasion stating that it

3    only took five minutes --

4                MR. GILBERT:    Objection.    Hearsay.

5    BY MR. ELDER:

6    Q.    -- to work with the clerk --

7                THE COURT:    Sustained.

8    BY MR. ELDER:

9    Q.    -- to fill out the form?

10               THE COURT:    Sustained.

11   BY MR. ELDER:

12   Q.    How confident you are -- how confident are you, sitting

13   here today, Ms. Greco, that 10 to 15 minutes was the correct

14   estimate of the time it took back in December of 2022?

15   A.    I am -- I mean, I -- it was a long time ago.    I'm not

16   100 percent confident that it was 10 to 15, which is why I'm

17   saying 10 to 15; but from approaching the desk to walking over

18   to the other side was 10 to 15 minutes.

19   Q.    When you say "walking to the other side," what does that

20   mean?

21   A.    That's where I went to actually process the paperwork and

22   submit it to the actual Clerk's Office.

23   Q.    Aah, I see.

24          So if we removed that portion of the time from when you

25   left that first counter to actually go, like, file the form and

1  pay, let's talk just about the time when you were at the

2  check-in counter completing the information in the form.

3      How much time would you estimate that -- just that segment

4  of time there at the check-in counter completing that form, how

5  much time do you estimate that took?

6  **A.**    Between the both times when I was speaking to the woman,

7  that would be about five minutes.

8  **Q.**    Okay.  Thank you.

9      And I think you said -- did it -- you engaged with a few

10 people that day between the check-in counter and then the

11 filing counter where you paid your money and got your

12 paperwork; is that right?

13 **A.**    Correct, yes.

14 **Q.**    And did anyone ever stop and suggest that something --

15 that they shouldn't be helping you transcribe your information

16 onto your form?

17 **A.**    Absolutely not.

18 **Q.**    Okay.  Were you able to verify that the information that

19 you had verbally dictated to them on the form was correct?

20 **A.**    Yes.

21 **Q.**    How did you do that?

22 **A.**    Once I was over at the side where the actual clerk's desk

23 was to file it, it was read back to me, and I confirmed that

24 that was correct.

25 **Q.**    And did you feel comfortable that you had verified

**GRECO - DIRECT / ELDER**

1  sufficient for you to sign under penalty of perjury that the

2  information was accurate?

3  **A.**  Absolutely.

4  **Q.**  Okay.  And after you had verified the accuracy of the

5  information transcribed onto your form, to the extent you were

6  content with it, did they assist you in putting your signature

7  onto the form?

8  **A.**  Yes.  I requested that they help me find the spot with my

9  hand, and I signed with my -- I signed, myself, on the form.

10 **Q.**  Did you pay your filing fee?

11 **A.**  Yes, I did.  I paid it in cash.

12 **Q.**  And were you able to file your FBNS form on that same day

13 that you arrived at the Clerk's Office?

14 **A.**  Absolutely.

15 **Q.**  Were you happy with the service that you received that

16 day?

17 **A.**  Yes.

18 **Q.**  Were there any problems?

19 **A.**  No.

20 **Q.**  Now, if the County had an electronic version of the FBNS

21 form on a computer with the JAWS screen reader there in the

22 CRO, would you have preferred to use that option instead of the

23 service that you received from the human clerk?

24 **A.**  No.

25 **Q.**  And why is that?

1    **A.**    I've been in technology an awful long time.  I know what

2    can go wrong with technology.  I know how difficult it is to

3    create an accessible version of a form.  My entire life I have

4    depended on scribes and scribing for things that are important.

5    You know, going through college and exams, I used scribes.  I

6    am much more comfortable getting something scribed in the way I

7    did.

8    **Q.**    Does the time -- does the amount of time that it takes to

9    complete a form in one method or another matter to you?

10   **A.**    Absolutely.

11   **Q.**    And how does it matter as to scribes versus filling it out

12   on a public computer kiosk?

13   **A.**    I think the time would, at the very least, triple to

14   quintuple, five times as hard getting the right file up,

15   getting to make sure that the field labels are correct, making

16   sure that it printed, frankly not knowing that the sheet I

17   printed out was the one that I actually had filled out, making

18   sure it's the right orientation, getting assistance to sign it.

19   It's just easier to use a scribe.

20   **Q.**    Okay.

21   **A.**    That's my opinion.

22        **MR. ELDER:**  Okay.

23   One moment.

24                    (Pause in proceedings.)

25        **MR. ELDER:**  Thank you, Ms. Greco.  I don't want to

1    take any more of your time today.

2        No further questions.  We'll pass the witness.

3            THE COURT:  Does defendant have any questions for the

4    witness?

5            MR. GILBERT:  Yes, please, Your Honor.

6            THE COURT:  Please go ahead.

7                        CROSS-EXAMINATION

8    BY MR. GILBERT:

9    Q.    Good afternoon, ma'am.  How are you?

10   A.    Good.  Thank you.

11   Q.    So I want to go back just for a second.

12       When did you head into the Clerk-Recorder's Office to

13   record your FBNS form?  Do you recall?

14   A.    If you're referring to actually submitting the

15   paperwork --

16   Q.    Yes, ma'am.

17   A.    -- that was approximately 2:15 that afternoon.

18   Q.    Would it -- do you recall approximately the month and

19   year?

20   A.    That would be December 15th, 2022.

21   Q.    Excellent memory.

22       And did you go to the County of Alameda's Clerk-Recorder's

23   Office to do this?

24   A.    I believe that was the office I was at, yes.

25   Q.    Now, when you went in, I think you mentioned that when you

1    first went in, you said that you wanted to complete a form for

2    an FBNS; is that right?

3    **A.**    Correct.

4    **Q.**    Did you have a pre-completed form when you went in?

5    **A.**    No, I did not.

6    **Q.**    Was there anything that you were asking the Clerk-Recorder

7    to modify or edit that you had completed before coming to the

8    office?

9    **A.**    No, I did not.

10   **Q.**    So when you came in, you didn't have a pre-completed form.

11   You were just asking for assistance in how to complete a new

12   form?

13   **A.**    Correct.

14   **Q.**    Did you find that the Clerk-Recorder's staff were helpful

15   to you?

16   **A.**    Absolutely.

17   **Q.**    Did you find that they were trying to accommodate you and

18   provide you with assistance?

19   **A.**    100 percent.

20   **Q.**    And were they polite in their interactions?

21   **A.**    Yes.

22   **Q.**    And did you find that you were able to complete the

23   services that you needed based upon the Clerk-Recorder's

24   programs and services that they made available to you at that

25   time?

1    **A.**    Yes.

2    **Q.**    And were you satisfied that you had received the services

3    that you needed and were able to complete your FBNS form at

4    that time without any problems?

5    **A.**    Yes.

6            **MR. GILBERT:**  Thank you very much.

7            **THE COURT:**  Does plaintiff have further questions for

8    the witness?

9            **MR. ELDER:**  One.

10                    **REDIRECT EXAMINATION**

11   **BY MR. ELDER:**

12   **Q.**    Just to clarify, Ms. Greco, the County clerk offered to

13   act as a transcriber for you; is that right?

14   **A.**    She offered to assist me, yes.

15           **MR. ELDER:**  Thank you.  No further questions.

16           **THE COURT:**  Any further questions from defendant?

17           **MR. GILBERT:**  Just a moment, Your Honor.

18                    (Pause in proceedings.)

19           **MR. GILBERT:**  No, Your Honor.  Thank you.

20           **THE COURT:**  All right.  Thank you, ma'am.  You can

21   stand down from the witness stand.

22       If you can please assist her, that would be appreciated.

23   Thank you.

24                    (Witness excused.)

25           **THE COURT:**  I would like to take a brief -- I would

**PROCEEDINGS**

 1   like to speak to the parties outside the presence of the jury.

 2        So I'll ask my courtroom deputy if you can bring the jury

 3   into the jury room.

 4        (Proceedings were heard out of the presence of the jury.)

 5        **THE COURT:**  Please be seated.

 6        I think I've been asking this question between each

 7   witness, but I just wanted to ask.  Is there anything plaintiff

 8   wants to address with me outside the presence of the jury

 9   before the next witness?

10        **MR. ELDER:**  Not before the next witness, Your Honor,

11   no.

12        **THE COURT:**  And does defendant have anything you'd

13   like to address with me before the next witness outside the

14   presence of the jury?

15        **MR. GILBERT:**  Yes, Your Honor.  We do have concerns

16   because these two witnesses, Ms. Greco and the other one is

17   Mr. Salsiccia, were supposedly to testify about the kiosk

18   system.  And the whole issue that the Court allowed them to

19   come in and testify was because the kiosk system was after the

20   fact and that they could not have provided testimony or been

21   disclosed properly in regards to their experiences with

22   the County because they occurred after the fact.

23        However, there was not one reference to the kiosk during

24   that examination, and the precipice that plaintiff represented

25   was why that witness was coming in was to discuss the kiosk.

**PROCEEDINGS**

1  So I do have concerns about that.

2      **THE COURT:** Does the County move to strike Ms. Greco's

3  testimony?

4      **MR. GILBERT:** No, but we would ask that the next

5  witness, Salsiccia, be excluded and not be allowed to come in

6  and testify.

7      **THE COURT:** Let me turn to plaintiff.

8    I believe that you did misrepresent to me what Ms. Greco's

9  testimony would be about in a way that was material, and I

10  would have excluded her as not timely disclosed if I had

11  realized this would be her testimony.

12      **MR. ELDER:** Well, Your Honor, she testified as to what

13  happened to her as compared to the computer kiosk system with

14  JAWS. And, like, if this is what happened to her when she went

15  down to file her FB- -- I believe the disclosure, that we

16  already went over this, was that it had to do with filing the

17  FBNS form. And their contention is that if someone comes down

18  to file an FBNS form, they're going to be directed to the

19  computer. They didn't do that in this occasion. So it is

20  connected to the process of being directed to the computer

21  kiosk.

22      **THE COURT:** Her testimony had nothing to do with the

23  new computer kiosk. Testimony like this about a paper form,

24  those witnesses had to be disclosed before the original close

25  of discovery by April 11th.

1    I reopened discovery explicitly limited, as to fact

2    discovery, as to the new kiosk that had been made available in

3    December of 2022, and her testimony was unrelated to that, and

4    you said it would be related to that.

5    Now, what is the deal with Ms. Salsiccia?  Is it going to

6    be the same, that she made no attempt to use the JAWS software?

7    **MR. ELDER:**  He -- it's the same situation; that he

8    went down there and they didn't let him use the JAWS software.

9    **THE COURT:**  She didn't say anything about being

10   prevented from using the JAWS software.  She didn't say

11   anything about attempting to use it.  And she explicitly said

12   that -- she was asked if there was such software, would she

13   have wanted to use it; and she said, no.  There was nothing in

14   her testimony concerning the JAWS software.

15   Is Mr. Salsiccia going to say the same thing, that he

16   never attempted to use the new kiosk, he didn't ask about it,

17   wasn't directed to it?

18   **MR. ELDER:**  His testimony will track Ms. Greco's same

19   sort of pattern, yes.

20   **THE COURT:**  Then I sustain the County's objection and

21   I exclude Mr. Salsiccia.  He was not a timely disclosed

22   witness.  And I believe that in persuading me otherwise,

23   I believe you misrepresented what his testimony will be.

24   Now that I've heard Ms. Greco's testimony and your

25   representation that his will be similar, this was not

PROCEEDINGS

 1    appropriate, Counsel.

 2              **MR. ELDER:**  Okay.

 3              **THE COURT:**  So I'm striking Salsiccia as not timely

 4    disclosed before the original close of fact discovery.

 5        Who is your next witness?

 6              **MR. ELDER:**  Can I --

 7              **MR. GILBERT:**  There is one quick issue before we call

 8    the next witness.

 9              **MR. ELDER:**  May I, Your Honor?

10              **THE COURT:**  Yes, go ahead.

11              **MR. ELDER:**  I mean, these witnesses, the facts that

12    they spoke to happened in December of '22 after the close of

13    fact discovery.

14              **THE COURT:**  Well, but events often do happen after the

15    close of fact discovery; but in order for the other side to be

16    able to take depositions and be prepared for trial, there has

17    to be an endpoint in evidence gathering.

18        And what you did here is you totally sprang a witness on

19    the defense at trial in a way that was prejudicial and unfair.

20    Now, they have decided not to move to strike with Ms. Greco's

21    testimony, but I'm not going to allow you to do that a second

22    time.

23              **MR. ELDER:**  That's fine.  We won't -- we'll withdraw

24    Mr. Salsiccia.  But everything she just said was in a

25    declaration submitted on summary judgment in December of 2022.

1    **THE COURT:**  That's eight months after the close of

2  fact discovery.  That's a hugely untimely disclosure.

3      And what did defendant want to raise?

4    **MR. GILBERT:**  When the jury comes in, would the Court

5  please provide a direction to the jury that -- just so they

6  understand that when we avoid them in the hallways, we're not

7  being rude; that the Court has advised that we cannot interact

8  with them?  Just the standard admonition.

9    **THE COURT:**  It is a standard admonition.  I will tell

10  them that.  Thank you.

11    **MR. GILBERT:**  Thank you.

12    **THE COURT:**  Who is plaintiff's next witness?

13    **MR. ELDER:**  We need to -- we need to locate Mr. Clark

14  in the building.  We thought Mr. Salsiccia was going next.  So

15  we will find Mr. Clark and bring him ASAP.

16    **THE COURT:**  Should we take a 15-minute recess?

17    **MR. ELDER:**  Yes, that would be great.

18    **THE COURT:**  Okay.  Then we'll recess for 15 minutes.

19    We're off the record.

20              (Recess taken at 1:51 p.m.)

21              (Proceedings resumed at 2:10 p.m.)

22      (Proceedings were heard out of the presence of the jury.)

23    **THE COURT:**  Good afternoon.  Please be seated.

24    **THE CLERK:**  Calling Civil Action 20-6570, Martinez vs.

25  The County of Alameda.

 1          Judge, please go ahead.

 2          **THE COURT:**  At this time, I'll ask my courtroom deputy

 3   to bring the jury back into the courtroom.

 4          (Proceedings were heard in the presence of the jury.)

 5          **THE COURT:**  Good afternoon, everyone.  Please be

 6   seated.

 7          Members of the jury, I should probably have explained this

 8   to you at the beginning of the trial; but if in the hallways of

 9   this building you cross paths with any of the lawyers in this

10   action and they don't say anything to you, not even "hi,"

11   they're not ignoring you.  Instead, I have instructed them that

12   they are not to talk to you at all.  So they're not being rude,

13   but they're just -- they're obeying my order that they are not

14   to talk to you at all.  So that's the reason for that.

15          Plaintiff, please call your next witness.

16          **MR. ELDER:**  We call Steven Clark.

17    (Witness enters the courtroom and steps forward to be sworn.)

18          **THE COURT:**  Please have a seat on the witness stand.

19          And, Rose, can you swear in the witness.

20          **THE CLERK:**  Mr. Clark, can you raise your right hand,

21   please.

22                          **STEVEN CLARK**,

23   called as a witness for the Plaintiff, having been duly sworn,

24   testified as follows:

25          **THE WITNESS:**  I do.

CLARK - DIRECT / ELDER

```
 1              THE CLERK:  Thank you.  You have been sworn.

 2              THE COURT:  Thank you, Counsel.  Please proceed.

 3                        DIRECT EXAMINATION

 4    BY MR. ELDER:

 5    Q.    Good afternoon.  Could you please speak your full legal

 6    name for the record?

 7    A.    Steven Clark.

 8    Q.    And where do you currently live?

 9    A.    San Mateo.

10    Q.    Have you lived in the Bay Area -- how long have you lived

11    in the Bay Area?

12    A.    35 years.

13    Q.    And in what field do you work?

14    A.    Assistive technology.

15    Q.    What is that?

16    A.    It's workaround equipment and services that help blind

17    people access information, such as print material or computers.

18    Q.    And how are you currently employed in this field?

19    A.    I own a business in San Francisco called Adaptive

20    Technology Services that offers specifically services only.  We

21    do assessments for blind people to help them figure out --

22    blind or low-vision people to help figure out which equipment

23    would be best for them to meet their vocational goals.

24          We do training on that equipment, some tech support.  And

25    I do a custom -- a special customized thing called JAWS
```

**CLARK - DIRECT / ELDER**

1  scripting, which customizes a screen reader for specific job

2  applications.

3  **Q.**   And do you have any special experience in the field of

4  making forms usable to blind individuals?

5  **A.**   Yeah.  Most of the specialized work I do is either working

6  with PDF forms to help make them usable for an employee who has

7  to fill out forms for their job, or dealing with web pages

8  where you have to fill out forms or look up information on the

9  Web where it's not working properly with the screen reader.

10 **Q.**   And does that experience that you just described involve

11 the use of JAWS or screen readers?

12 **A.**   Yes.

13 **Q.**   What is the geographic scope of your work with ATS?

14 **A.**   Depending upon how complicated it gets, I usually do most

15 of my work in Northern California.  I have customers in

16 Seattle, and I've worked as far as Chicago, and I've gone to

17 Georgia a couple of times for stuff.  So I'll go anywhere in

18 the country.

19 **Q.**   How many blind clients do you serve per year, if you could

20 estimate?

21 **A.**   Probably between 300 and 500 per year.

22 **Q.**   Do you have any special training or coursework in the

23 field?

24 **A.**   That I've taken specifically?

25 **Q.**   Yes.

1  **A.**   Yes.  I've taken some classes from -- the main product

2  that I work with for the specialized stuff that I do is a

3  screen reader called JAWS for Windows from Freedom Scientific.

4  I've taken two classes with them on specifically -- three

5  classes with them on learning specifics on how to write the

6  scripts, how to make accessible PDF and Excel forms, as well as

7  a very special class they did on how to create custom scripts

8  for braille users.  There's some different kind of stuff you

9  have to worry about when you're talking about a braille display

10 that's attached to the computer.

11 **Q.**   Could you briefly sketch out your education?

12 **A.**   I have a bachelor's degree in psychology from Ball State

13 University in 1980 -- 1983.

14 **Q.**   How did you first get into the field of assistive

15 technology?

16 **A.**   My dad was dating a blind woman who had a very early

17 Apple IIe computer with some software on it that made it talk,

18 and she asked me one day to help her figure out how she was

19 going to use that thing, and we sat down and played around with

20 it.

21     And a few months later, she went to a training center in

22 Palo Alto that was one of the first in the country to offer

23 computer training to blind people.  And they were looking for

24 an instructor.  The one they had there was leaving.  And she

25 happened to mention that I'd been helping her out.  And I

1  happened to need a job at around that time, and so I applied

2  for the job.  It turned out I was the only person who had

3  actually used a computer with a blind person in their applicant

4  pool, and I got the job.

5  **Q.**  And what was the name of that first employer?

6  **A.**  Sensory Access Foundation, although the project was a

7  joint project with the Veterans Administration, Western Blind

8  Rehab Center in Palo Alto.  So I worked at the VA under VA

9  rules and stuff like that, but my direct pay was paid through

10 Sensory Access Foundation non-profit agency.

11 **Q.**  And so just briefly, in general, what was the Sensory

12 Access Foundation doing?

13 **A.**  It was -- at the -- at the -- it still kind of exists at

14 the VA now.  It was a training program that blinded veterans

15 could come through and learn how to do skills around being

16 blind.

17     At that time in the '80s, the veteran population was

18 aging.  There was a lot more blindness showing up in the age

19 group, and computers were becoming popular.  So this program

20 was set up to figure out ways to teach veterans how to use

21 equipment, as well as they learn mobility skills and living

22 skills.  It was a kind of comprehensive live-in program.  Vets

23 would live there for six weeks while they took this program.

24     The exciting thing about the way the program was being run

25 that I was involved with is that they opened it up to civilians

1  as well so that people in Northern California could apply to go

2  there and get training on that equipment as well.

3  **Q.**   And did you work anywhere after the Sensory Access

4  Foundation?

5  **A.**   After Sensory Access Foundation, after that job, the

6  program was not re-funded.  It was a grant program.

7       I went from there to working for Telesensory Incorporated,

8  often called TSI.  At that time, they were the world's largest

9  manufacturer of assistive technology for blind people, and I

10  became -- I headed up the technical support department for one

11  of the products and eventually became the product manager for

12  their -- manager of the product managers for their blindness

13  products.

14  **Q.**   And how long did you work at Telesensory?

15  **A.**   11 years.

16  **Q.**   And did you hold more than one position there that whole

17  time?

18  **A.**   Yes.  I started out as tech support, just doing phone

19  calls, became manager of that department.  Then became a

20  product manager.  Then managed the product managers.

21       I did some -- I was also our technical liaison with the

22  IRS and Social Security Administrations.  Those two government

23  agencies hire more blind people than any other agencies in the

24  country, and it was my job to make sure our products would meet

25  their needs.  So I also went on a regular basis to D.C. to meet

**CLARK - DIRECT / ELDER**

1  with their people to find out what their requirements for their

2  employees were.

3  **Q.**   And did you work anywhere after Telesensory?

4  **A.**   After Telesensory, I started my own company here in

5  San Francisco.  We were doing, essentially, resellers and

6  distributors for a wide range of assistive technology.  We sold

7  both equipment and offered the services.

8  **Q.**   And was that ATS?

9  **A.**   Yes -- no, that was not.  That was Accessibility

10  Incorporated.  That company was purchased by an assistive

11  technology manufacturer from New Zealand called Pulse Data; and

12  during the merger, I realized that I had much more fun

13  providing services and selling equipment.  So I left that

14  business with my current business partner and started Adaptive

15  Technology Services, the current business I own now.

16  **Q.**   And is that what you've been working on to present?

17  **A.**   Since 1922, yes.

18      I'm sorry.  2022.  2002.  Sorry.  It's so long, I don't

19  remember the date.

20  **Q.**   Has any of your work experience specifically involved

21  evaluating website forms for people who are blind who are using

22  screen readers?

23  **A.**   Yes.  Most of my -- you know, just to step aside a little

24  bit, my business -- I have several employees; and my business

25  specializes in these assessments and training and tech support.

1        And in the course of that work across our employees, any

2    time somebody runs into any kind of specialized circumstance

3    work that's preventing somebody from either advancing in their

4    training or learning their -- or being able to perform the

5    essential functions of their job, I get involved in that, which

6    can mean I start -- I either do the assessment or I will do the

7    tech support or I will help do the training on the stuff where

8    we're having trouble with.  So I have a broad range across

9    those services.

10        And all of that can lead to "Hey, I need to do this task

11    in my job," which often involves filling out some kind of thing

12    on the computer, whether it's on the Web, whether it's a PDF

13    form, or it's just using a standalone application.  And part of

14    my job is then to look at that, figure out how to make it so

15    that that blind person can do that job and perform those tasks.

16    **Q.**   Does your work ever involve comparing the use of JAWS with

17    some other screen readers?

18    **A.**   Yes.  We often get other -- our -- my customers may be

19    familiar with other screen readers, and in those cases, we try

20    to work with the equipment that the customer is familiar with.

21        But primarily, we end up working with JAWS for Windows

22    because it's the market leader and that's what most of our

23    customers are working with.  But there are other packages out

24    there that I'm familiar with.  NVDA and Supernova are just

25    couple of them that I know of.

**CLARK - DIRECT / ELDER**

1   **Q.**   Do all blind people know how to use the JAWS screen

2   reader?

3   **A.**   No.  If they did, I wouldn't have the business.  A big

4   chunk of my business for my blind customers is teaching them

5   how to use JAWS.

6   **Q.**   I think you said it's the market leader.  How would you

7   describe the learning curve for learning how to use this

8   software?

9   **A.**   Learning curve's pretty tough, especially for a sighted

10  person who goes blind later in life.  They have to learn really

11  a lot of new stuff in order to figure out how they're using

12  this information that they're used to using visually.

13          For people that are blind as kids or learn the skills

14  earlier, they often are being taught these skills at school,

15  and it's not so hard to teach them how to do this.  But it

16  still is very different than just trying to sit down and use

17  any application as I, as a sighted person, would do.

18  **Q.**   I think you might have mentioned this.  Does your work

19  experience involve evaluating the process that a blind person

20  uses to complete a task?

21  **A.**   Yes.

22  **Q.**   Okay.  Are there methods other than the use of a screen

23  reader that a blind person might use to fill out a form?

24  **A.**   Yes.

25  **Q.**   Is a human reader ever something that you evaluate or

1  consider in your work?

2  **A.**   Yes.  That's often considered in -- as a -- as an

3  accommodation for employees where it might be faster than

4  trying to actually complete the work without someone.

5  **Q.**   And is a transcriber ever something that you see in your

6  work and evaluate?

7  **A.**   I would say the transcribers and readers are very similar

8  kinds of jobs, that your job is to take the print information

9  that we're seeing and tell the blind person what's there so

10 they can make whatever decisions they need to make.

11 **Q.**   Can you give an example in the work that you've seen where

12 an employer or some entity that you're evaluating might use

13 something like a human reader or transcriber as opposed to

14 technology?

15 **A.**   Yes.  I recently did some work for a state agency for a

16 lawyer who had gone blind after the age of 50, and he had

17 already had a caseload of stuff in his agency and was,

18 you know, dealing with learning how to deal with that.

19     And while we were evaluating the process of what it would

20 take to give him access to his case materials, his agency hired

21 a sighted person to read and review the sometimes massive

22 amounts of case materials that were provided to him for his

23 cases.

24 **Q.**   In your work experience, are you ever asked to consider

25 time efficiency when assessing how a blind person might

1    complete a task?

2    **A.**    Yes.

3    **Q.**    Does your work experience involve comparing different

4    methods, whether digital, paper, or otherwise, to determine

5    time efficiency --

6    **A.**    Yes.

7    **Q.**    -- for a blind person who needs to complete a task?

8    **A.**    Yes.

9    **Q.**    Does your work experience involve evaluating how PDF forms

10   work with the JAWS screen reader?

11   **A.**    Yes.

12   **Q.**    Do you participate in industry activities in your field?

13   **A.**    Yes, I do.  I just came back last week from the Cal State

14   University Northridge Assistive Technology Conference, which is

15   probably one of the biggest ones in the country, where they

16   show new technologies and have presentations on what's

17   happening in the current assistive technology fields.  I

18   probably attend two or three of those a year.  CSUN's one of

19   them but --

20      (Stenographer interrupts for clarification of the record.)

21          **THE WITNESS:**  Sorry.  CSUN is one of the conferences

22   that I attend.  C-S-U-N.  Sorry.  It's short for Cal State

23   University Northridge.

24      And the major blindness advocacy organizations, the

25   National Federation for the Blind and the American Council for

1  the Blind, have annual conferences around the country every

2  year; and when possible and those are close enough to us, we

3  also will attend those conferences.

4  **BY MR. ELDER:**

5  **Q.**   Do you ever do work for the State of California?

6  **A.**   Most of my work is for the State of California.

7  **Q.**   And are they paying for your assessments?

8  **A.**   Yes.

9  **Q.**   And do you have some standard principles and methods that

10  you use when you're auditing and evaluating and doing the work

11  that you're doing for the State of California?

12  **A.**   We do pay attention to standards about how things are

13  supposed to be done to make applications and PDFs accessible;

14  but primarily, my goal in meeting the State's needs is to make

15  whatever is out there usable to my customers so they can do

16  their job.

17      And that really just means sitting down and looking at the

18  documents and seeing how they work with the screen reader.  I

19  would say that the vast bulk of what my expertise in is just

20  25 years of experience about how screen readers work, what they

21  say and do, and how the end user is going to receive that

22  information and act upon it.

23  **Q.**   And so as you're doing this work -- and you've been doing

24  it for a while -- do you have sort of a consistent method that

25  you use as you go from project to project to project?

1   **A.**    I do.   I -- it gets pretty technical, but there are

2   multiple techniques that I can use to examine the material that

3   I'm looking at to get -- to find out, right off the bat, how --

4   first of all, to find out why something may not be working;

5   secondly, what it's going to take for me to fix that something.

6   And I'm looking for basically hooks in the programming code

7   that will let me solve the problem.

8   **Q.**    And has -- have you been asked in this case by plaintiff's

9   counsel to do an evaluation and audit of the process of filling

10  out an FBNS form at Clerk-Recorder's Office, including the use

11  of the computer kiosk that's in the facility?

12  **A.**    Yes.

13  **Q.**    And did you use the same sort of methodology and process

14  in evaluating the CRO technology that you use for all of your

15  other projects with the State of California?

16  **A.**    Yes.

17  **Q.**    Does the State of California rely on your reports and

18  evaluations in its delivery of services?

19  **A.**    Yes.

20          **MR. GILBERT:**  Objection.   Speculation.   Relevance.

21          **THE COURT:**  Overruled.

22          **MR. ELDER:**  Your Honor, I move that Mr. Clark be

23  qualified as an expert in the field of making forms usable to

24  blind individuals, including the use of JAWS and screen

25  readers.

1      **THE COURT:**  Any objection?

2      **MR. GILBERT:**  No, Your Honor.

3      **THE COURT:**  He may testify as an expert in that field.

4   BY MR. ELDER:

5   **Q.**   Now, could you briefly describe, in general terms, what

6   was the scope of the tasks you were asked to look at by

7   Ms. Martinez's counsel in this engagement?

8   **A.**   I was asked to look at two different parts of this

9   process.  Do you have a particular one you want me to talk

10  about?

11  **Q.**   What two parts were you --

12  **A.**   The PDF form and the kiosk.

13  **Q.**   Okay.  And were you looking at how these worked -- how

14  this process worked just in general in the Clerk-Recorder's

15  Office?

16  **A.**   Yes, but that did not involve the PDF form.  The PDF form

17  we looked -- I looked at separately from that.  But the process

18  for going to the kiosk and filling out the fictitious business

19  name Wizard I did.

20  **Q.**   And did you compare that process to a process of filling a

21  paper FBNS form out with a human transcriber?

22  **A.**   I did not do that directly, but the process of completing

23  the -- I'm familiar with filling out forms in paper and print;

24  and when we were examining the kiosk, I was comparing that to

25  just mentally and how -- what the same process would be to

1    handwrite that particular form.

2    **Q.**    In completing your evaluation, were you given information

3    about the experience of a blind person receiving transcriber

4    service in the Clerk-Recorder's Office?

5    **A.**    I was given that information after the evaluation.

6    **Q.**    And were you given -- you were given the information to

7    compare in your ultimate conclusions in this case?

8    **A.**    Yes.  I had that before I wrote my report, yes.

9    **Q.**    Okay.  Could you explain a little bit more about JAWS?  I

10   specifically would like to see if you could explain a little

11   bit about how the user interface for the cursors in JAWS works

12   for someone who maybe is more familiar with a standard computer

13   cursor.

14   **A.**    So when we're -- when sighted people are using a computer,

15   there's a thing you move around the screen called the focus.

16   And we never call it that.  It's just the cursor.  Sometimes

17   it's the mouse.  Sometimes it's where we're typing.  But

18   that -- as a sighted person, we move that around on the screen

19   and we move our mouse around and click on places on the screen

20   to do certain things.

21        A blind person cannot do those things.  There's no

22   feedback that they're moving the mouse in the right place.

23   There's -- there's often just -- there's places that you can't

24   even click on to get information from.

25        So what the screen reader does is it takes that

 1    information that's on the screen and overlays on top of that a

 2    set of custom keystrokes that are designed to let you move

 3    around the screen and find out what information is on the

 4    screen.

 5        A really basic example might be when you're using -- when

 6    you're working in, say, Microsoft Word and you're writing a

 7    document and you want to know what page you're on -- you know,

 8    if I've written -- I do this all the time.  My reports go to

 9    three to four pages, and I always go, "Well, I've been writing

10    for a long time.  How far have I written?"  I can glance down

11    on the corner of the screen and say, "I'm on page 4."

12        Blind people can't do that, and there's no command or

13    functionality in Word that says, "Hey, let me move to where the

14    page number is."

15        So JAWS has a technique, has some commands and stuff built

16    into it that would allow me to say to JAWS, "Hey, I want to go

17    find out what the page number is."  I still need to know where

18    it is, but I can go find out where that is, and it probably

19    takes me a handful of keystrokes to say, "Hey, JAWS, I want to

20    go into this review mode.  I want to go to the bottom of the

21    page.  I want to move to the beginning of the line.  I want to

22    read through that line a few words at a time until I hear it

23    say 'page' and tell me what number I'm on."

24    Q.  So for a sighted person watching a blind person use JAWS,

25    is it always obvious where the JAWS cursor will be and where

1   the blind person's focus and cursor is located?

2   **A.**   No.

3   **Q.**   And is the JAWS cursor always connected to the mouse or

4   the typing cursor?

5   **A.**   No.  So some of these commands that I say when I say I

6   want to move down and move and read the page number, I have to

7   disconnect from the focus where I'm typing on the screen, and

8   now I'm using the mouse.  Visually, it looks like I'm moving

9   the mouse around, but I'm hearing what's underneath that.  And,

10  by the way, there's ways to do that without moving the mouse.

11       And then when I'm all done, I have to reconnect myself

12  back up to the place where I was before where the real cursor

13  is for me to start working again.

14  **Q.**   So if a blind person were sitting at a computer, let's

15  just say, driving JAWS with keyboard commands and a sighted

16  person were standing next to them watching the screen, how easy

17  would it be for the blind person to understand where the

18  sighted person might be pointing to -- or let's say the sighted

19  person also is controlling the mouse.  How easy would it be for

20  the blind person and the sighted person to each understand

21  where their respective cursors were engaging and sort of

22  working together?

23  **A.**   I don't think it's necessarily obvious at all that

24  they're -- where or what the blind person is hearing unless the

25  sighted person is paying close attention.  And I know that the

```
 1   number one complaint I hear about sighted people is how

 2   difficult it is to understand the screen readers.

 3        So I think one of my complaints that I have in my -- when

 4   I'm working with people is often from family members of the

 5   person I'm working with that say they don't understand where or

 6   what or how their relative is using the computer to help them,

 7   especially on web pages, where the way that JAWS gives you

 8   information about web pages is even more opaque to a sighted

 9   user.

10   Q.   And did you go to inspect the Clerk-Recorder's facility

11   and computer kiosk in around August of 2023?

12   A.   Yes.

13   Q.   And did you have an opportunity to sit down and look at

14   the computer kiosk with the Web wizard or the software suite on

15   it?

16   A.   Yes.

17   Q.   And did you have a chance to look at the keyboard that was

18   there at the computer?

19   A.   Yes.

20   Q.   For a blind user, could you describe what is the

21   significance of a keyboard layout?

22   A.   So many applications -- there's so many applications that

23   do so many things that all the common combinations of

24   keystrokes are used up.  So, for example, if I want to do

25   something in Word to save a document, I might do control S or I
```

1    might do alt FS.  There's a bunch of ways I can do stuff, but I

2    have key commands that can do that.

3         But because JAWS requires more keystrokes to be able to

4    move around and use an application, sometimes there aren't very

5    many combinations that are left, or they're weird combinations

6    that don't make any sense.  So JAWS and all the screen readers

7    have come up with a custom keystroke -- usually it's the insert

8    key on the number pad -- to say "Use this key.  Hold this key

9    down and press a letter on the keyboard and I will do something

10   for you.  I will tell you something," so that it gives you a

11   whole new layer of commands.

12        No application -- no standard applications that I know of

13   have ever used the insert key for doing that kind of thing.

14        The problem with the insert key is that it is one of those

15   keystrokes that moves around on a keyboard, especially -- there

16   are standard desktop keyboard layouts; but from -- if you're

17   using -- if you're a laptop user, the insert key can move

18   around to a dozen different places on the keyboard, and

19   sometimes the insert key is not even obviously available on

20   that -- on a keyboard.

21   **Q.**  And so how easy would it be for a blind person to walk up

22   to a keyboard that was different from their, you know, keyboard

23   that they're used to using and to just sit down and start using

24   a computer with JAWS?

25   **A.**   It would be very difficult.

1  **Q.**   Could you explain what are the limitations of JAWS when

2  accessing website forms?

3  **A.**   Well, JAWS expects the websites to be, what I would say,

4  well-behaved, that they're following developmental guidelines;

5  and when those rules are met, when the guidelines are followed,

6  then JAWS is going to do a pretty good job of telling you

7  what's going on on the screen.

8      Unfortunately, it's rare to find applications that really

9  follow the guidelines.  And even in cases where they do follow

10 the guidelines, they often have usability issues where it makes

11 it difficult to get to certain places on the screen that takes

12 more time than it would take otherwise.

13     And JAWS itself is aware of that, so they often build in

14 their own solutions for popular programs that aren't following

15 the guidelines in order to make an application work and try to

16 get around that.  This is -- we're going to talk about JAWS

17 scripting at some point, and a lot of times this is

18 accomplished through that technique.

19 **Q.**   Is JAWS one of the more expensive screen readers?

20 **A.**   Yes.

21 **Q.**   Are there free screen readers on the market --

22 **A.**   Yes.

23 **Q.**   -- or in -- what's the free screen reader?

24 **A.**   NDVA.

25 **Q.**   And how would the -- how does a blind user -- sorry.

CLARK - DIRECT / ELDER

1    Strike that.

2        Is there a separate screen reader for the MAC operating

3    system?

4    **A.**    Yes.

5    **Q.**    What's that called?

6    **A.**    Voiceover.

7    **Q.**    And if someone was only familiar with Voiceover, would

8    they be able to walk up to a computer and start using JAWS?

9    **A.**    They would be able to navigate the computer within the

10   realm of where things followed the guidelines because

11   guidelines are designed to work with lots of screen readers.

12   But the minute they ran into something where the guidelines or

13   usability fell apart, they would not know how to use the

14   advanced commands that are in each of the screen readers to

15   figure out what was going on.

16   **Q.**    I'd like to turn your attention to the inspection that you

17   did in August of 2023, and I'd like to show you a photo that's

18   been marked as Exhibit 11A.  And it should be in your binder in

19   Tab 11.

20   **A.**    Is it going to be displayed over here?

21   **Q.**    We could have --

22   **A.**    Tab 11, you said?

23        (Witness examines document.)  Yes.  Okay.

24   **Q.**    Okay.  What are you seeing in Exhibit 11A?

25   **A.**    11A is a picture of the check-in area at the Alameda

1    County Clerk-Recorder's Office.  This was an open-air, looks

2    like it was a converted outdoor atrium because of COVID

3    requirements, where you would come in and check in to find out

4    what -- tell them what you wanted to do, and then they would

5    send you to the proper location in the building to accomplish

6    that task.

7    **Q.**   And you're familiar with this picture and what's depicted

8    in the picture?

9    **A.**   Yes.

10   **Q.**   Does it seem like an authentic representation of the

11   facility?

12   **A.**   Yes.

13          **MR. ELDER:**  May I -- I move to publish Exhibit 11A to

14   the jury.

15          **THE COURT:**  And for its admission?

16          **MR. ELDER:**  And for its admission, yes.

17          **THE COURT:**  Any objection?

18          **MR. GILBERT:**  No, Your Honor.

19          **THE COURT:**  Exhibit 11A is admitted, and you may

20   publish it to the jury.

21      (Trial Exhibit 11A received in evidence.)

22   **BY MR. ELDER:**

23   **Q.**   Okay.  So you just described what was in this photo.  As

24   you were assessing the process of filling out an FBS form -- an

25   FBNS form at the Clerk-Recorder's Office in August of 2023,

1    what was the first step in that process?

2        THE COURT:  Hold on, Counsel.  I don't mean to

3    interrupt, but what's being shown on the screen is not

4    Exhibit 11A.

5        MR. ELDER:  Oh.  What...

6            (Pause in proceedings.)

7        THE COURT:  There we go.  Thank you.  Please continue,

8    Counsel.

9    BY MR. ELDER:

10   Q.   Okay.  Can you see this?  Does this Photo 11A look like

11   the -- what you just --

12   A.   Yes.

13   Q.   -- described?

14        Thank you.  And when you first arrived that day, what was

15   the first step in the process of beginning to fill in an FBNS

16   form?

17   A.   So we walked into this area and walked to the back.  In

18   the center of the picture is an open door.  This was normally

19   an entered -- an entrance into the building; but at that

20   doorway, they had put a desk across the entranceway.  And we

21   walked up to that desk and checked in and said why we were

22   there.

23        You can see a person standing there checking in at the

24   moment.  It's a little dark in that picture, but that's the

25   person that was right before us when we went there.

**CLARK - DIRECT / ELDER**

1      There's a row of chairs also along the side.  It looks

2  like this is designed to handle a large number of people in the

3  waiting area; but the day we were there, there was only a few

4  people in front of us.

5  **Q.**   Okay.  And when you say "we," who was with you?

6  **A.**   You were.

7  **Q.**   Okay.  And did I go to the counter and ask to complete an

8  FBNS -- an FBNS form using the computer kiosk for my business?

9  **A.**   Yes.

10  **Q.**   And then what happened next?

11  **A.**   We were asked to stand to the side of the door there just

12  in front of that glassy area while the staff operating the door

13  tried to figure out what was the next step.  They asked us to

14  wait for a few minutes and they would tell us what we would do

15  next.

16      After about five minutes or so, they came and said they

17  had notified a supervisor that we were there and asked us to

18  proceed around the corner of the building, into the building

19  itself, for the next step in the process.

20  **Q.**   And where did we -- where did we go next?

21  **A.**   So we walked back across that atrium to the -- in the

22  front there, you can see these red tape lines for, you know,

23  guiding you in.  So we walked back to that front of the picture

24  and then went outside onto the street, walked to the corner,

25  turned the corner, turned again into the building.

CLARK - DIRECT / ELDER

1    And then once we in the building, we were told to go to
2    the first room on the right, which turns out to be their public
3    terminals, public -- I'm not quite sure what exactly they were
4    calling that room.  But then we were told to check in there in
5    that room where the supervisor would then help us with the rest
6    of the process.
7    Q.   Okay.  I'd like to show you what's been marked as 11D.
8    This is another photo probably in your tab there.
9    A.   I'm ready.
10   Q.   And does this photo -- well, sorry.
11        What is this a photo of?
12   A.   This is a photo of the room that had the kiosk in it.
13   It's showing the door that we entered to come in.  The kiosk is
14   immediately behind us.
15        And it's also showing a staff room where they have
16   somebody who's over-- there's a glass partition and a room
17   where somebody is overseeing that room, and it's available to
18   answer questions if people are having trouble with the
19   computers.
20   Q.   And so once -- sorry.
21        Does this -- does this photo reflect an accurate depiction
22   of the facility that you inspected that day?
23   A.   Yes.
24        MR. ELDER:  And, Your Honor, we would move this into
25   evidence and would ask to publish it to the jury.

 1           THE COURT:  Any objection?

 2           MR. GILBERT:  To 11D, no.

 3           THE COURT:  11D, as in "dog."

 4           MR. GILBERT:  No, Your Honor.

 5           THE COURT:  Okay.  Exhibit 11D is admitted, and you

 6    may publish it to the jury.

 7           (Trial Exhibit 11D received in evidence.)

 8           MR. GILBERT:  Your Honor, just to confirm,

 9    Exhibit A -- 11A and 11D have been admitted?

10           THE COURT:  11A, as in "apple," and 11D, as in "dog,"

11    have been admitted.

12           MR. GILBERT:  Thank you.

13    BY MR. ELDER:

14    Q.   Okay.  Are you able to see this on the screen now,

15    Mr. Clark?

16    A.   Yes.

17    Q.   Is this what you just described?

18    A.   Yes.

19    Q.   Did -- was there a -- you said there was a process of

20    meeting the supervisor at some kind of a station; is that

21    right?

22    A.   We met the supervisor at this window.  I think what's not

23    in this picture immediately to the right of that is a doorway

24    into that room.

25           So we came into this room, we stopped at this glass

1  partition, explained who we were and why we were there, and

2  they said just a moment, the supervisor will be with us, and he

3  came out through that door and then met with us.

4  **Q.**    Okay.   And do you recall how long did we wait for the

5  supervisor?

6  **A.**    Probably two or three minutes.

7  **Q.**    Okay.   And then once the supervisor arrived, what happened

8  next?

9  **A.**    He went with us to the kiosk that has the financial

10  fictitious business name wizard on it and the JAWS software,

11  made sure it was on, and signed in.   I think there's a sign-in

12  process to get to the particular page.   And said, "Looks like

13  everything was running," and then let us know to contact him if

14  we had any questions.

15  **Q.**    And did he have to activate the JAWS program?

16  **A.**    I don't remember.   I think so.   I think they have -- when

17  the computer came on, they had to start JAWS up.

18  Q.    Okay.   I'd like to show you what's been marked as

19  Photo 11C.   11C, Charlie.   It should be in your tab.

20  A.    Yes, I see it.

21  Q.    Okay.   And what is this a photo of?

22  A.    This is a photo of the room.   In the upper center of the

23  picture are you, me, and the supervisor in front of the kiosk.

24  You can see the door that I mentioned in the other one that

25  wasn't in the picture where he came from.   And then there's a

1    bunch of other workstations around the room that we never were

2    involved with.

3    **Q.**    Does it seem to depict what you saw that day?

4    **A.**    Yes.

5            **MR. ELDER:**  Your Honor, I'd move to admit Exhibit 11C

6    and publish to the jury.

7            **THE COURT:**  Any objection?

8            **MR. GILBERT:**  No, Your Honor.

9            **THE COURT:**  Exhibit 11C is admitted, and you may

10   publish it to the jury.

11       (Trial Exhibit 11C received in evidence.)

12   **BY MR. ELDER:**

13   **Q.**    And can you see this --

14   **A.**    Yes.

15   **Q.**    -- photo?

16       Okay.  Thank you.

17       So once the computer was signed in and the JAWS screen

18   reader was running, were there any other steps that happened

19   before the -- before you and I started using the computer?

20   **A.**    No.  I mean, the supervisor did say, "Here you go.  Let me

21   know if you have any questions."  I think he gave us a phone

22   number or way to get ahold of him, and then left us to our

23   devices.

24   **Q.**    Were there -- did he plug headphones in?

25   **A.**    No.

**CLARK - DIRECT / ELDER**

1   **Q.**   Okay.  What happened next in that process?

2   **A.**   You started filling out the form.  The form -- at the time

3   we were there, the form was on the screen.  We didn't have to

4   do any of the pre-picking the links to get to that form.  And

5   then you started to fill out the form.

6   **Q.**   And did you have a sufficient time to observe me using the

7   form?

8   **A.**   Yes.

9   **Q.**   Okay.  And other -- aside from observing me use it, did

10   you have an opportunity to use it on your own?

11   **A.**   Yes.

12   **Q.**   Okay.  And could you describe what you did with the

13   computer when you were using JAWS on the form?

14   **A.**   Well, what happened was, as we started to move into the

15   form, some of the form fields that we were trying to get

16   information about weren't very clear what the information was

17   asking for.  This would be where we would start to say this was

18   not a well-behaved program at that point.

19       And in yours and I's conversation, you were not able to

20   figure out what the form was asking for independently; and I

21   took over at some point to figure out if there was a way that I

22   could figure out, using advanced JAWS commands, what the

23   information that was being asked for was.

24       Even though at that point I could see what was going on, I

25   was trying to figure out if there was a way that a blind person

1    would have been able to do that independently.

2    **Q.**    And aside from anything you observed me doing, did you

3    feel you had an adequate opportunity to inspect the form

4    independently on your own without, you know, any input from me?

5    **A.**    Yes.

6    **Q.**    And at some point did you have an opportunity to review

7    the way that this FBNS wizard software suite works on your home

8    computer?

9    **A.**    Yes.

10   **Q.**    And did you feel that you had an adequate opportunity to

11   assess and review the FBNS wizard form as it was rendering on

12   your home computer web browser?

13   **A.**    Yes.

14   **Q.**    And how did the two versions of the FBNS wizard compare

15   between the computer in the Clerk-Recorder's Office and what

16   you observed at your home computer?

17   **A.**    They behaved identically.

18   **Q.**    Okay.  And what kind of computer -- you've called it a

19   kiosk, but what kind of a computer did the County have there in

20   the public viewing room?

21   **A.**    I think it was a Dell lap- -- a Dell desktop.  It might

22   have been an HP.  It was a desktop computer.

23   **Q.**    Did it appear to be, like, a standard Windows computer?

24   **A.**    Yes.

25   **Q.**    Okay.  And, Mr. Clark, I'm going to ask you about -- did

1    you eventually compose some opinions in this case about the

2    usability of the FBNS wizard form with JAWS?

3    **A.**    Yes.

4    **Q.**    And what was your opinion about the usability of the -- at

5    that time in August of 2023, what was your opinion about the

6    usability of the FBNS wizard form with the JAWS screen reader?

7    **A.**    Is there a copy of my report here that I could refer to?

8    **Q.**    Would that help refresh your recollection?

9    **A.**    Yes.

10            **MR. ELDER:**    Your Honor, may I pass the witness a copy

11    of his expert report?

12            **THE COURT:**    Yes.

13            **MR. ELDER:**    Okay.  Michelle?

14            **MS. KOROSY:**    Yeah.

15            **THE WITNESS:**    So what was your question again?

16    **BY MR. ELDER:**

17    **Q.**    So did you come to an opinion about the usability of the

18    FBNS wizard form as how it worked with the JAWS screen reader?

19    **A.**    I did.

20    **Q.**    And what was that opinion?

21    **A.**    I believe that the form could not be filled out

22    independently by what I would consider an average JAWS user;

23    that the form met -- just did not provide enough information in

24    certain places on the screen to be able to complete the form

25    and be sure that the information was correct before submitting

1    it.

2    **Q.**   And in your evaluation of filling out the form and sort of

3    assessing it, did you have enough time to estimate the amount

4    of time that it might take to fill out the FBNS wizard form if

5    someone were sort of running a tandem session with JAWS and the

6    mouse?

7         So a sighted person using the mouse and a blind person

8    sort of controlling with the JAWS screen reader and the

9    back-and-forth, did you -- were you able to spend enough time

10   with this program to estimate about how much time it might take

11   if a blind and a sighted person were trying to fill out this

12   form in a combination of techniques between clicking the mouse

13   and using JAWS?

14   **A.**   Yes.

15   **Q.**   And --

16   **A.**   Go ahead.

17   **Q.**   Oh.  And if you could estimate, about how much time do you

18   think it, you know, might take using that sort of tandem

19   process?

20   **A.**   I think 10 to 15 minutes.

21   **Q.**   Okay.  And then after -- let's go back to the -- to the

22   Clerk-Recorder's Office.

23        After the form -- sorry.  Was the form eventually

24   submitted through the FBNS form in the Clerk-Recorder's Office?

25   **A.**   Yes.

1    Q.    And then did you have to help submit that form through

2    their -- through their Web wizard?

3    A.    Yes.   There were places in that form that I had to fill

4    out.

5    Q.    Okay.   And then after that had been submitted through the

6    FBNS software suite wizard, what happened next in the process?

7    A.    We notified the supervisor that we had completed the

8    process and were ready for the next step.   We waited a minute

9    or so for him to come back.   And I don't remember -- we had to

10   wait for him to come back to give us a ticket, and the ticket

11   was our place in line for the next step.

12       And then once we were given that ticket, we left the room

13   and went to the next room to finish the process.

14   Q.    And that ticket, was that checking in at the supervisor

15   station in the photo that we saw in 11D?

16   A.    They -- yes.   They gave us the ticket there.   I don't know

17   what the normal process for getting the ticket was -- would be.

18   Q.    And so were we given a ticket with a number?

19   A.    Yes.

20   Q.    And then what was the next step in that process?

21   A.    So he guided us out of the room into the main lobby area

22   where they have looks like a dozen counters, told us what our

23   ticket number was.

24       As we entered the room, they actually called that ticket

25   number and told us to proceed to, I think, Counter 7 or 8 with

CLARK - DIRECT / ELDER

1    the forms.

2    Q.    Okay.   I'd like to show you what is marked as Exhibit 11B,

3    boy.

4    A.    Okay.

5    Q.    And what is this a photo of?

6    A.    This is a photo of the room that has the counters.

7    Q.    And does it reflect what you saw that day?

8    A.    Yes.

9              MR. ELDER:   I'd move Exhibit 11B into evidence and be

10   published to the jury.

11             THE COURT:   Any objection?

12             MR. GILBERT:   No, Your Honor.

13             THE COURT:   Exhibit 11B is admitted, and you may

14   publish it to the jury.

15        (Trial Exhibit 11B received in evidence.)

16   BY MR. ELDER:

17   Q.    And can you now see this?

18   A.    Not yet.   There we go.   Yes.

19   Q.    Okay.   And so was the number called?

20   A.    Yes, as we walked into the room.   The supervisor had not

21   actually left at that point.

22   Q.    Okay.   And then at some point did we approach the counter?

23   A.    Yes.   The supervisor took us to that counter --

24   Q.    Okay.

25   A.    -- because it was called as we walked in.

**CLARK - DIRECT / ELDER**

1   **Q.**   And what was the next step in the process, as you recall?

2   **A.**   We told them who you were.  They pulled the form up on

3   their computer screen, read back the form to us to make sure

4   that the information was correct.  It wasn't.  Your business

5   name was wrong on the form.

6        We corrected -- we told them that was wrong -- or you told

7   them it was wrong, and then they corrected that, printed the

8   form, and asked for your payment.

9   **Q.**   Okay.  And then -- I'm sorry.  Did you say -- did they

10  print out the corrected form?

11  **A.**   I don't know.  They did something on the computer.

12  I think she wandered back to a printer, and there was some --

13  some movement behind the counter that I'm not aware of that I

14  couldn't see, but I think she picked up a form from the

15  printer.  Yes, she had to print the form out because she

16  brought it back for you to sign.

17  **Q.**   Okay.  And after the information had been verified, the

18  form had been printed, did I sign it?

19  **A.**   Yes.

20  Q.   And in your assessment, were you given information about

21  the experiences of Lucy Greco in receiving transcriber services

22  at the Clerk-Recorder's Office?

23  A.   I was after this visit.

24  Q.   Okay.  But before you wrote your final report?

25  A.   But before I wrote my report.

CLARK - DIRECT / ELDER

1   Q.   Okay.  And were you working on the assumption that it

2   would take about five minutes for, at least in her case, to

3   complete an FBS form with a human transcriber at the check-in

4   counter?

5   A.   Yes.

6   Q.   And then did you come to an opinion about how the process

7   for a blind applicant to use the electronic FBNS form on the

8   computer in the Clerk-Recorder's Office compared with the

9   experience described by Ms. Greco?

10   A.   Yes.

11   Q.   And what was your opinion in that regard?

12   A.   That the multiple steps in the process to provide access

13   to that computer added several many minutes to the process of

14   filling out the form and getting it submitted.

15          MR. ELDER:  One second.

16              (Pause in proceedings.)

17   BY MR. ELDER:

18   Q.   Mr. Clark, in coming to your opinions, do you feel you had

19   sufficient information in which you were given to support your

20   conclusions?

21   A.   Yes.

22          MR. ELDER:  Okay.  We can turn the witness over,

23   Your Honor.

24          THE COURT:  All right.  Does the defense have any

25   questions for the witness?

1          **MR. GILBERT:**  Yes, Your Honor.  Thank you.

2                      **CROSS-EXAMINATION**

3    **BY MR. GILBERT:**

4    **Q.**   Good afternoon, sir.

5          You've known Mr. Elder for some time?

6    **A.**   I have.

7    **Q.**   You guys are quite close, aren't you?

8    **A.**   I wouldn't say that.

9    **Q.**   Well, you've worked on quite a few matters together?

10   **A.**   This is the only one we've officially worked on together.

11   **Q.**   But you spend a lot of time on other matters together,

12   talking, interacting, and crossing paths in the same circles?

13   **A.**   Yes.  It's a small community.

14   **Q.**   Now let's go back to your visit to the CRO that we looked

15   at.

16        Do you remember when approximately that was?

17   **A.**   August of last year.

18   **Q.**   August of 2023?

19   **A.**   Mm-hmm.

20   **Q.**   And you and Mr. Elder went there with the sole purpose of

21   testing out the kiosk and the software that was in place for

22   purposes of this lawsuit; isn't that correct?

23   **A.**   That's correct.

24   **Q.**   And when you went in, did you have a prior previously

25   completed form, an FBNS that had been completed and signed when

1   you walked in the door?

2   A.   No.

3   Q.   So you went there for the purpose of creating a new form?

4   A.   I went there to examine the form that was there.

5   Q.   And just to be clear, at no time did you or Mr. Elder ever

6   demand anyone at the CRO edit a previously signed or completed

7   form, did you?

8   A.   No.

9   Q.   Thank you.

10   Now, when you were shown to the kiosk, that was a kiosk

11   that was set aside especially available to the disabled

12   individuals; is that right?

13   A.   Yes.

14   Q.   And, in fact, when you were shown there, the supervisor

15   offered to provide assistance to you in utilizing it, didn't

16   he?

17   A.   He did, but that was -- the purpose was for us to figure

18   out if a blind person could independently complete the form.

19   Q.   But you were offered assistance and you rejected that

20   assistance?

21   A.   Yes.

22   Q.   And you understood that the County's typical operations on

23   a day-to-day basis is that they will offer to provide

24   assistance in using that kiosk for anyone who needs it?

25   A.   I was not aware of that at the time we made the visit.   I

1    was later given the policy form for how to deal with that

2    particular kiosk, but was not aware of that at the day -- on

3    the day of the visit.

4    Q.    And when you went through and were testing the system out,

5    you and Mr. Elder were typing in random phrases and things in

6    various forms just to test it out, weren't you?

7    A.    We were typing in relevant information to his business.  I

8    wouldn't say we were just randomly making up addresses.  We

9    were using his actual information.

10   Q.    But that might have been part of the reason why the

11   address was incorrect was because of the testing and the work

12   that you were doing?

13   A.    Very likely, yes.

14   Q.    Now, ultimately, Mr. Elder was able to complete an FBNS

15   form using that machine, wasn't he?

16   A.    Not without my help.

17   Q.    Well, did he ultimately complete an FBNS form that was

18   recorded in the Clerk-Recorder's Office?

19   A.    He did, yes.

20   Q.    And it was properly completed and it was recorded on that

21   day, wasn't it?

22   A.    Yes.

23   Q.    And after he completed at the kiosk and went to the

24   counter, at that point the information was independently

25   verified to him before he signed it, didn't he?

**CLARK - CROSS / GILBERT**

1  **A.**   Yes.

2  **Q.**   And once that information was verified, he was asked to

3  sign it under penalty of perjury, wasn't he?

4  **A.**   Yes.

5  **Q.**   And at no point did any clerk-recorder ever edit a

6  completed and signed form that you observed, did you?

7  **A.**   Yes, I agree.

8  **Q.**   Now, I want to focus on your expertise.  It sounds like

9  you've got quite a bit of experience in helping employees to

10  maximize their potential in the workplace.  Is that a fair

11  statement of your job?

12  **A.**   Yes.

13  **Q.**   Now, that's independent and separate from the ADA, isn't

14  it?

15  **A.**   I am hired because people have made reasonable

16  accommodations often at their job sites because of requirements

17  of the ADA.

18  **Q.**   Well, let's be very specific.  You do not evaluate whether

19  something is compliant with the ADA, do you?

20  **A.**   I do not.

21  **Q.**   And, in fact, you don't even know if any of the standards

22  that you utilize are even endorsed or even within the ADA?

23  **A.**   What I know -- the ADA I don't think addresses Web

24  accessibility.  There are other standards that say, "Hey,

25  look" -- the ADA says, "Look, we need to make things accessible

1  to people with disabilities, as accessible as they are to

2  non-disabled people."

3  **Q.**   Well, let's stop there.  I'm sorry.  Had you finished?

4  **A.**   Yeah.  I was going to say that when you get to this

5  specific case of looking at web pages, there are guidelines

6  published by state and federal agencies and disability

7  organizations, and stuff like that, that if followed,

8  provide -- are to provide some level of accessibility to the

9  software that you're looking at.

10 **Q.**   Well, let's be very specific.  As to the PDF forms that

11 you were accessing on the kiosk, there is no requirements in

12 the ADA that relate to those, is there?

13 **A.**   I would not --

14        **MR. ELDER:**  Objection, Your Honor.  Legal.

15        **THE COURT:**  Sustained.

16 **BY MR. GILBERT:**

17 **Q.**   Well, as an expert in this field, you're not aware of any

18 legal standards that you used to rely upon to judge your work,

19 were you?

20 **A.**   First, I should clarify, we did not look at the PDF form

21 which you said in your statement.  We looked at their Web-based

22 wizard on that particular visit.

23       And I -- the -- there are -- I don't know of any legal

24 standards that you would look at to determine whether something

25 is usable or not by a blind -- by a blind person.

1    The proof in the pudding is:  Can they do their job?  And

2    that's the goal in all of this, is:  Can we accomplish the task

3    that needs to be done?  And I determined that a reasonably good

4    JAWS user would not be able to complete this task.

5    **Q.**    Well, you made a good point there.  Can they do their job?

6        You agree that the provisions regarding disability access

7    for employment and that are applicable to an employer are

8    separate, distinct from the Title II obligations imposed on a

9    public entity to provide accommodations or services to the

10   public?  Those are different laws, aren't they?

11           **MR. ELDER:**  Objection, Your Honor.  Legal.

12           **THE COURT:**  Sustained.

13   **BY MR. GILBERT:**

14   **Q.**    Let's be very specific.  In evaluating usability of things

15   such as websites and the PDF suites and the Web-based program

16   that you looked at, there's different standards that can be

17   utilized to measure it against; is that right?

18   **A.**    Yes.

19   **Q.**    For example, we have WCAG, Web Contact Accessibility

20   Guidelines; is that right?

21   **A.**    These guidelines are --

22   **Q.**    Sir, is that a correct statement?

23   **A.**    Yes, that's a correct statement.

24   **Q.**    And then there's also ISO; is that right?

25   **A.**    Yes.

1    **Q.**    And then there's also the ADA?

2    **A.**    No.

3    **Q.**    Why not the ADA?

4    **A.**    The ADA does not specify --

5         **THE COURT:**  Stop.  Experts cannot opine on what the

6    law is.

7    **BY MR. GILBERT:**

8    **Q.**    Well, let's go back to --

9         **THE COURT:**  Members of the jury, I instruct you to

10   disregard the witness's statement just then about the ADA.

11   **BY MR. GILBERT:**

12   **Q.**    So let's go back to WCAG and ISO.  Those are generally

13   widely used standards, aren't they?

14   **A.**    There's standards and there's usability.  And I want to

15   state that I am not a standards expert.  This is not what I do.

16        Standards are given to developers, they're given to state

17   agencies, they're given to companies and said, "Follow these

18   standards to provide a chance of accessibility to meet some

19   accessibility guidelines or goals for your organization."

20        I'm a usability person.  I look at how organizations have

21   chosen to implement those standards, whether they've chosen or

22   not, and figure out what worked and what didn't work in those

23   standards.

24        **MR. GILBERT:**  Your Honor, I would move to strike as

25   nonresponsive.

1          **MR. ELDER:**  Your Honor, that was his answer.

2          **THE COURT:**  The motion is granted.  The answer was

3     nonresponsive.

4          Members of the jury, please ignore the witness's answer

5     just now.

6     **BY MR. GILBERT:**

7     **Q.**   You did not apply any recognized standard in evaluating

8     the software suite or the PDFs to determine whether they were

9     usable, did you?

10    **A.**   I used my 25 years of -- 20-some years of -- 25 years this

11    year of script writing and evaluation to examine the usability

12    of the program.

13    **Q.**   So despite there being standards that are widely used in

14    the industry that people like Acrobat and the governments

15    utilize and rely upon, you elected to not use those standards

16    and, instead, use your own self-made, self-imposed standards?

17    **A.**   No.

18    **Q.**   Well, you didn't use any written recognized, formal

19    standards, did you?

20    **A.**   There are no standards that would say to me this -- why

21    this control isn't or isn't working.  The standards provide a

22    developer with -- they're not standards.  They're guidelines.

23    They provide guidelines to developers to create accessible

24    pages.  And when those pages don't work, then you have to look

25    for -- it doesn't do any good to examine the violation of the

1  standard if what you're trying to do is accomplish a goal of

2  making it work.

3  **Q.**  Let me see if I can go through this.  Let me see if I

4  understand it.

5      You went to the County's facilities and inspected their

6  hardware and software; is that right?

7  **A.**  Yes.

8  **Q.**  And they had a nice newer desktop model machine that was

9  available and designated for disabled access?

10  **A.**  Yes.

11  **Q.**  And that was a very expensive nice machine that's

12  dedicated for public use; is that right?

13  **A.**  Yes.

14  **Q.**  And it had also been equipped with very qualified and

15  competent software to be able to access material and fill and

16  complete forms on that machine, hadn't it?

17  **A.**  Yes.

18  **Q.**  And, in fact, it was equipped with JAWS.  And I think I

19  heard you say earlier JAWS was one of the more expensive and

20  more wildly utilized screen reading programs.

21  **A.**  Yes.

22  **Q.**  And the County went out and purchased all this, put it

23  together, and had it available, functioning properly when you

24  went to inspect it, didn't it?

25  **A.**  No.

1  **Q.**  And you're saying no because, in your opinion, your

2  self-imposed standards were not met because it could have

3  been --

4  **A.**  If they had followed --

5  **Q.**  -- they could have hired you to write different scripts?

6  **A.**  If they had hired -- if they had followed the guidelines

7  that are published by these legal matters that you're pointing

8  at, then the form would have worked.

9  **Q.**  Well, let's go to the specific published guidelines that

10  you looked and tested this form against.

11      What specific guidelines did you utilize?

12  **A.**  One of the guidelines is do not use visual information to

13  portray information on the screen.

14      **MR. GILBERT:**  Your Honor, I'd like to read from

15  Mr. Clark's deposition, page 45, lines 8 through 20.

16      **THE COURT:**  Hold on.  I'll ask my courtroom deputy or

17  my law clerk to hand me the deposition.

18                    (Pause in proceedings.)

19      **THE COURT:**  Page 45, lines what?

20      **MR. GILBERT:**  8 through 20, Your Honor.

21      **THE COURT:**  Rose, do we have the depositions?

22      **THE CLERK:**  From?

23      **THE COURT:**  The defense.

24      **THE CLERK:**  That one?

25      **THE COURT:**  No.  We need Mr. Clark's.

1          MR. GILBERT:  And, Your Honor, it was page 45.

2          THE COURT:  Thank you.  And my apologies for the

3    delay.

4          MR. GILBERT:  Thank you.

5          THE COURT:  Go ahead.

6          MR. GILBERT:  Thank you.

7      (As read):

8      "QUESTION:  Your response, you kept using the phrase,

9      quote, 'the standard,' end quote.  What specific standard

10     are you applying here?  Right?  If it's not ISO, then what

11     is the actual standard?

12     "ANSWER:  I am not applying a specific published standard.

13     "QUESTION:  Any at all?

14     "ANSWER:  I'm applying a usability standard.  Can the user

15     access this form as published with the current version of

16     JAWS using standard JAWS functionability?  Any other

17     person doing this job would do the same thing.

18     "QUESTION:  Did you analyze the FBNS PDF specifically

19     under any recognized PDF-accessibility standard?

20     "ANSWER:  No."

21          MR. GILBERT:  Thank you, Your Honor.  Nothing further.

22          THE COURT:  Any further questions from plaintiff?

23          MR. ELDER:  Yes, briefly, Your Honor.

24     \\\

25     \\\

| 1 | <u>**REDIRECT EXAMINATION**</u> |

**BY MR. ELDER:**

**Q.**   Mr. Clark, are you familiar with the WCAG -- are you familiar with that term "WCAG"?

**A.**   Yes.

**Q.**   What does that stand for?

**A.**   I don't know.  Something worldwide accessibility guidelines.

**Q.**   Are those the guidelines that you're referring to with respect to website accessibility or usability?

**A.**   Yes.

**Q.**   And is it possible for a developer to follow the guidelines and develop a website and then that website may not work for a blind user using JAWS?

**A.**   Yes.

**Q.**   Conversely, is it possible that some developer might make a web page that doesn't fully comply with the WCAG guidelines but that the JAWS user could, in fact, still use?

**A.**   Yes.

**Q.**   And so the WCAG, those guidelines, is that an approximation of how to develop a website to make it as accessible as possible for the broadest range of disabilities as possible?

**A.**   Yes.  Can I give you an example?

**Q.**   Would you give me an example?

1   **A.**   One of the guidelines, as I've mentioned a few minutes

2   ago, is don't use visual indicators only to convey information.

3   And a very common thing that happens on web pages is that a

4   developer will put a star at the beginning or the end of a

5   label to indicate that's required information, and then they

6   won't make sure that that star is announced by the screen

7   reader when you're tabbing through the information.

8        So the guidelines are providing a thing to do something,

9   but the developers are not implementing that 100 percent to

10   make that happen.

11        **MR. ELDER:**   Thank you.

12        No further questions.

13        **THE COURT:**   Does defendant have any further questions

14   for this witness?

15        **MR. GILBERT:**   No, Your Honor.   Thank you.

16        **THE COURT:**   Thank you, Mr. Clark.   You may step down

17   from the witness stand.

18                      (Witness excused.)

19        **THE COURT:**   Did he give his report back to you?

20        **THE WITNESS:**   Oh, do you want that back?

21        **MR. ELDER:**   Thank you.

22        **THE WITNESS:**   Can I stay?

23        **THE COURT:**   We're excluding witnesses who are not

24   testifying.

25        **THE WITNESS:**   Okay.   Thank you very much.

**PROCEEDINGS**

1          **THE COURT:**  With that, I think we should wrap up for

2    the day.

3       And, members of the jury, please be here at 9:00 a.m.

4    tomorrow morning so we can get going again promptly in the

5    morning.

6       With that, I'll ask my courtroom deputy to bring the

7    jurors into the jury room.

8     (Proceedings were heard out of the presence of the jury.)

9          **THE COURT:**  Is there anything plaintiff would like to

10   discuss now outside the presence of the jury?

11         **MR. ELDER:**  Nothing other than an update on the

12   schedule and when we anticipate to close.

13         **THE COURT:**  By all means.  Let's have an update.

14         **MR. ELDER:**  So our final witness in our case-in-chief

15   will be Ms. Martinez, who we would call first thing in the

16   morning.

17      And then it will be up to defendants to see if they have

18   any other witnesses to call in their case that we have not

19   called.

20      And then there's only the question of Ms. Hill and whether

21   she's going to be allowed to testify, but she would be the

22   concluding witness.  And at the pace we're going, we're,

23   I think, scheduled to wrap up this case tomorrow.

24         **THE COURT:**  All right.  Thank you.

25      Anything that defendant would like to discuss right now

PROCEEDINGS

1    outside the presence of the jury?

2        **MR. GILBERT:**  So, Your Honor, we do not plan on

3    calling any witnesses in the defense case.  What I would ask is

4    guidance from the Court as far as when to prepare closings.

5        Where we're at, I don't believe we've had the final jury

6    instructions and verdict forms.  There are some legal issues to

7    address, and there will be a Rule 50 motion at the conclusion

8    of plaintiff's case.

9        My request, humbly, would be let's complete plaintiff's

10   testimony tomorrow, and then we can presumably release the

11   jury.  I'm assuming the Court would then -- we would tell

12   the Court on the record that we would have a motion.  The Court

13   can tell us to defer it and proceed with our case.

14       We'll formally announce that we have no witness and we

15   rest, and then we can release the jury for the day tomorrow

16   when we finish Ms. Martinez and bring them back Monday, and

17   we'll be ready to proceed with closing Monday morning and

18   instruction.

19       **THE COURT:**  So I think what you're asking for is

20   guidance on when you might do closings.

21       **MR. GILBERT:**  Yes, please.

22       **THE COURT:**  You will not do closings tomorrow.

23       **MR. GILBERT:**  Okay.  Thank you.

24       **THE COURT:**  Any further questions from either side?

25       **MR. ELDER:**  Just to alert the Court that we will be

**PROCEEDINGS**

1    submitting our support for Eve Hill so that that can be -- I

2    mean, that will need to be assessed pretty rapidly since she

3    would be -- it sounds like if the defendant is not calling

4    anyone else, she would be the next witness after Ms. Martinez.

5    So we'll get that to you as --

6              **THE COURT:**  When will you get that on file?

7              **MR. ELDER:**  Yes.  We will do it as soon as we can.

8              **THE COURT:**  Okay.  Thank you.  I agree the issue is

9    likely to be teed up for resolution tomorrow.

10             **MR. ELDER:**  Yes.

11             **THE COURT:**  All right.  Any other questions from the

12   defense?

13             **MR. GILBERT:**  No, Your Honor.

14             **THE COURT:**  Okay.  Thank you, Counsel.  We are done

15   for the day.  Please be here at 9:00 a.m. tomorrow morning.

16                  (Proceedings adjourned at 3:27 p.m.)

17                           ---o0o---

18

19

20

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, March 29, 2024

7

8

9                         *Ana Dub*

10   _____

11             Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25