# EXHIBIT C

**Volume 4**

**Pages 558 - 709**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

| | |
|---|---|
| LISAMARIA MARTINEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )  **NO. 3:20-CV-06570 TSH** |
| | ) |
| COUNTY OF ALAMEDA, MELISSA | ) |
| WILK, in her individual | ) |
| capacity, EVA HE, in her | ) |
| individual capacity, MARIA | ) |
| LAURA BRIONES, in her | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

San Francisco, California
Friday, March 29, 2024

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

For Plaintiff:

TRE LEGAL PRACTICE
1155 Market Street, Tenth Floor
San Francisco, California 94103
BY: **TIMOTHY R. ELDER, ATTORNEY AT LAW**

UNDAUNTED LAW FIRM, P.C.
600 California Street, Seventh Floor
San Francisco, California 94108
BY: **S. TOMIYO STONER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Kelly Shainline, RPR, CRR, CSR No. 13476
Official United States Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff:
                              UNDAUNTED LAW FIRM, P.C.
 3                            600 California Street, Seventh Floor
                              San Francisco, California 94108
 4                  BY:   S. TOMIYO STONER, ATTORNEY AT LAW

 5
     For Defendant:
 6                            ORBACH HUFF & HENDERSON LLP
                              6200 Stoneridge Mall Road, Suite 225
 7                            Pleasanton, California 94588
                    BY:   KEVIN E. GILBERT, ATTORNEY AT LAW
 8                        NICHOLAS D. FINE, ATTORNEY AT LAW

 9

10   Also Present:       Lisamaria Martinez
                         Michelle Korosy, Paralegal
11                       Matthew Yankee, County of Alameda

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   Friday, March 29, 2024 - Volume 4

 3                                          PAGE   VOL.

 4   Plaintiff Rests                         699    4
     Defense Rests                           708    4
 5
     PLAINTIFF'S WITNESSES                   PAGE   VOL.
 6
     MARTINEZ, LISAMARIA
 7   (SWORN)                                  574    4
     Direct Examination by Mr. Elder         574    4
 8   Cross-Examination by Mr. Gilbert        672    4
     Redirect Examination by Mr. Elder       680    4
 9
     HILL, EVE LYNN (IN REBUTTAL)
10   (SWORN)                                  683    4
     Direct Examination by Mr. Elder         683    4
11   Cross-Examination by Mr. Gilbert        694    4
     Redirect Examination by Mr. Elder       698    4
12
                        E X H I B I T S
13
     TRIAL EXHIBITS                    IDEN   EVID   VOL.
14
      5                                        627    4
15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Friday - March 29, 2024**</u>                                                    **9:29 a.m.** |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---o0o---** |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE CLERK:**  Calling Civil Action 20-6570, Martinez vs. |
| 6 | County of Alameda, the Honorable Thomas S. Hixson presiding. |
| 7 | Go ahead, Judge. |
| 8 | **THE COURT:**  Good morning. |
| 9 | I've received the plaintiff's offer of proof with respect |
| 10 | to Marco Salsiccia.  Does the County wish to make any comments |
| 11 | in response? |
| 12 | **MR. GILBERT:**  No, Your Honor, other than I believe |
| 13 | that would constitute a motion for reconsideration.  There's no |
| 14 | new facts, information, or law.  The time to have submitted |
| 15 | that information would have been yesterday.  So I don't believe |
| 16 | it's proper to resubmit it before the Court. |
| 17 | **THE COURT:**  Well, I'm not happy with what plaintiff is |
| 18 | doing because your story about Salsiccia's testimony or |
| 19 | expected testimony keeps changing. |
| 20 | The reason why I originally said that Greco and Salsiccia |
| 21 | could testify was your representation to me that their |
| 22 | testimony would relate to the new kiosk that the County had |
| 23 | installed, and I had reopened fact discovery as to the new |
| 24 | kiosk.  And after I reopened it as to the new kiosk is when |
| 25 | these two witnesses were disclosed, and so I concluded that if |

1    in fact their testimony relates to the new kiosk, their

2    disclosure was timely enough that the County could have deposed

3    them.  By contrast if their testimony did not relate to the new

4    kiosk, then it did not relate to the reopening of discovery,

5    and fact discovery had otherwise been closed in April of that

6    year.

7        When we had our hearing on this, plaintiff represented to

8    me that, in fact, both of these witnesses went to the

9    Clerk-Recorder's Office with the intention of using the new

10   kiosk and were in some manner deterred from doing so.  I

11   concluded that that meant that their testimony related to the

12   reopened discovery and they could testify, but then Greco took

13   the stand and she said nothing of the sort.  Her testimony in

14   no way related to the new kiosk.

15       So then I asked plaintiff what Mr. Salsiccia's testimony

16   would be about, and at the time plaintiff represented to me

17   that it would be the same as Greco's and so that seemed like he

18   was clearly untimely disclosed.

19       But I've now received the plaintiff's offer of proof,

20   which reverts to their previous story that he is going to

21   testify that he went to the Clerk-Recorder's Office with the

22   intention of trying the new kiosk.

23       Plaintiff, is that what his testimony is going to be?

24       **MS. STONER:**  He went with the intention of trying the

25   new kiosk.  It was not offered to him and he had no opportunity

1    to.  It's relevant because on December 1st, 2022, in context of

2    the motion of summary judgment, defendants disclosed to us for

3    the first time that they had a new kiosk system in place that

4    was -- that had new accessible software that it hadn't before.

5         So within that same month of December, we sent two

6    people -- or we, you know, found two people who went to test

7    the kiosk system.  Neither of them were even offered the

8    opportunity to test it.

9         So now we're here with the jury hearing all this evidence

10   about all these things the defendants have done after -- well

11   after Ms. Martinez visited the CRO, well after discovery

12   closed, and we are hamstrung because no one who was actually

13   blind got to try the system other than, of course, through our

14   expert witness, which is a completely separate issue.

15        So --

16        THE COURT:  Do you anticipate this witness will say he

17   was aware there was a new kiosk and he went there with the

18   intention of using it?

19        MS. STONER:  I believe he would say that.

20        THE COURT:  Well, then, fine, he can testify.  Based

21   on your offer of proof, I change my previous order, and he's

22   allowed to testify, but I expect his testimony does need to

23   relate to the new kiosk.  It can't just be that he went in and

24   filled out a paper form and he was unaware of the new kiosk or

25   didn't try to use it.  In some manner his testimony has to

 1   relate to the presence of that new kiosk.

 2        MS. STONER:  And I think this is where the disconnect

 3   may be, and I do want to clarify for the Court before there's

 4   any -- what happened with both Mr. Salsiccia and Ms. Greco is

 5   they went to fill out the FBNS form.  They were each directed

 6   to the option of a transcriber.  Neither of them were directed

 7   to the option of trying the kiosk.

 8     So they went in as if just any other person would go in.

 9   They didn't go in as an expert witness as a tester.  They went

10   in just as any other person would go in seeking to submit the

11   form, and what happened was quite a surprise to all of us,

12   including Mr. Salsiccia and everyone at this table, which was

13   that they were not offered the kiosk system.

14     Now, he won't testify that he insisted that he see the

15   kiosk because I just -- I don't think he was in the mindset.

16   He was in the mindset of filing an FBNS form.  He's not an

17   expert witness.  He wasn't there with the expressed purpose of

18   being at -- you know, of testing the kiosk.  He was there with

19   the purpose of filing the FBNS form in that month.

20        THE COURT:  Hmm... Is he going to say or do you expect

21   he's going to say he went there with the intention of trying

22   the new kiosk?

23        MS. STONER:  I think he's going to say he went there

24   with the intention of trying the FBNS form being aware that

25   there was a kiosk option.

1    **THE COURT:**  He's going to say that he was aware that

2  there was a kiosk option?

3    **MS. STONER:**  We could lay that foundation, yes.

4    **THE COURT:**  Well, I think that's good enough, and

5  you've satisfied the -- if -- I'm taking you at your word that

6  that's going to be what he says; but, again, this testimony has

7  to relate to the new kiosk, otherwise the witness wasn't timely

8  disclosed.

9    Counsel?

10    **MR. ELDER:**  I must apologize, Your Honor.  This is my

11  fault because this was true with Ms. Greco as well; but during

12  the exam, I neglected to lay that foundation, that she was

13  going there.

14    She -- counsel had asked her to report her findings, but

15  specifically to let us know what happened with respect to the

16  kiosk and this whole thing.

17    So this is probably my fault for not laying a foundation

18  with Ms. Greco, but I just wanted to apologize and say we do

19  treat our duty of candor very seriously and, you know, didn't

20  intend to misled you in anyway.

21    **THE COURT:**  Well, thank you.

22    Again, I reopened discovery as to the new kiosk, so

23  Mr. Salsiccia's testimony has to relate at least in some way to

24  an attempt to use the new kiosk.  You've represented that it

25  will relate to that.  So based on that, I change my previous

**PROCEEDINGS**

1   order and plaintiff can call Mr. Salsiccia to testify.

2        My understanding, however, is that your next witness is

3   the plaintiff or do you want to call Mr. Salsiccia?

4        **MR. ELDER:**  Mr. Salsiccia is not here.  We're going to

5   have to see if we can get him down here quickly, but it would

6   be Ms. Martinez.

7        Is there -- we also filed an item regarding Eve Hill and

8   whether she would be allowed to testify based on what

9   Mr. Yankee had said.

10        **THE COURT:**  You did.  I saw that and I reviewed that.

11   Do you want to argue the point now or after the plaintiff

12   testifies?

13        **MR. ELDER:**  I don't know if plaintiff's testimony

14   would shed any light on it.  If Your Honor needs more time to

15   look at anything, that's fine.  I just -- I'm more concerned

16   about the logistic of letting Ms. Hill know that she needs to

17   be ready at a particular time or to release her.

18        **THE COURT:**  Well, I -- this may be -- we're going to

19   need to hear argument from the County, and this may be a little

20   extended.  I think it might be better to have the plaintiff

21   testify, and then -- but in the meantime you should let

22   Ms. Hill know that if I allow her to testify, she would need to

23   testify today --

24        **MR. ELDER:**  Yes.

25        **THE COURT:**  -- and so she should be prepared to do so.

PROCEEDINGS

1          **MR. ELDER:**  She's standing by for the Zoom link, yes.

2          **THE COURT:**  With that, can we bring in the jury and

3    have plaintiff testify?

4          **MR. ELDER:**  Can we have -- one final thing is, so with

5    this particular witness, this is a blind attorney doing a

6    direct of a blind witness, and my intent is to -- for one of

7    the exhibits I'm going to connect to the system and let her

8    hear my JAWS interacting with Exhibit Number 22, which would

9    have some of the audio of that screen reader, you know, audible

10   for the jury as well but also for Ms. Martinez to hear what I'm

11   talking about.

12       I think this is analogous to an attorney zooming or

13   highlighting words on an exhibit for a witness, but this is

14   kind of an unusual situation so I just wanted to be transparent

15   and handle this before we're in front of the jury.

16         **THE COURT:**  Thank you for raising it before we're in

17   front of the jury.

18       So the idea is you would have -- you would play the audio

19   of JAWS reading portions of Exhibit 22?

20         **MR. ELDER:**  Correct.

21         **THE COURT:**  Okay.

22         **MR. ELDER:**  For the plaintiff to hear, and then I will

23   ask plaintiff questions about what she is hearing and

24   highlighting different things about what I am hearing and what

25   she is hearing in the JAWS on the exhibit.

568

1          **THE COURT:**  What is the County's view on that?

2          **MR. GILBERT:**  I have concerns about it because I don't

3     think it's relevant.  I think it's absolutely confusion of the

4     issues.

5          First of all, if I remember right, Exhibit 22 -- I'm

6     trying to pull it up while we're speaking -- I believe is

7     the -- is that the 2022 form? -- that's the 2021 form, which is

8     not the form that was completed by plaintiff initially or in

9     the resubmission nor is it the current version.

10         So to cherry-pick out a specific form and have JAWS

11    interact with it or not has no relevance to the pending issues

12    in this case.  It does not go to whether there's effective

13    communication at the time and nor does it go to whether or not

14    injunctive relief is appropriate today.

15         We do not use that form currently.  It currently is not in

16    play.  There's been two additional renovations to it that have

17    been marked as exhibits as well.

18         So to use an exhibit that was never accessed by plaintiff

19    is not in play and has no relevance to this would simply be a

20    confusion of issues for the jury and for the purpose of

21    inflaming the jury if there was possible JAWS issues on that

22    particular exhibit.

23         There was a separate software suite that was put in place.

24    I don't know if this form was derived from that software suite

25    or not.  There was no testimony on that from plaintiff.  They

**PROCEEDINGS**

1   did not try and authenticate that with Mr. Yankee or anyone

2   else from the County.  So there's no link to the documents, so

3   the jury is left to guess as to what's the relevance and

4   tangential connection of these issues.

5       JAWS is not on trial here.  Whether JAWS is effective or

6   whether the County can interface with JAWS is not the legal

7   issue.  The issue is:  Was there effective communication?  And

8   if the answer is no, then the question is:  Is the current

9   system in place sufficient to avoid the recurrence of the

10  problem?  And this form is not one that's currently being used,

11  nor is the JAWS software the only option that's available.

12      The testimony that we've had is that the County has

13  multiple ways that these forms can be completed.  It can be

14  done online using JAWS software or any other number of

15  software.  It can be done at the County's kiosk, which does

16  have JAWS software but not this form.  It has an updated

17  version.  It can be done with the assistance of County staff

18  from the -- I believe it's the clerk assistance unit -- or

19  the County -- I can't remember the name, I'm sorry -- that

20  would then provide assistance at the kiosk or it can be done

21  with a CRO at the counter.

22      So with that, Your Honor, I don't believe this is

23  relevant, and I do believe it should be excluded under 403.

24          **THE COURT:**  Well, there are really two issues on

25  trial.  One is whether the County violated the ADA on March 29,

1    2019, and the second is whether an injunction should issue.

2    The JAWS reading of Exhibit 22 does not relate to March 29,

3    2019, so its relevance would only be as to the propriety of

4    injunctive relief.

5        I don't think that the evidence concerning whether there

6    should be an injunction is limited only to the state of the

7    world as it exists today.  I think it can also be a broader

8    inquiry into the measures the County has implemented in the

9    periods of time leading up to today, and I would think that

10   would include FBNS forms adopted after March 29, 2019, and

11   before today.

12       Is plaintiff offering this in the theory that it's

13   relevant to the proposed injunction?

14       **MR. ELDER:**  Well, and I should be clear about this

15   because I -- so the relevance is that -- so we don't have a

16   County form from 2019 that's blank and was formatted so that it

17   was fillable.  We have a 2018 form and we have the 2021 form.

18   And the 2021 form, Ms. Martinez has gone through it and it

19   behaves substantially similar to the form that she did fill out

20   in 2019.  So it's relevant to her experience of filling out the

21   PDF form in 2019 because it's the closest-in-time revision and

22   version that we have to her actual experience.

23       The 2018 form does not accurately reflect what she

24   experienced when she filled out the form.  She was able to

25   partially fill out the form.  The Exhibit 22, the 421 form, is

1   similar to the experience that she had with when she did it in

2   2019.

3       If I had the original fillable form from 2019, we would do

4   it, but all we have are the end-product forms that were

5   completed and then printed and submitted and circulated, which

6   doesn't retain the same fillable nature to the exhibit.

7       So that's -- its relevance is to illustrate what she went

8   through on a form in 2019 and to clarify that she was able to

9   fill out some of these things; but the things specifically that

10  she was not able to fill out, the check boxes, those are a

11  problem on this 421 form.  And the experience that she had is

12  she will testify was similar to what she experienced when she

13  did fill out the form.

14      So, again, I don't have the best evidence.  All I have is

15  something that is the next reversion or a close-in-time

16  reversion of the form that seems, from Ms. Martinez's

17  perspective, to be very similar to the experience she had on

18  the form she did fill out.

19          **THE COURT:**  Okay.  Thank you.

20      It seems that I misunderstood.  You're not really offering

21  this for the injunction.  You're offering it for whether the

22  ADA was violated on March 29, 2019.

23      Will you have the witness lay a foundation that

24  Exhibit 22 -- that she has tried to use JAWS to read Exhibit 22

25  and it was similar to her experience in March 2019?

1    **MR. ELDER:**  Correct.  And we were even intending to

2    clarify that this, in fact, is not the form that you actually

3    filled out but one that seems to act similarly.

4         **THE COURT:**  Then that's fine.

5         **MR. ELDER:**  Yes.

6         **THE COURT:**  And you're set up to play that through the

7    audio system?

8         **MR. ELDER:**  Yeah.  I just need to plug in over there.

9    I can do that now or we can wait till the jury -- maybe I

10   should set up now while --

11        **THE COURT:**  If there's any setup you need to do now,

12   that would be --

13        **MR. ELDER:**  Yeah, I'll just come up.

14        **THE COURT:**  Okay.

15        **MS. STONER:**  And, Your Honor, while he sets that up, I

16   will add for clarity of the record, there is a 2018 -- a

17   10/2018 exhibit, but that PDF is flattened.  That means the PDF

18   has all the tags and accessibility features removed, so it's

19   going to act substantially different.

20        **MR. ELDER:**  I'm -- we're not 100 percent sure how

21   accurate that is, but it's -- at least from Ms. Martinez's

22   perspective, it does not seem to be similar to the one that she

23   filled out.  So whatever it was, it was there in 2018 but that

24   doesn't appear -- it's the later one that seems to be similar

25   to her experience in 2019, not the earlier one.

PROCEEDINGS

1    **THE COURT:**  I think the foundation that makes this

2  relevant will be her testimony that she used Exhibit 22 and she

3  believes it was similar to what she used in 2019.

4    Let me know when you're ready.

5    **MR. ELDER:**  You know, what I think we are -- let me

6  just test this.

7                  (Pause in proceedings.)

8    **MR. ELDER:**  That's working.  That will be fine.  I

9  won't let the jury do this the whole time I'm doing --

10    **THE CLERK:**  Just leave it up there.

11    **MR. ELDER:**  Well, I'll plug this in when it's time --

12    **THE CLERK:**  Okay.  That's fine.

13    **MR. ELDER:**  -- but I don't want the jury to hear my

14  JAWS the whole --

15    **THE CLERK:**  You don't have to show it.  Just -- you

16  don't have to take your computer back.  If you could just --

17    **MR. ELDER:**  Just stay here?

18    **THE CLERK:**  Yes.

19    **MR. ELDER:**  Yeah, I'm going to unplug from this so

20  they don't see my screen --

21    **THE CLERK:**  That's fine.

22    **MR. ELDER:**  -- during the rest of the exam and then it

23  will --

24    **THE CLERK:**  Okay.

25    **MR. ELDER:**  We're good.

**MARTINEZ - DIRECT / ELDER**

1        THE CLERK:  All right.

2        THE COURT:  All right.  At this time I'll ask my

3   courtroom deputy to bring the jury into the courtroom.

4                    (Pause in proceedings.)

5        (Proceedings were heard in the presence of the jury:)

6        THE COURT:  Good morning, everyone.  Please be seated.

7   Plaintiff, please call your next witness.

8        MR. ELDER:  Your Honor, plaintiff calls Lisamaria

9   Martinez.

10        THE WITNESS:  I can move these aside?

11        THE COURT:  Sure.  That's fine.

12        THE CLERK:  All right.  Ms. Martinez, this is the

13   courtroom deputy.  Could you please raise your right hand?

14   Thank you.

15                   <u>**LISAMARIA MARTINEZ**</u>,

16   called as a witness for the Plaintiff, having been duly sworn,

17   testified as follows:

18        THE WITNESS:  I do.

19        THE CLERK:  Thank you.  You have been sworn.

20                   <u>**DIRECT EXAMINATION**</u>

21   BY MR. ELDER:

22   Q.   Good morning, Ms. Martinez.

23   A.   Hello.

24   Q.   Could you state your full legal name for the record?

25   A.   Yes.  I am Lisamaria Martinez.

1  **Q.**   And where do you currently reside?

2  **A.**   Union City, California.

3  **Q.**   Who do you live with in Union City, California?

4  **A.**   I live with my husband and my three kids.

5  **Q.**   And do you have a disability?

6  **A.**   I do.

7  **Q.**   What is your disability?

8  **A.**   I am blind.

9  **Q.**   When did you become blind?

10 **A.**   When I was 5 years old.  A long time ago.

11 **Q.**   Okay.  And how has blindness affected the way that you

12 received an education as you grew up?

13 **A.**   Growing up as a blind kid, I learned the skills of

14 blindness, such as braille and cane travel and different types

15 of alternative techniques that I could use to access the

16 material -- the printed materials that my sighted peers were

17 accessing throughout school.

18 **Q.**   Were you in a mainstream classroom?

19 **A.**   I was.

20 **Q.**   And did you go to college?

21 **A.**   I did.

22 **Q.**   Where did you go?

23 **A.**   I received a Bachelor of Arts from the University of

24 California Berkeley minoring in sociology; and then a couple

25 years after receiving my bachelor's, I received a Master of

 1    Arts in educational psychology at Louisiana Tech specializing

 2    in orientation and mobility.

 3    **Q.**    You said "orientation mobility."  What is that?

 4    **A.**    A fancy phrase for cane travel.  So essentially I was

 5    learning how to teach other blind people how to travel safely

 6    and independently.

 7    **Q.**    And then did you eventually get a job after you graduated

 8    with your master's degree?

 9    **A.**    I did.  Actually I came home -- I remember I came home on

10    a Sunday night and Tuesday morning I had my first job

11    interview.

12    **Q.**    Okay.  And where did you -- did you get that job?

13    **A.**    I did.

14    **Q.**    And where was it?

15    **A.**    It was a part-time contractor for what was called the

16    Lions Center for the Blind.  They do not exist as a training

17    center any longer.

18    **Q.**    And then did you work anywhere after the Lions Center?

19    **A.**    I took a little bit of time off because I had been a very

20    competitive judo athlete all my life, and I had the opportunity

21    to potentially be on the Beijing Paralympic team, blind judo

22    Olympic team.  I qualified the spot but in the end, another

23    teammate went in my time -- in my spot.

24         And so after that, I took a couple months to recoupe, and

25    I found a full-time job at the Lighthouse for the Blind.

MARTINEZ - DIRECT / ELDER

1   Q.   And for those who don't know, what -- what is the sport of

2   judo?

3   A.   I'm sorry?

4   Q.   What is the sport of judo?

5   A.   Oh, judo in theory is the gentle way of jujitsu.  So in

6   jujitsu there is a lot of choking and arm bars and grappling

7   and floor work, pinning ultimately.

8        Judo is a little bit more gentler, only a few chokes and

9   arm bars and pins, but you start standing and there are throws

10  involved to get down and do mat work.

11  Q.   And is this a sport that can be done nonvisually?

12  A.   Yes.

13  Q.   Okay.  You mentioned the Lighthouse.  What did you do at

14  the San Francisco Lighthouse?

15  A.   I worked there for 10 years, so I had a couple of

16  different job positions while I was there.  I initially started

17  as the technology associate at their physical store for the

18  blind called Adaptations.  It sold blindness products.

19       And after a year, I was recruited into the development and

20  marketing department; and in the four and a half years that I

21  spent there, I was a donor relations coordinator, a public

22  relations coordinator, an event planner, and the social media

23  specialist.

24       After that, I decided that it would be fun to direct

25  programs and be a supervisor, and so for the last five years at

1    the Lighthouse I was director of community services overseeing

2    programs such as our youth program, our evening and weekend

3    program, volunteer management, the store.  I oversaw several

4    people, a department of roughly 12 to 14 people.

5    **Q.**    Okay.  Do you hold any other position -- like volunteer

6    positions in the community aside from paid positions?

7    **A.**    I do.  I'm a very active member of the National Federation

8    of the Blind called NFB for short.  I hold several leadership

9    positions within that blindness consumer organization.

10   **Q.**    Ms. Martinez, you heard the recordings that were played

11   earlier in this case; is that right?

12   **A.**    I did.

13   **Q.**    And I believe you mentioned the ADA and Title II.  How did

14   you come to have an understanding of the ADA and Title II and

15   what you believe your rights are under that law?

16   **A.**    So I've grown up in the NFB.  I came to know the

17   organization because of my parents trying to find successful

18   blind adults that I could meet and have as mentors, and that

19   was as early as the age of 7.  I'm very thankful for my parents

20   finding me blind mentors.

21        And so since then, as a kid, as a teenager, in college my

22   blind mentors would often invite me or alert me to some of the

23   advocacy going on within the NFB.  And so throughout my years

24   within the NFB, I've learned some lingo about the ADA and

25   rights of people with disabilities, and so that's where some of

1    my knowledge comes from.  And more recently, particularly since

2    I became a mom myself, I have been more active in advocacy

3    around IEPs.

4    **Q.**    What is an IEP?

5    **A.**    It stands for individualized education plan, and they are

6    essentially a contract and a list of goals, academic, social,

7    behavioral goals, for students with a disability, and those

8    goals list things that need to happen in order for the blind

9    child to be successful and independent in their classes.

10   **Q.**    In all of this work that you've done and education --

11   excuse me.

12        All this work you've done in all of these positions, have

13   you ever had a need to fill out paperwork?

14   **A.**    Yes.  All the time.

15   **Q.**    Okay.  It seems like you've been doing a lot of work in

16   the blindness field.  Why did you go into this field?

17   **A.**    I have always wanted to help people.  Ever since I was a

18   kid, I thought I'd become a psychologist or a counselor.  As I

19   grew older, I realized that wasn't exactly what I wanted to do,

20   but I could still help and make an impact in a community that

21   is particularly near and dear to my heart and a community

22   that's really given back to me in so many ways to help shape me

23   into, you know, the 40-something-year-old I am today.  And so I

24   wanted to give back and it was an easy enough direction to go

25   and know that I'd be helping people and making an impact in the

1  world and loving my job.

2  **Q.**   And in 2019, did you move in a slightly different career

3  direction?

4  **A.**   I did.

5  **Q.**   And what was that?

6  **A.**   I had a little nonprofit burnout, fatigue, as is common in

7  the nonprofit world, and I thought that my dream of being a

8  small business owner and having, you know, my own flexible

9  schedule and being my own boss, I felt like that was the right

10  time in my life where I was in my career and where I was in my

11  life as a mother with three younger children.

12      So I left the Lighthouse after 10 years very sadly, and I

13  took some time to become a certified life coach and start my

14  own life coaching business.

15  **Q.**   And is that how you're currently employed at the moment --

16  **A.**   Yes.

17  **Q.**   -- through the life coaching?

18  **A.**   Yes.

19  **Q.**   Okay.  And do you have any current -- well, have you --

20  since you filed your business in -- sorry.

21      Did you file -- when did you open your life coaching

22  business?

23  **A.**   I filed my Articles of Organization and all of my business

24  documents for the State in the City of Union City in the year

25  of 2019.

MARTINEZ - DIRECT / ELDER

1    **Q.**    And since you opened it, have you been seeing clients?

2    **A.**    Yes.

3    **Q.**    Okay.  Do you hold any certifications in the field of life

4    coaching?

5    **A.**    I do.  I have a certification as a certified professional

6    coach and -- which is recognized by the ICF, the International

7    Coaching Federation, which is a governing body for life

8    coaches.

9    **Q.**    And in this business of life coaching, have you had need

10   to complete paperwork?

11   **A.**    Yes.

12   **Q.**    So for all of the work experiences you've discussed --

13   your education, your nonprofit positions, and life coaching --

14   what techniques do you use to fill out paperwork or complete

15   forms --

16   **A.**    Right.

17   **Q.**    -- or applications that are in a paper format?

18   **A.**    Particularly when I was working at the Adaptations store,

19   there was a lot of print materials that needed to be accessed.

20   Even in a blindness nonprofit there is a lot of print that

21   everyone needs to access.  So I often engaged a reader and

22   transcriber.  That was one method.

23        And one thing that every successful blind person knows is

24   that you have to learn multiple ways of getting things done,

25   and so sometimes I had things electronically available.

1    Whenever I could, I'd try to push for braille.  That's,

2    honestly, my particular preferred method of accessing print is

3    in braille; and then, of course, sometimes there's things

4    audio.

5        But unfortunately, and particularly when I was a director,

6    I had to sign a lot of budget-related things and approve a lot

7    of expenses and accounting; and so when I could, I was using

8    screen reading software to view Excel spreadsheets.  And when

9    it came time to signing documents that my staff would submit to

10    me on printed form, I usually engaged a reader and transcriber

11    to read through the, for instance, submitted expenses for

12    reimbursement, and then I would be shown where to sign and I

13    would sign the document and return it.

14    **Q.**    You said a screen reader.  Could you just briefly explain,

15    like what is a screen reader?

16    **A.**    So there's many different screen-reading softwares out

17    there in the world and, I don't know, I would guess that JAWS

18    is probably the most well-known paid screen reader, and it

19    essentially is a piece of software that gets loaded onto your

20    computer and it is a text-to-speech software that allows me to

21    mostly access what is on my computer screen.

22    **Q.**    And you said it enabled you to view Excel spreadsheets.

23    What do you mean by "view"?

24    **A.**    Read through the information that might be on a

25    spreadsheet or a Word document or a PDF or a Google doc.

1    Unfortunately, things are not always created in an accessible

2    manner, and so sometimes I do receive documents that I cannot

3    view, meaning I cannot have my screen reader read out loud what

4    is on the screen.

5         So there may be print up on the screen, but I might hear

6    blank, blank, blank, blank, which doesn't give me any useful

7    information.

8    Q.   And when you say "view" and "read," are you referring to

9    visually being able to do it or is -- what do you mean by the

10   term "read"?

11   A.   I, as a blind person, use the word "view" and "read"

12   because I don't like to torture my language, meaning that it

13   just sounds a little funky when I'm talking to you or anybody

14   else, particularly to sighted people, for me to say, "Oh, I was

15   listening to a movie the other day."  That's -- that's not

16   commonly used language.  You know, people say, "Oh, I watched a

17   movie the other day."

18        So when I say "read," when I say "view," I am not using my

19   eyes to access the information; I am using my ears and

20   screen-reading software to access it.  I'm just, you know,

21   using the words that everyone uses around me.

22   Q.   What techniques do you use to take notes?

23   A.   I use a lot of different methods.  As I said previously, I

24   really do prefer braille.  That's how I feel I am a literate

25   human being.  I used to use a clunky, old braille writer, which

1    can be compared to a typewriter.

2        And as technology developed, I started to use braille note

3    takers or braille displays, which is a way to input braille

4    using braille dots and patterns; and then if your note taker

5    has a braille display, you could feel the braille at the bottom

6    that you've just typed or if you need to read through a

7    document, you could advance the screen and keep reading.

8        So I often will use a keyboard, whether it's a

9    braille-input keyboard or the ones -- you know, a bluetooth

10   keyboard that a sighted person might use, like QWERTY style,

11   the Q-W-E-R-T-Y style, keyboard and I might type up a note in a

12   note-taking app on my phone.

13       I might record a note because it's faster and easier and

14   perhaps I have a tiny purse that day and my keyboard isn't with

15   me or my braille display isn't with me.

16       You may have seen me use hard-copy braille throughout the

17   week using a slate and stylus.  So there I'm literally punching

18   out every single dot to form a braille letter using a stylus,

19   and so I really like that method for meetings because then I

20   can access braille and notes and info immediately.  You know, I

21   just take it out of the slate, turn it over, and there's the

22   braille.

23       And those are probably the ways I often take notes.

24   **Q.**  You said that you make a recording, I think you said, of

25   audio.  How would you make an audio recording?

1   **A.**   There is a voice memo app on the iPhone, and so that's a

2   pretty simple app to bring up very quickly.  You know, I just

3   pull my phone out of the pocket and I open the app.

4        And in theory, if I use a gesture of two-finger double tap

5   on the screen, that will toggle on and off the beginning and

6   the end of your audio recording.  And in the blindness

7   community, we call that magic tap because it works for, you

8   know, hanging up the phone; it works for toggling on and off

9   audio like music and any books you might be listening to.

10  **Q.**   Do you have your iPhone on you now?

11  **A.**   I do.

12  **Q.**   And does it have the same voice memo --

13  **A.**   Yes.

14  **Q.**   -- thing on it?

15  **A.**   Mm-hmm.

16        **MR. ELDER:**  Your Honor, with the Court's permission, I

17  would like Ms. Martinez to show how she does this.

18        **THE COURT:**  That's fine.  Go ahead.

19  **BY MR. ELDER:**

20  **Q.**   Okay.  Could you take your iPhone out, please?

21  **A.**   Would you like me to open the voice memo app?

22  **Q.**   I would.  I'd like, if you could, turn up your speech so I

23  can hear it as well.  That would be helpful.

24  **A.**   (Witness complies.)  Let me slow down the speech.  That

25  should be...

MARTINEZ - DIRECT / ELDER

1          Okay.

2    Q.    Now, if you were going to start a recording, how would you

3    do that?

4    A.    All I would do is the two-finger double tap.

5    Q.    Could you do that?

6    A.    Yes.  So I double tapped with two fingers, and I heard a

7    little bleep; and in theory, it should be recording and I can

8    check that.

9    Q.    Could you stop the recording now?

10   A.    I can.

11   Q.    Okay.  Could you show us how you would do that?

12   A.    Yeah.  So, again, I'm going to do a two-finger double tap,

13   and then I heard the little bleep again.

14   Q.    And if you were to -- could you play that recording?

15   A.    I can.  Let's see.

16              (Audio was played but not reported.)

17   A.    You can hear on the recording that I ended it with the

18   two-finger double tap.

19   Q.    Great.  Thank you.

20         Are you able -- sorry.

21         Do you have any residual vision for anything at all?

22   A.    Enough to get into trouble but not enough to get out.

23   Many blind people -- many people who are legally blind have

24   some kind of functional vision.  Very few are totally blind,

25   and I would fall under the category of people who have some

**MARTINEZ - DIRECT / ELDER**

1  functional vision.

2  **Q.**    Would you be able to recognize my face if I was standing

3  in front of you?

4  **A.**    No.

5  **Q.**    Would you be able to recognize that there was an object in

6  front of you?

7  **A.**    Yes.

8  **Q.**    Are you able to see well enough to write on the blanks on

9  a paper form if you put your face up very close or did whatever

10  you could do to try to write on the paper form?

11  **A.**    No.

12  **Q.**    So for all of these tools that you have to complete a

13  paperwork task, how do you decide which is the right tool in a

14  particular situation?

15  **A.**    It really comes down to what is the most efficient way at

16  the moment, and that could have to do with time.  It could have

17  to do with the length of the document.  What I mean by that is,

18  you know, if it's a few lines that need to be entered, it's a

19  lot simpler to have a reader or scribe assist me with that.

20  But, you know, if it's multiple pages and it's lengthy, that

21  would not be an efficient use of anybody's time and so, you

22  know, I would -- I would access a document like that a little

23  differently.  But it does come down to efficiency for everyone

24  involved if I have to involve other people to help me.

25  **Q.**    And if you wanted to access a document in a braille paper

1  format, would there be any difficulty in doing that?

2  **A.**    Oh, yeah.  Getting the document brailled, you know, I,

3  unfortunately, don't know too many places that have the

4  capabilities of brailling out documents on demand, and so it's

5  a rare occasion where I can access a braille document.  Usually

6  at blindness conferences I could get an agenda in braille

7  pretty easily; but if I went to, I don't know, a City Council

8  meeting, I would not expect a document to be handed to me in

9  braille.

10      Restaurants often have braille menus, not always.  I do

11  ask because if they do, it's very efficient for me to go

12  through and figure out what I want to eat versus asking someone

13  to read and reread and read and reread a particular section of

14  the menu.

15  **Q.**    And back in 2019 after you formed your life coaching

16  business with the State of California, did you eventually

17  become aware of a fictitious business name statement filing

18  requirement in the County of Alameda?

19  **A.**    Yes.

20  **Q.**    And at that time in 2019, what was your understanding of

21  that filing requirement?

22  **A.**    Can you explain what you mean by my understanding of the

23  filing?

24  **Q.**    Well, at that time, as you think back to 2019, what did

25  you believe you had to do with respect to an FBNS form?

**MARTINEZ - DIRECT / ELDER**

1  **A.**    Oh.  Because I wanted to run a business that wasn't --

2  that was using a different title than my personal name, I

3  needed to file an FBN form to open up a bank account under the

4  title of my coaching business.  And so my understanding is that

5  I needed to fill out this form, make payments, submit it, and I

6  would get it returned to me.  And if -- when it gets returned,

7  then I'm told, you know, you have -- officially have this title

8  registered in the State of California doing life coaching

9  business and people could find you in public records.

10 **Q.**    And what -- at that time -- and I'm talking, you know,

11 prior to March 29th, 2019 -- what did you do to prepare to file

12 your FBNS form?

13 **A.**    It appeared to be a simple document, mainly because it was

14 short, and I had to go online and download a PDF of the

15 document.  So I had to search for it on the Alameda County

16 website and download it and then open it, read it using a

17 screen reader because I was on my computer, and fill it out and

18 then print it, sign it, and either mail it in or go in in

19 person and submit it.

20 **Q.**    Do you remember having any problems filling out that PDF

21 form?

22 **A.**    I do.  So it made the preparation of the document harder

23 and a longer event than I had hoped it to be.

24 **Q.**    And do you remember any specific issues that you had with

25 that form?

1  **A.**    Yes.

2  **Q.**    And what were they?

3  **A.**    When I opened up the PDF document and started to arrow

4  around the document to get a feel for what was on it, there

5  were no what we call proper tagging so that I could skim

6  through the document.  So screen reader users are very accustom

7  to using keystrokes to maybe jump from heading to heading and a

8  heading being visually -- my understanding of a heading is

9  usually a title of a section or chapter or a piece of

10  information.  A heading is larger and usually bolder than the

11  text following it.  So jumping around by headings gives me a

12  clearer idea of what's -- what sections I might have to look

13  closely at.

14      So that's an example of being able to skim through the

15  document and understand it before going through it from top to

16  bottom.

17      Because there were no proper tags, I did have to go top to

18  bottom, line by line, you know, getting through names of

19  people, dates, addresses, instructions, and then finally

20  getting to the part that appeared to have edit fields that I

21  could type in.  An edit field is like a blank box on a form

22  online that you can start typing in and put information in.

23      And as a screen reader, I have to press "enter" in that

24  edit field with JAWS so that I can tell JAWS, "Hey, I'm going

25  to write letters now and I need you to type them, not jump

1   around the screen."  Right?  If I started to write "Happy

2   Birthday" in an edit field, the "H" is going to take me to the

3   next heading unless I toggle JAWS and get it into a different

4   mode for writing.

5        So --

6   **Q.**   So -- sorry.  Go ahead.

7   **A.**   So I had to -- I had difficulties knowing what edit field

8   belonged to what questions.  So if it asked for my name, the

9   edit box didn't tell me that.  I had to search around above,

10  below the edit box to figure out:  Okay, is this edit field

11  below the word "name" associated with "name" or is it an edit

12  box above "street address" and it actually wants street

13  address?  So there was that confusion.

14       And the biggest most clear memory I have was the check

15  boxes in a section of the form.  There were a lot of check

16  boxes; and like the edit fields, I had no idea what they were

17  attached to, so I didn't know what to check.

18  **Q.**   Okay.  And do you -- have we preloaded the exhibits in

19  this case onto your laptop?

20  **A.**   We have.

21  **Q.**   And is Exhibit 22 on your laptop?

22  **A.**   It is.

23  **Q.**   I'm wondering if you could pull that up for a second and

24  take a look at it as you need to, and I want to ask you some

25  questions about this document when you have a minute.

**MARTINEZ - DIRECT / ELDER**

1    **A.**    Okay.  I need to sign in really quick.

2    **Q.**    Oh, you know what?  It's okay.

3          Have you previously seen Exhibit 22?

4    **A.**    I have.

5    **Q.**    Okay.  And let me represent to you that Exhibit 22 has a

6    revision date of April of '21, or at least it has a revision

7    4/21.

8          When you saw Exhibit 22, did you understand that to

9    suggest that this was a form from April of 2021?

10   **A.**    Yeah.  I remembered that at the top of the document there

11   were a bunch of numbers and then in parentheses I remember

12   reading "Rev. 4/21."

13   **Q.**    Now, you filled out your form before April of 2021; right?

14   **A.**    Correct.

15   **Q.**    And -- okay.  That's good.

16         So Exhibit 22, this is not the exact form that you filled

17   out in 2019; right?

18   **A.**    Correct.  But it seems very similar.  I could not tell you

19   what differences there may have been.

20   **Q.**    Okay.  One second.

21                    (Pause in proceedings.)

22         **MR. ELDER:**  Do we have the --

23         **THE CLERK:**  It's on.

24         **THE WITNESS:**  Yes.

25   \\\

**MARTINEZ - DIRECT / ELDER**

 1  BY MR. ELDER:

 2  **Q.**   Okay.  So, Ms. Martinez, if I'm -- first of all, what is

 3  this sound?

 4                 (Audio was played but not reported.)

 5  **A.**   That sounds like a slowed-down version of JAWS, the screen

 6  reader I've talked about today.

 7  **Q.**   Okay.  If I go to the top of this document.

 8                 (Audio was played but not reported.)

 9  **Q.**   Okay.  Is that the 4/21 date that you were referring to?

10  **A.**   Yeah, and it seems to be in brackets not parentheses.

11  **Q.**   If I were to push the down arrow key in JAWS, what would

12  that indicate to you?

13  **A.**   It should go to the next line.

14  **Q.**   Okay.

15                 (Audio was played but not reported.)

16  **Q.**   I'm going to push down an arrow a few times and let you

17  listen to this.

18                 (Audio was played but not reported.)

19  **Q.**   Down arrow.

20                 (Audio was played but not reported.)

21  **Q.**   Down arrow.

22                 (Audio was played but not reported.)

23  **Q.**   Down arrow.

24                 (Audio was played but not reported.)

25  **Q.**   Down arrow.

1                  (Audio was played but not reported.)

2     Q.    Down arrow.

3                  (Audio was played but not reported.)

4     Q.    Down arrow.

5                  (Audio was played but not reported.)

6     Q.    If I were to push the letter "E" in JAWS, what does

7     that -- what is your understanding of what -- of the behavior

8     that JAWS would take if you push the letter "E"?

9     A.    In properly marked-up PDFs in online, it should jump you

10    to the next edit field.

11    Q.    Okay.  I'm going to press "E."

12                 (Audio was played but not reported.)

13    Q.    Okay.  Is that an edit field?

14    A.    It sounds like it's an edit field for the name of the

15    business.

16    Q.    Okay.  So if I were to push "enter," what would you expect

17    JAWS to do?

18    A.    That would toggle JAWS into the typing mode.

19    Q.    Okay.

20                 (Audio was played but not reported.)

21    Q.    Is -- did you hear like a click noise?

22    A.    Yes.  That's the audio indicator to tell you that the

23    "enter" told JAWS and JAWS understood and is now in typing

24    mode.

25    Q.    Okay.  And so far does this form, in terms of the way JAWS

MARTINEZ - DIRECT / ELDER

 1   is reacting with the edit fields and the instructions, even

 2   though it's not the same form that you filled out in 2019, does

 3   this experience with JAWS seem similar to the experience that

 4   you had in 2019 in filling out the PDF form?

 5   **A.**   Mostly.  And I don't give a firm yes or no because in 2019

 6   I do recall that there were edit fields that didn't say

 7   anything when I would jump to it.  I couldn't tell you which

 8   fields those were; but as people may have heard and understood,

 9   when you hit "E," it said "Print fictitious business name

10   firmly," or whatever, "black or blue ink."  It said what the

11   edit field was in -- for this particular one.

12   **Q.**   Just to be sure I understand your testimony, you were able

13   to fill some of the edit field forms out in the 2018 form;

14   right?

15   **A.**   Some but not all --

16   **Q.**   Okay.

17   **A.**   -- independently.

18   **Q.**   And so at least for this edit field, this does have a

19   label on it.  So you would be able to fill this out with JAWS

20   as you understand it?

21   **A.**   Yes.

22   **Q.**   Okay.

23              (Audio was played but not reported.)

24   **Q.**   And if I go out of forms now, what -- if I were to push

25   the letter "X," what would that indicate to you and what would

1   you expect JAWS to do next?

2   **A.**   That would take me to the next check box if one existed

3   and was tagged properly.

4   **Q.**   Okay.  I'm going to push the letter "X" now.

5                 (Audio was played but not reported.)

6   **Q.**   What did you hear JAWS say there?

7   **A.**   There was a little crackle, but I think it said, "29

8   graphic check box not checked."

9   **Q.**   Let me push it again.

10                (Audio was played but not reported.)

11  **A.**   Yes.

12  **Q.**   And would you expect JAWS to give you something -- some

13  label to know what this check box was associated with if you --

14  if this form had been properly tagged?

15  **A.**   Just like when you jump to the edit field and we heard

16  that it was the edit field for the business name, the check box

17  should say "Check box not checked cat, for instance," but I

18  didn't hear a label attached to the unchecked check box.

19  **Q.**   I'm going to push the letter "X" again.

20                (Audio was played but not reported.)

21  **Q.**   Were you able to tell what item on the form this check box

22  corresponds to?

23  **A.**   It just said that there was another check box unchecked.

24  **Q.**   I'm going to push "X" again.

25                (Audio was played but not reported.)

MARTINEZ - DIRECT / ELDER

1   **A.**   Same thing.

2   **Q.**   Again.

3              (Audio was played but not reported.)

4   **A.**   That time I heard the number 31, but that's all I know

5   about that check box.

6   **Q.**   Okay.  So these check boxes and this experience that you

7   just walked us through, does this seem similar to the form that

8   you remember from 2019?

9   **A.**   It does.

10  **Q.**   Okay.  At least as to the way that JAWS is behaving with

11  it; is that right?

12  **A.**   Correct.

13  **Q.**   I'm going to unplug this.

14          **MR. ELDER:**  Michelle, you can take the screen back.

15                  (Pause in proceedings.)

16  **BY MR. ELDER:**

17  **Q.**   So after you encountered this form, and I presume you

18  said -- well, sorry.

19      I think you testified that you were unable to finish this

20  form on your own; is that right?

21  **A.**   Correct.

22  **Q.**   And then what did you do next?

23  **A.**   So I needed to fill out the form so that I could print it,

24  sign it, and take it into the Clerk's Office as I had planned

25  to do the following day.

MARTINEZ - DIRECT / ELDER

1          And so I had to take my laptop to my husband downstairs

2     and have him -- who he could see -- have him go through the

3     document on my laptop, ensure that I put the right information

4     in the right edit fields wherever I had any question, and then

5     check that check box.  And then after that was done, I had him

6     read through the document, make sure everything was good, and

7     then I printed it out to sign it.

8     Q.    How did you sign it?

9     A.    My husband likes to crease fold the paper right on the

10    line so that I have a nice tactile line to feel while signing

11    my name.

12    Q.    Okay.  Is your husband always available to help you at

13    home?

14    A.    Oh, no.

15    Q.    Does he have a job?

16    A.    Yes.

17    Q.    What does he do?

18    A.    He's a software engineer at Roadblocks.

19    Q.    Would you say he's busy?

20    A.    Very much so.

21    Q.    Did you eventually travel to the Clerk-Recorder's Office

22    on March 29th, 2019?

23    A.    I did.

24    Q.    And did you go, well, in person I presume?

25    A.    I'm sorry?

**MARTINEZ - DIRECT / ELDER**

1  **Q.**  Did you go in person?

2  **A.**  I did.  I wanted to pay by credit card, and so the only

3  way to accomplish that was in person.

4  **Q.**  Were you aware at the time that there was an option for

5  mailing in an FBNS form?

6  **A.**  I did but it required a money order or a paper check, I

7  believe, and I could not tell you then or now if I even own a

8  checkbook anymore.

9  **Q.**  Were there any other reasons?

10  **A.**  Yes.  I, as a brand-new business owner, wasn't completely

11  confident that I properly filled out the document.  There were

12  a few questions I had about individual versus LLC.  My business

13  was organized as an LLC; but when the document referred to

14  individual, I didn't know if they meant me to put down my info

15  or if it was as a sole proprietor.

16  So I had confusion, and I figured I wasn't the first or

17  last human to be confused about that.  So if I went to the

18  Clerk's Office, I could ask my questions, fix anything that

19  needed fixing, and then pay by credit card and file my document

20  that day.

21  **Q.**  How did you get to the Clerk's Office that day?

22  **A.**  I walked and I took BART.

23  **Q.**  What time did you arrive?

24  **A.**  In the early part of 1:00 o'clock.

25  **Q.**  So once you arrived in the building, what was the first

1    step that you took in the building?

2    **A.**    When I went through the entrance, there appeared to be

3    some sort of desk.  I didn't know if it was a security desk or

4    an information desk to check in at.  Either way, I didn't know

5    where to go precisely.  So I went up to the counter to see if

6    there was a person on the other side I could ask, and I was

7    told I was in the right place and that they could give me a

8    number; and when my number was called, I could walk up to the

9    appropriate counter.

10        And so I did that.  I was given a number and I was told --

11    I got some orientation -- verbal orientation of the layout of

12    the area, and so I was able to wait.  There weren't a lot of

13    seats that were available that day, so I posted myself next to

14    a planter until my name was called -- or my number.  Sorry.

15    **Q.**    When you first arrived at that desk, what did you say to

16    the individual as to the reason you were there?

17    **A.**    I couldn't tell you with 100 percent accuracy, but

18    something along the lines of "Hi.  I need to file an FBN form

19    today and I don't know where to go.  Can you help me?"

20    **Q.**    Okay.  And then was your number eventually called?

21    **A.**    It was.

22    **Q.**    And what happened next?

23    **A.**    My number was called, and I was told to go to a counter

24    number I believe; and -- you know, one or two; and I didn't

25    know exactly where it was.  So, again, I can't remember with

1   100 percent accuracy; but when I need to locate a counter, for

2   instance, I do one of two things.  I either ask someone near

3   me, "Hey, can you point me in the right direction to Counter

4   whatever," or, B, I will in a louder voice say "Where's Counter

5   2?" hoping that whoever is staffing that counter will speak up

6   and give me a better audible clue as to where they are located.

7   **Q.**   Okay.  One second, Ms. Martinez.

8                        (Pause in proceedings.)

9   **BY MR. ELDER:**

10  **Q.**   Ms. Martinez, you sound nice and clear.  And just watch on

11  the mic.  Sometimes it's easy to get a little too close to it,

12  so -- but you're sounding clear.

13       So did you eventually make your way to the correct

14  counter?

15  **A.**   Yes.

16  **Q.**   Okay.  And what happened next?

17  **A.**   I handed my paperwork to the clerk behind the counter and

18  said, "I want to file an FBN and I have a couple questions

19  because I'm not sure if I did it right, and I'm hoping you can

20  help me."

21  **Q.**   Okay.  And what did the clerk do in response to that

22  request?

23  **A.**   I'm not sure if I asked my questions first or if she just

24  looked through the document and then asked what my questions

25  were, but eventually I found out what -- I did make a few

1    mistakes, and so I found out what those were, and I understood

2    what I needed to do in order to fix them and get the form

3    filed.  So I asked if I could have her assist me in making

4    those few corrections on the form so that I could pay and file.

5    **Q.**    And did the clerk let you know what was wrong with the

6    form?

7    **A.**    She did.

8    **Q.**    And what was her response to your request for assistance?

9    **A.**    She said that she could not help me make those

10   corrections.

11   **Q.**    Okay.  Did that surprise you?

12   **A.**    Yes and no.  Yes, because most times if I ask for

13   assistance to do a simple task in particular, people jump at

14   the opportunity to be helpful.  And, no, because I have heard

15   stories that places -- government places, hospitals, things

16   like that --

17           **MR. GILBERT:**  Objection.  Irrelevant.  403.

18           **THE COURT:**  Overruled.

19           **THE WITNESS:**  -- that sometimes there is hesitation

20   with frontline staff to assist in filling out a form or

21   correcting a form because that's not what they typically do.

22          But if I say, "Hey, I'm a person with a disability and I'm

23   asking for the help," then that is something that, you know,

24   usually can be done, and often a supervisor is called in to do

25   the assisting of the form instead of that frontline staff

 1   person.

 2        So I wasn't particularly surprised; but, like I said, most

 3   of the time I don't even have to say "I'm a person with a

 4   disability" because I guess it's obvious to some people that I

 5   do have a disability.

 6   **BY MR. ELDER:**

 7   **Q.**   Did you have your white cane with you --

 8   **A.**   Always.

 9   **Q.**   -- on March 29th, 2019?

10   **A.**   Yes.

11   **Q.**   Okay.  Did you happen to be wearing any kind of sunglasses

12   or anything that might suggest you're blind as well?

13   **A.**   In 2019 I wore sunglasses all the time.

14   **Q.**   And so is it correct -- is that the reason you asked to

15   speak with a supervisor?

16   **A.**   Yes.  I went back and forth a little bit with the clerk

17   saying that, you know, it was okay to do such things.  I

18   believe I even joked around because my father worked for the

19   DMV and this was something that happened often.

20        **MR. GILBERT:**  Objection.  Hearsay.  Foundation.  403.

21   Move to strike.

22        **THE COURT:**  I'm going to sustain the hearsay objection

23   as to what her father said and instruct the jury to ignore her

24   statement about what her father said.

25   \\\

1  **BY MR. ELDER:**

2  **Q.**   Ms. Martinez, if you could answer in a way without saying

3  what someone else said who's not here to say it today, that

4  would be helpful.

5       But, I'm sorry, what was your experience with the DMV?  Or

6  what was your -- what were you saying about your understanding

7  of the DMV?

8  **A.**   Oh, my understanding is that at the DMV there's paperwork

9  that needs to be filled out -- in fact, I have done that

10  myself -- and the frontline staff usually will get a supervisor

11  to help fill out the form so that, A, they can continue to help

12  other customers; and, B, the supervisor is doing the filling

13  out of the form because that's something the frontline staff is

14  asked not to do with most customers.  But if I say, "Hey, I'm

15  blind, I need help," then they will do it.

16       **MR. GILBERT:**  Objection.  Hearsay.  Speculation.

17  Foundation.  Calls for lay opinion.  Move to strike.

18       **THE COURT:**  Can you attempt to lay a foundation for

19  that?  Like, how does she know this?

20  **BY MR. ELDER:**

21  **Q.**   Ms. Martinez, have you ever been to the DMV?

22  **A.**   Yes.  As I said previously, I have actually filled out

23  forms at the DMV with assistance, and I've done it multiple

24  times for State ID renewals.

25  **Q.**   So your State ID has to be renewed every several years; is

MARTINEZ - DIRECT / ELDER

1  that right?

2  **A.**  Yes.

3  **Q.**  And have you -- you said you've gone into the DMV to fill

4  out paperwork.  Is that paperwork associated with the renewal

5  for the California State ID?

6  **A.**  Yes.  Because I'm blind, I have to take the picture all

7  the time in person because sometimes it looks like my eyes are

8  closed and IDs won't be submitted if your eyes are closed.  So

9  I have to get some sort of note written in that says that I'm a

10  person with a disability -- a visual disability and that my

11  eyes might appear closed and it's -- you know, it's still a

12  valid ID.

13  **Q.**  And you can't get a driver's license I presume.

14  **A.**  Absolutely not.

15  **Q.**  Okay.  And so in lieu of that, to have identification, you

16  get a State ID renewed to often; is that right?

17  **A.**  Yes.

18  **Q.**  You need it to travel to get on an airplane?

19  **A.**  Yes.

20  **Q.**  Okay.

21       **THE COURT:**  Just for the record, I think that's fine.

22  The objections are overruled.

23       **MR. ELDER:**  Okay.  Thank you.

24  **BY MR. ELDER:**

25  **Q.**  And so when you're in the DMV and you needed to fill out

**MARTINEZ - DIRECT / ELDER**

1  this paper form, did the clerks at the DMV or the supervisor

2  clerk act as a transcriber to write the information you spoke

3  onto the paperwork you were trying to file at the DMV?

4  **A.**   Yes.   They would read what they wanted -- what the form

5  said was needed, and then I would provide that information and

6  they would write it into the blank spaces.

7  **Q.**   And were you able to verify that what they were writing

8  onto the paper form was accurate?

9  **A.**   Yes.

10  **Q.**   Do you recall if you had to sign any of those documents at

11  the DMV?

12  **A.**   Yes.   Usually, though, the signature is done on a screen

13  sort of like a point-of-sales screen.   So it's just a big

14  window, and I have to make sure I am directed to write my name

15  in the middle or the top part of the screen or the lower part

16  of the screen.

17  **Q.**   And if I handed you a pen, would you be able to scribble

18  or write something that was your signature?

19  **A.**   Yes.

20  **Q.**   Have you received transcriber service at any other

21  government agencies?

22  **A.**   Yes.

23  **Q.**   Okay.   Can you give me the -- what's an example of another

24  one?

25  **A.**   Outside the DMV, I've done Social Security and I've done

1    like my Muni pass.

2          **MR. GILBERT:**  Objection, Your Honor.  Relevance.

3    Cumulative.  403.

4          **THE COURT:**  Overruled.

5    **BY MR. ELDER:**

6    **Q.**   Let me ask you about your Muni pass.  First of all, what

7    is Muni?

8    **A.**   Muni is a form of public transportation here in

9    San Francisco.

10   **Q.**   Okay.  And have you had to do paperwork or submit an

11   application or file paperwork at the Muni office in

12   San Francisco?

13   **A.**    In order to receive a disability discount on the rides and

14   get a card that states I'm a person with a disability, it used

15   to be -- not now I think -- that every three years you had to

16   prove again that you had a disability.

17        So I had to go into I guess it was a Muni office and fill

18   out a simple form and bring the proper documentation around my

19   continuing disability.

20   **Q.**   And did the clerks there at the Muni office transcribe the

21   information you spoke onto a paper form?

22   **A.**   All the time.

23   **Q.**   Okay.  And does this have any connection to the Clipper

24   card system?

25   **A.**   It does now.  Earlier in the 2000s it did not.  Clipper

1    didn't exist, but now everything is on Clipper, which is an

2    electronic, like -- kind of like a keycard for a hotel, and it

3    covers all the -- to my understanding, it covers all the

4    different modes of public transportation in the Bay Area.  So I

5    don't need to get special cards or fill out multiple types of

6    documentation around my disability, and so it's kind of a

7    one-and-done thing with Clipper.

8    **Q.**    Now, how about paperwork for your life coaching business?

9    Have you ever had to file a document -- have you ever had to

10   file a paper document for your life coaching business and

11   received transcriber service from a government entity?

12   **A.**    I have.

13   **Q.**    And what was that?

14   **A.**    I live in the city of Union City, and if I am doing

15   business within city limits, I first had to do a zoning

16   application because I was doing a business out of my home.  And

17   then I also have to do a business license every year, update

18   that.

19        And on top of that, I've moved in the last five years,

20   still within the city of Union City, but I had to change my

21   address.  So I had to do that with the city and the state.

22        And so I will typically get a notice via e-mail that it's

23   time to renew my business application, and so I go into City

24   Hall and talk to the really nice guy behind the counter, and he

25   knows my face already, and he pulls up the proper document and

1  he starts reading the info he needs and I tell him what he

2  needs.

3      It's pretty straightforward because nothing has changed

4  other than my address, so it's even faster than normal.

5  **Q.**   And does -- does the clerk at the Union City government

6  transcribe your information down onto a paper form for your

7  business?

8  **A.**   He does.

9  **Q.**   Have you received transcriber services outside of the

10  context of a government service provider?

11  **A.**   Hospitals.

12  **Q.**   Okay.  What kind of --

13  **A.**   That's not government.

14  **Q.**   What kind of -- well, what kind -- any specific hospitals?

15  **A.**   Yes.  I'm a patient at Kaiser, and so I've been using

16  Kaiser for decades now and often have to fill out

17  questionnaires and forms and read through documents that they

18  want me to, you know, provide certain kinds of information to

19  them.

20  **Q.**   And have you received transcriber service when filling out

21  forms at Kaiser?

22  **A.**   All the time.

23  **Q.**   So on March 29th, 2019, were you expecting to receive

24  transcriber service in the office from the County of Alameda's

25  Clerk-Recorder's Office?

**MARTINEZ - DIRECT / ELDER**

1    **A.**    I was.

2    **Q.**    Do you -- prior to this visit, had you been to the

3    Clerk's Office on many other times?

4    **A.**    I'm married so we had to file our marriage license there.

5    And I recall needing to get copies of my children's birth

6    certificates for their passports.

7         And the marriage license I went in with my husband with

8    the form.  And with the birth certificates, I was there alone

9    and, you know, completed a transaction in order to get the

10   copies of my children's birth certificate.

11   **Q.**    So at the time on March 29th, 2019, were you aware whether

12   there were blank, unsigned FBNS forms available in the

13   Clerk-Recorder's Office?

14   **A.**    I heard about blank forms available for the first time

15   this week.

16   **Q.**    So back in March 2019 you had no understanding that blank

17   forms were even an available option for a customer?

18   **A.**    I had no idea they existed as an option.

19   **Q.**    The first clerk that you encountered there at the

20   Clerk-Recorder's Office, after she told you that your form had

21   errors, did she ever offer to give you a blank FBNS form?

22   **A.**    No.

23   **Q.**    If she -- if that clerk had offered to fill out a blank

24   FBNS form with you, would you have accepted that offer?

25        **MR. GILBERT:**  Speculation.  Relevance.

1          THE COURT:  Overruled.

2          THE WITNESS:  Since I had corrections that needed to

3    be made on the form, I didn't quite understand how extensive it

4    could be.  If I were told that it would be easier to transcribe

5    it and that way I could receive assistance, absolutely.  It was

6    just a one-page document.

7    BY MR. ELDER:

8    Q.   Would you have felt comfortable having the clerk that you

9    spoke with transcribe your information for you onto a blank,

10   unsigned form?

11   A.   Yes.   She's a trusted source.

12   Q.   Okay.   When you said "trusted source," what do you mean by

13   that?

14   A.   Meaning she is a staff person of a government entity

15   and -- or any staff person who does assist me I believe is a

16   trusted source because, you know, they are doing their job and

17   they're helping a blind person with assistance.  They're

18   usually trained on helping people with disabilities.  So,

19   again, most people want to help.

20        I would not randomly ask someone off the street to help me

21   fill out a form or just a random person in the lobby of the CRO

22   because I don't know who they are.

23   Q.   If a clerk had acted as a transcriber to fill out your

24   information on the form, how would you have verified that what

25   the clerk wrote down was accurate?

1  **A.**    Great question.    I, throughout the entire process, repeat

2  what information is needed and on areas that tend to or might

3  be confusing.    For instance, I used to live on Herringbone

4  Court and people always want to know how to spell

5  "Herringbone."   So I would spell it out after saying it, and I

6  would spell it multiple ways -- or multiple times, sorry -- and

7  then ask them to spell back what they wrote.

8      Numbers often get repeated as being written for the, you

9  know, same concept.   You know, I might say 123 Main Street but

10 someone might repeat back that they wrote 213, and I'll go,

11 "Wait a minute.    Can you read that again?"    And they go, "Oh,

12 no, I'm sorry.    I didn't -- I said '213,' but I wrote '123.'"

13 And then I'll say, "You know, are you sure?"

14     Then when the form is completed before signing or if I

15 have to, you know, write in initials and resign because a

16 document had changes, then I would ask the transcriber to

17 please from top to bottom read through all the information, and

18 I would have them stop at the tricky points and reconfirm that

19 things were entered correctly.    And that is how I verify

20 information that is transcribed onto documents.

21 **Q.**   If the clerk-recorder that helped you on that first

22 encounter, if you had been able to verify that what they had

23 written down was correct, would you have felt comfortable

24 signing that document under penalty of perjury?

25 **A.**    A blank form that was filled out?

1   **Q.**   Yes.

2   **A.**   Yes, I would absolutely feel comfortable signing my name

3   to that document.

4   **Q.**   And -- okay.  Thank you.

5       So my understanding is that that did not happen on this

6   first encounter on March 29, 2019?

7   **A.**   I was not offered a blank form as an option.  I was

8   repeatedly told by several individuals that they could not help

9   me make fixes or corrections to my form.

10  **Q.**   Okay.  Did you have to wait awhile while you were -- well,

11  how much time did you have to wait while you were waiting to

12  speak with the supervisor to escalate this issue?

13  **A.**   When I asked for a supervisor, I was told that she was out

14  to lunch.  And so -- and that Ms. Moran, the clerk behind the

15  counter, she didn't know when Ms. Briones would return.

16      So I went close to where I had previously been waiting for

17  my number to be called, which was up against a planter, and I

18  waited for quite a long time.  Like I said, I came in close to

19  the beginning of 1:00 o'clock, and throughout -- it was over an

20  hour that I waited.  And I would start to walk toward the

21  counter to get an update from Ms. Moran in between customers,

22  and she would see me coming and say things like, "Oh, she's not

23  here yet" or "I just checked and she's not here yet."

24      So at some point after an hour I did walk up to the

25  counter and stay there and said -- I asked Ms. Moran more

**MARTINEZ - DIRECT / ELDER**

1    clarifying questions around, "You know, hey, did you really

2    check in with your supervisor?  Did you actually talk to her?

3    Do you know when she's coming back?  It's been over an hour.

4    And, you know, are you sure you don't want -- you know, are you

5    sure you cannot assist me in making these few corrections so

6    that I could submit this today.  It seems pretty

7    straightforward."

8         And she just continued to adamantly state she could not

9    help me make those corrections and that she didn't know when

10   her supervisor was coming back from lunch.

11   **Q.**   So let me ask you back a step.

12        Before you went up -- so go back an hour.  Before you went

13   back up to speak to Ms. Moran again and then started talking to

14   her and staying there, while you were by the planter, I think

15   you said you waited about an hour.  During that hour, were you

16   talking to any other customers?

17   **A.**   Customers, no.

18   **Q.**   Were you -- well, did you feel that you were bothering

19   anybody?

20   **A.**   No.  I was keeping to myself and texting on my phone.

21   **Q.**   And then after waiting for over an hour, you said you went

22   back up to the counter to talk to Ms. Moran, and you said at

23   that point you stayed at the counter.  Why -- what do you mean?

24   **A.**   I told her that I was going to continue to wait at the

25   counter off to the side, but that I was still physically

1   standing at the counter but off -- you know, not directly in

2   front of the work area.  And she said, "Fine."

3       And I told her I was going to stand there until her

4   supervisor came because I was feeling that maybe I was being

5   dismissed and that if I -- if they could outwait me, I'd live.

6   So...

7   **Q.**   Okay.  And did you hear Ms. Moran's testimony earlier this

8   week in which she suggested that you were bothering other

9   customers or making other customers feel uncomfortable?

10  **A.**   I did hear that.

11  **Q.**   How many customers did you speak to once you started

12  standing there off to the side at the counter?

13  **A.**   I only spoke to one customer that afternoon and only as he

14  was walking away from completing his transaction.

15  **Q.**   And what did you -- what was your purpose in talking to

16  that individual?

17  **A.**   When he was doing a transaction with the clerk, he had a

18  very similar situation to mine.  He had a mistake on his form,

19  and he was told to cross it out and write in the information in

20  the proper section.  And then I don't know if that was the only

21  one mistake, but it triggered me hearing that, and I was

22  starting to get very overwhelmed and I was trying not to cry

23  because I have been known to cry when feeling overly

24  frustrated.

25      And I took note of when he walked up and I took note of

616

1    when he left, and I believe it was around 5 minutes, definitely

2    less than 10.  Five years -- actually it's five years to the

3    day.  Five years later I didn't -- I can't remember with

4    100 percent accuracy how long he was at the counter, but it was

5    not long.  And that really hit me in the gut because obviously

6    he was able to fill out his form and submit it because he could

7    see; and I as this blind person was still at the office after

8    an hour waiting on a supervisor who I hoped would assist me in

9    getting my FBN filed that day.

10        And so when he left, I walked up to him and said something

11   along the lines of, "Hey, sir, can I speak with you for just a

12   few seconds?"  He said he was in a hurry.  So I kind of walked

13   a little bit with him and I said, "Hey, I've been trying to do

14   exactly -- well, very similar to what you're doing, and I'm

15   still waiting around.  I just want to confirm so I have an

16   understanding -- the correct understanding.  Did you really

17   just file that form this -- you know, that quickly?  And I

18   heard you had mistakes.  I had similar mistakes.  How did you

19   correct that?"

20        And he said, "Oh, she told me what to write and she told

21   me to cross out the wrong info."

22        And I asked him, "Did you make those corrections on the

23   form or did she?"

24            **MR. GILBERT:**  Objection.  Move to strike as hearsay.

25            **THE COURT:**  Sustained.

1    I instruct the jury to disregard the witness' testimony

2    about what that other person said.

3    **BY MR. ELDER:**

4    **Q.**   Yeah.  Without repeating what the individual said

5    directly, what understanding did you come away with after that

6    conversation?

7    **A.**   The understanding I walked away with was that a sighted

8    individual was able to complete a form and file it in around

9    five minutes even though there was a mistake.

10   **Q.**   And did that man appear to be uncomfortable from your

11   exchange with him?

12           **MR. GILBERT:**  Relevance.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  He did not.  He was -- I interpreted

15   that he was in a hurry to get out of there.  As he said, "I'm

16   on my way out."

17   **BY MR. ELDER:**

18   **Q.**   Okay.  And did you follow him out the door?

19   **A.**   No.  I had my things at the counter and I didn't want to

20   walk far away from the counter.

21   **Q.**   Okay.  Did you reach out or talk to any other customers

22   that day?

23   **A.**   No.

24   **Q.**   Were you -- okay.  I don't think that's...

25           So while you were waiting in that over an hour, before you

1  got to a supervisor, did you contact anyone while you were

2  waiting?

3  **A.**   Yes.

4  **Q.**   Who did you contact?

5  **A.**   I contacted three acquaintances who happen to be

6  attorneys.

7  **Q.**   And how do you happen to have three acquaintances who are

8  attorneys?

9  **A.**   There are quite a lot of blind attorneys out there, and I

10 happen to know these three in particular because of their work

11 in the NFB --

12         **MR. GILBERT:**  Objection.  Relevance.

13         **THE COURT:**  Overruled.

14         **THE WITNESS:**  -- their work in the NFB and my similar

15 work with them sometimes or just being made aware of some of

16 the involvement they've done in terms of advocacy.

17 **BY MR. ELDER:**

18 **Q.**   Why did you contact three?

19 **A.**   I was texting them individually, and I knew that the ADA

20 says something along the lines of if people with disabilities

21 want to access a public service, they can do so, they have the

22 right to; but I didn't know any code numbers, and I didn't know

23 the clearer language around that part of the ADA.

24        And so because I was going to be talking to a supervisor,

25 I wanted to make sure I could let her know more detailed

1  information about why I was asking -- more detailed information

2  about, you know, the ability to accommodate a person with a

3  disability.

4      So the first person I texted didn't get back to me.  The

5  second person -- you know, I wanted information and I wanted it

6  quickly.  I didn't know when the supervisor was going to come,

7  and so I ended up talking to three who eventually got back with

8  me with the same information around Title II.

9  **Q.**  And without --

10      **MR. GILBERT:**  Objection.  Move to strike plaintiff's

11  misstatement of the law.

12      **THE COURT:**  I'm going to overrule.  I don't think

13  she's gotten to a statement of the law.

14      But, Counsel, please be cautious here.

15      **MR. ELDER:**  Yes.

16  **BY MR. ELDER:**

17  **Q.**  And, Ms. Martinez, I don't want you to speak about

18  anything -- don't repeat anything the attorneys said to you,

19  but -- and you're not a lawyer; right?

20  **A.**  No.

21  **Q.**  But in terms of informing your expectation of what you

22  were hoping to achieve that day, did you walk away with a lay

23  understanding of what you should be asking for at the

24  Clerk-Recorder's Office?

25  **A.**  I did.  I came away with an understanding of vocabulary

1  words that would be useful to me when explaining what I was

2  looking for with Ms. Briones.

3  **Q.**    And what was the vocabulary word that you walked away

4  with?

5  **A.**    The word was "auxiliary aids and services," meaning

6  that --

7          **MR. GILBERT:**  Objection.  Calls for --

8          **THE COURT:**  Sustained.

9      I instruct the jury to disregard the answer that she just

10 gave.

11         **MR. ELDER:**  Michelle?

12         **MS. KOROSY:**  Yes.

13         **MR. ELDER:**  I believe Exhibit 4A is already in

14 evidence, if that's correct, and I'd like to play it for

15 Ms. Martinez now.

16         **THE COURT:**  That's fine.  It is in evidence.

17         **MR. ELDER:**  Okay.

18     Michelle, you can play the audio.

19         **MS. KOROSY:**  Just give me one moment.

20             (Audio was played but not reported.)

21         **MS. KOROSY:**  Let me start it over.

22         **MR. ELDER:**  Sure.

23 **BY MR. ELDER:**

24 **Q.**    Is that volume good?  Can you hear that, Ms. Martinez?

25 **A.**    Yes.

1          **MS. KOROSY:**  Okay.  I'll turn it up just a little.

2          (Audio was played but not reported.)

3          **MR. ELDER:**  Can you pause it?

4  **BY MR. ELDER:**

5  **Q.**   And when you said, "Okay, cool.  I'll wait right here," is

6  that what you were referring to when you said you were standing

7  off to the side?

8  **A.**   I did slide over to the side, yes.

9  **Q.**   Okay.

10          **MR. ELDER:**  You can play it, Ms. Korosy.

11          (Audio was played but not reported.)

12          **MR. ELDER:**  You can pause it right there, Ms. Korosy.

13  **BY MR. ELDER:**

14  **Q.**   Did you hear that beep?

15  **A.**   I did.

16  **Q.**   Is it your understanding that that beep on this exhibit

17  reflects some dead time of waiting in which it was just

18  basically background noise?

19  **A.**   Yes.

20  **Q.**   Okay.  And we don't want to sit through and listen to all

21  of that --

22  **A.**   No.

23  **Q.**   -- here today, so we will move on.

24          **MR. ELDER:**  You can play it again, Ms. Korosy.

25          (Audio was played but not reported.)

MARTINEZ - DIRECT / ELDER

1          **MR. ELDER:**  Pause it.

2   **BY MR. ELDER:**

3   **Q.**   Ms. Martinez, we heard this recording before and it's in

4   evidence.  I don't want you to have to listen to the whole

5   thing again.

6          Do you recall at the end of this exchange with the County

7   clerk, what were you feeling at this point?

8   **A.**   At that point I was definitely starting to feel like I

9   wasn't being heard correctly; that pretty much anything I said

10  was just being dismissed because I was sounding angry.  I was

11  definitely frustrated, and so I feel like my tone was not

12  helpful at the moment in terms of the clerk being willing to

13  be -- continuing to provide friendly customer service.  So I

14  definitely was feeling frustrated, and I was wondering where

15  the supervisor was, and...

16  **Q.**   Were you frustrated with Ms. Moran?

17  **A.**   Not with her, no.

18  **Q.**   What were you frustrated with?

19  **A.**   I understood that there was something in her job that

20  prevented her from helping me fill out a form, and I wanted to

21  know what it was so that I could be clear; and I was just

22  frustrated with what I perceived that day to be a broken

23  system.

24  **Q.**   Sitting here today, do you have any hard feelings against

25  Ms. Moran?

MARTINEZ - DIRECT / ELDER

1   **A.**   No.

2   **Q.**   Okay.

3       **THE COURT:**  Counsel, we've been going for about an

4   hour and a half, and we should take our break soon for the

5   benefit of the court reporter.  When you get to a convenient

6   point to pause, please let me know.

7       **MR. ELDER:**  Now is as good a time as any, Your Honor.

8   We can take our break now.

9       **THE COURT:**  All right.  Let's take our mid-morning

10   break.

11     And I'll ask my courtroom deputy to please bring the jury

12   into the jury room.

13     (Proceedings were heard out of the presence of the jury:)

14       **THE COURT:**  All right.  We will go off the record and

15   recess for about 15 minutes, and let's come back then.

16     Thank you, Counsel.

17       **MR. GILBERT:**  Thank you.

18       **THE WITNESS:**  May I leave my laptop here?

19       **THE COURT:**  Yes, you can.

20       **THE WITNESS:**  Thank you.

21           (Recess taken at 11:21 a.m)

22         (Proceedings resumed at 11:47 a.m)

23     (Proceedings were heard out of the presence of the jury:)

24       **THE COURT:**  Good morning, everyone.  Please be seated.

25       **THE CLERK:**  Recalling Civil Action 20-6570, Martinez

1  vs. County of Alameda, et al., the Honorable Thomas Hixson

2  presiding.

3       Please go ahead, Judge.

4       **THE COURT:**  All right.  At this time I'll ask my

5  courtroom deputy to bring the jury back into the courtroom.

6       **MR. ELDER:**  May we go to the witness stand and the

7  podium?

8       **THE COURT:**  Oh, yes, please.

9       (Proceedings were heard in the presence of the jury:)

10      **THE COURT:**  Good morning, everyone.  Please be seated.

11      Counsel, please continue with your examination.

12      **MR. ELDER:**  Thank you, Your Honor.

13 **BY MR. ELDER:**

14 **Q.**  Ms. Martinez, you recall we were speaking to you about

15 your interactions with the clerks on March 29th, 2019.  You

16 spoke about your interaction with the first clerk, Ms. Moran.

17      I'd like to now ask you about the interaction with the

18 second clerk supervisor, Ms. Laura Briones.

19      And at some point Ms. Briones did come out and start

20 speaking to you; is that right?

21 **A.**  Correct.

22 **Q.**  Okay.  And I'd like to play Exhibit 4C, which I believe is

23 already in evidence, for you.  And as you listen to this, I --

24 do you remember when we were talking about the -- that

25 two-finger double tap?

1  **A.**    Yes.

2  **Q.**    Could you tell me, as you listen to this, please let me

3  know when you -- if you hear anything that reflects that

4  two-finger double tap on this audio recording.

5  **A.**    Okay.

6          **MR. ELDER:**  Ms. Korosy, could you play Exhibit 4C

7  please?

8          **MS. KOROSY:**  Yes, one moment.

9              (Audio was played but not reported.)

10         **MR. ELDER:**  If you could pause it.

11 **BY MR. ELDER:**

12 **Q.**    So after Ms. Briones declined permission to be recorded,

13 were you attempting to shut off the recording on your phone?

14 **A.**    Right when I said, "I'll shut this off," you could hear me

15 two-finger double tapping while I was speaking.

16 **Q.**    Okay.  So this recording, the fact that it was made, was

17 this an accident?

18 **A.**    It absolutely was.

19 **Q.**    And after this recording was made, did you ever speak to

20 an attorney about whether this should be destroyed or not?

21 **A.**    I had the recordings because it had -- they all had

22 information I needed, like names and contact information, and I

23 let -- when I first attempted to reach out to the County to

24 come up with a solution, I did offer these recordings and let

25 the attorneys know that I clearly attempted to not continue

```
 1   recording after Laura said no.  And so I'm not 100 percent
 2   clear about your question in terms of the destroying part.
 3         MR. GILBERT:  Objection.  Move to strike as
 4   nonresponsive.
 5         THE COURT:  Hold on.
 6      I'm going to grant the motion.  It's nonresponsive and
 7   I'll instruct the jury to ignore the answer that the witness
 8   just gave.
 9   BY MR. ELDER:
10   Q.   Did you have an understanding that destroying evidence
11   would be a problem in your case?
12         MR. GILBERT:  Objection.  Relevance.
13         THE COURT:  Overruled.
14         THE WITNESS:  I understand that, generally speaking,
15   destroying evidence is not a good thing.
16   BY MR. ELDER:
17   Q.   Okay.  Thank you.
18      When you formed your business, did you get any documents
19   referred to as Articles of Organization?
20   A.   Can you repeat that?
21   Q.   When you formed your business back in 2019, did you get
22   any documents reflecting that you had formed the business,
23   anything referring to an Articles of Organization?
24   A.   Yes.  To start an LLC in the State of California, I needed
25   to file Articles of Organization, and I received a copy in the
```

1    mail saying that my business was organized.

2    **Q.**   I'd like to show -- do you have your laptop --

3    **A.**   I do.

4    **Q.**   -- able to pull up exhibits?

5    **A.**   Yes.

6    **Q.**   Could you pull up what's been labeled as Exhibit 5?

7    **A.**   Exhibit 5, Articles of Organization?

8    **Q.**   Yes.

9         What is this document that's labeled Exhibit 5?

10   **A.**   It seems to be the copy of the Articles of Organization

11   for the coaching LLC.

12        **MR. ELDER:**  Your Honor, I move to this exhibit be

13   admitted into evidence and published to the jury.

14        **THE COURT:**  Any objection?

15        **MR. GILBERT:**  Yes.  Relevance.

16        **THE COURT:**  Overruled.  Exhibit 5 is admitted, and you

17   may show it to the jury.

18        (Trial Exhibit 5 received in evidence.)

19        **MR. ELDER:**  And do we --

20        **MS. KOROSY:**  It is on the screen.

21        **MR. ELDER:**  Thank you.

22   **BY MR. ELDER:**

23   **Q.**   Now, Ms. Martinez, when you went down to the

24   Clerk-Recorder's Office that day, did you have this document

25   with you on your person?

1    **A.**    Yes.

2    **Q.**    And did you offer to show it to Ms. Briones if there was

3    any doubt as to whether you should be -- whether you were ready

4    to file your FBNS form that day on March 29th, 2019?

5    **A.**    She kept saying that the business owner had to correct the

6    form, and I kept telling her I was the business owner and I had

7    a copy of the Articles of Organization that could show that the

8    business was formed and I was a part of it, and that I had

9    everything I needed to file the FBN that day.

10   **Q.**    Did you have your government ID on your person?

11   **A.**    I had to in order to pay, yes.

12   **Q.**    Okay.  Did you have a debit or credit card with you on

13   that day, March 29th, 2019?

14   **A.**    Multiple credit cards.

15   **Q.**    Okay.  Did Ms. Briones ever look at the Articles of

16   Organization that you were offering to show her?

17   **A.**    No.

18   **Q.**    Okay.  So we heard the recording between you and

19   Ms. Briones.  After that exchange, what were you feeling?

20   **A.**    I was feeling more frustrated and more overwhelmed than I

21   had all afternoon.  I really wanted to know what was the policy

22   that she kept saying prevented her from assisting me to make

23   those corrections.  She kept saying it was illegal, and I

24   didn't understand and I wanted to know what was it that told

25   her that.

MARTINEZ - DIRECT / ELDER

1   Q.   Did Laura Briones, the supervisor, ever offer to assist

2   you with filling out a blank, unsigned FBNS form there in the

3   office on that day March 29th, 2019?

4   A.   No.

5   Q.   If Ms. Briones, who is the supervisor, had pulled out a

6   blank FBNS form and asked you if she could help you to

7   transcribe information on that blank FBNS form that was

8   unsigned, would you have accepted that offer?

9   A.   100 percent, yes.

10  Q.   Would you have felt comfortable letting Ms. Briones act as

11  a transcriber for your information?

12  A.   Yes, I would consider her a trusted source.

13  Q.   Do you feel you would have been able to verify the

14  information?

15  A.   Yes.

16  Q.   And if you had satisfactorily verified the information to

17  the extent you were content with it, would you have been

18  willing to sign a blank form there in the office under penalty

19  of perjury?

20  A.   Yes.

21  Q.   So after this second conversation, I believe -- well,

22  there was discussion of a Go Back Letter.

23      What happened after this recorded conversation with

24  Ms. Briones?

25  A.   She offered multiple times to do a Go Back Letter for me

1  and -- which said -- listed in a hard copy letter what I needed

2  to have someone help me fix on my FBN form in order to file it.

3  So she said she'd go back to her office to go do that and I

4  needed to wait for her.

5  **Q.**   And did she leave to go get the Go Back Letter?

6  **A.**   She did.

7  **Q.**   And where were you waiting when she was doing that?

8  **A.**   I kept waiting at the end of the -- of the counter off to

9  the side.

10 **Q.**   Was Ms. Moran involved in this transaction anymore?

11 **A.**   No.  She said she wasn't going to help me anymore.

12 **Q.**   And did you observe what -- where Ms. Moran was at this

13 point?

14 **A.**   It sounded like she went over one counter so that she can

15 continue to work with customers.

16 **Q.**   Okay.  And did you speak to any -- at this point going

17 forward, did you speak to any other customers about what was

18 going on in the Clerk's Office that day?

19 **A.**   No.

20 **Q.**   Did you approach anyone?

21 **A.**   Nope.  I stayed in my little corner.

22 **Q.**   Did you tell any customers that you were being

23 discriminated against?

24 **A.**   I don't recall saying that to customers.

25 **Q.**   Did you say anything to any customers after this point in

1   time?

2   **A.**   After that point, five years later I'm having a difficult

3   time remembering when it was I spoke to the gentleman.  I don't

4   recall if it was before or after Ms. Briones' conversation,

5   but --

6   **Q.**   Are you -- are you confident that that gentleman was the

7   one -- was the only person you -- the only customer you spoke

8   to that day?

9   **A.**   Yes.

10  **Q.**   Okay.  So while you were waiting for your Go Back Letter,

11  what were you feeling?

12  **A.**   I was feeling frustrated and overwhelmed and tired,

13  exhausted emotionally.  I really didn't think I was going to

14  spend that much time at the CRO.

15  **Q.**   Had you, since you didn't get anywhere with -- well, since

16  you -- Ms. Briones didn't -- wasn't assisting you with

17  correcting the form, did you try to escalate it to a third

18  level up the management chain?

19  **A.**   I did.

20  **Q.**   And do you remember who that third-level manager was?

21  **A.**   Eva Hill -- or He.  Sorry.  Eva He.

22  **Q.**   And had you requested to speak to Eva He?

23  **A.**   Yes.

24  **Q.**   Did Eva He ever come out and speak to you?

25  **A.**   No.  I was told that she was not there.

 1  **Q.**   So am I -- so is the case, then, that Ms. He never came

 2  out and offered that you might fill out a blank, unsigned form

 3  there at the Clerk-Recorder's Office?

 4  **A.**   Correct.  A blank form was never discussed by anybody with

 5  me.

 6  **Q.**   And if Ms. He had come out with a blank, unsigned FBNS

 7  form and offered to act as a transcriber to write your

 8  information onto that blank form, would you have accepted that

 9  offer?

10  **A.**   Yes.

11  **Q.**   If you had felt -- would you have felt comfortable that

12  you could verify whatever information she wrote down on the

13  form?

14  **A.**   Yes.

15  **Q.**   If you had verified it to the extent you were content with

16  it, would you have felt signing that document under penalty of

17  perjury?

18  **A.**   Yes.

19  **Q.**   Did Ms. Briones ever return with your Go Back Letter?

20  **A.**   She did and she also let me know that she was providing me

21  with an envelope and she could put a name on the envelope.  I

22  don't know if she actually did; but she said if she put a name

23  on it, it would expedite it so that it got to a specific human

24  who could file it when received via mail.

25  **Q.**   Now, she didn't give you any kind of expedited postage

MARTINEZ - DIRECT / ELDER

1  handling or shipping envelope, did she?

2  **A.**   She gave me an envelope and said I had to include a stamp

3  on it.

4  **Q.**   Okay.  So it wasn't a postage-paid envelope?  You still

5  had to pay for the postage?

6  **A.**   Correct.

7  **Q.**   Okay.  Were you able to read the contents of the letter

8  that day?

9  **A.**   No.

10  **Q.**   How did -- how would you -- let me move on.

11      So in the office that day, you weren't able to actually

12  read what was on this paper letter; is that right?

13  **A.**   No.

14  **Q.**   Okay.  And then did you -- what happened next?

15  **A.**   That's when I asked if her supervisor was available, and

16  Ms. Briones said that she had discussed already with her

17  supervisor and this is what she was instructed to do.  So I

18  asked for Eva He's contact -- or her name, how to spell it, and

19  what her title was.

20  **Q.**   Okay.  And is this about the time that you departed the

21  Clerk-Recorder's Office that day?

22  **A.**   Yeah.  After I got Ms. He's name and title, I ran to the

23  bathroom to splash cold water on my face and then go home.

24  **Q.**   Why were you splashing cold water on your face in the

25  bathroom?

MARTINEZ - DIRECT / ELDER

1  **A.**   I was flushed from being upset and so my face felt very

2  hot, and I just kind of needed a moment to center myself and

3  collect myself before going out of the building because I was

4  very, very close to crying again and I was trying to compose

5  myself, but it kind of didn't work.  I just kind of started a

6  crying jag in the bathroom stall.

7  **Q.**   And then did you eventually leave the building?

8  **A.**   I did.

9  **Q.**   And what did you do after you left the building?

10 **A.**   Either right before exiting the doors or on the street I

11 called my best friend and cried on the phone the whole way

12 home.

13 **Q.**   Who is your best friend?

14 **A.**   Serena Olsen.

15 **Q.**   What did you tell her that day -- or what did you --

16 without trying to say it specifically --

17 **A.**   Right.

18 **Q.**   -- but in general, what did you relay to Ms. Olsen?

19 **A.**   Generally speaking, I said I had a wild afternoon and for

20 the first time in my life I felt denied equal access for such a

21 simple, simple task.  And that, you know, I was today days old

22 in my life as a blind person, and I had never been denied equal

23 access so plainly and so clearly, and I just couldn't believe

24 it in 2019.

25 **Q.**   What did you do after your conversation with Ms. Olsen?

1    **A.**    I was talking to her and crying on the phone the whole

2    walk from the CRO to the Lake Merritt BART Station and then on

3    BART, and I hung up sometime before the kids came home.  So I

4    honestly don't recall if I hung up on the walk home or as soon

5    as I got home, but I eventually disconnected from her and had

6    to compose myself before the kids came home.

7    **Q.**    When you were on that BART ride home, what were you

8    feeling?

9    **A.**    I was crying.  So I was kind of feeling embarrassed and

10   awkward about that.  It was commuting hours, and so here was

11   this crying, blubbering blind woman, you know, walking around

12   with her Messenger bag and her cane and pushing through the

13   crowd of -- on BART trying to find a seat because there was no

14   way I was -- I could stand and cry.  I just -- I really needed

15   to sit down.

16       And so everyone was jumping up and trying to give me their

17   seat, and it just felt awkward.  But I was just at a point

18   where I could not compose myself, so I just kind of let people

19   handle me and put me in a seat.

20   **Q.**    Now, once you got home that day, did you immediately try

21   to fill out a corrected FBNS form?

22   **A.**    No.

23   **Q.**    We were talking about the Go Back Letter.  How -- it was

24   on a piece of paper.  How would you be able to read information

25   on a Go Back Letter that was printed on paper?

1    A.    Both Ms. Moran and Ms. Briones verbally told me what was

2    needing to be fixed and corrected on my form, so I had an

3    understanding of what to do.  But Ms. Briones did let me know

4    that I -- you know, she carefully went through the entire form

5    and made sure that everything was done perfectly and so that I

6    could fold it up and include payment and mail back the form.

7         So I personally could not read the print unless I scanned

8    it and -- with an OCR software, but I knew that I was going to

9    use sighted assistance and a reader scribe to fill out a new

10   form from scratch.

11   Q.    So if -- well -- oh, to fill out the form.  I see.

12        Did you immediately mail back your form with the envelope

13   that had been provided to you?

14   A.    I did not.

15   Q.    And why didn't you quickly mail it back?

16   A.    I was pretty upset about March 29th, and I needed some

17   distance of -- before going back to this form that caused a lot

18   of frustration for me.  And so I really needed some -- a couple

19   of days before going back to it.

20        And, you know, being a busy mom and life and spring break

21   and other business-related stuff just all kind of got in the

22   way; and when I was trying to set up a time with my reader and

23   transcriber to do a form, you know, coordinating two schedules

24   can take some time.

25        Also I really, really -- I really needed some distance,

1  and I started to feel doubt and some confidence issues around,

2  like, is this something I really, really want to do, need to

3  do.  You know, I need to renew this form every five years.

4  There's other documents that need to be filed with the County

5  more often.

6       I just -- you know, sometimes you just doubt yourself when

7  you hit a brick wall, and I had a lot of mental anxiety,

8  emotional anxiety to work through before I could do it.  So it

9  took -- it took a couple weeks.

10  Q.   Okay.  But you were moving on with life; right?

11  A.   I was moving on with life.  We were going to Mexico for

12  spring break.

13  Q.   Okay.  When did -- oh, so this was -- you testified a lot

14  about filling -- how to fill out a corrected form, and just so

15  I know, did you actually -- when you worked with your reader

16  and your scribe, did you correct the form that you filled out

17  previously or did you fill out a new form from scratch?

18  A.   I filled out a new form from scratch.

19  Q.   And why didn't you mail that corrected form back in?

20  A.   Despite the fact that I really didn't want to go in

21  person, I really wanted to make sure that this form was done

22  correctly.  Despite the fact that Ms. Briones did this Go Back

23  Form, I was feeling very anxious and paranoid and I really

24  wanted it -- you know, to make sure that it was perfectly done.

25       And, again, I went to the CRO in person in March because

1    in order to pay by credit card, I had to be in person.  So I

2    had to go because I did not have another method of paying.  So

3    that is why I took some time and decided to go back in person

4    again and not have it mailed.

5         Also somewhere in the documents -- I also was told it

6    could take a matter of weeks, but I did know that Laura,

7    Ms. Briones, gave me that envelope to expedite things, but I

8    didn't -- I don't trust the mail.

9    Q.   If you had made a mistake on it, you know, like there

10   was -- let's say you made a mistake on it a second time, would

11   they have had to mail it back to you?

12   A.   Yes.

13   Q.   Okay.  So how did you then -- so I assume, then, did you

14   decide to go back again in person to refile on a second trip --

15   A.   Yes.

16   Q.   -- your corrected FBNS form?

17   A.   Yes.

18   Q.   Did anyone help you prepare the corrected FBNS form?

19   A.   Yes.

20   Q.   And who?

21   A.   I'm sorry?

22   Q.   Who helped you?

23   A.   Oh, I hired my reader transcriber, Ms. Grim, who testified

24   earlier this week.

25   Q.   Okay.  And how did you get down to the Clerk-Recorder's

1    Office?  Oh, I'm sorry.

2         And did you say when?  When did you go back?

3    **A.**    May 31st, 2019.

4    **Q.**    Okay.  And how did you get back to the Clerk-Recorder's

5    Office on May 31st?

6    **A.**    This time around because she helped me and then, you know,

7    she can see, we just did the whole thing together at one time.

8    And so we did the form, we hopped in her car, drove up there,

9    parked, and then went inside together to the CRO.

10   **Q.**    And were you paying Ms. Grim for this time?

11   **A.**    I -- yes.  I always pay her for her services.

12   **Q.**    So when you walked into the office that day with Ms. Grim,

13   what's the -- you walked through the doors, what happened?

14   **A.**    When we walked through the doors, I went up to the I guess

15   it's called an information desk and got a number so that I can

16   wait for my number to be called.

17   **Q.**    Okay.  And was your number called?

18   **A.**    Yes.

19   **Q.**    And then did you approach the counter?

20   **A.**    I did.

21   **Q.**    And then what happened?

22   **A.**    Ms. Emily stood back.  She's worked with me long enough

23   that she usually stays kind of aside or behind me when I'm

24   working one on one with someone; for instance, someone behind

25   the counter.  Because, for whatever reason, the public often

1    talks to her and asks her questions about me and, you know,

2    that's not her job.

3         So she hung back, and I approached the counter and I

4    handed my FBN form and said -- to the clerk behind the counter

5    and said, "I'm pretty certain everything is right here.  So let

6    me know and" -- yeah.

7    **Q.**   A question.  When you said "Ms. Emily," is that Emily

8    Grim?

9    **A.**   Yes.

10   **Q.**   Okay.  Why didn't Ms. Grim -- I mean, if you were

11   concerned about people talking to her directly, why didn't she

12   just wait in the car?

13   **A.**   That's -- I don't know.  It's kind of not cool.  I also

14   didn't know how long I was going to be.  You know, and over the

15   years she's become a good family friend.

16   **Q.**   Did you feel a need to have Ms. Grim with you in the

17   Clerk's Office that day?

18           **MR. GILBERT:**  Objection.  Leading.

19           **THE COURT:**  Overruled.

20           **THE WITNESS:**  I did.  You know, one of the reasons why

21   it -- when I went back I decided to have her with me was

22   because I honestly did not have the wherewithal to relive a

23   similar situation to March 29th.  I was hoping and praying and

24   crossing my fingers that that would not happen.

25        I was confident that the form was correct, but there was

1   still that little doubt and that little voice in my brain

2   saying, "You know, something can be wrong."  And so I just

3   decided that this time around if anything were to happen, if I

4   could not file, if I was told I could not be helped, I was just

5   going to take names and document and have Ms. Grim help me

6   finish the transaction because I had to -- I had to file the

7   fictitious business name so that I can open up a bank account

8   and start having clients and charging them.

9   **Q.**   And going back to March 29th, 2019, I just want to ask

10  you, do you remember the man that you observed getting his

11  service?

12  **A.**   Uh-huh, yes.

13  **Q.**   Did he seem to have any kind of an assistant with him?

14          **MR. GILBERT:**  Speculation.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  He was the only person at the counter.

17  **BY MR. ELDER:**

18  **Q.**   Okay.  But when you came back on your second trip, you had

19  to bring -- you felt you had to bring someone with you; is that

20  right?

21  **A.**   I did, if I wanted to get anything done.  I couldn't -- I

22  didn't know what was going to happen to me.  I didn't know how

23  I was going to be treated.

24  **Q.**   Okay.  So after you handed the clerk your corrected FBNS

25  form on May 31st, 2019, what did the clerk do?

1   **A.**   I heard her typing; and after a couple of minutes, she

2   asked me to verify if everything on the screen was correct.

3   **Q.**   Let me pause you there.

4        So the information that was on your form, did it appear to

5   you that the clerk was typing that information onto something

6   in the computer?

7   **A.**   I presumed so since she asked me to verify if everything

8   on the screen was correct, and I don't know how else that

9   information would have gotten there if she wasn't typing it in.

10  **Q.**   Back on May 29th -- or sorry -- March 29th, were you able

11  to observe whether or not anyone typed anything onto the

12  computer from your form?

13  **A.**   We didn't get to a computer.  It was just my document, and

14  I was told it was -- there were some inconsistencies that

15  needed to be corrected.

16  **Q.**   Okay.  And so the going back to the clerk on May 31st,

17  your second trip, she typed some information into the computer

18  system, and then what did she do next?

19  **A.**   Asked me to verify if everything on the monitor was

20  correct.

21  **Q.**   Now, are you able to read information on a computer

22  monitor?

23  **A.**   Not without a screen reader.

24  **Q.**   Okay.  And then so how did you respond to that request?

25  **A.**   I said, "I'm blind.  Can you please read me the

 1    information?"  And she responded "I know you're blind."  And

 2    she turned the monitor to Ms. Grim and told her to verify -- or

 3    she told Ms. Grim to read the monitor.

 4    **Q.**   And you had asked that clerk to read the information to

 5    you?

 6    **A.**   I did.

 7    **Q.**   And did she do that?

 8    **A.**   Not -- no.

 9    **Q.**   Do you -- I think you've testified to this earlier, but do

10    you typically get government clerks who are willing to read

11    information to you?

12    **A.**   Yes.

13    **Q.**   Did the clerk say why they wouldn't read it for you?

14    **A.**   Nope.

15    **Q.**   And so how -- like, what happened after that?

16    **A.**   I wasn't totally surprised.  I expected something to go

17    wrong.  So I said to Ms. Emily, "Just -- just read me what's on

18    the screen, please.  I -- this has got to be filed."

19        So Ms. Emily read everything that was on the screen.  And

20    if I had any questions again, for instance, "Is Herringbone

21    Court spelled correctly," you know, I would double check on

22    that.  And then when I felt like everything was accurate and

23    verified, I turned to the clerk and said, "Everything is

24    verified.  Everything is correct."

25    **Q.**   So thinking back to your encounters with Ms. Moran,

1    Ms. Briones, and then this unknown clerk on May 31st, do you

2    hold any hard feelings against those clerks?

3    **A.**    No.    They were doing their job as they were instructed to

4    do.

5    **Q.**    And notwithstanding that, were you frustrated by what was

6    happening?

7    **A.**    Oh, I was definitely frustrated with what was happening,

8    but I was frustrated at this unknown policy that nobody could

9    tell me what it was that prevented them from doing their job.

10    **Q.**    Were you able to file your FBNS form that day on May 31st?

11    **A.**    Yes.

12    Q.    Do you feel that your experience of filing that FBNS form

13    on May 31st was equal to the man you observed filing his form

14    on March 29th?

15        MR. GILBERT:    Objection.    Calls for lay opinion.

16    Relevance.    403.

17        THE COURT:    Overruled.

18        THE WITNESS:    It was -- it was not equal.

19    BY MR. ELDER:

20    Q.    And why not?

21    A.    I was there a second day, and I -- to my understanding, he

22    did his thing that first day in a few minutes.

23    Q.    So after -- after this series of events, you got your --

24    did you get, actually, any documentation of your FBNS form

25    filing that day?

1  **A.**    I received copies I believe.

2  **Q.**    So you received something showing that as of that day,

3  your FBNS form had been filed and you were ready for business?

4  **A.**    Yes.

5  **Q.**    Now, this was May of 2019.  Does it sound accurate that

6  you -- hold on.  Let's see, let me take a look at the date.

7       So before you filed your lawsuit in this case, did you

8  reach out to the County?

9  **A.**    I did.

10          **MR. GILBERT:**  Objection.  Relevance.

11          **THE COURT:**  Sustained.

12                    (Pause in proceedings.)

13          **THE COURT:**  Sorry.  I sustained the objection.

14          **MR. ELDER:**  Yes.  I'm trying to consider that.

15  **BY MR. ELDER:**

16  **Q.**   Ms. Martinez, did you have concerns about whether other

17  blind people would be treated the way that you were treated?

18  **A.**    Absolutely.

19          **MR. GILBERT:**  Objection.  Relevance.  403.  Lay

20  opinion.

21          **THE COURT:**  Sustained.

22  **BY MR. ELDER:**

23  **Q.**   Ms. Martinez, did you have concerns about whether

24  the County would continue to violate rights of blind people in

25  the way that you believe they violated your rights?

1          **MR. GILBERT:**  Objection.  Calls for legal conclusion.

2    Misstates facts.  403.  Legal conclusion.

3          **THE COURT:**  Hold on one second.

4                     (Pause in proceedings.)

5          **THE COURT:**  Sustained.

6          **MR. ELDER:**  Could we have a sidebar?

7          **THE COURT:**  Why don't we excuse the jury.

8      I'll ask my courtroom deputy to take the jury back into

9    the jury room.

10          **MR. ELDER:**  Okay.

11      (Proceedings were heard out of the presence of the jury:)

12          **THE COURT:**  Counsel, what's the relevance of this?

13          **MR. ELDER:**  So this goes to the final advisory

14    question to the jury about whether the County will continue to

15    violate the ADA in the same way that it did back in 2019.

16      We're not trying elicit deliberate indifference.  We

17    understand that deliberate indifference, you know, Your Honor

18    has limited that to the March 29th period.

19      But she has asked the County going forward to do this for

20    other blind people, and she wants to prevent this from

21    happening to other people; and this is all meant to be relevant

22    to whether the County will continue to do what it did before,

23    and her asking them to stop doing this after it happened is

24    about their future conduct and whether they will continue to do

25    this.

MARTINEZ - DIRECT / ELDER

1    So we're trying to get into this history of her asking

2    the County, "Please change your ways.  Please don't violate the

3    ADA in the way I believe you have," and the County is not

4    responding or is continuing on down that same road.

5              THE COURT:  Let me hear from the defense.

6              MR. GILBERT:  Your Honor, the plaintiff's subjective

7    opinions and beliefs are simply not relevant to the injunctive

8    relief question.  The jury is to make that decision based upon

9    the evidence they hear as far as the County's current

10   operations, what systems are in place, how the County operates,

11   and the experiences of other patrons during this relevant time

12   frame.  We've received that testimony.

13       Plaintiff's demands in litigation and her prepared

14   statements with her attorney are her subjective interpretation

15   and beliefs and are nothing more than inflammatory and

16   excludable under 403 but are also simply not relevant to the

17   inquiry.

18             THE COURT:  So I will permit a brief, to-the-point

19   question about whether she asked the County if it would not

20   repeat this behavior in the future and what the response was,

21   but I am not going to allow you to get into all of the

22   communications between you -- between counsel and the County.

23   I think that is not relevant, and I don't want to put the

24   process of litigation before the jury.  That's not primary

25   evidence of conduct that happened.

1          And the plaintiff's subjective motivations for filing the

2   lawsuit, which is what I thought you were getting into, are

3   just not relevant.

4          So you can have the brief question about whether she asked

5   the County if it would not repeat this behavior and whether

6   they ever promised to do that, but you can't get into the fact

7   of your demand letters to the County and the communication

8   between the two sides that led up to the lawsuit or conduct in

9   the lawsuit.  I think that's a relevance problem and a 403

10  problem.

11         **MR. ELDER:**  That's fine, Your Honor.  And we certainly

12  aren't going to put any -- ask to put any of the exhibits in.

13         May I ask:  Did you write to the County and ask?

14         **THE COURT:**  And ask if it would not repeat this

15  behavior?

16         **MR. ELDER:**  Yes.

17         **THE COURT:**  That would be fine.

18         **MR. GILBERT:**  Your Honor, we would ask for an offer of

19  proof.  Specifically, I'm not aware of any correspondence from

20  plaintiff on this.  Everything came through her attorney

21  through Exhibit 10, which is the demand letter and structured

22  negotiations proposal.  So everything has been authored by her

23  attorney.  We're going to end up getting into questions about

24  attorney writing things and attorney-client communications,

25  which we will then be able to ask questions.

1        It then gets into gamesmanship as far as the litigation

2   strategy, which is not relevant to what the actual operations

3   are.

4        If the plaintiff herself made a direct request to

5   the County, I think that we need to hear that now outside the

6   presence of the jury so we can hear if there actually was such

7   a request because I'm not aware of anything that was done

8   outside of the presence of legal counsel and wasn't presented

9   through legal counsel.

10       **THE COURT:**  But if you have, I think, an offer of

11  proof that the plaintiff herself made such an outreach would be

12  appropriate, if there's anything like that.

13       **MR. ELDER:**  No, Your Honor.  She's -- I mean, this is

14  her letter.  Her attorney sent it for her.  We're not asking to

15  submit the letter.  We're not asking to get into any of the

16  specifics in the letter; but, I mean, she wrote to the County

17  and asked them to change their ways.

18       **THE COURT:**  Well, but if we're talking about a letter

19  that she asked counsel to send, cross -- that does open up some

20  cross into the attorney-client relationship, and I just don't

21  think that any of that should come in.

22       **MR. GILBERT:**  Your Honor, it adds one other wrinkle.

23  Once we receive a letter from her attorney, we can't respond to

24  her.  She is a represented party.  So at that point the notion

25  of, "Well, did you Ms. Martinez receive a response," the answer

 1    is, no, the State Bar prohibits us from responding because she

 2    is a represented party.  So it's even further misleading.

 3         **THE COURT:**  Yeah.  I don't think the plaintiff can

 4    testify about the communications between her attorney and

 5    the County.

 6         **MR. ELDER:**  Can she -- well, hold on.

 7        I mean, I will say that the Exhibit 10 was not a demand

 8    letter, so to speak.  It was an offer to sit down and

 9    collaborate on a solution in this alternative process.  I don't

10    think it was ever intended to be like a privileged settlement

11    discussion or anything like that.  It was -- it was an offer

12    to -- for the County to sit down with Ms. Martinez and work out

13    a problem.

14         **THE COURT:**  The letter is from you, and I don't think

15    she wrote it.  I think you or your colleagues likely wrote this

16    letter, and so I don't know that she even qualifies as a

17    percipient witness to this letter she didn't write and didn't

18    send.  And the County is correct, they would have had to

19    respond to you and not to her.

20         **MR. ELDER:**  And so may I ask did she ask the County to

21    change its behavior and then did -- as far as you know, has

22    the County changed its behavior?

23         **THE COURT:**  Well, but is it going to be -- is her

24    testimony going to be that she asked or is it going to be that

25    you asked?

1          MR. ELDER:  I suppose this is -- this is through that

2     letter, yes.

3          THE COURT:  Well, then, no.  This is your

4     communication with the County.  She didn't send this letter and

5     she didn't write this letter, and the County wouldn't have

6     responded to her.  It would have responded to you.  And then I

7     don't think this is appropriate.

8          MR. ELDER:  Okay.

9          MR. GILBERT:  Your Honor, I also ask that

10    Ms. Martinez's statement that she contacted the County, which

11    is immediately before the jury was taken out, be stricken.

12         MR. ELDER:  I'm sorry, what will be stricken?

13         MR. GILBERT:  I'll repeat that.

14       Your Honor, we would also request that Ms. Martinez's

15    statement, which was immediately before the jury was taken out,

16    that she had contacted the County be stricken.

17         THE COURT:  Let me -- I'm trying to pull up the

18    transcript.

19                   (Pause in proceedings.)

20         THE COURT:  You objected at the time on relevance

21    grounds, and I see, according to the record, I sustained your

22    objection.  So I don't think any further action by me is

23    required.  I think I addressed and sustained your objection in

24    realtime.

25         MR. GILBERT:  Thank you, Your Honor.

1      **MR. ELDER:**  Your Honor, this happened in May.  Her

2   lawsuit wasn't filed till over a year later.  May I ask her

3   about the time delay and whether or not she had sufficient time

4   to decide about whether or not to proceed forward and whether

5   the County had been given enough time to change its policy?

6            **THE COURT:**  No.  That's not relevant to anything.

7            **MR. ELDER:**  And as to her credibility and why she's

8   here and that this isn't just about her damages claim, she

9   wants to see this policy changed, may I ask her her reasons for

10  filing the lawsuit?

11           **THE COURT:**  For filing the lawsuit?

12      Well, if you do that, you're opening the door for the

13  defense to cross-examine her about her motivations for filing

14  the lawsuit; and I believe that at a prior hearing you

15  expressed outrage that they might suggest that she's needlessly

16  litigious.

17      If you decide you want to open the door to her motivations

18  in filing the lawsuit, then they get to cross on that.

19           **MR. ELDER:**  Okay.  That's fine.  I think we'll go with

20  that.

21           **THE COURT:**  Are we ready?  Can we bring the jury back

22  in now, Plaintiff?

23           **MR. ELDER:**  Yes.

24           **THE COURT:**  Defense, anything further before we bring

25  them back in?

1          **MR. GILBERT:**  No, Your Honor.  Thank you.

2          **THE COURT:**  All right.  Thank you.

3      I'll ask my courtroom deputy to please bring the jury back

4  into the courtroom.

5      (Proceedings were heard in the presence of the jury:)

6          **THE COURT:**  Good afternoon, everyone.  Please be

7  seated.

8      Please continue with your examination.

9  **BY MR. ELDER:**

10 **Q.**  Sorry, Ms. Martinez, I'm going to skip ahead through some

11 material that I'm not going to ask you about.

12     Ms. Martinez, sitting here today, do you have an

13 understanding as to whether or not the County would be willing

14 to provide transcriber service for you if you were to return to

15 the CRO on your five-year anniversary for the renewal of your

16 FBNS form?

17         **MR. GILBERT:**  Objection.  Relevance.  Speculation.

18 403.

19         **THE COURT:**  Overruled.

20         **THE WITNESS:**  I do have to return.  It's been

21 five years, and I have no idea what to expect or if the County

22 has done anything.  I've only heard contradictory information.

23 **BY MR. ELDER:**

24 **Q.**  Did you hear Matt Yankee testify the other day?

25 **A.**  I did.

1   Q.   And did you hear his comment about the CRO being sort of

2   an intermediary, it was like he might have said library, and

3   that they don't have responsibility for the information that's

4   just passed along and published to the community?  I'm trying

5   to summarize without being able to say it verbatim.  Do you

6   recall anything like that in his testimony?

7   A.   Yes.  I heard him say --

8            MR. GILBERT:  Misstates facts.

9            THE COURT:  Overruled.

10           THE WITNESS:  I heard him say "library," that, yes,

11  the CRO acts like a library.

12  BY MR. ELDER:

13  Q.   Does that give you any confidence that the County's taking

14  responsibility and will provide transcriber service for you on

15  your FBNS form if you return in a few weeks from now?

16           MR. GILBERT:  Objection.  Relevance.

17           THE COURT:  Overruled.

18           THE WITNESS:  I'm hesitating because my library has

19  helped me fill out applications but the County hasn't.  So I

20  don't -- I don't have any confidence at all.

21  BY MR. ELDER:

22  Q.   And you said that you had to pay Ms. Grim to drive you

23  back to the Clerk's Office on May 31st.  How much did you pay

24  her.

25  A.   I paid her for four hours of service at $25 an hour, so

MARTINEZ - DIRECT / ELDER

1   $100.

2   Q.   And did you have to spend some extra time to come back to

3   the CRO beyond that first trip where you weren't able to get

4   same day service on that day?

5   A.   Could you repeat the question, please?

6   Q.   Yeah, sorry.   It's a little bit weird.

7        In -- so you weren't able to file your form on March 29th,

8   2019; right?

9   A.   Correct.

10  Q.   You had to come back a second time, fill out a new form,

11  second trip.   Did that take up some of your time?

12  A.   It did.

13  Q.   And in terms of trying to understand any kind of dollar

14  value for what your time might be worth, how much -- if I came

15  to you and said, "I'd like some sessions of life coaching," how

16  much would you charge me for life coaching per hour?

17           MR. GILBERT:   Objection.   Rule 26.   Rule 37.   403.

18           THE COURT:   Overruled.

19           THE WITNESS:   So I offer coaching -- life coaching for

20  individuals on a -- like a package of sessions, and so one

21  session one hour is $175.

22  BY MR. ELDER:

23  Q.   And do you have other pricing schemes or different -- I

24  mean, is it always that price or are there variations?

25  A.   Yeah, I do have different pricing.   I often do group

1   coaching to make it a lot more affordable.  So that is offered

2   at a lower cost.  And if someone who clearly wants coaching

3   talks to me and we decide it's a good fit but they can't afford

4   individual coaching, I will offer it at a sliding scale.

5   **Q.**   Now, is there any uncompensated time that goes into

6   preparation or work needed for a one-hour of paid session?

7   **A.**   Tons.

8   **Q.**   Okay.  And can you estimate how much unpaid or

9   uncompensated time you spend preparing for one of these paid

10  one-hour sessions?

11  **A.**   Yeah.  So, you know, there's a lot of client acquisition,

12  engagement, audience building, e-mails, administrative stuff.

13  I would say that for every one hour of -- one hour of coaching,

14  I probably put in four hours of uncompensated time.

15  **Q.**   So can you estimate on an hourly basis about how much you

16  receive on your time for that 175?  If you're doing one-hour --

17  **A.**   Right.

18  **Q.**   -- of paid time and four hours of paid unpaid prep time,

19  what would you estimate your sort of take away is on an hourly

20  basis for that work?

21  **A.**   Right.

22           **MR. GILBERT:**  Objection.  Relevance.  Rule 37.

23           **THE COURT:**  Overruled.

24           **THE WITNESS:**  So in order to essentially pay me for my

25  uncompensated time, that for one -- that's five hours of

**MARTINEZ - DIRECT / ELDER**

1    one-hour being face to face for being all the client

2    acquisition and administrative stuff, so that would be five

3    hours divided by 175.   I believe that's $35 an hour.

4    **BY MR. ELDER:**

5    **Q.**   And is $35 an hour an estimate of -- is that your estimate

6    of the value of what your time might be worth?

7    **A.**   Yeah.   I would say so, yes.

8    **Q.**   Okay.   Sitting here today on the five-year anniversary of

9    what happened to you, how are you feeling about the way

10   the County has treated you?

11             **MR. GILBERT:**   Asked and answered.

12             **THE COURT:**   Overruled.

13             **THE WITNESS:**   Today I'm tired.   I'm drained.   The last

14   five years have been really emotionally tough for me, and there

15   have been points in my business when handling business-related

16   documents that I get a lot of anxiety.   And that little voice

17   in your head that tells you, you know -- whispers in your head

18   and makes you doubt yourself has cropped up quite a lot.

19        And I just -- I just feel like it's been a really long

20   journey for something that I know could have been a really

21   simple equal-access issue if I was just given the transcribing

22   assistance that I had asked for, and I don't want other blind

23   people to have to deal with that.   We're in the 21st century

24   and, you know, this should not be happening.

25   **Q.**   And do you consider yourself a resilient person?

1    **A.**    I do.

2    **Q.**    Okay.  We're on the five-year anniversary of the incident

3    on March 29th today.  Do you have an understanding of whether

4    or not you're going to have to go back do the CRO before

5    March 31st, 2024?

6    **A.**    Before March 31st?

7    **Q.**    Yes.  Sorry.  Before May 31st, 2024.

8    **A.**    I was going to say I'm a bit in trouble.

9         Yes, I do have to go back in order to file and pay by

10   credit card my FBN, at least that's my understanding.  I have

11   not gone on the web lately to check if anything has changed.

12   **Q.**    If you go in person sometime before May 2024 to renew your

13   FBNS form, would you be willing to have a County employee act

14   as a transcriber to fill out a blank FBNS form or renewal

15   document?

16             **MR. GILBERT:**  Cumulative.  Asked and answered.

17             **THE COURT:**  Overruled.

18             **THE WITNESS:**  Yes.

19   BY MR. ELDER:

20   **Q.**    Have you heard about the proposed -- or sorry.

21        Have you heard about the computer kiosk system that

22   the County has constructed?

23   **A.**    Yes.

24   **Q.**    Have you tried to use it?

25   **A.**    No.

1  **Q.**  But did you hear Mr. Clark's testimony about it in this

2  trial?

3  **A.**  I did.  I did.

4  **Q.**  Sitting here today, do you think you would opt to use the

5  computer Wizard system that the County has constructed as an

6  alternative to having a human transcriber fill out the paper

7  form?

8  **A.**  No.

9          **MR. GILBERT:**  Speculation.  Relevance.

10          **THE COURT:**  Overruled.

11          **THE WITNESS:**  No.

12          **MR. ELDER:**  I think that may be all.  Hold on one

13  second.

14                  (Pause in proceedings.)

15          **MR. ELDER:**  I think rather than get into further

16  issue, Your Honor, we're going to pass the witness.

17          **THE COURT:**  All right.  Thank you.

18      Now is a good time for us to break for lunch.  So I'm

19  going to ask my courtroom deputy to take the jury back into the

20  jury room.

21      (Proceedings were heard out of the presence of the jury:)

22          **THE COURT:**  Before I let you all go, I think we need

23  to deal with the Eve Hill issue now.

24      To retrace what happened, the defendant's expert Vaughan

25  gave an opinion in paragraph 28 of his report that says, quote

1    (as read):

2            "In my opinion, the auxiliary aids and services

3        provided by the CRO for completion of an FBNS are

4        effective, are provided in an accessible format in a

5        timely manner, and in such a way as to protect the privacy

6        and independence of the individual with a disability and

7        are in compliance with the ADA regulation requiring

8        auxiliary aids and services to be provided by a public

9        entity," end quote.

10    And then Hill was plaintiff's rebuttal expert to Vaughan.

11    She gave three opinions.  Her second opinion is, quote (as

12    read):

13            "The County's offered auxiliary aids when

14        Ms. Martinez went to the CRO in 2019 were not equally

15        effective to her requested aid," end quote.

16    In response to motions in limine brought by both sides, I

17    struck both of those opinions as legal conclusions.  What has

18    happened now is that in response to the County's questions, it

19    looks like Mr. Yankee walked back in paragraph 28 of Vaughan's

20    report.

21    And so my tentative thought is that this does open the

22    door for Hill to offer her Opinion Number 2, but let me hear

23    from the County first.

24            **MR. GILBERT:**  Your Honor, first of all, the Rule 26

25    disclosures are very clear.  They deal with the opinions of an

1   expert, not of a party; and so, therefore, the rebuttal expert

2   testimony under Rule 26 has to very specifically address that

3   of another expert, not a lay witness, first of all.

4       Second of all, the Rule 26 authority and as well as the

5   case law -- I'll give you the case law right now -- confirms

6   that there has to be evidence through a party's case-in-chief,

7   not in defense of another party's case.  And that opinion is

8   addressed I believe it's at *Stanley v. Cottrell*, 784 F.3d 454

9   at page 461 to 462.

10      Furthermore, the testimony of Mr. Yankee was in response

11  to direct questioning by plaintiff on those issues.  The County

12  objected to every one of those issues when they came up

13  initially, and the Court overruled the County's objection.

14      So, therefore, the questioning came in in response to

15  plaintiff raising the issue.  Plaintiff cannot put an issue in

16  play and then say that a party's response or addressing it is,

17  therefore, opening a door.  Plaintiff opened it.  They raised

18  the issue.

19      Furthermore, the context and the testimony of Mr. Yankee

20  was not in the context of an expert opinion.  Instead, it was

21  in the context of a deliberate indifference standard whether

22  the County's actions were undertaken with deliberate

23  indifference to the need of an individual plaintiff.

24      Furthermore, the Court's prior ruling that this does go to

25  legal testimony which is improper is still improper or still in

1  play.  The testimony of Ms. Hill on that point still

2  constitutes an inadmissible legal opinion and is still,

3  furthermore, predicated upon inadmissible authorities,

4  specifically the Technical Assistance Manual's guidance which

5  is not admissible or otherwise binding.  It also usurps the

6  jury's province on the exact issue of law in this case.

7       Continuing on, Your Honor, the next question is:  Is this

8  even the proper scope of rebuttal testimony?  As we stated in

9  the brief that we previously filed, if a party anticipates to

10 have the burden of proof on an issue, they're required to

11 address that within their opening briefs on their experts --

12 excuse me -- opening reports of their experts.  And we provided

13 that in the brief that was filed at Docket 143, and

14 specifically -- it's two points.

15      First of all, starting with the proper point is to rebut

16 evidence, to contradict evidence offered by an adverse party

17 during their case-in-chief, and I already gave the Court the

18 case cite for that.

19      But continuing on -- I'm trying to find... Expert

20 testimony that goes directly to an issue to be presented in a

21 party's case-in-chief, specifically here whether there was an

22 ADA violation, and that would include whether or not auxiliary

23 aids and services were necessary and whether they were

24 effective, must -- could have been anticipated and is not

25 proper for rebuttal testimony.

1       And that's *Kinder Morgan Energy Partners* at 159 F.3d --

2   I'm sorry -- F.Supp.3d at 1191.  It's also in the *Sentry*

3   *National Insurance Company* case at 460 F.Supp.3d at 1064 where

4   the court made very clear that in similar situations, the

5   witness is not a rebuttal witness or anything analogous to one

6   where they're addressing issues that go to a party's burden in

7   their case-in-chief.

8       Continuing on, Your Honor, rebuttal testimony is only

9   proper when we -- when the defense raises and presents a legal

10  issue or evidence in their case-in-chief.  Here, as the

11  defendants have made clear, there is no case-in-chief by the

12  defendants.  They will not be calling any witnesses, presenting

13  any testimony.

14      Once plaintiff rests, we'll move for Rule 50 and at that

15  point we will rest our case.

16      So with that, Your Honor, we'll submit.

17          **THE COURT:**  All right.  As to the question about

18  whether Hill's Opinion Number 2 was ever a proper rebuttal

19  opinion, as I've said before, defendant waived that issue.  I

20  set a deadline for motions in limine to be filed, and this

21  issue was squarely teed up by Hill's report and defendants did

22  not move to strike this as improper rebuttal.  So I think that

23  issue has been waived by failing to include that in a timely

24  motion in limine.

25      As for calling a rebuttal witness in the plaintiff's

**PROCEEDINGS**

1    case-in-chief, I don't think that's really what is happening

2    here as a practical matter.  What happened is that in

3    plaintiff's case-in-chief, they called to the stand all of the

4    defendants' witnesses; and then after the adverse direct by

5    plaintiff's counsel, defense counsel did their direct of their

6    witnesses.

7         In other words, the defendant put in its entire

8    case-in-chief during the plaintiff's case-in-chief.  It's not

9    that there wasn't a defense case-in-chief.  The two were just

10   put in at the same time, and the defense has informed me that

11   you have no further witnesses to call.

12        So at this point she would be functionally a rebuttal

13   witness because the defense has already presented its entire

14   case-in-chief and she would be following that case-in-chief.

15        And then as to the question of whether she has to rebut

16   another expert, we have an unusual situation here in that the

17   defendant withdrew Vaughan as an expert but then used the head

18   of the CRO to walk in one of Vaughan's opinions.  It's

19   essentially the same as his expert opinion in paragraph 28.

20        And now that he has done that -- and to be clear, he did

21   that on the County's direct.  I might feel different or, in

22   fact, I would probably feel different if plaintiff's counsel

23   questioned Mr. Yankee and then relied on that testimony to

24   argue for the opening.  That would be quite different if they

25   did it, but this happened on direct by the County's counsel

PROCEEDINGS

1    that walked in that opinion that is basically lifted from

2    Vaughan's report.

3                    (Pause in proceedings.)

4            **MR. GILBERT:**  Sorry.  It was a wire under my feet.

5            **THE COURT:**  I heard some static there for a bit.

6        Because of this situation where basically the lead witness

7    for the defendant walked in part of the expert report in

8    questioning by the County, I do think it is appropriate to

9    allow Hill to rebut that with Opinion Number 2.

10       I think this only opens the door to Opinion Number 2 and

11   not Opinion 1 and not Opinion 3, but I will let her give

12   Opinion 2.

13           **MR. GILBERT:**  May I be heard briefly on that?

14           **THE COURT:**  Sure.

15           **MR. GILBERT:**  On the waiver issue, there is no case

16   law that requires motions in limine to be filed or that there's

17   a waiver of any admissibility or scope of expert testimony

18   beforehand.  It is advisable and it allows the Court to make

19   advisory rulings ahead of time, but motions in limine are

20   without prejudice and the parties are still free to object

21   during the questioning.  In fact, there's ample cases on that.

22       Turning to the point the Court made about this was in

23   response to the County presented its case during plaintiff's

24   case-in-chief, the County's questioning never exceeded the

25   scope of plaintiff's questioning.  We never went into any new

PROCEEDINGS

 1   issues.  We never expanded the scope.  We never raised new

 2   issues whatsoever.

 3       The questioning that this Court is relying upon is in

 4   direct response to plaintiff's questioning of Mr. Yankee about

 5   his belief of what was required of the ADA and what the

 6   Clerk-Recorder's Office was required to do.

 7       Plaintiff's counsel asked those questions.  The County

 8   objected to that.  That is very clear on the transcript.  The

 9   Court overruled that objection and allowed plaintiffs to

10   insinuate what their opinions were on that expert testimony,

11   which should never have came in in the first instance.

12       When plaintiffs did that, the County responded by simply

13   following up on that same line of questioning that plaintiffs

14   have raised.  To go and say that that somehow opened the door

15   when there is nothing further that the County introduced or

16   opened -- and I would ask the Court to explain, if it would

17   please, how the testimony opened the door.  Because I'm looking

18   at the transcript and, I'm sorry, I don't mean to be dense, but

19   we're looking at a deliberate indifference standard and what

20   the County's understanding was.

21       And as I understand the Court, the Court gave instructions

22   to the jury when this was going on that this was Mr. Yankee's

23   opinions and that it's not the law of the case.  And the Court

24   was very, very clear that this is not law, you cannot accept it

25   as such.  Obviously that's my paraphrasing of the Court's

1    ruling.

2        But now the Court is saying:  Well, we're going to treat

3    Mr. Yankee as a pro forma expert having to opined on the law

4    and the legal duties even though the Court diminished his

5    testimony, told the jury in realtime that it was not to be

6    considered with the same weight in evidence and credibility as

7    what Ms. He would be or Ms. Hill would be allowed to submit and

8    now is awarding plaintiff by opening that door over the

9    defendants' objection.

10       **THE COURT:**  Well, I don't agree with that

11   characterization of events.

12       But as to Ms. Hill, I should add that she does need to

13   limit it to her understanding.  I'm not changing my mind about

14   whether witnesses can testify as to Vaughan.  The answer is no.

15       But Mr. Yankee testified as to his understanding of what

16   was required, and she can testify as to her understanding, and

17   then -- but she can't say, "You know, the ADA requires this or

18   this regulation requires that."  She can just -- her testimony

19   has to parallel his testimony.  He was giving his personal

20   understanding, she can give her personal understanding, and

21   then give her Opinion Number 2.

22       **MR. ELDER:**  Yes.  And we'll keep it in that line; and

23   if Your Honor needs to give an instruction similar to what was

24   given in Mr. Yankee's case, that seems fair.

25       **MR. GILBERT:**  Your Honor, could you tell us

 1    specifically the Opinion Number 2?  Because I'm looking in the

 2    report but they're not numbered.

 3            **MR. ELDER:**  Could I --

 4            **THE COURT:**  I already read it.  It's, quote (as read):

 5                "The County's offered auxiliary aids when

 6        Ms. Martinez went to the CRO in 2019 were not equally

 7        effective to her requested," end quote.

 8        That's Opinion Number 2.

 9            **MR. GILBERT:**  Thank you, Your Honor.

10            **MR. ELDER:**  And just for the record, in the report, as

11    I understand it, there's four opinions.  The first one has to

12    do with Mr. Vaughan's qualifications.  That's out.  The second

13    one has to do with whether auxiliary -- whether a transcriber

14    is a common auxiliary aid, that one no door was opened as we

15    understand it.  The third one is the one you just quoted.

16            **THE COURT:**  The swipe at Mr. Vaughan's credentials I

17    didn't know was necessarily an opinion.

18            **MR. ELDER:**  Oh, okay.  Okay.

19            **THE COURT:**  The three opinions are in larger font at

20    the beginning of a paragraph --

21            **MR. ELDER:**  Okay.

22            **THE COURT:**  -- so that's why it looked to me like --

23    but I think the one about auxiliary aids, that they were not

24    equally effective, that's the one I'm referring to.  And that's

25    what I understood you to say in your trial brief that you

1  wanted her to offer; is that correct?

2         **MR. ELDER:**  I'm sorry.  Could you repeat that?

3         **THE COURT:**  Oh, sorry.  This is the one about

4  auxiliary aids not being equally effective.  I interpreted your

5  brief to be arguing that she should be able to give that

6  opinion; is that right?

7         **MR. ELDER:**  That is right.

8         **THE COURT:**  Okay.  Well, then with that, my ruling

9  stands.

10     And let's break for lunch and come back in 45 minutes.

11         **MR. ELDER:**  May I, Your Honor?

12         **THE COURT:**  Go ahead.

13         **MR. ELDER:**  Just a quick update.

14     So we appreciated the reconsideration on Mr. Salsiccia.

15  We've reached out to him and, unfortunately, he's not available

16  to testify today; but in the grand scheme of things, I think

17  his testimony would be largely duplicative of the facts of

18  Ms. Greco.  So while we appreciate the opportunity, we are

19  going to withdraw Mr. Salsiccia for the pure scheduling of the

20  convenience of getting this trial wrapped up today.

21         **THE COURT:**  Thank you for the update.

22     Anything else before we break?

23         **MR. ELDER:**  No.  We'll work on the break to get

24  Ms. Hill available -- oh, I'm sorry.  They have direct on --

25         **THE COURT:**  Sorry, what?

1          **MR. ELDER:**  I'm sorry.  There's more witness Martinez.

2          **THE COURT:**  Yes, the other side has to cross-examine

3    her.

4      Anything more from the defense before we break?

5          **MR. GILBERT:**  No, Your Honor.

6      Just for the record, we object Ms. Hill testifying

7    remotely.  We don't believe she meets the prerequisites for

8    remote appearance, and I do think it raises questions about

9    credibility not having her here in the courtroom, and I don't

10   believe there's a good faith showing of necessity and actual

11   hardship for her to appear specially as an expert.  So we do

12   request that the Court order her to testify in person today.

13         **THE COURT:**  And can you remind me, Counsel, why she's

14   unavailable in person?

15         **MR. ELDER:**  Yes.  Ms. Hill is attending a previously

16   scheduled mediation at JAMS in Washington, D.C., and ethically

17   she could not be on a plane resolving that previously scheduled

18   matter again having enough time to fly out here.

19     The only way she could be here in person would be to delay

20   her testimony until Monday, which, I mean, I think we'd prefer

21   to wrap this up today and have her testify over Zoom rather

22   than trying to delay things any further.

23     But we do think she has a hardship because of her practice

24   and her ethical responsibility to be in that previously

25   scheduled JAMS meeting and not able to fly across country that

 1  quickly.  She's in person in Washington, D.C.

 2          **THE COURT:**  Okay.  I find the circumstances satisfy

 3  the good cause and compelling circumstances standard under

 4  Rule 43, and I find that the court's Zoom platform provides

 5  appropriate safeguards.  So I think Rule 43 is satisfied and

 6  the witness can testify remotely.

 7          **MR. GILBERT:**  Thank you, Your Honor.

 8      When are we back?

 9          **THE COURT:**  All right.  We're now on our lunch break.

10          **MR. GILBERT:**  When are we back, Your Honor?

11          **THE COURT:**  About 45 minutes.

12          **MR. GILBERT:**  Thank you.

13              (Luncheon recess was taken at 1:10 p.m.)

14  **AFTERNOON SESSION**                              **2:07 p.m.**

15      (Proceedings were heard out of the presence of the jury:)

16          **THE COURT:**  Good afternoon, everyone.  Please be

17  seated.

18          **THE CLERK:**  Good afternoon, everyone.

19      We're back on the record in civil action 20-6570, Martinez

20  vs. County of Alameda, et al.

21      Judge, please go ahead.

22          **THE COURT:**  At this time I'll ask my courtroom deputy

23  to bring the jury back into the courtroom.

24          **MR. ELDER:**  May Ms. Martinez go to the witness stand?

25          **THE COURT:**  Yes, please.

1          MR. ELDER:  Okay.

2      (Proceedings were heard in the presence of the jury:)

3          THE COURT:  Good afternoon, everyone.  Please be

4    seated.

5      Defendant, you may proceed to question the witness.

6          MR. GILBERT:  Thank you, Your Honor.

7          THE WITNESS:  Could I ask for my bottle of water

8    before we start?

9          MS. STONER:  May I approach?

10          THE COURT:  Yes.  You can approach to hand her her

11    bottle of water.

12          THE WITNESS:  Thank you.  Sorry.

13          MR. GILBERT:  May I, Your Honor.

14          THE COURT:  Yes, please.  Go ahead.

15          MR. GILBERT:  Thank you.

16                    **CROSS-EXAMINATION**

17    BY MR. GILBERT:

18    Q.   Good afternoon, ma'am.

19    A.   Hi.

20    Q.   So I wanted to focus on a few questions if I could.

21      Now, your first visit to the CRO's office was in

22    March 29th, 2019; is that correct?

23    A.   My first visit for my business, yes.

24    Q.   Now, when you went on March 29th, 2019, when you walked in

25    the door, you had already completed your FBNS form before even

MARTINEZ - CROSS / GILBERT

1  going to the office; is that right?

2  **A.**   I had a form that I filled out to the best of my ability,

3  yes.

4  **Q.**   And you had signed it before going to the office?

5  **A.**   Yes.

6  **Q.**   And you had incorrectly filled it out, though, you learned

7  at a later time?

8  **A.**   I did find out that corrections needed to be made, and

9  apparently that's common.

10  **Q.**   Now, when you were working with the CRO representatives on

11  that date, did you understand them to be explaining to you that

12  they were unable to edit a previously completed form?

13  **A.**   I was being told that they could not help me make the

14  corrections on the form.

15  **Q.**   And you understood that they were explaining that the

16  reason they couldn't is because it was an already completed

17  form that was signed under penalty of perjury already?

18  **A.**   Ms. Moran and Ms. Briones kept telling me that it would be

19  under penalty of perjury and that they could not help me.

20  **Q.**   But you understand their statements and that they were

21  explaining to you that they are prohibited from modifying a

22  previously completed legal form, didn't you?

23  **A.**   I did not understand that to be the case then, no.

24  **Q.**   But did you understand that that's what they were telling

25  you?

 1    **A.**    Today, yes.

 2    **Q.**    And you understood that at the time, didn't you?

 3    **A.**    No.

 4    **Q.**    Well, didn't you respond to them and tell them that you

 5    wanted them to modify the form so it could be filed?

 6    **A.**    I kept asking them to please assist me to transcribe the

 7    corrections that they told me I needed to make on my form.

 8    **Q.**    And they explained -- well, you've heard the recordings of

 9    those conversations, haven't you?

10    **A.**    Yes.

11    **Q.**    And those recordings accurately depict the exchanges

12    between you and Ms. Moran and you and Ms. Briones, don't they?

13    **A.**    Yes.  For the time that they were recorded, yes.

14    **Q.**    And there was actually quite a bit of other conversations

15    before and after those audios were recorded, was there?

16    **A.**    There were some conversations, yes.

17    **Q.**    Now, turning to the second audio, you mentioned that you

18    had attempted to turn off the second audio; is that correct?

19    **A.**    If you're referring to the first time I talked to

20    Ms. Briones, yes.

21    **Q.**    And you thought that you -- and you turned that off

22    because you understood that Ms. Briones did not want you to

23    record your conversations with her; is that right?

24    **A.**    Yes.

25    **Q.**    Now, there was actually another audio you took of a later

MARTINEZ - CROSS / GILBERT

1  conversation with Ms. Briones, wasn't there?

2  **A.**    There -- yes, there was.

3  **Q.**    And that was Exhibit 4D, which is a later conversation

4  with Ms. Briones; is that right?

5  **A.**    Yes.

6  **Q.**    And you recorded that without telling Ms. Briones you're

7  recording it knowing that she did not want to be recorded;

8  isn't that correct?

9  **A.**    No.  I would say that she did not want to be recorded the

10  first time, which was a more in-length conversation between her

11  and I.

12      The second time I absolutely needed to take down notes in

13  order to have the correct information about her supervisor's

14  name and title and her own name, Ms. Briones' own name and

15  title, and I had no way to really take notes other than to

16  record.

17  **Q.**    Well, you didn't explain you were recording to

18  Ms. Briones, did you?

19  **A.**    I didn't.

20  **Q.**    And you didn't ask for permission, did you?

21  **A.**    I did not.

22  **Q.**    And you're not aware whether she even knew that you were

23  recording that conversation?

24  **A.**    I had the phone on the counter facing up.  If she glanced

25  at my screen, she could have seen it.

1   Q.   Now, staying with that first conversation -- or that first

2   visit to the CRO's office on March 29th, 2019, at no time

3   during that visit did you ever ask anybody to prepare a new

4   FBNS form, did you.

5   A.   I was not aware that was an option.

6   Q.   And, in fact, when we discussed it previously during your

7   deposition, your exact words I believe when asked if you asked

8   for them to prepare a new FBNS was "Absolutely not" were the

9   words you used, weren't they?

10  A.   I'm a little confused.  Can you restate that?

11  Q.   When you were deposed in this matter and we asked you that

12  question whether you asked for a new FBNS to be prepared,

13  wasn't your response "Absolutely not"?

14  A.   In response to your question during deposition asking me

15  if I -- I'm a little unclear about that part.

16  Q.   During your deposition, you were asked whether or not

17  during your March 29th, 2019, visit you ever requested a new

18  FBNS form to be prepared.

19  A.   Mm-hmm.

20  Q.   Your response was "Absolutely not," wasn't it?

21  A.   If that is what is recorded in the deposition, then, yes,

22  that is what I responded.

23  Q.   And as you sit here today, that's what you recall saying,

24  isn't it?

25  A.   If that is what is in the deposition, yes.  I did review

1  the deposition before today.  It's also 180 pages, two years

2  ago.

3  **Q.**    And, in fact, you never asked anyone at the FBNS -- excuse

4  me -- at the CRO to prepare an updated FBNS form for you that

5  was accurate, could be filed on the spot, during your

6  March 29th, 2019, visit, did you?

7  **A.**    Again, I had absolutely no idea that that was an option

8  provided to me if I had asked.

9  **Q.**    So when you went back on March 31st -- I'm sorry --

10  May 31st, you met again with Ms. Moran, didn't you?

11  **A.**    I'm not sure who I met with.

12  **Q.**    Well, you heard her testimony earlier where Ms. Moran

13  testified that she was the person that helped you at that time,

14  didn't you?

15  **A.**    Yes, that is right.

16  **Q.**    And when you went on May 31st, 2019, before you went, you

17  had completed an updated FBNS form, hadn't you?

18  **A.**    I did complete a new one, yes.

19  **Q.**    And you completed it at home before you went in?

20  **A.**    Yes.

21  **Q.**    Did you sign it at home before you went in?

22  **A.**    Yes.

23  **Q.**    And, in fact, what we've seen is Exhibit 3 is the recorded

24  FBNS form that you recorded on May 31st, 2019, with your

25  signature, isn't it?

 1  **A.**   I don't have access to Exhibit 3.  It is the only one that

 2  is inaccessible.

 3  **Q.**   I understand.

 4       But you didn't create a new form or sign a new form when

 5  you went to the CRO's office on 5/31/2019, did you?

 6  **A.**   No.  As I stated previously, I completed it and brought it

 7  in.

 8  **Q.**   And so there was no new signature, no modifications to any

 9  form -- or any changes to the form when you went on May 31st,

10  2019, was there?

11  **A.**   I was told that everything -- let me start that over

12  again.

13       Ms. Moran typed in information into the computer, turned

14  the monitor toward me, asked me to verify it.  I stated I was

15  blind, "Could you please read it back so I can verify it."

16       And she said, "I know you're blind," and she turned the

17  monitor to Ms. Grim and told her to help me.  So I verified

18  everything and I -- there were -- no corrections were made.

19  **Q.**   I guess that's what I don't understand.

20       You came in with a completed form that was completed,

21  signed, and prepared and ready to go.  You handed that form to

22  Ms. Moran, and the same form that you walked in the door with

23  that had been signed was recorded by Ms. Moran, a copy given

24  back to you, and you left without any edits on it; is that

25  right?

MARTINEZ - CROSS / GILBERT

1   **A.**   Yes.

2   **Q.**   I understand.

3       So there was nothing to type on a computer regarding that

4   form, was there?

5   **A.**   I am presuming that the typing was entering information

6   onto the computer because she turned the monitor my way and

7   asked me to verify the information on there.  So I'm presuming,

8   based off of logic, my logic, that she must have typed

9   something that was appearing on the computer screen.

10      And my sense, Ms. Emily -- sorry -- Ms. Grim read

11  essentially the data on the form out loud to me, and I said

12  that was accurate, then everything falls into place for me to

13  tell you today that Ms. Moran must have typed in data off my

14  sheet and onto the computer.

15          **MR. GILBERT:**  Your Honor, I move to strike as

16  nonresponsive and speculative.

17          **THE COURT:**  Denied.

18          **MR. GILBERT:**  May I have just a moment?

19          **THE COURT:**  What?

20          **MR. GILBERT:**  May I have just a moment?

21          **THE COURT:**  Yes, please.

22                      (Pause in proceedings.)

23          **MR. GILBERT:**  Nothing further, Your Honor.  Thank you.

24          **THE COURT:**  Does plaintiff counsel have any further

25  questions for plaintiff?

PROCEEDINGS

---

1    <u>**REDIRECT EXAMINATION**</u>

2    **BY MR. ELDER:**

3    **Q.**   On -- when you said "Absolutely not" in your deposition,

4    Ms. Martinez, I just want to be clear, were you absolutely sure

5    that you did not ask anyone for a blank form on March 29th,

6    2019?

7    **A.**   Yes.

8    **Q.**   And is that because you weren't aware they were available?

9    **A.**   I had no idea there was a blank form option.

10           **MR. ELDER:**  Nothing further, Your Honor.

11           **THE COURT:**  Does defendant have any further questions

12   for the witness?

13           **MR. GILBERT:**  No, Your Honor.  Thank you.

14           **THE COURT:**  All right.  Thank you, ma'am.  You may

15   step down from the witness stand.

16                    (Witness excused.)

17           **THE COURT:**  If I understand correctly, plaintiff's

18   next witness is testifying remotely?

19           **MR. ELDER:**  That is -- that is correct, Your Honor.  I

20   wonder if -- I know we just had lunch, but I wonder if a break

21   to get the Zoom set up might be appropriate.

22           **THE COURT:**  I think that's a good idea.

23       I'll ask my courtroom deputy to take the jury into the

24   jury room.

25       (Proceedings were heard out of the presence of the jury:)

PROCEEDINGS

1         **THE CLERK:** Are you going to have her -- is she on --

2         **THE COURT:** Right now we're going to take a recess to

3   get the witness set up on Zoom. So let's go off the record.

4   We'll take a short recess and we'll come back when she's

5   available.

6                  (Recess taken at 2:22 p.m.)

7              (Proceedings resumed at 2:33 p.m.)

8       (Proceedings were heard out of the presence of the jury:)

9         **THE COURT:** Good afternoon, everyone. Please be

10  seated.

11        **MS. STONER:** Your Honor, before we bring the jury back

12  in, I have a brief motion Rule 106 motion.

13        **THE COURT:** Okay.

14        **MS. STONER:** So in the cross-examination it was read a

15  quote from page 69 of the deposition, and it said (as read):

16         "On March 29th, 2019, do you have a recollection of

17      ever asking either Angelina or Laura to just fill out a

18      new FBNS form for you using the information that you

19      provided."

20      And the answer, it begins "Absolutely not," but it ends "I

21  did not have the blank form." And I move to have "I did not

22  have the blank form" admitted pursuant to Rule 106.

23        **THE COURT:** What's your question to me?

24        **MS. STONER:** Just that I'm just moving that it be

25  included pursuant to the completeness.

PROCEEDINGS

 1          THE COURT:  Well, you had a chance to raise this

 2     during the cross-examination of the witness, and you didn't

 3     raise it at the time.

 4          MS. STONER:  Okay.  All right.  Thank you, Your Honor.

 5          THE COURT:  So I think this request is belated, so I'm

 6     going to deny it.

 7          MS. STONER:  Okay.  Thank you, Your Honor.

 8          MR. ELDER:  May I come to the podium?

 9          THE COURT:  Yes, please.

10          MR. ELDER:  Ms. Hill is ready.

11          THE COURT:  And at this time I'll ask the courtroom

12     deputy to bring the jury back into the courtroom.

13        (Proceedings were heard in the presence of the jury:)

14          THE COURT:  Good afternoon, everyone.  Please be

15     seated.

16        Plaintiff, please call your next witness.

17          MR. ELDER:  Thank you, Your Honor.

18        In rebuttal, we call our final witness in the trial,

19     Ms. Eve Hill.

20          THE COURT:  Please go ahead.

21          MR. ELDER:  Does she need to be sworn in?

22          THE CLERK:  She needs to be sworn.

23          THE COURT:  You're right.

24          THE CLERK:  Ms. Hill, I'm the courtroom deputy.  Can

25     you raise your right hand, please?

1  <u>**EVE LYNN HILL**</u>,

2  called as a witness for the Plaintiff, having been duly sworn,

3  testified as follows in rebuttal:

4          **THE WITNESS:**  I do.

5          **THE CLERK:**  Can you turn on your sound?

6          **THE WITNESS:**  My sound?

7          **THE CLERK:**  There you go.  Just turn it up a little

8  bit.  Okay.

9          **THE WITNESS:**  Okay.  I do.

10          **THE CLERK:**  Thank you.

11                  <u>**DIRECT EXAMINATION**</u>

12  **BY MR. ELDER:**

13  **Q.**   Good afternoon, Ms. Hill.  Can you hear me?

14  **A.**   Yes, I can.

15  **Q.**   Okay.  Could you please say your full legal name for the

16  record?

17  **A.**   Eve Lynn Hill.

18  **Q.**   Okay.  And where do you currently reside?

19  **A.**   Arlington, Virginia.

20  **Q.**   In what field do you work?

21  **A.**   I'm a disability rights attorney and consultant.

22  **Q.**   Did you go to college?

23  **A.**   Yes, I did.

24  **Q.**   Where did you go?

25  **A.**   Sweet Briar College in Virginia.

**HILL - DIRECT / ELDER**

1  **Q.**    And did you go to law school?

2  **A.**    Yes, I did.

3  **Q.**    Where did you go to law school?

4  **A.**    Cornell.

5  **Q.**    Do you have any special experience working in the equal

6  access provisions under the Americans with Disabilities Act as

7  implemented by state and local government entities?

8  **A.**    I do.  I've been practicing in the area of the Americans

9  with Disabilities Act for approximately 30 years, including in

10  academia, in federal government twice as the ADA coordinator

11  for the District of Columbia government, and now in private

12  practice.

13  **Q.**    And could you briefly sketch out the various positions you

14  have held over these 30 years?  I think I heard them, but I

15  just want to make sure we can hear you.

16  **A.**    Sure.  I started at the U.S. Department of Justice, Civil

17  Rights Division, in the Disability Rights section.

18        I then ran the -- ran Loyola Law School's Disability

19  Rights Legal Center where I was also visiting associate

20  professor of law teaching disability rights and special

21  education.

22        I was then the head of the District of Columbia's Office

23  for Disability Rights.

24        Subsequently I was at Syracuse University's Burton Blatt

25  Institute.

1          And then I went to Brown, Goldstein & Levy for a brief

2     time before joining the Justice Department's Civil Right

3     Division in its leadership offices, and then I joined Brown,

4     Goldstein & Levy again.

5     **Q.**    What is the Civil Rights Department of the Justice

6     Department?

7     **A.**    The Civil Rights Division of the Justice Department

8     enforces all the federal civil rights law.

9     **Q.**    And does that include the Americans with Disabilities Act?

10    **A.**    Yes, it does.

11    **Q.**    And what is the role of that section of the Justice

12    Department with respect to implementing the Americans with

13    Disabilities Act?

14    **A.**    Well, there are two sections that I worked in.  The

15    Disability Rights Section is responsible for implementing the

16    Americans with Disabilities Act both through providing

17    regulations and guidance and advice to covered entities and

18    individuals with disabilities and through enforcement when

19    necessary.

20         And then when I was in the Civil Rights Division's

21    leadership office I was responsible for all the disability

22    rights work of the division, which included some work in the

23    educational opportunity section which enforced some of the ADA

24    and the housing and civil enforcement section which also

25    enforced some of the ADA.

1    **Q.**   The position overseeing the civil rights section, is that

2    a high-level position?

3    **A.**   It's a presidential appointment.

4    **Q.**   Is that the President of the United States?

5    **A.**   Yes.

6    **Q.**   Okay.  In the -- and you said you worked for the District

7    of Columbia local government; is that right?

8    **A.**   Yes, that's right.

9    **Q.**   And what was your role working for the District of

10   Columbia local government?

11   **A.**   I was the founding director of the Office of Disability

12   Rights, which was essentially the ADA coordinator's office for

13   the district government.  My job was to make sure we complied

14   with the ADA and implemented best practices to make us a model

15   under the ADA.

16   **Q.**   Do you have any special experience working with the

17   communication needs of blind people?

18   **A.**   I do.  I've worked a great deal with the National

19   Federation of the Blind and its members and represented a

20   number of them in enforcement matters.

21       Also at the Justice Department we put out guidance and

22   often advised both people with disabilities and covered

23   entities about their obligations under the effective

24   communication regulations of the ADA.

25   **Q.**   And did any of that work -- again, without getting into

1    specific legal requirements, did any of that work give you

2    special experience involving blind people trying to access

3    paper government forms?

4    **A.**    Yes.  Many of the issues that blind people face and that

5    I've represented or assisted them with involve needing access

6    to paper forms in various contexts.

7    **Q.**    And has any of your work given you any special experience

8    with respect to understanding the communication needs of blind

9    persons when it involves computer access with a screen reader?

10   **A.**    Yes.  In many cases people with vision disabilities need

11   access to electronic-accessible documents that can be read on a

12   computer with a screen reader, and I've worked on those cases.

13   **Q.**    Have you published any -- have you published anything

14   significant reflecting your experience in this field?

15   **A.**    I don't know how significant they are, but I published a

16   number of articles on the ADA and its implications in a variety

17   of contexts.  I've also published a casebook used in law

18   schools and a treatise on ADA civil rights law and policy.

19   **Q.**    And what is a treatise?

20   **A.**    A treatise is a book that explains the law through more of

21   a layperson's lens, less aimed at law students and more aimed

22   at people who are interested in the law.

23       **MR. ELDER:**  Your Honor, I move that Ms. Hill be

24   qualified as an expert in the field of government program

25   access and the communication needs of blind people under the

```
 1    Americans with Disabilities Act.

 2           THE COURT:  Defendant has stated previously its

 3    objections to this witness, and there's no need to be repeated

 4    here.

 5        Does the County object to her being qualified as an

 6    expert?

 7           MR. GILBERT:  As that definition, yes.  I believe that

 8    the qualifications and the expert qualifications need to match

 9    Opinion Number 2 that the Court has allowed her to opine on and

10    not a different or broader scope as has been proposed.

11           THE COURT:  Okay.  The objection is overruled, and I

12    will allow the witness to testify as an expert in this field.

13           MR. ELDER:  Okay.

14    BY MR. ELDER:

15    Q.   Now, Ms. Hill, did the plaintiff's attorneys in this case

16    retain you to look at any questions about how the County of

17    Alameda is communicating and receiving communication from blind

18    people?

19           MR. GILBERT:  Objection.  Exceeds the scope of the

20    expert's approved opinion as far as communications.

21           THE COURT:  Yeah.  Sustained.

22    BY MR. ELDER:

23    Q.   Have the plaintiffs in this case asked you to look at some

24    issues involving the County of Alameda's communication with a

25    blind person?
```

1          **MR. GILBERT:**  Objection.  Same objections.

2          **THE COURT:**  Sustained.

3    **BY MR. ELDER:**

4    **Q.**   Ms. Hill, have the plaintiffs engaged you in this case to

5    offer an opinion?

6    **A.**   Yes.

7    **Q.**   Okay.  I'd like to ask you about one of your opinions.

8          Now, in coming -- in reaching your opinion, I'd like to

9    ask you first a little bit about your process.

10         Did you review the auxiliary aids that were offered to

11   Ms. Martinez, or the alleged auxiliary aids that were offered

12   to Ms. Martinez, when she attempted to fill -- when she

13   attempted to file her FBNS form with the County of Alameda on

14   March 29th, 2019, and then again on May 31st, 2019?

15   **A.**   Yes.

16   **Q.**   And what was your understanding about the Clerk-Recorder's

17   response to Ms. Martinez's request for an auxiliary aid?

18         **MR. GILBERT:**  Overbroad.  Calls for narrative.  Calls

19   for a factual discussion.  Exceeds the scope of the approved

20   opinion.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  My understanding was that Ms. Martinez

23   was trying to fill out a fictional business name report and

24   that the City -- County of Alameda staff offered to let her

25   have a blank report to take home -- form to fill out at home

1    and return by mail.

2    **BY MR. ELDER:**

3    **Q.**   Did the -- did you have an understanding of whether

4    the County offered Ms. Martinez a -- what was referred to as a

5    Go Back Letter?

6    **A.**   Yes, I believe they did offer her that.

7    **Q.**   And what was your understanding of the Go Back Letter?

8    **A.**   The Go Back Letter would explain what was wrong with her

9    initial filing.

10   **Q.**   Okay.  Did you compare the effectiveness of the Go Back

11   Letter and the envelope with Ms. Martinez's request that she'd

12   be given a human transcriber to complete an FBNS form there at

13   the Clerk-Recorder's Office?

14   **A.**   I did.

15   **Q.**   And did you assess -- well, what were you assessing?  Like

16   what was the standard you were using to assess -- again without

17   talking about what a legal requirement is, what were you --

18   what was the standard that you were assessing against?

19         **MR. GILBERT:**  Vague.  Possibly calls for a legal

20   conclusion.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  I was assessing whether the auxiliary

23   aid offered by the County gave equal access for Ms. Martinez to

24   the FBNS form.

25   \\\

HILL - DIRECT / ELDER

1   BY MR. ELDER:

2   Q.   And did you assess whether the Alameda County's offered

3   aid was sufficient to ensure that communications with

4   applicants with disabilities are as effective as communications

5   with others?

6   A.   Yes.

7          MR. GILBERT:  Legal conclusion.

8          THE COURT:  I'll allow it.

9   BY MR. ELDER:

10  Q.   And did you interview Ms. Martinez in your evaluation?

11  A.   I did.

12  Q.   What factors did you evaluate when you were interviewing

13  Ms. Martinez?

14  A.   I evaluated her preference for auxiliary aid as well as

15  timeliness, privacy, independence, and the effectiveness of

16  each form of auxiliary aid; the one that she requested versus

17  the one that was offered to her.

18         THE COURT:  So I need to clarify.  When I said, "I'll

19  allow it," what I meant was I did not think the question called

20  for a legal conclusion.

21      Continue.

22         MR. ELDER:  Okay.

23  BY MR. ELDER:

24  Q.   Did you assess whether the clerk-recorder's offered Go

25  Back Letter and envelope with the ability to send a form back

1  by mail was another equally effective means of communication?

2  **A.**    I did, and I found that it was not equally effective to

3  providing the transcriber while she was in the office.

4         **MR. GILBERT:**  Move to strike as non -- or excuse me --

5  as a legal conclusion.

6         **THE COURT:**  I'm going to deny the motion.

7  **BY MR. ELDER:**

8  **Q.**  And in your personal opinion -- again, not referring to

9  any legal requirements -- why did you believe that it was not

10  equally effective?

11  **A.**    For at least a couple of reasons.  It wasn't as timely as

12  getting the service while she was already at the office.  She

13  would have had to take the form home, have someone assist her

14  to fill it out at home, and return it by mail, which would

15  obviously be slower than getting it done right there while she

16  was there.

17      And in addition, my understanding is that returning a form

18  by mail requires you to submit a paper check while people who

19  submit their forms in the office can pay by debit or credit

20  card.

21  **Q.**  And I think you mentioned the primary consideration.

22  Could you explain, without speaking to any legal requirements,

23  what, in general, does that term "primary consideration" refer

24  to?

25  **A.**    In general, it means that a covered entity has to -- has

**HILL - DIRECT / ELDER**

1  to concede to the person with a disability's requested

2  accommodation unless it can prove that it has an equally

3  effective one.

4          **MR. GILBERT:**  Move to strike as legal conclusion.

5          **THE COURT:**  I'm going to deny it, but I will instruct

6  the jury, as I've instructed with other witnesses, that

7  witnesses are not allowed to testify about what the law is.

8  That's my job and I'll do that in the jury instructions.

9          So you're not to take her testimony about what the law is.

10  She is describing the standards that she applied when she did

11  the analysis, but this is -- you're not to take this as

12  testimony about what the law is.

13  **BY MR. ELDER:**

14  **Q.**  One second, Ms. Hill.

15          And just to be clear, did you eventually, after you went

16  through this process -- sorry.

17          Do you feel you had a sufficient opportunity to get the

18  information you needed either from Ms. Martinez or the County

19  or other sources to confidently support your opinions?

20  **A.**  Yes.

21  **Q.**  And did you come to an opinion about whether the County's

22  alleged auxiliary aids or the Go Back Letter and the envelope

23  that were offered to Ms. Martinez were equally effective to her

24  requested aid of a transcriber?

25  **A.**  Yes.  I came to the conclusion that they were not as

1  effective as the transcriber that she requested while she was

2  at the office.

3  **Q.**   Okay.

4          **MR. ELDER:**  No further questions, Your Honor.

5          **THE COURT:**  Does defendant have questions for the

6  witness?

7          **MR. GILBERT:**  Yes, Your Honor.  Thank you.

8                      **CROSS-EXAMINATION**

9  **BY MR. GILBERT:**

10 **Q.**   Good afternoon, ma'am.

11 **A.**   Good afternoon.

12 **Q.**   Now, you've known Mr. Elder, plaintiff's attorney, for

13 sometime, haven't you?

14 **A.**   I have known of him and known him for sometime.

15 **Q.**   And you've actually done cases together with him where you

16 both have been attorneys together on the same cases.

17 **A.**   I'm not sure we've been on the same cases.

18 **Q.**   Well, you've worked on the same projects with him over the

19 years, haven't you?

20 **A.**   I think we worked together on one case and various

21 projects, sure.

22 **Q.**   And you also had occasion to speak with him many times

23 socially over the years?

24 **A.**   Yeah.

25 **Q.**   And, in fact, you've gone out to dinner with him many

1    times, haven't you?

2    **A.**    Probably as a group.

3    **Q.**    And, in fact, you've gone out to dinner with just him and

4    you on occasions, haven't you?

5    **A.**    I don't believe I have.

6    **Q.**    Understood.

7         Now, as an expert, you're required to write a report that

8    presents all of your opinions that you expect to provide in

9    this court; is that correct?

10   **A.**    I did provide a report, yes.

11   **Q.**    And the report is required to contain the exact opinions

12   that you're going to give in court, isn't it?

13   **A.**    I'm not testifying as an expert to what the requirements

14   are for an expert report, but it did include the opinions that

15   have been raised here.

16   **Q.**    And you did put the opinions that you expected to provide

17   in this -- that you gave today?  They're in that report, aren't

18   they?

19   **A.**    Yes, they are.

20   **Q.**    And, in fact, within your report you have different colors

21   where you have the actual opinion in blue and then the

22   narrative below it is in black, isn't it?

23   **A.**    Yes, that's right.

24   **Q.**    And as to this opinion, the opinion you gave about whether

25   the auxiliary aids were not equally effective, that was one of

**HILL - CROSS / GILBERT**

1    the headings in your report that's in blue, isn't it?

2    **A.**    I'm not sure.

3    **Q.**    Well, let's be more specific.

4          The actual first outline of your report and the opinions

5    that were in blue, specifically the opinion about the auxiliary

6    aids, that was written by Mr. Elder, wasn't it?

7    **A.**    I don't know who wrote them.    I -- it was done in

8    conversations.    They were taken from conversations that we had,

9    and Mr. Elder's office provided me the outline.

10          **MR. GILBERT:**    Your Honor, I'd like to read from

11    Ms. Hill's deposition and I'd like to start at page 51.

12          **THE COURT:**    I need to have the deposition with me.

13          Let me ask my courtroom deputy if you're able to hand that

14    to me.

15          **THE CLERK:**    Which one is it?

16          **THE COURT:**    It's Hill, Eve Hill.

17          **THE CLERK:**    Do you have them over there?

18          **THE COURT:**    Oh, do I have it?

19          **THE CLERK:**    I don't know.

20          **THE COURT:**    You're right.    Thank you.

21                    (Pause in proceedings.)

22          **THE COURT:**    Was it page 51, Counsel?

23          **MR. GILBERT:**    51 starting on line 21 through 52,

24    line 20, please.

25          **THE COURT:**    Okay.    Thank you.    Go ahead.

1            **MR. GILBERT:**  Thank you.  (as read):

2      **"QUESTION:**  And did you start with like a form that you

3      filled in and built upon or did you create this whole

4      thing from scratch?

5      **"ANSWER:**  I started with an outline that the -- that

6      Mr. Elder put together.

7      **"QUESTION:**  And did you recall what portions of your

8      report were already there when you started drafting it?

9      **"ANSWER:**  Just the outlines.  The statement of

10     compensation, statement of opinions, the parts in blue.

11     **"QUESTION:**  Does that include the subtitles under the

12     statement of opinions and the basis and reasons?  So, for

13     instance, Mr. Chris C. Vaughan is not an expert in whether

14     auxiliary aids are effective in providing equally

15     effective communication to consumers with disabilities,

16     that's in blue?

17     **"ANSWER:**  Yes.

18     **"QUESTION:**  Was that there when you received this

19     document?

20     **"ANSWER:**  Yeah.  Yes.

21     **"QUESTION:**  Is it true that everything in blue on this

22     document was there when you received it?

23     **"ANSWER:**  I believe so.  It was in blue.  But I believe

24     so.

25     **"QUESTION:**  So everything that is currently in blue on

1          Exhibit EV1 was text that was already in this document

2          before you started working on it?

3          **"ANSWER:** Yes."

4    BY MR. GILBERT:

5    **Q.** Ms. Hill, the opinion that you just gave was in blue and

6    was written directly by Mr. Elder when he gave it to you,

7    wasn't it?

8    **A.** Yes, as a result of conversations that we had had

9    together.

10   **Q.** Mr. Elder told you exactly what to say and you're simply

11   his puppet on the stand, aren't you?

12   **A.** No, sir.

13          **MR. GILBERT:** Nothing further, Your Honor.

14          **THE COURT:** Does plaintiff have any further questions

15   for the witness?

16          **MR. ELDER:** Yes, briefly.

17                    <u>**REDIRECT EXAMINATION**</u>

18   BY MR. ELDER:

19   **Q.** Ms. Hill, did -- when we engaged you, did we sit down and

20   have a conversation about the scope of your engagement and the

21   categories that you would be asked to furnish opinions on?

22   **A.** Yes.

23   **Q.** And was I writing an outline based on what you were

24   telling me?

25   **A.** Yes.

PROCEEDINGS

1    **Q.**    Do you feel in any way that I pressured you to develop

2    these opinions in something other than your own personal

3    opinion?

4    **A.**    No.

5    **Q.**    Would you have any -- have had any problem disagreeing

6    with me if you disagreed with something you were being asked to

7    do?

8    **A.**    No, not at all.

9    **Q.**    And you understand that you would have to testify under

10    oath about the opinions in your document; is that right?

11    **A.**    Yes, that's right.

12    **Q.**    Okay.

13              **MR. ELDER:**    Okay.  No further questions.

14              **THE COURT:**    Does defendant have any further questions

15    for the witness?

16              **MR. GILBERT:**    No, Your Honor.  Thank you.

17              **THE COURT:**    All right.  Thank you, ma'am.  You've

18    completed your testimony.

19              **THE WITNESS:**    Thank you.

20                        (Witness excused.)

21              **THE COURT:**    Does plaintiff rest her case?

22              **MR. ELDER:**    Yes, Your Honor.  We rest our case.

23              **THE COURT:**    Okay.  We are going to let the jury go for

24    the day, and so -- actually, I want to talk with counsel

25    outside the presence of the jury before we let you go for the

 1    day.  I want to talk about how Monday is going to transpire.

 2        So at this time I'll ask my courtroom deputy to bring the

 3    jury into the jury room.

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE COURT:  Later today the Court will file its

 6    revised proposed verdict form and revised proposed final jury

 7    instructions.  We should have a hearing on Monday morning to

 8    discuss any objections or comments the parties may have on

 9    those.

10        Following the hearing, the Court will finalize its jury

11    instructions and verdict form, and then we should go into

12    closing arguments.

13        And I just want to figure out what time we should tell the

14    jurors to be here in the morning.  If we start the hearing

15    about the jury instructions and verdict form at 9:00, that

16    could go for a while, maybe an hour, until 10:00; and then --

17    so I'm wondering if the better course is to tell the jurors to

18    arrive by 10:00 a.m. on Monday.

19        Let me ask plaintiff your thoughts.

20        MS. STONER:  Your Honor, would it be possible at all

21    to have our charge conference today so that we can use that

22    proposed charge in preparing for closing statements first thing

23    Monday morning?

24        THE COURT:  That would mean that I would file them and

25    you might have, like, one hour to review them.

PROCEEDINGS

1          MS. STONER:  Plaintiff is fine with that.

2          THE COURT:  What does the County think?

3          MR. GILBERT:  So I don't know if it's feasible to

4  actually have a meaningful charging conference this afternoon

5  where we're at.

6      My preference would be a couple steps, and if I could

7  expand a little beyond what the Court has asked.

8      I think we ask the jury to come at 10:30 on Monday.  I

9  think we meet as a group at 9:00.

10     My humble request would be that the County -- and formally

11 I'm making a Rule 50 request now, that we want to have a

12 Rule 50 heard.  I think ideally we would bring the jury back in

13 the room now.  You would ask the County to call its first

14 witness.  We'll announce that we don't have any witnesses.

15     You can -- we can close the evidence and announce to the

16 jury:  That's concluded the evidence.  Good news.  We're ahead

17 of schedule.  It lets them plan their schedule.  Tell them to

18 bring them a little late on Monday so we can do closing.

19     It gives them a chance to plan accordingly.  It gives us

20 all a chance to make sure we have a reasonable review of the

21 Court's verdict form and jury instructions, and then we can

22 talk about it at 9:00.  If we go an hour, that gives the

23 parties 30 minutes to adjust presentations.

24     I think we all have a pretty good idea of where the

25 instructions are likely to be even if we get drafts of them

1    over -- at the end of the day today or tomorrow.

2         THE COURT:  I think it's fair to give the parties the

3    weekend to look over the proposed instructions and verdict

4    form.  I want you to have time to look through them and think

5    about any objections you might want to raise; and I do have

6    concern that if we try to do that this afternoon, it might be

7    rushed on your end, and I don't want to rush you.

8         MS. STONER:  Thank you, Your Honor.

9         Plaintiff further suggests that perhaps noon would be a

10   better time to have the jury begin hearing closing arguments.

11        THE COURT:  That's late in the day.  I would like

12   to -- each side has an hour for closing, and I would like them

13   to have meaningful time on Monday that they can do their

14   deliberations.

15        I guess if we have the charging conference at 9:00, then

16   we can hopefully wrap things up by 10:00 and then be ready to

17   go at 10:30 with the jury.  I think a 10:30 start time that

18   the County suggests makes sense to me, and then we can do both

19   sides' closings.  I'll do the -- both sides' closing, I'll

20   instruct the jury, and then we can go from there.

21        All right.  That proposal makes sense.

22        So then let me turn to defendant.  Please proceed with

23   your Rule 50(a) motion.

24        MR. GILBERT:  Thank you, Your Honor.

25        So the first point would be as to the Government

1    Code 11135 claim.  It does have a specific element of state

2    funding to the specific department at issue.  The only evidence

3    that has been obtained is that the CRO's division is a

4    net-positive agency.  In other words, there's no evidence of

5    any state funds going to the Clerk-Recorder's Office at all

6    from the State of California.  So plaintiff has failed to meet

7    the element of direct state funding as necessary to support

8    that claim.

9         As far as the remaining claims, they all relate to the

10   same standards, whether it's under the disabled persons act or

11   the Americans with Disabilities, about whether there's an

12   effective communication.

13        The evidence in its entirety that's been elicited has been

14   unanimous that the issue in this case is that the County

15   refused to complete a previously completed form based upon its

16   understanding of the Government Code that specifically

17   precluded editing previously completed forms.

18        Now going to the more broad programs and services,

19   the County has also elicited testimony that's undisputed that

20   the County does not edit completed forms for anybody.  So all

21   individuals are treated the same.

22        Plaintiff has admitted that she received direction from

23   Ms. He -- I'm sorry -- Ms. Moran and Ms. Briones that provided

24   her with directions on the specific deficiencies in her FBNS

25   form.  Not only did she receive that instruction orally that we

PROCEEDINGS

1    can hear on the audio tapes, which are marked as Exhibit 4A,

2    4C, and 4D, but also we can see it in the Go Back Letter, which

3    I believe is Exhibit 2, which articulates out the specific

4    provisions that needed to be addressed when she returned.  That

5    is consistent with the same service that's provided to everyone

6    whether they're disabled or not at the County's office.

7        There's also no evidence of any ineffective or deficient

8    communication or any need for any type of programs or auxiliary

9    services to enhance communication because the parties clearly

10   understood each other.  There's no discussion whatsoever that

11   there was a lack of understanding or that someone could not

12   understand someone during those verbal discussions.

13       Plaintiff has insinuated at times that there is some type

14   of deficiency because there was ineffective communication

15   through the document, but the undisputed evidence is that the

16   document does not communicate anything to the County.

17   The County does not receive the information in it.  It does not

18   act on it.  It is not dependent upon anything at the County.

19   And, in fact, when you listen to the audio, the message is very

20   clear and there's actually admission from plaintiff, both on

21   the audio as well as she testified today, that she simply

22   completed the form wrong.

23       Completing a form wrong and entering the wrong information

24   is not synonymous with ineffective communication.  That does

25   not rise to a violation of the ADA.  Because there was

**PROCEEDINGS**

1    effective communication, there's no need to go to whether an

2    auxiliary aid or service is necessary.  That is only required

3    if there is ineffective communication and someone is unable to

4    participate in the programs and services offered by a public

5    entity.

6        Going to the next component, plaintiff's claims for

7    deliberate indifference for monetary damages fail as a matter

8    of law because there is no evidence that the County knowingly

9    violated the law or acted with reckless disregard.

10       The evidence that's here is that there is a state law that

11   specifically prohibits anyone at the County from modifying a

12   previously completed form.  The evidence that we've heard and

13   seen is that the County will accommodate anybody.  They'll help

14   them prepare a blank form.  They'll help them on the kiosk.

15   They have the systems available.  They'll talk to them.  And,

16   in fact, we were able to hear the discussions between plaintiff

17   and Ms. Moran and Ms. Briones at the time, and we were able to

18   hear the discussion where both Ms. Moran and Ms. Briones

19   explained the reasons why they could not make the

20   modifications, that it was illegal.

21       That falls woefully short of the standard for deliberate

22   indifference as has been enunciated by *Duvall*.  And based on

23   that, even if the ADA claims were allowed to proceed, I do

24   believe that the claim for monetary damages must be dismissed

25   because that deliberate indifference, which is a much higher

PROCEEDINGS

1   standard and has a *mens rea* of intentional discrimination or

2   disregard for a disabled individual's needs, has not been

3   satisfied by the evidence here.

4        Just a moment, Your Honor.

5                    (Pause in proceedings.)

6        **MR. GILBERT:**  I'm sorry, Your Honor.  I made a

7   comment.  I said "net positive," I believe, on the financing.

8   It's net negative, meaning that the CRO does not receive funds.

9   It funnels them back to the County budget instead.

10       **THE COURT:**  Thank you.

11       Is there any more you want to say on your Rule 50(a)

12  motion or is that your presentation?

13       **MR. GILBERT:**  That's my presentation, Your Honor.

14  Thank you.

15       **THE COURT:**  All right.  Thank you, counsel.

16       The Court denies the County's motion under Rule 50(a)

17  without prejudice to its being renewed at a later time.

18       **MR. GILBERT:**  Thank you, Your Honor.

19       **MR. ELDER:**  May I?

20       **THE COURT:**  Sorry, what?

21       **MR. ELDER:**  May I?

22       **THE COURT:**  You can respond if you want to, but I've

23  denied your opponent's motion.

24       **MR. ELDER:**  No, I understand.

25       **MR. GILBERT:**  You won.

PROCEEDINGS

1          **MR. ELDER:** No, no, but it does flag another issue on

2   the state funding, which is we do have a stipulation on the

3   state funding element, which I understand was not sufficient

4   for the Court's purposes of removing that charge from the jury;

5   but there is a stipulation of a different degree affecting the

6   claim in that different regard and I think -- will the jury get

7   to see that stipulation?

8          **THE COURT:** Well, a stipulation can be in a jury

9   instruction.  That is a place where they can go.

10         **MR. ELDER:** So I think plaintiff would like to see

11  that stipulation put into the jury instruction on the 11135

12  state funding instruction.

13         **THE COURT:** That sounds like something for our Monday

14  morning hearing that we can talk about then.

15         **MR. ELDER:** Yes.

16         **THE COURT:** At this time I'll ask my courtroom deputy

17  to bring the jury back into the courtroom.

18         **MR. GILBERT:** Your Honor, when you do bring the jury

19  back in, did you want us to formally announce that we were not

20  calling witnesses?

21         **THE COURT:** I will ask the defendant if you would like

22  to call any witnesses, and then you should tell me what the

23  answer is.

24         **MR. GILBERT:** Thank you, Your Honor.

25      (Proceedings were heard in the presence of the jury:)

```
 1          THE COURT:  Good afternoon, everyone.  Please be

 2   seated.

 3      Does defendant wish to call any witnesses?

 4          MR. GILBERT:  No, Your Honor.  Defendant does not have

 5   any further testimony or evidence to submit.

 6          THE COURT:  All right.  Does defendant rest its case?

 7          MR. GILBERT:  Yes, Your Honor.  Thank you.

 8          THE COURT:  All right.  Members of the jury, evidence

 9   is now closed.  That means you've seen and heard all of the

10   evidence that has been admitted in this matter.

11      We're going to adjourn soon for the day, and I would like

12   you all to return at 10:30 in the morning on Monday.  The

13   reason for that is that I will be meeting with the lawyers at

14   9:00 a.m. to discuss the jury instructions.

15      So don't worry.  We'll be hard at working on those, and it

16   just means that you don't need to be here at 9:00 a.m.  You

17   should be here by 10:30 in the morning, and then we will

18   proceed with closing arguments in this matter.

19      And so, again, that's it for the day and please come back

20   at 10:30 on Monday morning.

21      And at this time I'll ask my courtroom deputy to bring the

22   jurors back into the jury room.

23      (Proceedings were heard out of the presence of the jury:)

24          THE COURT:  Plaintiff, is there anything further that

25   you'd like to address today?
```

PROCEEDINGS

```
 1            MR. ELDER:  No, Your Honor.

 2            THE COURT:  Defendant, is there anything further that

 3    you would like to address today?

 4            MR. GILBERT:  No, Your Honor.  Thank you.

 5            THE COURT:  All right.  Thank you, both.  Please be

 6    here at 9:00 a.m. on Monday morning for the charging

 7    conference.

 8            MR. GILBERT:  Have a good weekend.  Happy Easter, all.

 9            THE COURT:  Have a good weekend, everyone.

10                 (Proceedings adjourned at 3:18 p.m.)

11                          ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Friday, March 29, 2024

8

9

10

11   _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25