United States District Court
Northern District of California

1

2

3

4                      UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    LISAMARIA MARTINEZ,                        Case No. 20-cv-06570-TSH

8                     Plaintiff,

9           v.                                  ORDER DENYING RENEWED
                                                MOTION FOR JUDGMENT AS A
10   COUNTY OF ALAMEDA,                          MATTER OF LAW OR, IN THE
                                                ALTERNATIVE, FOR A NEW TRIAL
11                    Defendant.
                                                Re: Dkt. No. 212

12

13                          I.    INTRODUCTION

14          Pending before the Court is Defendant County of Alameda's renewed motion for judgment

15   as a matter of law or, in the alternative, for a new trial.  ECF No. 212.  Plaintiff Lisamaria

16   Martinez filed an Opposition (ECF No. 215) and Defendant filed a Reply (ECF No. 216).  For the

17   reasons stated below, the Court **DENIES** the motion.[1]

18                          II.    BACKGROUND

19          On March 29, 2019, Ms. Martinez, who is blind, visited the County of Alameda Clerk-

20   Recorder's Office ("CRO") to file a fictitious business name statement ("FBNS") for her small

21   business.[2]  Trial Transcript ("TT") at 212–14, 575, 598–99.[3]  CRO clerk[4] Angelina Moran

22

23   ───────────────────────────────
     [1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 6,
24   16.
     [2] A fictitious business name statement ("FBNS" or "FBNS form") is a form that is filed with
25   the County of Alameda that provides notice to the public that a company is doing business
     under another name. Trial Transcript at 251.
26   [3] The trial transcript is spread across six volumes, with one volume for each day of trial and
     continuous pagination across all six volumes.  Citations herein are to the multi-volume transcript
27   page numbers.  *See* ECF Nos. 168 (Transcript Vol. 1, pages 1–194), 169 (Vol. 2, pages 195–361),
     174 (Vol. 3, pages 362–557), 177 (Vol. 4, pages 558–709), 178 (Vol. 5, pages 710–847), and 189
28   (Vol. 6, pages 848–95).
     [4] The Court uses the term "clerk" loosely to refer to a clerical series of positions called Auditor
     Associate I, II, and III (previously known as clerk recorder specialists), or to temporary employees

reviewed Ms. Martinez's FBNS form and told her corrections were required before Ms. Martinez could file it. *Id.* at 218, 601–02. Ms. Martinez requested assistance in making the corrections because she is blind, but Ms. Moran told her she could not assist because it was the CRO's policy that CRO employees could not fill out or alter forms. *Id.* at 227–28, 602; ECF No. 191-4, Admitted Ex. 4A (Audio of Plaintiff's interaction with Angelina Moran) at 01:55–02:07. Ms. Martinez then spoke with CRO supervisor Maria Laura Briones, who also declined to make the changes under the same policy. TT at 290–91, 629; ECF No. 191-4, Admitted Ex. 4C (Audio of Plaintiff's first interaction with Ms. Briones) at 03:58–04:33.

Plaintiff filed this case on September 18, 2020, alleging five causes of action: (1) violation of Title II of the Americans with Disabilities Act ("ADA"), (2) violation of Title V of the ADA, (3) violation of the Unruh Civil Rights Act, (4) violation of the Disabled Persons Act, and (5) Declaratory Relief. ECF No. 1. On August 11, 2022, the Court granted Defendants' motion for summary judgment as to Ms. Martinez's Title V claim.[5] ECF No. 54. Plaintiff filed an amended complaint on July 10, 2023, alleging five causes of action: (1) violation of Title II of the ADA, (2) violation of Title V of the ADA,[6] (3) violation of California Government[7] Code section 11135, (4) violation of the Disabled Persons Act, and (5) Declaratory Relief. ECF No. 84.

In March and April 2024, the Court held a jury trial. After the close of evidence, Defendant moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. TT Vol. 4 at 701:10-12, 702:22–706:14. Defendant argued that Plaintiff had failed to satisfy the element of direct state funding required to support her claim under Government Code section 11135, that there was no evidence that the Defendant discriminated against or refused to provide services to people with disabilities, that there was no evidence of

---

who are working as an auditor associate in an acting capacity. *See* TT at 209, 373.

[5] Plaintiff filed this case against Defendants County of Alameda, Melissa Wilk, Eva He, and Maria Laura Briones. ECF Nos. 1, 84. On March 1, 2024, the parties filed a stipulation to dismiss the individual defendants, leaving Alameda County as the sole remaining defendant. ECF No. 125. In this order, the Court refers to "Defendants" for events that took place prior to the dismissal of the individual defendants.

[6] Plaintiff included her Title V claim "for completeness of the record," acknowledging the Court's prior summary judgment order. ECF No. 84 at 9 n.1.

[7] The amended complaint referred to California Civil Code section 11135, but the parties agree that was an error. TT at 12.

United States District Court
Northern District of California

ineffective communication to support Plaintiff's other claims, and that there was no evidence of deliberate indifference required to support an award of monetary damages to Plaintiff. *Id.* at 702:25–703:8, 703:9–705:5, 705:6–706:3. The Court denied the motion without prejudice. *Id.* at 706:16-17.

After a six-day trial, the jury returned a verdict. ECF No. 176. The jury found that Plaintiff "prove[d] by a preponderance of the evidence that Defendant . . . violated her rights under the [ADA] on March 29, 2019," and that this violation occurred because of Defendant's deliberate indifference to Plaintiff's federally protected rights. Verdict Form at 2, Questions 1–2, ECF No. 176. The jury awarded damages of $30,500 to Plaintiff under the ADA and under the California Disabled Persons Act. *Id.* at 3, Questions 3–4. The jury also found that Defendant's violation of the ADA "occurred in a program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state[.]" *Id.* at 3, Question 5. Finally, the jury found Plaintiff had not proved by a preponderance of the evidence that the CRO "will likely in the future violate its legal obligations described in Final Instructions Nos. 11 and 12 with respect to individuals with a disability of blindness or visual impairment in the same type of way that [the jury] found[.]" *Id.* at 4, Question 6; *see* Final Jury Instructions at 12–14, ECF No. 165.

On May 16, 2024, Plaintiff moved for a permanent injunction. ECF No. 200.[8] On January 17, 2025, the Court granted in part and denied in part Plaintiff's motion. ECF No. 208. The Court entered a permanent injunction ordering the CRO "to provide transcriber services[9] to any blind or

---

[8] Between the jury verdict and the Court's Permanent Injunction Order, Plaintiff's fifth cause of action for a "declaration . . . in order that each of the parties may know their respective rights and duties" (ECF No. 84 ¶ 101) has been fully adjudicated. In addition, Plaintiff never requested any specific form of declaratory relief beyond the questions set forth in the jury verdict and the request for injunctive relief addressed in the Permanent Injunction Order. Accordingly, the Court has found that any such request has been waived. *See* Permanent Injunction Order at 3 n.6.

[9] A "transcriber" or "reader" is a sighted individual who reads written documents or information for a blind individual and fills out information at the direction of the blind individual. A reader or transcriber "take[s] . . . print information . . . and tell[s] the blind person what's there so they can make whatever decisions they need to make." TT at 514–15. At trial, some witnesses alternately referred to such individuals as "scribes" or "reader scribe[s]." *See id.* at 497, 636. At trial, witnesses and counsel referred to the services transcribers provide as "transcriber service(s)," "scribe services," "transcribing," or "scribing." *See, e.g., id.* at 408, 497, 657, 792. For consistency and clarity, the Court refers to such individuals as "transcribers" and to the services

3

visually impaired individual who requests assistance with a CRO form, unless Defendant can document a fundamental alteration or undue burden with respect to a particular form." *Id.* at 46. The Court's injunction does not require the CRO to make alterations or corrections to an already-signed form. *Id.*

On February 14, 2025, Defendant filed the instant renewed motion for judgment as a matter of law, or, in the alternative, for a new trial. ECF No. 212. On March 10, 2025, Plaintiff filed an opposition to Defendant's motion. ECF No. 215. On March 27, 2025, Defendant filed a reply. ECF No. 216.

## III.    LEGAL STANDARD

"[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *Equal Emp't Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "A renewed motion for judgment as a matter of law is properly granted only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Castro*, 833 F.3d at 1066. In assessing the jury's verdict, the Court is tasked not with weighing the evidence, but with "simply ask[ing] whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.*

Federal Rule of Civil Procedure 59 allows a district court to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "[G]rounds for a new trial include: (1) a verdict that is contrary to the weight of the evidence; (2) a verdict that is based

---

they provide as "transcriber services."

United States District Court
Northern District of California

1    on false or perjurious evidence; or (3) to prevent a miscarriage of justice." *Securities & Exch.*

2    *Comm'n v. Panuwat*, No. 21-cv-06322-WHO, 2024 WL 4602708, at *3 (N.D. Cal. Sept. 9, 2024)

3    (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)).  Unlike with a Rule 50

4    motion, on "a Rule 59 motion, the district court can weigh the evidence, make credibility

5    determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice."

6    *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).  "A

7    trial court may grant a new trial if the verdict is contrary to the clear weight of the evidence . . .

8    even if substantial evidence supports the jury's verdict." *Kode v. Carlson*, 596 F.3d 608, 613 (9th

9    Cir. 2010).  However, "[a] district court may not grant a new trial simply because it would have

10    arrived at a different verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007).

11        "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also

12    bases for a new trial." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).  "When

13    the alleged error is in the formulation of the instructions, the instructions are to be considered as a

14    whole . . . to determine if they are misleading or inadequate." *Guebara v. Allstate Ins. Co.*, 237

15    F.3d 987, 992 (9th Cir. 2001).  The Court's formulation of civil jury instructions is reviewed for

16    abuse of discretion.  *Id.*

## IV.    DISCUSSION

### A.    Renewed Motion for Judgment as a Matter of Law and Motion for New Trial Based on Sufficiency or Weight of the Evidence Presented At Trial

20        Because Defendant's renewed motion for judgment as a matter of law and its motion for a

21    new trial require the Court to apply different standards to the same evidence presented at trial, the

22    Court considers both motions concurrently.

### 1.    Jury's Finding that the County Violated Ms. Martinez's Rights under the ADA on March 29, 2019

25        Under Title II of the ADA, public entities are required to "take appropriate steps to ensure

26    that communications with applicants, participants, and members of the public with disabilities are

27    as effective as communications with others" and to "furnish appropriate auxiliary aids and services

28    where necessary to afford an individual with a disability an equal opportunity to participate in, and

enjoy the benefits of," their services, programs, and activities. *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013) (quoting 28 C.F.R. §§ 35.160 (a) and (b)(1)). The implementing regulations for Title II of the ADA provide that:

> (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b).

> "Auxiliary aids and services" includes:

> (1) Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;

> (2) Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;

> (3) Acquisition or modification of equipment or devices; and

> (4) Other similar services and actions.

28 C.F.R. § 35.104. "If the public entity does not defer to the . . . individual's request, then the burden is on the entity to demonstrate that another effective means of communication exists or that

6

the requested auxiliary aid would otherwise not be required." *Updike v. Multnomah Cnty.*, 870

F.3d 939, 958 (9th Cir. 2017).

### a.    Effective Communication

The County contends it is entitled to judgment as a matter of law because there was

effective communication between the CRO and Plaintiff, such that no auxiliary aid or service was

required to ensure effective communication.  Defendant asserts that "effective communication"

means a level of communication substantially equal to that afforded to non-disabled individuals.

Mot. at 5.  *See Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017) (in Title III

context, "what matters is whether the handicapped patient was afforded auxiliary aids sufficient to

ensure a *level of communication* about medically relevant information substantially equal to that

afforded to non-disabled patients") (emphases in original); *Cropp v. Larimer Cnty.*, Colorado, 793

F. App'x 771, 784 (10th Cir. 2019) (unpublished) (citing *Silva* in Title II context).  Plaintiff argues

that because Title II regulations require public entities to "ensure that communications with

[disabled individuals] are as effective as communications with others," 28 C.F.R. § 35.160(a)(1),

Title II "holds public entities to a more precise standard of equitable access than private entities"

in the context of effective communication.  Opp'n at 3.  The Ninth Circuit has not conclusively

held that the effective communications provisions of Title III apply to Title II.  Still, some courts

within this circuit have found Title III's effective communication provision of instructive in

interpreting Title II's effective communications requirement.  *See Poway Unified Sch. Dist. v.*

*K.C. ex rel. Cheng*, No. 10-cv-897-GPC DHB, 2014 WL 129086, at *7 n.8 (S.D. Cal. Jan. 14,

2014).

The County contends that the evidence and testimony at trial confirm there was effective

communication between Plaintiff and the CRO staff on March 29, 2019.  The County asserts that

Plaintiff and the CRO staff were able to "speak[] to each other fluently" and understand each other

with no communication barrier.  Mot. at 6.  Defendant contends this means there was effective

communication between Plaintiff and the CRO clerks such that the County was not required to

provide any auxiliary aid or service, and that there is thus no substantial evidence to uphold the

jury's verdict.  Defendant further argues that the FBNS cannot itself be an ineffective

7

communication because the County acts as a library for FBNS forms, rather than having any "interest in the content of the form[.]" Mot. at 7. Defendant asserts that the FBNS form thus does not communicate any information to the County and cannot be considered a "communication" to the County. Mot. at 7.

The Court finds that Plaintiff presented substantial evidence at trial to support a finding that the CRO failed to provide effective communication to Plaintiff on March 29, 2019 even under the "substantially equal" standard Defendant argues applies, and that such a finding was not contrary to the weight of the evidence. Ms. Briones and Ms. Moran each offered testimony indicating that the CRO's communications with patrons seeking to file forms often include discussions of the form fields and edits made at the CRO. Ms. Briones testified that customers attempting to file forms at the CRO often have errors in their forms that cause their forms to be rejected initially. TT at 286. In those situations, it is common for a customer to step to the side and modify a document that has been rejected. *Id.* Ms. Moran further testified that if a CRO clerk misses a problem with a customer's form upon the clerk's initial review of the form, the clerk will exchange it back and forth with the customer until the form is complete and correct. TT at 220. This happens on a regular basis. *Id.* Business owners who can supply the information on an FBNS form are thus able to file their forms at the CRO the same day, even if their forms initially contained errors. TT at 286–87, 387; *see also* Admitted Ex. 4C at 05:51–06:13; 06:24–06:53. Ms. Martinez also testified that while waiting for Ms. Moran's supervisor, Ms. Martinez spoke to a customer who had just completed his transaction. TT at 615. That customer had a mistake on his form and was told to cross it out and write in the correct information in the proper section. *Id.* Although verbal communications between the CRO clerks and Ms. Martinez were fluent in a literal sense, this evidence is both sufficient to support and consistent with a jury finding that the CRO failed to provide effective communication to Plaintiff. The Court thus finds there was sufficient evidence presented at trial for a jury to find that the CRO's verbal instructions alone did not constitute effective communication, and that such a finding is consistent with the weight of the evidence.

The County suggests that finding that communications between the CRO and Plaintiff fell

United States District Court
Northern District of California

1    short of the standard imposed by Title II would require "extending" the meaning of the term

2    "communication" beyond "actual communications between the person with a disability and the

3    public entity" to "the physical act of completing or modifying forms for persons with disabilities."

4    Mot. at 7. This argument conflates acts of communication with auxiliary aids or services that

5    could be necessary to ensure communications are effective. The Court finds that the

6    contemporaneous, back-and-forth exchange described by Ms. Briones and Ms. Moran, in which a

7    customer provides information via edits to a form and a CRO clerk provides clarification,

8    constitutes an act of communication between the County and CRO patrons. It is undisputed that

9    Ms. Martinez was unable to engage in this communicative process to fix her FBNS form during

10   her visit to the CRO on March 29, 2019, and that sighted customers are routinely able do so to fix

11   and file their forms. No evidence was presented at trial that this communicative process depends

12   on whether the County has any long-term interest in the content of the form. Accordingly, the

13   Court finds there was substantial evidence presented at trial that the County failed to provide

14   effective communication to Ms. Martinez on March 29, 2019, and that such a finding is not

15   contrary to the weight of the evidence.

16            **b.        Provision of Appropriate Auxiliary Aid(s) or Service(s)**

17           The County argues that even assuming the CRO was required to provide Plaintiff with an

18   auxiliary aid or service, Plaintiff indisputably received all the benefits of the CRO's programs,

19   services or activities she sought.

20                   **i.        Jury Instructions Regarding Services, Programs or Activities at**
                                 **Issue**
21

22           First, the County argues that the Court should grant its motion for judgment as a matter of

23   law because the jury did not receive all information required to determine whether Plaintiff was

24   denied the benefits of the CRO's services, programs or activities. Mot. at 7–8. The County also

25   argues in its motion for a new trial that the Court improperly instructed the jury regarding the

26   program, service or activity at issue. *Id.* at 21–22. The County asserts that Final Jury Instruction

27   No. 11, concerning the ADA, "failed to provide the jury with the *specific* program, service, or

28   activity on which Plaintiff's Title II claim was premised." *Id.* at 22. However, that is wrong.

9

In Final Jury Instruction No. 11, the Court instructed the jury as follows:

FINAL INSTRUCTION NO. 11:  Americans with Disabilities Act

The Americans with Disabilities Act provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

For Plaintiff to recover under the Americans with Disabilities Act, she must prove each of the following three elements by a preponderance of the evidence:

First, that she is a qualified individual with a disability.

Second, that she was either excluded from participation in or denied the benefits of the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant.

Third, that such exclusion, denial of benefits, or discrimination was by reason of her disability.

The Parties agree the Plaintiff is a qualified individual with a disability and Defendant is a public entity that is required to comply with the Americans with Disabilities Act.  Therefore, I instruct you to find that Plaintiff has satisfied the first element of her Americans with Disabilities Act claim.

**The Court has found that both filing completed forms at the Clerk Recorder's Office and the Clerk Recorder's Office advising patrons of forms' technical deficiencies qualify as services, programs, or benefits provided by the Defendant.**

Final Jury Instr. No. 11, ECF No. 165 at 12 (emphasis added).  This jury instruction did identify the programs, services and benefits that Plaintiff's claim is based on.

The County argues that the Court's description of two services, programs or benefits provided by the CRO was vague and failed to instruct the jury "on the *specific* program, service or activity which served as the basis of Plaintiff's ADA claim, nor defined its scope." Mot. at 7–8 (emphasis in original).  But as quoted above, Final Jury Instruction No. 11 was specific.

Defendant's reliance on *Where Do We Go Berkeley v. California Dep't of Transportation*, in support of these arguments, is misplaced.  *Where Do We Go Berkeley*, 32 F.4th 852 (9th Cir. 2022).  In *Where Do We Go Berkeley*, the Ninth Circuit vacated a preliminary injunction enjoining the defendant for a period of six months from evicting plaintiffs who lived at certain encampments for the unhoused.  *Id.* at 855.  There, the Ninth Circuit found that the district court had improperly

10

1    failed to describe the scope of the program at issue. *Id.* at 860–61. Here, by contrast, the Court

2    found at summary judgment "that both filing completed forms at the CRO and the CRO's advising

3    patrons of forms' technical deficiencies qualify as services, programs, or benefits under Title II."

4    ECF No. 54 at 5 (Order on Mot. for Summ. J.). And the Court adopted that language in Final Jury

5    Instruction No. 11. The Court's instruction identifying certain services, programs or activities

6    provided by the CRO was thus sufficient for the jury to consider the evidence presented at trial

7    and to determine whether Plaintiff was excluded from participation in or denied the benefit of

8    those services, programs or activities.

9
              ii.    **Evidence Presented At Trial Regarding Whether the County**
10                   **Failed to Furnish Appropriate Auxiliary Aids or Services**

11            The Court also finds there was substantial evidence presented at trial to support a finding

12   that the County failed to furnish appropriate auxiliary aids and services necessary to afford Ms.

13   Martinez an equal opportunity to enjoy the benefits of the CRO's services, and that such a finding

14   is consistent with the weight of the evidence. *See* 28 C.F.R. §§ 35.160(b)(1); *K.M. ex rel. Bright*,

15   725 F.3d at 1096. The County argues it satisfied its obligations with respect to "advising patrons

16   of forms' technical deficiencies" because CRO clerks verbally informed Ms. Martinez of the

17   corrections that needed to be made for her to file her form, such that Ms. Martinez "had an

18   understanding of what to do." Mot. at 8; *see* TT at 635–36. However, as discussed above, there

19   was substantial evidence presented at trial that the CRO generally advises sighted patrons of

20   forms' technical deficiencies in a way that provides for the contemporaneous, back-and-forth

21   exchange of information regarding those deficiencies. Plaintiff put forward substantial evidence

22   that Ms. Martinez was unable to receive the same benefit of Plaintiff's service advising patrons of

23   forms' technical deficiencies as sighted patrons, as the CRO requires that the customer side of

24   these communications – making changes to the form for subsequent, immediate review by a CRO

25   clerk – be handwritten or printed by the customer, rather than transcribed by CRO staff. *See* TT at

26   296, 415, 429.

27            Defendant contends that although Ms. Martinez was unable to file her FBNS form during

28   her visit to the CRO on March 29, 2019, there is no promise of same-day service because many

1    customers are not able to file their forms on the same day.  The County further argues that the

2    services, programs or benefits identified by the Court in the jury instructions do not specify any

3    temporal period for receiving those services.  Reply at 4.  However, as discussed above, Ms.

4    Moran testified that business owners who can supply the information on an FBNS form are able to

5    receive same-day service and file their forms at the CRO, even if their forms initially contained

6    errors.  TT at 286–87, 387; *see also* Admitted Ex. 4C at 05:43–06:13; 06:24–06:53.  Ms. Moran

7    testified that none of the reasons why a sighted person would not be able to modify their FBNS

8    form and file it that same day applied to Ms. Martinez.  TT at 268.  If Ms. Martinez were sighted,

9    she would thus have been able to make the necessary corrections to her FBNS form in the CRO on

10   March 29, 2019.  It is undisputed that Ms. Martinez was unable to file her FBNS form in person

11   on March 29, 2019, and that she had to hire an individual as a reader transcriber to help her

12   prepare a corrected FBNS form.  *See id.* at 290–91, 638.  The Court finds this evidence is both

13   sufficient to support, and consistent with, a jury finding that Ms. Martinez was unable to receive

14   the same benefit as sighted patrons in filing completed forms at the CRO.

15           The County argues that even if an auxiliary aid or service was required to ensure effective

16   communication, the CRO furnished appropriate auxiliary services with regard to advising Ms.

17   Martinez of the technical deficiencies of her FBNS form and filing her completed FBNS form.

18   Ms. Martinez requested that the CRO provide her transcriber services so that she could correct and

19   file her FBNS form.  *See, e.g.*, TT at 220, 602; Admitted Ex. 4A at 1:53–1:56; Admitted Ex. 4C at

20   2:08–2:24.  Under applicable Title II regulations, the County was required to give primary

21   consideration to her request.  28 C.F.R. § 35.160(b)(2) (requiring a public entity to "give primary

22   consideration to the requests of individuals with disabilities" "[i]n determining what types of

23   auxiliary aids and services are necessary").  The primary consideration requirement does not

24   obligate a public entity to provide the requested auxiliary aid or service.  However, "[i]f the public

25   entity does not defer to the . . . individual's request, then the burden is on the entity to demonstrate

26   that another effective means of communication exists or that the requested auxiliary aid would

27   otherwise not be required."  *Updike*, 870 F.3d at 958.  The Court finds there is substantial

28   evidence that the County failed to satisfy this burden, and that a finding that the County failed to

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    satisfy this burden is consistent with the weight of the evidence.

2          As to advising Ms. Martinez of her FBNS form's technical deficiencies, the County

3    contends it furnished Ms. Martinez with auxiliary services beyond those generally available to

4    other customers by providing Ms. Martinez with written instructions regarding the corrections she

5    needed to make to her FBNS form (a "Go Back Letter"), a self-addressed envelope to mail in her

6    corrected FBNS, and an offer to expedite the filing of her FBNS form as soon as the County

7    received it in the mail.  Mot. at 8; *see* TT at 629–630; Admitted Ex. 4C at 02:59–03:09; 07:39–

8    07:47.  The County contends Ms. Martinez received all the benefits with respect to the service she

9    sought in "filing completed forms at the Clerk Recorder's Office" because she used the Go Back

10   Letter to complete a new, corrected FBNS form, which she was able to file without issue on her

11   next visit to the CRO.  Mot. at 8–9.[10]  But the CRO's furnishing of materials beyond those it

12   would typically offer sighted patrons does not mean those materials ensure effective

13   communication for a blind patron who cannot use them without sighted assistance.  *See* 28 C.F.R.

14   § 35.160(b)(2) ("The type of auxiliary aid or service necessary to ensure effective communication

15   will vary in accordance with" inter alia, "the method of communication used by the individual . . .

16   In order to be effective, auxiliary aids and services must be provided . . .  in such a way as to

17   protect the . . . independence of the individual with a disability.").  Defendant's suggestion that the

18   CRO's printed Go Back Letter and file-by-mail service – which involves a print form, print mail,

19   and the inclusion of a paper check or money order[11] – constituted appropriate auxiliary aids for

20   Ms. Martinez thus does not merit serious consideration.  Ms. Martinez is blind and cannot read a

21   printed form.  As Ms. Martinez repeatedly pointed out during her March 29, 2019 visit to the

22   CRO, she would need sighted assistance to use the Go Back Letter or to send mail, whether she

23   received that assistance in the CRO or at home.  Admitted Ex. 4C at 01:52–01:57 ("I can't write

24   print, I can't read print"), 03:11–03:17 ("I still have to have someone help me fill this out.  You

25   don't understand.  Whether I do this at home—"), 08:01–08:07 ("I'm still gonna need someone to

26

27   [10] The County further asserts that Ms. Martinez's subsequent visit to the CRO was unnecessary
     because Ms. Briones provided Ms. Martinez with a self-addressed envelope and offered her
28   expedited service to file the FBNS by mail.  Mot. at 9.
     [11] TT at 599 (testimony regarding option to mail in FBNS form).

United States District Court
Northern District of California

1  help me fill out the form to get it correct.").

2        There was also sufficient evidence presented at trial to support a finding that that

3  communication was not effective regarding the CRO's services advising patrons of forms'

4  technical deficiencies, and that such a finding was not contrary to the clear weight of the evidence.

5  When Ms. Martinez asked Ms. Moran for clarification as to what the errors were and what section

6  she was missing, Ms. Moran did not identify the section of the form by its alphanumerical

7  identifier or form field description.  Admitted Ex. 4A at 01:59-02:41.  Instead, Ms. Moran

8  repeatedly used words like "here" and "there," which refer to spatial locations on the page, to

9  describe where changes needed to be made.  *Id.* at 02:09-02:14, 02:33-02:36, 02:37-02:41.[12]

10       The Court thus finds there was sufficient evidence presented at trial to support the jury's

11  conclusion that the County violated Ms. Martinez's rights under the ADA on March 29, 2019, and

12  that the jury's finding of such a violation was not contrary to the clear weight of the evidence.

13       Accordingly, the Court **DENIES** Defendant's renewed motion for judgment as a matter of

14  law and its motion for a new trial as to Plaintiff's ADA claim.

15            **2.    Deliberate Indifference**

16       The Ninth Circuit has held that "[t]o recover monetary damages under Title II of the ADA

17  . . . a plaintiff must prove intentional discrimination on the part of the defendant."  *Duvall v.*

18  *County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (citing *Ferguson v. City of Phoenix*, 157

19  F.3d 668, 674 (9th Cir. 1998)).  In *Duvall*, the Court of Appeals determined that the appropriate

20  test for intentional discrimination under the ADA is deliberate indifference.  *See id.*  "Deliberate

21  indifference requires both knowledge that a harm to a federally protected right is substantially

22  likely, and a failure to act upon that the likelihood."  *Duvall*, 260 F.3d at 1139.

23       To recover monetary damages for her ADA claim, Plaintiff was required to prove

24  deliberate indifference by the County.  *Duvall*, 260 F.3d at 1138 (establishing deliberate

25  indifference standard for intentional discrimination under the ADA).  The County argues that the

26

27  [12] The County points out that Plaintiff does not argue that Ms. Briones, rather than just Ms. Moran,
    used inadequate language to describe the steps Plaintiff needed to take to correct her FBNS form.
28  But Ms. Moran was the front line county employee with whom Plaintiff interacted on March 29,
    2019, and Ms. Martinez waited over an hour to speak with Ms. Briones.   TT at 613.

Court's jury instruction regarding monetary damages under the ADA failed to adequately describe the deliberate indifference standard and that the evidence presented at trial fails to establish that the County acted with deliberate indifference.

### i.    Jury Instruction Regarding Deliberate Indifference

In Final Instruction No. 14, the Court instructed the jury as follows:

> FINAL INSTRUCTION NO. 14:    Monetary Damages Under the Americans with Disabilities Act
>
> Plaintiff does not need to prove that the Defendant acted intentionally to prove that the Defendant violated the Americans with Disabilities Act.  However, to recover monetary damages under the Americans with Disabilities Act, Plaintiff must prove intentional discrimination.
>
> To prove intentional discrimination, Plaintiff must show by a preponderance of the evidence that the Defendant acted with deliberate indifference.  Deliberate indifference means that the Defendant had knowledge that a harm to a federally protected right was substantially likely, and the Defendant failed to act upon that likelihood.
>
> When the Plaintiff has alerted the public entity to her need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the Plaintiff has satisfied the first element of the deliberate indifference test.
>
> In order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.

Final Instr. No. 14, ECF No. 165 at 16.

Defendant argues that the Court's jury instruction on deliberate indifference failed to fairly and adequately cover the issues presented because the Court did not include additional language from case law distinguishing the deliberate indifference standard from negligence and providing further guidance on what "deliberate" means in context.  Mot. at 9, 23.  Defendant contends that the Court erred in not informing the jury that deliberate indifference is a "stringent standard of fault," that "more than *gross negligence* is required to establish deliberate indifference" and that "deliberate indifference requires a state actor [to] recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." Mot. at 10.  Plaintiff contends the jury instructions fairly and accurately described the deliberate

15

United States District Court
Northern District of California

indifference standard based on Ninth Circuit precedent.  Opp'n at 9.

The Court's jury instruction on deliberate indifference is taken directly from *Duvall*, a Ninth Circuit decision that squarely addressed the standard for proving intentional discrimination under Title II of the ADA.  *See Duvall*, 260 F.3d at 1138 ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant"), 1139 ("Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood"; "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test . . . [T]o meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.").  Defendant offers no legal argument as to why the Court would have been required to augment the jury instructions with additional authorities on proving intentional discrimination under Title II of the ADA when there is squarely applicable case law.  Thus, the Court finds that Final Jury Instruction No. 14 fairly and adequately covered the issues presented, correctly stated the law, and was not misleading.

### ii.    Evidence Presented At Trial Regarding Deliberate Indifference

Defendant argues that the County could not have acted with deliberate indifference because Ms. Moran and Ms. Briones were following a CRO policy they believed to be consistent with applicable law.  Thus, Defendant argues, the CRO clerks could not have understood they were exposing Plaintiff to any risk or violating a federally protected right.  But Plaintiff was not, as Defendant suggests, required to show that Ms. Moran and Ms. Briones personally believed that CRO policy violated the ADA.  The requirement that a defendant had "knowledge that a harm to a federally protected right is substantially likely" is satisfied "[w]hen the plaintiff has alerted the public entity to [her] need for accommodation[,]" "or where the need for accommodation is obvious[.]"  *Duvall*, 260 F.3d at 1139.  Plaintiff could therefore satisfy her burden to prove the knowledge element of deliberate indifference through evidence that she had alerted the CRO to

her need for accommodation. Here, there was ample evidence presented at trial to indicate that Ms. Martinez repeatedly asked Ms. Moran and Ms. Briones to provide transcriber services during her visit to the CRO on March 29, 2019. *See, e.g.*, TT at 220, 602, 613–14; Admitted Ex. 4A at 01:52–01:57 (audio recording of Ms. Martinez asking Ms. Moran if she was sure she could not assist Ms. Martinez in making the corrections to her FBNS form); Admitted Ex. 4C at 02:15-02:21 (repeating request for sighted assistance). Ms. Martinez also repeatedly asked Ms. Moran for the legal authority preventing her from providing the services Ms. Martinez had requested. Admitted Ex. 4A at 02:55-03:13. There was also substantial evidence that Ms. Martinez's need for accommodation was obvious. When Ms. Martinez visited the CRO on March 29, 2019, she was using a white cane and was wearing sunglasses. TT at 603. Ms. Martinez also explicitly informed the CRO clerks that she could not read or write print. Admitted Ex. 4C at 01:52–01:57 ("I cannot physically fill it out because I can't write print, I can't read print), 08:01–08:07 ("I'm still gonna need someone to help me fill out the form to get it correct."). The evidence presented at trial was thus consistent with a finding that the CRO clerks had knowledge that a harm to Ms. Martinez's rights under the ADA was likely.

Defendant contends that Plaintiff's experience of not being able to file her FBNS on March 29, 2019, did not constitute a violation of the ADA in the first instance because Ms. Briones testified that many nondisabled customers are unable to file their FBNS on their first visit to the CRO. However, Ms. Briones also testified that business owners who are able to supply the information on their FBNS form are able to receive same-day service and file their forms at the CRO, even if their forms initially contained errors. TT at 286–87; Admitted Ex. 4C at 05:51-06:13; 06:24 – 06:53.

As discussed in detail above, there was likewise ample evidence presented at trial that Ms. Moran and Ms. Briones deliberately failed to act upon that likelihood of harm to Ms. Martinez's rights under the ADA by failing to furnish appropriate auxiliary aids or services. *See* Section IV(A)(1)(b), *supra.*

Accordingly, the Court finds Plaintiff has presented sufficient evidence at trial to support the jury's finding of deliberate indifference, and that the jury's finding of deliberate indifference

1   was not contrary to the clear weight of the evidence presented at trial.  Accordingly, the Court

2   **DENIES** Defendant's motions as to Plaintiff's award of damages under the ADA.

3   ### 3.    Availability of Monetary Damages Under DPA

4   Under the California Disabled Persons Act ("DPA"), "[a]ny person or persons, firm or

5   corporation who denies or interferes with admittance to or enjoyment of [ ] public facilities . . . or

6   otherwise interferes with the rights of an individual with a disability under Sections 54, 54.1 and

7   54.2 … is liable for … damages … and attorney's fees."  Cal. Civ. Code § 54.3.  "A violation of

8   the right of an individual under the Americans with Disabilities Act of 1990 . . . also constitutes a

9   violation of [the DPA]."  Cal. Civ. Code § 54(c).

10   Defendant argues that judgment as a matter of law is warranted as to the jury's award of

11   damages under the DPA.  Mot. at 11–14.  Defendant argues that monetary damages are not

12   available under the DPA, even given a finding of deliberate indifference, because government

13   entities such as Defendant are not "persons" to whom the DPA applies.

14   In a pretrial order regarding the jury instructions and verdict form, the Court wrote:

15   > The Court does not believe the Ninth Circuit has resolved whether
16   > public entities can be liable for damages under the California Disabled
     > Persons Act.  The Court finds the opinion in *Lonberg v. City of*
17   > *Riverside*, 300 F. Supp. 2d 942, 946-49 (C.D. Cal. 2004), persuasive
     > and will follow it.  Accordingly, the Court will instruct the jury on
18   > DPA damages and will include that on the verdict form.

19   ECF No. 161 at 6.

20   Defendant argues that it was error for the Court to rely on *Lonberg* because *Lonberg*

21   contradicts applicable state law authorities and was wrongly decided.  Mot. at 11.  Defendant

22   asserts that California courts "have unequivocally determined that public entities are not subject to

23   damages."  Reply at 1.  Defendant's argument regarding the availability of monetary damages

24   under the DPA is duplicative of the arguments the County raised on this issue in its pretrial filings.

25   *See* Def.'s Trial Br. at 15–18, ECF No. 101.

26   Moreover, even if the DPA did not allow for damages against public entities, that would

27   have no bearing on the judgment the Court entered.  The jury awarded Plaintiff damages of

28   $30,500 under both the ADA and the DPA.  Verdict Form at 2, Questions 3–4, ECF No. 176.

United States District Court
Northern District of California

There were different damages instructions for the ADA and DPA because the DPA has a minimum of $1,000 in damages and permits the trebling of actual damages. *See* Final Jury Instr. Nos. 15 & 18. To avoid juror confusion, the Court specifically instructed the jury that the two damages awards would *not* be added together. Rather, Plaintiff would receive only the larger one. *See* Final Jury Instr. No. 18 ("The Plaintiff will not recover double damages under both the California Disabled Persons Act and the Americans with Disabilities Act. If you award her damages under both the Americans with Disabilities Act and the California Disabled Persons Act, she will recover only the larger of the two awards."). Because the jury awarded exactly the same damages under both the ADA and DPA, even if damages were unrecoverable under the DPA, Plaintiff's damages would remain exactly the same: $30,500.

Accordingly, the Court **DENIES** Defendant's motions as to Plaintiff's award of damages under the DPA.

### 4. State Funding – Government Code Section 11135

In her third cause of action, Plaintiff alleged a claim for violation of California Government Code § 11135 ("section 11135"), which prohibits discrimination on several bases, including on the basis of physical disability. The text of section 11135 provides:

> No person in the State of California shall, on the basis of . . . physical disability . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a). Section 11135 "incorporates the protections and prohibitions of the ADA and its implementing regulations." *Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061, 1084 (C.D. Cal. 2015). *See* Cal. Gov't Code § 11135(b). Defendant argues that judgment as a matter of law is warranted on Plaintiff's section 11135 claim because there is no evidence that the CRO's FBNS program received funding or financial assistance from the State of California.

On March 26, 2024, the Parties stipulated for the purposes of Plaintiff's Section 11135 Claim that the County received funding or financial assistance from the State of California. ECF No. 147 (Stipulation "that the County of Alameda has received funding or financial assistance

19

1    from the State of California for the relevant period.").  This stipulation was included in Final Jury

2    Instruction No. 10.  During trial, County Representative Matthew Yankee acknowledged that the

3    CRO receives money from the County.  TT at 422–423, 425.

4          Defendant argues there was no evidence elicited at trial that the CRO received any funds

5    from the County's general fund, nor that any state moneys went into the County's general fund.

6    Mot. at 15–17, Reply at 10.  In support of this argument, Defendant cites a portion of Mr.

7    Yankee's testimony indicating that he does not know whether the County's general fund receives

8    state funding.  *See* TT at 424:25-425:6 (in response to question that "[t]he general fund of the

9    County of Alameda receives state funding; correct?", Mr. Yankee's response that he "wouldn't

10   know specifically. . . . How the general fund ultimately is made up and what percentage, if any,

11   comes from the state, I couldn't definitively tell you.").  Defendant concludes from Mr. Yankee's

12   testimony that Mr. Yankee simply lacked knowledge as to whether the CRO received state

13   funding.  However, several other portions of Mr. Yankee's testimony presuppose that the CRO

14   receives funds from the County's general fund, and that the general fund includes state funds.  *See*

15   TT at 422:21-23 (Mr. Yankee's testimony that he "do[es]n't believe the Clerk-Recorder's Office

16   directly receives state funding *unless it would be a pass-through from the general fund*.")

17   (emphasis added); TT at 423:2-4 (Mr. Yankee's testimony that "what we [the CRO] cost the

18   County is less than what the revenues we bring in.  So we actually put money *back* into the

19   general fund.") (emphasis added); TT at 425:18-19 (Mr. Yankee's testimony that "At the end of

20   the day, we send more *back* than we *get* from the general fund.") (emphasis added).  Although Mr.

21   Yankee's trial testimony was inconsistent, the Court finds that this testimony, in conjunction with

22   the parties' stipulation that the County receives state funds, constitutes substantial evidence to

23   support a plausible inference that the CRO receives financial assistance from the State of

24   California.

25         Defendant further argues that the CRO's receipt of state funding or financial assistance is

26   insufficient to trigger the obligations of section 11135.  Instead, Defendant asserts that Plaintiff

27   was required to establish "the CRO's FBNS program" specifically received such funding or

28   financial assistance on March 29, 2019.  Mot. at 15.  Defendant cites *San Francisco Taxi Coal. v.*

1    *City & Cnty. of San Francisco* and *Kirola v. City & Cnty. of San Francisco* in support of this

2    argument.  *San Francisco Taxi Coal. v. City & Cnty. of San Francisco*, 979 F.3d 1220, (9th Cir.

3    2020); *Kirola v. City & Cnty. of San Francisco*, 74 F. Supp. 3d 1187 (N.D. Cal. 2014), *aff'd in*

4    *part, rev'd in part on other grounds*, 860 F.3d 1164 (9th Cir. 2017).  These cases support the

5    proposition that "the state's infusion of money into one arm of local government does not

6    necessarily reach all limbs and digits of that government and thus it does not extend the state's

7    anti-discrimination law to every local government activity[.]"  *San Francisco Taxi Coal.*, 979 F.3d

8    at 1228.  *See also Kirola*, 74 F. Supp. 3d at 1249 (finding plaintiff lacked standing to bring section

9    11135 claim where "there [was] no evidence that each of the specific programs to which she was

10   allegedly denied access [was] state-funded or otherwise receive[d] financial assistance from the

11   state").

12          In *San Francisco Taxi Coalition*, the Ninth Circuit held that plaintiffs' allegations that the

13   San Francisco Municipal Transportation Agency ("SFMTA") received state funding were

14   insufficient to establish that section 11135 governed SFMTA's taxi medallion system, which was

15   at issue in the litigation.  *San Francisco Taxi Coal.*, 979 F.3d at 1228.  The plaintiffs' argument in

16   *San Francisco Taxi Coalition* for the application of section 11135 was grounded in their

17   allegations that the SFMTA "receive[d] state funding for various programs" distinct from its taxi

18   medallion program.  *Id.* at 1227.  Here, by contrast, although the County presumes that the filing

19   of FBNS forms constitutes a separate program from other filing services the CRO provides, there

20   was no evidence presented at trial to indicate that that the CRO's filing of FBNS forms constitutes

21   a distinct program or activity of the CRO.  While Defendant argues that "the CRO's FBNS

22   program" must receive financial assistance from the state to trigger the obligations of section

23   11135, there is no evidence that such a program exists.  Defendant's reading of the state funding

24   requirement would allow any government entity to evade liability under section 11135 by

25   choosing not to earmark funds for any specific purposes and declaring that each such purpose

26   constitutes a distinct program.

27          The Court in *San Francisco Taxi Coalition* relied on a California Court of Appeal decision

28   holding that the City of Los Angeles's waste management program was not covered by section

11135. The Court reasoned that allowing such a claim based on the City's receipt of state funds "would require finding that state funds directed to any number of city departments (including the library, police, and parks and recreation, among others) 'would constitute funding of the waste management program.'" *San Francisco Taxi Coal.*, 979 F.3d at 1228 (citing *Comunidad en Accion*, 219 Cal. App. 4th 1116, 1128–29 (2013)). Here, in contrast, it logically follows that the state's infusion of money into the CRO would reach the CRO's work in filing FBNS forms. There was no evidence presented at trial that the filing of the FBNS form specifically constitutes a distinct program. In contrast, Ms. Briones and Mr. Yankee provided testimony regarding "documents" and "forms" without specifying that any of their testimony was cabined to the FBNS form specifically. *See, e.g.*, TT at 285:23-25, 308:10-19, 406:5-25 (Mr. Yankee's testimony that a variety of blank forms would be available at the CRO information desk), 418:1-10 (Mr. Yankee's testimony that CRO's JAWS screen reader equipped kiosk could pull up "a variety of forms").

The Court thus finds that the receipt of state funds by the CRO is sufficient to establish that section 11135 governs this action. As the Court finds substantial evidence exists to support a finding that the CRO receives such financial assistance, the Court finds that section 11135 applies to this action.

Accordingly, the Court **DENIES** Defendant's motions as to Plaintiff's section 11135 claim.

## B.      Motion in the Alternative for New Trial

Defendant argues that a new trial is warranted because the jury's verdict was contrary to the clear weight of the evidence and because Defendant was not provided a fair trial.

### 1.      Whether the Verdict Was Contrary to the Clear Weight of the Evidence

As noted above, the Court considers Defendant's arguments that the verdict was contrary to the clear weight of the evidence concurrently with Defendant's argument in support of its renewed motion for judgment as a matter of law. For the reasons stated above, the court finds the jury's verdict was not contrary to the clear weight of the evidence.

### 2.      Whether the Court Properly Responded to the Jury's Question

Defendant argues that it is entitled to a new trial because the Court improperly responded

to the jury's sole question.  Defendant contends that the Court's response to this question misled the jury regarding the nature of Plaintiff's claims and deprived Defendant of a fair trial.

The jury's Verdict Form included both a question about liability (Question 1) and an advisory question relevant to the injunctive relief Plaintiff sought (Question 6).  Question 1 of the Verdict Form read: "Did Plaintiff Lisamaria Martinez prove by a preponderance of the evidence that Defendant Alameda County violated her rights under the Americans with Disabilities Act on March 29, 2019?"  Question 6 of the Verdict Form read: "Did Plaintiff prove by a preponderance of the evidence that the Defendant's Clerk Recorder's Office will likely in the future violate its legal obligations described in Final Instructions Nos. 11 and 12 with respect to individuals with a disability of blindness or visual impairment in the same type of way that you found?"  Verdict Form at 2, 4, ECF No. 166.

On April 2, 2024, during jury deliberations, the jury submitted a question for the Court, asking: "Does ADA experience apply to online services?"[13]  ECF No. 170 (Jury Note No. 1). After soliciting input from the parties, the Court submitted the following response:

> Members of the jury, the Court answers your question as follows:
>
> In answering Question 1 on the verdict form:  Plaintiff Lisamaria Martinez alleges that Defendant County of Alameda violated the Americans with Disabilities Act with regard to her attempt to file the FBNS form in-person on March 29, 2019.
>
> In answering Question 6 on the verdict form:  Final Instruction No. 21 states that if you find in favor of the Plaintiff on her claims under the Americans with Disabilities Act, the California Disabled Persons Act, or California Government Code section 11135, then the Court must determine whether to issue an injunction against further violations of those laws.  It states that you must decide whether the Defendant's Clerk Recorder's Office will likely in the future violate its legal obligations described in Final Instructions Nos. 11 and 12 with respect to individuals with a disability of blindness or visual impairment in the same type of way that you found.  The requirements of the Americans with Disabilities Act described in Final Instructions Nos. 11 and 12 apply to the services, programs, or activities of a public entity, regardless of whether they are provided in-person or online.

---

[13] The jury foreperson had also written, but crossed out, "as well as in person services?"  ECF No. 170.

1    ECF No. 173, Answer to Jury Question.

2           Defendant contends that the Court's answer to the jury's question improperly misled the

3    jury into believing that Plaintiff's claim for liability under the ADA concerned "online" access.

4    Mot. at 18.  Defendant asserts that the jury erred in addressing the applicability of the ADA to

5    "online services" because Plaintiff did not claim that the County discriminated against her via the

6    County's website, electronic forms, or any other online activities.  *Id.* at 19.  Defendant argues the

7    Court should simply have stated that the ADA's application to online services was irrelevant.  *Id.*

8           Defendant is mistaken.  As to Question 1 of the Verdict Form, the Court's answer

9    explicitly states that Plaintiff's allegations that the County violated the ADA concern "her attempt

10   to file the FBNS form *in-person* on March 29, 2019."  Answer to Jury Question (emphasis added).

11   Although Plaintiff testified that she previously encountered difficulties filling out the PDF FBNS

12   form available on the County's website, Plaintiff testified that she filled out the PDF, printed and

13   signed it prior to March 29, 2019.  TT at 589, 595, 597.  The Court finds the first half of the

14   Court's response to the Jury Question made clear that Ms. Martinez's claims were based on

15   alleged violations of the ADA in person, rather than online.  Thus, the jury's finding that

16   Defendant violated the ADA on March 29, 2019 could not have concerned the PDF form Plaintiff

17   had attempted to complete at home on an earlier date.

18          Question 6 of the Verdict Form was an advisory question relevant to the injunctive relief

19   Plaintiff sought.  The jury was directed to answer Question 6 only if it also found that the County

20   had violated Plaintiff's rights under the ADA on March 29, 2019.  *See generally* Verdict Form.

21   The second half of the Court's response to the jury's question, which begins "In answering

22   Question 6 on the verdict form[,]" would thus not reasonably mislead jurors into believing that

23   "online services" were relevant to the question of liability under the ADA.

24          Moreover, as to Question 6 of the Verdict Form, Defendant argued prior to trial that

25   injunctive relief was not warranted because the CRO had removed any alleged barriers to access

26   with the addition of a computer kiosk and online forms for use by patrons with disabilities.  *See,*

27   *e.g.*, ECF No. 105 (Joint Pretrial Conf. Statement) at 3 ("Even if Plaintiff establishes a violation of

28   the ADA, Plaintiff's claim for future injunctive relief is moot where the County has removed any

24

United States District Court
Northern District of California

alleged barriers to access through the implementation of an additional accommodation. Specifically, the County has reserved a computer kiosk . . . for use by persons with disabilities, and equipped that kiosk with screen reader software, such that a person with a disability can complete an FBNS electronically, in the physical CRO"), 6 (identifying as a disputed factual issue "[i]f an auxiliary aid or service was required, whether Ms. Martinez's requested auxiliary aid (a scribe) is required under the primary consideration doctrine, including whether the aids or services currently made available by the CRO to Ms. Martinez (mail filing, self-service online forms and computer kiosks) are effective.").  At trial, the County presented evidence of the online services it now provides to explain why any alleged ADA violations had ceased by the time of trial.  *See, e.g.*, TT at 454:25–455:4, 457:6-15 (Mr. Yankee's testimony regarding rollout of online FBNS submission form in December 2022); TT at 458:1-20 (Mr. Yankee's testimony that the CRO has since installed the JAWS screen-reader software "to assist individuals in completing their forms" by allowing visually-impaired patrons to access and complete "PDFs, as well as our interface with our online submission form.").  *See also* TT at 788 (closing argument from Defense Counsel that "the County has multiple avenues for assisting individuals with disabilities. They can access the forms themselves and do them online. They can access them at the counter and ask for assistance filling out a blank form. They can go in and use a kiosk. They can use the JAWS software. . . .").  The second half of the Court's response to the jury's question was thus necessary to explain that jurors could consider the evidence presented at trial to consider whether any ADA violations they found were likely to occur again.

Accordingly, the Court properly responded to the jury's sole question.

### 3.    Whether the Court Erred In Granting Permanent Injunctive Relief

The ADA provides for enforcement through the same remedies and procedures set forth in Section 505 of the Rehabilitation Act of 1973, which authorizes enforcement through injunctive relief.  42 U.S.C. § 12133; *see* 29 U.S.C. § 794a.  Plaintiff's section 11135 claim likewise authorizes injunctive relief.  *See* Cal. Gov't Code § 11139 (providing for enforcement "by a civil action for equitable relief[.]")  Plaintiff treats her federal and state law claims as equivalent for the purposes of injunctive relief; neither party contends that Plaintiff must satisfy different standards

to be entitled to injunctive relief for her ADA and Section 11135 claims. *See* Mot. at 8; Opp'n at 4.

The jury found that Plaintiff "prove[d] by a preponderance of the evidence that Defendant . . . violated her rights under the [ADA] on March 29, 2019." Verdict Form at 2, Question 1. In its Permanent Injunction Order, the Court granted an injunction ordering the CRO "to provide transcriber services to any blind or visually impaired individual who requests assistance with a CRO form, unless Defendant can document a fundamental alteration or undue burden with respect to a particular form[.]" Permanent Injunction Order at 46, ECF No. 208. The Court found Plaintiff was likely to suffer an irreparable injury that cannot be redressed by monetary damages because "the evidence presented at trial indicates that Ms. Martinez is likely to face [the] same violation when she returns to the CRO to renew her FBNS form." Permanent Injunction Order at 37–38.

Defendant argues that the Court erred in granting permanent injunctive relief to Plaintiff because there was no evidence presented at trial that Plaintiff faced a real and immediate threat of repeated injury if an injunction did not issue, because the CRO's kiosk option ensures effective communication for blind patrons, and because the Court's Permanent Injunction Order improperly supplants Title II's primary consideration requirement.

### a.    Threat of Repeated Injury

"Voluntary cessation of illegal conduct does not render a challenge to that conduct moot unless '(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (quoting *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992)). A defendant has a "'heavy burden' to show 'that the challenged conduct cannot reasonably be expected to start up again.'" *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 955 (N.D. Cal. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 189 (2000)).

Defendant asserts that there was no evidence presented at trial that Plaintiff faced a real and immediate threat of repeated injury if an injunction did not issue. Defendant contends the

United States District Court
Northern District of California

1    only evidence presented at trial regarding the threat of repeated injury was that of Plaintiff's

2    witnesses Lucia Greco and Steven Clark, who, Defendant maintains, "confirmed that the same

3    alleged violation has not occurred again and will not occur again." Mot. at 23. However, this

4    testimony was not the only evidence presented at trial that went to the threat of repeated injury.

5    As Defendant acknowledges, Ms. Moran, a front line CRO clerk, and her supervisor, Ms. Briones,

6    each testified that they do not believe they have the discretion to act as a transcriber to help a blind

7    or visually impaired patron complete a blank FBNS form. Mot. at 24; TT at 230-31, 328.

8    Defendant downplays this testimony, arguing that Ms. Moran and Ms. Briones "clearly did not

9    have a comprehensive understanding of the CRO's policy changes since the incident[.]" Mot. at

10   24. But the County did not present any evidence at trial of any global policy changes regarding

11   the provision of transcriber services at the CRO. Nor did Defendant submit any declarations with

12   its motion or briefing on Plaintiff's motion for a permanent injunction averring that the County

13   had changed its policies. Indeed, in a motion in limine filed just two months before trial,

14   Defendant repeatedly characterized the unnamed CRO employee who had provided Ms. Greco

15   with transcriber services as a "rogue County employee." ECF No. 103 at 6-7.

16        Matthew Yankee, who was present throughout the trial as the County's representative,

17   provided inconsistent testimony about whether CRO employees would be permitted to provide

18   transcriber services going forward. Mr. Yankee initially appeared to testify that the CRO had not

19   changed its policy against transcription since 2019. *See* TT at 415 (Plaintiff's counsel: "Did the

20   County have a policy in 2019 that clerks could not write on blank FBNS forms for any reason?"

21   County representative Matthew Yankee: "That would be our general policy, yes."). Minutes later,

22   Mr. Yankee testified that the CRO "empower[s] [its] managers to make a lot of those decisions[,]"

23   although he was "not aware of . . . any staff member who's handwritten a form" and "would

24   discourage staff from doing that"). TT at 428–29. At a later point in his testimony, Mr. Yankee

25   testified that if an individual with a disability who is unable to complete a form comes into the

26   CRO and needs to complete a form, "that might be one of the circumstances" in which the CRO

27   would complete the form. TT at 452. Mr. Yankee testified that he would allow a clerk to write on

28   a blank FBNS form for a person with a disability if the kiosk failed, and described providing a

transcriber as "within the realm of possibilities." *Id.* at 421, 481–82. Mr. Yankee's testimony suggests that the provision of transcriber services by CRO employees is discretionary at best. It does not obviate the reasonable expectation that the violation the jury found will occur again in the future. As the Court wrote in its Permanent Injunction Order:

> The fact that there are some circumstances under which at least some CRO employees will act as a transcriber to assist a blind customer in filling out a FBNS form does not obviate the reasonable expectation that the ADA violation Ms. Martinez experienced will reoccur. *See Cupolo*, 5 F. Supp. 2d at 1084 (finding transit system's new policies and procedures did not moot plaintiffs' request for injunctive relief due to a reasonable expectation that the harm would repeat). Plaintiff's claims for injunctive relief thus remain live.

Permanent Injunction Order at 37.

Because Plaintiff must return to the CRO every five years to renew her FBNS form to maintain her coaching business (TT at 637), Plaintiff faces a threat of repeated injury to support entry of a permanent injunction.

### b.    Continuing Barriers to Effective Communication

In the Court's Permanent Injunction Order, the Court found that "the alternatives to transcription the CRO currently provides fail to ensure effective communication and an equal opportunity to enjoy the benefits of the CRO's services." Permanent Injunction Order at 35. *See* 28 C.F.R. § 35.160(b). Among these alternatives, the Court discussed the CRO's JAWS-equipped kiosk, web and PDF forms. *Id.* at 22–25 (findings of fact regarding JAWS-equipped computer kiosk, which pulls up the County's web forms), 26–28 (findings of fact regarding PDF forms). Defendant argues that the continuing barriers to effective communication the Court identified in its Permanent Injunction Order do not prevent effective communication because they "pertained exclusively to compatibility issues between the electronic FBNS forms and screen reader software such as JAWS[.]" Defendant argues that the Court failed to account for another auxiliary aid or service mentioned at trial – namely, the use of the CRO's kiosk with the manual assistance of a CRO employee. At trial Mr. Yankee testified that sometime after Ms. Martinez visited the CRO in 2019 but before JAWS was installed on a public kiosk in 2022, Mr. Yankee personally assisted a visually impaired person in using the CRO's public kiosk by reading each form field and

28

1    directing the mouse to the field for the individual to fill out and type in the information.  TT at

2    419–20.  Defendant contends that this "kiosk accommodation" allows for effective

3    communication, and that no contrary evidence was presented at trial.

4         The "kiosk accommodation" Mr. Yankee described at trial and which Defendant asserts

5    allows for effective communication suffers from obvious drawbacks.  Under the applicable

6    regulations, "to be effective, auxiliary aids and services must be provided in accessible formats, in

7    a timely manner, and in such a way as to protect the privacy and independence of the individual

8    with a disability."  28 C.F.R. § 35.160(b)(2).  Although Defendant describes the "kiosk

9    accommodation" as an auxiliary aid or service potentially sought by persons with disabilities who

10   "prefer to be more independent" than Plaintiff (Mot. at 25), Defendant presented no evidence that

11   it would protect the independence of blind or visually impaired CRO patrons.  Nor is this a logical

12   conclusion to draw; a process by which a CRO employee and patron alternately navigate the

13   kiosk's mouse and keyboard, respectively, necessarily situates the employee and patron in each

14   other's personal space for the duration of the process.  Moreover, while the County assumes it

15   would be straightforward for blind patrons to use the kiosk keyboard to type in their information,

16   there was evidence presented at trial that variation across keyboard layouts can make it difficult

17   for blind individuals to use an unfamiliar keyboard.[14]  *See* TT at 523–24 (expert testimony

18   regarding difficulties for blind individuals of using unfamiliar keyboards to effectuate screen

19   reader commands).  Nor was there any evidence introduced at trial regarding how long it would

20   take for a CRO employee to provide such a service.

21        Defendant argues that the fact "that one auxiliary aid or service might require slightly more

22   time than another auxiliary aid or service does not render one reasonable and the other

23   unreasonable."  Mot. at 24.  However, this argument ignores the implementing regulations for

24

25   [14] The Court further finds that Mr. Yankee's testimony regarding the CRO's non-JAWS kiosk
     accommodation raises credibility questions.  Mr. Yankee is the Assistant Controller of the County
26   of Alameda.  TT at 371.  The Assistant Controller is the highest ranking non-elected CRO
     employee.  *Id*. at 433.  In 2019, Mr. Yankee was Division Chief for the Clerk-Recorder's Office.
27   *Id*. at 434.  The Division Chief is two levels of supervisor above Ms. Briones, who is herself a
     supervisor.  *Id*. at 373.  Mr. Yankee did not testify that his position as Assistant Controller
28   involves working directly with CRO customers, nor even that he would have provided services
     directly to customers in his previous role as the CRO's Division Chief.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Title II, which, along with imposing a timeliness requirement, provide that "[t]he type of auxiliary

2  aid or service necessary to ensure effective communication will vary in accordance with the

3  method of communication used by the individual; the nature, length, and complexity of the

4  communication involved; and the context in which the communication is taking place."  28 C.F.R.

5  § 35.160(b)(2).

6       Thus, the Court finds Defendant's proposed kiosk accommodation does not provide

7  effective communication such that it would obviate the need for injunctive relief.

8                    c.        **Wording of Permanent Injunction**

9       Finally, Defendant argues that the Court's order for the CRO "to provide transcriber

10  services to any blind or visually impaired individual who requests assistance with a CRO form"

11  (Permanent Injunction Order at 46) undermines the CRO's obligation to give primary

12  consideration to the requested auxiliary aid of the person with a disability.  *See* 28 C.F.R. §

13  35.160(b).

14      The Court agrees that as written, the Court's injunction has the potential to conflict with

15  the primary consideration requirement in situations in which a blind or visually impaired patron

16  requests a different auxiliary aid.  Plaintiff attempts to address this problem by offering to change

17  the Court's order to ". . . to provide transcriber services to any blind or visually impaired

18  individual who requests <u>that</u> assistance with a CRO form."  Opp'n at 22 (proposed addition

19  underlined).  Although this proposed change would resolve the primary consideration problem, it

20  runs the risk of reintroducing a different problem.  At trial, Defendant nitpicked about whether

21  Plaintiff's request for transcriber services was sufficiently specific.  The County maintained that

22  Plaintiff had only asked for CRO employees to fix the form she had completed and signed, rather

23  than specifically asking for transcriber services on a blank form.  *See, e.g.*, TT at 230 (Ms.

24  Moran's testimony that "all that [Ms. Martinez] asked was for me to alter the form"), 404–05 (Mr.

25  Yankee's testimony that when Ms. Martinez asked Ms. Moran to help her "fill out this form

26  correctly," the CRO "would have interpreted that as literally this form, the actual form that she has

27  in front of her, which would be the completed form."), 783 (Defendant's closing argument that

28

30

1     "[t]his case is about a request to modify a completed FBNS form, not to fill out a blank one").[15]

2     As the Court wrote in its Permanent Injunction Order:

> A blind patron cannot be expected to know that there are blank paper forms in the office and to specifically ask for one. Requests such as the one Ms. Martinez made should thus be understood as a request for transcriber services. Defendant cannot require patrons to invoke magic words to receive such services. *See, e.g., Boston Hous. Auth. v. Bridgewaters*, 452 Mass. 833, 847–48 (2009) (in Fair Housing Amendments Act context, holding no magic words are required for a disabled tenant to request a reasonable accommodation, but that they must "make the request in a manner that a reasonable person could understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability"); *Brooker v. Altoona Hous. Auth.*, No. 3:11-CV-95, 2013 WL 2896814, at *10 (W.D. Pa. June 12, 2013) ("An individual seeking reasonable accommodations for a disability need not use 'magic' words.").

Permanent Injunction Order at 42. Plaintiff's proposed addition to the language of the permanent injunction "to provide transcriber services to any blind or visually impaired individual who requests <u>that</u> assistance with a CRO form" runs the risk of reintroducing a "magic words" problem. With that in mind, the Court thus amends the wording of the Permanent Injunction as follows (additions underlined):

> The Court hereby enters a **PERMANENT INJUNCTION ORDERING** Defendant Alameda County's Clerk-Recorder's Office to <u>offer and, if accepted, to</u> provide transcriber services to any blind or visually impaired individual who requests assistance with a CRO form, unless Defendant can document a fundamental alteration or undue burden with respect to a particular form. This injunction does not require the CRO to make alterations or corrections to an already-signed form.

## V.    CONCLUSION

Based on the analysis above, the Court hereby **DENIES** Defendant's renewed motion for

---

[15] As the Court noted in its Permanent Injunction Order, Ms. Martinez did explicitly ask for assistance in "filling out" the FBNS form. Permanent Injunction Order at 94; *see* Admitted Ex. 4C at 00:13–00:27 (audio from March 29, 2019 of Ms. Martinez telling Ms. Briones "I filled it out to the best of my ability, and apparently I need to fix it, so I asked Angelina [Moran] if she could assist in filling it out for me."), 01:52–01:57 ("I cannot physically fill it out because I can't write print, I can't read print), 02:15–02:21 ("all I need is you, or anybody, to help me fill this form out correctly"), 04:23–04:31 (Ms. Briones "I'm saying this is a legal document that is to [be] filled out by the business owner . . . or whoever they designate . . ." Ms. Martinez's response, "Which is me, and I'm designating you"), 08:01–08:07 ("I'm still gonna need someone to help me fill out the form to get it correct.")

United States District Court<br>Northern District of California

judgment as a matter of law and motion for a new trial.  The Court changes its injunction to read as follows:

> The Court hereby enters a **PERMANENT INJUNCTION ORDERING** Defendant Alameda County's Clerk-Recorder's Office to <u>offer and, if accepted, to</u> provide transcriber services to any blind or visually impaired individual who requests assistance with a CRO form, unless Defendant can document a fundamental alteration or undue burden with respect to a particular form.  This injunction does not require the CRO to make alterations or corrections to an already-signed form.

**IT IS SO ORDERED.**

Dated: June 2, 2025

THOMAS S. HIXSON
United States Magistrate Judge